# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **DANIEL R. GOLDENSON**, | ) |
| **SUZANNE K. GOLDENSON**, | ) |
| **SKG  PARTNERS, L.P**. and | ) |
| **SKG GENERAL CORP.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )          **CIVIL ACTION** |
| | )          **Docket No. _____** |
| **JOHN L. STEFFENS**, **GREGORY P. HO,** | ) |
| **SPRING MOUNTAIN CAPITAL GP, LLC**, | ) |
| **SPRING MOUNTAIN CAPITAL LP**, and | ) |
| **SPRING MOUNTAIN CAPITAL, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COME NOW** the Plaintiffs, by and through their attorneys, McCloskey, Mina & Cunniff, LLC, and allege as follows:

## SUMMARY OF THE ALLEGATIONS

1.      This Complaint alleges that the Defendants, who at material times were acting as fiduciaries and investment advisors in connection with the purchase and sale of securities, breached their fiduciary duties to the Plaintiffs by falsely and deceptively marketing, promoting and recommending that the Plaintiffs invest large sums of money in so-called "hedge funds" managed and operated by them and others, including their consultant and business partner, J. Ezra Merkin ("Merkin").

2.      The Defendants had financial interests in Merkin's funds. Merkin had a financial interest in the Defendants' funds.  The Defendants and Merkin recommended to the Plaintiffs that they invest large sums of money in a hedge fund known as Ascot Partners, L.P. ("the Ascot Fund").

3.     The Defendants promoted the Ascot Fund as a hedge fund that purportedly used a "proprietary strategy" involving an active, controlled and complex investment formula whereby investors' money was equally "long" and "short" in order to stabilize investment returns and protect against dramatic market fluctuations.

4.     In reliance upon the representations and recommendations of the Defendants, the Plaintiffs invested large sums of money in the Ascot Fund, through both the Defendants' own hedge fund and directly with the Ascot Fund.

5.     Contrary to the Defendants' representations, the Ascot Fund never employed a proprietary trading strategy and, in fact, employed no investment strategy and engaged in no trading of securities whatsoever.  Rather, the Ascot Fund was nothing more than a "feeder fund" that simply funneled investors' money to Madoff Investment Securities (MIS), which was controlled by one Bernard Madoff ("Madoff"), the infamous and now convicted perpetrator of the largest investment fraud and Ponzi scheme in history.

6.     At all times material, the Defendants knew or should have known that all money invested in the Ascot Fund was being entrusted to a single manager, that is Madoff, and that the Ascot Fund itself was engaged in no trading, monitoring or supervision whatsoever of its investors' money, let alone a "proprietary strategy", and that Ascot was extracting handsome "management fees" from investors for doing virtually nothing with their money.

7.     Commencing in late 2001 and continuing thereafter through and including January of 2009, the Defendants knew but failed to disclose to the Plaintiffs that their investments in the Ascot Fund were completely subject to the control and supervision of Madoff, all the while knowing that the Plaintiffs had invested and were continuing to invest money in the Ascot Fund.

8.      As a consequence of the Defendants' misrepresentations, concealments, lack of due diligence, self-dealing and deceptive tactics, the Plaintiffs were induced to invest their money, directly and indirectly, in the Ascot Fund, and to not transfer it from the Ascot Fund to other investments; were denied access to full disclosure as required by law; were prevented from making informed decisions in the selection and management of their investments; and were subjected to the loss of their entire investment in the Ascot Fund when Madoff's fraudulent conduct was ultimately revealed.

## THE PARTIES

9.      Daniel R. Goldenson and Suzanne K. Goldenson ("the Goldensons") are a married couple and are, and were at all times relevant to this Complaint, residents and/or domiciliaries of the State of Maine.

10.     SKG Partners, L.P. ("SKG") is a Delaware limited partnership.  Suzanne K. Goldenson is the President of SKG General Corporation ("SKGGC"), which is the general partner of SKG.  SKGGC is a Maine corporation.

11.     Spring Mountain Capital GP, LLC ("SMCGP" or collectively with other Spring Mountain entities "Spring Mountain") is a Delaware limited liability company and the general partner of the Spring Mountain Partners QP1, LP ("the QP1 Fund"), a private investment instrument that functions as a so-called "hedge" fund.  SMCGP has a principal place of business in New York, New York.

12.     Spring Mountain Capital LP, ("SMCLP" or collectively with other Spring Mountain entities "Spring Mountain") is a Delaware limited partnership and the management company for the QP1 Fund.  It has a principal place of business in New York, New York.

13.     Spring Mountain Capital, LLC ("SM" or collectively with other Spring Mountain entities "Spring Mountain") is the General Partner of the Management Company.  It has a principal place of business in New York, New York.

14.     At times material to this Complaint, SMCGP, SMCLP and SM were Investment Advisors within the meaning and contemplation of the securities laws of the United States and the State of Maine.

15.     John L. Steffens ("Steffens") is the sole managing member of SMCGP, the Managing Director of SMCLP and the sole managing member of SM.  Steffens is a resident of New Jersey.  At times material to this Complaint, Steffens was an Investment Advisor, and/or associated with an Investment Advisor, within the meaning and contemplation of the securities laws of the United States and the State of Maine.

16.     Gregory P. Ho ("Ho") is the President and Chief Operating Officer of SMCLP and is a resident of New York, New York.  At times material to this Complaint, Ho was an Investment Advisor, and/or associated with an Investment Advisor, within the meaning and contemplation of the securities laws of the United States and the State of Maine.

17.     At times material to this Complaint, Steffens and Ho were representatives or controlling persons of Spring Mountain.

**JURISDICTION AND VENUE**

18.     The Court has original jurisdiction over this civil action pursuant to 28 U.S.C. §§1331 and 1332(a) and 15 U.S.C. §78aa, as well as supplemental jurisdiction over certain pendant common law claims pursuant to 28 U.S.C. §1367.

19.     The matter in controversy in this civil action exceeds the sum or value of $75,000, exclusive of interest and costs.

20.    Pursuant to 28 U.S.C. §1391(a), venue in this District is proper because many of the acts and omissions giving rise to the Plaintiffs' claims occurred within this District; during the operative time period the Defendants had numerous and repeated contacts and communications with the Plaintiffs within this District in furtherance of their tortious conduct; and because the individual Plaintiffs are residents of this District and domiciliaries of the State of Maine.

## THE FACTS

21.    The QP1 Fund  is a so-called "hedge fund."  Hedge funds are private investment instruments designed to avoid or lessen investment risks by managing and offsetting gains and losses between investments.

22.    The QP1 Fund has two components, a portfolio of underlying "hedge funds" and a "private equity fund."  These underlying investments are collectively referred to as the QP1 "Portfolio Funds."

23.    Investors in hedge funds are typically "limited partners" in a private investment formed pursuant to a limited partnership agreement. Because they are private investments that do not advertise in the manner of publicly-traded investments, hedge funds typically attract high net worth individuals by word of mouth.

24.    Prior to December of 2001, the Goldensons were high net worth individuals who had never invested in hedge funds.

25.    Prior to December of 2001, substantially all of the Goldensons' investments were in the custody and control of Merrill Lynch, where over 90% of their investments were placed in AAA municipal bonds.

26.     Prior to December of 2001, the Goldensons invested heavily in municipal bonds in order to ensure a safe and steady rate of return upon which they relied as their fixed income and for their retirement.

