| | | |
|---|---|---|
| DANIEL R. GOLDENSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:10-cv-00440-JAW |
| | ) | |
| JOHN L. STEFFENS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION TO DISMISS

On October 27, 2010, Daniel and Suzanne Goldenson; SKG Partners, L.P.; and SKG General Corp. (Plaintiffs) filed a complaint against John L. Steffens; Gregory P. Ho; Spring Mountain Capital GP, LLC; Spring Mountain Capital LP; and Spring Mountain Capital, LLC, (Defendants) alleging under a variety of legal theories that the Defendants committed fraud against them by recommending that they invest their money in the Ascot Fund, a hedge fund with a complex proprietary strategy that stabilized investment returns and protected against market fluctuations when in fact, as the Defendants knew, the Ascot Fund was merely a feeder fund for the notorious Bernard Madoff, the infamous and now convicted perpetrator of the largest investment fraud in history. The Plaintiffs also claim that the Defendants committed a similar fraud by convincing them to invest in a Spring Mountain hedge fund called QP1 Fund, which itself was substantially invested in the Ascot Fund. The Defendants moved to dismiss the Complaint. The Court dismisses one count of the Complaint but concludes that all other counts withstand the motion.

# I. STATEMENT OF FACTS

## A. Procedural Background

On October 27, 2010, the Plaintiffs filed their Complaint against the Defendants. *Compl.* (Docket # 1). The parties engaged in an initial skirmish about whether the Court should decide a choice of law issue before the Defendants filed a motion to dismiss; by Order dated December 8, 2010, the Magistrate Judge resolved this issue, noting that the choice of law issue could be raised in the contemplated motion to dismiss. *Defs.' Mot. for Ruling on Choice of Law* (Docket # 14); *Pls.' Objection to Defs.' Mot. for Ruling on Choice of Law* (Docket # 18); *Defs.' Reply in Support of Mot. for Ruling on Choice of Law* (Docket # 19); *Memorandum Decision on Mot. for Ruling on Choice of Law* (Docket # 20).

On December 20, 2010, the Defendants filed a motion to dismiss. *Defs.' Mot. to Dismiss the Compl.* (Docket # 26) (*Defs.' Mot.*). On February 1, 2011, the Plaintiffs responded. *Pls.' Consolidated Objections to Defs.' Mot. for Ruling on Choice of Law and Defs.' Mot. to Dismiss the Compl.* (Docket # 27) (*Pls.' Opp'n*). On February 17, 2011, the Defendants replied. *Defs.' Reply Mem. in Further Support of Their Mot. to Dismiss the Compl.* (Docket # 31). On February 22, 2011, the Defendants' moved for oral argument. *Defs.' Req. for Oral Arg.* (Docket # 32). On February 23, 2011, the Court granted the request for oral argument. *Order Granting Mot. for Oral Arg.* (Docket # 33).

On March 31, 2011, the Plaintiffs moved to amend their Complaint and on April 19, 2011, the Court granted the motion without objection. *Pls.' Mot. for Leave*

*to File an Am. Compl.* (Docket # 34); *Defs.' Resp. to Pls.' Mot. for Leave to File Am. Comp.* (Docket # 35); *Order Granting Mot. to Am.* (Docket # 37).  In their response to the motion to amend complaint, the Defendants emphasized that the amended allegations did not alter the merits of their motion to dismiss.  *Defs.' Resp. to Pls.' Mot. for Leave to File Am. Compl.* at 1-6.  The Plaintiffs filed the First Amended Complaint on April 21, 2011.  *First Am. Compl.* (Docket # 38) (*Am. Compl.*).

### B.    The Allegations

#### 1.    The Plaintiffs

Daniel and Suzanne Goldenson are married residents of the state of Maine. *Am. Compl.* ¶ 9.  Ms. Goldenson is the President of SKG General Corporation (SKGGC), a Maine corporation, the general partner of SKG Partners, L.P. (SKG), a Delaware limited partnership.  *Id.* ¶ 10.

#### 2.    The Defendants

Spring Mountain Capital GP, LLC (SMCGP or with other Spring Mountain entities Spring Mountain) is a Delaware limited liability company and the general partner of the Spring Mountain Partners QP1, LP (QP1 Fund), a private investment instrument that functions as a so-called hedge fund.  SMCGP has a principal place of business in the city of New York, state of New York.  *Id.* ¶ 11. Spring Mountain Capital LP (SMCLP or collectively with other Spring Mountain entities Spring Mountain) is a Delaware limited partnership and the management company for QP1 Fund.  Its principal place of business is in the city of New York, state of New York.  *Id.* ¶ 12.  Spring Mountain Capital, LLC (SM or collectively with

other Spring Mountain entities Spring Mountain) is the general partner of the Management Company. *Id.* ¶ 13. Its principal place of business is in the city of New York, state of New York. SMCGP, SMCLP and SM were investment advisers within the meaning of the securities laws of the United States and the state of Maine. *Id.* ¶ 14.

John L. Steffens is the sole managing member of SMCGP, the Managing Director of SMCLP, and the sole managing member of SM. *Id.* ¶ 15. He is a resident of the state of New Jersey and was an Investment Advisor (or was associated with an Investment Advisor) within the meaning of the securities laws of the United States and the state of Maine. *Id.*

Gregory P. Ho is the President and Chief Operating Officer of SMCLP and is a resident of the city of New York, state of New York. *Id.* ¶ 16. Mr. Ho was an Investment Advisor (or was associated with an Investment Advisor) within the meaning of the securities laws of the United States and the state of Maine. *Id.* The Plaintiffs claim that Mr. Steffens and Mr. Ho were the controlling persons of Spring Mountain. *Id.* ¶ 17.

### 3. Before Spring Mountain

Before December 2001, when Mr. Steffens established Spring Mountain, Mr. Steffens had been Vice Chairman of Merrill Lynch, an institution upon which the Goldensons relied on for investment advice and the Goldensons had both a personal and business relationship with Mr. Steffens and reposed great trust and confidence in him and his investment advice. *Id.* ¶ 28. The Goldensons were high net worth

individuals who had never invested in hedge funds; instead, over 90% of their investments were in AAA municipal bonds to ensure a safe and steady rate of return upon which they relied as their fixed income and for their retirement. *Id.* ¶¶ 24-26. The Goldensons made known to their investment advisers their preference for predictable and stable rates of return and the risk averse nature of their long-term investment strategies. *Id.* ¶ 27.

In June 2001, Mr. Steffens resigned from Merrill Lynch and established Spring Mountain, which he promoted as an investment management venture for the "ultra-high end net worth market." *Id.* ¶ 29. By November 2001, the municipal bond rates had diminished and the Goldensons considered other investment options. *Id.* ¶ 30.

### 4. The Plaintiffs, Mr. Steffens, QP1 Fund, Ascot Fund, and Ezra Merkin

In the fall of 2001, the Goldensons learned about Mr. Steffens' Spring Mountain venture over dinner at a restaurant in Princeton, New Jersey. *Id.* ¶ 31. Mr. Steffens described Spring Mountain as a well-diversified "fund of funds" that employed numerous "sub-managers", who in turn used various investment strategies to generate earnings. *Id.* The Goldensons and Mr. Steffens met on a number of occasions and Mr. Steffens described how he and Spring Mountain carefully selected these sub-managers and monitored their trading strategies and performance. *Id.* ¶ 32. Mr. Steffens encouraged them to dispense with municipal bonds and invest instead in the QP1 Fund, a hedge fund. *Id.* ¶¶ 21, 32. QP1 Fund

has two components, a portfolio of underlying hedge funds and a private equity fund, collectively referred to as "Portfolio Funds." *Id.* ¶ 22. Despite the fact that the Goldensons had never invested in hedge funds, *id.* ¶ 24, Mr. Steffens encouraged them to invest in Spring Mountain because the QP1 Fund would simultaneously provide them with consistently superior rates of return and reduced risk. *Id.* ¶ 32.

On or about December 14, 2001, Mr. Goldenson met with Mr. Steffens at Mr. Steffens' Manhattan office and further discussed an investment in QP1 Fund. *Id.* ¶ 33. During this meeting, Mr. Goldenson inquired about investing additional money in another secure, well-managed hedge fund and Mr. Steffens immediately recommended the Ascot Fund, which he said was well managed by his friend and business associate Ezra Merkin. *Id.* ¶¶ 1, 33. Mr. Merkin was an Investment Adviser within the meaning of federal securities laws and an investment consultant to Spring Mountain; he was also an investor and limited partner in Spring Mountain and entitled to nearly half its profits. *Id.* ¶¶ 34-35.

Mr. Steffens told Mr. Goldenson that the Ascot Fund would provide the Goldensons with consistently better rates of return than municipal bonds as well as reduced risk. *Id.* ¶ 36. He said that the Ascot Fund employed a proprietary investment strategy even more conservative than QP1 Fund and therefore the Goldensons would likely see a somewhat lower rate of return on the Ascot Fund investments than from Spring Mountain. *Id.* ¶ 37. At the same time, Mr. Steffens thought Ascot Fund was well-managed and reliable and a good complement to the

Goldensons' investment in QP1 Fund. *Id.* He informed Mr. Goldenson that a portion of QP1 Fund was invested in the Ascot Fund so that a portion of their investment would, in any event, be invested in Ascot Fund. *Id.*

During this December 14, 2001 conversation, Mr. Steffens offered to introduce Mr. Goldenson to Mr. Merkin, whose office was in the same Manhattan building as Mr. Steffens' office. *Id.* ¶ 39. In fact, the same day, Mr. Steffens did introduce Mr. Goldenson to Mr. Merkin at Mr. Merkin's Manhattan office. *Id.* ¶ 39. Mr. Steffens said that Mr. Merkin was a new investor in the Spring Mountain QP1 Fund. *Id.* The three men met for approximately one hour. *Id.* During their meeting, Mr. Steffens and Mr. Merkin described the Ascot Fund as Mr. Steffens had previously described it—a fund that employed a proprietary strategy of put and call options on selected securities in order to hedge against market fluctuations, thereby generating consistent annual returns of 8% to 10%. *Id.* ¶ 42. They further told Mr. Goldenson that the Ascot Fund employed a "split-strike" trading strategy whereby the fund ensured its investments were equally long and short at all times, a strategy that worked better for unclear reasons in a high interest environment. *Id.* ¶ 43. Mr. Steffens again told Mr. Goldenson that his own QP1 Fund held a position in the Ascot Fund as a stable core investment. *Id.* When the three men met, Mr. Merkin was a limited partner in SMCLP and a consultant to SMCLP and/or SMCGP and during this time, QP1 invested heavily in the Ascot Fund and in Gabriel Capital, LP (Gabriel Fund), another Merkin fund. *Id.* ¶¶ 40-41, 43.

