# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re GOLDENSON SUBPOENA ENFORCEMENT ACTION ) ) ) ) | |
| GOLDENSON, et al., ) ) Movants, ) ) v. ) ) J. EZRA MERKIN, et al., ) ) Respondents. ) ) | No. 1:12-mc-00068-P1 |

**MOVANTS' CONSOLIDATED REPLIES TO RESPONDENTS' OPPOSITIONS TO MOVANTS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**

**COME NOW** the Movants, by and through their undersigned attorneys, McCloskey, Mina and Cunniff, LLC, in consolidated reply to Respondent J. Ezra Merkin's Opposition to the Movants' Motion to Compel (Docket No. 18) ("Merkin's Opposition"), Respondent Simpson, Thacher and Bartlett, LLP ("STB")'s Opposition to Movants' Motion to Compel (Docket No. 19) ("STB's Opposition"), to the Declaration of Casey D. Laffey (on behalf of Receiver Bart M. Schwartz) in Opposition to the Movants' Motion to Compel (Docket No. 25) ("Laffey Declaration") and to the Declaration of Kimberlee A. Malaska (on behalf of Receiver David B. Pitofsky) in Response to Movants' Motion to Compel (Docket No. 29) ("Malaska Declaration").[1] On March 22, 2012, the United States District Court for the District of Maine

---

[1] The Movants are unclear as to the representation and position of Respondent Schneiderman, the New York Attorney General ("NYAG"). Although the Movants served the NYAG with their Motion, counsel has not entered an appearance on the NYAG's behalf. Undersigned counsel brought this fact to the attention of Mr. Daniel Sangeap, Esquire, at the Office of the NYAG. *See id.* ¶ 19. Mr. Sangeap indicated that he would participate in a March 15, 2012 "meet and confer" conference scheduled between

extended the discovery deadline in the Movants' underlying action against the Spring Mountain Defendants until May 6, 2012.

### A.     *The Movants' Motion is Procedurally Proper*

The Movants respectfully disagree with the Respondents' contentions that the Movants did not attempt to "meet and confer" with each Respondent. *See Merkin's Opp.* at 2; *STB's Opp.* at 6; *Laffey Declaration* ¶ 7; *Malaska Declaration* ¶ 6.[2] Although Rule 45 of the Federal Rules of Civil Procedure imposes no "meet and confer" requirement on a party seeking to enforce a subpoena issued in a foreign district, the Movants had multiple conversations and correspondence with counsel for each Respondent, except for STB, prior to filing their Motion to Compel the Production of Documents (Docket No. 1) ("Movants' Motion"). *See generally Frawley Declaration* ¶¶ 6-12. Moreover, the Movants' December 8, 2011 letter to STB stated that it would be the final communication they would initiate with STB, and the Movants explicitly indicated that they would be willing to continue discussions if STB so wished. *See Movants' Mem. of Law in Support of Movants' Mot. to Compel* at Ex. M (Docket No. 2) ("Movants' Memorandum"). The Movants filed their Motion only after it became readily apparent that each Respondent had decided to discontinue further discussions and that enforcement of the Movants' subpoenas would require court intervention. *See Frawley Declaration* ¶ 2. Rather than burden the Court with multiple filings, the Movants moved against all Respondents at once due to the similarity of the disputes and in the interest of judicial

---

counsel. Mr. Sangeap did not. *Id*. The Movants have continued to serve Mr. Sangeap and the NYAG with all filings made in connection with this action. *Id*.

[2] The Movants also wish to respond to Mr. Merkin's statement that the Movants "impermissibly shortened the time" for the Respondents to answer their Motion. *Merkin's Mot.* at 2-3 n.2. The Movants interpreted Local Rule 6.1(a) to include all motions filed under Federal Rule of Civil Procedure 45. At any rate, the Movants deferred to Mr. Merkin's counsel extensive experience in this District and re-noticed their Motion to correct any inadvertent error. *See Movants' Am. Notice of Mot. to Compel* (Docket No. 16). Contrary to what his Opposition asserts, Mr. Merkin took advantage of the additional time when he filed his Opposition on March 19, 2012.

