UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DANIEL R. GOLDENSON,<br>SUZANNE K. GOLDENSON,<br>SKG PARTNERS, L.P., and<br>SKG GENERAL CORP.,<br><br>    Plaintiffs,<br><br>v.<br><br>JOHN L. STEFFENS, GREGORY P. HO,<br>SPRING MOUNTAIN CAPITAL G.P., LLC<br>SPRING MOUNTAIN CAPITAL, LP, and<br>SPRING MOUNTAIN CAPITAL, LLC<br><br>    Defendants. | Case No. 10-CV-440 (JAW)<br><br>**EXPEDITED HEARING AND<br>BRIEFING REQUESTED** |

**DEFENDANTS' MOTION TO DESIGNATE AN EXPERT OUT OF TIME AND FOR
AN ORDER REQUIRING PLAINTIFFS TO PROVIDE ADDITIONAL DISCOVERY**

Based on the Court's direction at a telephonic hearing on April 9, 2012, Defendants respectfully submit this motion seeking (1) leave to designate an expert out of time, and (2) an order requiring Plaintiffs to provide additional discovery, including additional deposition testimony.  Defendants' request regarding designation of an expert is based on the Court's March 22 and 28 rulings that Plaintiffs can pursue the misallocation theory of wrongdoing on the ground that it can be considered to be part of Plaintiffs' claim for breach of fiduciary duty; and on Plaintiffs' belated production of documents relating to sophisticated and complex financial trusts created and controlled by them, to which they have transferred personal assets worth millions of dollars.  Both of these developments occurred after the March 19 deadline for Defendants to designate experts. Defendants' request for an order requiring Plaintiffs to provide additional discovery is based on Plaintiffs' late disclosure of documents relating to the trusts.

23526.5/0241 - 00001

## BACKGROUND

A. **Plaintiffs' Cause Of Action For Breach of Fiduciary Duty And Related Discovery By Defendants**

Count One of Plaintiffs' Amended Complaint ("Complaint") sets out a cause of action for "breach of fiduciary duty" under "Maine Common Law." *Id.* at p. 28. Plaintiffs allege that Defendants owed fiduciary duties to them on two different bases: (1) Defendants' status as "Investment Advisors…within the meaning and contemplation of the securities law of the United States," *id.* at ¶ 123 (an apparent reference to the Investment Advisers Act of 1940 ("1940 Act")), and (2) Plaintiffs' "special relationship with the Defendants," which led Plaintiffs to "repose[] great trust and confidence" in Defendants, *id.* at ¶ 124.

In response to Defendants' motion to dismiss Count One, Plaintiffs fleshed out their theory regarding the "special relationship" prong of their fiduciary duty claim. Citing case law, Plaintiffs explained that "a fiduciary relationship exists where one party places trust or confidence in another, thereby giving that person influence, control or responsibility over the first," or where one party places "trust or confidence in another" and there is "disparity of position or influence" between the parties.[1] Dkt. No. 27, p. 17. Defendants argued that any claim regarding disparity of position or influence was inconsistent with representations Plaintiffs had made regarding their financial sophistication at the time they invested in the QP I Fund in January 2002. Specifically, in the Subscription Agreement that Plaintiffs executed to initiate that

---

[1] *Innovative Network Solutions, Inc. v. Onestar Communications, LLC,* 283 F. Supp. 2d 295, 303 (D. Me. 2003); *see also DDCLAB Ltd v. E.I DuPont de Nemours & Co.*, No. 03 Civ 3654, 2005 WL 425, 495 at *8 (S.D.N.Y. Feb. 18, 2005) ("Under New York a fiduciary relationship arises when one has reposed trust or confidence in the integrity of another who thereby gains a resulting superiority of influence over the first."); *Leighton v. Fleet Bank of Maine*, 634 A.2d 453, 457 (Me. 1993) ("a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge").

investment, they represented that "they have such knowledge and experience in financial and business matters" that they are "capable of evaluating the merits and risks" of the investment. Dkt. No. 26, Ex. E.  Plaintiffs, in turn, denied that this representation gave rise to any inference regarding their sophistication in financial and business matters.  Dkt. No. 27, p. 16 n. 10.

