*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *DANIEL R. GOLDENSON, et al.,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *No. 2:10-cv-440-JAW* |
| | ) | |
| *JOHN L. STEFFENS, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

*MEMORANDUM DECISION ON PLAINTIFFS' MOTION TO COMPEL AND
RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SANCTIONS*

The plaintiffs move to compel the defendants to produce documents containing communications between various Spring Mountain entities and the law firm of Simpson Thacher & Bartlett LLP ("STB").  *See* Plaintiffs' Motion To Compel the Production of Documents ("Motion To Compel") (ECF No. 104) at 1; *see also* Plaintiffs' Second Request for the Production of Documents and Things ("Second RFP") (ECF No. 107-4), Exh. D to Declaration of David Spears in Support of Defendants' Motion for Sanctions and an Award of Costs ("Spears Decl.") (ECF No. 107), Document Requests, ¶ 13; Defendants' Objections to Plaintiffs' Second Request for Production of Documents ("Second RFP Objections") (ECF No. 104-6), Exh. F to Motion To Compel, Specific Objections, ¶ 13.  Because I conclude that the plaintiffs (i) never were STB's clients, (ii) fail to make an adequate showing to pierce the attorney-client privilege pursuant to the so-called "fiduciary exception," or *Garner* doctrine, as articulated in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), and (iii) continue to press an overbroad request for the documents at issue, I deny the Motion To Compel.

1

The defendants separately move for sanctions with respect to a motion brought by the plaintiffs in the United States District Court for the Southern District of New York ("S.D.N.Y.") to compel nonparty STB, pursuant to a subpoena, to produce substantially the same documents sought from the defendants by way of paragraph 13 of the Second RFP. *See* Defendants' Motion and Incorporated Memorandum of Law for Sanctions and an Award of Costs Incurred in Opposing Plaintiffs' Motion To Compel Against Simpson Thacher & Bartlett LLP ("Motion for Sanctions") (ECF No. 106) at 1-2. Invoking this court's inherent power to sanction abusive discovery tactics and violation of court orders, they seek recovery of their expenses as intervenors, as well as STB's expenses, incurred in opposing the S.D.N.Y. motion to compel, which ended with the summary dismissal of that motion. *See id.* at 7-10. I conclude that the plaintiffs' simultaneous pursuit of a similar body of documents from both STB and the defendants did not constitute sanctionable conduct and that the plaintiffs did not violate this court's March 22, 2012, oral order, set forth in a March 28, 2012 report, to meet and confer with respect to the Second RFP. *See* Report of Hearing and Order re: Discovery, Scheduling Motions ("March Order") (ECF No. 98) at 7-8. Hence, I recommend that the court deny the Motion for Sanctions.

## I. Applicable Legal Standards

In this district, no written discovery motion may be filed without the prior approval of a judicial officer. *See* Local Rule 26(b). During an April 12, 2012, teleconference with counsel, I granted leave to file the Motion to Compel and the Motion for Sanctions. *See* ECF No. 103 at 4.

Federal Rule of Civil Procedure 37 provides, *inter alia*, that, "[a] party seeking discovery may move for an order compelling . . . production, or inspection . . . if . . . a party fails to respond that inspection will be permitted – or fails to permit inspection – as requested under Rule 34."

Fed. R. Civ. P. 37(a)(3)(B)(iv).  Federal Rule of Civil Procedure 34, in turn, pertains, in relevant

part, to requests for production of documents and electronically stored information ("ESI").  *See*

Fed. R. Civ. P. 34(a)(1)(A).

> Pursuant to Federal Rule of Civil Procedure 26:
>
> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  All discovery is, however, subject to the following limitations:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> (i)  the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)  the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii)  the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

> With respect to courts' inherent power to issue sanctions, the First Circuit has observed:
>
> A court may award sanctions upon finding that a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  Because of its potency, a court's inherent power to shift attorneys' fees should be used sparingly and reserved for egregious circumstances.  A district court exercising this power must describe the bad faith conduct with sufficient specificity, accompanied by a detailed explanation of the reasons justifying the award.

*F.A.C., Inc. v. Cooperativa de Seguros de Vida de P.R.*, 563 F.3d 1, 6 (1st Cir. 2009) (citations

and internal quotation marks omitted*).  See also Chambers v. NASCO, Inc*., 501 U.S. 32, 44-45

(1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion.  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.") (citation omitted).  The "narrowly defined circumstances [in which] federal courts have inherent power to assess attorney's fees against counsel" include not only abuse of the judicial process but also "willful disobedience of a court order."  *Id.* at 45 (citations and internal quotation marks omitted).

## II.  Background

The plaintiffs, husband and wife Daniel R. Goldenson and Suzanne K. Goldenson (the "Goldensons"), as well as SKG Partners, L.P., and SKG General Corp., seek damages for losses incurred as a result of their investment of substantial sums of money in the so-called "QP 1 Fund" and "Ascot Fund," two hedge funds offered and/or managed by defendants Spring Mountain Capital GP, LLC, Spring Mountain Capital LP, Spring Mountain Capital, LLC, John L. Steffens, and Gregory P. Ho.  *See* Amended Complaint (ECF No. 38) ¶¶ 1-17, 21-30, 118-21.

The plaintiffs allege that, unbeknownst to them, the defendants "simply funneled investors' money to Madoff Investment Securities (MIS), which was controlled by Bernard Madoff ("Madoff"), the infamous and now convicted perpetrator of the largest investment fraud and Ponzi scheme in history."  *Id*. ¶ 5.  The plaintiffs state that the Goldensons first learned of Madoff's securities fraud from news media reports on December 11, 2008, at which time they had no knowledge or suspicion that their own investments in either the QP 1 Fund or the Ascot Fund were at risk as a result of Madoff's Ponzi scheme.  *See id*. ¶ 89.  By correspondence dated December 12, 2008, the defendants apprised the Goldensons of the funds' potential exposure to Madoff-related losses.  *See id*. ¶ 91.  In a December 15, 2008, correspondence, the defendants informed the Goldensons that two funds, the Ascot Fund and Gabriel Capital, L.P., had direct

exposure to Madoff Securities, with substantially all of the Ascot Fund and 29 percent of the Gabriel fund so exposed. *See id.* ¶ 93. The defendants also stated that, as a result of the QP 1 Fund's own investments in the Ascot and Gabriel funds, approximately 9.89 percent of its assets were exposed to Madoff Securities. *Id.*

On December 11, 2008, the same day that reports of the Madoff fraud surfaced in the press, Tara C. Sharp, general counsel of Spring Mountain Capital, LP, contacted James G. Kreissman, a partner at STB. *See* Declaration of James G. Kreissman ("Kreissman Decl.") (ECF No. 109-2), Exh. B to Defendants' Opposition to Plaintiffs' Motion To Compel ("Opposition/Compel") (ECF No. 109), ¶¶ 1-2. Thereafter, STB was retained to represent various Spring Mountain entities and affiliates. *See id.* ¶ 2. Before the Madoff fraud was discovered, STB did not draft any fund-related documents, advise any Spring Mountain entities about fund formation, or counsel anyone about what representations they should, or did, make to investors about the fund. *See id.* ¶ 4.

The plaintiffs initiated this lawsuit by the filing of a complaint in this district on October 27, 2010. *See* ECF No. 1. Prior to doing so, they never communicated with STB for purposes of obtaining legal advice, whether for status updates or otherwise, in writing, in person, or by phone. *See* Kreissman Decl. ¶ 5. Before the plaintiffs filed the instant suit, but after they threatened to file it, their counsel had various discussions with Kreissman in his capacity as counsel for the parties that are now defendants in this action. *See id.* ¶ 6. It was clear from the conversation that the plaintiffs' counsel was aware that Kreissman was representing parties that were adverse to the plaintiffs. *See id.*

On October 24, 2011, the plaintiffs served a subpoena *duces tecum* on STB (the "Subpoena") seeking documents created or collected in the course of STB's representation of the Spring Mountain entities. *See id.* ¶ 7. Specifically, the Subpoena sought:

1.      All documents . . . concerning your provision of professional legal services to the investors of the Spring Mountain QP 1, LP (the "Fund"), or to persons or entities having authority to obtain professional legal services on behalf of the Fund or its investors, between December 1, 2008, and the present.

