**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **DANIEL R. GOLDENSON,** et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | Docket No. 2:10-CV-440-JAW |
| | ) | |
| **JOHN L. STEFFENS,** et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT/KUMHO* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PATRICK E. CONROY**

**COME NOW** the Plaintiffs, by and through their undersigned attorneys, in opposition to the Defendants' Motion to Exclude the Expert Testimony of Patrick E. Conroy under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (Docket No. 167) (the "Defendants' Motion").

**I.    BACKGROUND**

Dr. Patrick E. Conroy, Ph.D., is a forensic financial analyst who performs quantitative analyses of the trading strategies, allocations and valuations of hedge fund securities as well as non-quantitative analyses relating to the financial management and structure of these funds. Dr. Conroy's expertise in these areas is essential to the factfinder's proper understanding of how, when and where the Defendants reported Madoff-related losses to their investors. Specifically, the Plaintiffs offer Dr. Conroy to aid the factfinder's understanding of the complex financial reporting practices employed by the Defendants between January, 2007 and December, 2008 and the sudden change in those practices when it came to reporting Madoff-related losses. *See generally Pls.' Supp. to the Expert Witness Designation of Patrick E. Conroy, Ph. D.* at 3-5 (Docket No. 167-2) ("Dr. Conroy's Supplementation"). Dr. Conroy's expert testimony is also

essential to the factfinder's understanding of the Defendants' December 15, 2008 correspondence to investors in the Spring Mountain Partners QP I Fund (the "QP I Fund" or the "Fund"), the sources, scope and magnitude of the Plaintiffs' Madoff-related losses and the nature of the Plaintiffs' investments in the QP I Fund and Ascot Partners, L.P. ("Ascot"). These key but complex facts are not readily discerned or explained without expert testimony.

## II.   LEGAL STANDARD

Under Fed. R. Evid. 702, "if an expert has scientific, technical, [or] other specialized knowledge that will assist the trier better to understand a fact in issue, and that knowledge rests on a reliable foundation, that testimony must be admitted." *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 57 (1st Cir. 2010) (internal citations and quotation marks omitted).  In other words, "an expert with appropriate credentials and an appropriate foundation for the opinion at issue must be permitted to present testimony" as long as that testimony is probative of the claims at issue.  *Pagés-Ramirez v. Ramirez González*, 605 F.3d 109, 115 (1st Cir. 2010)). (citing Fed. R. Evid. 401).  "[T]he question of admissibility 'must be tied to the facts of the particular case,'" *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25 (1st Cir. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 150), and "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, advisory committee notes.

## III.   ARGUMENT

The Defendants argue that the Court must exclude Dr. Conroy's expert testimony for two reasons.  First, the Defendants argue that because Dr. Conroy's findings carry "no significance," his testimony "would not be helpful to the jury, and would create the risk that the jury would draw unwarranted inferences of wrongdoing."  *Defs.' Mot.* at 6.  Second, the Defendants argue that Dr. Conroy cannot testify because he was unfamiliar with key facts at his deposition.  *See id.*

at 9-10.  Neither argument properly characterizes Dr. Conroy's expected testimony.

> **A.    *Dr. Conroy's Expert Testimony Will Be of Significance to the Factfinder in Resolving the Issues in this Case.***

The Defendants' main argument for the exclusion of Dr. Conroy's expert testimony is that he "spent much of his deposition conceding that he attributes no significance to the opinions offered in his designation." *Defs.' Mot.* at 3.[1]  The Plaintiffs, however, do not offer Dr. Conroy to opine on whether the Defendants' financial reporting of their investors' Madoff-related losses gives rise to wrongdoing; rather, the Plaintiffs offer Dr. Conroy to 1) report and explain, in terms that the factfinder can understand, the findings of his quantitative analyses of the securities held in the QP I Fund before and after the Madoff fraud; and 2) "help a jury understand unfamiliar terms and concepts.'" *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180 (S.D.N.Y. 2008) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d. Cir. 1991)).   Put simply, the Plaintiffs offer Dr. Conroy as an aid to "the trier of fact to better understand the evidence and provid[e] the trier of fact with the tools necessary to make an ultimate determination" of key issues in this case.  *Id.* at 181.

