UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DANIEL R. GOLDENSON, *et al.*,    ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | 2:10-cv-00440-JAW |
| ) | |
| JOHN L. STEFFENS, *et al.*,    ) | |
| ) | |
| Defendants.    ) | |

**ORDER ON THE PARTIES' *DAUBERT* MOTIONS
TO EXCLUDE EXPERT TESTIMONY**

In this hard-fought securities fraud litigation, the parties filed multiple *Daubert* motions, seeking to exclude the others' experts. The Court denies all the motions, concluding that any inadequacies in the experts' proposed testimony do not require exclusion and are best tested in the crucible of cross-examination.

## I.    BACKGROUND

### A.    Procedural History

On July 27, 2012, the Plaintiffs filed a motion to exclude the expert testimony of Sonia M. Brooks, C.P.A. *Pls.' Mot. to Exclude the Expert Test. of Sonia M. Brooks, CPA Pursuant to Fed. R. Evid. 702 and* Daubert/Kumho (ECF No. 163) (*Pls.' Brooks Mot.*). On August 27, 2012, the Defendants responded to the Plaintiffs' motion to exclude Ms. Brooks' testimony, *Defs.' Opp'n to Pls.' Mot. to Exclude the Expert Test. of Sonia M. Brooks* (ECF No. 173) (*Defs.' Brooks Opp'n*), and on August 24, 2012, the Plaintiffs replied to the Defendants' opposition, *Pls.' Reply to Defs.' Opp'n to Pls.'*

*Mot. to Exclude the Expert Test. of Sonia M. Brooks, CPA Pursuant to Fed. R. Evid. 702 and* Daubert/Kumho (ECF No. 179) (*Pls.' Brooks Reply*).

Next, on July 27, 2012, the Defendants filed a motion to exclude the expert testimony of Robert A. Strong, Ph.D., C.P.A. *Defs.'* Daubert/Kumho *Mot. to Exclude Expert Test. of Robert A. Strong* (ECF No. 165) (*Defs.' Strong Mot.*). The Plaintiffs opposed the Defendants' motion on August 17, 2012, *Pls.' Opp'n to Defs.'* Daubert/Kumho *Mot. to Exclude the Expert Test. of Robert A. Strong* (ECF No. 177) (*Pls.' Strong Opp'n*), and the Defendants replied to the Plaintiffs' opposition on August 24, 2012, *Defs.' Reply in Supp. of* Daubert/Kumho *Mot. to Exclude Expert Test. of Robert A. Strong* (ECF No. 182) (*Defs.' Strong Reply*).

The Defendants also moved to exclude the testimony of Patrick E. Conroy, Ph.D. on July 27, 2012. *Defs.'* Daubert/Kumho *Mot. to Exclude Expert Test. of Partrick Conroy* (ECF No. 167) (*Defs.' Conroy Mot.*). The Plaintiffs opposed this motion on August 17, 2012, *Pls.' Opp'n to Defs.'* Daubert/Kumho *Mot. to Exclude the Expert Test. of Patrick E. Conroy* (ECF No. 175) (*Pls.' Conroy Opp'n*), and the Defendants replied to the Plaintiffs' opposition on August 24, 2012, *Defs.' Reply in Supp. of* Daubert/Kumho *Mot. to Exclude Expert Test. of Patrick E. Conroy* (ECF No. 184) (*Defs.' Conroy Reply*).

Finally, the Defendants filed a motion to exclude Arthur Laby's expert testimony on July 27, 2012. *Defs.'* Daubert/Kumho *Mot. to Exclude Expert Test. of Arthur Laby* (ECF No. 169) (*Defs.' Laby Mot.*). The Plaintiffs responded to the Defendants' motion on August 17, 2012, *Pls.' Opp'n to Defs.'* Daubert/Kumho *Mot. to*

*Exclude the Expert Test. of Arthur Laby* (ECF No. 176) (*Pls.' Laby Opp'n*), and the Defendants replied to the Plaintiffs' opposition on August 24, 2012, *Defs.' Reply in Supp. of* Daubert/Kumho *Mot. to Exclude Expert Test. of Arthur Laby* (ECF No. 180) (*Defs.' Laby Reply*).

### B. The Disputed Experts

#### 1. The Defendants' Sonia M. Brooks Designation

On March 19, 2012, the Defendants designated Ms. Brooks as an expert witness. *Defs.' Brooks Opp'n* Attach 2, *Defs.' Expert Witness Designation* (ECF No. 174-2) (*Brooks Desig.*). Ms. Brooks' designation reveals that she is a certified public accountant "who manages financial accounting functions for businesses and individuals including development of financial statements, profit and cash flow analysis, and investment performance monitoring." *Id.* at 2. At trial, the Defendants wish to offer Ms. Brooks as an expert "on the investment losses and gains incurred by the plaintiffs relevant to this proceeding in a number of investment funds." *Id.*

#### 2. The Plaintiffs' Robert A. Strong Designation

The Plaintiffs designated Dr. Strong as an expert for trial on February 29, 2012. *Decl. of Max Nicholas in Supp. of Defs.' Mot. to Strike Supplemental Expert Designation of Dr. Patrick E. Conroy as Untimely* Attach 1, *Pls.' Expert Witness Designations* at 1, 8 (ECF No. 142-1) (*Pls.' Expert Desigs.*). According to his designation, Dr. Strong holds a Ph.D. in finance from Penn State University, is a chartered financial analyst, has authored various articles and books on investments

and portfolio management, and currently works at the University of Maine as a Professor of Investment Education and Finance. *Id.* The Plaintiffs offer Dr. Strong as an expert "on asset valuation and risk management" and note that he will estimate the value of the Plaintiffs' investments had they decided to continue investing in tax free municipal bonds rather than the Ascot Fund. *Id.* at 9-10.