27.     Prior to December of 2001, the Goldensons had a long and documented history as conservative investors and made known to their investment advisors their preferences for predictable and stable rates of return and the risk-adverse nature of their long-term investment strategies.  It was also well-known to their investment advisors that Daniel Goldenson was an investor who was careful and inquisitive about the facts and circumstances underlying his investments.

28.     Prior to 2001, the Goldensons had both a personal and business relationship with Steffens, who was then Vice Chairman of Merrill Lynch, an institution upon which the Goldensons relied for investment advice.  Consequently, the Goldensons reposed great trust and confidence in Steffens and in his advice concerning investment strategies.

29.     In or about June of 2001, Steffens resigned his position as Vice Chairman of Merrill Lynch and established Spring Mountain, which he promoted as an investment management venture for the "ultra-high end net worth market."

30.     By November of 2001, the rates of return available to the Goldensons on their investments in municipal bonds had diminished.  Confronted with the prospect of purchasing new bonds with substantially lower rates of return, the Goldensons decided to consider other investment options.

**THE FALSE REPRESENTATIONS**

31.     The Goldensons learned about Steffens' Spring Mountain venture in the fall of 2001 over dinner with Steffens at a restaurant in Princeton, New Jersey.  Steffens described

Spring Mountain as a well-diversified "fund-of-funds" that employed numerous "sub-managers" that in turn used various investment strategies to generate earnings.

32.     During meetings with the Goldensons, Steffens described how he and Spring Mountain carefully selected these sub-managers and monitored their trading strategies and performance.  Steffens encouraged the Goldensons to invest in Spring Mountain and to not reinvest in municipal bonds because, among other reasons, the QP1 Fund would provide them with consistently superior rates of return and a reduced risk of exposure to adverse market trends.

33.     On or about December 14, 2001, Daniel Goldenson met with Steffens at Steffens' office in Manhattan and further discussed an investment in the QP1 Fund.  At this meeting, Mr. Goldenson inquired about investing additional money in another secure and well-managed hedge fund.  Steffens immediately recommended a hedge fund known as the Ascot Fund, which was well-managed, he claimed, by his friend and business associate Merkin.

34.     At times material to this Complaint, Merkin was an investment advisor, and/or associated with an Investment Advisor, within the meaning and contemplation of the federal securities laws and was an investment consultant to Spring Mountain.

35.     At times material to this Complaint, Merkin was also an investor and limited partner in Spring Mountain and, upon information and belief, was entitled to nearly half of its profits.

36.     In recommending the Ascot Fund to Daniel Goldenson, Steffens stated to Mr. Goldenson, just as he had in recommending the Spring Mountain investment to him, that the Ascot Fund would provide the Goldensons with consistently better rates of return than would investments in municipal bonds, as well as a reduced risk of exposure to adverse market trends.

37.     Steffens stated to Daniel Goldenson that because Merkin's Ascot Fund employed a "proprietary" investment strategy that was even *more* conservative than that used by the QP1 Fund, the Goldensons were likely to see a somewhat lower rate of return on their investment in Ascot than they would enjoy from Spring Mountain.  However, according to Steffens, the Ascot Fund was well-managed and reliable and a good complement to the Goldensons' investment in Spring Mountain's QP1 Fund.  Steffens also stated to Goldenson that the QP1 Fund itself invested in the Ascot Fund so that a portion of the Goldensons' money would, in any event, be invested in that fund.

38.     During this second conversation between Daniel Goldenson and Steffens, Steffens offered to introduce Mr. Goldenson to Merkin, whose office was in the same Manhattan office building as Steffens, in order for Mr. Goldenson to learn more about the Ascot Fund.  Mr. Goldenson accepted Steffens' invitation.

39.     On or about December 14, 2001, Daniel Goldenson was introduced to Merkin by Steffens at Merkin's office in New York City and the three men met for approximately one hour.  Steffens introduced Daniel Goldenson to Merkin as a new investor in the Spring Mountain QP1 Fund.

40.     At the time of the aforementioned meeting on or about December 14, 2001, Merkin was a limited partner in SMCLP and a "consultant" to SMCLP and/or SMCGP.

41.     At times material to this Complaint, the QP1 Fund invested extensively in both the Ascot Fund and in Gabriel Capital, LP ("the Gabriel Fund"), another of Merkin's hedge funds.

42.     During their meeting with Daniel Goldenson on or about December 14, 2001, both Steffens and Merkin again described the Ascot Fund as Steffens had previously, that is, as a

fund that employed a "proprietary strategy" of "put" and "call" options on selected securities in order to "hedge" against market fluctuations, thereby generating consistent returns of between 8% and 10% annually.

43.     During the December 14, 2001 meeting, both Steffens and Merkin described the Ascot Fund's use of a "split-strike" trading strategy whereby the fund's strategy was to ensure that its investments were equally "long" and "short" at all times and they noted that, for some reason that was unclear to them, the strategy tended to work better in a high interest rate environment.  Steffens again remarked to Mr. Goldenson that his own QP1 Fund held a position in Ascot, which he again described as a stable core investment of the QP1 Fund.

44.     During the December 14, 2001 meeting with Steffens and Merkin, and in subsequent conversations with other personnel at the Ascot Fund, Daniel Goldenson was instructed to wire any funds he invested in the Ascot Fund to Ascot's account at Morgan Stanley, a major and respected investment bank.

45.     On or about January 1, 2002, the Goldensons, acting on the advice of Steffens, invested $2,000,000 in Spring Mountain's QP1 Fund by and through SKG.

46.     Based on the representations of both Steffens and Merkin concerning the Ascot Fund's "proprietary" investment strategy, the Ascot Fund's purported use of Morgan Stanley as the repository for its assets, and because they reposed great trust and confidence in the investment expertise of Steffens and relied upon their fiduciary relationship with him, on or about January 1, 2002, the Goldensons, by and through SKG, invested $2,250,000 in the Ascot Fund.

## THE CONFIDENTIAL OFFERING MEMORANDA

47.     Both the QP1 Fund and the Ascot Fund issued Confidential Offering Memoranda ("COMs") that contained false or misleading statements and information, and which, when taken in conjunction with false or misleading statements made directly to the Plaintiffs by the Defendants, further misled the Plaintiffs about the nature of their investments in the QP1 Fund and the Ascot Fund.

48.     Prior to investing as limited partners in the QP1 Fund, investors were provided with a Confidential Offering Memorandum dated October 2001 ("the QP1 COM") that described the fund's investment strategies and warned of certain risks associated with investing in the QP1 Fund.  The QP1 COM was amended from time to time thereafter, but it remained largely unchanged in all substantive respects at times material to this Complaint.

49.     The QP1 COM advised prospective limited partners in the fund that its objective was to "generate a long-term growth rate in excess of 15% per annum."

50.     To achieve its investment objective, the QP1 COM advised that it would employ a "five-step, top-down investment process" whereby it would, among other things, identify, evaluate and select managers for proposed strategies and construct "a high-performing and truly diversified portfolio."  The QP1 COM, as well as Spring Mountain's Uniform Application for Investment Advisor Registration filed with the United States Securities and Exchange Commission, further promised to test the portfolio by *monitoring the portfolio and its underlying managers and making required adjustments."*

51.     The QP1 COM advised prospective investors that they were "[i]nvited to meet with the General Partner to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of this offering of the interests, and to obtain any additional

information, to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein."

52.     Between December of 2001 and the present, Daniel Goldenson availed himself of the invitation contained in the QP1 COM by having numerous conversations with Steffens and Gregory Ho, the President and Chief Operating Officer of SMCLP, concerning their investments in the QP1 Fund and its underlying Portfolio Funds, including specifically, the Ascot Fund.