### 5.    The Goldensons' Investments

On or about January 1, 2002, through SKG, the Goldensons, acting on Mr. Steffens' advice, invested $2,000,000 in Spring Mountain's QP1 Fund. *Id.* ¶ 45. In addition, on or about January 1, 2002, through SKG, the Goldensons, acting on representations of both Mr. Steffens and Mr. Merkin, invested $2,250,000 in the Ascot Fund. *Id.* ¶ 46. In or about September 2002, Mr. Goldenson transferred his Individual Retirement Account (IRA) in the amount of $250,000 and in or about October 2006, he transferred $40,000 from another IRA to the Ascot Fund. *Id.* ¶¶ 71-72. In or about November 2006, Ms. Goldenson transferred her IRA in the amount of $90,706.55 to the Ascot Fund. *Id.* ¶ 73. Finally, in or about December 2006, through SKF, they transferred an additional $250,000 to the Ascot Fund. *Id.* ¶ 74.

### 6. The QP1 Fund and Ascot Fund Confidential Offering Memoranda

Before investing in the QP1 Fund and the Ascot Fund, the Goldensons relied not only on advice from Mr. Steffens and Mr. Merkin, but also on Confidential Offering Memoranda (COMs) that QP1 Fund and Ascot Fund both issued, which were false or misleading. *Id.* ¶ 47. The QP1 Fund provided investors, including the Goldensons, with a COM dated October 2001 (the QP1 COM), which described QP1 Fund's investment strategies and risks; QP1 amended the October 2001 COM from time to time, but it remained essentially unchanged. *Id.* ¶ 48. Explaining its objective was to achieve 15% per annum growth, the QP1 Fund told investors it would employ a "five-step, top-down investment process" whereby it would, among

other things, identify, evaluate, and select managers for proposed strategies and would construct "a high-performing and truly diversified portfolio." *Id.* ¶¶ 49-50. The QP1 Fund COM and Spring Mountain filed a registration application with the United States Securities and Exchange Commission that promised to test the portfolio by "monitoring the portfolio and its underlying managers and making required adjustments." *Id.* ¶ 50.

The QP1 COM told its prospective and existing investors that its success depended "upon the ability of the Management Company and [the Fund's] Submanagers to develop and implement investment strategies that achieve the Fund's investment objectives." *Id.* ¶ 53. As it pertained to the Ascot Fund, this representation was false because the submanager, namely Mr. Merkin, did not develop and implement strategies, but instead relied exclusively on the ability and trustworthiness of Bernard Madoff. *Id.* ¶ 53. All of the Defendants either knew or should have known that it was Bernard Madoff, not Mr. Merkin, who managed QP1 Fund's investment in Ascot Fund. *Id.* ¶ 54.

The QP1 COM invited prospective investors "to meet with the General Partner to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of this offering of the interests, and to obtain any additional information, to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein." *Id.* ¶ 51. Mr. Goldenson availed himself of this invitation and spoke repeatedly to Mr. Steffens and to Mr. Ho concerning

their investments in QP1 Fund and its underlying Portfolio Funds, including Ascot Fund. *Id.* ¶ 52.

The QP1 COM contained broad exculpation and indemnification clauses for its General Partner, the Management Company, and their respective partners, managers, consultants, and agents, including Messrs. Steffens, Ho, and Merkin, and for Spring Mountain's key personnel, including Messrs. Steffens, Ho, and Merkin. *Id.* ¶¶ 55-56. However, the clauses do not apply to mistakes of judgment, gross negligence, willful misconduct, and bad faith and only apply to acts committed by agents or brokers if an indemnified party "selected, engaged and retained" the agents or brokers in accordance with the standard of care in the QP1. *Id.*

The Defendants knew or should have known about the representations that Mr. Merkin had made about the Ascot Fund. *Id.* ¶ 57. Furthermore, Mr. Merkin made statements to the Goldensons regarding the Ascot Fund with the Defendants' knowledge, endorsement, or acquiescence. *Id.* The Ascot Fund issued a series of COMs in 1992, 1996, 2002 and 2006 in which the Ascot Fund and Mr. Merkin consistently misrepresented Mr. Merkin's role in the management of the Ascot Fund and concealed Bernard Madoff's role as the repository of virtually all the money in Ascot Fund. *Id.* ¶ 58. The Defendant knew or should have been aware of Ascot Fund's misrepresentations including that the Ascot Fund had an active investment strategy, that Mr. Merkin was involved in the Ascot Fund's day-to-day management, that Mr. Merkin was devoting substantially all his time to the Ascot Fund, that the Ascot Fund employed multiple money managers, that the Ascot

Fund was using multiple unaffiliated brokerage firms as custodians and to execute and clear trades, and that Morgan Stanley and MIS were "principal prime brokers and custodians." *Id.* ¶ 59.

### 7. Omissions and Concealments

After January 1, 2002, Mr. Goldenson communicated regularly with Mr. Steffens, Mr. Ho, and other Spring Mountain personnel about the Goldenson investments in QP1 Fund and in the Ascot and Gabriel Funds, which Spring Mountain supposedly managed. *Id.* ¶ 62. All the Defendants gave continual reassurances about the stability and soundness of the Goldensons' investments with QP1 and Ascot Funds and about their monitoring and adjusting of their investments and the submanagers. *Id.* ¶ 63. The Defendants represented to the Goldensons that the Ascot Fund used a more conservative investment approach than QP1 Fund and that Mr. Merkin carefully supervised its proprietary trading strategy. *Id.* ¶ 75. The Goldensons placed particular credence in the Defendants' representations about the Ascot Fund because they knew that the QP1 Fund, a so-called "fund of funds," made its own substantial investment in Ascot Fund. *Id.* ¶ 64. Spring Mountain provided the Goldensons with monthly account statements and performance overviews for the QP1 Fund but these documents provided no information about the individual underlying Portfolio Funds in which Spring Mountain had invested and only discussed in general terms the performance and earnings of the Portfolio Funds. *Id.* ¶ 65.

From January 1, 2002 onward, Mr. Goldenson also communicated regularly with Mr. Merkin and other personnel at the Ascot Fund. *Id.* ¶ 66. The Ascot Fund sent the Goldensons statements reflecting the purported value of their Ascot Fund investments. *Id.* ¶ 67. However none of these statements disclosed that the Ascot Fund was not investing the Goldensons' money according to a proprietary investment strategy and instead had turned over complete custody and control of their Ascot Fund investment to Mr. Madoff. *Id.* ¶ 68.

### 8. The Defendants and Ezra Merkin

The Defendants and Mr. Merkin enjoyed a symbiotic business relationship. *Id.* ¶ 76. The QP1 Fund was a substantial investor in Mr. Merkin's Ascot and Gabriel Funds and Mr. Merkin received substantial performance-based fees for purportedly managing those Funds. *Id.* ¶ 76. At the same time, Mr. Merkin had a substantial limited property interest in SMCLP, the management company for QP1 Fund, received nearly half of its profits, served as a consultant for QP1 Fund, and QP1 Fund advertised Mr. Merkin's expertise to prospective investors. *Id.* ¶ 77. The Defendants and Mr. Merkin shared other business relationships, including 1) Mr. Steffens served on the Board of Directors of Aozora Bank of Japan and was instrumental in the creation of a joint venture between Aozora and Spring Mountain relating to hedge fund investments; 2) Cerberus Capital Management in which Mr. Merkin was a substantial investor was a major shareholder in Aozora; 3) Aozora was a major shareholder in General Motors Acceptance Corporation (GMAC) for which Mr. Merkin served as Chairman; and 4) Spring Mountain engaged in a

hedge fund joint venture with Bank Leumi of Israel and Mr. Merkin, whose funds had a substantial interest in Bank Leumi, was instrumental in establishing this joint venture. *Id.* ¶ 78. Because of their numerous interlocking investments, the Defendants and Mr. Merkin were interdependent and the Defendants were motivated to promote and protect him, not to view him critically or expose him to criticism. *Id.* ¶ 79.

**9. The Goldensons Seek to Redeem the Hedge Fund Portion of QP1 Fund But Not The Ascot Fund**

By 2007, market conditions had adversely affected the Goldensons' investment in QP1 Fund and Mr. Goldenson spoke to Mr. Steffens and Mr. Ho about their intention to liquidate their hedge fund portion of their QP1 Fund assets. *Id.* ¶¶ 83-84. The Goldensons narrowly missed the 2007 redemption deadline but the Defendants were well aware that the Goldensons wanted to withdraw from QP1 as early as September 2007 and in September 2008, the Goldensons timely sought a redemption of their interest in the hedge fund portion of QP1. *Id.* ¶¶ 85-86. The Goldensons expected to receive their liquidated investment from the hedge fund portion of QP1 by the end of 2008. *Id.* ¶ 86.

The Goldensons did not seek to redeem their interest in the Ascot Fund before 2007 because the fund continued to report high yields. *Id.* ¶ 87. By 2007 and 2008, there had been numerous warning signs about Bernard Madoff. *Id.* ¶ 80. Other investors could not model Mr. Madoff's purported investment strategy and reported it could not be duplicated. *Id.* The mainstream financial media reported

these warning signs and there was widespread concern about Mr. Madoff's secretive approach to the details of his trading strategy. *Id.* ¶¶ 81-82. These warning signs about Mr. Madoff did not concern the Goldensons because they had no knowledge or suspicion that a large portion of their own assets was in his care and custody. *Id.* ¶ 87.

### 10. Bernard Madoff Is Exposed and Arrested

On December 11, 2008, federal authorities arrested Bernard Madoff for perpetrating the largest investment fraud in history and Mr. Madoff was ultimately convicted of his crimes. *Id.* ¶¶ 88-89. When the Goldensons learned about Mr. Madoff, they had no knowledge or suspicion that their own investments in the QP1 Fund and the Ascot Fund were at risk because of Mr. Madoff's massive Ponzi scheme. *Id.* ¶ 89.

### 11. The Defendants React

On December 12, 2008, the Defendants sent the Goldensons a letter signed by Mr. Steffens and Mr. Ho, which advised them that the Defendants were "actively investigating what our potential exposure is to Madoff Securities and related entities" and represented that they had no "direct investments with Madoff Securities" but that some of their "underlying managers do have exposure." *Id.* ¶¶ 90-91. On December 15, 2008, the Defendants sent the Goldensons a follow-up letter describing their efforts to "quantify" the exposure of the QP1 Fund's submanagers to Madoff Securities and reported that only two funds had direct exposure to Madoff Securities—the Ascot Fund and Gabriel Capital. *Id.* ¶¶ 92-93.

The December 15, 2008 letter stated that "substantially all of the Ascot investment" and "approximately 29% of the Gabriel investment" were exposed to Madoff Securities and that the QP1 Fund "had approximately 9.89% of its assets exposed to Madoff Securities as of November 30, 2008." *Id.* ¶ 93. The December 15, 2008 letter also informed the Goldensons that the Defendants had taken "affirmative steps" to protect their interests including the retention of "one of the nation's most highly regarded and sophisticated law firms." *Id.* The December 15, 2008 letter failed to mention that a substantial portion of QP1's assets was invested in Cerberus even though the Defendants knew that Cerebrus was a substantial investor in Aozora Bank, which was heavily invested in the Ascot and Gabriel funds. *Id.* ¶¶ 94-95.