2

economy. *Id.* The Movants subsequently and happily agreed to the Respondents' offer to "meet and confer" once the Movants' Motion renewed the Respondents interest in speaking with them. Unfortunately, the parties remain at an impasse.

### B. Movants' Reply to Respondent Merkin's Opposition

#### 1. The Movants' Motion is Not Moot with Respect to the Monthly Reports.

##### a. NAV Summaries

The Movants respectfully disagree with Mr. Merkin's assertion that the Movants' Motion "should be denied as to the Monthly Reports because [Movants'] request is now moot." *Merkin's Opp.* at 2. After the March 15, 2012 "meet and confer" conference held between counsel, it is certainly true that Mr. Merkin promptly produced certain Monthly Reports at issue. *See Frawley Declaration* ¶ 17. *After* he filed his Opposition to the Movants' Motion, Mr. Merkin later produced the requested Net Asset Value ("NAV") summaries for Ariel Fund Limited. *Id*. Mr. Merkin also produced incomplete NAV summaries for Ascot Fund Limited. *Id.* Curiously, however, the entries corresponding to the months of November and December 2008 were blank. This is the period of time directly before and after the public learned of the massive Ponzi scheme perpetrated by Bernard L. Madoff and the precise months when the Movants contend that their Madoff-related losses were inaccurately reported and allocated by the Spring Mountain Defendants to the Movants. *See id.* and Ex. A attached thereto. Mr. Merkin has claimed that, despite the massive losses incurred by investors in his funds during this time period, he does not have this data. *Id.* Mr. Merkin has also not produced NAV summaries for the domestic funds, Ascot Partners, L.P. and Gabriel Capital, L.P. without explanation.

##### b. Estimated Partnership Valuation/Returns

3

The Movants continue to seek the Estimated Partnership Valuation/Returns depicting Spring Mountain's investments in Ascot Partners, L.P., Ascot Fund Limited, Gabriel Capital, L.P. and Ariel Fund Limited during the month of December, 2008. Mr. Merkin's counsel have informed the Movants that this data was never prepared, despite the fact that discrete percentages of loss (down to one one-hundredth of a percent) were reported to Spring Mountain and Gabriel investors, including the Movants. *See id*.

### c. Other Data Supporting the Losses Claimed

If, for one incredible reason or another, documents of this style are no longer available, the Movants have asked Mr. Merkin to stipulate to this effect and produce different monthly statements and/or reports that *do* depict the dollar holdings, performance and estimated net value of each fund during the month of December, 2008 as called for by their subpoena. *Id.* Despite the plain language of the Movants' subpoena, Mr. Merkin has refused. *Id.* The Movants are entitled to know what happened to their money, and the claim that this information does not exist or is irrelevant to their case simply does not pass the straight-face test. The Movants have no documentation that supports the occurrence and numerical extent of the Movants' Madoff-related. This is simply unbelievable.

### 2. Respondent Merkin Must Also Produce the Testimonial Documents

The Movants also respectfully disagree with Mr. Merkin's contention that the transcripts of his deposition testimony are irrelevant to the Movants' case against the Spring Mountain Defendants. It is axiomatic that courts must give the discovery rules "a broad and liberal treatment to effectuate their purpose that civil trials in the federal courts [need not] be carried on in the dark." *Schlagenhauf v. Holder,* 379 U.S. 104, 114-15 (1964) (quoting *Hickman v. Taylor,*

4

329 U.S. 495, 501, 507 (1947) (internal quotation marks omitted). Under Federal Rule of Civil Procedure 26(b)(1), therefore:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Notably, the Rules "do not place any initial burden on parties to justify their . . . discovery requests." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2nd Cir. 2003). They do, however, impose a heavy burden on the party *opposing* discovery to show "good cause" for a protective order. *See id.* (citing Fed. R. Civ. P. 26(c)).