Accordingly, one of Defendants' primary objectives in discovery was to seek evidence relating to Plaintiffs' level of sophistication in financial matters.  In particular, Defendants hoped to obtain full discovery on such matters as (1) Plaintiffs' income level and net worth, which have been recognized as "an objective and clear standard to use in ascertaining whether a purchaser of a private investment vehicle's securities is likely to have sufficient knowledge and expertise in financial and business matters to enable that purchaser to evaluate the merits and risks of a prospective investment," SEC Release No. 8766, at *10 (Dec. 27, 2006); and (2) the complexity of the financial arrangements that Plaintiffs had chosen to introduce into their personal lives, which would provide valuable insight into Plaintiffs' ability to understand complex financial investments and to act independently in their own interest with regard to such investments.

The Complaint itself provided a useful starting point regarding Plaintiffs' net worth at a critical time – December 2001 and January 2002, when Plaintiffs made their $2 million investment in the QP I Fund and a separate $2.25 million investment in the Ascot Fund.  The Complaint included excerpts from two emails written by Mr. Goldenson to Defendants on December 17 and 22, 2008, respectively – just days after the Madoff fraud was revealed – in which he stated that Plaintiffs had committed all of their liquid assets to those two investments. *See* Complaint ¶ 101 (in late 2001, "[we] ended up placing half of our worldly liquidity with

each firm"); ¶ 103 ("in late 2001," "[w]e … plac[ed] half our money with you [QP I] … and the other half with the Ascot Fund").

Defendants were also aware of other statements Mr. Goldenson had made relating to Plaintiffs' income level and net worth as of December 2008, when the Madoff fraud was revealed; these statements were significant because they had implications for Plaintiffs' income level and net worth in earlier years. First, in the December 17 email that was excerpted in the Complaint at ¶ 101, Mr. Goldenson was seeking from Defendants an emergency – and irregular – liquidation of Plaintiffs' remaining interest in the QP I Fund; and to make his case more compelling, he described the desperate state of Plaintiffs' financial condition as a result of the Madoff fraud. He stated that REDACTED

(emphasis in original); REDACTED

; and REDACTED

Nicholas Decl. Ex. A. Second, on that same day, Mr. Goldenson wrote a letter to the United States District Judge who had been appointed to oversee the SIPC liquidation of Madoff's securities firm, in which he described the losses he and Mrs. Goldenson had sustained through Ascot and stated that the Madoff fraud "has left retirees like ourselves having to sell our homes and raise money any way we can." Nicholas Decl. Ex. B.

Mindful of these self-serving statements by Mr. Goldenson, Defendants set out in discovery to learn all they could regarding Plaintiffs' prior financial dealings. Defendants' First Request For Production Of Documents ("First Request"), issued just after the commencement of formal discovery in September 2011, focused almost exclusively on Plaintiffs' financial status and dealings. *See* Nicholas Decl. Ex. C. The period covered by the Request was 1996 through

2009.  Based on the fact that two of the named Plaintiffs are special purpose investment entities, the very existence of which suggests some level of financial sophistication on the part of Plaintiffs, *see* Complaint ¶ 10, the First Request set out a "Definition" of the term "Goldenson" that included any entity in which Mr. or Mrs. Goldenson "had any ownership or beneficial interest of ten percent or more," *id.* at 2.  Similarly, since it seemed possible that Plaintiffs would have relied on the services of professionals in the management of their financial affairs, the First Request included an "Instruction[]" that the materials sought included "documents in the possession, control, or custody of any physician, attorney, accountant, or other professional … that Plaintiffs have a right to obtain."  *Id.* at 3.