2.      All non-privileged documents . . . arising out of your provision of legal services to any of the following persons or entities, or to persons or entities having authority to obtain professional legal services on behalf of the following persons or entities:

a.      John L. Steffens;
b.      Gregory P. Ho;
c.      Spring Mountain Partners QP 1, LP;
d.      Spring Mountain Capital GP, LLC;
e.      Spring Mountain Capital LP; or
f.      Spring Mountain Capital, LLC,

between January 1, 2001 and the present, that relate to or reference J. Ezra Merkin, Bernard Madoff, Bernard L. Madoff Investment Securities, LLC, Ascot Partners, L.P., the Ascot Fund, Ascot Fund Limited, Gabriel Capital, L.P., the Gabriel Fund, Ariel Capital, L.P. or the Ariel Fund.

Subpoena (ECF No. 107-1), Exh. A to Spears Decl.

On November 7, 2011, STB served written objections to the Subpoena. *See* Kreissman Decl. ¶ 7; *see also* [Subpoena Response] (ECF No. 107-2), Exh. B to Spears Decl. The plaintiffs never contacted STB to clarify or discuss the stated objections and never indicated an intention to move to compel production. *See* Kreissman Decl. ¶ 7. By letter to STB dated December 8, 2011, Thimi R. Mina, one of the plaintiffs' attorneys, stated, in relevant part:

Either STB was retained to provide legal services for the benefit or protection of SMC [Spring Mountain Capital] and its partners and investors, including the Goldensons, or it wasn't. If STB was not retained for that purpose, then the December 15, 2008 correspondence from Steffens and Ho was indeed false and misleading and intended to lull SMC's investors and partners into the impression that lawyers had been retained to protect their interests when, in fact, that was not

the case.  If STB did, in fact, provide legal services for the benefit of the Goldensons, then the attorney-client privilege cannot be asserted against them by the very fiduciaries purporting to act on their behalf and for their protection, particularly under the circumstances of this case, where that same fiduciary duty has been allegedly violated.  By this correspondence, the Goldensons again assert their right to information concerning STB's representation.

So that there is no confusion concerning our position, this will serve as our only notice to STB that at the trial of this matter we will offer evidence that STB declined to cooperate with and/or produce any information to the Goldensons concerning its representation as described in SMC's December 15, 2008 letter to the Goldensons.  Furthermore, we will seek a jury instruction from the Court that, by virtue of its assertion of the attorney-client privilege as a bar to the production of subpoenaed documents to the Goldensons, it may be fairly inferred that STB has not represented the Goldensons' interests in this matter and did not provide legal services on their behalf.  The Goldensons will also offer evidence that, in fact, STB has served as legal counsel to Steffens and Ho in the very matter that gave rise to the Subpoena.

Letter dated December 8, 2011, from Thimi R. Mina to James Kreissman ("12/8/11 Mina Letter") (ECF No. 107-3), Exh. C to Spears Decl., at 2.  Kreissman did not respond to that letter because he did not believe that any response was sought or required.  *See* Kreissman Decl. ¶ 8. There was no further contact between the plaintiffs and STB until the plaintiffs filed a motion to compel in the S.D.N.Y.  *See id.* ¶ 9.

On or about February 9, 2012, the plaintiffs served the Second RFP on the defendants. *See* Second RFP at 12.  Paragraph 13 of the Second RFP sought:

All documents and items of ESI depicting or concerning communications occurring among or between Spring Mountain and Simpson, Thacher and Bartlett LLP regarding the transactional, structural, regulatory and litigation issues for which Spring Mountain sought their legal advice on behalf of Spring Mountain's investors between December 1, 2008 and the Present.

Second RFP, Document Requests, ¶ 13 ("Second RFP No. 13").[1]  On February 28, 2012, the defendants filed a motion for a protective order with respect to 12 of the 13 requests set forth in

---

[1] "Spring Mountain" was broadly defined to include the three defendant Spring Mountain entities, a fourth Spring Mountain entity, all funds owned or operated by those entities, and a variety of Spring Mountain personnel,

the Second RFP – all but Second RFP No. 13 – on the basis that the plaintiffs sought documents relating solely to a theory of wrongdoing, the so-called "misallocation theory," that had not been pleaded in their complaint.  *See* Defendants' Motion for a Protective Order Relating to Plaintiffs' Second Request for the Production of Documents and Things (ECF No. 89) at 1.

On March 6, 2012, in the S.D.N.Y., the plaintiffs filed an omnibus motion dated March 2, 2012, to compel responses to several subpoenas served in that district in connection with the instant action, including the STB subpoena.  *See* Notice of Motion To Compel the Production of Documents Pursuant to Fed. R. Civ. P. 45(c)(2)(B)(i) ("Motion To Compel/S.D.N.Y.") (ECF No. 1), *In re Goldenson Subpoena Enforcement Action*, No. 1:12-mc-68-P1 (S.D.N.Y.) ("*New York Action*").  In an accompanying memorandum of law, they argued that STB had withheld the requested documents under an "unlawful claim of privilege" in that an attorney-client relationship existed between themselves and STB and, alternatively, they were entitled to pierce the privilege by virtue of the so-called fiduciary exception, or *Garner* doctrine.  *See* Memorandum of Law in Support of Movants' Motion To Compel the Production of Documents Pursuant to Fed. R. Civ. P. 45(c)(2)(B)(i) (ECF No. 2), *New York Action*, at 15-17.

On or about March 12, 2012, the defendants served a written response to the Second RFP, objecting to each of the 13 requests contained therein.  *See generally* Second RFP Objections.  They objected to Second RFP No. 13 on grounds, *inter alia*, that it was overly broad, unduly burdensome, called for the production of irrelevant documents, and called for the production of documents protected by the attorney-client privilege and/or the work-product doctrine.  *See id.*, Specific Objections, ¶ 13.

After the plaintiffs filed their motion to compel in the S.D.N.Y, STB and others contacted the plaintiffs' counsel to suggest a "meet and confer" to better understand the

plaintiffs' position, what documents they were seeking, and to determine whether any compromise could be reached. *See* Kreissman Decl. ¶ 10. STB, among others, participated in a telephone conference with the plaintiffs' counsel on March 15, 2012. *See id*. ¶ 11. Kreissman asked the plaintiffs' counsel to explain what information they wanted and why they needed it. *See id*. The plaintiffs' counsel did not provide any information in response to that request. *See id*. At the end of the teleconference, the plaintiffs' counsel stated that they would consider withdrawing the motion to compel as against STB if STB stipulated that it had not been retained to represent the plaintiffs. *See id*. Although Kreissman agreed to so stipulate, the plaintiffs' counsel decided to proceed with a hearing on the motion to compel. *See id*.

As of March 19, 2012, STB had identified almost 100 custodians who had files containing documents that might be responsive to the Subpoena. *See id*. ¶ 12. Kreissman estimated that it would take several weeks to collect, cull, and stage documents from these custodians' files, including emails, before even beginning a labor-intensive privilege and responsiveness review. *See id*. He estimated that it would cost more than $100,000 in attorney and staff time and related expenses to respond to the Subpoena. *See id*. ¶ 14.

On March 19, 2012, STB filed its opposition to the plaintiffs' motion to compel in the S.D.N.Y., a 25-page memorandum of law accompanied by the declarations of Kreissman and Sharp as well as David Spears, one of the defendants' attorneys in the instant action. *See* Simpson Thacher & Bartlett LLP's Memorandum of Law in Opposition to Motion To Compel the Production of Documents ("STB Opposition/S.D.N.Y.") (ECF No. 19), *New York Action*; Declaration of James G. Kreissman in Opposition to the Motion To Compel the Production of Documents from Simpson Thacher & Bartlett LLP (ECF No. 20), *New York Action*; Declaration of Tara C. Sharp in Opposition to the Motion To Compel the Production of Documents from

Simpson Thacher & Bartlett LLP (ECF No. 21), *New York Action*; Declaration of David Spears in Opposition to the Motion To Compel the Production of Documents from Simpson Thacher & Bartlett LLP ("Spears Decl./S.D.N.Y.") (ECF No. 22), *New York Action*.