> **1.    Dr. Conroy's Expert Testimony Will Aid the Fact-Finder's Understanding of the Complex Terms, Concepts and Practices Inherent in Securities Cases.**

It is common practice in securities cases for federal courts to admit "expert testimony to assist the trier of fact in understanding trading patterns, securities industry regulations, and complicated terms and concepts inherent in the practice of the securities industry." *Id.* at 180. Specifically, Dr. Conroy's expert testimony is essential to the factfinder's proper understanding of 1) Ascot's historical portfolio holdings and the fact that they were always approximately

---

[1] The degree to which the Defendants opposed the Plaintiffs' inspection of Spring Mountain's financial documents and their repeated attempts to exclude Dr. Conroy from testifying at trial undermine their arguments that Dr. Conroy's opinions "signify nothing."  *Defs.' Mot.* at 4.

100% with Madoff; 2) the terms "hedge fund portion" and "private equity portion" and the difference between these two concepts; 3) the difference between the two types of reports – "Preliminary Performance Estimates" ("PPEs") and "flash" reports – that the Defendants sent to their investors to inform them of the performance of their investments and the typical relationship between these two reports; and 4) what these reports were intended to convey.  *See Dr. Conroy's Supp.* at 3-5.  Although the Defendants either offer to stipulate to some of these facts or concede that they are not disputed, *see Defs.' Mot.* at 7-8, "without industry context, the jury may have no understanding of the[ir] importance, or lack of importance" absent Dr. Conroy's expert testimony.  *Highland Capital Mgmt., L.P.*, 551 F. Supp. 2d at 185.  To arrive at his findings on these subjects, Dr. Conroy analyzed documents that "are studded with complex terminology, [which] a lay jury may well have difficulty understanding their meaning without the aid of expert testimony."  *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 462 (S.D.N.Y. 2010) (allowing an expert to summarize the content of hedge fund documents distributed to investors "because the content of these documents is both relevant to his testimony and is not unduly prejudicial").

Just because Dr. Conroy did not form an opinion one way or another as to any liability arising from the Defendants' reporting practices hardly means that his findings and testimony have no significance to the factfinder's resolution of the issues or proper understanding of the facts in this case.  Dr. Conroy's expert testimony will aid the factfinder's comprehension of complicated subjects when it comes time to evaluate the transparency with which the Defendants reported Madoff-related losses to their investors.  In this complex securities case, it is imperative to properly educate the factfinder about the historical performance of the funds at issue and the Defendants' general reporting of this performance so that the factfinder can properly evaluate the

4

evidence before it. *Cf.* Fed. R. Evid. 702, advisory committee notes ("[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case"). Simply put, Dr. Conroy's expert testimony will give the factfinder "the necessary context and framework" to evaluate the "complex and unfamiliar concepts" at issue in this case. *See First Marblehead Corp. v. House*, 541 F.3e 36, 44 (1st Cir. 2008).

### 2. Dr. Conroy's Expert Testimony Will Help the Fact-Finder Understand Facts that Are Probative of the Plaintiffs' Claims that the Defendants Breached Their Fiduciary Duties to the Plaintiffs.

Ironically, the Defendants fault Dr. Conroy for not reaching the same sort of "conclusions" that they claim require the Court to exclude the testimony of the Plaintiffs' fiduciary duty expert, Professor Arthur Laby. On the one hand, the Defendants argue that the Court must exclude Professor Laby's expert testimony because he offers conclusions about his findings, *see generally Defs.' Daubert/Kumho* Motion to Exclude the Expert Testimony of Arthur Laby (Docket No. 169) (the "Defendants' Laby Motion"); on the other hand, they argue that the Court must exclude Dr. Conroy's expert testimony because he does *not* offer conclusions about his findings. *See generally Defs.' Mot.* The Defendants' "heads you lose, tails I win" position mischaracterizes the expected testimony and purpose of *both* experts.