### 3.  The Plaintiffs' Patrick E. Conroy Designation

On February 29, 2012, the Plaintiffs designated Dr. Patrick E. Conroy as an expert. *Id.* at 10. Dr. Conroy holds a Ph.D. in Economics with a concentration in Finance from the University of Miami and is the Vice President of National Economic Resource Associates. *Id.* According to the Plaintiffs' supplemental designation, Dr. Conroy will testify as a forensic analyst concerning the Defendants' management of the Ascot fund, the amount of Madoff-related losses suffered by the QP 1 fund, the Defendants' use of Preliminary Performance Estimates (PPEs) and Flash Reports, the "misleading" nature of the Defendants' December 15, 2008 letter to investors, the fact that the Defendants acquired additional investments in the closed-QP 1 fund just prior to revelation of Madoff's Ponzi scheme, and the Defendants' withdrawal of incentive fees in 2008 from the QP 1 fund. *Decl. of Max Nicholas in Supp. of Defs.' Mot. to Strike Pls.' Supplemental Expert Designation of Dr. Patrick E. Conroy as Untimely* Attach 2, *Pls.' Supplementation to the Expert Witness Designation of Patrick E. Conroy, Ph.D* at 2-5 (ECF No. 142-2) (*Dr. Conroy's Suppl. Desig.*).

### 4.     The Plaintiffs' Arthur Laby Designation

The Plaintiffs also designated Professor Arthur Laby as an expert for trial on February 29, 2012. *Pls.' Expert Desigs.* at 1. According to his designation, Professor Laby teaches at the Rutgers University School of Law, practiced securities law at law firms in Washington, D.C., and served as Assistant General Counsel of the United States Securities and Exchange Commission (SEC) between 2001 and 2005. *Id.* The Plaintiffs designate Professor Laby as an expert on "the legal and compliance obligations of securities professionals under the securities laws" and "the fiduciary obligations and responsibilities of securities professionals." *Id.* at 3. Professor Laby will testify that (1) the Defendants owed the Plaintiffs fiduciary duties and (2) that the Defendants breached the fiduciary duties they owed to the Plaintiffs. *Id.* at 4-7.

## II.     PARTIES' POSITIONS

### A.     Motion to Exclude the Expert Testimony of Sonia M. Brooks, C.P.A.

#### 1.     The Plaintiffs' Characterization of Ms. Brooks' Opinion

The Plaintiffs first claim that Ms. Brooks' testimony is "not relevant to any conceivable claim or defense present in this action" because she is not expected to testify about the Plaintiffs' investments in the Ascot or QP 1 funds but rather about the amount of money the Plaintiffs gained or lost in investment funds unrelated to the current lawsuit. *Pls.' Brooks Mot.* at 3. Second, the Plaintiffs argue that Ms. Brooks does not have the requisite experience to testify about the "nature, complexity or sophistication of the Plaintiffs' investing practices" or hedge fund

investments.  *Id.*  Finally, the Plaintiffs insist that Ms. Brooks cannot testify about whether they were conservative investors because she did not analyze their investments prior to 2001 and her deposition testimony contradicts any opinion she may express on that issue.  *Id.* at 4.

### 2.    The Defendants' Characterization of Ms. Brooks' Opinion

The Defendants respond that because the Plaintiffs claim they were "conservative investors led astray, with catastrophic financial results", Ms. Brooks' testimony on this point is relevant.  *Defs.' Brooks Opp'n* at 2.  First, they say that Ms. Brooks' testimony would establish that the Plaintiffs "had substantial investment assets in addition to their investments in QP 1 and Ascot", which undercuts the Plaintiffs' claim that nearly all their money was invested by the Defendants.  *Id.* at 3.  Second, the Defendants maintain that her testimony would call into question the magnitude of the losses allegedly caused by the Defendants because the Plaintiffs sustained significant monetary losses through other investments, "almost twice as much as they lost in the QP1 Fund."  *Id.*  Third, noting that the Plaintiffs' expert, Robert Strong assumed that they were happy to invest in municipal bonds, the Defendants also say that Ms. Brooks would further confirm that the Plaintiffs did not exclusively invest in municipal bonds but rather in far sophisticated investments that carried higher levels of risk than the Plaintiffs themselves characterize.  *Id.*  Finally, the Defendants insist that Ms. Brooks is qualified to make her opinions given her education and experience.  *Id.* at 4.

### 3.      The Plaintiffs' Reply

In reply, the Plaintiffs characterize Ms. Brooks as "an expert fact witness." *Pls.' Brooks Reply* at 1.   They argue that Ms. Brooks' admissions during her deposition testimony undercut her competence to testify about whether the Plaintiffs' investments were conservative.   *Id.* at 1-2.   The Plaintiffs also contend that the Defendants' arguments in favor of Ms. Brooks' testimony undermine their own arguments for disqualifying Dr. Conroy's expert testimony.   *Id.* at 2-3.   Finally, the Plaintiffs assert that Ms. Brooks' testimony is only offered to attack their credibility, which should instead be done through vigorous cross-examination.   *Id.* at 3.

## B.      Motion to Exclude the Expert Testimony of Robert A. Strong, Ph.D., C.F.A.

### 1.      The Defendants' Characterization of Dr. Strong's Opinion

First, the Defendants argue that Dr. Strong's testimony is inadmissible because it would be speculative and employ theories to calculate damages that courts have "repeatedly rejected."   *Defs.' Strong Mot.* at 1-2.   The Defendants cite First Circuit caselaw confirming that "damages covering the expected fruits of an unrealized speculation" cannot provide a basis for a damages claim.   *Id.* at 1, 3 (citing caselaw).   Second, the Defendants contend that "the basic assumption underpinning Dr. Strong's opinions—that [the] Plaintiffs would have invested in municipal bonds, had they not decided to invest in the Ascot Fund— . . . [would be] contradicted by [the] Plaintiffs' actual investment history."   *Id.* at 2.   Accordingly,

the Defendants' argue that Dr. Strong's testimony would not be helpful to a jury in determining any fact in issue.  *Id.* at 7.