53.     The QP1 COM stated to its prospective and existing investors that the Fund's success "depends upon the ability of the Management Company and [the Fund's] Submanagers to develop and implement investment strategies that achieve the Fund's investment objectives." In fact, however, this representation was false as it pertained to the Ascot Fund because, as the Defendants well knew or should have known, the success of the Ascot Fund sub-manager (that is, their partner and financial consultant Merkin) had nothing whatsoever to do with Merkin's ability to develop and implement investment strategies on behalf of its investors, but rather was entirely dependent on the ability and trustworthiness of Bernard Madoff.

54.     In fact, as all the Defendants well knew or should have known, it was Madoff and not Merkin who "managed" the QP1 Fund's investment in Ascot.

55.     The QP1 COM provided for broad exculpation and indemnification by the Fund of its General Partner, the Management Company and their respective partners, managers, consultants and agents, including Steffens, Ho and Merkin.  Notably, however, the COM's exculpation and indemnification provisions did not insulate these insiders from mistakes of judgment or actions or inactions of gross negligence, willful misconduct and bad faith, or to losses resulting from such conduct.

56.    The QP1 COM also extended exculpation and indemnification to Spring Mountain's key personnel, including Steffens, Ho and Merkin, from liability for acts of negligence, dishonesty and bad faith committed by any agent or broker, but only if such agents or brokers were "selected, engaged and retained" by an indemnified party in accordance with a standard of care supposedly contained in the QP1 COM.

57.    As the general partner, managers and controlling persons of the QP1 Fund, which had invested a substantial portion of its assets in Portfolio Funds purportedly managed by Merkin, and as investment advisors who recommended the Ascot Fund in its own right as an investment to the Goldensons, the Defendants were or should have been familiar with the representations made by their financial consultant and business partner, Merkin, concerning the Ascot Fund.   These representations included both verbal statements made by Merkin to the Goldensons with the Defendants' knowledge, endorsement or acquiescence, as well as statements concerning the Ascot Fund contained in its official offering memoranda to prospective and existing investors.

58.    Prior to investing in the Ascot Fund, qualified investors, including the Goldensons, were provided with a Confidential Offering Memoranda (the "Ascot COM's"). Ascot issued a series of COM's in 1992, 1996, 2002 and 2006, wherein Ascot and Merkin consistently misrepresented Merkin's role in the management of the fund and concealed from investors Bernard Madoff's role as the repository for virtually all of the money invested in the Ascot Fund.

59.    Among the misrepresentations contained in the Ascot COMs that were or should have been known to the Defendants to be material misrepresentations, were the following:

A)      The Ascot COM's represented that the fund itself had an active investment strategy, stating for example in the January 2002 COM under the heading of "Investment Approach," that:

> **Ascot Partners, L.P. a Delaware limited partnership formed on August 17, 1992, engages primarily in the practice of index arbitrage, convertible arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options.  The strategies are used to take advantage of price disparities among related securities.  The Partnership may also make investments in private debt claims and publicly traded securities of bankrupt and distressed companies and in risk arbitrage as well as make indirect investments, including investments in private investment partnerships, closed-end funds, and other pooled investment vehicles which engage in similar investment strategies ("collectively "Other Investment Entities"). …**

In fact, however, this description of Ascot's investment approach was false and misleading because, as the Defendants well knew or should have known, it was always the intent of Merkin and the Ascot Fund to serve merely as a conduit for Madoff and never to pursue the investment strategy described in the Ascot COM's and by the Defendants themselves in the course of their conversations with Daniel Goldenson.

B)      The Ascot COM's concealed Madoff's role as the exclusive manager of virtually all of the fund's assets by falsely claiming that Merkin would be involved in the fund's day-to-day management and by stating, for example, in the January 2002 COM under the heading of "Dependence on the Managing Partner" that:

> **All decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin.  Consequently, the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin.**

In fact, however, the success of the Ascot Fund was entirely dependent on the skill and trustworthiness of Madoff.

C)      While the Ascot COM's concealed from prospective investors on one hand that Madoff was responsible for whatever trading and investing the fund engaged in, it also falsely and affirmatively stated that Merkin was committing virtually all of his time and effort to the management of the Ascot Fund.  For example, the January 2002 COM claimed under the heading of "The Managing Partner: Exculpation; Indemnity." that:

**The Managing Partner is required to devote substantially his entire time and effort during normal business hours to his money management activities, including (but not limited to) the affairs of the Partnership.**

In fact, however, as the Defendants well knew or should have known, Merkin, who was a significant partner in and financial consultant to Spring Mountain, and whose office was located in the very same Manhattan office building as the Defendants', was engaging in little if any management of the Ascot Fund and was yet receiving management and/or performance fees from investors such as the Goldensons for doing virtually nothing with their money other than delivering it to Madoff.

D)      The Ascot COM's consistently emphasized that the fund would employ multiple independent money managers. While no specific reference is made to the number of such independent money managers, they are always referred to in the plural.  For example, the January 2002 COM stated under the heading of "Independent Money Managers" that:

**The Managing Partner may delegate investment discretions for all or a portion of the Partnership's funds to money *managers*, other than the Managing Partner, or make investments with Other Investment Entities.**

E)      The Ascot COM's consistently misled investors, including the Goldensons, to believe that multiple unaffiliated brokerage firms were used as custodians and for executing and clearing the fund's securities trades.  For example, its COM's dated December 2002 and October 2006 stated that:

**The Partnership will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms.**

Furthermore, in the Subscription Agreements it required from investors, including the Goldensons, Ascot directed investors to wire their funds to the investment bank Morgan Stanley and Co., Inc. ("Morgan Stanley"). These actions and statements, as the Defendants well knew or should have known, were misleading because virtually all of Ascot's holdings were custodied with Madoff Securities, and any of its purported securities transactions would have been executed and cleared by Madoff alone. In fact, as the Defendants well knew or should have known, Morgan Stanley acted as nothing more than a bank to transfer cash from investors to the Ascot Fund or from the Ascot Fund to Madoff.

F)     The Ascot COM dated October 2006 misled investors by mischaracterizing the roles of Morgan Stanley and MIS, which were identified as "principal prime brokers and custodians" responsible for the ministerial function of "clearing" Ascot's securities transactions. However, the COM completely omitted to state the crucial material fact that Madoff was, as the Defendants well knew or should have known, solely responsible for making all of Ascot's purported investment decisions.

### THE ONGOING OMISSIONS AND CONCEALMENTS OF MATERIAL FACTS

60.     The Goldensons purchased their residence in Bremen, Maine in 1995 and between 1995 and 2006 spent substantial time at that Maine residence and were, in fact, part-year residents of the State of Maine until they made Maine their place of domicile in or about June of 2006.

61.     Commencing in or about June of 2006 through and including the present, the Goldensons resided and were domiciled in Bremen, Maine. The Goldensons duly advised both

the Defendants and the Ascot Fund of their change of residence and their status as domiciliaries of Maine.

62.     After about January 1, 2002 and at all times thereafter material to this Complaint, Daniel Goldenson communicated regularly with Steffens, Ho and other personnel of Spring Mountain concerning their investments in the QP1 Fund and in the various Portfolio Funds of the QP1 Fund, including without limitation, the Ascot and Gabriel funds purportedly "managed" by Spring Mountain's "sub-manager" Merkin.  These communications took the form of interstate telephone conversations, electronic mail and the United States Mail.