On December 21, 2008, the Defendants sent the Goldensons a letter informing them that all redemptions from the QP1 Fund were suspended immediately. *Id.* ¶ 96. On December 22, 2008, the Defendants sent the Goldensons another letter, announcing a "dramatic change in the way we manage money," saying that they "now believe the correct strategy is a complete disengagement from pooled investment vehicles and a movement to . . . actively managed accounts . . . ." *Id.* ¶ 97. They declared that this strategic choice was "the responsible thing to do as fiduciaries of the assets which you have placed under our care." *Id.*

### 12. The Goldensons Respond and the Defendants Dissemble

After receiving the December 12, 2008 correspondence, the Goldensons immediately contacted Mr. Steffens and Mr. Ho about their investments in the QP1

Fund and the Ascot Fund. *Id.* ¶ 99. On December 17, 2008, they emailed Mr. Steffens about their concern, following a conversation with Mr. Ho, about their pending redemption request. *Id.* ¶ 100. On December 19, 2008, they wrote to Mr. Steffens thanking him for his efforts in arranging for a partial redemption of their interest in the hedge fund portion of the QP1 Fund. *Id.* ¶ 102. Mr. Goldenson followed up with Mr. Steffens and Mr. Ho on December 22, 2008 but they never revealed to him that they were aware that the Goldensons' investments in the Ascot Fund either directly or through the QP1 had been funneled to Mr. Madoff, that the Ascot Fund was a "feeder fund" for Madoff Securities, or that the Ascot Fund did not engage in any trading at all much less the proprietary trading strategy Mr. Steffens, Mr. Merkin, and the various Ascot COMs had described. *Id.* ¶ 106. Nor did the Defendants reveal to QP1 Fund investors that the QP1 Fund losses went well beyond the Fund's investments in the Ascot and Gabriel Funds and included losses sustained by its other funds, including Cerberus. *Id.* ¶ 108. Despite their representations of affirmative action, the Defendants took no action against their business partner Ezra Merkin or against the Ascot Fund to protect the interests of the Goldensons and other investors. *Id.* ¶ 110.

### 13. The Goldensons Discover the Truth

On or about January 6, 2009, Mr. Goldenson read an article in *The Dartmouth*, the Dartmouth College newspaper. *Id.* ¶ 111. Mr. Steffens is an alumnus of Dartmouth. *Id.* The article, *Alumni Interests Hurt By Madoff*, recounted how various non-profit organizations had been adversely affected by Mr.

Madoff's fraud and how one, New York Law School, had sued Mr. Merkin, Ascot Partners, and its auditor for failing to inform the school about the extent to which the Fund had invested in Madoff Securities. *Id.* The article quoted Mr. Ho as saying that Spring Mountain did not intend to initiate a similar legal action against Mr. Merkin because Spring Mountain was "fully aware" of the Ascot Fund's investment in Madoff Securities and that "we asked and were given the information." *Id.* ¶ 112.

By reading the article, the Goldensons learned for the first time that the Defendants were fully aware the money they had invested in the Ascot Fund had simply been funneled to Mr. Madoff, that the Ascot Fund was a mere "feeder fund," and that it engaged in no trading whatsoever. *Id.* ¶ 113. Mr. Goldenson asked Spring Mountain personnel whether it intended to initiate a legal action against Mr. Merkin or Ascot Fund and was informed that no such action was anticipated because Mr. Merkin was Mr. Steffens' business partner and the Defendants were aware of Mr. Madoff's role as the repository of Ascot Fund money. *Id.* ¶ 114.

In effect, the Goldensons learned that the Defendants had known but concealed from them highly material information about their investments in the Ascot Fund, which would have been critically important to the Goldensons' initial decision to invest in the Ascot Fund. *Id.* ¶ 115. With that information, the Goldensons would have been aware that the media reports about Mr. Madoff involved their own personal investments and would have known that nearly half of their assets were in the hands of Mr. Madoff. *Id.* ¶ 116.

## II.    THE LEGAL CONTENTIONS[1]

### A.    The Legal Theories

The Goldensons' multi-count Amended Complaint sets forth the following causes of action: Count One—Breach of Fiduciary Duty under Maine common law; Count Two—Fraudulent Misrepresentation/Deceit under Maine common law; Count Three—Aiding and Abetting Tortious Conduct under Maine common law; Count Four—Intentional Infliction of Emotional Distress under Maine common law; Count Five—Civil Conspiracy under Maine common law; Count Six—Securities Fraud under 15 U.S.C. § 78(j)(b) and SEC Rule 10b-5; Count Seven—Securities Fraud: Controlling Persons Liability under 15 U.S.C. § 78t(a); Count Eight—Maine Securities Fraud under 32 M.R.S. § 16509(6); Count Nine—Maine Joint and Several Liability for Securities Fraud under 32 M.R.S. § 16509(7); Count Ten—Punitive Damages under Maine common law; and Count Eleven—Unjust Enrichment/Constructive Trust under Maine law of equitable remedy.

### B.    The Defendants' Position

---

[1] The Defendants initially argued that choice of law principles establish that New York law should apply to the Plaintiffs' state law claims. *Defs.' Mot. for Ruling on Choice of Law* (Docket # 14) (*Defs.' Choice of Law Mot.*).  Acknowledging that the initial task of a choice of law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions, the Defendants argued that New York's Martin Act, N.Y. Gen. Bus. Law, Art. 23-A §§ 352-59 preempts common law causes of action for securities fraud, breach of fiduciary duty, aiding and abetting breach of tortious conduct, and unjust enrichment. *Id.* at 5-6.  However, recent opinions from the Appellate Division of the New York Supreme Court and the District Court for the Southern District of New York question whether the Martin Act preempts other causes of action. *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 7, 14 (1st Dep't 2010); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354, 357 (S.D.N.Y. 2010).  At oral argument, the Defendants conceded that the preemption rule in New York is unsettled and declined to press their choice of law contentions for purposes of the motion.  Consistent with *Roc-Century Assocs. v. Giunta*, 658 A.2d 223 (Me. 1995), the Court applies Maine law. *Id.* at 226 ("Consequently, New York law on this issue is unsettled and the court erred in failing to apply Maine law").

Noting that two of the Plaintiffs' causes of action allege violations of federal securities statutes, two allege violations of Maine securities statutes, and seven allege violations of Maine common law, the Defendants claim that "[a]ll these claims are legally insufficient." *Defs.' Mot.* at 6.

### 1. The Federal Statutory Claims

The Defendants observe that in Count Six, the Plaintiffs are proceeding under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 for alleged misstatements and omissions to the Plaintiffs in connection with their purchase of interests in Spring Mountain's QP1 Fund and in Ezra Merkin's Ascot Fund, and that in Count Seven, they are proceeding under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), on the theory that the Defendants are controlling persons of each other and of Mr. Merkin. *Id.* at 7. The Defendants address each statutory provision separately.

### a. Section 10(b) and Rule 10b-5

The Defendants make two overriding points in their motion to dismiss the § 10(b) and Rule 10b-5 claims: 1) the vast majority of the investments occurred outside the applicable statute of limitations; and 2) what remains is inadequate under the heightened pleading standards for such claims. *Id.*

Turning to the statute of limitations issue, the Defendants note that a private right of action for a claim of fraud under federal securities law must be brought no later than "5 years after such violation." *Id.* at 8 (citing 28 U.S.C. § 1658(b)). They say that the statute of limitations starts to run from the date the buyer purchased

the security. *Id.* at 8-9. Thus, the Defendants say that any federal securities law claims for purchases before October 27, 2005, five years before the Plaintiffs filed their Complaint, are time-barred. *Id.* at 9. The Defendants claim the statute of limitations eliminates all § 10b-5 claims relating to the Plaintiffs' January 2002 QP1 Fund purchase ($2 million), the January 2002 Ascot Fund purchase ($2.25 million), and their September 2002 Ascot Fund purchase ($250,000). *Id.* According to the Defendants, the Plaintiffs' cognizable claims melt to their three timely Ascot Fund purchases, totaling $380,000. *Id.*

Turning to the timely claims against Mr. Merkin and Ascot Fund, the Defendants say the statutory cause of action is fatally flawed because there is no allegation that the Defendants wrote or published the Ascot Fund COM. *Id.* The Defendants assert they cannot be held responsible for misstatements or omissions by third parties. *Id.* In other words, Rule 10b-5 applies only to primary, not secondary violations. *Id.* at 10.

The Defendants next address the direct claims against them. For these claims, they observe that there is a heightened pleading requirement and that the allegations fail to meet that standard. *Id.* For example, general allegations that the Defendants made assurances does not, in Defendants' view, meet the time, place and content specificity requirements under Rule 9(b) and under § 78u-4 of the Private Securities Litigation Reform Act of 1995 (PSLRA). *Id.* Referring to the QP1 Fund's 2001 COM, they assert that the Plaintiffs have engaged in wordplay and twisted the meaning of a section that conveys the risks of this type of investment

into an affirmative performance promise. *Id.* at 10-12. They turn next to the claim that when Mr. Steffens met with Mr. Goldenson in December 2001, he misled him by act and by omission when Mr. Steffens described Mr. Merkin's investment strategy and failed to mention that Mr. Merkin's fund was purely a feeder fund for Bernard Madoff. *Id.* at 12. Even assuming the truth of these allegations, the Defendants point to the legal requirement of scienter and say that the Plaintiffs failed to allege that Mr. Steffens intended to deceive, manipulate or defraud. *Id.* at 12-16. Finally, the Defendants say that the Plaintiffs have failed to allege that a disclosure that Ascot Fund had invested some or all of its capital with Mr. Madoff would have been material. *Id.* at 17-18.

### b. Section 20(a)

To start, the Defendants observe that § 20(a) creates only a derivative liability, requiring first that a person be liable for an underlying violation. If, as the Defendants claim, there is no liability under Rule 10b-5, there is no liability under § 20(a). *Id.* at 18. If the Plaintiffs survive this challenge, the Defendants claim that the Amended Complaint must be dismissed because the Plaintiffs fail to allege control to generate a § 20(a) cause of action. *Id.* at 18-19.

### 2. The Maine Statutory Claims

The Defendants say that the jurisdictional provision of the Maine Uniform Securities Act, 32 M.R.S. § 16610, limits its reach to acts occurring in Maine and there is no allegation that the Defendants ever entered the state of Maine or that any sales took place in Maine. *Id.* at 20-21.