Mr. Merkin's claim as to why the requested transcripts of testimony are irrelevant came as a surprise to the Movants. In his Opposition, Mr. Merkin stated that "Merkin's testimony and the opinions of his expert witnesses in the NYAG Action cannot possibly lead to admissible evidence for the [Movants] in the Maine action because it is undisputed that the Spring Mountain Defendants were aware of Ascot's investments with Madoff." *Merkin's Opp.* at 4. Mr. Merkin does not speak for the Spring Mountain Defendants, who have stated, under penalty of perjury, that they "did not have knowledge or otherwise have reason to believe prior to December 10, 2008 that Madoff was making all, virtually all or most of the investment decisions concerning Ascot Partners, L.P. and/or Ascot Fund Limited." *See Responses of John L. Steffens to Plaintiffs' First Set of Interrogatories* at 3, attached to *Frawley Declaration* as Exhibit B; *Responses of Gregory P. Ho to Plaintiffs' First Set of Interrogatories* at 3, attached to *Frawley Declaration* as Exhibit C (same). It is quite clear that the Spring Mountain Defendants' level of knowledge concerning Madoff's role in the investment decisions of Ascot Partners, L.P. and

5

Ascot Fund Limited is very much in dispute. For this reason alone, these transcripts are extremely relevant to the Movants' claims against the Spring Mountain Defendants.

Mr. Merkin then argues that the transcripts cannot be relevant because, he claims, "there is no reference to Goldenson, Spring Mountain, Steffens or Ho in the transcripts." *Merkin's Opp.* at 4-5.[3] Even if true, it does not follow that the transcripts are irrelevant to the Movants' claims against the Spring Mountain Defendants. The Movants' Complaint alleges that the Spring Mountain Defendants *should have known* that their investments in Ascot Partners, L.P. were completely subject to the control and supervision of Bernard L. Madoff. *See, e.g.*, *Movants' Memorandum* at Ex. A ¶¶ 6-7 ("Movants Complaint"). If the transcripts reveal that Mr. Merkin, to any degree, communicated Mr. Madoff's role in Ascot Partners, L.P., Ascot Fund Limited, Gabriel Capital, L.P. and/or Ariel Fund Limited to investors and/or business partners, this fact is undoubtedly likely to lead to the discovery of admissible evidence that the Spring Mountain Defendants were among those that Mr. Merkin communicated this information to, even if they are not mentioned by name in the transcripts. Mr. Merkin's testimony on his relationship with Madoff is very likely to lead to admissible evidence of what the Spring Mountain Defendants *should have known* if they had adequately performed their fiduciary duties as investment advisors to the Plaintiffs.

The Movants' Complaint also alleges that the Spring Mountain Defendants aided and abetted each other and Mr. Merkin in breaching their fiduciary duties to the Movants. *See, e.g.*, *Movants' Compl.* ¶¶ 135-39. It also alleges that the Spring Mountain Defendants committed torts in furtherance of a civil conspiracy with Mr. Merkin. *See id.* ¶¶ 145-50. At bottom, the Movants' Complaint is replete with allegations that Mr. Merkin was a creditor, investor, business

---

[3] The Movants would not have limited such an electronic search to these terms alone, and surely there must be mention of "Madoff," "Ascot," "Gabriel" and "Ariel."

6

partner, consultant, sub-manager, conspirator and joint-venturer.  Put simply, evidence of Mr. Merkin's admissions in the transcripts sought is likely to lead to admissible evidence of liability that can be attributed to the Spring Mountain Defendants under an agency or vicarious liability theory of liability.

Moreover, Mr. Merkin ignores the standard he himself sets forth in evaluating whether a subpoena imposes an undue burden on a non-party.  As Mr. Merkin notes, "[w]hether a subpoena imposes an undue burden depends upon such factors as relevance, the need of the party for documents, the breadth of the document request, the period of time covered by it, the particularity with which the documents are described and the burden imposed. *Merkin's Opp.* at 4 (quoting *Sanofi-Synthelabo v. Apotex Inc.*, No. 02-cv-2255, 2009 WL 5247497, at *3 (S.D.N.Y Dec. 30, 2009)).  As described above, these transcripts are highly relevant and utterly necessary to the Movants' case against the Spring Mountain Defendants.  The Movants' subpoena and Motion described with particularity the transcripts sought and the dates thereof.  There is no reason for the Court to issue Mr. Merkin a protective order against the Movants' subpoena, if indeed this is a proper remedy.  *See Merkin's Opp.* at 4.