The First Request specifically asked for *all* documents regarding (a) "any investment by or on behalf of the Goldensons through any financial or investment entity" (Request No. 4), (b) "federal, state, and local tax returns filed by the Goldensons" (Request No. 6), (c) "any real property owned by the Goldensons, including … the grant, or donation of such property or any portion of it" (Request No. 7), and (d) Plaintiffs' current residence at "68 Keene Narrows Road, Bremen, ME, … including the grant, or donation of such property" (Request No. 8).  In October and November 2011, Plaintiffs produced approximately 8,300 pages of documents in response to the First Request.  Generally, as to the specific Requests quoted above, Plaintiffs produced only documents relating narrowly to the named Plaintiffs, not documents relating to any trust that Plaintiffs had created or in which they held a beneficial interest.

With the same discovery purpose in mind, Defendants issued their First Set of Interrogatories ("First Interrogatories") on October 28, 2011, *see* Nicholas Decl. Ex. D, which relied on the same definition of "Goldenson" as the First Request and covered the same extended

time period, *id.* at 2, 3.  Interrogatory No. 4 asked Plaintiffs to identify all "financial or investment entities through … which any of the Goldensons have made investments."  *Id.* at 4.  Plaintiffs' Response to that Interrogatory stated that "since 1996 we have made investments through SKG Partners, L.P. and Goldenson Partners, L.P.," and otherwise referred Defendants to documents Plaintiffs had produced in response to Defendants' First Request.  Nicholas Decl. Ex. E, at 3-4.

Armed with only the information that Plaintiffs had provided, Defendants took the depositions of Mr. and Mrs. Goldenson on November 29 and 30, 2011.  Mr. Goldenson's deposition lasted approximately seven hours.  Mrs. Goldenson's deposition lasted less than 100 minutes.  Defendants asked no detailed questions regarding any trusts Plaintiffs had created or had a beneficial interest in, as the discovery Plaintiffs had provided indicated that there were none.

### B. Plaintiffs' Belated Disclosures Relating To Complex Financial Trusts They Created, Funded, And Control

On February 23, 2012, Defendants issued their Second Set of Interrogatories ("Second Interrogatories").  *See* Nicholas Decl. Ex. F.  Interrogatory No. 12 asked Plaintiffs to "[i]dentify all transfers of anything of value greater that $1,000, to any family member of any of the Goldensons and/or any trust relating to the Goldensons or any family member of the Goldensons, including the name of the individual recipient or trust; what was transferred, including the amount or value of the transfer; and the date of the transfer."  *Id.* at 6.  Plaintiffs responded 30 days later, on March 26, as follows:

> Without waiver of their objection, the Goldensons respond by stating that the burden of discovering or ascertaining the answer to this Interrogatory is the same

> for the Defendants as it is for the Plaintiffs and, therefore, pursuant, to Fed. R. Civ. P. 33(d), the Plaintiffs refer the Defendants to the United States Gift (and Generation-Skipping) Tax Returns for 2001-2007 and 2010 that will be produced in *a supplemental production pursuant to the Defendants' First Request for the Production of Documents.*

Nicholas Decl. Ex. G, at 4 (emphasis added). This disclosure by Plaintiffs came six months after they had received Defendants' First Request, four months after the dates of Plaintiffs' depositions, and one week after Defendants' deadline for designating experts.