STB argued that (i) the plaintiffs never had been its clients and had failed to make the showing necessary to invoke the fiduciary exception, (ii) the fiduciary exception bears only on the attorney-client privilege, not on work-product protection, and (iii) it would be an undue burden to collect and produce the requested nonprivileged documents. *See* STB Opposition/S.D.N.Y. at 7-25. In his declaration, Spears informed the S.D.N.Y. that the plaintiffs had sought the same privileged documents directly from the defendants in the instant action and that, after the defendants had formally objected, the plaintiffs had taken no further action. *See* Spears Decl./S.D.N.Y. ¶¶ 14-15. He also stated that, while the plaintiffs had requested STB's documents directly from the defendants, they had not diligently pursued discovery in the Maine action, instead choosing to "end-run" that action, including its then-March 23, 2012, discovery deadline, by bringing the subpoena enforcement action in the S.D.N.Y. *See id.* ¶¶ 3, 15.

On March 22, 2012, I convened a hearing on three pending motions, during which, *inter alia*, I denied the defendants' motion for a protective order but directed counsel for the parties to meet and confer no later than April 5, 2012, to narrow the scope of the Second RFP sufficiently to enable the defendants reasonably to produce all documents responsive to that RFP, as narrowed, by April 23, 2012. *See* March Order at 6-8. I further directed that, to the extent that any dispute remained, the parties submit to me by noon on April 9, 2012, letters describing their positions on any such remaining disputes. *See id.* at 8. At the conclusion of the hearing, I enlarged the parties' discovery deadline to May 7, 2012. *See id.* at 8.

During the course of that four-hour hearing, the following colloquy took place:

10

MR. MINA: Your Honor, do I understand from the defendants that their objection or participation in the Southern District of New York with respect to the discovery of the subpoena enforcement action pending down there does not involve an objection to our subpoena to depose Mr. Merkin? Because even though this Court does not have the authority to order Mr. Merkin's deposition in the Southern District –

THE COURT: Or the stomach to get involved.

MR. MINA: Or the stomach to get involved, I think it impacts greatly and it would be very helpful to present to Judge Wood, the presiding judge in the Southern District, that the defendants do not object to us taking Mr. Merkin's deposition or that they do.

MR. SPEARS: Your Honor, we haven't seen their reply papers. I don't know if we're going to be allowed to intervene. I'm not limiting – I have no idea what's going to happen on this.

We asked to intervene with regard to the Simpson Thacher subpoena. I'm not – who knows what they are going to represent to the Court about Merkin and what we've said and what we've done. I'm not giving him the right to ever represent to anyone what my position is on anything.

THE COURT: All right. Let me say this. I'm obviously not going to get involved in a motion to quash that's pending in the Southern District with regard to Mr. Merkin.

What I've done is I've moved this discovery deadline to run past the date, not necessarily because of the notice of Mr. Merkin's deposition but simply note that the discovery deadline now in this case is subsequent to the date that's been noticed for Mr. Merkin's deposition so that should not be a hindrance[.]

Transcript of Proceedings of March 22, 2012 ("March 22 Hearing Transcript") (ECF No. 107-6),

Exh. F to Spears Decl., at 150-51.

On March 26, 2012, the plaintiffs filed their reply brief in support of their motion to compel in the New York action. *See* Movants' Consolidated Replies to Respondents' Oppositions to Movants' Motion To Compel the Production of Documents ("Reply/S.D.N.Y.) (ECF No. 30), *New York Action*. The plaintiffs clarified that they did not request attorney work-product information and did not expect STB to produce its own internal notes, communications,

and documents.  *See id*. at 10.  They agreed that, to the extent that STB represented Steffens and

Ho personally, the documents sought were privileged.  *See id*.  They continued to press for other

privileged and nonprivileged documents.  *See id*. at 11-16.  In the context of challenging Spears'

representation that they had failed to diligently pursue discovery in the Maine action, *see id*. at

15, they relied on a declaration of one of their attorneys stating:

> The Movants have also sought this information [STB documents] from the Spring
> Mountain Defendants.  On or about February 9, 2012, the Movants[] served the
> Spring Mountain Defendants with a second document request that sought, in part,
> the very same documents.  Mr. Spears, in his declaration to the Court, did not
> mention that the Spring Mountain Defendants immediately moved for protection
> from this request, which the Movants opposed.  On March 22, 2012, the United
> States District Court for the District of Maine denied the Spring Mountain
> Defendants' motion, but declined to insert itself into the issue of privilege now
> pending before this Court.

Declaration of Alfred C. Frawley IV in Support of Movants' Consolidated Replies to

Respondents' Opposition to Movants' Motion To Compel the Production of Documents

("Frawley Decl./S.D.N.Y.") (ECF No. 31), *New York Action*, ¶ 22.

On March 27, 2012, in response to this court's oral order that the parties meet and confer

concerning the Second RFP, the plaintiffs' counsel sent the defendants' counsel proposals for

narrowing the scope of the Second RFP, stating, with respect to Second RFP No. 13, "We expect

this request to be resolved in the Southern District of New York next week."  Email dated March

27, 2012, from Alfred Frawley to James Kilbreth, David Spears, and Michelle Skinner (ECF No.

107-8), Exh. H to Spears Decl.  In a responsive email the following day, James Kilbreth, one of

the defendants' attorneys, did not mention either Second RFP No. 13 or the New York action.

*See* Email dated March 28, 2012, from James Kilbreth to Alfred Frawley, David Spears, and

Michelle Skinner (ECF No. 108-3), Exh. C to Plaintiffs' Opposition to Defendants' Motion for

Sanctions and an Award of Costs Incurred in Opposing Plaintiffs' Motion To Compel Against Simpson, Thacher & Bartlett LLP ("Opposition/Sanctions") (ECF No. 108).

On April 2, 2012, following United States District Court Judge Barbara S. Jones' March 27, 2012, grant of their motion to intervene as of right in the New York action, the defendants filed an opposition to the plaintiffs' motion to compel the production of documents from STB. *See* Order (ECF No. 32), *New York Action*; Spring Mountain Intervenors' Opposition to Motion To Compel Production of Documents from Simpson Thacher & Bartlett, LLP ("Intervenors' Opposition/S.D.N.Y.") (ECF No. 37), *New York Action*.   The defendants argued that this court, not the S.D.N.Y., should resolve the dispute over the plaintiffs' request for STB documents in view of the simultaneous and overlapping requests for such documents in the Maine and New York actions and this court's greater familiarity with this complex and contentious case.  *See* Intervenors' Opposition/S.D.N.Y. at 2-3.   The defendants complained that the plaintiffs had mischaracterized the record in the Maine action in their quest to bring the complicated privilege dispute before the S.D.N.Y. by intimating that (i) the plaintiffs' motion for a protective order encompassed Second RFP No. 13, when it did not, and (ii) this court had "declined" to address the issue of privilege, when it had not.  *See id*. at 6-7.

On April 3, 2012, Judge Jones held a hearing in the omnibus subpoena enforcement proceeding, stating at the outset:

> I've had a conversation with Judge Rich in Maine, and he and I are in agreement that the motion to compel document production from Simpson Thacher is something that is not an issue.  The attorney/client privilege issue is not one that should be resolved in this court and it should be handled in Maine when you next have your appearance there with respect to your original request, or the plaintiff's original request for documents directly from the party whose privilege it is.  So I'm dismissing the motion to compel.

Transcript of Proceedings of April 3, 2012 ("Transcript/S.D.N.Y.) (ECF No. 108-4), Exh. D to

Opposition/Sanctions, at 4.  The following colloquy then took place:

> MR. McCLOSKEY:  Your Honor, we understand the court's order.  I just want to make sure the court understands that we raised that issue at the last discovery conference and we told him we were down here on that matter, and he didn't – we didn't argue that issue, but I just wanted you to know it did come up while we were in Maine.[2]
>
> THE COURT:  I'm not imputing any bad faith to you –
>
> MR. McCLOSKEY:  No, I understand.  I just want [you to] know that.
>
> THE COURT: – but I spoke to him about an hour and a half ago.
>
> MR. McCLOSKEY:  That's fine.
>
> THE COURT:  Okay.  So the motion to compel with respect to Simpson Thacher is dismissed.