Professor Laby will testify to "the customs and practices of the [securities] industry." *Highland Capital Mgmt., L.P.*, 551 F. Supp. 2d at 180. On the subject of the Defendants' reporting of Madoff-related losses in their December 15, 2008 letter to QP I Fund investors, Professor Laby testified that "it's critically important at this point in time that [the Defendants] be correct because they're telling the investors now in the wake of exposing the [Madoff] fraud what their exposure is. . . . This letter has to be crystal clear with respect to exactly what the

losses were, when Spring Mountain learned of those losses down to – down to the dollar." *See Trans. Of the Dep. of Arthur Laby* at 52:3-6; 55:23-25 (Docket No. 169-4).

Dr. Conroy, on the other hand, is expected to testify that 1) Madoff-related losses were only incurred in the hedge fund portion of the QP I Fund, not the private equity portion; 2) the hedge fund portion of the Fund suffered Madoff-related losses that were greater than the percentage figure used in the Defendants' December 15, 2008 letter to investors; 3) the Fund also was exposed to Madoff-losses through its investment in the SMC Leveraged Fund, LLC, a fact this letter did not inform investors of; and 4) the Fund was not invested in Ascot Fund Limited, a fact this letter incorrectly reported as true. *See id.* at 5. He is also expected to compare the Defendants' reporting of their Madoff-related losses to the Defendants' reporting of market losses and the complicated inquiry required for a reasonable investor to ascertain: a) that Madoff losses were accounted for in November, 2008, rather than in December, 2008, as an investor would expect them to be; b) that the Defendants reported Madoff losses as a percentage of the investor's entire investment rather than a percentage of the hedge fund portion of that investment, as was the practice investors were accustomed to; and c) the actual dollar amount of money the investor lost in Madoff's Ponzi scheme, as opposed to some abstract percentage with no numerator or denominator. *See id.* at 3-5.[2] Absent Dr. Conroy's testimony, the Defendants' December 15, 2008 communication to investors was incomprehensible, which of course was its alleged objective.

In sum, Professor Laby will testify as to what the Defendants' standard of care was with regards to reporting their Madoff-related losses. Dr. Conroy will testify as to what the

---

[2] Although the Defendants argue on this point that Dr. Conroy's testimony is not helpful because "[t]he jury is more competent than an expert to determine what an ordinary investor could determine from the facts," *Defs.' Mot.* at 7 n.5., the point of Dr. Conroy's testimony is that he had to perform a forensic analysis to determine these facts based on the documents provided to investors, facts that an ordinary investor could *not* determine.

Defendants actually did by explaining to the factfinder precisely how, when and where the Defendants reported the Madoff-related losses. The factfinder will then decide whether the Defendants breached their fiduciary duties to the Plaintiffs in reporting their Madoff-related losses. Dr. Conroy's testimony is therefore essential to the factfinder's understanding of the Defendants' financial reporting practices when it comes time to evaluate whether the Defendants' actions breached their fiduciary duties to the Plaintiffs.

### 3. Dr. Conroy's Expert Testimony Will Help the Factfinder Understand Key Indirect Evidence of Wrongdoing.

Dr. Conroy's expected testimony will also help aid the factfinder's understanding of key indirect evidence of wrongdoing, i.e., that the Defendants 1) accounted for Madoff losses in November, 2008 rather than December; 2) purchased additional shares of Ascot Partners, L.P. ("Ascot") in the weeks leading up to the Madoff revelation while another, higher-risk fund sold Ascot; and 3) that the Defendants took incentive fees out of the Fund after the revelation of the Madoff fraud even though the Fund was purportedly frozen. The Defendants argue that this testimony could cause the factfinder to "draw unwarranted inferences of wrongdoing." *See Defs.' Mot.* at 5-6. In short, the Defendants are arguing that Dr. Conroy should not testify about evidence simply because it might be harmful to their defense.