### 2.     The Plaintiffs' Characterization of Dr. Strong's Opinion

In support of Dr. Strong's calculations, the Plaintiffs cite an Eleventh Circuit opinion stating "while damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." *Pls.' Strong Opp'n* at 6 (citing *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985)) (internal citations omitted).  The Plaintiffs also point out that the Defendants do not question Dr. Strong's methodology or the reliability or accuracy of his conclusions.  *Id.* at 7. Furthermore, the Plaintiffs insist that Dr. Strong does not rely on a "'pretend' investment" in making his calculations because the Plaintiffs had a well-documented history of investing in more conservative municipal bonds before accepting "the Defendants' fraudulent investment advice." *Id.* at 6.  Finally, the Plaintiffs argue that the proper way to test the factual predicates for Dr. Strong's opinion is through cross-examination and that his testimony will help the jury understand the Plaintiffs' financial situation "but for" the Defendants' alleged misconduct. *Id.* at 8-9.

### 3.     The Defendants' Reply

The Defendants reply that Dr. Strong's expert testimony fails to meet *Daubert* standards for two reasons: (1) his testimony does not relate to a viable theory of damages and (2) his municipal bond calculations and related testimony

rely on baseless assumptions and are speculative. *Defs.' Strong Reply* at 1. The Defendants insist that the Plaintiffs attempt to transform their doomed lost-profits theory to an "'*actual* out-of-pocket loss' [theory of damages] . . . is pure semantics." *Id.* at 2 (emphasis in original). Furthermore, the Defendants argue that Dr. Strong's theory relates to "pretend" investments because the "Plaintiffs did not invest in municipal bonds and earn those returns." *Id.* at 3. Even if the Court accepted the Plaintiffs lost-profits theory, the Defendants maintain that the foundation for Dr. Strong's theory is "speculative at best." *Id.* at 4.

## C.   Motion to Exclude the Expert Testimony of Patrick E. Conroy, Ph.D.

### 1.   The Defendants' Characterization of Dr. Conroy's Opinion

The Defendants first argue that Dr. Conroy's testimony would add nothing to the jury's understanding of the issues in this case because "[he] spent much of his deposition conceding that he attributes no significance to the opinions offered in his designation."[1] *Defs.' Conroy Mot.* at 2-3. Second, the Defendants claim that the opinions Dr. Conroy did not disclaim during his deposition would not be helpful to a jury. *Id.* at 6. In particular, the Defendants argue that Dr. Conroy's opinion that the Defendants' December 15, 2008 letter to investors in the QP 1 fund was

---

[1]   Specifically, the Defendants highlight four of Dr. Conroy's opinions, all crucial to the Plaintiffs' case, which Dr. Conroy undermines with his own testimony: (1) that the Defendants reported December Madoff-related losses in the QP 1 fund as occurring in November and adjusted these loses to the already-reported November 2008 figures; (2) that the Defendants had a practice of providing investors with monthly PPEs followed by Flash Reports that revised the estimates in the PPEs; (3) that "investors in the QP 1 fund, which was closed to new investors, acquired additional interests in Ascot Partners, LP two months prior to the revelation of the Madoff fraud"; and (4) that the Defendants accrued incentive fees of over $1,000,000 in 2007 related to the QP 1 fund and withdrew those fees in 2008. *Defs.' Conroy Mot.* at 3-6.

misleading based on what "investors were led to believe" is inadmissible because "it is not based on any expert methodology but on lay reasoning . . . [and] [t]he jury needs no expert on the latter." *Id.* at 6-7.  Next, the Defendants contend that "[t]he rest of Dr. Conroy's opinions are statements of fact that have nothing to do with financial expertise." *Id.* at 8.  Finally, the Defendants argue that Dr. Conroy's testimony should be excluded because he did not review all of the documents relevant to the fifteen funds he plans to testify about and his deposition testimony revealed a lack of familiarity with the facts of the case.  *Id.* at 9.

### 2.    The Plaintiffs' Characterization of Dr. Conroy's Opinion

The Plaintiffs first respond that Dr. Conroy's testimony is essential for the jury to understand: (1) the Ascot fund's historical portfolio holdings; (2) the terms "hedge fund portion" and "private equity portion"; (3) the difference between PPEs and Flash Reports; and (4) what these reports are used for.  *Pls.' Conroy Opp'n* at 3-4.  The Plaintiffs insist that "[j]ust because Dr. Conroy did not form an opinion one way or another as to any liability . . . hardly means that his findings and testimony have no significance to the factfinders' resolution of the issues or proper understanding of the facts in this case." *Id.* at 4.  Second, the Plaintiffs insist that Dr. Conroy's testimony supplements Professor Laby's testimony and is essential to "explaining to the factfinder precisely how, when and where the Defendants reported Madoff-related losses." *Id.* at 6-7.

Notably, the Plaintiffs point out that the Defendants do not argue that Dr. Conroy's quantitative analysis was unfounded or based on unreliable methodology.

*Id.* at 10.   They also argue that Dr. Conroy's opinion regarding the misleading nature of the Defendants' December 18, 2008 letter is admissible and is not lay testimony.   *Id.* at 9.   Finally, the Plaintiffs contend that the Defendants' concern about Dr. Conroy's familiarity with the facts is a subject for cross-examination, not a reason to exclude his testimony.   *Id.* at 9-10.