63.     In the course of regular communications with the Goldensons, as well as in the QP1 COM's issued over a course of years, all of the Defendants gave continued assurances of the stability and soundness of the Goldensons' investments in both the QP1 Fund and the Ascot Fund and assured them that their investments in the QP1 Fund's portfolio funds and their sub-mangers were being "monitored" and "adjusted" as required.

64.     The Goldensons placed particular credence in the Defendants' representations about the Ascot Fund because the QP1 Fund, a so-called "fund of funds," made its own substantial investment in that fund as a so-called Portfolio Fund.

65.     Among the documents received by the Goldensons from Spring Mountain in the State of Maine and elsewhere were monthly account statements and "performance overviews" for the QP1 Fund.  These documents provided no information whatsoever about the individual underlying Portfolio Funds in which Spring Mountain had invested, but rather discussed only the performance and earnings of the Portfolio Funds in general terms.

66.     After about January 1, 2002 and at all times thereafter material to this Complaint, Daniel Goldenson communicated regularly with personnel of the Ascot Fund, including Merkin,

concerning their investment in the Ascot Fund.  These communications took the form of interstate telephone conversations, electronic mail and the United States Mail.

67.      Among the documents received by the Goldensons from the Ascot Fund in the State of Maine and elsewhere were periodic statements that provided them with the purported value of their Ascot accounts and specifying any purported appreciation that occurred during the statement period.

68.      All of these periodic account statements from the Ascot Fund failed to disclose what Merkin and the Defendants well knew or should have known, that is, that any investing that was purportedly occurring at Ascot was being conducted solely by Madoff and not pursuant to any propriety investment strategy being conducted or monitored by Merkin. Nor did these account statements disclose that Madoff had complete custody and control of the assets of the Ascot Fund.

69.      Upon information and belief, the Defendants received similar periodic reports from the Ascot Fund concerning Ascot's performance as a Portfolio Fund.

70.      After making their initial investments to the QP1 Fund and the Ascot Fund in the amounts of $2,000,000 and $2,250,000, respectively, the Goldensons made additional contributions and withdrawals from the Ascot Fund.  The Goldensons made no further investments in the QP1 Fund.

71.      In or about September of 2002, the Goldensons transferred Daniel Goldenson's Individual Retirement Account (IRA) in the amount of $250,000 to the Ascot Fund.

72.      In or about October of 2006, the Goldensons transferred Daniel Goldenson's IRA in the amount of $40,000 to the Ascot Fund.

73.    In or about November of 2006, the Goldensons transferred Suzanne Goldenson's IRA in the amount of $90,706.55 to the Ascot Fund.

74.    In or about December of 2006, the Goldensons, by and through SKG, transferred the additional amount of $250,000 to the Ascot Fund.

75.    The Goldensons' additional investments in the Ascot Fund, including the transfer of their IRA's to the fund, were made in reliance on, among other things, statements by Steffens that the Ascot Fund was *more conservative* in its investment approach than was the QP1 Fund, the Defendants' assurances that the Ascot Fund and its "proprietary" trading strategy was under the careful supervision of their business partner, Merkin, and the purportedly steady and reliable returns reported by the Ascot Fund.

## THE BUSINESS RELATIONSHIP BETWEEN THE DEFENDANTS AND MERKIN

76.    The Defendants and Merkin enjoyed a symbiotic business relationship.  As noted elsewhere herein, the QP1 Fund was a substantial investor in both the Ascot and Gabriel funds, both of which were purportedly managed by Merkin, who received management and performance-based fees related to those investments.

77.    At the same time, Merkin held a substantial limited partnership interest in SMCLP, the management company for the QP1 Fund, and upon information and belief, was entitled to nearly half of that entity's profits at times material to this Complaint.  Merkin also served as a financial "consultant" to the QP1 Fund and his investment expertise was touted to prospective investors in the QP1 COMs.

78.    The Defendants and Merkin shared other mutual business interests.  For example:

A)      At times material to this Complaint, Steffens served as a director of the Aozora Bank of Japan and he was instrumental in the creation of a joint venture between the Aozora Bank and Spring Mountain relating to hedge fund investments;

B)      A major shareholder of the Aozora Bank was Cerberus Capital Management, L.P., ("Cerberus") in which Merkin was a substantial investor;

C)      Aozora Bank held a substantial interest in General Motors Acceptance Corporation (GMAC), for which Merkin served as Chairman; and

D)      Spring Mountain engaged in a hedge fund joint venture with the Bank Leumi of Israel.  Merkin, whose own funds had a substantial interest in Bank Leumi, was instrumental in establishing this joint venture.

79.      Because they shared numerous financial interests with Merkin and his related entities, the Defendants and Merkin were interdependent, and the Defendants were motivated to promote and protect Merkin rather than to view him critically or to expose him to criticism from others.

**WARNING SIGNS CONCERNING MADOFF SECURITIES**

80.      At times material to this Complaint, there were numerous warning signs that investments made by or through Bernard Madoff and Madoff Securities were at risk or of questionable value.   Other investment advisors attempted to model Madoff's purported investment strategy and reported that it could not be replicated.

81.      At times material to this Complaint, these warning signs were widely reported in the mainstream financial media and focused on the fact that Madoff reported unusually stable and consistently high investment returns regardless of market conditions.

82.     At times material to this Complaint, there existed widespread concern in the investment industry because Madoff was highly secretive about the details of his trading strategy, which itself raised questions about its authenticity.

83.     By 2007, market conditions had adversely impacted the Goldensons' investment in the QP1 Fund and caused them to rethink their investment in that fund.

84.     Daniel Goldenson spoke to Steffens and Ho during 2007 about the Goldensons' intention to liquidate their interest in the hedge fund portion of the QP1 Fund.

85.     Because they narrowly missed the deadline for a year-end redemption, the Goldensons were unable to redeem their interest in the QP1 hedge fund in 2007.  However, the Defendants were well-aware of the Goldensons' desire to withdraw from the fund as early as September of 2007.

86.     In September of 2008, the Goldensons timely sought the redemption of their interest in the hedge fund portion of the QP1 Fund, which they expected to receive at year end.

87.     The Goldensons did not contemplate redemption of their interest in the Ascot Fund prior to 2007 because the fund was continuing to report high yields and because, despite public warnings suggesting that Madoff's purported trading strategy was of questionable validity, they had no knowledge or suspicion that a large portion of their own assets was in the care and custody of Madoff.

## THE REVELATION THAT MADOFF WAS A FRAUD AND THE DEFENDANTS' RESPONSE TO IT

88.     On December 11, 2008, Bernard Madoff was arrested by federal authorities for allegedly perpetrating the largest investment fraud in history.  Madoff was ultimately convicted of his crimes.

89.     The Goldensons first learned about Madoff's securities fraud when it was announced through national media outlets on December 11, 2008 and at the time they had no knowledge or suspicions whatsoever that their own investments in either the QP1 Fund or the Ascot Fund were at risk due to Madoff's massive Ponzi scheme.

90.     On December 12, 2008, the Defendants sent the Goldensons correspondence, signed by both Steffens and Ho, concerning Madoff's arrest and criminal charging for securities fraud.