### 3.    Common Law Claims Asserting Primary Liability

The Plaintiffs' Maine common law claims asserting primary liability include breach of fiduciary duty, fraudulent misrepresentation/deceit, and intentional infliction of emotional distress.  *Id.* at 21.   Since fraud is the lynchpin of these causes of action, the Defendants say that Rule 9(b)'s heightened pleading requirements apply.  *Id.*  Turning first to the breach of fiduciary duty claim, the Defendants assert it must fail because the Plaintiffs have failed to allege a fiduciary relationship between the Plaintiffs and the Defendants.  *Id.* at 23-25.   If the Plaintiffs have stated a fiduciary relationship, they have not alleged facts sufficient to extend the relationship to their investments in Ascot Fund.  *Id.* at 26.

As regards the fraudulent misrepresentation/deceit claim, the Defendants contend that if the Rule 10b-5 claim fails for lack of specificity, the fraudulent misrepresentation/deceit claim must fail as well since the standards for the federal and state causes of action are similar.  *Id.* at 26-27.

The Defendants describe the intentional infliction of emotional distress claim as baseless and urge its dismissal.  *Id.* at 27-28.   Citing caselaw, the Defendants say that the type of actions the Plaintiffs have alleged do not rise to the extreme level to sustain an intentional infliction of emotional distress claim and that courts have not allowed similar allegations to proceed in securities fraud cases.  *Id.* at 29-30.

### 4.    Common Law Derivative Claims

Count Three claims that the Defendants aided and abetted tortious conduct by each other and by Mr. Merkin.  *Id.* at 30.   Count Five alleges a civil conspiracy.

*Id.* The Defendants say that these claims are derivative claims and depend upon the existence of an underlying tort. *Id.* at 30-31. Since there is no cognizable underlying tort, the Defendants assert these derivative claims must fail as well. *Id.* If the claims survive, the Defendants contend that they still fail: the aiding and abetting count because it fails to allege Defendants' knowledge of a breach of duty, which is essential for an aiding and abetting claim, and the civil conspiracy count because it fails to allege an agreement among the Defendants. *Id.* at 31.

### 5. Remedial Counts

The Defendants urge the Court to dismiss the punitive damages count because it is a remedy rather than an independent cause of action. *Id.* at 32. They urge the Court to dismiss the constructive trust/unjust enrichment count because the Plaintiffs have failed to establish a fiduciary relationship necessary to impose such a remedy and none of the Plaintiffs' alleged damages is the type of damage susceptible to the imposition of a constructive trust. *Id.* at 32-34.

### C. The Plaintiffs' Response

### 1. The Federal Statutory Claims

Responding first to the statute of limitations question, the Plaintiffs point out that even by the Defendants' account, some of the transactions in Counts Six and Seven fall within the five-year statute of limitations, the Counts are not subject to wholesale dismissal and the determination of what falls within and outside the applicable statute requires a factual determination not appropriate for a motion to dismiss. *Pls.' Opp'n.* at 25-26. Next, the Plaintiffs contend that under 28 U.S.C. §

1658(b)(1), the applicable statute of limitations is "2 years after the discovery of the facts constituting the violation" and they contend that they fit within that exception to the five year provision. *Id.* at 25-26.

They then address the Defendants' contention that the Amended Complaint fails to meet the heightened pleading standards under Rule 9(b) and the PSLRA. *Id.* at 26-33. After reviewing the necessary elements of a Rule 10b-5 violation, the Plaintiffs address the Defendants' contention that the Plaintiffs have pleaded secondary rather than primary liability. *Id.* at 27-28. The Plaintiffs note that they have alleged that Mr. Steffens, Mr. Merkin, and Mr. Ho each gave Mr. Goldenson a detailed and false description of Ascot Fund, expressly assuring him that Ascot Fund had an elaborate trading strategy, which was undertaken under their watchful eyes. *Id.* at 27. None of this, according to the Plaintiffs, was true. *Id.* The Plaintiffs emphasize that the Goldensons are not seeking to hold the Defendants responsible for Bernard Madoff's misdeeds; instead, they are trying only to hold the Defendants to their own misrepresentations and omissions. *Id.* As to the scienter requirement, the Plaintiffs contend they can demonstrate scienter by showing that the Defendants either "consciously intended to defraud, or that they acted with a high degree of recklessness." *Id.* at 28. (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)). Citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the Plaintiffs say that their Amended Complaint when viewed in its entirety fits within the requirement that the inference of scienter be cogent and compelling or strong in light of other

explanations. *Pls.' Opp'n.* at 29. In particular, the Plaintiffs dismiss the Defendants' assertion that the Amended Complaint failed to establish that Mr. Steffens knew about Mr. Merkin's action, noting that it was Mr. Steffens who introduced Mr. Goldenson to Mr. Merkin and who participated in the glowing but false description of his vaunted trading strategy. *Id.* at 30. Furthermore, they point out that Mr. Ho admitted that the Defendants knew all along about the feeder fund nature of the Ascot Fund and its capitulation of any investment strategy to Mr. Madoff, which is why they refused to take any action against Mr. Merkin even after Mr. Madoff was exposed. *Id.* In addition, the Plaintiffs say that the Amended Complaint alleges that the Defendants actively misled them about QP1 Fund's exposure to Mr. Madoff's Ponzi scheme. *Id.* at 31.

The Plaintiffs observe that materiality is generally a jury question. *Id.* at 31. Citing case law, they state that they need not prove they relied on the misstatements or omissions; they must merely "demonstrate that a reasonable investor would have considered the applicable facts important to his investment decision-making process." *Id.* at 32. Addressing the Defendant's contention that the Defendants' statements were not material because Mr. Madoff used the same investment strategy purportedly used by Ascot, the Plaintiffs emphasize that the Defendants' repeatedly touted the unique acumen of themselves and Mr. Merkin. *Id.*

    **2.**    **Section 20(a)**

The Plaintiffs make precisely the obverse argument to the Defendants' § 20(a) argument: they say that since they have established underlying violations, the § 20(a) cause of action remains viable. *Id.* at 33. Regarding the allegation of "control," the Plaintiffs clarify that they have not claimed that the Defendants controlled Mr. Merkin, but they have claimed that they controlled each other. *Id.*

### 3. The Maine Statutory Claims

In response to the Defendants' claim that Maine law restricts its jurisdictional reach, the Plaintiffs say that "the Defendants generate a jurisdictional limitation . . . where none exists." *Id.* at 33. The Plaintiffs assert that section 16610(1)-(5) limits Maine jurisdiction only for actions involving "sales and offers to sell" and "purchases and offers to purchase" when neither party is located in the state of Maine. *Id.* at 34. Since the Plaintiffs have alleged that they were domiciled and present in Maine in 2006, they say that they acted in reliance on the Defendants' misrepresentations and omissions to purchase Ascot Fund securities and Counts Eight and Nine should therefore survive. *Id.* at 34-35.

### 4. Common Law Claims Asserting Primary Liability

Turning to their common law claims, the Plaintiffs first address the Defendants' contention that they failed to plead a breach of fiduciary duty. *Id.* at 12. They acknowledge that the Defendants articulated the proper legal standard but argue that they misapplied it by "ignoring the most inculpatory allegations against them and by drawing inferences that are, at best, palpably biased in their favor." *Id.* Specifically, the Plaintiffs contend that the Defendants were acting as

investment advisers even though they were not registered as such, and their failure to register as investment advisers "does not extricate them from a fiduciary status with the Plaintiffs." *Id.* at 13-14. Similarly, the Plaintiffs dismiss as a mischaracterization of the law the Defendants' categorical assertion that hedge funds managers have no fiduciary duties to their individual investors. *Id.* at 14-15. They argue that a fiduciary relationship was formed because they placed trust and confidence in the Defendants through their long personal and professional relationship with Mr. Steffens, their reliance on the Defendants' investment counsel over the course of a decade, and the Defendants' repeated representations that the Plaintiffs' investments were being carefully managed. *Id.* at 18.

With regard to their fraudulent misrepresentation/deceit claim, the Plaintiffs do not dispute that the heightened pleading requirements of Rule 9(b) and the PSLRA apply. *Id.* at 19. But they assert that Count Two should not be dismissed for the same reasons their federal securities fraud claim should not be dismissed. *Id.*

The Plaintiffs maintain that the Defendants' conduct was so "extreme or outrageous" as to countenance a claim for intentional infliction of emotional distress. *Id.* at 19-21. The Plaintiffs direct the Court to other cases that have allowed intentional infliction of emotional distress claims to proceed in the context of securities fraud. *Id.* at 20. Against that backdrop, they emphasize the special relationship they had with the Defendants and the amount of money invested and lost, and they argue they should be allowed to proceed with discovery. *Id.* at 20-21.

### 5. Common Law Derivative Claims

Regarding the aiding and abetting and conspiracy claims, the Plaintiffs say their pleadings speak for themselves. They assert that the allegations regarding the Defendants' collaboration with Mr. Merkin in making and perpetuating misleading information about the Ascot Fund, the Defendants' business relationships with Mr. Merkin, and their mutual concealments and omissions are sufficient for the claims to survive. *Id.* at 22.

### 6. Remedial Counts

The Plaintiffs do not dispute that punitive damages are a remedy, not an independent cause of action. *Id.* They clarify that the punitive damages count "is merely notice pleading that the Plaintiffs are alleging that the Defendants' conduct was extreme, outrageous and marked by malice or implied malice." *Id.*

With regard to the constructive trust/unjust enrichment claim, the Plaintiffs dispute the Defendants' assertion that the claim is barred by written contract. *Id.* at 22-23. They assert that a written contract to pay fees is meaningless if the fees were earned dishonestly or in breach of a fiduciary duty as alleged. *Id.* Moreover, the Plaintiffs emphasize that Count Eleven is based not only on the fees the Plaintiffs paid to the Defendants but also on consideration the Defendants received from Mr. Merkin in exchange for their referral of investors to his fund. *Id.* at 23.