Finally, Mr. Merkin's claims of "fishing expedition" are unfounded and improper.  The Supreme Court famously summarized what Rule 26(b)(1) means for parties opposing a discovery request: "No longer can the time–honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying his opponent's case." *Hickman*, 329 U.S. at 507–508. *See also Bridgewater v. Taylor*, 745 F. Supp. 2d 355, 359 n.1 (S.D.N.Y. 2010) ("The 'fishing expedition' objection to discovery under the Federal Rules of Civil Procedure was expressly rejected by the Supreme Court more than 60 years ago") (citing *Hickman*)); *S.E.C. v. Cymaticolor Corp.*, 106 F.R.D. 545, 549 (S.D.N.Y. 1985) (A claim that a party "is embarking on

a fishing expedition . . . is clearly an improper ground to avoid discovery" (citing *Hickman*)).

C.  *Movants' Reply to Declarations Made on Behalf of the Receivers*

As explained above, the Movants' disputes concerning production of the Monthly Reports have not been resolved. For this reason, they are hesitant to release Mr. Schwartz or Mr. Pitofsky from the purview of their Motion. As the court-appointed Receiver for Ariel Fund Limited and Gabriel Capital, L.P., Mr. Schwartz stands in Mr. Merkin's shoes. Mr. Pitosky, as the Receiver for Ascot Partners, L.P. and Ascot Fund Limited, does the same. As investors in Gabriel Capital, L.P., and Ascot Partners, L.P., the Movants are among the "aggrieved investors" who Mr. Schwartz and Mr. Pitofsky (together, the "Receivers" and their respective funds, the "Receivership Defendants") were appointed to protect. Although the Movants are highly cognizant of the valuable and limited resources available to the Receivers, they joined them as respondents to their Motion because they are in actual or constructive possession of all of the documents sought.

The Orders appointing the Receivers describe their general powers and duties. Each Receiver has "all powers, authorities, rights and privileges hereto possessed by the officers, directors, managers, managing partners and general partners" of the Receivership Defendants. *See Ex. A to Laffey Declaration* at 3; *Ex. A to Malaska Declaration* at 3.[4] The Receivers assumed "control of the operations and assets" of the Receivership Defendants. *Id.* Moreover, each Receiver has the duty:

1. To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind . . . .

2. To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and

---

[4] In the interests of simplicity, the Movants hereafter cite only to Mr. Schwartz' Receivership Order, which is the same as Mr. Pitofsky's in all material aspects.

8

> collect, recover, receive and take into possession from third parties all Receivership Property and Receivership Defendants' records relevant thereto . . . .

*Id.* at 9. Additionally, the Receivership Orders commanded Mr. Merkin and his employees "to turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants, and/or all Receivership Property, in such manner as the Receiver may specify; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers." *Id.* at 15. *See also id.* at 16 ("[T]he Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other document or instruments of the Receivership Defendants. All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver"). Finally, New York law requires the Receivers to keep "open to inspection[,] by any person having an apparent interest in the property[,]" the records of the receivership, *see* N.Y. CPLR § 6404, and produce these documents to any person "establishing an interest" therein. N.Y. GEN. BUS. LAW § 353-a.