On March 28, 2012, Defendants' counsel in New York received from Plaintiffs a letter that enclosed a CD described as containing "Plaintiffs' Second Supplemental Response to the Defendants' First Request for Production of Documents." Nicholas Decl. Ex. H. The CD contained 555 pages, including approximately 380 pages relating to trusts that Plaintiffs had not provided documents for previously: The Goldenson Family Insurance Trust, created in 1991 ("Insurance Trust"); and the Goldenson 2005 Special Trust, created in 2005 ("2005 Special Trust"). The documents relating to the Trusts included lengthy and complicated Trust Agreements, *see* Nicholas Decl. Ex. I, Ex. J, filed federal tax returns relating to the Trusts for the years 2000-2007 and 2010, and documents evidencing certain transfers to, and transactions engaged in by, the Trusts. These documents, while obviously a very limited and highly selective sample of all the documents that must be within Plaintiffs' control regarding the Trusts, show the creation, maintenance, and use over more than 20 years of sophisticated and complex financial vehicles that hold millions of dollars in assets. The Trusts were apparently designed to exploit esoteric estate planning and tax laws through present transfers of Plaintiffs' personal assets to the Trusts, a large number of which have occurred over many years. It appears that Mr. and Mrs. Goldenson are entitled to enjoy the benefits of the Trusts' assets while they are alive, and that

upon their deaths some or all of the Trusts' assets will pass to their children outside of the Goldensons' respective estates and free of any estate tax.

Among the documents produced are federal tax returns filed by Mr. and Mrs. Goldenson and accompanying documents detailing transfers to, and transactions by, the Trusts dating back to 1991. The tax returns in question are on "IRS Form 709," which is a "United States Gift (and Generation Skipping Transfer) Return." The returns were all prepared by a lawyer at a large law firm called Lowenstein Sandler PC. Among other things, the tax returns and attachments to them show the following:

REDACTED

There can be no doubt that Plaintiffs control the Trusts, including the REDACTED assets transferred to the Trusts. The day after Defendants received Plaintiffs' previously withheld "Supplemental Production," Defendants received documents subpoenaed from a financial institution called TD Ameritrade. The documents revealed a host of brokerage accounts established by Plaintiffs and members of their family in 2010 and 2011. One of those accounts is in the name of the 2005 Special Trust. REDACTED

REDACTED

## ARGUMENT

### A. Defendants Should Be Permitted To Designate Their Expert On Fiduciary Duty Out Of Time

Plaintiffs provided designations for three experts on February 29, 2012.[2] *See* Nicholas Decl. Ex. Q. As to a fourth expert, who is expected to address Plaintiffs' misallocation theory of wrongdoing, Plaintiffs provided only a name and certain background information, explaining that "no further information concerning [the expert's] opinions can be provided at this time," and that at a later time the "designation will be supplemented to specify any and all opinions…." *Id.* at p. 4. Defendants' time for designating experts was March 19, 2012. On March 19, Defendants designated an expert who had analyzed other hedge fund investments Plaintiffs had made.

Defendants now seek leave to designate out of time an expert on fiduciary duties imposed on an investment adviser under the Investment Advisers Act of 1940. Prior to the April 9 telephonic hearing before this Court, Defendants met and conferred with Plaintiffs regarding a

---

[2] The Court initially set a deadline of November 4, 2011, but changed the date to January 13, 2012 at the request of Plaintiffs. Plaintiffs then sought a further enlargement of time, and the Court changed the deadline to February 29, 2012.

23526.5/0241 - 00001                                9

late designation, and Plaintiffs indicated that they would oppose. Defendants then told the Court at the April 9 hearing that they would file a motion seeking leave to designate an expert out of time. On April 17, Defendants provided to Plaintiffs their proposed designation, to which is attached hereto as Exhibit 1. Plaintiffs' proposed expert on the fiduciary duties imposed on an investment adviser is James Fanto. Mr. Fanto is a professor of law at Brooklyn Law School and an authority on the scope and nature of the fiduciary responsibility of securities professionals under the federal securities laws.

### 1. The Applicable Legal Standard

This Court has held that a party seeking to designate an expert late must establish "excusable neglect or substantial justification for his delay in seeking the designation." *U.S. Bank Nat'l Assoc. v. James*, No. 09 Civ. 84, 2010 WL 1416, 26, at *6 (D. Me. Apr. 5, 2010)). That party bears the burden "to establish that his failure is harmless or substantially justified." *Id.* The First Circuit has held that "[t]he excusable neglect inquiry involves a significant equitable component and we must give due regard to the totality of the relevant circumstances surrounding the movant's lapse." *Dimmitt v. Ockenfels*, 407 F.3d 21, 24 (1st Cir. 2005).