*Id*. at 4-5.

On or about April 9, 2012, the parties submitted letters to me confirming that they had

reached agreement with respect to all of the document requests contained in the Second RFP

except for Second RFP Nos. 9 and 13.  *See* ECF No. 103 at 2.  I scheduled the April 12, 2012,

teleconference with counsel, during which, with respect to Second RFP No. 13, I set a briefing

schedule for both the motion to compel and the motion for sanctions.  *See id*. at 4.  I directed

that, in their motion to compel, the plaintiffs address, *inter alia*, "the narrowing of RFP No. 13

with a view to permitting a relatively quick document production to the extent that the motion to

compel is granted."  *Id*.

---

[2] Jay McCloskey is one of the plaintiffs' attorneys.

### III.  Discussion

### A.  Motion To Compel

The plaintiffs seek an order compelling the defendants to produce documents responsive to Second RFP No. 13, narrowed as follows:

> Between December 1, 2008 and April 6, 2009, all documents and communications within the Defendants' custody or control, including without limitation communications in the possession of their agent STB, depicting or concerning STB's provision of Madoff-related legal or investigative services to Spring Mountain, LLC, Spring Mountain, L.P., Spring Mountain G.P., LLC, Spring Mountain Partners QP 1, L.P. and/or any general partner, manager, member or employee thereof, including without limitation, John L. Steffens, Gregory P. Ho and J. Ezra Merkin.

Declaration of Alfred C. Frawley IV in Support of the Plaintiffs' Motion To Compel the Production of Documents ("Frawley Decl.") (ECF No. 104-5), Exh. E to Motion To Compel, ¶ 10.[3]  To further narrow the scope of the request, they propose limiting it to communications involving six STB attorneys, including Kreissman.  *See id*. ¶ 11.  However, they also seek an order directing the defendants to request from STB the documents sought pursuant to the Subpoena.  *See* Motion To Compel at 1.

The plaintiffs seek to compel the production of these documents on the alternative bases that:

1.      As a result of the defendants' own communications, the plaintiffs reasonably understood that the defendants retained STB on behalf of their limited partners, including plaintiffs.  *See id*. at 1-2.  They merely seek communications pertaining to services rendered on their behalf.  *See id*. at 2.

---

[3] In his declaration, Frawley inadvertently stated that the plaintiff sought documents for the period ending April 6, 20**12**, rather than April 6, 20**09**.  *See* Frawley Decl. ¶ 10; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion To Compel the Production of Documents ("Reply/Compel") (ECF No. 110) at 4 n.2.  The plaintiffs corrected this error in their reply brief, *see* Reply/Compel at 4 n.2; however, the defendants did not have the benefit of that correction when responding to the Motion To Compel.  *See* Opposition/Compel at 1-2, 10.

2.      Alternatively, the defendants fail to make the requisite threshold showing that the attorney-client privilege applies to any of the documents sought, justifying the grant of the motion.  *See id.* at 2-5.[4]

3.      Alternatively, even if the requested documents are protected by some kind of an attorney-client relationship and privilege, the plaintiffs are entitled pursuant to the so-called *Garner* doctrine to pierce the privilege, given the defendants' fiduciary relationship with them. *See id.* at 5-10.

The defendants dispute that (i) the plaintiffs ever were STB's clients, (ii) they need make any threshold showing regarding attorney-client privilege given the plaintiffs' own description of the documents sought, and (iii)  the *Garner* doctrine applies.  *See* Opposition/Compel at 2-10. They add that, in any event, the Motion To Compel should be denied on the independent basis that the request for documents remains overbroad.  *See id.* at 10.

After careful consideration, I conclude that the defendants have the better argument.[5]

### 1.   Whether the Plaintiffs Were STB's Clients

The plaintiffs first contend that they are entitled to the production of the requested documents because, as a result of letters sent to them by the defendants in December 2008 and January 2009, they reasonably understood themselves to be STB's clients, and relied on that

---

[4] The plaintiffs argue, for the first time in their reply memorandum, that work-product protection does not bar their access to the requested documents.  *See* Reply/Compel at 2-5.  This argument could and should have been raised in their motion, as a result of which it is waived.  *See Kenney v. Head*, 670 F.3d 354, 359 (1st Cir. 2012) ("Arguments raised for the first time in a reply brief are waived.") (citations and internal quotation marks omitted).  In any event, as discussed below, it is unpersuasive.

[5] The plaintiffs argue, and the defendants do not contest, that federal law regarding the application of privileges applies in this mixed federal and state-law case.  *See* Motion To Compel at 2 n.2; Opposition/Compel at 2-10; *Madigan v. Webber Hosp. Ass'n*, No. 2:11-cv-94-JAW, 2012 WL 664754, at *4 (D. Me. Feb. 15, 2012) ("Where a federal civil action involves combined state and federal law claims, as here, and the asserted privilege is relevant to both claims, federal courts have consistently ruled that privileges are governed by federal law, not state law.") (citation and internal quotation marks omitted).

understanding.  *See* Motion To Compel at 1-2.  They point to the following letters sent to investors by Steffens and Ho in the wake of the revelation of the Madoff fraud:

      1.      A letter dated December 12, 2008, in which Steffens and Ho stated, *inter alia*:

> . . . We are actively investigating what our potential exposure is to Madoff Securities and related entities.
>
> Although we do not have any direct investments with Madoff Securities, some of our underlying managers do have exposure.  If those managers are not able to recover their investments, our entities' returns will reflect losses we otherwise did not anticipate.  At this point, we are attempting to establish the size of the losses that may be suffered as a result of this tragedy and will continue to diligently follow all developments with the greatest emphasis on protecting our investors' assets.
>
> We will be in touch with you as soon as we have more information and will continue to act in your best interest during this trying time.

Letter dated December 12, 2008, from John L. Steffens and Gregory P. Ho to Investor ("12/12/08 Steffens/Ho Letter") (ECF No. 104-1), Exh. A to *id*.;

      2.      A letter dated December 15, 2008, in which Steffens and Ho acknowledged that some funds were exposed to the Madoff Securities loss and announced the retention of STB, stating, *inter alia*:

> Since the announcement of the Madoff Securities fraud, we have taken affirmative steps to protect our interests.  We have retained Simpson Thacher & Bartlett LLP to provide us with legal advice concerning all transactional, structural, regulatory and litigation issues that may arise in connection with this matter.  Simpson Thacher is one of the nation's most highly regarded and sophisticated law firms.  Our team at Simpson Thacher consists of attorneys with expertise in advising victims of financial fraud, working with regulatory and criminal authorities in connection with ongoing investigations, and analyzing all aspects of investment structures, such as ours, in order to maximize their stability and prospect for future success.
>
> We are evaluating other steps to be taken in order to protect the Fund's assets and expect to have further announcements within the next few days.

> The partners and employees of Spring Mountain Capital have over $130 million invested across our funds and alongside investor assets and have not at any point this year removed our capital.

Letter dated December 15, 2008, from John L. Steffens and Gregory P. Ho to Investor ("12/15/08 Steffens/Ho Letter") (ECF No. 105-1), Exh. B to Motion To Compel;

   3.   A letter dated December 22, 2008, in which Steffens and Ho stated, in the context of announcing a new strategy to disengage from "pooled investment vehicles" and move to "actively managed accounts[,]" suspending all redemptions from the QP 1 Fund and commencing an "orderly realization" of its assets:

> Spring Mountain Capital's partners and employees will share the outcome with you – both as stewards of your money and as one of the largest investor groups in the investment vehicles we have created.  We assure you that none of our capital will be returned to us with any priority over your funds.

Letter dated December 22, 2008, from John L. Steffens and Gregory P. Ho to Investor ("12/22/08 Steffens/Ho Letter") (ECF No. 104-3), Exh. C to Motion To Compel, at 2-4;

   4.   A letter dated January 7, 2009, in which, in the context of providing an update on the implementation of the new QP 1 Fund strategy, Steffens and Ho stated:

> The decision to dramatically change the way we manage hedge fund capital was not an easy one.  It involves a comprehensive change in the way we manage money; but we firmly believe that it is the responsible thing to do as fiduciaries of the assets that you have placed under our care.