In complex securities cases, "an expert can prove helpful to the trier of fact by providing him with indirect evidence" that the Defendants engaged in wrongdoing. *Cf. S.E.C. v. U.S. Envt'l Exch. Comm'n*, No. 94Civ.6608(PKL)(AJP), 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2012) (expert testimony helpful to the fact-finder "by providing him with indirect evidence of market manipulation"). Although the Defendants claim that Dr. Conroy's expected testimony "appears to invite the jury to infer something suspicious," *Defs.' Mot.* at 5-6, they do not explain why this is somehow impermissible. If the Plaintiffs present circumstantial evidence of the

Defendants' wrongdoing, any reasonable inferences the factfinder draws therefrom are not "unwarranted" so long as it is based on the facts. *See U.S. Envt'l Exch. Comm'n*, 2002 WL 31323832, at **4-5 (citing *United States v. Scop*, 846 F.2d 135, 140, *modified* 856 F.2d 5 (2d Cir. 1988) and *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977), *cert. denied*, 434 U.S. 861 (1977)).  Indeed, the Defendants appear to suggest that any probative testimony is inadmissible if it allows the factfinder to draw a negative inference against the Defendants.  This suggestion is diametrically opposed to the very foundations of the adversary process.

### 4.   Dr. Conroy's Expert Conclusions about the Defendants' December 15, 2008 Letter is an Admissible Expert Opinion.

Dr. Conroy is expected to testify that "the Defendants' December 15, 2008 correspondence to QP 1 investors was also misleading because [] it did not inform the Fund's investors that the Madoff-related loss was only incurred in the hedge fund portion of the fund, and not in the private equity portion," when historically the Defendants only reported the performance of the hedge fund portion of the Fund to investors.  *Dr. Conroy's Supp.* at 5.  The Defendants argue that Dr. Conroy cannot draw "the unsupported inference that a person who is accustomed to figures signifying one thing on certain reports that have a very specific and limited purpose will assume that other figures in a completely different report with a different purpose signify the same thing."  *Defs.' Mot.* at 7.  This claim is wrong as a matter of law.

Dr. Conroy only proposes to testify that "over time, when *one* historically would have looked at that number, they would have understood that [the performance percentage] would have been the hedge fund portion only.  *I* understood that was how it was previously reported over time.   Then, when a calculation was done using a different methodology, but the methodology wasn't described, *one* would still believe it was based on the hedge fund portion only, but, in fact, it included the private equity portion as well."  *See Conroy Dep. Tr.* at 50:7-17

(Docket No. 167-3) (emphasis supplied).  He does not propose to testify that the Plaintiffs were in fact misled, or that the misleading nature of this letter means that the Defendants are liable to the Plaintiffs. "[S]o long as [the expert] refrains from opining on the actual state of mind of the Plaintiffs, his opinions on these matters are admissible." *Pension Comm. of the Univ. of Montreal Pension Plan*, 691 F. Supp. 2d. at 467 (finding that expert testimony on "what would have been customary for the plaintiffs to expect or assume, not what they actually did expect or assume" was admissible so long as the expert does not opine on the "actual state of mind of the Plaintiffs).  Dr. Conroy's testimony that the Defendants' December 15th letter is misleading given the "reasonable expectations of investors" is admissible because it is a "factual conclusion that embrace[s] an ultimate issue [rather] than an ultimate legal conclusion." *See U.S. Envt'l Exch. Comm'n*, 2002 WL 31323832, at *4.