### 3.   The Defendants' Reply

The Defendants reply that, given their willingness to stipulate to many of the facts that Dr. Conroy plans to testify about and that he attributes no "importance" to, his testimony is unnecessary.   *Defs.' Conroy Reply* at 5-6.   Next, the Defendants reiterate their position that Dr. Conroy's statement about the Defendants' December 15, 2008 letter is impermissible lay opinion because there "is no basis whatsoever for a forensic financial analyst to offer expert testimony as to how an ordinary investor would interpret the letter."   *Id.* at 3-4.   Fundamentally, the Defendants assert that Dr. Conroy's opinion is a matter for the Plaintiffs' closing argument, not for expert testimony.   *Id.* at 5.   Finally, the Defendants stress that Dr. Conroy's unfamiliarity with the facts in this case disqualifies him as an expert because it would be unfair to force the Defendants "to assume the risk of [his] unpreparedness—the risk that he makes serious mistakes on the stand and they bear the gloss of expert testimony."   *Id.* at 7.

### D.   Motion to Exclude the Expert Testimony of Professor Arthur Laby, Esq.

#### 1.   The Defendants' Characterization of Professor Laby's Opinion

First, the Defendants urge the Court to exclude Professor Laby's testimony because they believe he will testify as to his legal conclusions about the proper meaning of securities laws and about whether the Defendants owed and breached fiduciary duties to the Plaintiffs. *Defs.' Laby Mot.* at 3. Furthermore, the Defendants object to Professor Laby's proposed definition of the legal terms "good faith" and "fair dealing" because they are legal standards for the Court to define. *Id.* at 3-4. The Defendants also argue that given Professor Laby's deposition, some portions of his testimony would likely involve lay reasoning and rely on unsubstantiated facts. *Id.* at 8. Finally, the Defendants point out that some portions of Mr. Laby's testimony were "prone to the kind of narrative summarizing that is reserved for closing argument", not for expert witnesses. *Id.* at 9.

### 2. The Plaintiffs' Characterization of Professor Laby's Opinion

In response, the Plaintiffs acknowledge that Professor Laby's testimony cannot be used solely to establish legal principals or draw ultimate conclusions and argue that his testimony will help shed light on circumstances that give rise to fiduciary duties. *Pls.' Laby Opp'n* at 4-5. Given Professor Laby's background and experience, the Plaintiffs contend that Professor Laby may testify about the Defendants' standard of care as the Plaintiffs' fiduciaries and point out potential deviations from that standard as long as he does not offer an ultimate conclusion that the Defendants breached their fiduciary duties. *Id.* at 5-6. Finally, the Plaintiffs dismiss the Defendants' arguments that Professor Laby's opinion was based on lay reasoning because "[h]is testimony was not a summary of 'out-of-court

sources but a thorough opinion drawing on multiple sources to ensure accuracy.'"
*Id.* at 9-10 (quoting *United States v. Luna*, 649 F.3d 91, 105 (1st Cir. 2011)).

### 3.   The Defendants' Reply

In reply, the Defendants claim that after conceding his designation was comprised of legal conclusions, the Plaintiffs cannot "detach their expert from his designation", "repurpose him", or defend his testimony on the ground that there are some subjects he may lawfully testify about. *Defs.' Laby Reply* at 2-3.  Moreover, the Defendants reiterate their fears that Professor Laby will impermissibly make legal conclusions concerning their fiduciary duties. *Id.* at 4.  Finally, the Defendants argue that "Professor Laby's detours into lay testimony and narrative summation, as described in the Motion, create a high risk of prejudice and provide an independent basis to exclude his testimony." *Id.* at 7.

## III.   DISCUSSION

### A.   Legal Standard: *Daubert* Motions to Exclude Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court designated trial judges as gatekeepers responsible for determining whether Rule 702's requirements are met in any given case. *Id.* at 589. "A judge exercising the gatekeeper role must evaluate whether the challenged expert testimony is based on reliable scientific principles and methodologies in order to ensure that expert opinions are not 'connected to existing data only by the *ipse dixit* of the expert.'" *Knowlton v. Bankers Life & Cas. Co.*, No. 1:09-cv-00334-MJK, 2012 U.S. Dist. LEXIS 1365, at *2-3 (D. Me. Jan. 6, 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### B.    Motions to Exclude Expert Testimony

#### 1.    Sonia M. Brooks, C.P.A.

The Defendants designated Ms. Brooks to testify about her analysis of some investments the Plaintiffs made outside of the QP 1 and Ascot funds between 2002 and 2008. *Brooks Desig.* at 2. At trial, she is expected to inform the jury that the Plaintiffs suffered losses of approximately $470,000 in those investments. *Id.*; *Defs.' Brooks Opp'n* at 2. The Court agrees that Ms. Brooks' testimony is relevant. Her expert opinions tend to contradict the Plaintiffs' theory of the case and may undermine some of the foundation for Dr. Strong's expected testimony. *See First Am. Compl. and Demand for Jury Trial* at 43-44 (ECF No. 38) (*Am. Compl.*) (seeking compensatory damages, punitive damages and prejudgment interest).

The Plaintiffs correctly point out that Ms. Brooks' testimony has certain limitations; however, these limitations do not render her expert testimony

irrelevant.  *See Pls.' Brooks Reply* at 1-2.  When asked at her deposition whether she had opinions about "the nature of the[] [Plaintiffs'] investments . . . whether they [were] conservative, [or] what kind of strategies they employ[ed]?", Ms. Brooks responded "I didn't look at that specifically, no."  *Pls.' Brooks Mot.* Attach 2, *Tr. of Dep. of Sonia M. Brooks, CPA* at 43:11-16 (ECF No. 163-2) (*Brooks Dep.*).  She also admitted that she did not compare the Plaintiffs' losses in the Ascot and QP 1 funds to the losses in their other investments.  *Id.* at 42:13-43:3.

The fact that Ms. Brooks may not be an expert in all things does not mean she is not an expert in anything.   Expert opinions are admissible if they are "relevant not only in the sense that all evidence must be relevant [pursuant to Federal Rule of Evidence 402], but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue."  *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1988).  In other words, "[t]he fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is 'whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved.'"  *United States v. Shay*, 57 F.3d 126, 132-33 (1st Cir. 1995) (quoting *United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994)).