91.     In their December 12, 2008 correspondence, the Defendants advised the Goldensons and other investors in Spring Mountain that they were *"actively investigating what our potential exposure is to Madoff Securities and related entities,"* adding that:

> **Although we do not have any direct investments with Madoff Securities, some of our underlying managers do have exposure.  If those managers are not able to recover their investments, our entities' returns will reflect losses we otherwise did not anticipate.  At this point, we are attempting to establish the size of the losses that may be suffered as a result of this tragedy and will continue to diligently follow all developments with the greatest emphasis on protecting our investors' assets. We will be in touch with you as soon as we have more information and continue to act in your best interest during this trying time.**

92.     On December 15, 2008, the Defendants sent the Goldensons additional correspondence, again signed by both Steffens and Ho, wherein they described their efforts to "quantify" the exposure of the QP1 Fund's sub-managers to Madoff Securities.

93.     In their December 15, 2008 correspondence, the Defendants reported that "based on [their] research, only two funds had direct exposure to Madoff Securities – Ascot Fund Limited and Gabriel Capital, L.P."   The December 15th correspondence further informed investors that:

A)      "[w]e believe that substantially all of the Ascot investment" and "approximately 29% of the Gabriel investment" were exposed to Madoff Securities;

B)      between the Ascot and Gabriel sub-managers, the QP1 Fund "had approximately 9.89% of its assets exposed to Madoff Securities as of November 30, 2008";

C)      "[s]ince the announcement of the Madoff Securities fraud, we have taken affirmative steps to protect our interests," including the retention of "one of the nation's most highly regarded and sophisticated law firms" to "provide us with legal advice concerning all transactional, structural, regulatory and litigation issues that may arise in connection with this matter;" and

D)      they were "evaluating other steps to be taken in order to protect the Fund's assets and expect to have further announcements within the next few days."

94.      The Defendants' December 15, 2008 correspondence to the Goldensons and other investors in Spring Mountain made no reference to the fact that a substantial portion of the QP1 Fund's assets were invested in Cerberus.

95.      At the time of the December 15, 2008 correspondence, the Defendants' knew that Cerberus was a substantial investor in Aozora Bank and that Aozora was heavily invested in the Ascot and Gabriel funds, both of which were known to the Defendants to have been substantially or completely invested in Madoff Securities.

96.       On December 22, 2008, the Defendants sent the Goldensons additional correspondence, again signed by both Steffens and Ho, wherein they informed them that all redemptions of the QP1 Fund were suspended, effective immediately.

97.      In a December 22, 2008 letter to the Goldensons and other investors in Spring Mountain, the Defendants announced "a dramatic change in the way we manage money," stating

that "we now believe the correct strategy is a complete disengagement from pooled investment vehicles and a movement to … actively managed accounts … ." and that this strategic change was "the responsible thing to do as fiduciaries of the assets which you have placed under our care."

98.     Among the reasons expressed by the Defendants in their December 22, 2008 letter for the need to change the QP1 Fund's investment strategy was

> **the difficulty in hedging exposures due to insufficient transparency into the portfolio's underlying funds.**

99.     The Goldensons first learned that their investments had possible adverse exposure due to Madoff's fraud when they received the Defendants' December 12, 2008 correspondence and they immediately engaged in a series of telephone and electronic mail communications with the Defendants, including directly with Steffens and Ho, concerning their investments in both the QP1 Fund and the Ascot Fund.

100.     On December 17, 2008, the Goldensons wrote to Steffens via electronic mail because, as a consequence of their conversation with Ho, they were concerned about their pending liquidation request in the face of the Madoff revelation.

101.     In their December 17, 2008 correspondence to Steffens, the Goldensons appealed for special assistance in liquidating their investment in the QP1 fund, reminding him that:

> **We came to you in late fall of 2001 with proceeds from our municipal bond portfolio, since most of our bonds had, by then, been called, and we became one of your early investors in Spring Mountain.  We learned about Ezra's Ascot Fund from you, and ended up placing half of our worldly liquidity with each firm.  Today we are sitting with a grim reality: $2 million of our money, and all of our IRA funds ($500,000) which had been at Ascot are wiped out. … We never imagined in our wildest dreams we could be in this awful situation.**

102.    Two days later, on December 19, 2008, the Goldensons again corresponded with Steffens, thanking him for his efforts in arranging for a partial redemption of their interest in the hedge fund portion of the QP1 Fund.

103.    On December 22, 2008, Daniel Goldenson spoke telephonically with Ho and then wrote to him via electronic mail to confirm his understanding concerning the partial redemption of the Goldensons' interest in the QP1 Fund and to discuss the recovery of funds invested in Ascot.  In his email to Ho, Daniel Goldenson remarked:

> **Needless to say, our personal situation is now dire.  We had been an original investor in SMC in late 2001, placing half our money with you, and, after being introduced to Ezra Merkin, we placed the other half with the Ascot Fund.  I am hoping that there will be a partial retrieval of Ascot money over time, especially since all of us relied upon the reports of the Seidman auditing firm.  They issued the audited statements which always showed all the money in treasuries when it was not being traded.  I am sure everyone thought these funds were fully segregated for the protection of Ascot investors. … I know this is a terribly difficult time for you, Launnie, and all of us.**

104.    On December 22, 2008, Daniel Goldenson again wrote to Ho via electronic mail in order to transmit to Ho an internet link to an analysis critical of Madoff's purported trading strategy and which had been made known to the United States Securities and Exchange Commission in 2005.

105.    In his December 22, 2008 correspondence to Ho, Daniel Goldenson was acrimonious that, given the existence of public information casting serious doubt on the validity of Madoff's purported investment strategy, federal regulators ignored warning signs that could have protected investors, stating to Ho:

> **Greg.  You can follow this link and print out the 20-page detailed analysis of Madoff's operation which was submitted to the SEC in 2005.  They had many alerts but disregarded all of them.  Go figure!**

106.    Never once during the course of Mr. Goldenson's direct conversations and correspondence with Steffens and Ho following the revelation of Madoff's massive fraud did the Defendants volunteer to the Goldensons that a) the Defendants had well known from the outset that all of the Goldensons' investments in the Ascot Fund, either directly with that fund or through the QP1 "fund of funds," had been funneled to Madoff, b) that the Ascot Fund was nothing more than a "feeder fund" for Madoff Securities or c) that that Ascot Fund itself engaged in no trading whatsoever, let alone a "proprietary" trading strategy of the sort described to the Goldensons by Steffens, Merkin or the various Ascot COM's.

107.    Never once following the revelation of Madoff's massive fraud did the Defendants volunteer generally to the QP1 Fund's investors that the Defendants had well known from the outset that all of their money purportedly invested in the Ascot Fund "sub-manager" had been funneled to Madoff and that the Ascot Fund was nothing more than a "feeder fund" for Madoff Securities.

108.    Never once following the revelation of Madoff's massive fraud did the Defendants disclose to the Goldensons and other Spring Mountain investors that the Defendants well knew that the QP1 Fund's Madoff-related losses went well beyond the fund's investments in the Ascot and Gabriel funds and included losses sustained by other of its Portfolio Funds, such as Cerberus.

109.    Following the revelation of Madoff's massive fraud, Merkin withdrew as a limited partner in and consultant to Spring Mountain.

110.    Following the revelation of Madoff's massive fraud, despite their promises to investors that they were "evaluating other steps" to protect the QP1 Fund's assets and to act as responsible fiduciaries of their investors, and notwithstanding their own purported concerns

about "insufficient transparency into the portfolio's underlying funds," the Defendants took no action whatsoever against their business partner and financial consultant Merkin or the Ascot Fund in order to protect the interests of the Goldensons or their other investors.