### D. The Defendants' Reply

Regarding the statute of limitations question, the Defendants respond that whether the Plaintiffs made their investments in 2002 in Ascot Fund and QP1 Fund

does not present a factual issue; rather, it is an "inescapable legal bar." *Defs.' Reply* at 2. Turning to the misstatements and omissions by Mr. Merkin, the Defendants characterize the Plaintiffs' argument as premised on the "substantial participation" doctrine, which the Defendants point out the First Circuit has not adopted. *Id.* at 3. As to the Defendants' own misstatements and omissions, they insist that the factual allegations do not meet Rule 9(b) specificity requirements. *Id.* The Defendants also dispute whether the Court may draw the Plaintiffs' requested inference about what Mr. Steffens knew when he made his representations regarding Ascot Fund. *Id.* They reassert their contention that at most, the Plaintiffs have alleged fraud by hindsight. *Id.* Regarding the Maine Securities Act, the Defendants dispute the contention that section 16610 only applies to administrative actions. *Id.* at 4. They observe that it expressly cross-references private causes of action. *Id.*

As to the Plaintiffs' fiduciary duty argument, the Defendants say that the Plaintiffs have failed to plead special circumstances to transform an otherwise arms-length business transaction into a fiduciary-based transaction. *Id.* at 5-6. The lack of specificity, according to the Defendants, becomes more pronounced as the allegations seep from the Plaintiffs' direct relationships with the Defendants into their indirect relationships with Ascot Funds. *Id.* at 6-7. As to the intentional infliction of emotional distress claim, the Defendants reiterate their position that, even though such a claim can be made, the Plaintiffs have failed to allege it with sufficient specificity. *Id.* at 7-8. Finally, the Defendants dispute the Plaintiffs' efforts to distinguish the unjust enrichment caselaw, noting that courts have

dismissed unjust enrichment claims where the enrichment was the subject of a written contract between the parties. *Id.*

## III. DISCUSSION

### A. The Legal Standard

In *Securities and Exchange Commission v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc) the First Circuit set forth the legal standards applicable to a securities fraud case. In ruling on a motion to dismiss, a court is required to "accept as true all the well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader." *Id.* at 441. "As a general proposition, a complaint must contain no more than 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 442 (quoting FED. R. CIV. P. 8(a)(2)). To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). "In other words, the complaint must include 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Id.*

"Because the complaint in this case contains allegations of fraud, an additional hurdle must be surmounted: the pleader . . . must 'state with particularity the circumstances constituting [the] fraud.'" *Id.* (quoting FED. R. CIV.

P. 9(b)). "To satisfy this particularity requirement, the pleader must set out the 'time, place, and content of the alleged misrepresentation with specificity." *Id.* (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999)).

## B.     Section 10(b) and Rule 10b-5

### 1.     The Statute of Limitations

The statute of limitations for causes of action under § 10b-5, 15 U.S.C. § 78j(b), is found in 28 U.S.C. § 1658(b):

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of - -
>     (1) 2 years after the discovery of the facts constituting the violation; or
>     (2) 5 years after such violation.

The Plaintiffs filed their Complaint on October 27, 2010 and therefore by operation of the five-year statute of limitations, violations before October 27, 2005 are time-barred.

The Rule 10b-5 statute of limitations provides two periods: 1) within two years "after the discovery of the facts constituting the violation," and 2) within five years "after such violation." *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002) (addressing the predecessor statute with one and three year statutes of limitation respectively).[2] The five-year period of repose serves "as a cutoff" and "tolling

---

[2] As part of the Sarbanes-Oxley Act of 2002, Congress amended the securities fraud statute of limitations in 28 U.S.C. § 1658 by increasing the discovery period from one to two years and the repose period from three to five years. Public Company Accounting Reform and Investor Protection Act of 2002, Pub. L. 107-204 § 804, 116 Stat. 745, 801 (2002), codified in part at 28 U.S.C. § 1658(b); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 334 (D. Mass. 2005).

principles do not apply." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991) (addressing predecessor three year statute of limitations).

This leaves only the question of when the "violation" in this case occurred for purposes of the commencement of the five-year statute of limitations. Courts are generally in agreement that the repose period runs from the date of the alleged fraudulent statements. In *In re Exxon Mobil Corp. Securities Litig.*, 500 F.3d 189, 200-01 (3d Cir. 2007), the Third Circuit distinguished between accrual for purposes of a typical statute of limitations and for purposes of a statute of repose like § 1658(b)(2). According to the Third Circuit, "[u]nlike statutes of limitations, which traditionally do not begin to run until a cause of action has accrued (or when a reasonable person should have discovered it), statutes of repose start upon the occurrence of a specific event and may expire before a plaintiff discovers he has been wronged or even before damages have been suffered at all." *Id.* at 199. The Third Circuit observed that though statutes of repose are similar to statutes of limitations, the former are more "defendant-friendly" in that they set a time when "allowing people to put their wrongful conduct behind them—and out of the law's reach—becomes more important than providing those wronged with a legal remedy." *Id.* In the context of a § 10(b) claim, the *Exxon Mobil* Court reasoned:

> [W]hile it is true that for a § 10(b) claim to 'accrue' there must be an exchange of securities . . . ,the specific acts targeted by a § 10(b) cause of action are fraudulent statements themselves. It is therefore more consonant with the traditional understanding of how a statute of repose functions for the repose period[] of . . .§ 1658(b)(2) to begin from the date of Exxon's alleged misrepresentation.

*Id.* at 200.  More recently, the Second Circuit in *City of Pontiac General Employees'*
*Retirement System v. MBIA, Inc.*, 637 F.3d 169, 176 (2d Cir. 2011), employed similar
reasoning in distinguishing between the two-year limitation period in § 1658(b)(1)
and a statute of repose.  It observed that a period of repose begins to run from the
date of a defendant's violation while a limitations period "cannot begin to run until
the plaintiff's claim has accrued."  *City of Pontiac*, 637 F.3d at 176.  Consistent with
*Exxon Mobil* and *City of Pontiac*, district courts have held that securities fraud
violations occur and the repose period begins to run at the time of a defendant's
misrepresentation.  *In re iBasis, Inc. Derivative Litig.*, 532 F. Supp. 2d 214, 221
(D.N.H. 2007) (holding that the statute of repose applies to each individual proxy
statement); *Quaak v. Dexia S.A.*, 357 F. Supp. 2d 330, 337 (D. Mass. 2005)
(considering a limited exception to the consensus that the period of repose "begins to
run when the alleged misrepresentations is made"); *Take-Two Interactive Software,*
*Inc. v. Brant*, No. 06 Civ 05279 (LTS), 2010 WL 1257351, at *5 (S.D.N.Y. Mar. 31,
2010) ("The statute of repose for claims based upon misrepresentations begin to run
on the date of the alleged misrepresentation"); *In re Silicon Storage Tech. Inc.*,
*Shareholder Derivative Litig.*, No. C 06-4310 JF, 2009 U.S. Dist. LEXIS 58705, *12
(N.D. Cal. Jul. 7, 2009) ("Each false representation constitutes a separate violation
of § 10(b), such that the five-year period begins to run with respect to each violation
when it occurs"); *Plymouth Cnty Ret. Ass'n v. Schroeder*, 578 F. Supp. 2d 360, 378
(E.D.N.Y. 2008) ("the weight of authority, including in this Circuit, dictates that the
five year statute of repose first runs from the date of the last alleged

misrepresentation regarding related subject matter"). Accordingly, in calculating when a period of repose began, the focus is on the Defendants' alleged fraudulent statements.

There is some authority that softens the application of the five-year statute of repose in cases of "ongoing and continuing fraudulent schemes that relate to the very core of each company's business." *In re iBasis*, 532 F. Supp. 2d at 221 (D.N.H. 2007). In *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d at 338, a district court concluded that "the statute of repose runs from the date of the last fraudulent misrepresentation." Similarly, the Southern District of New York, while recognizing that this is an unsettled area of law, has declined to dismiss securities claims related to misrepresentations outside of the repose period where the same defendant made at least one similar fraudulent statement within the repose period. *Take-Two Interactive Software, Inc. v. Brant*, 2010 WL 1257351, at *6; *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897(HB), 2009 WL 3380621, at *18 (S.D.N.Y. Oct. 19, 2009). A district court in the Eastern District of New York applied the same theory where "statements made within the repose period likely [bore] a factual nexus to statements made outside of the repose period." *Plymouth Cnty Ret. Ass'n v. Schroeder*, 578 F. Supp. 2d 360, 378 (E.D.N.Y. 2008). The "continuing fraudulent scheme theory" does not violate the *Lampf* Court's conclusion that principles of equitable tolling do not apply to § 1658(b). The theory does not allow a claim to go forward more than five years after a defendant's final violation. Rather, when a defendant has committed a violation within the repose period, it allows a

plaintiff to hold the defendant accountable for previous violations that are part of the same scheme.

Because the alleged misrepresentations in this case came from a common group of defendants in pursuit of a common scheme, the Court concludes that none of the misrepresentations is time-barred if any of them occurred within the period of repose. The Plaintiffs allege that they received a QP1 COM every year that touted the investment strategy of QP1 and the stability of its portfolio funds. Because the COMs were delivered after October 27, 2005, the Plaintiffs claims are not time-barred.

### 2. Heightened Pleading Requirements

The Defendants next contend that the remaining claims should be dismissed because they fail to meet the heightened pleading standards under Rule 9(b) and the PSLRA. *Defs.' Mot.* at 9.

### a. Primary v. Secondary Violators

First, the Defendants say that the Plaintiffs are attempting to hold them legally responsible for the actions of a third party, namely, Mr. Merkin, and that "a defendant cannot be liable under Rule 10b-5 based on misstatements or omissions made by third parties." *Id.* They cite *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) for the proposition that Rule 10b-5 does not extend to aiding and abetting; they quote *Tambone*: "[The Rule's] private right of action extends only to primary violations, not to secondary violations." *Defs.' Mot.* at 9-10 (quoting *Tambone*, 597 F.3d at 446).

In response, the Plaintiffs stress that they are not attempting to hold the Defendants responsible for another's actions; rather, they are attempting to hold the Defendants responsible for their own actions. *Pls.' Resp.* at 27-28. They reiterate that Mr. Steffens and Mr. Ho knowingly made false statements about the Ascot Fund, its purported trading strategy, and Mr. Merkin's supervisory role. *Id.* They quote *Tambone* as observing that "liability inheres when 'defendants have expressly or impliedly adopted statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the [statements] to a significant degree.'" 597 F.3d at 449 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 37-38 (1st Cir. 2002)).

The parties correctly identify the applicable law. In *Tambone*, the First Circuit reviewed the Supreme Court's holding in *Central Bank* that although the Exchange Act provides for a private cause of action for a Rule 10b-5 violation, the "right of action is not unbridled: private plaintiffs are permitted to bring suit under Rule 10b-5 against only 'primary' violators." *Tambone*, 597 F.3d at 445. In *Tambone*, the First Circuit set forth the "two divergent strains of authority" that have evolved to test the line between primary and secondary violations. *Id.* at 447. One is the "substantial participation" test under which a person's "substantial participation or intricate involvement in the preparation of fraudulent statements" is enough to establish a primary violation. *Id.* (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000)). The second adheres to the "bright line" test under which a primary violation requires proof both that the defendant actually

made a false or misleading statement and that it was attributable to him at the time of public dissemination. *Id.* (citing *Wright v. Ernst & Young,* 152 F.3d 169, 175 (2d Cir. 1998)). The First Circuit declined to choose between the two but observed that "[b]oth tests focus, albeit to different degrees on the actual role that a defendant played in creating, composing, or causing the existence of an untrue statement of material fact." *Id.* Accordingly, the Court focuses on the Defendants' role in making the fraudulent statements, not Mr. Merkin's.