Pursuant to the above-described duties, the Receivers have a great deal of information that is highly relevant to the Movants' claims against the Spring Mountain Defendants. The Movants recognize that, in the ordinary case, the financial documents would be more readily obtainable from Mr. Merkin and/or the Spring Mountain Defendants. However, to the extent that these parties have asserted that they do not have custody or control of these documents or that such financial information was never recorded, the Receivers stand in their place. Presumably, they have reconstructed the financial events leading up to and occurring immediately after the Madoff fraud's revelation in order to properly perform their duties, and presumably they have commanded that Mr. Merkin produce to them the necessary information to

9

do so. The Movants, who have been unable to obtain any transparency from the usual sources, have subpoenaed the Receivers for this data. In fact, a strong argument can be made that the Receivers should be the ones that investors in the Movants' unfortunate position ought to turn to first for clarity regarding their suspicious investment losses. The same can be said for the Testimonial Documents. The Receivers are in constructive possession of these materials under the Receivership Orders. Moreover, they are in *actual* possession of the transcripts because the Receivership Defendants are relief defendants in the NYAG's case. They have these documents and the Movants have a substantial need to review them.

The Movants are sensitive to the burdens confronting the Receivers and their desire to preserve scarce resources for the protection of investors. Therefore, the Movants styled their subpoenas as narrowly as possible in order to minimize any production burden without giving up their rights to inspect critical information. However, the Movants are among the investors whose money the Receivers now spend to maintain a lack of transparency as to the circumstances preceding and immediately following the loss of their investments. Therefore, any expense and burden now placed on the Receivers in responding to the Movants' subpoenas and Motion is not undue.

   **D.**  ***Movants' Reply to Respondent STB's Opposition***

Movants continue to seek privileged and non-privileged documents and communications from STB. As a threshold matter, the Movants wish to clarify the scope of what they continue to seek. First, the Movants' subpoena and Motion to Compel do *not* request attorney work product information. The Movants do not expect STB to produce its own internal notes, communications and documents.

Second, to the extent that STB represented Mr. Steffens and Mr. Ho personally, the Movants agree that the documents sought are privileged. However, to the extent that STB

10

represented the QP 1 Fund Limited Partnership because of its "expertise in advising victims of financial fraud," STB should not be allowed to assert the attorney-client privilege against the Movants. *See Movants' Mem.* at Ex. Q. STB has only said that it "has never been retained by, or provided legal counsel to, any of the limited partner investors in Spring Mountain Partners QP 1 (the 'Fund') in connection with their investments in the Fund." *Declaration of James G. Kreissman* ¶ 3 (Docket No. 20). Because "[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it," *United States v. Daugerdas*, 757 F. Supp. 2d 364, 369 (S.D.N.Y. 2010) (citation omitted), STB must actually state on the record who in fact it represented. "In general, the 'fact of retainer [and] identity of the client' are not privileged, because they do not qualify as 'confidential communications' made for the purpose of securing legal advice." *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 101 (S.D.N.Y. 2009) (alteration in original) (citing *United States v. Pape,* 144 F.2d 778, 782 (2d Cir. 1944) STB remains coy on this point. Until they meet their burden that the attorney-client privilege applies, it does not.

### 1. The Privileged Communications

STB contends that the Movants are not entitled to any privileged documents in STB's possession relating to the Spring Mountain Defendants because the fiduciary exception to the attorney-client privilege does not apply to persons in the Movants' position. STB misstates the law on good cause. As this Court said in *Lawrence v. Cohn*:

> [G]enerally speaking this requirement has been limited to the corporate-shareholder context, and with good reason. As has been noted, the animating rationale for imposing the good cause test is that there may well be divergences of interest between the plaintiff shareholder in a derivative action and the corporation itself. *In contrast, in the other comparable fiduciary relationships, there exists no legitimate need for a [fiduciary] to shield his actions from those whom he is obligated to serve.* Thus, the courts have generally recognized that

11

the good-cause test is inapplicable beyond the factual context presented in *Garner.*

No. 90CIV.2396 (CSHMHD), 2002 WL 109530, at *5 (S.D.N.Y. Jan. 25, 2002) (emphasis supplied) (alteration in original) (internal citations and quotation marks omitted). *See also In re Omnicom Group, Inc. Securities Litigation*, 233 F.R.D. 400, 412 (S.D.N.Y. 2006); *Martin v. Valley Nat'l Bank of Ariz.*, 140 F.R.D. 291, 326-27 (S.D.N.Y. 1991). STB has shown "no legitimate need for a [fiduciary] to shield his actions from those whom he is obligated to serve." *Lawrence*, 2002 WL 109530, at *5.