### 2. Defendants Meet The Legal Standard

Defendants meet the applicable legal standard. Their late designation is "substantially justified" because developments in this case after the March 19 deadline for Defendants' designation constitute changed circumstances that were not foreseeable to Defendants as of March 19 and made it necessary to designate an expert on fiduciary duty. Because of the procedural posture of the case, the late designation will be "harmless" in that Plaintiffs could not conceivably suffer prejudice from it.

One changed circumstance is the introduction of the misallocation theory of wrongdoing into the case, which occurred after March 19. Specifically, at the hearing on March 22, the Court ruled for the first time that Plaintiffs' misallocation theory was part of the case for purposes of discovery. Tr. 136. Defendants had argued vigorously to the contrary, including filing a motion for a protective order to preclude discovery based on such a theory, but the Court denied that motion. The Court acknowledged that "the issue of misallocation of funds is … not expressly or specifically alleged by the plaintiffs," Tr. 138; *see also* Tr. 136, but nevertheless held that "the misallocation theory of wrongdoing has been properly raised for purposes of discovery," *id.* at p. 136; *see also* Report of Hearing and Order, Dkt. No. 98, p. 6.

Leading up to the Court's ruling on the misallocation theory, Plaintiffs argued that the "loss misallocation idea" is an independent "way that the defendants are liable to the plaintiffs," because it "goes to breach of fiduciary duty": "If you're treating one limited partner better than a different limited partner, that's a breach of fiduciary duty." Tr. 131, 132. In its ruling allowing discovery on the misallocation theory, the Court also referenced Plaintiffs' claim for breach of fiduciary duty as a basis for finding the theory relevant. Tr. 137. Given the addition of the misallocation theory and the impact of that theory on Plaintiffs' breach of fiduciary duty claim, Defendants' request to designate out of time is substantially justified.

Mr. Fanto's designation speaks specifically to what fiduciary duties an investment adviser owes under the 1940 Act: "duties of care and loyalty," including "the fair allocation of investment opportunities among the Fund and the Investment Adviser's other funds, and properly calculating the net asset value of the Fund and each Investor's interest in the Fund." Ex. 1, p. 3. While Defendants do not know what Plaintiffs will eventually argue regarding the

substance of the misallocation theory, *see*, *e.g.*, Tr. 132 (Plaintiffs addressing misallocation theory at March 22 hearing: "we've alleged breach of fiduciary duty and we just don't have to produce evidence right now and frankly, we just couldn't"), Defendants believe that Mr. Fanto's discussion of the duties of care and loyalty will be highly relevant to the misallocation theory.

Another changed circumstance arises from Plaintiffs' months-late disclosure – and wrongful withholding – of documents relating to their Trusts. This evidence drastically alters the status of Plaintiffs' claim that Defendants owed them fiduciary duties under a common law standard. Plaintiffs' creation and use of such complex and exotic investment vehicles makes it virtually impossible to argue that they lacked the sophistication to analyze the investments at issue in this case and were consequently dependent on Defendants to direct and control their investment decision-making. This leaves the 1940 Act as the sole source, and sole definer of content, of any fiduciary duties that Defendants could have owed to Plaintiffs. The new prominence of the 1940 Act as the exclusive standard for assessing alleged breaches of fiduciary duty by Defendants makes it imperative for Defendants to present an expert to detail the limited fiduciary duties created by that Act and to distinguish them from no-longer-relevant common law fiduciary duties.