Letter dated January 7, 2009, from John L. Steffens and Gregory P. Ho to Investor ("1/7/09 Steffens/Ho Letter") (ECF No. 105-2), Exh. D to Motion To Compel, at 3.

   The plaintiffs contend that, "[t]o the extent that STB represented the QP 1 Fund because of its 'expertise in advising victims of financial fraud,' . . . the Fund's limited partners, including the plaintiffs, may in fact have had an attorney-client relationship with STB[.]"  Motion To Compel at 4 n.3 (quoting 12/15/08 Steffens/Ho Letter).

However, it is a "basic proposition that . . . when [a partnership] retains an attorney, the partnership is the client." *Rhode Island Depositors Econ. Prot. Corp. v. Hayes*, 64 F.3d 22, 27 (1st Cir. 1995). "Thus, an attorney for a partnership or for a general partner does not thereby undertake representation of limited partners." *Id*. "An attorney . . . may expressly or impliedly undertake simultaneous representation of the partnership and a partner or limited partners[,]" but "to imply a contract, including one between an attorney and a client, the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing has become his lawyer." *Id*.

As the defendants argue, *see* Opposition/Compel at 4, it is doubtful that the plaintiffs even subjectively considered STB their counsel. Despite their demonstrated anxiety to take immediate action to recover their losses following the Madoff fraud, they never communicated with STB about their supposed representation. *See* Declaration of Tara C. Sharp ("Sharp Decl.") (ECF No. 109-3), Exh. C to Opposition/Compel, ¶ 5 (stating that Daniel Goldenson "contacted Spring Mountain repeatedly, and more frequently than any other investor, following news of the Madoff fraud[,]" with his communications taking "an acrimonious tone soon after this news"; in addition to seeking "immediate redemption of his investment, Mr. Goldenson requested that Spring Mountain grant him preferential treatment vis-à-vis other Fund investors, and suggested that other investors would not have to know about any preferential treatment that was given to him"); Kreissman Decl. ¶ 5 (prior to filing Maine action, plaintiffs never contacted STB for purposes of obtaining legal advice).

In any event, the available objective evidence does not demonstrate that the plaintiffs were STB's clients. The letters on which the plaintiffs rely cannot reasonably be construed to so indicate. As the defendants point out, *see* Opposition/Compel at 5, Steffens and Ho differentiate

19

in those letters between "we," "us," and "our" (themselves and possibly the Spring Mountain entities) and "you," "our investors," and "your" (their investors/limited partners, among them, the plaintiffs). Although Steffens and Ho noted that STB had "expertise in advising victims of financial fraud," 12/15/08 Steffens/Ho Letter, that did not signal that STB was retained to represent the plaintiffs, particularly in circumstances in which Spring Mountain's partners and employees were among the largest investors in those vehicles and also were victims of the Madoff fraud, *see* 12/22/08 Steffens/Ho Letter.

At bottom, the letters suggest that Steffens/Ho/the Spring Mountain entities retained STB to assist *them* in dealing with a myriad of issues arising from Spring Mountain funds' exposure to the Madoff fraud. This is consistent with Kreissman's declaration that STB "has never been retained by, or provided legal counsel to, any of the limited partner investors in Spring Mountain Partners QP 1 (the "Fund") in connection with their investments in the Fund[,]" Kreissman Decl. ¶ 3, and Sharp's declaration that she contacted Kreissman on December 11, 2008, "to seek representation of various Spring Mountain entities in connection with Bernard Madoff-related and other issues[,]" Sharp Decl. ¶ 3. [6]

---

[6] The plaintiffs cite three cases for the proposition that, to the extent that STB represented the QP 1 Fund, it may have also had an attorney-client relationship with that fund's limited partners, including the plaintiffs, or at least have owed fiduciary duties to those limited partners, including the right to inspect the records of communications made on their behalf. *See* Motion To Compel at 4 n.3 (citing *Steinfeld v. Marks*, No. 96 CIV. 0552(PKL), 1997 WL 563340 (S.D.N.Y. 1997), *Pucci v. Santi*, 711 F. Supp. 916 (N.D. Ill. 1989), and *Roberts v. Heim*, 123 F.R.D. 614 (N.D. Cal. 1988)). To the extent that *Pucci* and *Roberts* hold that an attorney for a limited partnership is presumed to represent each individual partner, *see Pucci*, 711 F. Supp. at 927; *Roberts*, 123 F.R.D. at 624-25, they diverge from the First Circuit's well-reasoned decision in *Hayes*, *see Hayes*, 64 F.3d at 27, and I reject them on that basis. To the extent that *Pucci* also held that the plaintiffs/limited partners had adequately alleged the existence of a fiduciary relationship with the attorney for the limited partnership, *Pucci* is distinguishable in that, there, the plaintiffs alleged that they had a close relationship with that attorney and relied on his assurances that he was acting as their attorney in representing the partnership. *See Pucci*, 711 F. Supp. at 927-28. There is no evidence that the plaintiffs ever had any communication with STB. To the extent that the court in *Steinfeld* held that the plaintiff/joint venturer had adequately alleged the existence of an attorney-client relationship between himself and the attorney who represented the joint venture, *Steinfeld* is distinguishable in that the plaintiff alleged "facts sufficient to support the existence of an attorney-client relationship[,]" including that the plaintiff personally hired the attorney and the entity was a small joint venture consisting of only two constituents with equal interests. *See Steinfeld*, 1997 WL (*continued on next page*)

In these circumstances, the plaintiffs were not STB's clients. Therefore, they cannot access information shielded by the attorney-client privilege on that basis.[7]

## 2. Showing of Requisites of Attorney-client Privilege

As the plaintiffs observe, *see* Motion To Compel at 3, "the party seeking to invoke the attorney-client privilege must carry the devoir of persuasion to show that it applies to a particular communication and has not been waived[,]" *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 71 (1st Cir. 2011). "Whatever quantum of proof is necessary to satisfy this obligation, a blanket assertion of privilege is generally insufficient." *Id.*; *see also, e.g., Gerber v. Down East Cmty. Hosp.*, 266 F.R.D. 29, 32 (D. Me. 2010) (proponent of attorney-client privilege must expressly make claim of privilege and supply privilege log describing nature of documents withheld in a manner that, without revealing protected or privileged information, will enable other parties to assess the claim).

The plaintiffs argue that this court should grant their motion to compel because the defendants have made no attempt whatsoever to make the threshold showing of application of the privilege with respect to any particular withheld document. *See* Motion To Compel at 3-4. They point out that the defendants have neither identified withheld documents, disclosed who or what was/were STB's clients, nor offered evidence that any of the withheld documents reflects the seeking or provision of confidential legal advice or that the privilege was not waived. *See id.* at 4-5; *see also, e.g., Grand Jury Subpoena*, 662 F.3d at 71 (noting that "[a] failure to satisfy any one of the enumerated elements defeats the claim of privilege"; describing elements as: "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as

---

563340, at *5. The *Steinfeld* court took pains to point out that it did "*not* hold that an attorney for a joint venture always represents the individual joint venturers." *Id.* at *5 n.3 (emphasis added).

[7] The same is true of any assertion that, by virtue of their status as STB's clients, the plaintiffs are entitled to see documents that are subject to work-product protection.

such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived") (citations and internal quotation marks omitted).

Nonetheless, as the defendants suggest, *see* Opposition/Compel at 3, this is an unusual circumstance. The plaintiffs themselves request "all documents and communications within the Defendants' custody or control, including without limitation communications in the possession of their agent STB, *depicting or concerning STB's provision of Madoff-related legal or investigative services*" to various Spring Mountain entities and personnel. Frawley Decl. ¶ 10 (emphasis added). By definition, they seek documents shielded by the attorney-client privilege.[8] While it is conceivable that some small quantity of responsive documents might be unprotected, no useful purpose would be served in burdening the defendants to create a privilege log in advance of a ruling as to whether privileged documents, which form the core if not the totality of documents sought, even are accessible to the plaintiffs.