### B.   The Defendants' Argument that Dr. Conroy is Not Familiar with the Facts of this Case is a Subject for Cross-Examination, Not a Motion to Exclude.[3]

The Defendants also argue that the Court should exclude Dr. Conroy's expert testimony because he committed factual errors in his deposition.  *See Defs.' Conroy Mot.* at 9-10.  None of these errors, however, even pertained to his expert analysis or expected testimony.[4]  For example, Dr. Conroy testified that he did not review confidential offering memoranda or

---

[3] The Defendants also claim that Dr. Conroy did "not review many of the documents Plaintiffs insisted were essential to his testimony," *Defs.' Mot.* at 9, though it is unclear what this has to do with their *Daubert* Motion. Although Dr. Conroy may have been unfamiliar with the titles of certain documents at his deposition, he testified that he did review forms K-1, *Conroy Dep. Tr.* at 81:8-17, and the exhibits appended to his Supplementation refer to for their basis 1) data submitted by J. Ezra Merkin and the Office of the New York Attorney General, *see Conroy's Supplementation* at Exs. A & B (citing *People of the State of New York v. J. Ezra Merkin*, Index No. 450879/2009, NYSCEF Doc. No. 136-3); 2) Rothstein, Kass & Company, P.C.'s work papers pertaining to its 2008 independent audit of the QP I Fund, *see id.* at Ex. E; and 3) data pertaining to nine Spring Mountain funds.  *See id.* at Exs. C & D.  Dr. Conroy also clarified that he understood that PPEs and "flash" reports "are not the same document."  *See Conroy Dep. Tr.* at 68:19-69:2.  "Even if an expert directly contradicts his report in deposition testimony, however, that contradiction merely provides ground for impeaching his testimony at trial.  It does not require that the opinions expressed in the report be excluded from the evidence presented at trial."  *Fullerton v. General Motors Corp.*, 408 F. Supp. 2d. 51, 58 (D. Me. 2006).

[4] Indeed, these errors speak only to how little time Dr. Conroy had to review the documents due to the Defendants' withholding of their production.

descriptions of the various funds he analyzed and that he "didn't look into lining up – who managed which fund" because these facts did not impact his financial analysis.  *See Conroy Dep. Tr.* at 67:5-68:2.   Importantly, the Defendants do not argue that Dr. Conroy's quantitative analysis was based on an unreliable methodology or foundation.   They simply argue that he misstated facts that are not within his area of expertise or expected testimony.   "Accordingly, once a trial judge determines the reliability of the proffered expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to the inferences and conclusions he draws from it, and any flaws in his opinion may be exposed through cross-examination or competing expert testimony."  *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002).   Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky yet admissible evidence."  *Daubert*, 509 U.S. at 596.   The factual "errors" that the Defendants suggest undermine Dr. Conroy's expert testimony are the proper subjects of cross-examination at trial and not a motion to exclude expert testimony.

**WHEREFORE**, the Plaintiffs respectfully request that the Court deny the Defendants' Motion to Exclude the Expert Testimony of Dr. Patrick E. Conroy, Ph.D. (Docket No. 167).

Dated at Portland, Maine this 17th day of August, 2012.

/s/      Jay P. McCloskey
         Jay P. McCloskey

/s/      Thimi R. Mina
         Thimi R. Mina

/s/      Alfred C. Frawley IV
         Alfred C. Frawley IV

         Attorneys for the Plaintiffs
         MCCLOSKEY, MINA & CUNNIFF, LLC
         12 City Center

10

Portland, Maine 04101
(207) 772-6805

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **DANIEL R. GOLDENSON,** et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | Docket No. 2:10-CV-440-JAW |
| | ) | |
| **JOHN L. STEFFENS,** et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2012, I have electronically filed the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' *DAUBERT/KUMHO* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PATRICK E. CONROY** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

James T. Kilbreth, Esquire
DRUMMOND WOODSUM & MACMAHON
84 Marginal Way, Number 600
Portland, Maine 04101

David Spears, Esquire (*pro hac vice*)
Michelle Skinner, Esquire (*pro hac vice*)
Max Nicholas, Esquire (*pro hac vice*)
SPEARS & IMES LLP
51 Madison Avenue
New York, New York 10010

Dated this 17th day of August, 2012.

/s/     Alfred C. Frawley IV
        Alfred C. Frawley IV

        MCCLOSKEY, MINA & CUNNIFF, LLC
        12 City Center
        Portland, Maine 04101
        (207) 772-6805
        afrawley@lawmmc.com

12