The average layperson is not an expert in reading and analyzing financial statements or computing profit and loss.  Ms. Brooks' testimony would be helpful to

the "untrained layman" and would assist the jury in weighing the validity of Dr. Strong's testimony and the Plaintiffs' claims for damages. *See Shay*, 57 F.3d at 132-33. Thus, her designated testimony meets Rule 702's special relevancy standard.

Next, the Court concludes that Ms. Brooks is qualified to make her expert opinion. In *Santos v. Posadas de P.R. Associates, Inc.,* the First Circuit emphasized that "experts come in various shapes and sizes; there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." 452 F.3d 59, 63 (1st Cir. 2006). Instead, courts should determine "whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702 - - knowledge, skill, experience, training or education." *Id.* at 64.

Ms. Brooks is a certified public accountant and has worked in accounting for over ten years. *Brooks Desig.* at 5. In 1990, she obtained a Bachelor of Science in Business Management/Administration with a concentration in economics and accounting from the University of Southern Maine. *Id.* She worked as a tax manager for an accounting firm, Baker, Newman & Noyes, for ten years before starting her own accounting firm in 2009. *Id.* She also worked as the controller for the Woodlands Club, where she "[g]athered, compiled, and analyzed information for a $6M annual budget [and] [u]pdated [the] budget to account for results and changes in forecasts." *Id.* Currently, Ms. Brooks manages financial accounting functions for businesses and individuals, develops financial statements, performs investment monitoring, and manages loans and lines of credit. *Id.*

16

The Plaintiffs emphasize that Ms. Brooks is not qualified to opine whether their investments were conservative given her limited investigation into their investment history, which focused only on the losses they sustained from investments outside the QP 1 and Ascot funds. *Pls.' Brooks Mot.* at 3-4; *Pls.' Brooks Reply* at 1-2. Furthermore, Ms. Brooks has not published any articles on accounting or investing and has not testified as an expert witness in the past. *See Brooks Desig.* at 5. Notably, however, "[i]t is not required that experts be 'blue-ribbon practitioners' with optimal qualifications." *United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006) (quoting *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006)). Given the conceded limitations on Ms. Brooks' testimony, Ms. Brooks is qualified to testify as an expert in the opinions for which she has been designated. The Plaintiffs' objections to her status as an expert "go to the weight of the proffered testimony, not to its admissibility." *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007).

Of course, the Plaintiffs are welcome to put Ms. Brooks' expertise and opinions to the test on cross-examination. *See Hinton v. Outboard Marine Corp.*, 828 F. Supp. 2d 366, 372 (D. Me. 2011). At the close of trial, the standard jury instructions will inform the jury that it may weigh "the relative expertise of each expert in evaluating how much weight to give the expert's testimony." *Id.* Nevertheless, because it concludes that Ms. Brooks is qualified to express the expert opinions for which she has been designated and because it concludes that those

opinions would be helpful to the jury, the Court declines to exclude her expert testimony under Rule 702.

### 2.    Robert A. Strong, Ph.D., C.F.A.

The Defendants move to exclude Dr. Strong's testimony because they contend that his opinions are irrelevant and speculative. *Defs.' Strong Reply* at 1. Here, the Plaintiffs seek compensatory damages for their twelve state and federal claims against the Defendants that allege breach of fiduciary duty, fraudulent misrepresentation, aiding and abetting tortious conduct, intentional infliction of emotional distress, civil conspiracy, federal securities fraud (15 U.S.C. § 78(j)(b) and SEC Rule 10b-5), controlling person's liability (15 U.S.C. § 78(t)(a), state of Maine securities fraud (32 M.R.S.A. § 16509(6)), joint and several liability for Maine securities fraud (32 M.R.S.A. § 16509(7)), and unjust enrichment. *Am. Compl.* at 29-43. The Plaintiffs offer Dr. Strong "to calculate what their present-day investment portfolio would look like had they not been misled by the Defendants into purchasing Ascot." *Pls.' Strong Opp'n* at 4.

In tort, compensatory damages are designed to put the Plaintiffs in the position they would be in but for the Defendants' harmful conduct. *Probate Court of Warwick v. Bank of Am., N.A.,* 813 F. Supp. 2d 277, 323-24 (D.R.I. 2011) (quoting RESTATEMENT (SECOND) OF TORTS § 901 cmt. a) ("When there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed"). The lost profits or lost

opportunity damages that the Plaintiffs allegedly would have earned through investments in municipal bonds "had they not been misled by the Defendants into purchasing Ascot" would factor into this damages calculation. *Pls.' Strong Opp'n* at 4. At trial, the Defendants will have an adequate opportunity to attack the reliability of the assumptions underlying Dr. Strong's opinions through cross-examination and through reference to Ms. Brooks' testimony. Thus, under *Ruiz-Troche*, Dr. Strong's expert testimony is relevant as it "would assist the trier of fact to understand or determine a fact in issue." 161 F.3d at 81.

Next, the Defendants argue that even if the Plaintiffs lost profits are recoverable, Dr. Strong's testimony lacks an adequate foundation because it is based on speculative assumptions. *Defs.' Strong Mot.* at 4-6. With respect to the state law claims "[w]hile it is true that Maine law requires that, in order to be recoverable, damages must not be uncertain or speculative, lost profits or future income are not too speculative per se." *Forum Fin. Group v. President & Fellows of Harvard Coll.*, No. 00-306-P-C, 2002 U.S. Dist. LEXIS 18571, at *51-53 (D. Me. Sept. 30, 2002). "'Damages for loss of prospective profits are allowable only if they can be estimated with reasonable certainty.'" *Id.* (quoting *Marquis v. Farm Family Mut. Ins. Co.*, 628 A.2d 644, 650 (Me. 1993)). Similarly, in federal securities lawsuits "[a] defrauded *buyer* [ ] may recover the difference between the actual value of an item purchased and the price paid, as well as outlays directly attributable to the defendant's conduct, "but not damages covering 'the expected fruits of an unrealized speculation.'" *Hutt v. Dean Witter Reynolds, Inc.*, 737 F.