## THE GOLDENSONS DISCOVER THE TRUTH

111.    On or about January 6, 2009, Daniel Goldenson read an article contained in *The Dartmouth*, the newspaper of Dartmouth College, of which Steffens is an alumnus.  That article, *Alumni Interests Hurt By Madoff,* recounted how various non-profit organizations had been adversely effected by Madoff's fraud and how one, New York Law School, had sued Merkin, Ascot Partners and its auditor for failing to inform the school of the extent to which the fund had invested in Madoff Securities.

112.    When asked if Spring Mountain intended to initiate a similar legal action against Merkin on behalf of its investors, Ho stated to *The Dartmouth* that it would not pursue such action because Spring Mountain was "fully aware" of Ascot's investment in Madoff Securities and that "we asked and were given the information."

113.    The Goldensons learned for the first time by reading the aforementioned article in *The Dartmouth* that the Defendants were fully aware that the money they invested in Ascot had been simply funneled to Madoff and that the Ascot Fund was nothing more than a "feeder fund" that placed investors' money with Madoff Securities and the Ascot Fund itself engaged in no trading whatsoever, let alone a "proprietary" trading strategy of the sort described to the Goldensons by Steffens, Merkin and the various Ascot COMs.

114.    Following the revelation from Ho that the Defendants had been fully aware of Merkin's role as a "feeder fund" for Madoff, Daniel Goldenson spoke to other personnel of Spring Mountain and inquired as to whether any legal action was anticipated against Merkin or

the Ascot Fund in order to recoup losses sustained from that sub-manager and was told that no

such action was anticipated because Merkin was Steffens' business partner and the Defendants

were aware of Madoff's role as the repository of money invested in the Ascot Fund.

115.    The Goldensons were emotionally devastated by the knowledge that their

investment advisors had known but concealed from them, over a lengthy course of dealings,

highly material information concerning their investments in the Ascot Fund, information which,

had it been disclosed, would have been critically important to any assessment of statements made

by the Defendants and Merkin relating to the use of a "proprietary" trading strategy by the Ascot

Fund.

116.    Had the true destination of their investments in the Ascot Fund been disclosed to

the Goldensons prior to its collapse due to the underlying Ponzi scheme, they could and would

have had access to public information that was critical or skeptical of Madoff's purported trading

strategy and of the validity of his purported investment returns, and then acted on such

information.  Instead, the Goldensons were left oblivious to the fact that nearly half of their long-

acquired wealth was left solely to the devices of Madoff and his dubious investment "strategy."

117.    The Defendants have made false and deceptive statements to the Goldensons

concerning their investments in the Ascot Fund, both through direct investments in that fund and

through the QP1 Fund.

118.    The Defendants have concealed from the Goldensons material facts and

information relative to their investments in the Ascot Fund and the QP1 Fund which were

necessary in order to make the statements they made to the Goldensons concerning those funds

not misleading.

119.    The Defendants Steffens and Ho were highest level executives of Spring Mountain and were thereby in positions to have knowledge, and in fact did have knowledge, that statements made by them and others, including the QP1 Fund's financial consultant and their partner in Spring Mountain, Merkin, were false and misleading.  As controlling persons, the Defendants could have prevented those statements from being made or corrected them, but failed to do so.

120.    The Defendants owed to the Goldensons, at all times relevant to this Complaint, a duty to act with reasonable care and to employ due diligence in providing the Goldensons with investment advice and in monitoring the money that the Goldensons entrusted to them.  The Defendants breached that duty of care to the Goldensons over a lengthy course of dealings with them.

121.    Above all, at all times material to this Complaint, the Defendants owed the Goldensons fiduciary duties to act with the utmost good faith and loyalty toward them.  The Defendants breached those duties and, as a consequence, the Goldensons have suffered significant monetary damages and severe emotional distress.

## COUNT ONE
### Breach of Fiduciary Duty: All Defendants
### (Maine Common Law Action)

122.    The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 121 hereof.

123.    At times material to this Complaint, the Defendants were Investment Advisors, and/or associated with Investment Advisors, within the meaning and contemplation of the securities laws of the United States and the State of Maine and, therefore, owed fiduciary duties to the Plaintiffs.

124.    In recognition of the Defendants' status as Investment Advisors and their special relationship with the Defendants, the Plaintiffs reposed great trust and confidence in the Defendants.

125.    The Plaintiffs entrusted substantial sums of money to the Defendants and others on the advice and recommendation of the Defendants, and paid the Defendants and others substantial fees to manage and monitor their investments in the QP1 Fund and the Ascot Fund with reasonable care, competence and diligence.

126.    As Investment Advisors, the Defendants owed the Plaintiffs fiduciary duties to act toward them with the utmost good faith and fair dealing, including duties to:

A)    Not make false or misleading statements to the Plaintiffs of material facts pertaining to their investments;

B)    Not omit to make material statements which, under the circumstances, were necessary to make other statements made to the Plaintiffs not misleading or deceptive;

C)    Correct false or misleading statements of material facts pertaining to the Plaintiffs' investments that were made by others and which the Defendants knew to be false or misleading;

D)    Use reasonable care and the competence of a skilled Investment Advisor when performing due diligence inquiries concerning the appropriateness of the Plaintiffs' investments in the QP1 Fund and the Ascot Fund and those funds' investments with sub-managers of Portfolio Funds;

E)    Use reasonable care and the competence of a skilled investment advisor in managing and monitoring the Plaintiffs' investments in the QP1 Fund and the Ascot Fund once made;

F)      Ensure that the Plaintiffs' investments in the QP1 Fund and the Ascot Fund were suitable for the Plaintiffs given their circumstances;

G)      Avoid and/or fully disclose conflicts of interests that could effect their decisions in the management of the Plaintiffs' investments;

H)      Warn the Plaintiffs if and when their investments were subjected to an undue risk of loss; and

I)      Take such remedial steps as were available to them to minimize or recover the Plaintiffs' financial losses.

127.    Defendants have breached their fiduciary duties owed to the Plaintiffs by, among other things:

A)      Falsely stating to the Plaintiffs, and by confirming or acquiescing in the making of false statements to Plaintiffs by their business partner and consultant, Merkin, that the Ascot Fund employed a "proprietary" investment strategy and that the Ascot Fund used a more conservative investment strategy than did the QP1 Fund;

B)      Failing to disclose to the Plaintiffs that any purported investing of their money by the Ascot Fund was being conducted solely by Madoff and not pursuant to any "propriety" investment strategy being conducted or monitored by Merkin, and by failing to disclose to the Plaintiffs that Madoff had complete custody and control of the money they invested in the Ascot Fund;

C)      Failing to correct statements made to the Plaintiffs by Merkin that they knew to be false and misleading, namely, that any purported investing of the Plaintiffs' money by the Ascot Fund was being controlled solely by Madoff and not pursuant to any "propriety" investment

strategy being controlled by Merkin, and that Madoff had complete custody and control of the money they invested in the Ascot Fund;

D)      Failing to employ reasonable care and competence in performing due diligence concerning the Ascot Fund, and in managing or monitoring the Plaintiffs' investments in the Ascot Fund once they were made;

E)      Causing the Plaintiffs to pay substantial management fees relating to their investment in the Ascot Fund when, in fact, neither the Defendants nor Merkin were performing any meaningful management, oversight, monitoring or control over those investments and the money purportedly invested by the Plaintiffs in the Ascot Fund was simply being transferred to Madoff;

F)      Failing to satisfactorily disclose to the Plaintiffs the serious nature, scope and effect of conflicts of interest arising from their business relationships with Merkin;

G)      Failing to warn the Plaintiffs that their investments with the Ascot Fund were subject to undue risk of loss, even in the face of reputable reports over a course of years questioning the legitimacy of Madoff's purported investment strategy and the authenticity of his reported investment returns;

H)      Failing, following the public revelations about Madoff's criminal conduct, to disclose to the Plaintiffs the fact that they knew that their investments in the Ascot Fund had been placed entirely in the care and custody of Madoff and failing to take any remedial actions against their business partner and consultant, Merkin, in order to recover or minimize the Plaintiffs' financial losses; and

I)      Making false or misleading statements to the Plaintiffs following the revelation of Madoff's criminal conduct concerning the true breadth of the QP1 Fund's Madoff-related exposure to loss.