For purposes of the motion to dismiss, the question is whether the Plaintiffs' Amended Complaint has successfully alleged a cause of action for primary liability under either the "substantial participation" or "bright line" test. The Court carefully reviewed the allegations in the Amended Complaint and it readily concludes that the Amended Complaint survives this challenge. Whether the Plaintiffs are successful in convincing a properly instructed jury that the Defendants are primarily liable remains to be seen; however, they have made sufficiently detailed allegations of the Defendants' own asserted misconduct, as opposed to the actions of third parties, to survive the motion to dismiss.

The Amended Complaint alleges a number of fraudulent statements made by the Defendants themselves. It alleges that Mr. Steffens personally made repeated assertions about the reliability of the Ascot Fund, its conservative trading strategy, its "reduced risk of exposure to adverse market trends," the effectiveness of its split-strike strategy in high interest trading environments, and its performance as a portfolio fund of QP1. *Am. Compl.* ¶¶ 32-33, 36-37, 43. Similarly, QP1's COM,

which remained "largely unchanged in all substantive respects," *Am. Compl.* ¶ 48, emphasized QP1's reliance on the investment strategies of its submanagers. *Id.* ¶ 53. Moreover, Messrs. Steffens and Ho, in conversations with Mr. Goldenson, assured him of the "stability and soundness" of his investments in the QP1 Fund and the Ascot Fund and maintained that the portfolio funds and their submanagers were being monitored and adjusted as required. *Id.* ¶ 63. Finally, in their December 15, 2008 correspondence to the Goldensons, the Defendants underrepresented QP1's exposure to Madoff Securities. *Id.* ¶¶ 92-95.

## b. Scienter

One of the six essential elements of a § 10(b) and Rule 10b-5 complaint is an allegation of scienter.[3] *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008). "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 58 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). The First Circuit has held "that a plaintiff can demonstrate scienter by showing that defendants either 'consciously intended to defraud, or that they acted with a high degree of recklessness.'" *Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)). In a securities fraud case, the Plaintiff's obligation to clearly state the grounds for his complaint is encouraged by the confluence of three strands of law: for scienter as well as the other required

---

[3] The six PSLRA elements are 1) a material misrepresentation or omission, 2) scienter, or a wrongful state of mind, 3) a connection with the purchase or sale of a security, 4) reliance, 5) economic loss and 6) loss causation. *ACA Fin.*, 512 F.3d at 58 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

elements, a plaintiff must state "a plausible entitlement to relief" under *Twombly*, 550 U.S. at 559, must meet the heightened pleading requirements of Rule 9(b) for fraud, *ACA Fin.*, 512 F.3d at 58 n.7, and must satisfy the "exacting pleading requirements" of the PSLRA, *Tellabs*, 551 U.S. at 313; *ACA Fin.*, 512 F.3d at 56 n. 5. Under the PSLRA, the complaint

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Specifically, as regards scienter, the PSLRA mandates that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In *Tellabs*, the Supreme Court directed the courts in evaluating this statutory requirement to engage in a comparative evaluation:

> [I]t must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of [§ 78u-4(b)(2)], we hold, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

551 U.S. at 314.[4]

---

[4] In support of their position, the Defendants cite *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999) and its statement that the PSLRA standard has been viewed in the First Circuit as "notably strict and rigorous." *Defs' Mot.* at 8. The Plaintiffs counter that in *Mississippi Public*

Armed with this array of procedural, statutory and decisional law, the Defendants vigorously attack the sufficiency of the allegations in the Amended Complaint, which they dismiss as "a transparent exercise in wordplay and obfuscation" and "fraud by hindsight." *Defs.' Mot.* at 11; *Defs.' Reply* at 4. The Plaintiffs respond by saying that the fraud allegation rests upon a "schism between what was said and written to the Plaintiffs by the Defendants and the truth." *Pls.' Opp'n.* at 29.

The Court has carefully reviewed the allegations in the Amended Complaint and concludes that they survive dismissal. The first premise of the Plaintiffs' cause of action is that the Defendants were partners with Mr. Merkin, that they shunted the Plaintiffs' funds to him on the fraudulent pitch that Mr. Merkin had a highly sophisticated investment strategy whereby his fund generated consistently high investment returns with minimal risk, when in fact the Defendants knew all along that Mr. Merkin had no such strategy but operated only a feeder fund, which supplied capital to Bernard Madoff's notorious Ponzi scheme. The second premise is that the Defendants affirmatively represented to the Plaintiffs that they would assume an active monitoring role over their investments with Mr. Merkin. For both aspects of this alleged fraud, the Plaintiffs have alleged specific instances of the Defendants' representations by date and content sufficient to survive the higher pleading standard. *See ACA Fin.*, 512 F.3d at 65 ("[T]he fact that a defendant

---

*Employees Retirement System v. Boston Scientific Corp.*, 523 F.3d 75, 89 (1st Cir. 2008) the First Circuit observed that in *Tellabs*, the Supreme Court "reversed a higher standard for scienter imposed by the prior law of this circuit." *Pls' Opp'n* at 29 n.25. However described, the Court views the *Tellabs* standard, as applied in *Boston Scientific*, as specific and binding.

knowingly made a false statement is 'classic evidence of scienter'") (quoting *Aldridge*, 284 F.3d at 83). The Plaintiffs have alleged that the Defendants had close business and personal ties to Mr. Merkin. They have further alleged Mr. Ho's admission that the Defendants were aware of Ascot's exposure to Madoff Securities. Contrasting this specific evidence of knowledge with the Defendants' representations regarding the responsible management of Ascot and their active and strategic monitoring of QP1's portfolio funds, the Court finds that the inference of fraudulent intent is cogent and compelling.

In drawing this conclusion, the Court is mindful of the First Circuit's admonition in *Boston Scientific* that courts must be cautious about dismissal at the Rule 12(b)(6) stage. 523 F.3d at 90. As the First Circuit explained, at the pleadings stage, "we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence." *Id.* (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)). "The law 'proscribes the pleading of "fraud by hindsight," but neither can plaintiffs be expected to plead fraud with complete insight.'" *Id.* (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).

### c. Materiality

The Defendants also claim that the Amended Complaint fails to sufficiently allege the necessary element of materiality. The First Circuit has defined "materiality" in the securities context:

> The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement. Rather, information is 'material' only if its disclosure would alter the '*total mix*' of facts available to the investor and 'if there is a *substantial*

> *likelihood* that a reasonable shareholder would consider it important'
> to the investment decision.

*Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1ˢᵗ Cir. 1994) (citations omitted). The appellate court has also stated that "[t]he existence of a material omission is usually a question for the trier of fact." *Boston Scientific*, 523 F.3d at 87.

The Defendants characterize as "both disingenuous and grandiose" the Plaintiffs' allegation that if they had known that Mr. Merkin was investing in Madoff Securities, they would not have invested with Mr. Merkin. *Defs.' Mot.* at 17. The Defendants say that Mr. Merkin's purported investment strategy was "exactly like the investment strategy that Madoff claimed to employ." *Id.* In response, the Plaintiffs point out that the standard is not whether they personally relied on these facts but whether a reasonable investor would have considered the facts important to an investment decision-making process. *Pls.' Resp.* at 32.

Here, the Court readily concludes that the Plaintiffs have alleged sufficient facts to avoid dismissal on the materiality element. The Plaintiffs allege that the Defendants introduced Mr. Goldenson to Mr. Merkin and represented that he, not some other person, would be handling the Goldensons' investments and using a unique and proprietary investment strategy. It is one thing to place millions of dollars in the care of someone the investor has been introduced to, has taken the personal stock of, and has been assured by; it is another to entrust investments to

an unknown third party.[5]  The Court concludes that the allegations in the Amended Complaint are sufficient to create an issue of fact on materiality that must be resolved by a jury.

## C.    Section 20(a)

In addition to their claims under § 10(b) and Rule 10b-5, the Plaintiffs have pleaded a claim under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, against Mr. Steffens and Mr. Ho in their corporate capacities as "controlling persons" of the Spring Mountain entities.  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation.  *Id.* at § 78t(a); *ACA Fin.*, 512 F.3d at 67.  Because a § 20(a) claim is a derivative cause of action, to state a viable § 20(a) claim a plaintiff must also state a viable § 10b-5 violation.  *ACA Fin.,* 512 F.3d at 67-68.  As the Court concluded that the § 10b-5 claim survives dismissal, the § 20(a) claim survives dismissal on the same basis.

The Defendants further claim that the Plaintiffs have failed to allege sufficient actual control of each other and of Mr. Merkin or that they actually exercised such control.  *Defs.' Mot.* at 18-19.  "[T]o meet the control element, the alleged controlling person must not only have the general power to control the [person primarily liable], but must also actually exercise control over the [person]."  *Aldridge*, 284 F.3d at 85.  Evidence that the defendants are controlling shareholders, for example, is insufficient; the test is not "some potential ability to

---

[5] It is unknowable whether Mr. Goldenson, had he met Mr. Madoff, would have succumbed to Mr. Madoff's legendary charm.  What is known is that he did meet Mr. Merkin and was convinced to place millions of dollars under his care.

control" but the "*exercise* of control over the entity primarily liable." *Id.* Before "controlling person liability can be imposed," the Plaintiffs must allege "facts that indicate that the controlling shareholders were actively participating in the decisionmaking processes of the corporation." *Id.*

The allegations in the Amended Complaint place Mr. Steffens and Mr. Ho as executives and managers in a much more active role than a shareholder regarding the activities of the Spring Mountain Defendants. The Amended Complaint alleges that Mr. Steffens has been the "sole managing member" of Spring Mountain Capital GP, the "Managing Director" of Spring Mountain Capital LP, and the "sole managing member" of Spring Mountain Capital, LLC; it alleges that Mr. Ho has been "the President and Chief Operating Officer of Spring Mountain Capital LP." *Am. Compl.* ¶¶ 15-16. Spring Mountain Capital LP is alleged to have been the "management company for the QP1 Fund;" Spring Mountain Capital GP is alleged to have been the General Partner of the QP1 Fund; and Spring Mountain Capital, LLC is alleged to have been the General Partner of Spring Mountain Capital LP. *Id.* ¶¶ 11-13. The allegations against Mr. Steffens are sufficient to meet the requirements of control and the exercise of control for each Defendant entity and the allegations against Mr. Ho are similarly sufficient for Spring Mountain LP, since the titles alone convey the active participation in the decisionmaking process. Whether the interrelationship among Spring Mountain Capital GP, Spring Mountain Capital LLC, and Spring Mountain Capital LP allow Mr. Ho's authority over Spring Mountain LP to be exercised in Spring Mountain Capital GP and

Spring Mountain LLC is less clear. However, the Court will not assume to the contrary given the allegations in the Amended Complaint. The Court concludes that the allegations in the Amended Complaint state a claim under § 20(a).