Regarding the mutuality of interests prong, the same standard should not apply in the partnership context as what applies in the shareholder derivative context. It is black-letter law that "[a] partner, as a fiduciary, is held to higher standards than those of the marketplace. 'Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.'" *NCAS Realty Mngmt. Corp. v. Nat'l Corp. for Housing Parts.*, 143 F.3d 38, 39-40 (2nd Cir. 1998) (quoting *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, C.J)). Almost by definition, partners have a mutuality of interests. This is not a shareholder derivative suit, and STB cannot support their argument by claiming a breach of fiduciary duty case based on misrepresentations and conflicts of interests is analogous to the shareholder derivative action context where the "antagonism between the derivative plaintiff and those who really run (i.e. are) the corporation is a common phenomenon." *Lawrence*, 2002 WL 109530, at *5 n.4 (quoting WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 503(b) [05] at 503–56.14 (2d ed. 1990)). In the partnership context, given the increased standard of loyalty applied, a mutuality of interests should be presumed up until the point when the Spring Mountain Defendants hired legal counsel in connection with the Maine action—when it hired Spears and Imes, not STB.

Nevertheless, even if STB's formulation of the fiduciary exception applies in this case, there was a mutuality of interests between the Movants and the Spring Mountain Defendants for a time following the revelation of the Madoff fraud, and the Movants have good cause to pierce the privilege. Their good cause, in fact, rests squarely on the Spring Mountain Defendants' departure from and misrepresentations regarding these interests. On December 12, 2008, the Spring Mountain Defendants wrote the QP 1 Fund's investors and limited partners a letter informing them about Madoff and comforting them that Spring Mountain "will continue to act in your best interest during this trying time." *See Dec. 12, 2008 Letter to Investors*, attached to the *Frawley Declaration* as Exhibit D. Three days later, the Spring Mountain Defendants purported to retain STB on behalf of these same investors and limited partners, including the Movants. *See Movants' Mem.* at Ex. Q. The Spring Mountain Defendants wrote the December 15th letter in the plural first person: the personal pronouns "our," "us," and "we" are so prominently used as the beneficial subjects of the representations made that any reasonable investor, at least initially, would be lulled into a protective sense of advisement. The letter promises "further announcements within the next few days." *Id.* These statements caused the Movants to reasonably belief that the Spring Mountain Defendants had hired STB to represent the QP 1 Fund Limited Partnership because of its "*expertise in advising victims of financial fraud.*" *Id.* (emphasis supplied).

At this point, both the Movants and the Spring Mountain Defendants had a mutuality of interests in retrieving as much money as possible from those responsible for the Madoff fraud. Indeed, a trustee was appointed to oversee customer claims to the liquidation proceeds of Madoff's estate. Both the Movants as investors in the QP 1 Fund and the Spring Mountain Defendants had a plethora of claims against Mr. Merkin. The Movants had no reason to suspect

13

that the Spring Mountain Defendants were not victims of Madoff's fraud alongside them. If there were no mutuality of interests at this time, than that in itself is a breach of the Spring Mountain Defendants' fiduciary duties.

By the time the Movants realized that STB was not retained to protect the QP 1 limited partners and the Spring Mountain Defendants' collective interests—when they read in *The Dartmouth* magazines interview of Mr. Ho on January 6, 2009 that the Spring Mountain Defendants had no intention to pursue legal action against Mr. Merkin because they were "fully aware" of Ascot's investments in Madoff—much of the damage had already been done. *See Movants' Memorandum* at Ex. A ¶¶ 111-113. Documents apparently were misplaced, significant accounting errors were made, and events were reconstructed. Had the Movants known that no one was looking out for the mutual interests shared in seeking relief from Mr. Merkin and Madoff's conduct, they would have acted. But because they more than reasonably believed during this time that the Spring Mountain Defendants were pursuing legal action on behalf of themselves and their fellow partners during the month following the Madoff fraud, they did not. Rather than seek relief from Mr. Merkin, they hid from their fiduciaries to their partners. Because Mr. Merkin was their creditor, investor, business partner, consultant, sub-manager, conspirator and joint-venturer, the Spring Mountain Defendants chose to remain loyal to Mr. Merkin rather than their limited partners. They are now entitled to review privileged communications and documents from this period to see exactly why the Spring Mountain Defendants retained STB, who STB actually represented, what advice was given that was contrary to the Movants' "best interests" and whether the facts comport with the representations made to the QP 1 Fund's limited partners. In short, the Movants have good cause to seek the