Mr. Fanto's designation scrupulously lays out the content and scope of fiduciary duties imposed upon an investment adviser under the 1940 Act, particularly as such duties might relate to key factual allegations in Plaintiffs' Complaint. The designation of Plaintiffs' expert on fiduciary duty commingles the concepts of fiduciary duty under the 1940 Act and fiduciary duty under common law principles. *See, e.g.*, Nicholas Decl. Ex. Q at 6. Mr. Fanto's careful focus on the 1940 Act is therefore essential.

Allowing Defendants' late designation would be "harmless" because there is no conceivable prejudice to Plaintiffs. The fact that Plaintiffs' own expert on fiduciary duty received Defendants' designation on April 17 rather than March 19 is of no moment – Plaintiffs' expert was not deposed until April 25 and therefore had sufficient time to fully consider Defendants' designation prior to the deposition. As to Plaintiffs' expert who is devoted wholly to the misallocation theory, Plaintiffs have to date declined to provide a designation indicating what he will testify to. Therefore, far from being prejudiced, Plaintiffs would benefit from having Defendants' fiduciary duty designation in advance of creating a designation for him. Further, Plaintiffs' ability to depose Defendants' expert is in no way affected by the late designaton, as the Court has now ordered that expert depositions may be taken after the May 7 discovery cutoff.

### B.  Plaintiffs Should Be Ordered to Provide Additional Discovery Relating to the Withheld Trust Documents

Plaintiffs' decision to withhold the documents relating to the Trusts is inexcusable. It had the effect of depriving Defendants of the opportunity to take meaningful discovery on a central issue relating to the cause of action that Plaintiffs elected to set out as Count One of their Complaint – breach of fiduciary duty.

Similarly, nothing could be more important to a fair outcome of the case than the fact-finder's assessment of Mr. Goldenson's credibility. After all, he is Plaintiffs' only witness as to all of the statements and actions by Defendants that Plaintiffs rely on to establish fraud. Yet Plaintiffs' strategic decision to withhold all evidence relating to the Trusts has deprived Defendants of the opportunity to confront Mr. Goldenson about the blatant falsity of the

statements he made regarding Plaintiffs' net worth in 2001-2002 and Plaintiffs' near-impoverishment as a result of the Madoff fraud.

Critical discovery that Defendants have been denied as a result of Plaintiffs' machinations includes:

- Evidence relating to     REDACTED

- Complete documentary evidence relating to the Trusts, which likely would expand Defendants' understanding of the Trusts significantly and reveal even more assets held by the Trusts; such evidence might also disclose the existence of additional trusts;

- A review of the Trust documents by an expert and opinions on the significance of the Trusts for Plaintiffs' sophistication regarding complex financial dealings and investments;

- The opportunity to press Plaintiffs in depositions for all relevant details regarding the assets held by these Trusts and the possible existence of other trusts that still have not been disclosed; and

- The opportunity to confront Plaintiffs in depositions regarding false statements made regarding their financial status at key times.

In sum, Defendants should be permitted to take the discovery that they would have been entitled to in the first place.

## CONCLUSION

For all of the reasons set out above, the Court should grant the relief sought by Defendants herein.

Dated: April 25, 2012
       New York, New York

                          Respectfully submitted,

                          SPEARS & IMES LLP

                        By: /s/ David Spears
                            David Spears

                        By: /s/ Max Nicholas
                            Max Nicholas
                            51 Madison Avenue
                            New York, New York 10010
                            Telephone: (212) 213-6996

                        DRUMMOND WOODSUM

                        By: /s/ James T. Kilbreth
                            James T. Kilbreth
                            Drummond Woodsum
                            84 Marginal Way
                            Portland, Maine 04101
                            Telephone (207) 253-0555
                            *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

>Thimi R. Mina
>Jay P. McCloskey
>Alfred Frawley
>McCloskey, Mina & Cunniff, LLC
>12 City Center
>Portland, ME 04101

Dated: April 26, 2012

/s/ David Spears
David Spears
51 Madison Avenue
New York, New York 10010
(212) 213-6996
dspears@spearsimes.com