In these circumstances, the defendants' failure to identify all withheld documents, or to meet the customary burden of proving that attorney-client privilege attaches to each, does not warrant the grant of the motion to compel the production of those documents.[9]

### 3.  Applicability of *Garner* Doctrine

The plaintiffs finally alternatively seek access to the requested documents on the basis that the so-called *Garner* doctrine applies. *See* Motion To Compel at 5-10; *see also Garner*, 430

---

[8] As the defendants observe, *see* Opposition/Compel at 2 n.5, an attorney's "investigative" services can qualify as legal services for purposes of the attorney-client privilege, *see, e.g., Sandra T.E. v. South Berwyn Sch. Dist.*, 600 F.3d 612, 620 (7th Cir. 2010); *In re Allen*, 106 F.3d 582, 602 (4th Cir. 1997).

[9] The same analysis pertains with respect to the plaintiffs' forfeited assertion, in their reply brief, that the defendants make no evidentiary showing that any single communication is protected from disclosure by the work-product doctrine. *See* Reply/Compel at 2-5.

F.2d at 1103-04 (holding that a "corporation is not barred from asserting [the attorney-client privilege] merely because those demanding information enjoy the status of stockholders"; "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance") (footnote omitted); *Lugosch v. Congel*, 219 F.R.D. 220, 243 (N.D.N.Y. 2003) (observing that *Garner* doctrine "is not limited to the corporate realm nor shareholder derivative actions" and has been applied in cases, *inter alia*, involving both general and limited partnerships).

Under the *Garner* doctrine, "[w]hen a fiduciary retains an attorney to advise him in the exercise of his fiduciary responsibilities, his communications with that attorney are not absolutely protected from inquiry by the beneficiaries for whom the fiduciary performs." *Lawrence v. Cohn*, No. 90CIV.2396(CSHMHD), 2002 WL 109530, at *3 (S.D.N.Y. Jan. 25, 2002). This balance was struck because:

> On the one hand, management is under a legal obligation to serve the best interests of the corporation, and since the corporation is owned by its stockholders, it would seem anomalous to deny stockholders access to information ostensibly gathered for their own ultimate benefit. On the other hand, the complete removal of the attorney-client privilege from the grasp of the corporation client . . . would expose corporations to harassment suits by minority stockholders and a possible deterioration of candid attorney-client communication and effective corporate management.

*Cohen v. Uniroyal, Inc*., 80 F.R.D. 480, 483 (E.D. Pa. 1978).

"The *sine qua non* of the *Garner* Rule is that the actors in the fiduciary relationship have a 'mutuality of interest' in seeking advice." *Lugosch*, 219 F.R.D. at 243; *see also, e.g., In re Atl. Fin. Mgmt. Sec. Litig*., 121 F.R.D. 141, 146 (D. Mass. 1988) (in order for a fiduciary relationship to override the attorney-client privilege, "[t]he key element is the mutuality of interests between

a fiduciary and the beneficiary . . . at the time the communications to counsel are made").  The party seeking application of the *Garner* doctrine bears the burden of establishing a mutuality of interest.  *See, e.g., In re JP Morgan Cash Balance Litig*., No. 06 Civ. 0732 HB DFE, 2007 WL 1280623, at \*1 (S.D.N.Y. Apr. 30, 2007) ("There is general agreement that the burden of proving the preliminary facts of exceptions to the privilege is on the opponent of the privilege claim.") (citation and internal punctuation omitted).  A party seeking to pierce the privilege also bears the burden of establishing "good cause" to do so.  *See, e.g., Arcuri v. Trump Taj Mahal Assocs*., 154 F.R.D. 97, 109-10 (D.N.J. 1994).

### i.   The Parties' Arguments

In invoking the *Garner* doctrine, the plaintiffs argue that:

1.     The defendants have admitted that they acted as fiduciaries.  *See* Motion To Compel at 6; 1/7/09 Steffens/Ho Letter at 3 ("We firmly believe that [a described change] is the responsible thing to do as fiduciaries of the assets that you have placed under our care.").

2.     After the Madoff fraud, the plaintiffs and the defendants had a mutuality of interest in seeking advice on how to be made whole and hold those responsible to account.  *See* Motion To Compel at 6.  In any event, "[g]iven the increased standard of loyalty applied in the partnership context, a mutuality of interests must be presumed up until the point when the Defendants hired legal counsel in connection with the Maine action."  *Id*. at 8 (footnote omitted).

3.     Even if the parties had no mutuality of interest at the relevant times, the court should permit the piercing of the privilege on the basis that, "[w]here the fiduciary has conflicting interests of its own, to allow the attorney-client privilege to block access to the information and bases of its decisions as the persons to whom the obligation is owed would

allow the perpetration of frauds." *Id.* (quoting *Valente v. PepsiCo*, *Inc.*, 68 F.R.D. 361, 369 (D. Del. 1975) (footnote omitted)).

4.      Because the plaintiffs were limited partners rather than shareholders, they need not make a showing of good cause to pierce the privilege. *See id*. In any event, they do demonstrate good cause. *See id*. at 9-10.

The defendants dispute that they had a fiduciary relationship with the plaintiffs, but contend that, even assuming *arguendo* that they did, the *Garner* doctrine is unavailing because the plaintiffs fail to show either a mutuality of interest or good cause. *See* Opposition/Compel at 6-10 & n.9. I agree that the plaintiffs must make a showing of good cause, and fall short of doing so. That is dispositive of their bid to obtain privileged documents on the basis of the invocation of the so-called fiduciary exception, or *Garner* doctrine.

### ii.  Whether a Good Cause Showing Is Required

The plaintiffs cite three cases in support of the proposition that they need not make a showing of good cause to pierce any privilege attaching to the requested STB documents: *Lawrence*, *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400 (S.D.N.Y. 2006), and *Martin v. Valley Nat'l Bank of Ariz*., 140 F.R.D. 291 (S.D.N.Y. 1991). *See* Motion To Compel at 8-9. None of these cases helps them.

The court in *Omnicom* questioned whether plaintiffs in a securities-fraud lawsuit properly could invoke the doctrine *at all*, given that that they (i) were "seeking personal benefit and [were] not seeking to benefit the company, which is the intended beneficiary of fiduciary obligations owed by corporate management[,]" and (ii) had "complain[ed] of alleged misconduct injurious to them as members of the investing public rather than injurious to the corporation and its shareholders at the time of the misconduct." *Omnicom*, 233 F.R.D. at 412. The court went on

to find that, even *if* the plaintiffs could avail themselves of the *Garner* doctrine, for many of the same reasons, they failed to demonstrate the requisite good cause.  *See id.*

While the courts in *Martin* and *Lawrence* did dispense with a need for a showing of good cause to pierce the privilege, they did so in contexts other than that of a limited partnership, materially distinguishing those cases.  *See Martin*, 140 F.R.D. at 326 (holding that good cause need not be shown to pierce attorney-client privilege with respect to a trustee-beneficiary relationship in an ERISA benefits suit; noting that, whereas, in a corporate setting, officers serve the corporation directly but the shareholder only indirectly, and there are likely to be significant differences of interest among different classes of shareholders, "in a trustee relationship there exists no legitimate need for a trustee to shield his actions from those whom he is obligated to serve.") (citation and internal punctuation omitted); *Lawrence*, 2002 WL 109530, at *4-*5 (holding that good cause need not be shown to pierce attorney-client privilege with respect to a relationship between an executor of an estate and an estate's beneficiaries, there being "no legitimate need for a fiduciary to shield his actions from those whom he is obligated to serve") (citations and internal punctuation omitted).

By contrast, as the defendants point out, *see* Opposition/Compel at 8, courts considering the application of the *Garner* doctrine in the limited partnership context have held that limited partners must show good cause to access privileged documents, *see, e.g., Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469, 475 n.5 (4th Cir. 1992) (affirming district court's finding that limited partners had not shown good cause, pursuant to the *Garner* doctrine, to pierce attorney-client privilege asserted by general partners); *In re M-L Lee Acquisition Fund II, L.P. & M-L Lee Acquisition Fund (Ret. Accounts) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 563-64 (D. Del. 1994) (declining to grant limited partners "an absolute right to disclosure of privileged

communications"; concluding that the "better approach is to afford privileged communications between general partners and limited partnership counsel qualified protection" and require a showing of good cause); *Ferguson v. Lurie*, 139 F.R.D. 362, 366 (N.D. Ill. 1991) ("[L]imited partners should not be exempt from *Garner*'s requirement of showing good cause before obtaining" otherwise privileged documents.).