Supp. 128, 131 (D. Mass. 1990) (quoting *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965)) (emphasis in original).   In *Redstone v. Goldman, Sachs & Co.*, the district court held that the plaintiffs could recover the difference in potential gains if the defendants had invested in AA-grade municipal bonds, as requested, rather than lower yield securities because these damages would award them the "realization of their reasonably certain expectations rather than 'the expected fruits of an unrealized speculation.'"  583 F. Supp. 74, 76-77 (D. Mass. 1984).

On this point, the Defendants attack the foundation of Dr. Strong's testimony: they insist that the Plaintiffs did not and would not have placed their money in conservative investment vehicles.   However, the Plaintiffs have not conceded this point and without becoming a fact-finder, the Court cannot weigh the convincing power of their trial evidence.  Although the Plaintiffs voiced an interest in investing in alternative investment vehicles to generate greater returns, the Plaintiffs point to a twenty-year history of investing in municipal bonds and Mr. Goldenson's testimony that "the notion of doing something entirely different was not something that [they were] comfortable with."  *Pls.' Strong Opp'n* Attach 1, *Dep. Tr. of Daniel R. Goldenson* at 22:14-21, 32:1-5 (ECF No. 178-1)).   Based on the Plaintiffs' investment history, a jury could conclude the Plaintiffs would have continued down the "safe road" and kept investing in municipal bonds without the Defendants' interference.  S*ee Forum Fin. Group,* 2002 U.S. Dist. LEXIS 18571, at *51-53.

"When the 'adequacy of the foundation for expert testimony is at issue, the law favors vigorous cross-examination over exclusion." *Zuckerman v. Coastal Camps, Inc.,* 716 F. Supp. 2d 109, 119 (D. Me. 2010) (quoting *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 119 (D. Me. 2010)).   The Defendants' efforts to discredit Dr. Strong's testimony about the profits the Plaintiffs would have made from municipal bonds had they continued to invest in them can and should be made on cross-examination rather than through the exclusion of Dr. Strong's expert testimony.   In short, the weight and credibility of Dr. Strong's testimony is a jury issue.  *See Payton v. Abbott Labs*., 780 F.2d 147, 156 (1st Cir. 1985) ("If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of their testimony").   Dr. Strong's expert testimony is admissible.

### 3.    Patrick E. Conroy, Ph.D.

The Defendants first move to exclude Dr. Conroy's expert testimony on the ground that he "attributes no significance to many of his own 'findings'" and therefore, his opinions "would not be helpful to the jury, and would create the risk that the jury would draw unwarranted inferences of wrongdoing." *Defs.' Conroy Mot.* at 3-6.   However, simply because Dr. Conroy does not make ultimate conclusions of wrongdoing or attribute special significance to certain facts does not render his opinions, which are based on an analysis of financial data, irrelevant. Instead, his opinions regarding (1) the Defendants' accounting for losses in November rather than December of 2008, (2) their practice of providing PPEs

followed by Flash Reports—one of which contained a subsequent alteration, (3) the interplay between both the acquisition of Ascot Partners, LP interests by QP 1 investors and the liquidation of Spring Mountain investors' interests in that fund prior to the revelation of Madoff's Ponzi scheme, and (4) the Defendants' 2008 withdrawal of over $1,000,000 in incentive fees from 2007 are all relevant to the Plaintiffs' tort claims.  *Id.*

Even without drawing conclusions of wrongdoing, Dr. Conroy's opinions are admissible because they "likely would assist the trier of fact to understand . . . a fact in issue" related to the allegations of fraud and civil conspiracy.  *Ruiz-Troche*, 161 F.3d at 81.  Accordingly, the Defendants' concerns about Dr. Conroy's opinions misleading the jury are outweighed by the relevance of his testimony and are safeguarded by the Defendants' ability to engage in vigorous cross-examination at trial.  *See* FED. R. EVID. 403; *see First Marblehead Corp. v. House*, 541 F.3d 36, 42 (1st Cir. 2008).  Thus, the duty to connect Dr. Conroy's opinions with ultimate conclusions of wrongdoing is appropriately left to the jury based upon the admissible evidence and the instructed law.

Second, the Defendants object to Dr. Conroy's opinion that "the Defendants' December 15, 2008 letter to investors in the QP 1 Fund was misleading in its statement that 'the Fund had approximately 9.89% of its assets exposed to Madoff Securities as of November 30, 2008'" because it is irrelevant and based on lay reasoning.  *Defs.' Conroy Mot.* at 6-7.  Dr. Conroy's testimony on this point is relevant as it would likely help the jury better determine a fact in issue regarding

the Plaintiffs' tort and civil conspiracy claims.  *See Ruiz-Troche*, 161 F.3d at 81.
With respect to lay reasoning, the Plaintiffs point out that Dr. Conroy's opinion is
based on his comparison of QP 1's reporting procedures for PPEs and Flash Reports
and the performance percentage reported in the Defendants' December 15, 2008
letter, which contrary to prior performance reports reflected losses on the entire
fund rather than just the hedge fund.  *Pls. Conroy Opp'n* at 8-9.   Given this
reporting pattern, Dr. Conroy concluded that the change in reporting in the
Defendants' letter may have been misleading to a reasonable investor because it
"dilute[ed] the apparent impact of the Fund's Madoff-related losses as a percentage
of the Fund's consolidated value."  *Id.*; *Dr. Conroy's Suppl. Desig.* at 4-5.