128.    As a direct and proximate result of the Defendants' numerous breaches of their fiduciary duties to the Plaintiffs, the Plaintiffs have suffered substantial monetary damages and severe emotional distress.

<u>COUNT TWO</u>
**Fraudulent Misrepresentation/Deceit**
**(Maine Common Law Action: All Defendants)**

129.    The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 128 hereof.

130.    Despite having a fiduciary and/or confidential relationship with the Plaintiffs, the Defendants made false representations of material facts to them, actively concealed material facts from them, and omitted to make statements of material fact concerning their investments in the QP1 Fund and the Ascot Fund.  These false representations and omissions of material facts are set forth with particularity in paragraphs 31 through 121 hereof.

131.    The Defendants well knew that the above-referenced representations were false or made with reckless disregard for their truth or falsity, and that they were made for the purpose of inducing the Plaintiffs to invest substantial sums of their money in the QP1 Fund and the Ascot Fund.

132.    The Defendants well knew that the above-referenced material facts they omitted to make and actively concealed were necessary in order to make statements made to the Plaintiffs concerning their investments not misleading.

133.    The Plaintiffs reposed great trust and confidence in the Defendants as their investment advisors and relied upon the above-referenced representations concerning the QP1 Fund and the Ascot Fund in determining whether, how much and for how long to invest in those funds.

134.    As a direct and proximate result of the Defendants' intentional misrepresentations of material facts and their omission and active concealment of material facts, the Plaintiffs have suffered substantial monetary damages.

**<u>COUNT THREE</u>**
**Aiding and Abetting Tortious Conduct**
**(Maine Common Law Action: All Defendants)**

135.    The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 134 hereof.

136.    The Defendants, acting in concert and in common design with each other and their partner and consultant, Ezra Merkin, breached fiduciary duties to the Plaintiffs and made misrepresentations to them and omissions of material facts as set forth in paragraphs 31 through 121 hereof.

137.    The Defendants well knew that Merkin's conduct toward the Plaintiffs, as well as their own conduct, constituted breaches of fiduciary duties owed to the Plaintiffs or defrauded them.

138.    The Defendants gave substantial assistance to each other and to Merkin in breaching fiduciary duties to the Plaintiffs and defrauding them, and their own conduct constituted a breach of fiduciary duty to the Plaintiffs.

139.    As a direct and proximate result of the Defendants' aiding and abetting of each other and Merkin in breaching fiduciary duties to the Plaintiffs and in defrauding them, the Plaintiffs have suffered substantial monetary damages and severe emotional distress.

### COUNT FOUR
**Intentional Infliction of Emotional Distress**
**(Maine Common Law Action: All Defendants)**

140.    The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 139 hereof.

141.    The Plaintiffs reposed a high degree of trust in the Defendants with the expectation that their substantial investments in the QP1 Fund and the Ascot Fund, including a large portion of their anticipated retirement assets, would be managed and monitored by the Defendants with reasonable care, competence and due diligence, and that the Defendants would deal with them with the utmost good faith, fairness and candor.

142.    As set forth herein, the Defendants have breached their fiduciary duties owed to the Plaintiffs and have defrauded them, thereby causing them to suffer substantial financial losses as they enter their retirement years and at a time when they are heavily reliant on their investments as income.

143.    The Defendants have intentionally or recklessly engaged in extreme and outrageous conduct which was intended or substantially certain to inflict severe emotional distress upon the Defendants.

144.    As a result of the Defendants' extreme and outrageous conduct, the Plaintiffs have suffered and continue to suffer severe emotional distress.

## COUNT FIVE
### Civil Conspiracy
### (Maine Common Law Action: All Defendants)

145.    The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 144 hereof.

146.    The Defendants combined, agreed and conspired with each other and with others to commit tortious acts against the Plaintiffs as set forth in Counts One through Four hereof.

147.    It was an object and purpose of the conspiracy to conceal material information from the Plaintiffs and to provide them with false or misleading information concerning their investment of substantial sums of money in the QP1 Fund and the Ascot Fund, in violation of fiduciary duties owed by the Defendants to the Plaintiffs.

148.    It was further an object and purpose of the conspiracy to conceal material information from the Plaintiffs and to provide them with false or misleading material information concerning the extent to which the Plaintiffs' were exposed to financial losses related to fraudulent conduct by Madoff and MIS, as well as the degree to which the Defendants' partner and business associate, Merkin, was involved in that fraud, all in violation of fiduciary duties owed by the Defendants to the Plaintiffs.

149.    In furtherance of the conspiracy, the Defendants engaged in overt actions and conduct as alleged in Paragraphs 31 through 121 hereof.

150.    As a direct and proximate result of the Defendants' actions in committing the tortious conduct as set forth in Counts One through Four hereof, and because of their combination, agreement and conspiracy in furtherance of such tortious conduct, the Defendants are each liable for the damages thereby suffered by the Plaintiffs.

**COUNT SIX**
**Securities Fraud**
(15 U.S.C. §78(j)(b) and SEC Rule 10b-5: All Defendants)

151.     The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 150 hereof.

152.     At times material to this Complaint, in connection with the Plaintiffs' purchase of securities, namely, their investments in the QP1 Fund and the Ascot Fund, the Defendants directly or indirectly and by the use of the means of interstate commerce and the mails:

A)     engaged in a scheme and artifice to defraud the Plaintiffs;

B)     made statements of material facts to the Plaintiffs which were untrue, and omitted to make material statements of fact which were necessary to make their statements, in light of the circumstances in which they were made, not misleading to the Plaintiffs; or

C)     engaged in acts, practices and a course of business which operated as a fraud and deception upon the Plaintiffs.

153.     The Defendants engaged in the aforementioned scheme and artifice, made the aforementioned statements, omitted to make necessary material statements, or engaged in fraudulent and deceptive practices or courses of business with scienter, that is, they did so knowingly or recklessly.

154.     It was the purpose and effect of the Defendants' actions to induce the Plaintiffs to invest their money in the QP1 Fund and the Ascot Fund and to not withdraw their investments in those funds once they were made.

155.     Specifically, and as set forth with particularity in Paragraphs 31 through 121 hereof, the Defendants stated, among other things, to the Plaintiffs:

A)      that money invested in the Ascot Fund was being managed by their own business partner and associate Ezra Merkin by means of a "proprietary" investment strategy, when in truth and fact as the Defendants well knew, the Ascot Fund was not trading securities or managing those investments at all, but rather simply acting as a "feeder fund" for Bernard Madoff; and

B)      that the money they invested in the Ascot Fund was being managed by means of a an investment strategy that was even more conservative than the one employed by the QP1 Fund.

156.    Over the course of nearly eight years, the Defendants concealed and failed to disclose to the Plaintiffs the truth about the Ascot Fund and/or Madoff's role in it, despite their own knowledge concerning these matters.