## D. Maine Uniform Securities Act: Counts Eight and Nine

The Defendants raise a jurisdictional defense to the Plaintiffs' statutory causes of action under Maine's Blue Sky Law, 32 M.R.S. § 16509(6) and (7).[6] *Defs.' Mot.* at 19-21. Subsection 6 establishes liability for fraudulently providing investment advice and subsection 7 imposes joint and several liability for—among other things—a violation of subsection 6. 32 M.R.S. § 16509(6), (7). Under section 16610, Maine law sets forth the jurisdictional requirements for different violations of Maine's Uniform Securities Act. For example, section 16610(1) requires that to impose civil liability for sales and purchases of securities and offers of the same the seller must make the offer to sell or the sale or the buyer must make the offer to purchase or the purchase in the state of Maine. 32 M.R.S. §§ 16610(1)(I), 16610(2)(G). However, it sets out a different jurisdictional requirement for civil liability regarding investment advice and misrepresentations. 32 M.R.S. § 16610(6). Subsection 6 reads:

> The following sections apply to a person if the person engages in an act, practice or course of business instrumental in effecting prohibited or actionable conduct in this State, whether or not either party is then present in this State: A) section 16403, subsection 1, B) section 15404, subsection 1, C) section 16405, subsection 1, D) section 16502, E) section 1605, and F) section 16506.

---

[6] The Defendants' first basis for dismissal is that New York law applies. *Defs.' Mot.* at 20. However, the Defendants have since conceded that Maine not New York law applies.

32 M.R.S. § 16610(6)(A-F). Noting that this list of applicable sections does not include section 16509, which is the only section under which the Plaintiffs have brought the Blue Sky portion of this lawsuit, the Defendants claim there is no statutory jurisdiction.

While acknowledging that the statutory language is dense and that it is difficult to glean the drafters' intent from the listed (and unlisted) affected sections, the Court disagrees with the Defendants.[7] Maine has adopted the Uniform Securities Act of 2002 and the Court looks to the uniform act for guidance.[8] Section 16502 prohibits fraud in providing investment advice. The commentary clarifies that "[t]here is no private cause of action, express or implied under Section [16]502" but that "Section [16]509 provides for a private cause of action for prohibited conduct in providing investment advice that could violate Section [16]502." UNIF. SECURITIES ACT § 502 cmt. 5 (2002). Indeed, sections 16509 and 16411 "provide the exclusive private causes of action under this Act." *Id.* § 509 cmt. 17. Specifically, section 16509(6) provides a private cause of action for fraudulent investment advice.

That leaves unanswered which subsection of 16610 determines the jurisdiction for a section 16509(6) action. Contrary to the Plaintiffs' position, section 16610 is not limited to administrative proceedings. Instead, section 16610

---

[7] There is a paucity of authority on this provision. The parties, who were otherwise able to research and find ample authority for their respective positions, were unable to present any assistance—other than their own opposing statutory constructions—on the correct meaning of these contested provisions.

[8] The relevant sections of the uniform act are numbered consistently with the last three numerals of the Maine sections. Moreover, the uniform act designates its subsections with letters while the Maine Act uses numbers. For example, Uniform Securities Act sections 502(a) and 610(f) are consistent with Maine Uniform Securities Act sections 16502(1) and 16610(6) respectively. To avoid confusion, the Court refers to the numbering in the Maine Act.

"applies to all types of proceedings specified by the Act—administrative, civil, and criminal." *Id.* § 610 cmt. 1. The Court concludes that the action's jurisdiction is determined by section 16610(6). Not only is section 16610(6) titled "Investment advice and misrepresentations," the commentary to section 16610 states that subsection 6 "is a new provision that specifies jurisdiction in cases involving investment advice and misrepresentations." *Id.* § 610 cmt. 3. Moreover, subsection 6 expressly applies the substantive prohibitions of section 16502 to persons within its jurisdictional reach. Because section 16509(6) provides the private cause of action for violations of section 16502, section 16610(6) specifies the jurisdictional scope of the cause of action. The only wrinkle in this seemingly compelled conclusion is the inclusion of section 16509 in the more limited jurisdictional provisions of 16610(1) and (2). However, those provisions only limit the application of section 16509 to "a person that sells or offers to sell" or "a person that purchases or offers to purchase" a security. In this case, the Plaintiffs' section 16509 claims are limited to the Defendants' role as investment advisers, not as purchasers or sellers of securities. Accordingly, the jurisdictional limitations in sections 16610(1) and (2) do not apply.

Despite section 16610(6)'s somewhat cryptic language and a dearth of case law, the Court concludes that the statute grants the Court jurisdiction over the Plaintiffs' statutory claims. Section 16610(6) assumes that there has been "an act, practice or course of business instrumental in effecting prohibited or actionable conduct <u>in this State</u>." (emphasis supplied). If so, section 16610(6) allows the Court

to assume jurisdiction for the listed sections "whether or not either party is then present in the State." Here, the Goldensons had a residence in Maine at all material times and were domiciled in Maine from 2006 onward. Therefore, the Defendants' investment advice and misrepresentations effected prohibited conduct in this state, namely a fraud on Maine residents. The Court concludes that Counts Eight and Nine survive the motion to dismiss.

## E. Common Law Claims Asserting Primary Liability: Counts One, Two and Four

In the Amended Complaint, the Plaintiffs allege three primary liability common law claims: Count One—Breach of Fiduciary Duty; Count Two—Fraudulent Misrepresentation/Deceit; and Count Four—Intentional Infliction of Emotional Distress. *Am. Compl.* ¶¶ 122-34, 140-44.

First the Defendants say that each of these counts is subject to the higher pleading requirements of Rule 9(b). *Defs.' Mot.* at 21-22. The Court agrees. Under *North America Catholic Educational Programming Foundation, Inc. v. Cardinale*, 567 F.3d 8, 14 (1st Cir. 2009), Rule 9(b) pleading requirements apply whenever "fraudulent misrepresentation is the lynchpin" of the cause of action. Here, Count One alleges that the Defendants made "[f]alse and misleading statements," *Am. Compl.* ¶ 127(I); Count Two sounds in fraudulent misrepresentation and deceit, *id.* ¶¶ 129-34; and, Count Four alleges that the Defendants "defrauded them." *Id.* ¶ 142.

### 1. Breach of Fiduciary Duty

In Count One, the Plaintiffs allege that the Defendants were acting as fiduciaries for them and that they engaged in numerous breaches of their fiduciary duty; the Plaintiffs reassert the existence and breach of a fiduciary duty throughout the Amended Complaint. *Am. Compl.* ¶¶ 122-28, 130, 136-39, 142, 147-48, 182. Meeting this contention head on, the Defendants flatly deny that any fiduciary relationship existed between the Plaintiffs and themselves and describe any such claim as "meritless." *Defs.' Mot.* at 23. The Plaintiffs disagree, contending that they have alleged sufficient facts to generate fiduciary obligations. *Pls.' Opp'n.* at 12-18.

The Defendants make the blanket statement that "there was no fiduciary relationship based on the fact that any defendant was an investment adviser under the federal securities laws." *Defs.' Mot.* at 23. The Defendants say that as of 2002, "none of the defendants was a registered investment adviser under the Investment Advisers Act of 1940" (IAA). *Id.* Therefore, they say, the Defendants "did not owe plaintiffs fiduciary duties as investment advisers under 'the securities laws of the United States.'" *Id.* (quoting *Am. Compl.* ¶ 123)). The Plaintiffs respond that registration as an investment adviser is not a prerequisite for the assumption of fiduciary duties under the IAA. *Pls.' Resp.* at 12-13. In their reply, the Defendants agree that "[i]t is axiomatic that investment advisers *can* be fiduciaries." *Defs.' Reply* at 4. Instead, they assert that the Plaintiffs failed to "plead [the] special circumstances in order to transform an otherwise arms-length business relationship into one in which a fiduciary duty arose that will support a common law cause of action." *Id.* at 4-5. Furthermore, the Defendants say that the federal and state

securities statutes do not create a fiduciary duty between investment adviser and customer.[9] *Id.*

Reviewing the allegations in the Amended Complaint, the Court concludes that the Plaintiffs have sufficiently pleaded the existence of a fiduciary relationship to survive the Defendants' motion to dismiss. First, as the Defendants concede, as a matter of law, an investment adviser can be a fiduciary. *Security and Exchange Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-94 (1963). Whether the Defendants were in fact fiduciaries is, therefore, largely an issue of fact. It is true, as earlier discussed, that the pleading requirements of Rule 9(b) require more than a mere assertion of fraud. *Boston Scientific*, 523 F.3d at 85 n.5; 15 U.S.C. § 78u-4(b)(1); FED. R. CIV. P. 9(b). But the allegations here include a long course of dealing between the Goldensons and Mr. Steffens, a personal friendship, a switch whereby they followed him when he changed investment firms, a request for investment advice, a recommendation to invest in a relatively esoteric form of investment concerning which he professed specialized knowledge, and repeated assurances of his personal involvement with and monitoring of the investments. The case against Mr. Ho as a fiduciary is not nearly as strong; nevertheless, the Court concludes it is sufficient to withstand dismissal. In other words, if the

---

[9] In evaluating a motion to dismiss, the Court is usually restricted to the allegations in the four corners of the Complaint. However, courts have made exceptions "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to the plaintiffs' claim; [and] for documents sufficiently referred to in the complaint." *Boston Scientific*, 523 F.3d at 86 (quoting *Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). Both the Plaintiffs and the Defendants attached to their filings affidavits which authenticate documents central to the claims and defenses here. In the absence of objection, the Court has considered the attached documents.

Defendants can be fiduciaries as a matter of law, whether they are fiduciaries is a matter of fact.

The Defendants next contend that if they were investment advisers to the QP1 Fund, they owed a fiduciary duty to the Fund, not to its investors. *Defs.' Mot.* at 23-24. Quoting *Goldstein v. Security and Exchange Comm'n*, 451 F.3d 873, 880 (D.C. Cir. 2006), the Defendants say that "[t]he adviser [of a hedge fund] does not tell the *investor* how to spend his money; the investor made that decision when he invested in the fund." But as the Sixth Circuit explained in *United States v. Lay*, 612 F.3d 440, 446-47 (6th Cir. 2010), "*Goldstein* did not hold that no hedge fund adviser could create a client relationship with an investor, but rather held only that the SEC had 'not justified treating *all* investors in hedge funds as clients.'" (quoting *Goldstein*, 451 F.3d at 883). The Court agrees with the *Lay* Court that *Goldstein* did not create a categorical rule that hedge fund advisers can never have fiduciary duties to their individual investors. Whether a fiduciary relationship existed remains a fact-specific inquiry. *See Lay*, 612 F.3d at 446 (holding that the "jury could . . . reasonably find, as a matter of fact" that a hedge fund had a fiduciary duty to an individual investor). In *Goldstein*, the District of Columbia Circuit Court quoted the SEC's distinction between an adviser-client and an adviser-fund relationship:

> [A] client of an investment adviser typically is provided with individualized advice that is based on the client's financial situation and investment objectives. In contrast, the investment adviser of an investment company need not consider the individual needs of the company's shareholders when making investment decisions, and thus

> has no obligation to ensure that each security purchased for the
> company's portfolio is an appropriate investment for each shareholder.