documents sought precisely because the Spring Mountain Defendants breached their fiduciary duties to the Movants by failing to pursue their mutual interests.

### 2. The Non-Privileged Documents.

The Movants' above-described substantial need for this evidence outweighs any burden imposed upon STB. As noted above, the Movants do not seek to compel documents that can be properly described as attorney work product. Given STB representations to the Court that attorney work product comprises most of the documents in its possession relating to Spring Mountain, this revelation should alleviate most of their concerns about expense and burden.

Second, the Movants also sought this information from the Spring Mountain Defendants in a second document request to the Spring Mountain Defendants. The Spring Mountain Defendants immediately moved for protection from this request, which the Movants opposed. *See Frawley Declaration* ¶ 23. On March 22, 2012, the United States District Court for the District of Maine denied the Spring Mountain Defendants' motion, but declined to insert itself into the issue of privilege now pending before this Court. Even a brief glimpse at the docket in the Maine action unequivocally reveals that the Movants have diligently pursued discovery in their case.

Third, the Movants do not seek documents relating to STB's representation of the Defendants in connection with their defense of the Movants' case; they seek documents relating to the circumstances following the Madoff fraud and whether the Spring Mountain Defendants properly pursued the Movants' best interests. They seek evidence of the manner in which the Spring Mountain Defendants attempted to circumvent their fiduciary duties to the Movants by pursuing their own self interests and not those of their limited partners, contrary to what they represented in the December 15, 2008 letter. If the issue of privilege and identity of the client

15

are resolved by this Court and the Movants' Motion is granted, the Movants will work with STB to use search terms and custodians to alleviate as much burden from STB's shoulders as possible. They certainly will not require STB to spend $100,000 on their subpoena.

Dated at Portland, Maine this 26th day of March, 2012.

/s/ <u>Alfred C. Frawley IV</u>
Alfred C. Frawley IV

/s/ <u>Jay P. McCloskey</u>
Jay P. McCloskey

Attorneys for the Movants
MCCLOSKEY, MINA & CUNNIFF, LLC
12 City Center
Portland, Maine 04101
(207) 772-6805

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| In re GOLDENSON SUBPOENA ENFORCEMENT ACTION<br><br>GOLDENSON, et al.,<br><br>    Movants,<br><br>v.<br><br>J. EZRA MERKIN, et al.,<br><br>    Respondents. | No. 1:12-mc-00068-P1 |

## MOVANTS' CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2012, I have electronically filed the foregoing **MOVANTS' CONSOLIDATED REPLIES TO RESPONDENTS' OPPOSITIONS TO MOVANTS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Neil A. Steiner
Diane Nicole Princ
Kristina Arlene Moon
Dechert, LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797

Casey Devin Laffey
Reed Smith (NYC)
599 Lexington Avenue
New York, NY 10022

David B. Pitofsky
Kimberlee A. Malaska
Goodwin Procter, LLP(NYC)
The New York Times Building, 620 Eighth Avenue
New York, NY 10018-1405

17

Simona Sophia Gurevich
Simpson Thacher et ano.
425 Lexington Ave.
NY, NY 10017-3954

James Glenn Kreissman
Simpson Thacher & Bartlett LLP (CA)
3330 Hillview Avenue
Palo Alto, CA 94304

Dated this 26th day of March, 2012.

/s/    <u>Alfred C. Frawley IV</u>
      Alfred C. Frawley IV

      MCCLOSKEY, MINA & CUNNIFF, LLC
      12 City Center
      Portland, Maine 04101
      (207) 772-6805
      afrawley@lawmmc.com