Therefore, to avail themselves of the *Garner* doctrine, the plaintiffs must make a showing of good cause to pierce the attorney-client privilege.

### iii.  Whether a Good Cause Showing Is Made

The *Garner* court described the elements of a good cause showing as follows:

> There are many indicia that may contribute to a decision of presence or absence of good cause, among them the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

*Garner*, 430 F.2d at 1104.

The plaintiffs contend that they meet this test in that (i) they were among only 50 non-related investors in the QP 1 Fund in 2008 and were unique investors, having had a long-standing personal relationship with defendant Steffens and having independently invested with Spring Mountain partner Merkin at Steffens' suggestion and direction, (ii) their claims are colorable because they have survived a motion to dismiss and because the defendants admitted, in Steffens' and Ho's January 7, 2009, letter, that they are "fiduciaries," (iii) they have a

substantial need for these communications, which they have attempted to get from all available sources," to see exactly why the defendants retained STB, who STB represented, whether advice contrary to the plaintiffs' best interests was given, whether the facts comport with the statements made to limited partners, and the extent to which the plaintiffs' interests were subordinated to the personal and conflicting interests of their general partners and investment advisors, (iv) these communications could be evidence of corporate action of "doubtful legality" because they are relevant to the plaintiffs' theory that the defendants misrepresented the QP 1 Fund's Madoff-related losses to investors and federal authorities, (v) the plaintiffs seek communications relating to past actions, not this lawsuit, and do not seek communications between the defendants and their current counsel, (vi) the plaintiffs have significantly narrowed the scope of their document request by identifying communications involving specific persons during a specific time period about a specific subject matter, (vii) there is no risk of disclosure of sensitive information, given the existence of the parties' consent confidentiality order, and (viii) the plaintiffs have demonstrated good cause because of their reliance on their fiduciary relationship with the defendants, who subordinated the plaintiffs' interests to their own interests and those of their partner, Merkin.  *See* Motion To Compel at 9-10.

Nonetheless, the defendants adduce evidence that the plaintiffs' holdings represented less than 2 percent of the QP 1 Fund.  *See* Sharp Decl. ¶ 8.  Their small stake, together with their self-described status as "unique investors" and their bringing of suit for their own personal benefit, potentially in conflict with the interests of other QP 1 Fund investors, weigh against a finding of good cause.  *See, e.g., Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1415 (11th Cir.), *modified on reh'g on other grounds*, 30 F.3d 1347 (11th Cir. 1994) (observing, "Although many of the factors listed in *Garner* appear to support the plaintiffs' argument that there is good

cause for discovery, two factors foreclose it: the fact that only a tiny percentage of the defendant Union's members are members of the plaintiff class; and the fact that the interest of the plaintiff class is adverse to those who are not in the class."); *Ward v. Succession of Freeman*, 854 F.2d 780, 786 (5th Cir. 1988) (plaintiffs' mere 4 percent ownership stake weighed against finding of good cause, particularly when, unlike in the case of a shareholder derivative suit, plaintiffs sought damages for themselves); *Mui v. Union of Needletrades, Indus. & Textile Emps.*, No. 97 CIV. 7270 HB KNF, 1998 WL 915901, at *2 (S.D.N.Y. Dec. 30, 1998) (declining to pierce privilege when, although many of the *Garner* factors seemed to support good cause, two factors militated against suspending the privilege: the fact that the plaintiffs were only three in number and did not represent a large class of union members, and an insufficient showing that the information sought could not be secured from other sources). Nor do the defendants demonstrate a "substantial need" for particularized documents. Rather, they indicate a desire to embark on what is essentially a broad search: an inspection of a still broad range of documents with a view to determining whether any happen to buttress a conclusion that the defendants acted against their best interests.[10]

---

[10] The plaintiffs make an argument for the first time in their reply memorandum that the defendants' decision to charge STB's legal fees to their investors conveys good cause to review the requested documents "to determine exactly why and to what extent STB and the Defendants were speaking out of both sides of their mouths and the extent to which the Plaintiffs were damaged as a consequence." Reply/Compel at 6-7. They point to evidence submitted with their reply that, as of June 14, 2011, the defendants were still charging 20 percent of STB's legal fees to the QP 1 Fund. *See id.* at 7; Exh. D (ECF No. 110-4) thereto. They state: "Simply put, the Plaintiffs *have been paying for the defense of a lawsuit they brought.*" *Id.* at 7 (emphasis in original). From all that appears, this argument, and the evidence on which it is based, could have been presented in the plaintiffs' motion. Thus, the plaintiffs' failure to raise this point effectuates a waiver. *See Kenney*, 670 F.3d at 359. In any event, it is unclear why the plaintiffs have a substantial need of the requested documents for this purpose. Assuming *arguendo* that their claim regarding legal fees is sufficiently pleaded in their complaint and has merit, they already have information indicating that, subsequent to the filing of the instant suit, the QP 1 Fund was being charged a proportionate share of STB's legal fees. While they profess a need to discover at what point STB no longer represented their interests, STB has been clear that it never was retained to represent them, *see* Kreissman Decl. ¶ 11, and both STB and the defendants have argued that there was no "mutuality of interest," for purposes of application of the *Garner* doctrine, at any time after STB was retained, *see* STB Opposition/S.D.N.Y. at 10-13; Opposition/Compel at 6-7.

For these reasons, the plaintiffs' reliance on invocation of the *Garner* doctrine to gain access to the requested documents is unavailing.[11]

### 4.   Continuing Overbreadth of Request

The defendants offer an independent reason why the court should not grant the Motion To Compel: that the plaintiffs have in some respects expanded the scope of their request. *See* Opposition/Compel at 10.

As the defendants observe, *see* Opposition/Compel at 10, the plaintiffs clarified in their reply brief filed in the New York action that they did not request work-product information, STB's notes, communications, or documents, or any communication to the extent that STB represented Steffens or Ho personally, *see* Reply/S.D.N.Y. at 10.   Their narrowed version of Second RFP No. 13 contains no such exclusions.   *See* Frawley Decl. ¶¶ 10-11.   Further, as the defendants point out, *see* Opposition/Compel at 2-3 n.5, the narrowed Second RFP No. 13 is, in at least one respect, broader than the original: it seeks documents depicting or concerning "legal or investigative services" rather than "legal advice."  *Compare* Frawley Decl. ¶ 10 *with* Second RFP No. 13.   The continuing overbreadth of Second RFP No. 13, which the defendants represent would have made their compliance with the discovery deadline impracticable, *see* Opposition/Compel at 10, further weighs in favor of the denial of the Motion To Compel.

For all of the foregoing reasons, the Motion To Compel is denied. [12]

---

[11] The *Garner* doctrine does not extend to attorney work product and, thus, does not afford a basis for obtaining such materials.  *See, e.g., Lugosch*, 219 F.R.D. at 243; *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 524 (S.D.N.Y. 2001).

[12] Because the plaintiffs' position in this matter was substantially justified, bearing on issues with respect to there is no controlling precedent in this circuit, I decline to order the plaintiffs and/or their attorneys to pay the defendants' reasonable expenses of opposing the Motion To Compel.  *See* Fed. R. Civ. P. 37(a)(5)(B).

**B.  Motion for Sanctions**

The defendants urge this court to exercise its inherent power to impose sanctions in the form of assessment of their costs, legal fees, and expenses, and those of STB, incurred in contesting the plaintiffs' motion filed in the New York action.  They argue that:

1.   The plaintiffs improperly commenced the action against STB on March 6, 2012, having (i) signaled to STB in December 2011 that they would not pursue the matter further, and (ii) sought substantially the same documents from the defendants on February 12, 2012, *see* Motion for Sanctions at 8-9;

2.   In the course of so doing, the plaintiffs misstated to the S.D.N.Y. and Judge Jones facts regarding the Maine action, *see id.* at 9; and

3.   The plaintiffs disregarded this court's order to meet and confer to narrow Second RFP No. 13, instead looking to the S.D.N.Y. to resolve the parties' dispute regarding access to STB documents, *see id.* at 9-10.