Contrary to the Defendants' contention, a specialist in forensic economics
may testify concerning his observation of patterns in financial reporting procedures,
changes in those patterns, and how those changes may have been misleading.
Without the aid of an expert capable of highlighting the reporting patterns and any
changes in them, the average juror may not have been able to make this connection.
*See Shay*, 57 F.3d at 132-33.  Similarly, in *First Marblehead Corp.,* the First Circuit
allowed an expert in economics to explain to the jury how stock options function and
how an investor would think about exercising those options.  541 F.3d at 41-42.  The
Court concluded that "[t]hose are not topics ordinarily within the knowledge of the
jury and thus are appropriate for expert testimony."  *Id.* at 42.

Because Dr. Conroy's testimony is not "'well within the bounds of a jury's
ordinary experience,'" it is admissible.  *United States v. Valdivia*, 680 F.3d 33, 51

23

(1st Cir. 2012) (quoting *Montas*, 41 F.3d at 781-84) ("the testimony was not so obviously within the jury's bounds of knowledge as to negate all probative value [as] [t]he average juror may not be aware that some phone companies permit the account subscriptions without the presentation of identification . . . .")); *cf. United States v. Raymond*, 700 F. Supp. 2d 142, 151 (D. Me. 2010) (excluding part of the expert's testimony in a child molestation case because many of the expert's opinions embraced "common sense observations" such as "'the fact is that any child can be groomed by any reasonably nice adult with interpersonal skills'"). Of course, the Defendants may seek to discredit Dr. Conroy's testimony on this point through cross-examination.

Furthermore, the Defendants argue that Dr. Conroy's expected testimony is irrelevant because it will address undisputed facts. *Defs.' Conroy Reply* at 5-6. For example, the Plaintiffs have proffered Dr. Conroy to explain the differences between "hedge fund portion" and "private equity portion" and PPEs versus Flash Reports. *Id.* at 5; *Pls.' Conroy Opp'n* at 3-4. These are not subjects within common lay knowledge and Dr. Conroy's explanations are likely to enhance the jury's understanding. In *First Marblehead Corp.*, the First Circuit stated, "[t]estimony that provides a necessary context and framework, especially in cases involving complex or unfamiliar concepts, can be appropriate for expert testimony." 541 F.3d at 42. On that basis, the Court allows Dr. Conroy's testimony on undisputed facts relating to the financial aspects of the parties' transactions.

Finally, with respect to the Defendants' argument that Dr. Conroy's deposition evidences a lack of familiarity with the facts relevant to his expected testimony, this concern is better addressed with cross-examination, not exclusion. Here, the Defendants argue that Dr. Conroy does not "know the rudimentary facts of this case or, in large part, the contents of his own designation" and that the "Defendants should not be forced to assume the risk of Dr. Conroy's unpreparedness . . . ." *Defs.' Conroy Reply* at 7.  However, "'[w]hen the adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion.'"  *Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 U.S. Dist. LEXIS 6331, at *5-6 (D Me. Jan. 16, 2013) (quoting *Zuckerman,* 716 F. Supp. at 28).  "If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of their testimony."  *Payton*, 780 F.2d at 156.  "'[O]nly if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded' on foundational grounds."  *Brown v. Wal-Mart Stores, Inc.,* 402 F. Supp. 2d 303, 308 (D. Me. 2005) (quoting *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005)).

Moreover, the Court does not accept the Defendants' argument that Dr. Conroy did not know the basic facts in this case.  Although they cite isolated instances during his deposition in which he either could not remember or was not sure about facts, his analysis of financial data was unaffected.  *Defs.' Conroy Mot.* at 9-10 (stating that Dr. Conroy did not know who the managers of the Gabriel, Ascot, Ariel, and QP 1 funds were, how much the Plaintiffs' lost in the Ariel fund, and that

PPEs and Flash Reports were essentially the same thing). To the extent the Defendants unearthed confusion or forgetfulness, this does not render Dr. Conroy's opinion "so fundamentally unsupported" that his testimony should be excluded. *Larson*, 414 F.3d at 941. Thus, the Defendants' are free to seek to exploit these issues during their cross-examination of Dr. Conroy. His expert testimony is admissible.

### 4. Professor Arthur Laby, Esq.

The Defendants voice several concerns with Professor Laby's testimony. They first contend that Professor Laby should not be allowed to testify that the Defendants owed the Plaintiffs fiduciary duties or to testify about "the meaning and contemplation of the securities laws" because that testimony would require him to define the applicable law and would impinge on the Court's authority. *Defs.' Laby Mot.* at 2-3. On a similar note, the Defendants insist that Professor Laby may not testify regarding the meaning of the terms "fiduciary duty and "good faith and fair dealing" or opine whether Defendants Steffens and Ho were "'controlling person[s]' under the securities laws." *Id.* at 3-4, 7-8.

The Court agrees that the proper place to define legal terms, such as "fiduciary duty" and "good faith and fair dealing", is in the jury instructions because "it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (quoting *United States v. Newman*, 49 F.3d 1, 7 (1st Cir. 1995)). Yet, given the technical regulatory framework involved in this case—federal and state securities

laws—rather than preventing Professor Laby from discussing the "meaning of the securities laws", the Court may "provide the jury with preliminary instructions concerning the regulatory framework and require [Professor Laby] to couch his [ ] testimony in terms of the Court's instructions on the law, rather than in terms of his private characterizations." *Darling v. Indymac Bank, F.S.B.,* No. 06-123-B-W, 2007 U.S. Dist. LEXIS 88931, at *15-16 (D. Me. Dec. 3, 2007); *see United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.  Its use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it").

Once the Court defines the applicable legal standards and terms, Professor Laby, a qualified expert on securities laws and the securities industry, may opine on how the facts of this case tie into the legal framework and the relevant industry. *CDX Liquidating Trust v. Venrock Assocs.,* 411 B.R. 571, 588 (N.D. Ill. 2009) (allowing expert testimony where his "report and testimony offer his analysis of the practices and standards of corporate governance and a description of Defendants' conduct in light of those practices and standards"); *Darling,* 2007 U.S. Dist. LEXIS 88931, at *11.  Faced with similar objections to an expert's testimony, the *CDX* Court held that the plaintiff's fiduciary duty expert could not testify about his interpretation of Delaware or Maryland fiduciary duty law but could "testify

regarding Defendants' conduct in the descriptive sense in terms of what Defendants did and did not do, but [could not] opine on whether the Defendants' actions constituted a breach of their fiduciary duties."   411 B.R. at 588-89.   The Court permits Professor Laby to offer an analysis of the facts underlying his opinions in sections two, three, and four of his designation in light of judicially-defined relevant law.

At the same time, Professor Laby may not testify about his legal conclusions concerning whether the Defendants owed the Plaintiffs fiduciary duties or breached those duties.   *See id.*   Recently in *Kirouac*, the Court excluded the part of the Plaintiff's expert's testimony where he drew ultimate conclusions on liability in an employment discrimination case; namely that the plaintiff was "subjected to a hostile work environment" and that the "work environment was discriminatory." 2013 U.S. Dist. LEXIS 6331, at *6-8.   Similarly, in section three of Professor Laby's designation, he explicitly states he will testify "that the Defendants have each breached their fiduciary duties owed to the Plaintiffs."   *Pls.' Expert Desigs.* at 4.   He then lists nine ways the Defendants' breached fiduciary duties owed to the Plaintiffs.   *Id.* at 4-6.

Here, the parties appear to agree that Professor Laby's testimony crosses the limits of an expert's ability to "embrace[] [ ] ultimate issue[s]" in a case pursuant to Rule 704 and instead arrives at conclusions on the ultimate issues.   FED. R. EVID. 704; *Dinco v. Dylex Ltd.,* 111 F.3d 964, 973 (1st Cir. 1997) ("[T]he bar on 'ultimate issues' opinions has been abolished in civil cases; but this is not a *carte blanche* for

experts to substitute their views for matters well within the ken of the jury")
(internal citations omitted); *see Defs.' Laby Mot.* at 4-7; *Pls.' Laby Opp'n* at 3, 5, 7.
Accordingly, the Court excludes this portion of Professor Laby's expected
testimony.[2]  The line between explaining the context of a regulation and defining
the law may be a subtle one and the Court's exclusion should be read as affecting
the latter, not the former.

Third, the Defendants attack Professor Laby's testimony because "all nine
'breaches' he identifies are founded on facts that are not established in the record."
*Defs.' Laby Mot.* at 6.  The Defendants point to one example, which they state is
unsupported: in his deposition, Ezra Merkin testified that he informed the Plaintiffs
of Mr. Madoff's role in the Ascot Fund.  *Id.* at 6 n.3.  However, again, the Court is
not in a position at this point to referee a factual dispute; if the Defendants dispute
the facts underpinning Professor Laby's opinion, they may do so by seeking to
exclude the underlying foundational evidence and by cross-examination, not by pre-
trial exclusion.  *See Payton,* 780 F.2d at 156.

Finally, the Defendants argue that Professor Laby's testimony is
inadmissible because it embraces lay inferences and poses a risk of summarizing
evidence to the jury.  *Defs.' Laby Mot.* at 8.  The Defendants point to one example of
Professor Laby's "lay reasoning" where he stated "[I]t strikes me that [Defendant]
Steffens, like many of us, would want to please or appease his lender."  *Id.* at 8

---

[2]     In their response, the Plaintiffs fear that the Defendants themselves will testify with
impunity as to these ultimate legal questions without fear of contradiction by an opposing expert.
*Pls.' Laby Opp'n* at 2 n.1.  Of course, if the Defendants open the door to such testimony, the Plaintiffs
may be allowed to call Mr. Laby on rebuttal.

(citing *Defs.' Laby Mot.* Attach 3, *Dep. Tr. of Arthur Laby* 23:19-13:23 (ECF No. 170-3) (*Laby Dep.*)).   If this were actually Professor Laby's expert opinion on Mr. Steffens' conflicts of interest, his testimony would run the risk of exclusion because it embraces "common sense observations" which do not aid the jury.  *Raymond*, 700 F. Supp. 2d at 151.   Yet, when the Defendants' citation is read with the rest of Professor Laby's answer, it becomes apparent that he was explaining, in terms a jury might understand, that, in his view, it was a conflict of interest for Mr. Steffens not to disclose that he had a close relationship with Mr. Merkin.  *Laby Dep.* at 23:9-24:6.   Based on this isolated statement alone, the Court declines to exclude his testimony.

Moreover, the Defendants' concerns about Professor Laby's potential to engage in narratives and summarize contested facts do not compel the exclusion of his testimony.  *See* FED. R. EVID. 403.  At the same time, the Court has the authority to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence."  FED. R. EVID. 611(a).  In sum, Professor Laby's testimony is admissible subject to the discussed limitations.

## IV.   CONCLUSION

1. The Court DENIES the Plaintiffs' Motion to Exclude the Expert Testimony of Sonia M. Brooks, CPA (ECF No. 163);

2. The Court DENIES the Defendants' Motion to Exclude the Expert Testimony of Robert A. Strong (ECF No. 165);

3. The Court DENIES the Defendants' Motion to Exclude the Expert Testimony of Dr. Patrick E. Conroy (ECF No. 167); and,

4.  The Court DENIES the Defendants' Motion to Exclude the Expert
    Testimony of Arthur Laby (ECF No. 169).


SO ORDERED.



/s/ John A. Woodcock, Jr.
JOHN A. WOODOCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 25th day of February, 2013