157.    Even after the arrest of Bernard Madoff for criminal securities fraud and the revelation that Madoff was engaged in the largest Ponzi scheme in history, the Defendants failed to disclose to the Plaintiffs the fact that they had known that Madoff, and not Merkin or the Ascot Fund, was the purported investment manager of every dollar they had ever invested in the Ascot Fund.

158.    Following the revelations concerning Bernard Madoff's securities fraud, the Defendants failed to disclose to and concealed from the Plaintiffs the true extent of their losses related to the QP1 Fund's investments in certain Portfolio Funds that they knew to be directly and indirectly exposed to Madoff's fraud.

159.    The Plaintiffs relied upon the Defendants' false representations about the Ascot Fund and, to their detriment, invested substantial sums of money in the Ascot Fund both directly and through the Defendants' QP1 Fund.

160. The Plaintiffs were deprived of the material information concerning the Ascot Fund that the Defendants' possessed, namely, that all of their substantial investments in that fund were being delivered to and managed by a single individual.

161. As a direct and proximate consequence of the Defendants' actions in making false and misleading statements to the Plaintiffs, and their omissions in failing to make material statements to the Plaintiffs that were necessary to make their statements not misleading, the Plaintiffs have suffered significant monetary damages.

**COUNT SEVEN**
**Securities Fraud: Controlling Persons Liability**
(15 U.S.C. §78t(a): All Defendants)

162. The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 161 hereof.

163. At times material to this Complaint, the Defendants acted as controlling persons within the meaning and contemplation of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §78t(a)).

164. At times material to this Complaint, Steffens and Ho held high level positions in Spring Mountain and had active and direct participation in and knowledge of false or misleading statements, as set forth in paragraphs 31 through 121 hereof, made by each other or by Spring Mountain's financial consultant, Merkin, to the Plaintiffs regarding the Ascot Fund.

165. At times material to this Complaint, Merkin was publicly identified and promoted to prospective investors by the Defendants as an investment consultant to Spring Mountain and he held a major financial interest in SMCLP.

166. The Defendants each had the actual power to influence and control the content and dissemination of false and misleading statements made by Merkin and the Ascot Fund to the

Plaintiffs in order to prevent the dissemination of such false and misleading statements or to cause them to be corrected.

167.     The Defendants each had the actual power to influence and control the content and dissemination of false and misleading statements made by each other to the Plaintiffs in order to prevent the dissemination of such false and misleading statements or to cause them to be corrected.

168.     By virtue of their status as controlling persons, the Defendants are liable for damages suffered by the Plaintiffs as a direct and proximate result of wrongful conduct by the Defendants or by Merkin as alleged herein.

**COUNT EIGHT**
**Maine Securities Fraud**
**(32 M.R.S.A. § 16509(6): All Defendants)**

169.     The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 168 hereof.

170.     Each of the Defendants are investment advisors in the business of providing investment advice in exchange for financial consideration and, in fact, received compensation from the Plaintiffs for their provision of investment advice over a long course of dealings.

171.     As set forth with particularity in paragraphs 31 through 121 hereof, the Defendants engaged in a device, scheme and artifice to defraud the Plaintiffs and engaged in acts, practices or a course of business that operated as a fraud or deceit on the Plaintiffs.

172.     Each Defendant is liable to the Plaintiffs for damages proximately caused by such conduct.

## COUNT NINE
### Maine Joint and Several Liability for Securities Fraud
### (32 M.R.S.A. §16509(7): All Defendants)

173.　The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 172 hereof.

174.　At times material to this Complaint, Steffens and Ho held high level positions in Spring Mountain and had active and direct participation in and knowledge of false or misleading statements made by each other and by Spring Mountain's financial consultant, Merkin, regarding the Ascot Fund.

175.　The Defendants each were employed by or associated with each other or with their consultant and partner, Merkin, and materially aided each other or Merkin in conduct giving rise to liability under 32 M.R.S.A. §16509(6).

176.　The Defendants are each jointly and severally liable to the Plaintiffs for damages proximately caused by such conduct.

## COUNT TEN
### Punitive Damages
### (Maine Common Law Action: All Defendants)

177.　The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 176 hereof.

178.　The Defendants' conduct as alleged herein was extreme and outrageous so as to shock the conscience.

179.　The Defendants engaged in such conduct with malice toward the Plaintiffs, or the conduct was such that malice is implied.

180.　The  Defendants' conduct justifies and warrants an award of punitive damages.

## COUNT ELEVEN
### Unjust Enrichment/Constructive Trust
### (Maine Equitable Remedy: All Defendants)

181.    The Plaintiffs reallege and incorporate herein by reference each and every allegation contained in Paragraphs 1 through 180 hereof.

182.    A fiduciary and/or confidential relationship existed between each of the Defendants and the Plaintiffs.

183.    The Defendants secured management and performance-based fees from the Plaintiffs in exchange for investment advisory services which were to be provided with reasonable care and competence, due diligence and the utmost good faith and fair dealing toward the Plaintiffs.

184.    Upon information and belief, the Defendants received other valuable consideration, either directly or indirectly, from their consultant and partner Merkin or from other sources under his management, control or influence, in exchange for their referral of investors such as the Plaintiffs to the Ascot Fund or other funds purportedly controlled or managed by Merkin.

185.    As set forth herein, the Defendants have breached their duties to the Plaintiffs and have defrauded them.

186.    To prevent unjust enrichment, the Court should impose a constructive trust upon each of the Defendants in an amount equal to any pecuniary benefits they have received, whether directly or indirectly, by virtue of the Plaintiffs' investments in the  Ascot Fund or other funds controlled or managed by Merkin.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs demand judgment against the Defendants as follows:

A)      On **COUNT ONE** for an award of compensatory and punitive damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

B)      On **COUNT TWO** for an award of compensatory and punitive damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

C)      On **COUNT THREE** for an award of compensatory and punitive damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

D)      On **COUNT FOUR** for an award of compensatory and punitive damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

E)      On **COUNT FIVE** for an award of compensatory and punitive damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

F)      On **COUNT SIX** for an award of compensatory damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

G)      On **COUNT SEVEN** for an award of compensatory damages, costs of suit, interest, and such other relief as the Court may consider just and proper;

H)      On **COUNT EIGHT** for an award of compensatory damages, costs of suit, interest, reasonable attorneys fees, and such other relief as the Court may consider just and proper;

I)      On **COUNT NINE** for an award of compensatory damages, costs of suit, interest, reasonable attorneys fees, and such other relief as the Court may consider just and proper;

J)      On **COUNT TEN** for an award of punitive damages, costs of suit, interest, and such other relief as the Court may consider just and proper.

K)      On **COUNT ELEVEN** for the imposition of a Constructive Trust in an amount to be determined, together with costs of suit, interest, and such other relief as the Court may consider just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure and Rule 38 of the Rules of the United States District Court for the District of Maine, the Plaintiffs hereby demand a jury trial on any and all issues triable of right by jury.

Dated at Portland, Maine this 27th day of October 2010.

/s/      Thimi R. Mina_____
         Thimi R. Mina
         tmina@lawmmc.com

/s/      Jay P. McCloskey_____
         Jay P. McCloskey
         jmccloskey@lawmmc.com

/s/      Shaun M. Garry_____
         Shaun M. Garry
         sgarry@lawmmc.com

         Attorneys for the Plaintiffs
         McCloskey, Mina & Cunniff, LLC
         12 City Center
         Portland, Maine 04101
         (207) 772-6805