*Goldstein*, 451 F.3d at 880 (quoting Status of Investment Advisory Programs Under

the Investment Company Act of 1940, 62 Fed. Reg. 15,098, 15,102 (Mar. 31, 1997)).

The relevant factual question here is whether the relationship between the

Plaintiffs and the Defendants was more like the former or the latter. The

allegations in the Plaintiffs' Amended Complaint sufficiently allege that the

Defendants had assumed the role of advisers to them as clients, meeting with them

individually, reviewing their personalized investment objectives, recommending

investments in funds tailored to their investment objectives, and promising to

monitor the funds in their personal interest. Indeed, in the Defendants' December

12, 2008 correspondence with the Plaintiffs, they seemed to contemplate a fiduciary

relationship with their investors, asserting that they would act "with the greatest

emphasis on protecting our investors' assets" and "continue to act in your best

interest during this trying time." *Am. Compl.* ¶ 91.

## 2. Fraudulent Misrepresentation/Deceit

The Defendants contend that because the Plaintiffs have failed to meet the

PSLRA's pleading standards, the same fate must befall their common law fraud

claims because they are subject to the same Rule 9(b) heightened pleading

requirements. *Defs.' Mot.* at 26-27. This argument fails, however, because the

Court has determined that the Plaintiffs have met the more rigorous pleading

standards of the PSLRA and Rule 9(b).

## 3. Intentional Infliction of Emotional Distress

The Defendants say that the Plaintiffs' claim of intentional infliction of emotional distress is "baseless and should be dismissed." *Defs.' Mot.* at 28. They assert that the allegations fail to meet the requirement that the Defendants' conduct be outrageous or extreme and the requirement that the Defendants intended to inflict emotional distress on the Plaintiffs. *Id.* at 28-30. Citing caselaw, Defendants claim that "[o]ther courts that have considered the question have found allegations of securities fraud and related conduct insufficient to support an intentional infliction of emotional distress claim." *Id.* at 29.

The Plaintiffs respond that the Amended Complaint alleges a "personal history and special relationship with Defendant Steffens and the Defendants' fiduciary status as investment advisors," that the Plaintiffs "reposed great trust and confidence in the Defendants," that they "entrusted a large portion of their worldly wealth (including all of their IRA funds) to them and their partner, Merkin," that over the course of their relationship, the Defendants "completely misle[]d the Plaintiffs about the true nature of their investment in the Ascot Fund," and that the Plaintiffs were "emotionally devastated." *Pls.' Opp'n.* at 19-20. The Plaintiffs cite separate caselaw in which courts have determined that intentional infliction of emotional distress claims in the context of securities fraud survive dismissal. *Id.* at 20-21.

The Court agrees with the Plaintiffs. In effect the Plaintiffs have alleged that the Defendants were self-dealing and double dealing to the Plaintiffs' detriment and that they suffered extreme emotional anguish as a result of losing virtually all their

personal investments. From the Court's perspective, the allegations, taken as a whole, are sufficient to withstand a motion to dismiss. It is true that some courts have dismissed intentional infliction of emotional distress claims in securities cases. *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 902-03 (N.D. Ill. 2009) (allegations of stress and fear insufficient to support IIED claim); *Prymak v. Contemporary Fin. Solutions, Inc.*, No. 07-cv-00103-EWN-KLM, 2007 U.S. Dist. LEXIS 87734, *59-61 (D. Col. Nov. 29, 2007) (acknowledging that damages are available for outrageous conduct in the context of a securities suit but concluding that the allegations in the complaint were insufficient); *Mosko v. Defilippo*, No. 91-10675-Z, 1991 U.S. Dist. LEXIS 13501, *9-11 (Sept. 10, 1991) (allegation of stock churning "not sufficiently outrageous"); *Jacobson v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 510, 512-13 (W.D. Pa. 1984); *LeCroy v. Dean Whitter Reynolds, Inc.*, 585 F. Supp. 753, 763-65 (E.D. Ark. 1984). Other courts have allowed such claims to go forward at the preliminary motion stage. *Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1157-67 (10th Cir. 1981); *Castro v. Paine, Webber, Jackson & Curtis, Inc.*, 99 F.R.D. 655, 657 (D.P.R. 1983); *Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 532 F. Supp. 480, 485 (S.D. Ohio 1982).

In view of this split of authority and the allegations in the Amended Complaint, the Court concludes the better approach is to allow the parties to engage

in discovery and revisit this issue in the event the Defendants file a motion for summary judgment.[10]

### F.    Derivative Claims: Counts Three and Five

Count Three alleges that the Defendants aided and abetted the tortious conduct of their partner and consultant Ezra Merkin and Count Five alleges that they engaged in a civil conspiracy to breach their fiduciary duties toward the plaintiffs, to defraud the plaintiffs, and to intentionally inflict emotional distress on the plaintiffs. *Am. Compl.* ¶¶ 135-39, 145-50. The Defendants move to dismiss these counts as derivative claims and they say that the derivative claims must fail because the Plaintiffs failed to adequately plead an underlying tort. *Defs.' Mot.* at 30-31. On this point, however, the Court concludes that the Defendants' motion must fail because the Court has determined that the underlying tort claims have survived the Defendants' motion to dismiss.

The Defendants still say that these derivative claims must be dismissed even if the underlying tort claims remain. *Defs.' Mot.* at 31. They claim that the Plaintiffs failed to allege that the Defendants had "knowledge of any breach of fiduciary duty or fraud." *Id.* at 31. The Plaintiffs disagree. *Pls.' Opp'n.* at 22.

The Court agrees with the Plaintiffs. In the Amended Complaint, they alleged an extensive business relationship between Mr. Merkin and the Defendants, *Am. Compl.* ¶¶ 75-79, and that Mr. Ho admitted in *The Dartmouth* that Spring

---

[10] Count Five of the Plaintiff's Amended Complaint alleges the intentional infliction of emotional distress on behalf of all Plaintiffs against all Defendants. *Am. Compl.* ¶¶ 140-45. Although Defendants do not raise it, the Court assumes that the only Plaintiffs who could assert a viable emotional distress claim would be the Goldensons, not their businesses.

Mountain would not pursue a legal action against Mr. Merkin because Spring Mountain was "fully aware" of Ascot Fund's investment in Madoff Securities and that "we asked and were given information." *Am. Compl.* ¶ 112. These allegations are sufficient to establish that the Defendants actually knew that the Plaintiffs' investments were not being invested by Mr. Merkin and instead that they were being diverted to a third party in a fashion contrary to the Defendants' repeated and explicit representations to the Plaintiffs.

### G.    Punitive Damages

Count Ten of the Amended Complaint states a separate demand for punitive damages for the Defendants' alleged violations of Maine common law. *Am. Compl.* ¶177-80. The Defendants move to dismiss Count Ten on the ground that punitive damages is a form of relief, not an independent cause of action. *Defs.' Mot.* at 32. The Plaintiffs concede this is so. *Pls.' Opp'n.* at 22.

The parties are correct: a claim for punitive damages "is not a separate and distinct cause of action under Maine law. Rather, it is a type of remedy." *Frank v. L.L. Bean, Inc.*, 352 F. Supp. 2d 8, 13 (D. Me. 2005). The Court therefore dismisses Count Ten. However, the "Plaintiff[s] may pursue a punitive damages remedy against [Defendants] . . . if [they] can make the proper showing at trial" and they "may still rely on the factual averments in [their] First Amended Complaint regarding punitive damages." *Id.* at 14.

### H.    Constructive Trust

In Count Eleven, the Plaintiffs have demanded that to prevent unjust enrichment, the Court "impose a constructive trust upon each of the Defendants in an amount equal to any pecuniary benefits they have received, whether directly or indirectly, by virtue of the Plaintiffs' investments in the Ascot Fund or other funds controlled or managed by Merkin." *Am. Compl.* ¶ 186. The Defendants move to dismiss this Count on the assumption that the Court would conclude the Plaintiffs had failed to adequately plead the existence of a fiduciary duty. *Defs.' Mot.* at 32. As the Court has concluded the opposite, this part of the Defendants' motion fails.

The Defendants next say that even if the Plaintiffs have alleged "unjust" conduct on the Defendants' part, the Plaintiffs failed to adequately allege any "enrichment." *Defs.' Mot.* at 33. They point out that the Plaintiffs alleged two types of property unjustly retained by the Defendants: 1) management and performance-based fees, and 2) other valuable consideration they received from Mr. Merkin in exchange for referrals. *Id.* (quoting *Compl.* ¶¶ 183, 184). The Defendants say that because the management and performance fees were received in accordance with a written contract, the law does not allow a claim for unjust enrichment. *Id.* Regarding the "other valuable consideration" claim, the Defendants contend that since the Plaintiffs have made this assertion on "information and belief," they have not alleged sufficient facts to withstand a motion to dismiss. *Id.* at 33-34.

To support their claim that the law does not permit a claim for unjust enrichment where there exists a written contract that governs the same subject matter, the Defendants cite *Feigen v. Advance Capital Mgmt. Corp.*, 541 N.Y.S.2d

797 (1st Dep. 1989). Although *Feigen* was later questioned, *see Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 40 (S.D.N.Y. 1991), the trend in New York law is that a claim for unjust enrichment may not proceed when there is a written contract between the two parties governing the subject matter of the dispute. *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 195-96 (S.D.N.Y. 2009); *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). Assuming the Defendants are correct on New York law, the Defendants' argument faces two further hurdles. First, Maine law, not New York law, applies to this case and the Defendants have cited no Maine law on this point. Second, the gravamen of the Plaintiffs' constructive trust request is that the Defendants profited from defrauding them. Although the Defendants claim there is a written contract that covers the same subject matter, the Court remains to be convinced that the written contract between the Plaintiffs and the Defendants specified what would happen to management and performance-based fees that the Plaintiffs paid to the Defendants if the Defendants defrauded the Plaintiffs. Regarding the "information and belief" question, the Court concludes it would be wiser to allow the parties to engage in discovery on this issue and to allow the Defendant to resurrect it in the event the allegation is unsupported by facts.

The Court rejects the Defendants' motion to dismiss Count Eleven, the constructive trust count.

## IV.  CONCLUSION

Upon motion of the Defendants, the Court deems the Defendants' Motion for Ruling on Choice of Law (Docket # 14) WITHDRAWN.  The Court partially GRANTS and partially DENIES the Defendants' Motion to Dismiss (Docket # 26). The Court GRANTS, without prejudice, the Defendants' motion to dismiss Count Ten because it states a remedy rather than a claim upon which relief can be granted.  The Court DENIES the Defendants' motion to dismiss Counts One through Nine and Count Eleven because each states a claim upon which relief can be granted and the Court has jurisdiction over each count.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 4th day of August, 2011