With respect to the first point, the defendants elaborate that (i) the plaintiffs admitted in the New York action that they sought, in part, the same documents from STB as they were seeking from the defendants in this court, *see* Motion for Sanctions at 6, (ii) it is well-established that a party should pursue discovery available from other parties before burdening a nonparty to an action, *see id.* at 8-9, (iii) the plaintiffs, who had abandoned their initial effort to obtain documents from STB and sought to obtain them from the defendants, had no legitimate reason to switch course again, *see id.* at 9, (iv) in so doing, the plaintiffs evidently hoped to secure a more favorable hearing from a judge less familiar with this case in the wake of a contentious discovery hearing before this court in February 2012, *see id.* at 2, 8, (v) the plaintiffs' tactics were costly for STB and the defendants, who were obliged to explain the background of this complex case to

31

the S.D.N.Y., *see id.* at 7; [Reply/Sanctions] (ECF No. 112) at 5-6, and, (vi) given its familiarity

with this case and its managed approach to discovery, this court was better positioned to decide

this matter, as Judge Jones readily found when she summarily dismissed the motion insofar as it

pertained to STB. *See* Reply/Sanctions at 5-6.

The plaintiffs oppose the motion on grounds that:

1.      They never signaled any intent to abandon enforcement of the Subpoena. *See*

Opposition/Sanctions at 2.

2.      They had legitimate reasons to pursue the motion to compel against STB despite

having requested some of the same documents from the defendants; for example, that (i) the

universe of documents sought from each was different, (ii) the issue of access to those

documents was not then before the Maine court, the defendants having not moved for a

protective order with respect to Second RFP No. 13, (iii) the S.D.N.Y., rather than this court, had

jurisdiction over the Subpoena, (iv) it was less burdensome for STB and the defendants to appear

in New York, their home district, and (v) the Second Circuit, unlike the First Circuit, had directly

addressed the *Garner* doctrine. *See id.* at 3-4 & n.2.

3.       Their statements to Judge Jones and the S.D.N.Y. were accurate and were based

on their reasonable understanding of what had transpired. *See id.* at 6 & n.6, 8-9.

4.      They complied with this court's order to meet and confer with the defendants

regarding Second RFP No. 13 and to bring any remaining dispute to this court's attention. *See*

*id.* at 9-10 & n.7.

The plaintiffs' simultaneous pursuit of a similar set of documents from STB in the

S.D.N.Y. and the defendants in this court was an aggressive, but not an abusive, discovery tactic.

As an initial matter, in their December 8, 2011, letter to STB, the plaintiffs did not renounce all

further efforts to enforce the Subpoena.  They reasserted their right to information concerning STB's representation, while warning of negative consequences to the defendants at trial as a result of STB's nonproduction of the requested documents.  Hedging their bets, they served a request for similar documents on the defendants on February 9, 2012, in time to meet the then-discovery deadline of March 23, 2012.  However, on March 6, 2012, with the discovery deadline looming, they chose to move to compel documents from STB in the S.D.N.Y, as part of an omnibus motion addressing several outstanding New York subpoenas.

At that time, there was no live issue before this court with respect to Second RFP No. 13, the defendants having moved for protection as to all requests in the Second RFP save No. 13 and having not, as yet, served their written response to the Second RFP.  It was not then reasonably foreseeable that Judge Jones would summarily dismiss the motion to compel as to STB on grounds that the Maine court was better suited to resolve the issues presented through the lens of Second RFP No. 13.

However, the complexion of these parallel matters changed after the defendants served their March 12, 2012, written response to the Second RFP, lodging numerous objections to the production of documents sought by No. 13, and after I directed the parties, during the March 22, 2012, hearing, to meet and confer with respect to *all* requests contained in the Second RFP.  In "meeting and conferring" by email on March 27, 2012, the plaintiffs reasonably took the position that they expected any issue over Second RFP No. 13 to be resolved in the S.D.N.Y. the following week, when a hearing was scheduled before Judge Jones.  Tellingly, in responding the same day, the defendants voiced no problem or concern with that position.

The plaintiffs represent, and I accept, that they intended to narrow the scope of Second RFP No. 13 if Judge Jones ruled in their favor and withdraw it if Judge Jones ruled against them.

33

*See* Opposition/Sanctions at 7-8.  As it happened, when Judge Jones summarily dismissed their motion to compel as against STB, they engaged in negotiations with the defendants with respect to the scope of Second RFP No. 13, and submitted, by the deadline of April 9, 2012, a letter outlining their position.  *See id*. at 9-10 & Exhs. E (ECF No. 108-5), F (ECF No. 108-6), and G (ECF No. 108-7) thereto; *see also* Reply/Sanctions at 5 ("The fact that after the New York Court had sent Plaintiffs packing, Plaintiffs actually did engage with Defendants on Request No. 13 is not in dispute[.]").  This was consistent with, not in defiance of, my oral order of March 22, 2012, as set forth in the March Order.[13]

Turning, finally, to the alleged misrepresentations made by the plaintiffs to Judge Jones and the S.D.N.Y., I do not find that the plaintiffs' counsel misrepresented to Judge Jones, at the April 3, 2012, hearing, that this court knew about the plaintiffs' motion to compel against STB and was "fine with it."  Motion for Sanctions at 7.  The plaintiffs' counsel indicated that this court was aware of the New York action and had not suggested that it was improper, although the issue of its propriety had not been argued.  *See* Transcript/S.D.N.Y. at 4.  That is an accurate statement.

However, I do find the following statement, submitted as part of the plaintiffs' reply in support of their motion to compel the production of documents from STB, misleading:

> On or about February 9, 2012, the Movants[] served the Spring Mountain Defendants with a second document request that sought, in part, the very same documents.  Mr. Spears, in his declaration to the Court, did not mention that the Spring Mountain Defendants immediately moved for protection from this request, which the Movants opposed.  On March 22, 2012, the United States District Court for the District of Maine denied the Spring Mountain Defendants' motion, but declined to insert itself into the issue of privilege now pending before this Court.

---

[13] While, clearly, it would have been more efficient and less costly to the defendants and STB for the plaintiffs to have litigated the issues raised by Second RFP No. 13 in this forum alone, it bears noting that the defendants in this matter were able to make productive use of much of the work that they and STB performed in the New York action.

Frawley Decl./S.D.N.Y. ¶ 22. This leaves the misimpression that (i) the defendants' motion for protection concerned Second RFP No. 13, which was explicitly carved out from that motion, and (ii) this court, in the context of denying that motion, expressly considered but declined to rule on the issue of privilege raised by both Second RFP No. 13 and the motion to compel against STB. In fact, this court heard no argument concerning the invocation of the attorney-client privilege with respect to the STB documents and neither ruled, nor declined to rule, on any such matter.[14]

This misleading statement is troubling, and the plaintiffs' counsel would be well-advised to exercise greater care in characterizing court rulings. However, in the absence of any indication that Judge Jones or the S.D.N.Y. was actually misled, or that STB or the defendants were otherwise prejudiced, the statement does not, standing alone, warrant the sanction of the requested imposition of costs and fees.[15]

Accordingly, I recommend that the Motion for Sanctions be denied.

### IV. Conclusion

For the foregoing reasons, I **DENY** the Motion to Compel and recommend that the motion for sanctions be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

---

[14] This is evident from a perusal of the hearing transcript excerpt that the plaintiffs cite as justification for their representation. *See* Opposition/Sanctions at 6 n.6. In that passage, this court merely commented, in the context of adjusting the discovery deadline, that it would not get involved in a motion by Merkin to quash a deposition that the plaintiffs sought to take in New York. *See* March 22 Hearing Transcript at 150-51.
[15] In their opposition to the motion to compel in the New York action, the defendants highlighted the very inaccuracies that I have described. *See* Intervenors' Opposition/S.D.N.Y. at 6-7.

Dated this 31st day of May, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge