UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DANIEL R. GOLDENSON, et al.,   )
                             )
          Plaintiff,        )
                             )
         v.              )     2:10-cv-00440-JAW
                             )
JOHN L. STEFFENS, et al.,     )
                             )
         Defendant.      )

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Daniel and Suzanne Goldenson invested in several hedge funds. One, the Ascot Fund, was a feeder fund to notorious Ponzi-schemer Bernard Madoff. Another, the QP I Fund, had significant exposure to Mr. Madoff's fraud. The Goldensons allege that they suffered substantial financial losses when Mr. Madoff's fraud was uncovered in December, 2008. The Goldensons claim that John Steffens, Gregory Ho, and assorted institutional defendants committed a panoply of statutory and common law wrongs in connection with these investments and their subsequent losses.

Before the Court is the Defendants' Motion for Summary Judgment. The Court concludes that a fact-finder, viewing all the evidence in a light most favorable to the Goldensons and drawing all reasonable inferences, could legally conclude that at least some of the Defendants are liable on almost all of the remaining counts. On

this record, the Court grants the Motion for Summary Judgment only partially as to Count IV, partially as to Count VII, and as to Count XI in its entirety.

## I. LEGAL STANDARD

A court may grant summary judgment under Federal Rule of Civil Procedure 56 if the record demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Material" means that the fact "'has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). "Genuine" means that "'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Id.* (quoting *McCarthy*, 56 F.3d at 315). The Court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000).

## II. FACTS

### A. Procedural History

The Plaintiffs are Daniel R. Goldenson, Suzanne K. Goldenson, SKG Partners, L.P., and SKG General Corp. (collectively "the Goldensons"); the Defendants are John L. Steffens,[1] Gregory P. Ho, Spring Mountain Capital G.P., LLC, Spring Mountain Capital, LP, and Spring Mountain Capital, LLC (collectively

---

[1] Both parties, and portions of the summary judgment record, occasionally refer to Mr. Steffens as "Launnie" or "Lonnie."

"the Defendants").[2]  The Goldensons filed their original eleven-count Complaint (ECF No. 1) on October 27, 2010, and an Amended Complaint on April 21, 2011 (ECF No. 38).  The Court dismissed without prejudice one count, for "punitive damages," on August 4, 2011.  *Goldenson v. Steffens*, 802 F. Supp. 2d 240 (D. Me. 2011).

On May 1, 2013, after nearly two years of discovery, the Defendants filed a Motion for Summary Judgment.  *Mot. for Summ. J.* (ECF No. 200) (*Motion*).  This motion included a Defendants' Statement of Material Facts (DSMF) (ECF No. 201) supported by  affidavits from Mr. Steffens, *Decl. of John L. Steffens* (ECF No. 197) (*Steffens Decl.*); Mr. Ho, *Decl. of Gregory P. Ho* (ECF No. 202) (*Ho Decl.*); and Alison Ward, a legal assistant to counsel for the Defendants, *Mot. to Seal* Attach. 13 *Decl. of Alison Ward* (ECF No. 195) (*Ward Decl.*).

The Goldensons filed their opposition to the motion on June 24, 2013.  *Mot. to Seal* Attach. 1 *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 211) (*Pl.'s Opp'n*).  With it came a reply to the Defendants' statement of material facts and the Goldensons' statement of additional material facts.  *Mot. to Seal* Attach. 2 *Pl.'s Opposing Statement of Material Facts and Statement of Additional Facts* (ECF No. 211) (PRDSMF, PSAMF).  The Goldensons also filed affidavits from attorney Alfred Frawley IV, *Aff. of Alfred C. Frawley IV* (ECF No. 214) (*Frawley Decl.*); attorney Jay McCloskey, *Aff. of Jay P. McCloskey* (ECF No. 215) (*McCloskey Decl.*); and Daniel Goldenson, *Aff. of Daniel R. Goldenson* (ECF No. 216) (*Goldenson Decl.*).

---

[2]       The Court refers to the Plaintiffs as "the Goldensons" and the Defendants as "the Defendants" unless it is necessary to refer to one of them specifically.

The Defendants replied to the Goldensons' opposition on July 15, 2013. *Mot. to Seal* Attach. 1 *Def.'s Rep'y Mem. of Law* (ECF No. 222) (*Def.'s Reply*). They also filed a reply to the Goldensons' statement of additional material facts. *Mot. to Seal* Attach. 2 *Def.'s Reply to Pl.'s Statement of Additional Facts* (ECF No. 222) (DRPSAMF). With the reply statement of facts came an additional affidavit from Mr. Steffens, *Mot. to Seal* Attach. 3 *Reply Decl. of John L. Steffens* (ECF No. 222) (*Steffens Reply Decl.*), and a new affidavit from attorney Max Nicholas, *Decl. of Max C. Nicholas* (ECF No. 226) (*Nicholas Decl.*) On the same day they filed their reply, the Defendants requested oral argument on the Motion. *Mot. for Oral Argument/Hearing* (ECF No. 227). The Court granted that motion and held oral argument on February 28, 2014. *Order Granting Mot. for Oral Argument/Hearing* (ECF No. 230).

**B.     Summary Judgment Facts**

**1.     The Defendants' Undisputed Facts**

The Defendants offer the facts below in their Statement of Material Facts. The Court adjusted the Defendants' versions to reflect successful denials or qualifications by the Goldensons.

**a.     Background About the Goldensons**

Mr. and Mrs. Goldenson are married. DSMF ¶ 1; PRDSMF ¶ 1. Between them, Mr. and Mrs. Goldenson have established and control a number of entities that have, at various times, held assets or engaged in financial dealings. DSMF ¶ 2; PRDSMF ¶ 2. These include SKG Partners, L.P.; SKG General Corp.; Goldenson Partners, L.P.; Goldenson Management, L.P.; D.R. Goldenson & Company, Inc.;

1991 Insurance Trust; and 2005 Insurance Trust. DSMF ¶ 2; PRDSMF ¶ 2.[3] Mr. Goldenson graduated Phi Beta Kappa from Princeton University earning a Bachelor of Arts degree and majoring in economics. DSMF ¶ 3; PRDSMF ¶ 3.[4]

Mr. Goldenson was in the real estate development business in the 1970s and 1980s. DSMF ¶ 4; PRDSMF ¶ 4.[5] His real estate development activities included

---

[3] The Goldensons object to this statement under District of Maine Local Rule 56(f) on the grounds that the assertions are not supported by citations to identified record material as required by Local Rule 56(b). PRDSMF ¶ 2. The Court agrees that paragraph 2 of the Defendants' Statement of Undisputed Material Fact lacks a record citation as required by the Local Rule. However, the Goldensons have supplied the record citations while maintaining their objection. The record supports the list of entities, and so the Court has considered it. *Frawley Decl.* Ex. A *Pl.'s Reply to Def.'s First Set of Interrogs.*, at 6 (ECF No. 214-1) (Nov. 28, 2011); *Frawley Decl.* Ex. C *Videotape Dep. of Daniel R. Goldenson*, at 5:1-11 (ECF No. 211-3) (June 11, 2012) (*Def.'s D.G. 2012 Dep. Tr.*); *Ward Decl.* Ex. M *Goldenson 2005 Special Trust* (ECF No. 195-25) (Apr. 15, 2005) (*2005 Special Trust*). As the purpose of the statement of material fact process is to isolate truly genuine disputes of material fact, the Court overrules the Goldensons' objection. *United States v. Walsh*, 702 F. Supp. 2d 6, 8 (D. Me. 2010) ("While the Local Rule 56 process may be cumbersome to describe, '[t]he rule is intended to focus both the parties and the Court on what facts are actually in dispute'") (quoting *Toomey v. Unum Life Ins. Co. of Am.*, 324 F. Supp. 2d 220, 222 n.1 (D. Me. 2004)).

The Goldensons interpose a qualified response to paragraph 2, adding that the trusts were created for estate planning purposes and "[t]he Goldensons are not beneficiaries or trustees of either trust." PRDSMF ¶ 2. The additional statements are supported by the record. *Ward Decl.* Ex. L *The Goldenson Family Insurance Trust* (ECF No. 195-24) (Oct. 6, 1991) (*1991 Insurance Trust*); *2005 Special Trust*. However, the qualification does not demonstrate that the facts of the Defendants' paragraph 2 are incorrect. A qualified response is not an appropriate vehicle for introducing new facts. Rather, the qualification should offer record citations that show that the statement must be modified in some way to be accurate—or explain why such citations are not available. The proper place for additional contextual facts, if necessary for the summary judgment decision, is in the Statement of Additional Material Facts. D. ME. LOC. R. 56(c). Indeed, the Goldensons restated, in their Statement of Additional Material Facts, virtually all of the assertions in their many qualified responses to the Defendants' facts. The Court deems paragraph 2, and a great many of the Defendants' other paragraphs, *infra*—admitted only for the purpose of summary judgment under Local Rule 56(f), (g).

[4] The Goldensons interpose a qualified response. PRDSMF ¶ 3. The Court altered Defendants' paragraph 3 to respond to the Goldensons' qualified response.

[5] The Goldensons object to the assertions in paragraph 4 on two grounds: first, because each fact is not supported by a record citation; and second, because each fact is not set forth in a separately numbered paragraph. PRDSMF ¶ 4 (citing Local Rule 56(b), (f)). While it is true that the Local Rule requires each "fact asserted in the statement" to be "supported by a record citation," the Local Rule also provides that "the court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement." D. ME. LOC. R. 56(f). Although the preferred practice is to provide a record citation that clearly supports the statement, the Court is not anxious to nitpick the citation to generate factual controversies or to leave factual holes, so long as the party referred to a part of the record that confirms the statement.

buying industrial land and buildings, and leasing them to such clients as Lockheed Martin and a company called Mathematica. DSMF ¶ 4; PRDSMF ¶ 4. Mr. Goldenson developed and managed these properties, then later sold them to Public Real Estate Trust in Great Britain for a gross profit of $12 million and an after-tax profit of $8 million. DSMF ¶ 4; PRDSMF ¶ 4.[6] Mr. Goldenson testified that he did "everything [him]self" without the benefit of investment advice. DSMF ¶ 4; PRDSMF ¶ 4.[7]

---

Turning to the Goldensons' objection that the Defendants violated Local Rule 56(b) and (f) by failing to posit a single fact in a single paragraph, the Court has never interpreted the Local Rule to require single sentence paragraphs. In fact, the term "paragraph" in the Local Rule implies that each statement may contain more than one sentence. D. ME. LOC. R. 56(b) ("A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, each set forth in a separately numbered paragraph(s), as to which the moving party contends there is no genuine issue of material fact to be tried"). The Court reads the Local Rule as encouraging the parties not to load up statements so as to make them difficult to respond to. Here, the Court does not view the Defendants' statements of material fact as having violated the Local Rule requiring each fact to be simply and directly stated. D. ME. LOC. R. 56(b).

The Goldensons have objected to nearly every one of the Defendants' statements of material fact on these two grounds, *see* DSMF ¶¶ 1-128; PRDSMF ¶¶ 1-128; the Court overrules each and every such objection.

The Goldensons also interpose a qualified response to paragraph 4, characterizing Mr. Goldenson's real estate activities as a single office park development. PRDSMF ¶ 4 (citing *Ward Decl.* Ex. A *Tr. of Videotaped Dep. of Daniel R. Goldenson*, at 279:23-281:02 (ECF No. 203) (Sept. 26, 2011) (*Def.'s D.G. 2011 Dep. Tr.*)). The qualification goes to the characterization of Mr. Goldenson's activities but does not controvert the basic factual assertion of paragraph 4. The Court deems paragraph 4 admitted under Local Rule 56(f), (g).

[6] Paragraph 4 characterizes Mr. Goldenson's profit as "$12 million to himself." DSMF ¶ 4. The Goldensons interpose a qualified response, stating that the $12 million was gross profit; the net profit was $8 million after taxes. PRDSMF ¶ 4. This qualification is supported by the record. *D.G. 2011 Dept. Tr.* 280:22-281:2. The Goldensons do not deny the $12 million figure as gross profit. To clarify the record, the Court used both gross and net figures.

[7] Paragraph 4 states that "Mr. Goldenson testified in this case that he did 'everything for [him]self' without the benefit of advice." DSMF ¶ 4. The Goldensons interpose a qualified response, clarifying that Mr. Goldenson "did everything [him]self" without the benefit of *investment* advice. PRDSMF ¶ 4 (emphasis in original). The record citation is ambiguous on this point. *D.G. 2011 Dep. Tr.* 280:22-281:2 Mr. Goldenson was asked whether he had any investment advice and he replied:

I did everything myself. I rented the space, I built the buildings, learned how to do it, and managed them. I did everything.

When he was an undergraduate at Princeton, Mr. Goldenson started a company called Resource Publications. DSMF ¶ 5; PRDSMF ¶ 5. Resource Publications was a publishing company that published career opportunity guides, principally in engineering. DSMF ¶ 7; PRDSMF ¶ 7. After starting the company, he expanded it and sold it to another company for restricted stock that he thought was worth $1,000,000, but that he later liquidated for $300,000. DSMF ¶ 7; PRDSMF ¶ 7.[8]

Mr. Goldenson subsequently started a company called eMedguides, Inc. DSMF ¶ 6; PRDSMF ¶ 6. eMedguides was an online venture whose purpose was to "index the medical internet in every field of medicine." DSMF ¶ 6; PRDSMF ¶ 6 (quoting *Def.'s D.G. 2011 Dep. Tr.* 277:8-11).[9] eMedguides was an "ambitious project." DSMF ¶ 6; PRDSMF ¶ 6. Mr. Goldenson sold eMedguides to the Physicians' Desk Reference group for approximately $2 million. DSMF ¶ 6; PRDSMF ¶ 6. He personally retained "40 percent or 38 percent" of the sale amount,

---

*Id.* The question supports Mr. Goldenson's qualification; his response does not. As the Court is required to view the evidence in a light most favorable to Mr. Goldenson, it accepts his qualified response and has altered paragraph 4.

[8] Paragraph 5 states that Mr. Goldenson sold the company for "$1 million in restricted stock." DSMF ¶ 5 (citing *Def.'s D.G. 2012 Dep. Tr.* 278:20-279:12). The Goldensons interpose a qualified response, asserting that when the stock restrictions were lifted it was only worth $300,000. PRDSMF ¶ 5 (citing *Def.'s D.G. 2012 Dep. Tr.* 278:20-279:12). Mr. Goldenson testified that when he sold the company, he thought he was receiving $1,000,000 in restricted stock, but by the time the restriction on the stock was lifted, it was worth only $300,000. *Id.* To clarify the statement, the Court included both figures in its recitation of the facts.

[9] The Defendants originally quoted Mr. Goldenson's deposition as saying that eMedguides "index[ed] the medical internet." DSMF ¶ 6 (quoting with alteration *Def.'s D.G. 2011 Dep. Tr.* 277:07-24). The Goldensons interpose a qualified response, restoring the altered language and denying that eMedguides actually succeeded in "indexing the medical internet in every field of medicine." PRDSMF ¶ 6. The Goldensons' version is supported by the record, and the Court credits it.

and "a friend of [his] son's who had gone to Princeton" retained between 5 and 7 percent. DSMF ¶ 6 (quoting *Def.'s D.G. 2011 Dep. Tr.* 277:07-24); PRDSMF ¶ 6.

Mr. Goldenson also started a company called Medbioworld that operated a medical website. DSMF ¶ 7; PRDSMF ¶ 7. To start the company, Mr. Goldenson first purchased a preexisting website company called ScienceKomm "'that had every medical publication in every possible field.'" DSMF ¶ 7 (quoting *Def.'s D.G. 2011 Dep. Tr.* 278:12-13); PRDSMF ¶ 7. He purchased ScienceKomm because he judged it to be "a great platform" to start his own company; it was "'the most comprehensive'" medical website in existence at the time. DSMF ¶ 7 (quoting *Def.'s D.G. 2011 Dep. Tr.* 277:2, 13-14); PRDSMF ¶ 7. Mr. Goldenson later sold Medbioworld to a company called Healthnostics in or around 2003 for $135,000, a loss of approximately $65,000 on his original investment. DSMF ¶ 7; PRDSMF ¶ 7.[10]

In 2008, Mr. Goldenson started a company called Starting Out, Inc. DSMF ¶ 8; PRDSMF ¶ 8. Starting Out was a publishing company that published books on life skills education. DSMF ¶ 8; PRDSMF ¶ 8. He sold the company to the publisher McGraw-Hill in 2010 for approximately $800,000, of which he personally

---

[10] Paragraph 7 omits the fact that Mr. Goldenson took a loss on the sale. The Goldensons interpose a qualified response, highlighting that fact. PRDSMF ¶ 7. The qualification is supported by the record, and the Court credits it. The qualification also asserts that Mr. Goldenson did not "run" Medbioworld, PRDSMF ¶ 7; the Court credits this qualification as well.

retained $600,000. DSMF ¶ 8; PRDSMF ¶ 8. Mr. Goldenson's net profit on the investment was approximately half of his share of the sale amount. PRDSMF ¶ 8.[11]

Mr. Goldenson also started a corporation called Academic Databases with the intent of forming a business around it, but did not do so. DSMF ¶ 9; PRDSMF ¶ 9. Mr. Goldenson is the co-author of a book called "How To Succeed In Business Before Graduation." DSMF ¶ 10; PRDSMF ¶ 10.

### b. The Goldensons' Financial Status and Dealings

#### i. Financial Background; Financial Advisor Relationships

As of October 2001, the Goldensons owned or controlled the following assets. They had approximately $10.7 million in Merrill Lynch and Morgan Stanley accounts, predominantly in municipal bonds. DSMF ¶ 11; PRDSMF ¶ 11.[12] They had artwork of unknown provenance and value. DSMF ¶ 11; PRDSMF ¶ 11.[13] They owned a home in Princeton, New Jersey that they later sold in 2004 for $1.6

---

[11] The Defendants omit this fact from their paragraph 8. DSMF ¶ 8. The Goldensons interpose a qualified response highlighting the net profit amount. PRDSMF ¶ 8 (citing *Frawley Decl.* Ex. C *Tr. of Videotaped Deposition of Daniel R. Goldenson*, at 195:22-196:3 (ECF No. 211-4) (*Pl.'s D.G. 2011 Dep. Tr.*)). Their qualification also asserts that Mr. Goldenson was not the sole owner of Medbioworld; however, paragraph 7 did not make this claim. The Court disregards that portion of the qualification.

[12] Paragraph 11 divides this amount between accounts with two different firms, Merrill Lynch and "Salomon" (presumably Salomon SmithBarney), and did not include the fact that the amounts were primarily in bonds. DSMF ¶ 11. The Goldensons interpose a qualified response to this effect. PRDSMF ¶ 11 (citing *2011 D.G. Dep. Tr. 2* 168:14-169:5; *Ward Decl.* Ex. F (ECF No. 195-18) (Oct. 31, 2001); *Ward Decl.* Ex. H (ECF No. 195-20) (Oct. 28, 2001)). The qualification is supported by the record, and the Court credits it.

[13] The Defendants value this artwork at $500,000. DSMF ¶ 11. The Goldensons interpose a qualified response, insisting that the value was merely speculative and the authorship unknown. PRDSMF ¶ 11 (citing *Pl.'s D.G. 2011 Dep. Tr.* 12:7-22). The qualification is supported by the record, and the Court credits it.

million. DSMF ¶ 11; PRDSMF ¶11.[14] Finally, they owned a residence and land in Maine. DSMF ¶ 11; PRDSMF ¶ 11.

The Defendants contend that in 2001 Mr. Goldenson was an "experienced and sophisticated investor," but the Goldensons dispute this characterization. DSMF ¶ 12; PRDSMF ¶ 12.[15] Mr. Goldenson has said that he considers himself to be "educated about investments and the investment world" and a "careful and inquisitive" investor. DSMF ¶ 13; PRDSMF ¶ 13. Mr. Goldenson has also described himself as a "conservative investor." DSMF ¶ 14; PRDSMF ¶ 14.[16]

From 1991 to 2010, Brian Burns was one of the Goldensons' financial advisors at Merrill Lynch, DSMF ¶ 15; PRDSMF ¶ 15, but the Goldensons considered Mr. Steffens to be "probably above all others our investment advisor." PRDSMF ¶ 15.[17] The Goldensons worked with Mr. Burns when he was at Drexel

---

[14] The Defendants value the residence at $1.6 million in 2001, DSMF ¶ 11; the Goldensons interpose a qualified response, pointing out that the $1.6 million sale price was established in 2004, not 2001. PRDSMF ¶ 11 (citing *Pl.'s D.G. 2011 Dep. Tr.* 11:9-20). The qualification is supported by the record, and the Court credits it.

[15] Both parties' characterizations of Mr. Goldenson's sophistication as an investor are more argument than fact. The Court will not credit either one as a "fact." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 796 (1st Cir. 1992).

[16] The Defendants also assert that Mr. Goldenson "considers hedge funds to be consistent with his conservative approach." DSMF ¶ 14 (citing *Def.'s D.G. 2011 Dep. Tr.* 15:18-16:5). The Plaintiffs deny this assertion, arguing that Mr. Goldenson only considered hedge funds to be conservative because Mr. Steffens told him that they were more reliable than municipal bonds. PRDSMF ¶ 14 (citing *Pl.'s D.G. 2011 Dep. Tr.* 15:18-16:9, 21:14-22:21). This portion of paragraph 14 is conclusory, and the Court does not credit it.

[17] The Defendants assert that the Goldensons "relied on" Mr. Burns. The Goldensons interpose a qualified response, claiming that while they worked with Mr. Burns, Mr. Steffens was "probably above all others our investment advisor." PRDSMF ¶ 15 (citing *Def.'s D.G. 2011 Dep. Tr.* 17:16-20:05, quoting *Def.'s D.G. 2011 Dep. Tr.* 17:20-21). The Goldensons' version is supported by the record, and the Court credits it. However, not surprisingly, the term "investment advisor" has significant potential legal implications, which the Court discusses later. Especially in the context of a summary judgment motion, the Defendants are in no position to challenge the Goldensons' assertion that they believed Mr. Steffens was their investment advisor. Whether the facts underlying the relationship between the Goldensons and Mr. Steffens are sufficient to actually make

Burnham before and during 1991, when he moved to Merrill Lynch in 1991, and to Morgan Stanley in 2004. DSMF ¶ 15; PRDSMF ¶ 15. The Goldensons' investment accounts with Mr. Burns were non-discretionary, and Mr. Burns discussed the merits of specific investment options with both Mr. and Mrs. Goldenson. DSMF ¶ 16; PRDSMF ¶ 16.[18] Mr. Burns testified that he thought Mr. Goldenson was a "sophisticated investor" based on his knowledge and intelligence. DSMF ¶ 16; PRDSMF ¶ 16.[19]

### ii. Investments in Summit Hedge Funds

Plaintiff SKG Partners, L.P. made investments in, and withdrawals from, two hedge funds called Summit SP I Plus and Summit SP II, respectively, as follows. DSMF ¶ 17; PRDSMF ¶ 17. In 2005, SKG Partners contributed $1,500,000 to Summit SP II. DSMF ¶ 17; PRDSMF ¶ 17. In 2006, SKG Partners contributed $750,000 to Summit SP II. DSMF ¶ 17; PRDSMF ¶ 17. In 2007, SKG Partners contributed $400,000 to Summit SP I Plus. DSMF ¶ 17; PRDSMF ¶ 17. In 2008,

---

Mr. Steffens their investment advisor is another matter. In its recitation of facts, the Court has distinguished between the Goldensons' belief about Mr. Steffens' status as their investment advisor, which the Court accepts for purposes of this motion, and his actual status as their investment advisor.

[18] The Defendants specify that Mr. Burns "discussed every investment he made in the Goldensons' accounts with Mr. Goldenson before making the investment." DSMF ¶ 16. The Goldensons interpose a qualified response, rephrasing the statement as it appears above. PRDSMF ¶ 16 (citing *Frawley Decl.* Ex. D *Dep. of Brian Burns*, at 14:6-15:4 (ECF No. 211-5) (Feb. 15, 2012) (*Pl.'s Burns Dep. Tr.*)). Aside from phrasing, the difference appears to be that in the Goldensons' view, Mr. Burns consulted with both Mr. and Mrs. Goldenson, not merely Mr. Goldenson.

[19] The Defendants quote Mr. Burns as saying that Mr. Goldenson "participated actively," but the record does not support this assertion. *See Ward Decl.* Ex. D *Dep. of Brian Burns*, at 147:12-19 (ECF No. 206) (Feb. 15, 2012) (*Def.'s Burns Dep. Tr.*). The Defendants also assert that Mr. Burns regarded Mr. Goldenson as someone who "understood complicated investment concepts and strategies." DSMF ¶ 16 (citing *Def.'s Burns Dep. Tr.* 16:7-23). The Goldensons deny this portion of paragraph 16, arguing that Mr. Burns only testified that Mr. Goldenson had never expressed that he was unable to understand investment concepts. PRDSMF ¶ 16 (citing *Pl.'s Burns Dep. Tr.* 16:19-23). The Defendants' version of the disputed clause is conclusory and unsupported by the record, and the Court will not credit it.

SKG Partners contributed $300,000 to Summit SP I Plus; withdrew $358,873 from Summit SP I Plus; and withdrew $2,162,163 from Summit SP II. DSMF ¶ 17; PRDSMF ¶ 17. The amounts invested in the two hedge funds totaled $2.95 million; the amounts withdrawn totaled $2,521,036. DSMF ¶¶ 17-18; PRDSMF ¶ 17-18.[20]

Mr. Goldenson redeemed assets the Goldensons had invested with Spring Mountain, in addition to assets they had invested with Ascot, in order to invest in Summit. DSMF ¶ 19; PRDSMF ¶ 19. Mr. Goldenson informed the Defendants before he decided to invest in Summit funds because he "wanted them to know that I was trying to diversify," but he did not ask for their views on the Summit Fund. PRDSMF ¶ 19.[21]

Mr. Goldenson was introduced to Summit by James Straus, who was President and CEO of Straus Capital, LLC. DSMF ¶ 20; PRDSMF ¶ 20. During the same period when the Goldensons made and maintained their investments in QP I and Ascot, Mr. Goldenson corresponded with Mr. Straus and informed him that he had come up with his own "idea for a new fund that would generate returns

---

[20] The Goldensons also deny all of paragraph 18, claiming without elaboration that the cited material does not support the facts. PRDSMF ¶ 18. This probably refers to the arithmetic error in totaling the withdrawals from both hedge funds; while the Defendants claim the total withdrawals are $2,162,163, this sum disregards the withdrawals from Summit SP I Plus. The Defendants also claim that "[t]he losses in the hedge funds total $428,964," DSMF ¶ 18, but the Court cannot locate any combination of gain/loss numbers in Exhibit I to the Ward Affidavit that would support this sum. Since the Defendants do not provide a specific citation supporting the total loss amount, the Court does not credit it. D. ME. LOC. R. 56(f), (g).

[21] The Goldensons characterize this conversation with the Defendants regarding Summit as a "consult." PRDSMF ¶ 19 (citing *Pl.'s D.G. 2011 Dep. Tr.* 183:12-184:9). By contrast, the Defendants assert that Mr. Goldenson made "the decision to do so on his own and without consulting Defendants." DSMF ¶ 19 (citing *Def.'s D.G. 2011 Dep. Tr.* 183:12-184:9). At his 2011 deposition, Mr. Goldenson testified that he asked neither Mr. Steffens nor Mr. Ho for their opinions on whether Mr. Goldenson should invest in Summit. *Pl.'s D.G. 2011 Dep. Tr.* 183:19-184:9. Given this testimony, the Court does not characterize the conversations as a "consult."

considerably higher than those I am in now, and I would like to discuss it with you." DSMF ¶ 20 (quoting *Ward. Aff.* Ex. K (ECF No. 195-23) (Mar. 3, 2006) (*Straus Email*)); PRDSMF ¶ 20.[22] He further proposed "put[ting] a plan together" with Mr. Straus and others for a new fund. DSMF ¶ 20 (quoting *Straus Email*); PRDSMF ¶ 20.

### iii.    Other Investments and Trust Activity

In 2003, the Goldensons invested $1 million in a hedge fund called Eagle Yield LLC ("Eagle"). DSMF ¶ 21; PRDSMF ¶ 21.[23] After 2001, the Goldensons invested $600,000 in a hedge fund called Telemetry Fund. DSMF ¶ 22; PRDSMF ¶ 22.

During the same period when the Goldensons made and maintained their investments in QP I and Ascot, they invested $500,000 in oil and gas-related limited partnerships based on Mr. Goldenson's own research. DSMF ¶ 23; PRDSMF ¶ 23.[24]

---

[22]    The Defendants characterize this statement to Mr. Straus as a "boast." DSMF ¶ 20. The Goldensons deny paragraph 20 to the extent that it represents that Mr. Goldenson "boasted" about any idea. PRDSMF ¶ 20. The Defendants' characterization of the Straus conversation is conclusory, and the Court does not credit it.

[23]    The Goldensons admit paragraph 21, but also qualify it, adding that Mr. Steffens recommended the Eagle investment to Mr. Goldenson and was his investment advisor with regard to this investment, and furthermore that QP I also invested in Eagle. PRDSMF ¶ 21 (citing *Pl.'s D.G. 2011 Dep. Tr.* 143:15-19, 188:9-189:1; *Frawley Decl.* Ex. E *Dep. of Suzanne K. Goldenson*, at 31:7-32:2 (ECF No. 211-5) (Nov. 30, 2011) (*Pl.'s S.G. 2011 Dep. Tr.*)). This is not the correct procedure. "Each . . . statement shall begin with the designation 'Admitted,' 'Denied,' or 'Qualified' and, in the case of an admission, shall end with such designation." D. ME. LOC. R. 56(c). Furthermore, even if the Court were to treat this response as "qualified," the additional material does not change the substance of paragraph 21. The Court disregards the additional material appended to the admitted response.

[24]    The Goldensons interpose a qualified response, asserting that "Mr. Goldenson invested in oil and gas-related master limited partnerships after he noticed that Spring Mountain was investing in them and 'was curious because there were quite a few.'" PRDSMF ¶ 23 (citing *Def.'s D.G. 2011 Dep. Tr.* 190:2-192:23 and quoting *Def.'s D.G. 2011 Dep. Tr.* 191:4-5). However, the qualification does not change the substance of paragraph 23.

Mr. Goldenson chose these investments because they were tax-friendly, and made "a very nice return" on them. DSMF ¶ 23; PRDSMF ¶ 23.[25]

Since 1991, the Goldensons have worked with a large national law firm called Lowenstein Sandler LLP to create and utilize complex financial trusts for the purpose of transferring assets to their descendants without taxation. DSMF ¶ 24; PRDSMF ¶ 24.[26] With Lowenstein Sandler, in 1991 the Goldensons created the 1991 Insurance Trust. DSMF ¶ 25; PRDSMF ¶ 25. That Trust holds a whole life insurance policy with a face value of $14 million.[27] In 2005, the Goldensons and their lawyers created another trust, the 2005 Special Trust. DSMF ¶ 26; PRDSMF ¶ 26. In 2006, the Special Trust engaged in a complex series of financial transactions involving three parcels of real property owned or controlled by the Goldensons with appraised values of $2,720,000, $1,185,000, and $205,000, respectively. DSMF ¶ 26; PRDSMF ¶ 26.[28]

---

[25] The Goldensons interpose a qualified response, asserting that Mr. Goldenson did not "end up getting much of a tax benefit." PRDSMF ¶ 23 (citing *Def.'s D.G. 2011 Dep. Tr.* 190:2-192:23 and quoting *Def.'s D.G. 2011 Dep. Tr.* 192:20). The qualification does not change the substance of paragraph 23. The Court deems the qualified response admitted under Local Rule 56(f), (g).

[26] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 24. The Court deems the qualified response admitted under Local Rule 56(f), (g).

[27] The Defendants also assert that the 1991 Insurance Trust has a face value of $2.25 million as of March 31, 2004. DSMF ¶ 25 (citing *Def.'s D.G. 2012 Dep. Tr.* 5:15-7:3, 44:3-44:22 and *1991 Insurance Trust*). The Goldensons interpose a qualified response, denying the cash value amount. PRDSMF ¶ 25. The record does not support any cash value for the insurance policy, and the Court rejects that portion of paragraph 25. *See Def.'s D.G. 2012 Dep. Tr.* 5:15-7:3, 44:3-44:22; *1991 Insurance Trust*.

[28] The Goldensons interpose a qualified response, asserting that "[t]he Goldensons' trust and estate attorneys created this trust[] and structured these transactions." PRDSMF ¶ 26. The qualification does not change the substance of paragraph 26. The Court deems the qualified response admitted under Local Rule 56(f), (g).

### iv. Returns on the Goldensons' Spring Mountain Investments

Beginning in or around 2003 and ending in or around 2006, the Goldensons held investments in two other funds managed by SMC besides QP I.  DSMF ¶ 27; PRDMSF ¶ 27.[29]  Those funds were the SMC Leveraged Fund, LLC, and the SMC Alternative Strategies Fund, LLC.  DSMF ¶ 27; PRDSMF ¶ 27.[30]  In QP I the Goldensons recovered the full amount of their principal investment and made a gain of $864,186, of which $485,838 has already been distributed to them.  DSMF ¶ 27; PRDSMF ¶ 27.[31]  In SMC Leveraged Fund, LLC, the Goldensons recovered the full amount of their principal investment and made a gain of $720,014, all of which has been distributed to them.  DSMF ¶ 27; PRDSMF ¶ 27.  In SMC Alternative Strategies Fund, the Goldensons recovered the full amount of their principal investment and made a gain of $56,006 all of which has been distributed to them. DSMF ¶ 27; PRDSMF ¶ 27.  In total, the Goldensons have made approximately $1.6 million on their Spring Mountain investments.  DSMF ¶ 27; PRDSMF ¶ 27.

[29]    The Court overrules the Goldensons' objection that paragraph 27 lacks evidentiary foundation; Mr. Steffens has personal knowledge of the Goldensons' investments in the funds he owns and controls.  The Court also overrules the Goldensons' objection that Mr. Steffens' affidavit was not produced in discovery.  A motion for summary judgment is not an appropriate vehicle to resolve a discovery dispute, and in any event the Goldensons failed to demonstrate any unfair prejudice from the non-disclosure.

[30]    The Goldensons interpose a qualified response, claiming that they invested in these funds on Mr. Steffens' advice, and withdrew from them when they felt their exposure to SMC was too great.  PRDSMF ¶ 27 (citing *Pl.'s D.G. 2012 Dep. Tr.* 184:10-15, 185:5-186:12).  The qualification does not change the substance of paragraph 27, so the Court deems paragraph 27 admitted under Local Rule 56(f), (g).

[31]    The Goldensons interpose a qualified response, asserting that "[t]he estimated remaining value of SKG Partners L.P.'s interest in the QP I fund is $378,349."  PRDSMF ¶ 27 (citing *Steffens Decl.* Ex. C (ECF No. 195-6) (May 1, 2013)).  This number can be arrived at by subtracting the distribution amount from the gain amount stated in paragraph 27, and so the qualification does not change the substance of paragraph 27.  The Court deems this portion of paragraph 27 admitted under Local Rule 56(f), (g).

### c.    The History of the Goldensons' Dealings With Mr. Steffens

There is a genuine dispute as to whether, prior to December 2001, the Goldensons had any business or investment dealings with Mr. Steffens.  DSMF ¶ 28; PRDSMF ¶ 28.[32]

### i.    The Goldensons Meet the Steffens

Mrs. Goldenson met Mr. Steffens' wife, Louise Steffens, as early as the mid-1990s, when both families had children at Princeton Day School.  DSMF ¶ 29; PRDSMF ¶ 29.  During that time, Mrs. Steffens and Mrs. Goldenson became social friends outside of their dealings at the Princeton Day School.  DSMF ¶ 29; PRDSMF ¶ 29.[33]  Mrs. Goldenson first met Mr. Steffens in late 1999 when, in connection with her role as President of the Arts Council of Princeton, she requested and obtained a meeting with Mr. Steffens to introduce herself and request a donation.  DSMF ¶ 30; PRDSMF ¶ 30. At the meeting, Mr. Steffens agreed to make a $100,000 donation to the Council.  DSMF ¶ 30; PRDSMF ¶ 30.  The Arts Council received a donation in

---

[32]    The Defendants claim that "[p]rior to December 2001, the Goldensons had no business or investment dealings with Mr. Steffens."  DSMF ¶ 28 (citing *Steffens Decl.* ¶ 7).  However, the Goldensons deny this statement, offering Mr. Goldenson's deposition testimony as to his and his wife's dealings with Mr. Steffens during this period.  PRDSMF ¶ 28 (citing *Pl.'s D.G. 2011 Dep. Tr.* 14:22-15:7, 17:16-20:5).  Whether Mr. Steffens and Mr. Goldenson did, in fact, have "business and investment dealings" is partly a dispute of fact and partly an issue of interpretation.  The Court accepts neither side's conclusory interpretations as to the nature of the relationship, and the Court will address the individual factual allegations in detail below.

[33]    The Defendants assert instead that "they formed a social acquaintance through the school."  DSMF ¶ 29 (citing *Ward Decl. Ex.* C *Dep. of Suzanne K. Goldenson*, at 3:24-5:16 (ECF No. 205) (Nov. 30, 2011) (*Def.'s S.G. 2011 Dep. Tr.*)).  The Goldensons interpose a qualified response, insisting that they became acquainted outside the school.  PRDSMF ¶ 29 (citing *Pl.'s S.G. 2011 Dep. Tr.* 3:24-5:16).  The cited passage indicates that Mrs. Goldenson met Mrs. Steffens through their children at Princeton Day School, *Def.'s S.G. 2011 Dep. Tr.* 3:24-25, but they became social friends outside of the Princeton Day School.  *Def.'s S.G. 2011 Dep. Tr.* 5:8-16.  The Goldensons' version is supported by the record, and so the Court credits it.

that amount from Mr. and Mrs. Steffens on December 24, 1999. DSMF ¶ 30; PRDSMF ¶ 30.

At the time of Mrs. Goldenson's visit to Mr. Steffens' office to request a donation, Mr. Goldenson had never met Mr. Steffens, though they saw each other at dinner events after Mr. Steffens donated to the Arts Council. DSMF ¶ 31; PRDSMF ¶ 31.[34] Following Mrs. Goldenson's initial meeting with Mr. Steffens in late 1999, Mrs. Goldenson's social acquaintance with Mrs. Steffens grew into a "casual friendship" that entailed conversations about "future daughters-in-law" and related topics. DSMF ¶ 32; PRDSMF ¶ 32. After 1999, Mrs. Goldenson was "casual friends" with Mr. Steffens but did not have much contact with him. DSMF ¶ 33; PRDSMF ¶ 33.[35] Mr. Goldenson and Mr. Steffens met for the first time after Mrs. Goldenson had first met Mr. Steffens. DSMF ¶ 34; PRDSMF ¶ 34. The two met through their wives at a social event. DSMF ¶ 34; PRDSMF ¶ 34.[36] Although Mrs. Goldenson "didn't have that much contact" with Mr. Steffens after she met him,

---

[34] The Defendants did not include that the two couples saw each other at dinner events after the Arts Council donation. DSMF ¶ 31. The Goldensons interpose a qualified response to this effect. PRDSMF ¶ 31 (citing *Pl.'s S.G. 2011 Dep. Tr.* 62:24-63:4). The Goldensons' version is supported by the record, and so the Court credits it.

[35] The Defendants stated that Mrs. Goldenson "'didn't have that much contact'" with Mr. Steffens after 1999, DSMF ¶ 33 (quoting *Def.'s S.G. 2011 Dep. Tr.* 20:4-5), but the Goldensons interpose a qualified response, pointing out that Mrs. Goldenson "testified that she was 'casual friends' with Mr. Steffens." PRDSMF ¶ 33 (quoting *Pl.'s S.G. 2011 Dep. Tr.* 20:6). The difference is merely one of characterization.

[36] The Goldensons interpose a qualified response, restating that "the number of times the Goldensons and Steffens saw each other at dinner events 'grew' after Mr. Steffens donated to the Arts Council of Princeton." PRDSMF ¶ 34 (citing *Pl.'s S.G. 2011 Dep. Tr.* 62:24-63:4). The qualification does not change the substance of paragraph 34. The Court deems the qualified response admitted under Local Rule 56(f), (g).

Mrs. Goldenson had a "longer history" with Mr. Steffens and a "closer relationship" with him than Mr. Goldenson did. DSMF ¶ 35; PRDSMF ¶ 35.[37]

### ii. The Relationship Between Mr. Goldenson and Mr. Steffens Before November 2001

Between the first meeting of Mr. Goldenson and Mr. Steffens and the time when Mr. Goldenson visited Mr. Steffens at SMC's offices in December 2001, they were together only a handful of times, always at social events. DSMF ¶ 36; PRDSMF ¶ 36.[38] Before December 2001, Mr. Goldenson "discussed investments with Mr. Steffens" on "six to eight specific occasions, most of which were actually social occasions." DSMF ¶ 37; PRDSMF ¶ 37. Mr. Goldenson apparently never visited Mr. Steffens at his Merrill Lynch office. DSMF ¶ 38; PRDSMF ¶ 38.

For many years Mr. Steffens served as Vice Chairman of the Board of Directors of Merrill Lynch. DSMF ¶ 39; PRDSMF ¶ 39.[39] He was a senior executive with managerial and supervisory responsibilities for important parts of Merrill Lynch's retail brokerage network. DSMF ¶ 39; PRDSMF ¶ 39. His duties at

---

[37] The Goldensons interpose a qualified response, asserting that "Mrs. Goldenson testified that she was 'casual friends' with Mr. Steffens." PRDSMF ¶ 35 (citing *Pl.'s S.G. 2011 Dep. Tr.* 19:23-20:6). The qualification does not change the substance of paragraph 35. The Court deems the qualified response admitted under Local Rule 56(f), (g).

[38] The Goldensons interpose a qualified response highlighting the details of investment conversations between Mr. Goldenson and Mr. Steffens at these social events. PRDSMF ¶ 36 (citing *Pl.'s D.G. 2011 Dep. Tr.* 14:11-17, 20:14-21, 22:4-13). This portion of the qualification is captured by the Defendants' paragraph 37, so there is no need to qualify paragraph 36. The Goldensons also interpose that "Mr. Steffens 'was [the Goldensons'] investment advisor," which led to the questions at social events. *Id.* (quoting *Pl.'s D.G. 2011 Dep. Tr.* 14:3-14). The Defendants do not agree with this characterization of Mr. Steffens, *see* DSMF ¶ 28 ("Prior to December 2001, the Goldensons had no business or investment dealings with Mr. Steffens"). Mr. Goldenson's assertion that Mr. Steffens was his investment advisor is conclusory, and the Court is not required at this stage to give it credit. The Court treats paragraph 36 admitted under Local Rule 56(f), (g).

[39] The Goldensons interpose a qualified response containing many additional details of Mr. Steffens' career at Merrill Lynch. PRDSMF ¶ 39. The qualification does not change the substance of paragraph 39. The Court deems paragraph 39 admitted under Local Rule 56(f), (g).

Merrill Lynch did not include advising individual accounts, with only three exceptions for accounts holding $2 billion to $6 billion in assets. DSMF ¶ 39; PRDSMF ¶ 39.

Mr. Burns' name appeared on the Goldensons' Merrill Lynch statements as their "executing broker," and Mr. Steffens' name never appeared on any of their account statements. DSMF ¶ 40; PRDSMF ¶ 40.[40] During his tenure at Merrill Lynch, Mr. Steffens and Mr. Burns did not know each other and did not work at the same location. DSMF ¶ 41; PRDSMF ¶ 41.[41] After Mr. Steffens' departure from Merrill Lynch in 2001, the Goldensons invested a total of $1.25 million with Mr. Burns. DSMF ¶ 42; PRDSMF ¶ 42.[42] Mr. Steffens left Merrill Lynch in June 2001

---

[40] The Defendants also claim that "Mr. Steffens never played any role at all with respect to any accounts that [the Goldensons] held at Merrill Lynch." DSMF ¶ 40 (citing *Steffens Decl.* ¶ 7(b)). The Goldensons deny this statement, and the Court is bound to resolve factual disputes in favor of the non-movant. The Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 14:22-15:7, and it properly controverts the Defendants' assertion.

As to Mr. Burns, the Goldensons interpose a qualified response asserting that Brian Burns' name appeared on their Merrill Lynch statements as their "executing broker." PRDSMF ¶ 40 (citing *Def.'s D.G. 2011 Dep. Tr.* 164:3-15). However, this does not address the Defendants' claim that Mr. Steffens' name never appeared on the statements, and in fact Mr. Goldenson admitted this in his 2011 deposition. *Def.'s D.G. 2011 Dep. Tr.* 164:10-12. The Court deems this fact admitted under Local Rule 56(f), (g).

[41] The Goldensons interpose a qualified response, claiming that at some time "long before" October 31, 2011, Mr. Steffens asked Mr. Goldenson who his Merrill Lynch broker was and Mr. Goldenson informed him that it was Mr. Burns. PRDSMF ¶ 41 (citing *Pl.'s D.G. Dep. Tr.* 163:20-165:6). The qualification does not change the substance of paragraph 41. The Court deems paragraph 41 admitted under Local Rule 56(f), (g).

[42] The Defendants claim that the Goldensons "continued to invest millions of dollars with Mr. Burns," DSMF ¶ 42, but the Goldensons deny this claim. PRDSMF ¶ 42 (citing *Pl.'s Burns Dep. Tr.* 62:8-63:21). According to Mr. Burns, the total of the two investments the Goldensons made in Merrill Lynch after 2001 was $1.25 million. *Pl.'s Burns Dep. Tr.* 62:8-63:21. The remainder of the Goldensons' denial does not contradict the Defendants' statement, as modified to include the specific dollar amount, and so the Court deems the remainder admitted under Local Rule 56(f), (g).

and formally organized Spring Mountain Capital and the QP I fund on October 29, 2001.  DSMF ¶ 43; PRDSMF ¶ 43.[43]

### iii.    The November Dinner and the December Meeting

In November 2001, the Goldensons met Mr. Steffens and his wife at a restaurant in Princeton for "a social gathering."  DSMF ¶ 44; PRDSMF ¶ 44.[44]  That November 2001 dinner marked only the second time in the course of the Goldensons' acquaintance with Mr. and Mrs. Steffens that the couples were together without a larger group of people.  DSMF ¶ 44; PRDSMF ¶ 44.  Over dinner, Mr. Steffens told the Goldensons that he had started Spring Mountain Capital and generally described its hedged investing concept.  DSMF ¶ 45; PRDSMF ¶ 45.[45]  Mr. Goldenson expressed interest.  DSMF¶ 45; PRDSMF ¶ 45.

On December 14, 2001, Mr. Goldenson visited Mr. Steffens at SMC's offices in New York City to discuss a possible investment in an SMC fund.  DSMF ¶ 46;

---

[43]    Paragraph 43 claims that Mr. Steffens "founded" Spring Mountain Capital in June 2001, not October.  DSMF ¶ 43 (citing *Steffens Decl.* ¶ 7(a)).  However, Mr. Steffens' Declaration only states that he "left Merrill Lynch to start Spring Mountain" in June 2001.  The Goldensons interpose a qualified response stating that Mr. Steffens formally organized Spring Mountain Capital on October 29, 2001.  PRDSMF ¶ 43 (citing *Frawley Decl.* Ex. J *Limited Liability Company Agreement Spring Mountain Capital G.P., LLC* (ECF No. 211-9) (Oct. 29, 2001) (*SMC General Partner Papers*) and *Frawley Decl.* Ex. K *Limited Partnership Agreement Spring Mountain Capital, LP* (ECF No. 211-10) (Oct. 29, 2001) (*SMC Limited Partnership Papers*)).  The qualification is supported by the record, and the Court credits it.

[44]    The Goldensons interpose a qualified response, reciting contextual details about the prior relationship between the parties and details about what was discussed over dinner.  PRDSMF ¶ 44.  The Defendants adequately capture the details of the dinner conversation in their paragraph 45, and the other details do not change the substance of paragraph 44.  The Court deems paragraph 44 admitted under Local Rule 56(f), (g).

[45]    The Goldensons interpose a qualified response, adding detail about their conversations with Mr. Steffens prior to November 2001.  PRDSMF ¶ 45.  However, these details do not change the substance of paragraph 45.  The Court deems paragraph 45 admitted under Local Rule 56(f), (g).

PRDSMF ¶ 46.[46]  They had not spoken about a possible investment between the November dinner and the December 14 meeting.  DSMF ¶ 46; PRDSMF ¶ 46.

### d.    Defendants in This Litigation

Defendants Spring Mountain Capital G.P., LLC, Spring Mountain Capital, LP, and Spring Mountain Capital, LLC are entities associated with the Spring Mountain Capital family of investment funds.  DSMF ¶ 47; PRDSMF ¶ 47.  Spring Mountain Capital G.P., LLC served as the general partner of the only Spring Mountain fund at issue in this case, Spring Mountain Partners QP I, LP.  DSMF ¶ 47; PRDSMF ¶ 47.  Spring Mountain Capital, LP provided investment management and administrative services to QP I and was referred to as the Management Company.  DSMF ¶ 47; PRDSMF ¶ 47.  Spring Mountain Capital, LLC was the general partner of the Management Company.  DSMF ¶ 47; PRDSMF ¶ 47.

John L. Steffens formally organized Spring Mountain and the QP I Fund on October 29, 2001.  DSMF ¶ 48; PRDSMF ¶ 48.[47]  At all relevant times, Mr. Steffens was the sole managing member of Spring Mountain Capital G.P., LLC; the managing director of the Management Company; and the sole managing member of

---

[46]    The Goldensons interpose a qualified response, claiming that "[i]n 2001 and into 2002, Mr. Steffens 'worked in the offices of Gabriel [Capital Corporation].'"  PRDSMF ¶ 46 (citing *Frawley Decl.* Ex. H *Dep. of J. Ezra Merken*, at 122:12-21, 186:7-15 (ECF No. 211-7) (May 2, 2012) (*Merkin Dep. Tr.*) and quoting *Merkin Dep. Tr.* 186:10-11).  However, this does not change the substance of paragraph 46.  The Court deems paragraph 46 admitted under Local Rule 56(f), (g).

[47]    The Defendants claimed that "Defendant Steffens founded Spring Mountain in June 2001."  DSMF ¶ 48 (citing *Ho Decl.* ¶¶ 3-5).  The Goldensons interposed a qualified response, again asserting that the relevant entities were "formally organized" on October 29, 2001.  PRDSMF ¶ 48 (citing *SMC General Partner Papers* and *SMC Limited Partnership Papers*).  The paragraphs of the Ho Declaration that the Defendants cite contain no mention of the date on which the entities were "founded."  *See Ho Decl.* ¶¶ 3-5.  The Goldensons' version is supported by the record, and the Court credits it.

Spring Mountain Capital, LLC.  DSMF ¶ 48; PRDSMF ¶ 48.[48]  At all relevant times, Gregory P. Ho was a limited partner and Chief Operating Officer of the Management Company.  DSMF ¶ 49; PRDSMF ¶ 49.[49]  He was a non-managing member of Spring Mountain Capital G.P., LLC and Spring Mountain Capital, LLC

---

[48]  The Goldensons deny this assertion, citing the Defendants' answer to paragraph 15 of the Amended Complaint.  PRDSMF ¶ 48.  The relevant portion of the Amended Complaint charged that Mr. Steffens "is the sole managing member of [Spring Mountain Capital G.P., LLC], the Managing Director of [the Management Company,] and the sole managing member of [Spring Mountain Capital, LLC]."  *Am. Compl.* ¶ 15 (ECF No. 38) (Apr. 21, 2011).  The Defendants, in their Answer, "[denied] the allegations in the [foregoing sentences] . . . except admit[ted] that Steffens is a Managing Director of [the Management Company and a managing member of [Spring Mountain Capital G.P., LLC] and [Spring Mountain Capital, LLC]."  *Answer to Am. Compl.* ¶ 15 (ECF No. 46) (Aug. 18, 2011).  The difference in plurality between the adjective "sole" and the indefinite article "a" is not significant for two reasons.  First, one can be the "sole" managing partner and still be "a" managing partner.  "A" does not contradict "sole," and the Defendants may have had good reason to be oblique but accurate in their early responses.  Second, the Answer admits the allegation of the Amended Complaint, which is that Mr. Steffens was the "sole" managing member of the various entities.  The Goldensons supply no other record material to contradict paragraph 48, and so the Court treats paragraph 48 admitted under Local Rule 56(f), (g).

[49]  The Goldensons deny all of paragraph 49 except that Mr. Ho was Chief Operating Officer of Spring Mountain Capital, L.P.  PRDSMF ¶ 49.  First, they claim that a Spring Mountain Capital employee organization chart identifies Mr. Ho as the "President and Chief Operating Officer" of Spring Mountain Capital.  *Id.* (citing *Frawley Decl.* Ex. M *Spring Mountain Capital Employee Organizational Chart* (ECF No. 214-13) (date unknown) (*SMC Org. Chart*)).  However, even if the employee chart is correct that Mr. Ho was the "President and Chief Operating Officer" of Spring Mountain Capital, the Defendants' assertion in paragraph 49 remains correct; he was the Chief Operating Officer.

Next, the Goldensons argue that the QP I Confidential Memorandum identified Mr. Ho as one of the individuals on Spring Mountain's "'investment team . . . who have extensive management experience.'"  *Id.* (quoting *Ho Decl.* Ex. A *Confidential Memorandum*, at PLS' RSP 000260 (ECF No. 195-10) (Oct. 2001) (*QP I COM*)).  Not only does this isolated phrase fail to establish Mr. Ho as anything other than the Chief Operating Officer of the Management Company, the text on the same page states that "Mr. Ho . . . is Chief Operating Officer of the Management Company."  *QP I COM* at PLS' RSP 000260.

Finally, the Goldensons argue that Mr. Ho "formally became a Managing Member of both [Spring Mountain Capital, LLC] and [Spring Mountain Capital G.P., LLC] on December 18, 2008."  PRDSMF ¶ 49 (citing *McCloskey Decl.* Ex. G *Amendment No. 1 to the Limited Liability Company Agreement of Spring Mountain Capital, LLC* at SMC000004752 (ECF No. 215-4) (Dec. 18, 2008) and *McCloskey Decl.* Ex. H *Amendment No. 2 to the Limited Liability Company Agreement of Spring Mountain Capital G.P., LLC*, at SMC000004288 (ECF No. 215-4) (Dec. 18, 2008)).  Because facts comprising elements of the IIED claim allegedly occurred after December 18, 2008, Mr. Ho was a managing member of both entities at a "relevant time."  *See* Section II.B.2.p, *infra*.  The Court adjusted the assertion of paragraph 49 to reflect this late accession to managerial duties by Mr. Ho.

The Court deems the Defendants' revised paragraph 49 admitted under Local Rule 56(f), (g).

until December 18, 2008, when he became a managing member of both entities. DSMF ¶ 49; PRDSMF ¶ 49.[50]

### e. Spring Mountain's Business Model

At all relevant times, Defendants created and managed investment funds, including QP I, their first fund. DSMF ¶ 51; PRDSMF ¶ 51.[51] QP I was a "fund of funds": a fund that invested in a portfolio of outside hedge funds run by different managers utilizing different investment strategies. DSMF ¶ 51; PRDSMF ¶ 51.[52] QP I also made investments in private equity funds. DSMF ¶ 51; PRDSMF ¶ 51. The primary purpose of the "fund of funds" concept was to achieve diversity and limit the risk of any one investment. DSMF ¶ 51; PRDSMF ¶ 51. Before Mr. Steffens founded Spring Mountain, he had quantitative studies run on the impact of diversification among funds and strategies to help determine a level of

---

[50] Defendants' paragraph 50 asserts that Mr. Ho "did not have the power to control any of the Defendant entities, and did not in fact exercise control over them." DSMF ¶ 50. There is, however, a genuine dispute as to whether Mr. Ho had such control. DSMF ¶ 50; PRDSMF ¶ 50. The Goldensons deny this statement, citing a variety of sources from the record. PRDSMF ¶ 50. At this stage, the Court is required to view disputed evidence in a light most favorable to the Goldensons and therefore for purposes of this motion only, the Court accepts the Goldensons' denial. The Court has not included paragraph 50.

[51] The Goldensons qualified or denied portions of Defendants' paragraph 51, but no portion of their qualifications and denials address this sentence. PRDSMF ¶ 51. Therefore, the Court deems it admitted under Local Rule 56(f), (g).

[52] The Goldensons deny this assertion, citing an array of record material to the effect that the QP I fund did not "actually invest[] in a portfolio of diverse outside hedge funds run by different managers utilizing different investment strategies." PRDSMF ¶ 51. First, the Defendants' paragraph 51 does not claim that QP I actually achieved "diversity"; rather, it claims that "[t]he primary purpose of the 'fund of funds' concept was to achieve diversity." DSMF ¶ 51. The Goldensons effectively admit this portion of the statement, PRDSMF ¶ 51 ("QUALIFIED as to the QP I Fund's purported investment objective"); no portion of the qualification contradicts the assertion that the goal of the fund was diversity. *See id.* Second, the Goldensons' denial does not rebut the Defendants' assertion that the Fund used "different managers utilizing different investment strategies." Taking the Goldensons' most damaging calculation at face value, "[a]s of October 31, 2008, the QP I fund was invested 43.8% in funds affiliated with [Bernard] Madoff." *Id.* That leaves 56.2% of the fund invested with "other managers," presumably using "different investment strategies." In short, the Goldensons have failed to properly controvert the disputed sentence, and the Court therefore deems it admitted under Local Rule 56(f), (g).

diversification that would generate attractive risk adjusted returns. DSMF ¶ 51; PRDSMF ¶ 51.[53] Mr. Steffens was the primary investor in QP I when it launched. DSMF ¶ 52; PRDSMF ¶ 52.[54] He invested at least $30.5 million of his own personal assets in QP I and maintained that investment at all times. DSMF ¶ 52; PRDSMF ¶ 52.

After creating QP I, Spring Mountain went on to create at least fifteen additional investment funds. DSMF ¶ 53; PRDSMF ¶ 53.[55] Each Spring Mountain Fund, including QP I, charged a standard management fee to each outside investor in the fund, and in turn the fund paid Spring Mountain Capital, LP to serve as investment advisor to the fund and manage the fund's assets. DSMF ¶ 54; PRDSMF ¶ 54. Spring Mountain also offered managed account services for high net

[53] The Goldensons object because "the referenced 'studies' were not produced in discovery, and factual assertions cited thereto should be stricken." PRDSMF ¶ 51. Regarding the asserted discovery violation, a motion for summary judgment is not a proper vehicle for the resolution of a discovery dispute. Furthermore, Mr. Steffens' sworn affidavit to this effect, made on his own personal knowledge, is sufficient to support the assertion that the studies exist and he made use of them. FED. R. CIV. P. 56(c)(1)(A), (c)(4). The Court overrules this objection.

[54] The Goldensons interpose a qualified response, supplying additional details of the financing of QP I. PRDSMF ¶ 52. However, none of the additional facts in the qualification changes the substance of paragraph 52. The Goldensons cite record evidence showing that Mr. Steffens contributed at least $2 million to QP I, *Frawley Decl.* Ex. QQ *Assignment and Assumption Agreement*, at SMC000002571 (ECF No. 214-41) (Oct. 31, 2001); Mr. Ho contributed $1 million, *Frawley Decl.* Ex. N *Spring Mountain Partners QP I, LP Subscription Agreement*, at SMC000000077 (ECF No. 214-14) (Oct. 29, 2001); and Mr. Merkin contributed $1.25 million, *Frawley Decl.* Ex. O *Spring Mountain Partners QP I Subscription Agreement*, at SMC000000456 (ECF No. 214-15) (Oct. 29, 2001). These initial contributions are enough to characterize Mr. Steffens as "the primary investor in QP I when it launched." DSMF ¶ 52. The Court deems the Defendants' paragraph 52 admitted under Local Rule 56(f), (g).

[55] The Defendants claimed that Spring Mountain "went on to create 10 additional investment funds." DSMF ¶ 53 (citing *Steffens Decl.* ¶ 23). The Goldensons denied this statement, asserting instead that the number was at least fifteen. PRDSMF ¶ 53 (citing *Frawley Decl.* Ex. P *SMC Fund Map* (ECF No. 214-16) (date unknown) and *Frawley Decl.* Ex. Q *Decl. of Custodian of Records or Qualified Person* (ECF No. 214-17) (Apr. 12, 2012) (*RKC Decl.*)). The Court treats the Goldensons' denied response as qualified and credits its version of the number of funds created by Spring Mountain Capital.

worth investors, pursuant to which the investor could pay a fee to maintain an account at SMC and receive investment advice and recommendations from SMC. DSMF ¶ 54; PRDSMF ¶ 54.[56]  The Goldensons were not eligible for a managed account at SMC, for which the minimum investment amount was $25 million, and never maintained such an account.  DSMF ¶ 54; PRDSMF ¶ 54.

### f.    Defendants' Relationship With Ezra Merkin

From the inception of Spring Mountain until December 16, 2008, Ezra Merkin was, at least, a limited partner in and consultant to Spring Mountain. DSMF ¶ 55; PRDSMF ¶ 55.[57]  Mr. Merkin also loaned money to Spring Mountain in January 2002.  DSMF ¶ 56; PRDSMF ¶ 56.[58]

Mr. Steffens first met Mr. Merkin in 1997.  DSMF ¶ 57; PRDSMF ¶ 57.  At the time Mr. Steffens met Mr. Merkin, and throughout his relationship with Mr. Merkin, Mr. Merkin had an excellent reputation in the investment community, of

---

[56]    The Goldensons denied paragraph 54 "to the extent the Defendants suggest that investors who did not have a managed account at Spring Mountain did not receive investment advice from the Defendants."  PRDSMF ¶ 54.   The denial is unnecessary, because the sentence to which the Goldensons object does not assert that a managed account was the only method by which a client could receive investment advice from Spring Mountain.  It only states that Spring Mountain offered managed accounts, and holders of such accounts received investment advice.  It does not preclude what the Goldensons say actually happened—that they received investment advice from Mr. Steffens, perhaps under the auspices of Spring Mountain.  *See* PRDSMF ¶ 54.  The Court deems paragraph 54 admitted under Local Rules 56(f), (g).

[57]    The Goldensons deny this statement "to the extent the Defendants suggest these were [Mr. Merkin's] only roles."  PRDSMF ¶ 55.  The sentence does not claim that Mr. Merkin's only roles were as a limited partner and consultant; the Defendants' later statements of fact state, at the very least, that Mr. Merkin was also a creditor of Spring Mountain. *See* DSMF ¶ 56.  Nonetheless, the Court adjusted the sentence to reflect that the list is non-exclusive.

[58]    The Goldensons' interpose a qualified response, supplying additional details of the loan. PRDSMF ¶ 56 (citing *Frawley Decl.* Ex. L *Promissory Note* (ECF No. 21-11) (Jan. 17, 2002) and *Merkin Dep. Tr.* 15:5-16:19).  These additional details do not change the substance of paragraph 56, and the Court deems paragraph 56 admitted under Local Rule 56(f), (g).

which Mr. Steffens was aware. DSMF ¶ 58; PRDSMF ¶ 58.[59] Among other things, Mr. Steffens knew that Mr. Merkin was Chairman of Yeshiva University's investment committee and a member of, and at times Chairman of, the investment committee for UJA-Federation of New York. DSMF ¶ 58; PRDSMF ¶ 58. Both of these committees had investment portfolios with billions of dollars in assets. DSMF ¶ 58; PRDSMF ¶ 58. Before starting Spring Mountain, Mr. Steffens spoke with individuals in the investment community who had dealt with Mr. Merkin on a long-term basis, including the then-General Counsel of Merrill Lynch. DMSF ¶ 59; PRDSMF ¶ 59. These individuals spoke highly of Mr. Merkin. DSMF ¶ 59; PRDSMF ¶ 59.[60]

Mr. Merkin managed his own separate investment funds, including Ascot.[61] DSMF ¶ 61; PRDSMF ¶ 61.[62]

---

[59]    The Goldensons also interpose a qualified response, supplying additional details of Mr. Merkin's and Mr. Steffens' activities at Yeshiva University and the UJA-Federation of New York Investment Committee. PRDSMF ¶ 58 (citing *Merkin Dep. Tr.* 48:4-21, 49:2-16 and *Frawley Decl.* Ex. W (ECF No. 214-22) (Dec. 17, 2008)). These additional details do not change the substance of paragraph 58, and the Court therefore treats paragraph 58 admitted under Local Rule 56(f), (g).

[60]    The Goldensons object to this statement as inadmissible hearsay not within an exception. PRDSMF ¶ 59. Hearsay is an out of court statement offered in evidence for the truth of the matter asserted. FED. R. EVID. 801(c). However, this statement is offered, not for the proposition that Mr. Merkin was an upstanding individual and a skilled investor, but to show Mr. Steffens' knowledge and understanding of Mr. Merkin's reputation. Thus, it is not hearsay. The Court overrules the Goldensons' objection.

[61]    Paragraph 60 states that Mr. Merkin "was not involved in the operations of Spring Mountain or in managing its funds; and he was not a member of SMC's investment committee, which selected SMC's investments." DSMF ¶ 60. The Goldensons denied this statement, citing record evidence to support their denial. PRDSMF ¶ 60 (citing *McCloskey Decl.* Ex. J, at SMC000006103 (ECF No. 215-6) (2008) (*2008 SMC, L.P. Firm Description*) (describing Mr. Merkin as a member of the "investment team"; *McCloskey Decl.* Ex. A *Mem. Re: Madoff Exposure* (ECF No. 215-1) (June 20, 2009) (identifying Mr. Merkin as "a former member of SMC management"); *Goldenson Decl.* ¶ 6 (swearing that Mr. Steffens told Mr. Goldenson that Mr. Merkin was SMC's investment advisor); QP I COM at PLS' RSP 000261 (describing Mr. Merkin as a consultant to the investment team); and others). The record evidence the Goldensons cite is sufficient to generate a genuine dispute as to this fact. As the

### g. Defendants' Understanding of Ascot and Inclusion of Ascot in QP I's Portfolio of Funds

From QP I's inception, Defendants sought out low-volatility, institutional quality investments with strong track records for QP I's portfolio. DSMF ¶ 63; PRDSMF ¶ 63.[63] Ascot was a well-established fund that met these criteria. DSMF ¶ 63; PRDSMF ¶ 63. Spring Mountain included Ascot as one of seven funds in QP

---

Court is required to view disputed facts in a light most favorable to the Goldensons, it has not included paragraph 60.

    Paragraph 62 states: "There was never any understanding between Defendants on the one hand, and Mr. Merkin on the other hand, that Defendants would receive any compensation or financial benefit from Mr. Merkin or Ascot in exchange for investing in Ascot or directing business to Ascot, and no such compensation or benefit was ever requested or conferred." DSMF ¶ 62 (citing *Steffens Decl.* ¶ 19). The Goldensons vigorously deny this assertion, and provide supporting record citations too voluminous to reproduce here. *See* PRDSMF ¶ 62. The Court studied the material carefully and found that it shows that Mr. Merkin directed some business to Mr. Steffens and worked with him on a number of financially lucrative projects. Viewing this circumstantial evidence in a light most favorable to the Goldensons, a fact-finder could infer that there was an agreement that Ascot and Mr. Merkin would provide compensation or financial benefit to SMC and Mr. Steffens. *Cf. Colvin v. Barrett*, 118 A.2d 775, 779 (Me. 1955) (holding that a contract may be implied where "services were . . . rendered in pursuance of a mutual understanding between the parties that the plaintiff was to receive payment . . . and . . . the circumstances and conduct of the defendant justified such expectation and belief"). *See also infra* note 262 (discussing PSAMF ¶ 287). As the Court is required at this stage to view contested evidence in a light most favorable to the Goldensons, the Court has not included paragraph 62.

[62]    The Goldensons deny paragraph 61 "to the extent the Defendants assert that Mr. Merkin managed Ascot and that Ascot was a "separate fund." PRDSMF ¶ 61 (citing PSAMF ¶ 296-304). The most relevant definition of "separate" is "existing or maintained independently." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1746 (Stuart Berg Flexner and Leonore Crary Hauck, eds., 2d ed. unabridged 1987). However, the material offered in denial only shows that SMC invested heavily in Ascot and pitched Ascot to SMC's clients—not that the two funds did not have a separate existence or were not maintained independently. *E.g., Pl.'s D.G. 2011 Dep. Tr.* 112:13-23, 285:20-286:3 (quoting Mr. Steffens as describing Ascot as a "core holding" of QP I). Likewise, the record evidence offered to deny that Mr. Merkin "managed Ascot" shows, at worst, only that Mr. Merkin established Ascot ""largely but not entirely" for the purpose of investing with Madoff,' and that substantially all of its assets were invested with Madoff upon its inception." PRDSMF ¶ 61 (quoting *Merkin Dep. Tr.* 24:23-25:10). This does not controvert that Mr. Merkin managed Ascot.

    In sum, the Goldensons have not showed record evidence to controvert that Mr. Merkin managed Ascot or that Ascot was a "separate fund." The Court treats paragraph 61 admitted under Local Rule 56(f), (g).

[63]    The Goldensons deny this paragraph, but the argument and record citations they supply do not address the substance of paragraph 63. The Court deems paragraph 63 admitted under Local Rule 56(f), (g).

I's portfolio as of December 2001.  DSMF ¶ 64; PRDSMF ¶ 64.[64]  QP I later came to

hold as many as 40 outside hedge funds in its portfolio at a given time.  DSMF ¶ 64;

PRDSMF ¶ 64.

The decision to include Ascot in QP I's portfolio was made by SMC's

investment committee.  DSMF ¶ 65; PRDSMF ¶ 65.[65]  Prior to QP I's investment in

Ascot, analysts at SMC reviewed Ascot's returns over a long period of time and

found them to be consistent with returns achieved by other successful fund

managers over a similar period of time. DSMF ¶ 66; PRDSMF ¶ 66.[66]  The analysts

also tested Ascot's performance and volatility in different markets using statistical

---

[64]  The Goldensons interpose a qualified response, adding additional detail about Ascot and two other hedge funds not mentioned in paragraph 64.  The details do not change the substance of paragraph 64, so the Court deems paragraph 64 admitted under Local Rule 56(f), (g).

[65]  The Goldensons interpose a qualified response, adding that "[t]he Defendants identified Mr. Merkin as a member of Spring Mountain's investment committee in describing their firm to investors."  PRDSMF ¶ 65 (citing *McCloskey Decl.* Ex. J, at SMC000006103 (ECF No. 215-6)).  This does not change the substance of paragraph 65, so the Court deems paragraph 65 admitted under Local Rule 56(f), (g).

[66]  The Court overrules the Goldensons' objections.  *See supra* note 5 (form of responses); *supra* note 29 (material not produced in discovery).  The Goldensons deny paragraph 66, but their denial does not address the substance of the assertion.  What the Defendants claim in paragraph 66 is that their analysts "reviewed Ascot's returns over a long period of time and found them to be consistent with returns achieved by other successful fund managers over a similar period."  DSMF ¶ 66 (citing *Steffens Decl.* ¶¶ 21, 24).  The Goldensons' denial claims that "[t]he Defendants did not perform sufficient due diligence" on Ascot because Mr. Steffens knew that "'Ascot was a pass-through fund . . . to Madoff's firm, so in order to do [due] diligence . . . with respect to Ascot, one would have to figure out how Madoff was investing that money, and that was not done.'"  PRDSMF ¶ 66 (quoting *McCloskey Decl.* Ex. FFF *Dep. of Arthur B. Laby, Esq.*, at 36:2-37:2, 37:24-38:11) (ECF No. 215-50) (Apr. 25, 2012) (*Laby Dep. Tr.*)).  "Due diligence" is a term of art in the financial world.  While reviewing and comparing historical returns may be part of "due diligence," it is not the entirety of due diligence—as the Goldensons' own expert points out.  The Defendants do not claim in paragraph 66 that they performed due diligence; they only claim that SMC's analysts reviewed and compared historical returns.  Thus, while the Goldensons' record evidence may indeed show that SMC failed to perform due diligence on Ascot, it does not controvert the Defendants' statement in paragraph 66. Consequently, the Court deems paragraph 66 admitted under Local Rule 56(f), (g).

models; these tests indicated that Ascot should achieve an unspectacular but steady return in a wide range of markets. DSMF ¶ 66; PRDSMF ¶ 66.[67]

Prior to QP I's investment in Ascot and throughout the duration of that investment, Defendants understood a "split-strike" strategy to entail buying an equity position in a stock while simultaneously buying put options below the current stock price and selling call options above the current stock price. DSMF ¶ 67; PRDSMF ¶ 67.[68] Also prior to QP I's investment in Ascot, Defendants ascertained that Ascot had an independent auditor, the national accounting firm BDO Seidman. DSMF ¶ 68; PRDSMF ¶ 68. BDO Seidman audited Ascot every year. DSMF ¶ 68; PRDSMF ¶ 68. Defendants reviewed Ascot's audited financials annually throughout the duration of QP I's investment in Ascot, though there is a

---

[67]     The Goldensons' denial does not address the substance of this assertion, so the Court deems the assertion admitted under Local Rule 56(f), (g). *See supra* note 66.

[68]     Paragraph 67 states: "Prior to QP I's investment in Ascot and throughout the duration of that investment, Defendants understood that Ascot employed a 'split-strike' trading strategy that would minimize risk while limiting upside potential. Defendants understood the split-strike strategy to entail buying an equity position in a stock while simultaneously buying put options below the current stock price and selling call options above the current stock price. Defendants considered Ascot's historical returns to be consistent with the use of a split-strike strategy." DSMF ¶ 67 (citing *Steffens Decl.* ¶ 21). The Goldensons deny and controvert these statements. PRDSMF ¶ 67. Their denial shows record proof that Mr. Ho agreed with Andrew Panteli's assertion that Mr. Madoff had "'transparency issues'" and that his "'numbers'" did not "'square . . . with the strategy'" as early as January 2002. PRDSMF ¶ 67 (quoting *Frawley Decl.* Ex. I (ECF No. 211-8) (Jan. 10, 2002) (*Panteli Email*)). Furthermore, "Madoff's 'too good to be true' returns were widely reported on . . . and discussed in the small hedge fund community." PRDSMF ¶ 67 (citing *Frawley Decl.* Ex. NN *Don't Ask, Don't Tell* (ECF No. 214-38) (May 7, 2001) (*Barron's Article*), *Frawley Decl.* Ex. OO *Madoff Tops Charts; Skeptics Ask How* (ECF No. 214-39) (May 2001) (*MAR/Hedge Article*), and *Frawley Decl.* Ex. F *Dep. of Fabio Savoldelli*, at 31:14-33:13 (ECF No. 214-6) (Feb. 16, 2012) (*Savoldelli Dep. Tr.*)). The Goldensons also show expert testimony that "Mr. Steffens understood that Ascot was a pass-through fund . . . to Madoff." *Laby Dep. Tr.* 38:5-6. As the Court is required to view disputed evidence in the light most favorable to the Goldensons, the Court has not included the first and last sentences of paragraph 67.

genuine dispute as to whether they found anything "out of the ordinary." DSMF ¶ 68; PRDSMF ¶ 68.[69]

Over the period when QP I was an investor in Ascot, Mr. Steffens reviewed Ascot's trade sheets at least twenty times, and SMC analysts reviewed Ascot's trade sheets as well, finding nothing suspicious. DSMF ¶ 70; PRDSMF ¶ 70.[70] In addition, a quantitative analysis group at SMC reviewed a series of Ascot trades

---

[69] Paragraph 68 states in part: "Defendants reviewed Ascot's audited financials annually throughout the duration of QP I's investment in Ascot and found nothing out the ordinary." DSMF ¶ 68 (citing *Steffens Decl.* at 25). The Goldensons deny and controvert this portion of the paragraph. PRDSMF ¶ 68. They provide record evidence showing that "all of Ascot's audited financial statements listed only investments in United States Treasury Bills, not stocks or options, at the same time every year, regardless of market conditions." *Id.* (citing *Frawley Decl.* Ex. T *Ascot Partners, L.P. Financial Statements Year Ended December 31, 2004* (ECF No. 211-14) (Jan. 31, 2005); *Frawley Decl.* Ex. U *Ascot Partners, L.P. Financial Statements Year Ended December 31, 2006* (ECF No. 211-15) (Mar. 29, 2007); *Frawley Decl.* Ex. V *Ascot Partners, L.P. Financial Statements Year Ended December 31, 2007* (ECF No. 211-15) (Mar. 17, 2008)). They further offer testimony to the effect that at least one person knowledgeable in finance found Mr. Madoff's tactic of going into cash at the end of the year to be "'highly improbable.'" *Id.* (quoting *Savoldelli Dep. Tr.* 23:7-16). As the Court is required to view disputed evidence in a light most favorable to the Goldensons, it has not included the disputed portion of paragraph 68.

In paragraph 69, the Defendants claim that "Merkin represented to Defendants that at various times Merkin kept Ascot out of the market and in cash." DSMF ¶ 69 (citing *Steffens Decl.* ¶ 26). The Goldensons deny and controvert this assertion. PRDSMF ¶ 68. They provide record evidence that for most of the time between 2001 and 2008, Mr. Madoff "'managed substantially all the assets' of Ascot." *Id.* (quoting *Merkin Dep. Tr.* 41:8-13). Furthermore, they provide evidence that Mr. Merkin did not conceal his knowledge of Mr. Madoff and his purported trading strategy from Mr. Steffens. *Id.* (citing *Merkin Dep. Tr.* 66:22-67:2). They provide evidence that the Defendants knew that Mr. Madoff had "'final say'" on all of Ascot's trading decisions. *Id.* (citing *McCloskey Decl.* Ex. U, at SMC000063042 (ECF No. 215-16) (Nov. 22, 2005) (*Ascot Investment Recommendation*)). As the Court is required to view disputed evidence in a light most favorable to the Goldensons, it has not included paragraph 69.

[70] The Goldensons deny this statement, but their denial does not address the substance of the assertion. *See* PRDSMF ¶ 70. Whether the trades and trade sheets were suspicious is different than whether the audited financials were suspicious. *See supra* note 69. The Goldensons' denial of paragraph 70 goes to whether the Defendants performed "due diligence" on Ascot and whether they performed "due diligence" on Madoff. As before, the Goldensons conflate the Defendants' language with "due diligence." *See supra* note 66. What the Defendants claim in paragraph 70 is that Mr. Steffens and his analysts reviewed certain trades and trade sheets and found them reasonable and non-suspect. Allowing, as the Goldensons claim, that Mr. Steffens knew that Ascot was a pass-through for Madoff, and that the Ascot trade sheets were prepared by Madoff and bore his name, nothing the Goldensons offer contradicts the factual assertion made by the Defendants. Because the Goldensons do not properly controvert the statements of paragraph 70, the Court deems paragraph 70 admitted under Local Rule 56(f), (g).

and confirmed that the positions reflected therein were reasonable. DSMF ¶ 70; PRDSMF ¶ 70.

Defendants understood that Mr. Merkin had authority over and responsibility for Ascot's investment and trading decisions at all times. DSMF ¶ 71; PRDSMF ¶ 71.[71] Defendants' understanding was based on extensive discussions with Mr. Merkin about Ascot both prior to and throughout the period of QP I's investment in Ascot. DSMF ¶ 71; PRDSMF ¶ 71. Ascot charged QP I a 1% to 1.5% fee to invest in Ascot, and Defendants considered that fee a payment to have Mr. Merkin be in charge of and responsible for their investment. DSMF ¶ 72; PRDSMF ¶ 72.[72] If the Defendants had not believed that to be the case, they would not have paid Mr. Merkin a fee and they would not have invested in Ascot. DSMF ¶ 72;

[71] The Court overrules the Goldensons' hearsay objection because the assertions are also supported by Mr. Steffens' Declaration, which is non-hearsay.

The Goldensons deny paragraph 71, but their denial does not address the substance of the assertion. *See* PRDSMF ¶ 71. What the Defendants assert is that they "understood that Merkin had authority over and responsibility for Ascot's investment and trading decisions at all times." DSMF ¶ 71. All of the Goldensons' record evidence shows that Ascot was a feeder fund for Mr. Madoff, but nowhere does it suggest that Mr. Merkin was not in control of Ascot and could not have made his own decisions about trading had he wished to do so. Ascot was, by all evidence, Mr. Merkin's hedge fund—and Mr. Merkin made the poor choice to invest almost exclusively in Mr. Madoff's fund. This does not mean that Mr. Merkin did not have "authority over and responsibility for Ascot's investment and trading decisions"; it means he delegated that authority unwisely. Because the Goldensons' denial does not controvert the assertion of paragraph 71, the Court considered it admitted under Local Rule 56(f), (g).

[72] The Goldensons interpose a qualified response as to the amount of Ascot's management fee, but the qualification does not change the substance of paragraph 72. *See* PRDSMF ¶ 72. The Court deems the qualified portion of the response admitted under Local Rule 56(f), (g). The Goldensons also deny the remainder of paragraph 72, again asserting that Mr. Steffens knew that Mr. Madoff "'managed substantially all of the assets of Ascot.'" PRDSMF ¶ 72 (quoting *Merkin Dep. Tr.* 41:12-13 and citing *Merkin Dep. Tr.* 66:22-67:2). Whether the Defendants "paid these fees for their 'access [to] Bernie,'" *id.* (quoting *McCloskey Decl.* Ex. V, at SMC000043686 (ECF No. 215-7) (Sept. 8, 2006) (*Maurella Notes*)), does not challenge the assertion that the Defendants were paying Mr. Merkin to be responsible for the investment. *See Maurella Notes* at SMC000043686 ("[Ascot] provides a way to access Bernie Mathoff [sic] . . . with an Ezra [Merkin] judgment overlay. Although [the client] recognizes and appreciates the discomfort with Bernie's lack of transparency, at the end of the day our bet is really on Ezra's judgment and reputation"). Because the Goldensons have not controverted the assertion of paragraph 72, the Court deems paragraph 72 admitted under Local Rule 56(f), (g).

PRDSMF ¶ 72. The Defendants were aware that, for the most part, Mr. Merkin used Bernard Madoff to execute the split/strike strategy for Ascot. DSMF ¶ 73; PRDSMF ¶ 73.[73]

Prior to and throughout the duration of QP I's investment in Ascot, the Defendants understood from Mr. Merkin that he authorized the specific parameters for Ascot's split strike strategy and decided what types of trades were permissible; that he decided when Ascot would be trading and when, instead, it would be out of the market; that he diverged from Mr. Madoff at various times in determining whether to be in or out of the market; that he closely oversaw [Mr.] Madoff's trade execution on behalf of Ascot and reviewed it with Mr. Madoff; and that the decision whether to use the split-strike strategy, or Mr. Madoff at all, was always subject to Mr. Merkin's discretion, good judgment, and regular reevaluation. DSMF ¶ 74; PRDSMF ¶ 74.[74]

---

[73] The Goldensons interpose a qualified response, highlighting previous inconsistencies in the sworn testimony of Messrs. Steffens and Ho regarding their knowledge of Mr. Madoff's role in managing Ascot trades. PRDSMF ¶ 73. While these inconsistencies are troubling, they do not change the substance of paragraph 73. The Goldensons' additional record evidence regarding the extent of Mr. Madoff's involvement in Ascot also makes no substantial change to the assertion. The Court deems paragraph 73 admitted under Local Rule 56(f), (g).

[74] The Goldensons deny all of these assertions, but their denial does not properly controvert any of them. *See* PRDSMF ¶ 74. What the Goldensons offer in rebuttal is the same evidence that they have offered previously: that Ascot was formed to gain access to Mr. Madoff's "strategy," that Mr. Madoff "managed substantially all of the assets" of Ascot, and that the Defendants knew all of this. *Id.* (citing *Merkin Dep. Tr.* 34:22-41:7, 66:22-67:2; *Ascot Investment Recommendation* at SMC000063037, 63040, 63042; *Maurella Notes* at SMC000043686). But none of this evidence, even taken in a light most favorable to the Goldensons and drawing all reasonable inferences in their favor, contradicts the proposition that the Defendants trusted and understood "from Mr. Merkin" that he would keep a firm grip on the reins of his investments with Mr. Madoff. Whether Mr. Merkin actually did so is a different matter; what the Defendants assert, and the Goldensons do not supply evidence to contradict, is that the Defendants thought Mr. Merkin was in control. *See Maurella Notes* at SMC000043686 ("[A]t the end of the day our bet is really on Ezra's judgment and reputation"). Because the Goldensons do not controvert the assertions of paragraph 74, the Court deems paragraph 74 admitted under Local Rule 56(f), (g).

Mr. Madoff was a registered broker-dealer under the Securities Exchange Act of 1934 and was audited regularly by the SEC and the NASD. DSMF ¶ 77; PRDSMF ¶ 77. He had been Chairman of NASDAQ, an alternative exchange to the New York Stock Exchange. DSMF ¶ 77; PRDSMF ¶ 77. The Defendants also knew that the firms Deutsche Bank and BNP Paribas had done substantial diligence on Mr. Madoff and authorized substantial investments with him. DSMF ¶ 77; PRDSMF ¶ 77.

### h. Background to the Goldensons' December 14, 2001 Meeting with Mr. Steffens

In the fall of 2001, the Goldensons held a significant amount of municipal bonds that were maturing and could only be replaced by bonds with much lower interest rates. DSMF ¶ 78; PRDSMF ¶ 78.[75] The prospect of lower rates, along with Mr. Steffens' advice, made the Goldensons feel they "had to think of another

---

In paragraphs 75 and 76, the Defendants assert that Mr. Merkin accorded Mr. Madoff only "a very very narrow award of discretion," that Mr. Merkin had "primary responsibility for running the money," that Mr. Merkin and Mr. Madoff were engaged in continuing conversations, and that the Defendants understood at all times until Ascot collapsed that the fund was fully under Mr. Merkin's charge. DSMF ¶¶ 75-76. The assertion of paragraph 75 speaks, not to what the Defendants knew, but to what Mr. Merkin actually did. The same evidence that fails to controvert Defendants' paragraph 74 is sufficient to controvert paragraph 75. PRDSMF ¶ 74; *see also* PRDSMF ¶ 73 (citing record evidence that Madoff made almost all of the decisions regarding Ascot's trading). Viewing the evidence in a light most favorable to the Goldensons, a fact-finder could reasonably infer that Mr. Merkin almost completely abdicated control of Ascot to Mr. Madoff during the period of 2001 to 2008.

Likewise, the assertion of paragraph 76 relies on the disputed facts of (1) the actual extent of Mr. Merkin's control over Ascot, and (2) the "objective indications of Ascot's trading activity." The Defendants' denial of paragraph 75 also controverts the first leg of this assertion. The Defendants' denial of paragraphs 68 and 69 controverts the second leg. As the Court is required to view disputed facts in a light most favorable to the Goldensons, the Court has not included these paragraphs in its recitation of facts.

[75] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 78. *See* PRDSMF ¶ 78. The Court deems the qualified response admitted under Local Rule 56(f), (g).

way to create some income." DSMF ¶ 79; PRDSMF ¶ 79.[76] As noted earlier, it was in November 2001 that the Goldensons met Mr. and Mrs. Steffens at a restaurant in Princeton during which Mr. Steffens told the Goldensons about Spring Mountain and described its hedged investing concept, and Mr. Goldenson expressed interest.[77] DSMF ¶¶ 44-46; 80-82; PRDSMF ¶¶ 44-46; 80-82.

### i. Mr. Goldenson's December 14, 2001 Meeting With Mr. Steffens and Subsequent Investment in QP I

On December 14, 2001, Mr. Goldenson visited Mr. Steffens at SMC's offices in New York City in order to discuss a possible investment in an SMC fund. DSMF ¶¶ 46, 83; PRDSMF ¶¶ 46, 83.[78] They had not spoken about a possible investment between the November dinner and the December 14 meeting. DSMF ¶¶ 46, 83; PRDSMF ¶¶ 46, 83. The meeting between Mr. Steffens and Mr. Goldenson lasted between forty-five and sixty minutes. DSMF ¶ 84; PRDSMF ¶ 84.[79] At the meeting, Mr. Steffens explained the QP I fund, including, among other things, that QP I hedged risk by holding a portfolio of hedge funds with different strategies and

---

[76] The Goldensons interpose a qualified response, asserting that it was Mr. Steffens who convinced the Goldensons to move away from bonds. PRDSMF ¶ 79 (citing *Pl.'s D.G. 2011 Dep. Tr.* 13:10-19, 13:23-14:17, 19:15-20:5, 20:22-22:3). Viewing this evidence in a light most favorable to the Goldensons, part of the motivation for the Goldensons' move away from bonds was Mr. Steffens' advice. Consequently, the Court has modified the assertion to reflect this.

[77] The Goldensons interpose qualified responses to each of these paragraphs, but the qualifications do not change the substance of paragraphs. *See* PRDSMF ¶¶ 80-82. The Court deems paragraphs 80 through 82 admitted under Local Rule 56(f), (g).

[78] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 83. *See* PRDSMF ¶ 83. The Court deems the qualified response admitted under Local Rule 56(f), (g).

[79] The Goldensons interpose a qualified response claiming that it actually lasted closer to ninety minutes, including a follow-on conversation with Mr. Merkin about Ascot. *See* PRDSMF ¶ 94 (citing *Pl.'s D.G. 2011 Dep. Tr.* 40:19-23, 43:23-44:5). The Court has clarified that the forty-five to sixty minute time period refers solely to the meeting between Mr. Steffens and Mr. Goldenson and does not include the subsequent meeting that day with Mr. Merkin.

submanagers.  DSMF ¶ 85; PRDSMF ¶ 85.[80]  Mr. Goldenson expressed an interest in making an investment in QP I, and the Defendants subsequently sent the Goldensons a Confidential Memorandum (COM) for QP I, which Mr. Goldenson reviewed "relatively carefully."  DSMF ¶ 86; PRDSMF ¶ 86.[81]  The QP I COM stated that the Defendants would not be liable for any mistakes of judgment or other actions that did not constitute gross negligence, willful misconduct, or bad faith. DSMF ¶ 87; PRDSMF ¶ 87.[82]  It also contained a section titled "Risk Factors" that stated:  "An investment in the Fund involves a high degree of risk, including the risk that the entire amount invested may be lost." DSMF ¶ 87; PRDSMF ¶ 87.

On December 19, 2001, Mrs. Goldenson executed a subscription agreement for a $2 million investment in QP I and sent it to the Defendants.  DSMF ¶ 88; PRDSMF ¶ 88.[83]  The QP I subscription agreement stated that the investor had "such knowledge and experience in financial and business matters that the Investor

---

[80]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 85.  *See* PRDSMF ¶ 85.  The Court deems Defendants' paragraph 85 admitted under Local Rule 56(f), (g).

[81]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 86.  *See* PRDSMF ¶ 86.  The Court deems Defendants' paragraph 86 admitted under Local Rule 56(f), (g).

[82]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 87.  *See* PRDSMF ¶ 87.  The Court deems Defendants' paragraph 87 admitted under Local Rule 56(f), (g).

[83]    The Defendants stated that "the Goldensons" executed the subscription agreement.  DSMF ¶ 88.  The Goldensons interposed a qualified response, claiming that Mrs. Goldenson executed it. PRDSMF ¶ 88 (citing *Ward Decl.* Ex. O *Spring Mountain Partners QP I Subscription Agreement*, at 20 (ECF No. 195-27) (Dec. 19, 2001) (*Goldenson Subscription Agreement*).  The Goldensons' qualification is supported by the record, and the Court credits it.

is capable of evaluating the merits and risks of the Investor's investment in the fund and is able to bear such risks." DSMF ¶ 89; PRDSMF ¶ 89.[84]

Mr. Goldenson does not recall communicating with Mr. Ho prior to investing in QP I. DSMF ¶ 90; PRDSMF ¶ 90.[85] Mr. Goldenson believes he was introduced to Mr. Ho on one occasion, in 2003, but does not recall having "'any face-to-face discussions with him.'" DSMF ¶ 90 (quoting *Def.'s 2011 D.G. Dep. Tr.* 95:20-21); PRDSMF ¶ 90. Mr. Ho does not recall meeting Mr. Goldenson in person until the commencement of this lawsuit. DSMF ¶ 90; PRDSMF ¶ 90.

### j. Mr. Goldenson's December 14, 2001 Discussion With Mr. Steffens and Mr. Merkin About Ascot

At the same December 14, 2001 meeting at Mr. Steffens' office, Mr. Goldenson asked Mr. Steffens if he had any "recommendations" for an additional investment separate from QP I. DSMF ¶ 91; PRDSMF ¶ 91.[86] Mr. Steffens suggested that he consider an investment with Ascot. DSMF ¶ 92; PRDSMF ¶ 92.[87] Mr. Steffens told Mr. Goldenson that QP I held Ascot as one of the funds in its

---

[84]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 89. *See* PRDSMF ¶ 89. The Court deems Defendants' paragraph 89 admitted under Local Rule 56(f), (g).

[85]    The Goldensons interpose a qualified response, but the qualification does not change the substance of any of the assertions of paragraph 90. *See* PRDSMF ¶ 90. The Court deems Defendants' paragraph 90 admitted under Local Rule 56(f), (g).

[86]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 91. *See* PRDSMF ¶ 91. The Court deems Defendants' paragraph 91 admitted under Local Rule 56(f), (g).

[87]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 92. *See* PRDSMF ¶ 92. The Court deems Defendants' paragraph 92 admitted under Local Rule 56(f), (g).

investment portfolio. DSMF ¶ 93; PRDSMF ¶ 93.[88] Mr. Steffens told Mr. Goldenson that Ascot was run by Ezra Merkin and that Mr. Merkin was his business partner. DSMF ¶ 94; PRDSMF ¶ 94.[89] He further told Mr. Goldenson that Ascot employed a split-strike trading strategy and explained that strategy to Mr. Goldenson. DSMF ¶ 94; PRDSMF ¶ 94.[90]

That same day, Mr. Steffens also introduced Mr. Goldenson to Mr. Merkin, who at the time worked in different rooms on different floors of the same building; both offices were owned by Gabriel Capital Corporation, which was owned by Mr. Merkin. DSMF ¶ 95; PRDSMF ¶ 95.[91] Mr. Goldenson spoke with Mr. Merkin for approximately 45 minutes about Ascot, with Mr. Steffens present. DSMF ¶ 96;

[88] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 93. *See* PRDSMF ¶ 93. The Court deems the Defendants' paragraph 93 admitted under Local Rule 56(f), (g).

[89] The Goldensons interpose a qualified response, but the qualification does not address this assertion of paragraph 94. The Court deems this assertion admitted under Local Rule 56(f), (g).

[90] The Goldensons interpose a qualified response, adding that Mr. Steffens claimed that the split-strike strategy was Mr. Merkin's "'proprietary strategy and that he was doing the trades, that . . . it was on his computer [and that] it was like his algorithm.'" PRDSMF ¶ 94 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 156:4-6). This statement does not, however, change the assertion that Mr. Steffens "told Mr. Goldenson that Ascot employed a split-strike trading strategy and explained that strategy to Mr. Goldenson." DSMF ¶ 94. In other words, whether Mr. Steffens attributed the strategy to Mr. Merkin personally or not does not change the fact that Mr. Steffens told Mr. Goldenson that Ascot employed the strategy and explained it to Mr. Goldenson. The Court deems paragraph 94 admitted under Local Rule 56(f), (g).

[91] The Goldensons deny this assertion, but the denial is largely one of characterization. PRDSMF ¶ 95. The Defendants call Mr. Merkin's office a "different office," DSMF ¶ 95 (citing *Def.'s D.G. 2011 Dep. Tr.* 43:13-20), while the Goldensons point out that at the time Mr. Steffens "'worked in the offices of Gabriel [Capital Corporation].'" PRDSMF ¶ 95 (quoting *Merkin Dep. Tr.* 186:10-11). Gabriel Capital Corporation was owned by Mr. Merkin, *Merkin Dep. Tr.* 22:6-23:3, so the Goldensons conclude that Mr. Steffens' office could not have been a "different" office. PRDSMF ¶ 95. However, the context of the sentence reveals that Mr. Goldenson was talking about the room in which Mr. Merkin worked, not the "office" as a complex of rooms. *See Def.'s D.G. 2011 Dep. Tr.* 43:19-22 ("At that time, Ezra Merkin's office was in the same building. And I remember that we went . . . and sat down with him . . . ."). The Court deems paragraph 95 admitted under Local Rule 56(f), (g), and has slightly amended paragraph 95 to clarify the facts.

The Goldensons interpose a qualified response as to the rest of the assertion, but the qualification does not change the substance of paragraph 95. *See* PRDSMF ¶ 95. The Court deems paragraph 95 admitted under Local Rule 56(f), (g).

PRDSMF ¶ 96.[92]  Mr. Merkin described Ascot to Mr. Goldenson.  DSMF ¶ 97; PRDSMF ¶ 97.[93]  As part of the presentation, he told Mr. Goldenson about the split-strike trading strategy used by Ascot and showed Mr. Goldenson several years' worth of data reflecting Ascot's performance.  DSMF ¶ 97; PRDSMF ¶ 97.

### k.    The Goldensons' First Direct Investment in Ascot

By the time Mr. Goldenson left Mr. Merkin's office on December 14, 2001, he had made the decision to invest directly in Ascot.  DSMF ¶ 98; PRDSMF ¶ 98.[94]  He subsequently received a COM from Ascot for a direct investment in that fund, but neither the Ascot COM nor the QPI COM that he received from the Defendants "ha[d] a material impact on [his] decision," because "[he] made the decision to invest before [he] even received the COMs."  DSMF ¶ 98; PRDSMF ¶ 98.  The Ascot COM also stated, among other things and in a subsection called "Independent Money Managers": "The Managing Partner [Mr. Merkin] may delegate investment discretion for all or a portion of [Ascot's] funds to money managers," and also stated

---

[92]    The Goldensons deny paragraph 96 "to the extent the Defendants suggest that Mr. Steffens did not participate in the conversation."  PRDSMF ¶ 96 (citing *Pl.'s D.G. 2011 Dep. Tr.* 45:11-23, 47:20-48:3, 48:19-49:21).  However, the Defendants do not suggest this.  They only assert that Mr. Merkin spoke to Mr. Goldenson about Ascot with Mr. Steffens present.  DSMF ¶ 96.  The Court reads no suggestion that Mr. Steffens remained silent during this conversation.  *See* Section II.B.2.f.iii, *infra* (describing Mr. Steffens' role in the conversation).  The Court deems paragraph 96 admitted under Local Rule 56(f), (g).

[93]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 97.  *See* PRDSMF ¶ 97.  The Court deems paragraph 97 admitted under Local Rule 56(f), (g).

[94]    The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 98.  *See* PRDSMF ¶ 98.  The Court deems paragraph 98 admitted under Local Rule 56(f), (g).

that "[Mr. Merkin] may not have custody over the funds invested with the other money managers." DSMF ¶ 99; PRDSMF ¶ 99.[95]

Mr. Steffens subsequently received at Spring Mountain's offices a subscription agreement dated December 20, 2001 for a direct investment by the Goldensons of $2 million in Ascot. DSMF ¶ 100; PRDSMF ¶ 100. Mr. Goldenson did not consult with Mr. Steffens between the December 14, 2001 meeting and the time Mr. Steffens received the Ascot subscription agreement. DSMF ¶ 100; PRDSMF ¶ 100.[96]

---

[95] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 99. *See* PRDSMF ¶ 99. In support of paragraph 99, the Defendants quote a confidential offering memorandum dated February 1996. *See Ward Decl.* Ex. Q, *Confidential Offering Mem. Ascot Partners L.P.*, at 10 (ECF No. 195-29) (Feb. 1996) (*1996 Ascot COM*)). The Court deems paragraph 99 admitted under Local Rule 56(f), (g).

[96] The Defendants assert that "Mr. Goldenson did not consult with Mr. Steffens before sending him the subscription agreement." DSMF ¶ 100. The Goldensons deny paragraph 100 "to the extent the Defendants suggest that Mr. Goldenson did not consult with Mr. Steffens before sending him the Ascot subscription agreement." PRDSMF ¶ 100 (citing *Def.'s D.G. 2011 Dep. Tr.* 58:13-21 and *Pl.'s D.G. 2011 Dep. Tr.* 54:23-55:9, 60:8-10). The Goldensons point to the December 14, 2001 meeting itself as a "consult." *Id.* In the context of paragraphs 91-97, the Court views the Defendants' assertion to mean that Mr. Goldenson did not consult with Mr. Steffens between December 14 and the time Mr. Steffens received the subscription—not that Mr. Goldenson never consulted with Mr. Steffens at all. However, the Court has modified the assertion to identify the range of time when Mr. Goldenson did not consult with Mr. Steffens. The Court deems the Goldensons' denied response to the assertion, as modified, admitted under Local Rule 56(f), (g).

In paragraph 101, the Defendants assert that "Mr. Steffens was surprised to receive a subscription agreement for Ascot because Ascot was not a Spring Mountain Capital fund and Mr. Steffens had nothing to do with its management." DSMF ¶ 101. However, Mr. Goldenson testified that he sent the Ascot subscription to Mr. Steffens because he "'was instructed by [Mr. Steffens] to send [both the Ascot and QPI subscriptions] to him.'" PRDSMF ¶ 101 (quoting *Pl.'s D.G. Dep. Tr.* 60:9-10)). Viewing the evidence in a light most favorable to the Goldensons, the Court concludes that Mr. Steffens was not "surprised" to receive the Ascot subscription because he had instructed Mr. Goldenson to send it to him. In light of the Goldensons' denial, the Court has not included this assertion in paragraph 101.

The Defendants next assert that "Mr. Steffens was also surprised that [the Goldensons] were investing $2 million in Ascot because investing a substantial sum of money in a single-strategy hedge fund was contrary to Spring Mountain Capital's fund-of-funds diversification concept that Steffens had explained to Mr. Goldenson on December 14, 2001." DSMF ¶ 101. However, Mr. Goldenson testified that Mr. Steffens told him that "'we think [Ascot is] worthy of your consideration for a major additional investment.'" PRDSMF ¶ 101 (citing *Pl.'s D.G. 2011 Dep. Tr.* 112:18-19). Viewing the evidence in a light most favorable to the Goldensons, the Court concludes that Mr.

Mr. Steffens was disappointed to discover that the Goldensons were taking $2 million that they presumably could have invested with Spring Mountain Capital, which would have yielded fund management fees for SMC, and investing it instead in Ascot, which would yield no fees for SMC. DSMF ¶ 101; PRDSMF ¶ 101.[97] Mr. Steffens forwarded the documents he received pertaining to Ascot to Mr. Merkin. DSMF ¶ 102; PRDSMF ¶ 102.

The Defendants never received any compensation from the Goldensons in connection with the Goldensons' direct investments in Ascot. DSMF ¶ 103; PRDSMF ¶ 103.[98] The only fees the Goldensons paid to the Defendants were for managing Spring Mountain funds in which the Goldensons invested. DSMF ¶ 103; PRDSMF ¶ 103.[99]

---

Steffens was not "surprised" at the amount of the investment, given that he had invited Mr. Goldenson to make a "major additional investment" in Ascot. In light of the Goldensons' denial, the Court does not credit this assertion in paragraph 101 in its recitation of undisputed material facts.

[97] The Goldensons' denial of paragraph 101 does not address this assertion, so the Court deems it admitted under Local Rule 56(f), (g).

[98] The Defendants also claim that they "never received any compensation . . . from any other source in connection with [the Goldensons'] direct investments in Ascot or in connection with discussing Ascot with [the Goldensons]." DSMF ¶ 103. The Goldensons deny this. PRDSMF ¶ 103. As the Court explained previously, there is a genuine dispute as to whether Mr. Steffens or SMC received financial benefit in exchange for investing in Ascot and referring business to Ascot. *See supra* note 61 (evaluating paragraph 62 of the Defendants' Statement of Material Facts). That conclusion compels the denial of those portions of paragraph 103 that suggest the Defendants "never received any compensation" in connection with the Goldensons' investment in Ascot.

[99] The Goldensons' denial of paragraph 103 does not controvert this assertion. *See* PRDSMF ¶ 103. It is true that the Goldensons paid fees in connection with QP I while QP I was invested in funds affiliated with Mr. Merkin. *Id.* This does not change the fact that they paid fees to the Defendants for managing the Spring Mountain funds, just as the Defendants assert. QP I was a fund-of-funds that invested in Mr. Merkin's hedge funds, and the Goldensons paid fees to the Defendants for the privilege of investing in QP I. The Court deems this assertion admitted under Local Rule 56(f), (g).

### l.   The Goldensons' Subsequent Direct Dealings With Ascot

After making their initial direct investment in Ascot, the Goldensons made two additional direct investments in Ascot in or about October 2002, each for $250,000.   DSMF ¶ 104; PRDSMF ¶ 104.[100]   On or about April 1, 2003, the Goldensons made a redemption of $250,000 from Ascot.   DSMF ¶ 105; PRDSMF ¶ 105.[101]   The Goldensons made the redemption in order to invest the money in a different hedge fund.   DSMF ¶ 105; PRDSMF ¶ 105.   On or about July 1, 2003, the Goldensons made a redemption of $500,000 from Ascot.   DSMF ¶ 106; PRDSMF ¶ 106.[102]   The Goldensons made the redemption in order to invest the money in a

---

[100]   The Defendants claim that "Mr. Goldenson did not consult with Defendants for advice before making these two investments in Ascot."   DSMF ¶ 104.   However, the Goldensons deny and controvert this assertion.   Mr. Goldenson testified, in response to a question "as to those two 250,000-dollar subscriptions on October 1, 2002," that "[m]y recollection is certainly that I mentioned that we were going to put money from the IRAs [into Ascot] . . . . I can't recall whether it was to Launny [Steffens] or Greg [Ho] . . . . I wanted to see if they -- if whoever I spoke to felt it was an okay thing to do . . . for an IRA to be in Ascot."   *Pl.'s D.G. 2011 Dep. Tr.* 137:12-25.   Viewing Mr. Goldenson's testimony in a light most favorable to the non-movants, it follows that Mr. Goldenson did "consult with Defendants for advice before making these two investments in Ascot," DSMF ¶ 104; he asked either Mr. Steffens or Mr. Ho whether the investment "was an okay thing to do."   *Pl.'s D.G. 2011 Dep. Tr.* 137:25.   Because the Goldensons deny and controvert the second assertion of paragraph 104, the Court has not included it in its recitation of undisputed material facts.

[101]   The Defendants assert that Mr. Goldenson did not consult with them before making this redemption.   DSMF ¶ 105.   The Goldensons deny this, citing Mr. and Mrs. Goldensons' deposition testimony.   PRDSMF ¶ 105 (citing *Pl.'s D.G. 2011 Dep. Tr.* 143:4-22, 146:8-19, 147:7-11 and *Pl.'s S.G. 2011 Dep. Tr.* 143:15-19, 188:9-189:1).   The Goldensons probably made this redemption in order to invest in Eagle.   DSMF ¶ 21; *Pl.'s D.G. 2011 Dep. Tr.* 143:7-25.   Mr. Goldenson testified that "Launny [Steffens] recommended Eagle to me."   *Pl.'s D.G. 2011 Dep. Tr.* 143:16-17.   However, Mr. Goldenson didn't "have a recollection of . . . discussing each individual change."   *Id.* at 147:3-4.   He recalled "explaining [to Mr. Steffens or Mr. Ho] that we were in the process of diversifying."   *Id.* at 147:4-5.   He further recalled that "I mentioned to either Greg or Launny that we had decided that we wanted to diversify our investments into other funds and that I would be making withdrawals."   *Id.* at 146:14-16.   Viewing this evidence in a light most favorable to the Goldensons, the Court concludes that Mr. Goldenson did "consult" with either Mr. Steffens or Mr. Ho regarding the July 1, 2003 withdrawal.   Because the Goldensons deny and controvert the second assertion of paragraph 105, the Court has not included it in its recitation of undisputed material facts.

[102]   The parties dispute whether Mr. Goldenson consulted with Mr. Steffens and Mr. Ho before making this redemption from Ascot.   DSMF ¶ 106; PRDSMF ¶ 106.   The denial and supporting record evidence regarding this assertion is similar to those as to the second assertion of paragraph

different hedge fund. DSMF ¶ 106; PRDSMF ¶ 106. On or about October 1, 2005, the Goldensons made a redemption of $600,000 from Ascot. DSMF ¶ 107; PRDSMF ¶ 107.[103] The Goldensons made the redemption in order to invest the money in a Summit hedge fund. DSMF ¶ 107; PRDSMF ¶ 107.

On or about October 1, 2006, the Goldensons made a direct investment of $40,000 in Ascot. DSMF ¶ 108; PRDSMF ¶ 108.[104]

On or about January 1, 2007, the Goldensons made a direct investment of $90,670 in Ascot. DSMF ¶ 109; PRDSMF ¶ 109.[105]

---

105. In this case, rather than Eagle, Mr. Goldenson recalled that he made the withdrawal in order to invest in Summit. *Pl.'s D.G. 2011 Dep. Tr.* 144:12-20. However, even though Mr. Goldenson apparently did not testify that he consulted with Mr. Steffens about the Summit investment, he still testified that he was in contact with either Mr. Steffens or Mr. Ho about his decision to diversify. *Id.* at 146:14-147:11. Viewing the evidence in a light most favorable to the non-movants, the Court infers that these were consultations. Because the Goldensons deny and controvert the second assertion of paragraph 106, the Court has not included it.

[103] The Defendants' denial of paragraph 107 fails for the same reasons described with respect to paragraph 106. *See supra* note 102. Because the Goldensons deny and controvert the second assertion of paragraph 106, the Court has not included it.

[104] The Defendants assert that Mr. Goldenson did not consult with them before making the investments in Ascot described in paragraph 108. DSMF ¶ 108. The Goldensons deny that assertion, citing Mr. Goldenson's testimony as to Mr. Steffens' earlier representation as to Ascot, PRDSMF ¶ 108 (citing *Pl.'s D.G. 2011 Dep. Tr.* 137:12-138:2), as well as Mr. Goldenson's testimony that the Defendants "regularly told him that the only downside to Ascot were occasional periods of low to non-existent returns and that Spring Mountain was closely monitoring Ascot." PRDSMF ¶ 108 (citing *Goldenson Decl.* ¶ 10 and PRDSMF ¶ 119). Viewing the evidence in a light most favorable to the Goldensons, the Court infers that Mr. Goldenson did "consult with the Defendants before making this investment" in a general sense. Because the Goldensons deny and controvert the second assertion of paragraph 108, the Court has not included those assertions.

[105] The Defendants assert that Mr. Goldenson did not consult with them before making the investments described in paragraphs 109 and 110. DSMF ¶¶ 109-10. The Goldensons deny that assertion, citing Mr. Goldenson's testimony that he regularly "discussed these additional investments with the Defendants." PRDSMF ¶ 109 (citing *Pl.'s D.G. 2011 Dep. Tr.* 109:6-16, 285:20-286:3). Mr. Goldenson claims that when he encountered Mr. Steffens on social occasions he "always wanted to know—independent of what the Merkin organization was telling [him], . . . what Launny and Greg were feeling about that core investment. Were they still in it, did they like it, was it performing." *Pl.'s D.G. 2011 Dep. Tr.* 113:21-114:24. Viewing this evidence in a light most favorable to the Goldensons, the Court concludes that Mr. Goldenson did "consult with the Defendants before making this investment in Ascot." DSMF ¶ 109. The same record evidence controverts paragraph 110. Because the Goldensons deny and controvert the second assertion of paragraphs 109 and 110, the Court has not included those assertions.

On January 1, 2007, the Goldensons made a direct investment of $250,000 in Ascot. DSMF ¶ 110; PRDSMF ¶ 110.

On or about each of April 1, July 1, and October 1, 2007, the Goldensons made redemptions of $6,000 from Ascot. DSMF ¶ 111; PRDSMF ¶ 111. The Goldensons did not consult with the Defendants regarding these specific redemptions. DSMF ¶ 111; PRDSMF ¶ 111.[106]

On or about July 1, 2008, the Goldensons made redemptions of $6,000, $20,000, and $5,000 from Ascot. DSMF ¶ 112; PRDSMF ¶ 112.[107]

On or about October 1, 2008, the Goldensons made redemptions of $6,000 and $20,000 from Ascot. DSMF ¶ 113; PRDSMF ¶ 113.[108]

---

[106] The Defendants assert that Mr. Goldenson "did not consult with [them] before making these redemptions" from Ascot. DSMF ¶ 111. The Goldensons interpose a qualified response, asserting that they made all of their transactions with Ascot in reliance on the Defendants' alleged representations as to the stability and reliability of that fund. PRDSMF ¶ 108 (citing *Pl.'s D.G. 2011 Dep. Tr.* 137:12-138:2 and *Goldenson Decl.* ¶ 10). Although the qualification only marginally alters the substance of paragraph 111, the Court has modified the Defendants' assertion to reflect that the Goldensons did not consult with the Defendants about these specific redemptions. As modified, the Court deems paragraph 111 admitted under Local Rule 56(f), (g).

[107] The Defendants assert that Mr. Goldenson "did not consult with [them] before making these redemptions" from Ascot. DSMF ¶ 112 (citing *Def.'s D.G. 2011 Dep. Tr.* 151:18-152:12, *Steffens Decl.* ¶ 13). The Goldensons interpose a qualified response. PRDSMF ¶ 112. They claim that by January 2008, Mr. Goldenson was considering taking his money entirely out of Ascot, but that after he expressed his anxieties to Mr. Steffens in January, Mr. Steffens persuaded him to stay in the fund. PRDSMF ¶ 112 (citing *Pl.'s D.G. 2011 Dep. Tr.* 150:2-12 and *Goldenson Decl.* ¶ 12). Mr. Goldenson further claims that he made only limited redemptions from Ascot in reliance on these assurances from Mr. Steffens. *Goldenson Decl.* ¶ 12. Crediting Mr. Goldenson's testimony, the Court concludes that Mr. Goldenson did consult with Mr. Steffens regarding the 2008 redemptions from Ascot. Although the Goldensons' response is only "qualified," the record evidence establishes a genuine dispute as to the entire assertion; therefore, the Court treats the assertion as denied and has not included it.

[108] The Defendants assert that the Goldensons did not consult with them before making these redemptions from Ascot. DSMF ¶ 113. The Goldensons have denied this assertion. PRDSMF ¶ 113. As the Court is required to view the evidence in a light most favorable to the non-movant, the Court has not included the Defendants' assertion.

By December 2008, the Goldensons had directly invested just under $2.9 million total in Ascot and withdrawn approximately $1.75 million from their direct investments in Ascot. DSMF ¶ 114; PRDSMF ¶ 114.[109]

During the entire period when the Goldensons were direct investors in Ascot, Mr. Goldenson communicated on a regular basis directly with those running Ascot, including, rarely, Mr. Merkin. DSMF ¶ 115; PRDSMF ¶ 115.[110] The Defendants were not privy to Mr. Goldenson's communication with Ascot. DSMF ¶ 115; PRDSMF ¶ 115.[111] During this period, Ascot sent the Goldensons reports detailing Ascot's performance, which Mr. Goldenson relied on. DSMF ¶ 116; PRDSMF ¶ 116.[112] In 2007, Mr. Merkin assured Mr. Goldenson in a direct communication between them that Ascot would continue to earn a return of 8% to 9%, which was consistent with its historical return. DSMF ¶ 117; PRDSMF ¶ 117.[113] The Goldensons received copies of Ascot's audited financial statements prepared by BDO

---

[109] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 114. *See* PRDSMF ¶ 114. The Court deems paragraph 114 admitted under Local Rule 56(f), (g).

[110] The Goldensons interpose a qualified response, but most of the qualification does not change the substance of this assertion in paragraph 115. *See* PRDSMF ¶ 115. The Court changed the Defendants' statement to reflect that the Goldensons spoke only rarely with Mr. Merkin. The Court deems paragraph 115, as altered, admitted under Local Rule 56(f), (g).

[111] The Goldensons' qualification does not address this assertion. *See* PRDSMF ¶ 115. The Court deems paragraph 115 admitted as to this assertion under Local Rule 56(f), (g).

[112] The Goldensons interpose a qualified response to the effect that they frequently discussed Ascot's returns with Mr. Ho during this period. PRDSMF ¶ 116. While the Goldensons may have also relied on advice from Mr. Ho and Mr. Steffens, this does not change the assertion that they relied on the reports from Ascot. The Court deems paragraph 116 admitted under Local Rule 56(f), (g).

[113] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 117. *See* PRDSMF ¶ 117. The Court deems paragraph 117 admitted under Local Rule 56(f), (g).

Seidman, and relied on those statements in making their direct investments with Ascot. DSMF ¶ 118; PRDSMF ¶ 118.[114]

### m. Mr. Goldenson's Communications With Defendants About Ascot After the Goldensons Had Invested in Ascot

Mr. Goldenson had "numerous" telephone conversations with Mr. Steffens and Mr. Ho in which Ascot was discussed, "but [they] had to do with the performance" of Ascot. DSMF ¶ 119; PRDSMF ¶ 119. Mr. Goldenson had conversations with Mr. Steffens or Mr. Ho that touched on the performance of Ascot either "every month for the first two years" after the Goldensons' initial investments in QP I and Ascot, or "every month for . . . 12 or 18 [months]." DSMF ¶ 119; PRDSMF ¶ 119.[115] In Mr. Goldenson's telephone conversations with Mr. Ho that touched on Ascot's performance, "[o]ther than telling me that [Ascot] was performing well and that they were very pleased with the performance of the Ascot

---

[114] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 118. *See* PRDSMF ¶ 118. The Goldensons claim that they only "relied on" the audited financials "for the proposition that they 'showed all the money in treasuries when it was not being traded.'" *Id.* (quoting *Ward Decl.* Ex. T (ECF No. 195-32) (Dec. 22, 2008) (*Goldenson Email to Ho Dec. 22 2008*)). They also "'thought these funds were fully segregated for the protection of Ascot investors.'" *Id.* (quoting *Goldenson Email to Ho Dec. 22 2008*). The Defendants' paragraph 118 does not identify a specific purpose for which the Goldensons relied on the statements; it only claims that the Goldensons "relied on those statements." DSMF ¶ 118. Furthermore, relying on the statements to show that the money was safe in treasury bonds when it was not being traded is a substantial reliance. The Court deems paragraph 118 admitted under Local Rule 56(f), (g).

[115] The Goldensons interpose a qualified response with additional details of Mr. Goldenson's communication with Messrs. Steffens and Ho. PRDSMF ¶ 119. The qualification does not change the substance of paragraph 119. *See id.* Paragraph 119 does not imply, as the Goldensons seem to fear, that after the initial period following the Ascot investment, Mr. Goldenson never spoke with Messrs. Steffens or Ho about Ascot. It merely states that Mr. Goldenson spoke with the Defendants every month during the first twelve to twenty-four months of the investment. DSMF ¶ 119. The Court deems paragraph 119 admitted under Local Rule 56(f), (g).

Fund, no, he didn't discuss anything else. These were calls about performance." DSMF ¶ 120; PRDSMF ¶ 120.[116]

Mr. Goldenson had a total of "25 [or] 30" telephone conversations with Mr. Ho "[o]ver a period of eight years.'" DSMF ¶ 121; PRDSMF ¶ 121.[117]

### n. The Collapse of Ascot and Its Effects

On December 11, 2008, Bernard Madoff was arrested and accused of running a Ponzi scheme. DSMF ¶ 123; PRDSMF ¶ 123.[118] When Mr. Madoff was exposed as a fraud on December 11, 2008, the value of Ascot went essentially to zero. DSMF ¶ 124; PRDSMF ¶ 124. As a result, the Goldensons lost at a minimum the $1.15 million difference between the $2.9 million they had invested in Ascot over the years and the $1.75 million they had withdrawn from Ascot during that time.

---

[116] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 120. *See* PRDSMF ¶ 120. The Court deems paragraph 120 admitted under Local Rule 56(f), (g).

[117] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 121. *See* PRDSMF ¶ 121. The Court deems paragraph 121 admitted under Local Rule 56(f), (g).

In paragraph 122, the Defendants claim that "Mr. Goldenson's conversations with Ho that touched on Ascot were strictly performance-related calls, with Ho telling him '[o]nly that [Ascot] was performing well, that it was very reliable, it was a core holding, and that they seemed very pleased with how it was contributing to the overall earnings of . . . QP I.'" DSMF ¶ 122 (quoting *Def.'s D.G. 2011 Dep. Tr.* 108:19-22). The Goldensons deny this assertion "to the extent the Defendants suggest that Mr. Goldenson's calls with Mr. Ho about performance did not include discussions about Mr. Merkin's purported execution of Ascot's trading strategy." PRDSMF ¶ 122 (citing *Goldenson Decl.* ¶¶ 9-10). Mr. Goldenson's Declaration claims that these discussions touched on Mr. Merkin's execution of Ascot's strategy and why Ascot had performed the way that it had in light of then-current market conditions. *Id.* (citing *Goldenson Decl.* ¶¶ 9-10). Viewing Mr. Goldenson's version in a light most favorable to the non-movants, Mr. Ho discussed more with Mr. Goldenson than simply that Ascot was performing well and reliably; he discussed the details of how it was performing. Because the Goldensons deny and controvert the paragraph 122, the Court has not included it in its recitation of undisputed material facts.

[118] The Goldensons offer an admitted response to paragraph 123, but also supply an additional record citation. PRDSMF ¶ 123. The Court disregards the additional material. *See supra* note 23.

DSMF ¶ 125; PRDSMF ¶ 125.[119]  The Goldensons have not sued Mr. Merkin, though Mr. Merkin has not sought relief in bankruptcy court and has litigated a number of cases brought against him.  DSMF ¶ 126; PRDSMF ¶ 126.[120]

QP I took a write-down of at least $6.1 million on its investment in Ascot, and the Goldensons' pro rata share of that amount was at least $200,714.  DSMF ¶ 127; PRDSMF ¶ 127.[121]  Spring Mountain funds collectively wrote down at least $34,000,000 on their holdings in Ascot.  DSMF ¶ 128; PRSDMF ¶ 128.[122]

---

[119]    The Goldensons deny this assertion, claiming instead that their damages are the difference between the value of their Ascot investment on December 11, 2008—$2,563,187.50—and zero, plus the fees they paid Mr. Merkin to manage the Ascot Fund and the lost investment opportunity in municipal bonds.  PRDSMF ¶ 125 (citing *Ward Decl.* Ex. G; *Steffens Decl.*, ¶ 32; *Frawley Decl.* Ex. UU (ECF No. 211-20) (Mar. 30, 2009)).  The proper measure of the Goldensons' damages, if any, is a matter of law, not susceptible to resolution based on the parties' statements of fact.  The Goldensons do not dispute that the Defendants' paragraph represents a minimum loss figure and the Court has included it.

[120]    The Goldensons deny this claim, supplying details of Mr. Merkin's ownership stake in Spring Mountain Capital G.P., LLC and Spring Mountain Capital, L.P.  PRDSMF ¶ 126 (citing PRDSMF ¶ 55).  They also offer a statement from a SMC customer service representative to Mr. Goldenson that SMC would not sue Mr. Merkin because Mr. Merkin was a partner.  *Id.* (citing *Pl.'s D.G. 2011 Dep. Tr.* 283:7-284:13).  However, none of these facts changes the assertion of paragraph 126: that the Goldensons have not named Mr. Merkin as a defendant in any lawsuit, and that Mr. Merkin has not sought bankruptcy protection.  Because the Goldensons have not controverted the assertions of paragraph 126, the Court deems paragraph 126 admitted under Local Rule 56(f), (g).

[121]    The Goldensons claim that the amount of the write-down is $7 million and their pro-rata share is $262,619.  PRDSMF ¶ 127 (citing *Frawley Decl.* Ex. WW *Spring Mountain Partners QP I, LP Financial Statements and Independent Auditors' Report*, at 13 (ECF No. 211-23) (Dec. 31, 2008) (*QPI 2008 Auditors' Report*) and *Second Decl. of Lucianne Painter* ¶ 6 (ECF No. 89-5) (Feb. 28, 2012)).  For purposes of the motion for summary judgment, the exact amount of the loss is immaterial and, in any event, the Goldensons do not appear to disagree that the amounts in paragraph 127 represent a minimum of the losses they sustained.  The Court included paragraph 127 but altered it to reflect the figures are minimum loss figures.

[122]    The Goldensons deny this, citing record evidence.  PRDSMF ¶ 128 (citing *Frawley Decl.* Ex. TT, at SMC000057170) (ECF No. 211-20) (Mar. 30, 2009) (*Lajara Email*)).  Again, the exact amount of this write-down is not material to the issues in the motion for summary judgment.  The Court has amended the paragraph to state that the $34,000,000 figure is a minimum.

    However, the Goldensons have not controverted any other assertion of paragraph 128.  Their contention that the present value of their holdings in QP I is $378,349 squares with the assertion in paragraph 128 that their total gain in QPI is $864,000, of which $500,000 has been distributed.  *Compare* DSMF ¶ 128 *with* PRDSMF ¶ 128.  Their concern that they may not get the rest of the money back, PRDSMF ¶ 128, does not change the substance of the Defendants' assertion.  Therefore,

Notwithstanding this share of QP I's write-down, the Goldensons have made gains in both QP I and investments in other Spring Mountain funds, totaling over $1.6 million. DSMF ¶ 128; PRSDMF ¶ 128. This gain includes approximately $864,000 in QP I, of which they have already received approximately $500,000. DSMF ¶ 128; PRSMF ¶ 128. It also includes approximately $776,000 in other Spring Mountain funds. DSMF ¶ 128; PRSMF ¶ 128.

Mr. Steffens personally lost approximately $4.6 million on his indirect investments in Ascot through Spring Mountain funds, and approximately $6.7 million altogether through his investments in Spring Mountain funds that, in turn, had invested in Mr. Merkin's funds that had exposure to Mr. Madoff. DSMF ¶ 129; PRDSMF ¶129.[123] Following Mr. Madoff's fraud, in combination with other financial pressures in 2008, SMC was forced to liquidate its investment funds. DSMF ¶ 130; PRDSMF ¶ 130.[124]

## 2. The Goldensons' Additional Facts

The Defendants object to a number of the Goldensons' statements on the grounds that they are supported only by Mr. Goldenson's affidavit, which they claim varies from his deposition testimony. *E.g.*, DRPSAMF ¶ 133. It is true that a

---

the Court deems their denied response admitted as to the remainder of the assertions under Local Rule 56(f), (g).

[123] The Goldensons interpose a qualified response, claiming that "Mr. Steffens had liquidated all but a penny of his entire personal interest in Ascot by July 1, 2003." PRSMF ¶ 129 (citing *Frawley Decl.* Ex. PP, at JEM-GOLD0000918 (ECF No. 211-18) (date unknown)). While this may be true, the assertion of paragraph 129 speaks of Mr. Steffens' indirect holdings in Ascot and his indirect exposure through his holdings in other Spring Mountain funds—not his personal interest in Ascot. DSMF ¶ 129. The Court deems paragraph 129 admitted under Local Rule 56(f), (g).

[124] The Goldensons interpose a qualified response, but the qualification does not change the substance of paragraph 130. *See* PRDSMF ¶ 130. The Court deems paragraph 130 admitted under Local Rule 56(f), (g).

statement in an affidavit that contradicts deposition testimony should be disregarded on summary judgment. *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). The Third Circuit, in a searching analysis of this "sham affidavit" doctrine, explained that it is not an exercise in evidentiary weighing, forbidden at the summary judgment stage. *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Rather, a court should disregard a sham affidavit because it does not generate a "'genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

> It is this determination that permits trial judges to disregard contradictory affidavits. A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant.

*Id.*; *see also Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006) (upholding a district court's rejection of an affidavit filed in response to a summary judgment motion, where the affidavit contradicted testimony given at two previous depositions and the affiant never testified as to difficulty remembering the contradicted facts).

However, not every variance from earlier deposition testimony renders an affidavit a "sham." A court will disregard an affidavit as a sham if it "contradicts clear answers to unambiguous questions in an earlier deposition." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002). "A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition

is entitled to consideration in opposition to a motion for summary judgment." *Id.* Moreover, "[a]dditional information may be provided by an affidavit submitted in opposition to a motion for summary judgment so long as the affiant did not testify at deposition that no such additional information existed." *Net 2 Press, Inc. v. 58 Dix Ave. Corp.*, 266 F. Supp. 2d 146, 153 (D. Me. 2003).

### a. The Goldensons' Investment History

Prior to December of 2001, the Goldensons had never invested in hedge funds. PSAMF ¶ 131; DRPSAMF ¶ 131.[125] The Goldensons always considered themselves to be "conservative" investors, meaning that their primary investment objective was to protect their principal in order to balance Mr. Goldenson's start-up businesses. PSAMF ¶ 132; DRPSAMF ¶ 132.[126] The Goldensons also desired to invest in a reliable investment strategy that was completely transparent. PSAMF ¶ 133; DRPSAMF ¶ 133.[127]

---

[125] The Defendants object to this assertion, arguing that it is not relevant to any material issue in dispute. DRPSAMF ¶ 131. The Court overrules this objection because the assertion is relevant to the existence of a common law fiduciary relationship between the Defendants and the Goldensons. The Defendants also interpose a qualified response, offering details of the Goldensons' other prior investments, DRPSAMF ¶ 131 (citing *Def.'s D.G. 2011 Dep. Tr.* 12:15-12:22, 168:14-169:8, 205:11-205:22 and *Def.'s D.G. 2012 Dep. Tr.* 5:1-8:23). These details do not change the substance of paragraph 131, and so the Court deems paragraph 131 admitted under Local Rule 56(f), (g).

[126] The Defendants object to this assertion, arguing that it is not relevant to any material issue in dispute. DRPSAMF ¶ 132. The Court overrules this objection because the assertion goes to the existence of a common law fiduciary relationship. The Defendants also deny paragraph 132, but their denial does not controvert the Goldensons' assertion. *See* DRPSAMF ¶ 132. The substance of the assertion is not that the Goldensons were actually "conservative" investors; it is that they "considered themselves to be 'conservative' investors." PSAMF ¶ 132. Although the Defendants' record evidence might persuade a fact-finder that this was not so, the Court is required at this stage to view all evidence in a light most favorable to the non-movant—here the Goldensons. As the Defendants have not controverted the Goldensons' assertion with record evidence, the Court treats paragraph 132 admitted under Local Rule 56(f), (g).

[127] The Court overrules the Defendants' objection that this statement varies from Mr. Goldenson's deposition testimony; the Defendants supply no contradictory passage of the deposition that constitutes a clear answer to an unambiguous question. The Court also overrules the

In the early 1980s, the Goldensons began purchasing mostly "triple-A New Jersey municipal bonds" with mostly ten-year call back periods. PSAMF ¶ 134; DRPSAMF ¶ 134.[128] By December of 2001, most of the Goldensons' investments were placed in AAA municipal bonds. PSAMF ¶ 135; DRSPAMF ¶ 135.[129] For perspective and strategic advice on the future "interest-rate climate" of these bonds,

Defendants' objection that the assertion is irrelevant; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim.

   The Defendants also deny the assertion of paragraph 133. DRPSAMF ¶ 133 (citing DRPSAMF ¶ 132). However, the record evidence cited in paragraph 132 does not controvert the assertion. Viewing the evidence in a light most favorable to the Goldensons, the Court accepts the assertion of paragraph 133 as true for purposes of the motion for summary judgment only. Therefore, the Court deems the Plaintiffs' paragraph 133 admitted under Local Rule 56(f), (g).

[128]   The Court overrules the Defendants' objection that the assertion is irrelevant; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Court deems paragraph 134 admitted under Local Rule 56(f), (g).

   In Plaintiffs' paragraph 134, they state in quotes that they "'had very strict standards about very high ratings for the bonds that they bought.'" PSAMF ¶ 134 (purportedly quoting *Pl.'s D.G. 2011 Dep. Tr.* 13:5-14:7). The Defendants objected on the ground that the quoted statement does not appear in the cited portion of Mr. Goldenson's deposition. DRPSAMF ¶ 134. The Defendants are correct and the Court has not included this portion of Plaintiffs' paragraph 134.

[129]   The Court overrules the Defendants' objection that the assertion is irrelevant; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also object on the ground that portions of the original assertion are unsupported by the record. DRPSAMF ¶ 135. The Goldensons claim that "[b]y December of 2001, substantially all of the Goldensons' investments were in the custody and control of Merrill Lynch, where over 90% of their investments were placed in AAA municipal bonds." PSAMF ¶ 135 (citing *Pl.'s D.G. 2011 Dep. Tr.* 13:5-14:7 and *Pl.'s Burns Dep. Tr.* 144:5-19). The Defendants deny the statement that "substantially all of the Goldensons' investments were in the custody and control of Merrill Lynch." DRPSAMF ¶ 135. The Defendants are correct that the cited record provides no support for this assertion, and so the Court does not credit it. The Defendants also deny that "90% of [the Goldensons'] investments were placed in AAA municipal bonds." *Id.* The Defendants are correct that the 90% figure is not supported by the record; Mr. Goldenson only stated that "[p]rior to December of 2001 . . . [w]e invested in . . . mostly triple-A new Jersey municipal bonds." *Pl.'s D.G. 2011 Dep. Tr.* 12:24-13:7. The Court has modified the assertion to remove the 90% figure. As modified, the Court deems the assertion admitted under Local Rule 56(f), (g).

   In their paragraph 136, the Goldensons assert that they were "faced with a decision: either reinvest in municipal bonds at lower interest rates or find a new, equally conservative investment strategy that would provide the [Goldensons] with roughly the same interest income on the same schedule." PSAMF ¶ 136 (citing *Pl.'s D.G. 2011 Dep. Tr.* 13:10-14:19). The Defendants deny the claim that the Goldensons were faced with such a choice. The Defendants are correct that the record does not support the assertion that the Goldensons were faced with such a limited set of options, *see Pl.'s D.G. 2011 Dep. Tr.* 13:10-14:19, and so the Court does not credit it.

the Goldensons turned to Mr. Steffens, whom they considered a friend and investment adviser. PSAMF ¶ 137; DRPSAMF ¶ 137.[130]

### b. The Goldensons' Relationship with Mr. Steffens at Merrill Lynch

Mr. Steffens was the Goldensons' neighbor in Princeton. PSAMF ¶ 138; DRPSAMF ¶ 138.[131] The Goldensons spent occasions with the Steffens that the Goldensons regarded as important, such as Valentine's Day and "an engagement party that [the Goldensons] gave for [their] older son." PSAMF ¶ 139; DRPSAMF ¶ 139.[132]

While Mr. Steffens was the head of Merrill Lynch's Private Client Group, the Goldensons "decided that we really would feel more comfortable having all of our bonds, or essentially all of our bonds, reposed at Merrill Lynch rather than in many accounts." PSAMF ¶ 140; DRPSAMF ¶ 140.[133] The Goldensons had "great trust

---

[130] The Defendants deny this assertion, citing numerous portions of the record detailing the Goldensons' relationship with Mr. Steffens before December, 2001. DRPSAMF ¶ 137. The Plaintiffs' paragraph 137 originally stated as a fact that Mr. Steffens was their friend and investment advisor. PSAMF ¶ 137. These typically innocuous assertions are loaded with implications in this motion. To respond to the Defendants' objection, the Court altered paragraph 137 to reflect that these adjectives are from the Goldensons' perspective only.

[131] The Goldensons continue to assert that Mr. Steffens was "their friend and their investment advisor," PSAMF ¶ 138 (citing *Merkin Dep. Tr.* 120:23-121:3 and *Pl.'s D.G. 2011 Dep. Tr.* 14:11-17), and the Defendants continue to deny that Mr. Steffens was "their investment advisor." DRPSAMF ¶ 138. The Court addressed this characterization in the footnote above and it does not add anything to repeat the contested adjectives.

[132] The Defendants object to this assertion, arguing that it is not material to any issue in dispute. DRPSAMF ¶ 139. The Court overrules this objection because the assertion is relevant to the existence of a common law fiduciary relationship between the Defendants and the Goldensons. The Defendants also object to the Goldensons' characterization of the two occasions as "important"; the Court altered paragraph 139 to reflect that the occasions were important from the Goldensons' perspective. The Defendants otherwise interpose a qualified response, but their qualification does not change the substance of paragraph 139. *See* DRPSAMF ¶ 139. The Court deems paragraph 139, as modified, admitted under Local Rule 56(f), (g).

[133] The Court overrules the Defendants' relevance objection; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. However, the Defendants'

and admiration'" for Mr. Steffens' position on Wall Street and his professional judgment. PSAMF ¶ 141; DRPSAMF ¶ 141.[134] While at Merrill Lynch, Mr. Goldenson believed that Mr. Steffens "was probably above all others our investment advisor." PSAMF ¶ 142; DRPSAMF ¶ 142.[135] For many years, Mr. Goldenson was always interested in what Mr. Steffens' "perspective was about bonds and

---

denial does controvert the original assertion. The Goldensons assert that "[w]hen Mr. Steffens became the head of Merrill Lynch's Private Client Group" they decided to consolidate their bond holdings at Merrill Lynch. PSAMF ¶ 140 (citing *Pl.'s D.G. 2011 Dep. Tr.* 18:19-19:8 and *Goldenson Decl.* ¶ 2). The Defendants deny this assertion, pointing out that Mr. Steffens became the head of the Private Client Group in 1997, but neither Mr. nor Mrs. Goldenson met Mr. Steffens until 1999. DRPSAMF ¶ 140 (citing PSAMF ¶ 345, *Savoldelli Dep. Tr.* 15:13-22, and *QP I COM* at PLS' RSP 000241). Mr. Goldenson's affidavit states that the Goldensons consolidated at Merrill Lynch "while Mr. Steffens was the head of Merrill Lynch's Private Client Group," *Goldenson Decl.* ¶ 2, not "[w]hen Mr. Steffens became the head of [the Private Client Group]," as paragraph 140 claims. Using this language resolves the Defendants' denial, because it shows that Mr. Goldenson did not move his bonds in response to Mr. Steffens taking the position, but during his tenure. The Court deems the paragraph 140 admitted as modified under Local Rule 56(f), (g).

[134]     The Goldensons also assert that they "'became clients'" of Mr. Steffens "'with great respect for his wisdom and . . . what he told us.'" PSAMF ¶ 141 (citing *Pl.'s D.G. 2011 Dep. Tr.* 14:22-15:7 and *Goldenson Decl.* ¶ 2). The Defendants deny this portion of the assertion, pointing out that the Goldensons were Merrill Lynch clients approximately nine years before they met Mr. Steffens. DRPSAMF ¶ 141 (citing *Def.'s Burns Dep. Tr.* 9:5-15, 10:3-7, 11:3-13:23, 128:6-128:9) and *Def.'s D.G. 2011 Dep. Tr.* 17:24-18:2). The portion of Mr. Goldenson's deposition in which he made this statement also claims that his relationship with Mr. Steffens began in the mid-nineties. *Pl.'s D.G. 2011 Dep. Tr.* 15:1-2. The Court views Mr. Goldenson's mid-nineties testimony as a mistake. It contradicts other evidence the Goldensons admitted that establishes the date Mrs. Goldenson met Mr. Steffens as late 1999 and the date that Mr. Goldenson met Mr. Steffens as after then. DSMF ¶¶ 30-31; PRDSMF ¶¶ 30-31. At the same time, viewing the evidence in a light most favorable to the non-movants, the Court accepts the Goldensons' assertion that after they met Mr. Steffens, they decided to place all of their bonds with Merrill Lynch because they trusted and respected Mr. Steffens.

[135]     The Goldensons claim that Mr. Steffens "'was probably above all others [their] investment advisor.'" PSAMF ¶ 142 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 13:13-14). The Defendants object on the grounds that the assertion is conclusory and subjective. DRPSAMF ¶ 142. The Court has modified the statement to reflect that it reflects the Goldensons' opinion of the relationship. Viewing all evidence in a light most favorable to the Goldensons, the Court concludes that Mr. and Mrs. Goldenson genuinely believed that Mr. Steffens was their investment advisor while Mr. Steffens was at Merrill Lynch.

particularly the interest-rate climate," a topic the two talked about "even at social

occasions." PSAMF ¶ 143; DRPSAMF ¶ 143.[136]

> Mr. Steffens provided the Goldensons with

> strategic advice, [and] he provided knowledge and his opinion about the direction of interest rates. He . . . expressed to [Mr. Goldenson] on a number of occasions that he thought that [the Plaintiffs'] portfolio may not have been the best maintained in municipal bonds by the latter part of 2001. And that was very important strategic advice.

PSAMF ¶ 144; DRPSAMF ¶ 144.[137] Mr. Steffens was "very free to provide advice,"

he "always had an opinion about the nature of the economic climate and direction of

interest rates," and he was "a person about who you can discuss markets all day,

every day." PSAMF ¶ 145; DRPSAMF ¶ 145.[138] Mr. Steffens made the Goldensons

"aware that market conditions with municipal bonds could affect [their] principal,"

and consequently that their "bonds were not as secure for various reasons as [Mr.

Goldenson] thought they were" because "in the changing-interest-rate environment

---

[136] The Court overrules the Defendants' relevance objection; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants deny this assertion, DRPSAMF ¶ 143, but their denial only controverts the Goldensons' characterization that Mr. Goldenson was interested in Mr. Steffens' opinion for "many years." The evidence is that Mr. Goldenson met Mr. Steffens in 1999, first consulted him on investments in 2001, and consulted with him periodically until at least 2008; this is sufficient to sustain the Goldensons' characterization of their discussions as having occurred over "many years." The Court deems paragraph 143 admitted under Local Rule 56(f), (g).

[137] The Court overrules Defendants' relevance objection; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty. The Defendants also deny and qualify the assertion of paragraph 144, but their record evidence does not controvert it. The Court treats the Plaintiffs' paragraph 144 admitted under Local Rule 56(f), (g).

[138] The Court overrules Defendants' relevance objection; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also deny paragraph 145, but the denial amounts to a disagreement over characterization. *See* DRPSAMF ¶ 145. Viewing the evidence in a light most favorable to the non-movants, the Court deems paragraph 172 admitted under Local Rule 56(f), (g).

[one] could find [one]self owning a lot less value than – than [the Goldensons] thought [they] had." PSAMF ¶ 146; DRPSAMF ¶ 146.[139]

Initially, Mr. Steffens' warnings that the Goldensons would get lower returns if they continued to purchase municipal bonds to replace their called-in bonds "wasn't a matter of concern" to them. PSAMF ¶ 147; DRPSAMF ¶ 147.[140] Although the Goldensons "were attentive to ideas that were presented to [them by Mr. Steffens] as being very conservative that were different from municipal bonds," they were "not interested in risking [their] principal" or changing their investment strategy because they "loved municipal bonds." PSAMF ¶ 148; DRPSAMF ¶ 148.[141] "[T]he notion of doing something entirely different" was not something the

---

[139]     The Court overrules Defendants' relevance objection; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty. The Defendants also deny this assertion. DRPSAMF ¶ 146 (citing *Def.'s S.G. 2011 Dep. Tr.* 23:9-11 and *Pl.'s S.G. 2011 Dep. Tr.* 23:7-9). The Defendants cite the deposition testimony of Suzanne Goldenson for the proposition that the Goldensons moved away from bonds independently of Mr. Steffens; however, viewing this evidence in a light most favorable to the Goldensons, the Court concludes that, as Mr. Goldenson testified, they were aware of the changing interest rates and made the decision to move away from bonds in response to information received from Mr. Steffens. *See Pl.'s D.G. 2011 Dep. Tr.* 13:8-19, 16:6-19. The Court deems paragraph 146 admitted under Local Rule 56(f), (g).

[140]     The Court overrules Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty. The Defendants also deny paragraph 147, but their denial fails for the same reasons described above. *See supra* note 139.

[141]     The Court overrules Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty. The Defendants deny paragraph 147, but their denial fails for the same reasons described above. *See supra* notes 125, 126, 139. Furthermore, the Defendants' claim that the Goldensons wrongly inserted "[them by Mr. Steffens]," DRPSAMF ¶ 148, is not well taken. Further on in the same sentence, Mr. Goldenson testified that these "ideas . . . was [sic] really the area that Launny [Steffens] opened up for us." *Pl.'s D.G. 2011 Dep. Tr.* 16:16-19. The Court deems paragraph 148 admitted under Local Rule 56(f), (g).

Goldensons were comfortable with because they were very cautious about their investments.  PSAMF ¶ 149; DRPSAMF ¶ 149.[142]

Based on Mr. Steffens' repeated warnings "about the nature of the economic climate and direction of interest rates" in the municipal bond market, however, the Goldensons became increasingly concerned about "whether or not [they] were in the right investment."  PSAMF ¶ 150; DRPSAMF ¶ 150.[143]

### c.  Mr. Steffens Introduces the Goldensons to the Idea of Hedged Investments

Mr. Steffens had previously told the Goldensons that they should think about hedged investments—which, according to Mr. Steffens, "were actually more reliable than investments [in] municipal bonds"—because they were not subject to changing market conditions.  PSAMF ¶ 151; DRPSAMF ¶ 151.[144]  These conversations were continuing when the Goldensons heard that Mr. Steffens had left Merrill Lynch to

---

[142]  The Court overrules Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty.  The Defendants also deny paragraph 147, but their denial fails for the same reasons described above.  *See supra* notes 125, 126, 139.

[143]  The Court overrules Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty.  The Defendants also deny paragraph 150, claiming that Mr. Goldenson's purported discomfort with his bond investments was not the result of any warnings by Mr. Steffens.  DRPSAMF ¶ 150 (citing *Pl.'s D.G. 2011 Dep. Tr.* 21:7-10).  It is true that the passage selected by the Goldensons to support paragraph 150 suggests that Mr. Goldenson was concerned and then spoke to Mr. Steffens.  *See Pl.'s D.G. 2011 Dep. Tr.* 21:7-12.  However, Mr. Goldenson also testified that he had learned of and become concerned about the drop in interest rates from Mr. Steffens.  *See supra* note 139.  In this interpretation, Mr. Goldenson learned of the changing interest rates from Mr. Steffens, became concerned as a result, and then went to Mr. Steffens to ask him if he should make any changes to his portfolio.  The Court is bound to view all record evidence in a light most favorable to the non-movants and to draw all reasonable inferences in their favor; consequently, the Court deems paragraph 150 admitted under Local Rule 56(f), (g).

[144]  The Court overrules Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim and to the existence of a common law fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 151.  The Court deems paragraph 151 admitted under Local Rule 56(f), (g).

start a fund-of-funds. PSAMF ¶ 152; PRDSAMF ¶ 152.[145] After Mr. Goldenson asked "whether [Mr. Steffens] thought [they] should continue to stay in municipal bonds," Mr. Steffens invited the Goldensons to hear more about this new fund of funds on "several occasions." PSAMF ¶ 153; DRPSAMF ¶ 153.[146] Because of their great respect for Mr. Steffens' advice that the Goldensons should be thinking about hedge funds, the Goldensons "agreed to listen to what he was doing." PSAMF ¶ 154; DRPSAMF ¶ 154.[147]

---

[145]     The Goldensons claim that "[t]hese conversations accelerated when the Plaintiffs heard that their investment adviser, Mr. Steffens, had left Merrill Lynch to start a fund-of-funds." PSAMF ¶ 152. As discussed above, the assertion that Mr. Steffens was the Goldensons "investment advisor" is conclusory. *See supra* notes 15, 32. The Defendants also deny that the conversations "accelerated" when the Goldensons heard that Mr. Steffens had left Merrill Lynch to start a fund-of-funds. The Defendants are correct that the record does not support an "acceleration" of conversations; it merely shows that the conversations continued. *See Pl.'s D.G. 2011 Dep. Tr.* 21:14-22:1, 34:10-14. The Court modified paragraph 152 to account for the Defendants' denial, and, as modified, it deems the paragraph admitted under Local Rule 56(f), (g).

[146]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 153. DRPSAMF ¶ 153. They claim that the passage cited by the Goldensons does not concern Mr. Steffens' fund of funds. *Id.* (citing *Pl.'s D.G. 2011 Dep. Tr.* 21:5-19). The passage is ambiguous, but viewing it in a light most favorable to the Goldensons, the Court concludes that Mr. Goldenson's inquiries to Mr. Steffens "ultimately led to his inviting us to hear more" about his new fund of funds "on several occasions." This inference is strengthened by Mr. Goldenson's later testimony that these conversations took place during the precise time that Mr. Steffens had left Merrill Lynch to start SMC. *See id.* at 21:29-22:3. And, contrary to what the Defendants claim, Mr. Goldenson only testified that he learned *facts* about Spring Mountain at the November, 2001 social dinner, *id.* at 34:9-10; he did not testify that he learned about the *existence* of Spring Mountain for the first time at that dinner. In fact, earlier he testified that he had already learned about Mr. Steffens' new fund of funds well before the dinner. *Id.* at 21:19-22. In sum, because a reasonable fact-finder could reach the conclusion that the Goldensons assert in paragraph 153, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[147]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 154, claiming that "[t]he implication that Steffens was seeking to bend Plaintiffs' ear about his fund and the Goldensons condescended to listen is inaccurate and misleading." DRPSAMF ¶ 154. They claim that Mr. Goldenson testified that "he first learned about Spring Mountain at a dinner with his wife and the Steffenses that was organized as a social occasion." *Id.* (citing *Pl.'s D.G. 2011 Dep. Tr.* 34:9-10, 37:17-19 and *Steffens Decl.* ¶ 5). However, Mr. Goldenson testified that he had heard of the existence of Mr. Steffens's fund of funds some time before the November dinner. *See Pl.'s D.G. 2011 Dep. Tr.* 21:19-22; *see also supra* note 146. Viewing the evidence in a light most favorable to the Goldensons, the Court concludes that Mr. Steffens

### d. The Defendants and J. Ezra Merkin Form Spring Mountain Capital and QP I

### i. Formation of Spring Mountain Capital

Messrs. Steffens and Merkin's "extensive dealings" began in 1997. PSAMF ¶ 155; DRPSAMF ¶ 155. Mr. Merkin helped finance Spring Mountain during the first year of its existence. PSAMF ¶ 156; DRPSAMF ¶ 156.[148]

On October 29, 2001, Messrs. Steffens, Ho, and Merkin founded Spring Mountain Capital G.P., LLC. PSAMF ¶ 157; DRPSAMF ¶ 157.[149] Mr. Merkin was entitled to 47.5% of SMC G.P., LLC's net profits attributable to "(i) a capital contribution made by a new Member to the extent such capital contribution is to be distributed to any Member; (ii) merging or consolidating the Company with another Person; and (iii) selling any asset of the Company other than in the ordinary course of business." PSAMF ¶ 158; DRPSAMF ¶ 158.[150]

---

induced the Goldensons to seriously consider investing in hedge funds, and in particular his own fund of funds. Therefore, the Court deems paragraph 154 admitted under Local Rule 56(f), (g).

[148] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty by Mr. Steffens. The Goldensons claim that "Mr. Merkin helped finance Spring Mountain's creation." PSAMF ¶ 156. The Defendants interpose a qualified response, pointing out that Mr. Merkin loaned Spring Mountain a total of $1.2 million between January 17, 2002 and September 30, 2002. DRPSAMF ¶ 156 (citing *Frawley Decl.* Ex. L *Promissory Note* (ECF No.211-11) (Jan. 17, 2002)). Given that Spring Mountain was formally organized in October of 2001, PRDSMF ¶ 43, the Defendants are correct that it is misleading to say that Mr. Merkin financed the "creation" of Spring Mountain. The Court adjusted the assertion of paragraph 156 to reflect this.

[149] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty by Mr. Steffens. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 157. The Court deems paragraph 157 admitted under Local Rule 56(f), (g).

[150] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, claiming that Mr. "Merkin's consulting firm, Jennyness Consulting, LLC, was entitled to 47.5% of the combined profits of Spring Mountain Capital, LP and Spring Mountain Capital G.P., LLC." DRPSAMF ¶ 128 (citing *Steffens Reply Decl.* ¶ 7). However, the LLC formation agreement for SMC G.P., LLC does not mention Jennyness Consulting, LLC; it speaks only of "J. Ezra Merkin" as a Class B member. *SMC General Partner Papers* at 2, 4. Mr. Merkin's Jennyness Consulting, LLC did have a consulting agreement with SMC G.P., LLC and SMC, L.P. *Frawley Decl.* Ex. R *Consulting Services Agreement*

SMC G.P., LLC was "empowered to formulate the overall investment strategy to be carried out by the [QP I] Fund and to exercise full discretion in the management of the trading, investment transactions and related borrowing activities of the Fund in order to implement such strategy." PSAMF ¶ 159); DRPSAMF ¶ 159.[151]

On October 29, 2001, Messrs. Steffens, Ho, and Merkin founded Spring Mountain Capital, L.P. PSAMF ¶ 160; DRPSAMF ¶ 160.[152] Mr. Merkin was entitled to 47.5% of SMC, L.P.'s net profits attributable to "(i) a capital contribution made by a new Partner to the extent such capital contribution is to be distributed to any Partner; (ii) merging or consolidating the Partnership with another Person; and (iii) selling any asset of the Partnership other than in the ordinary course of business." PSAMF ¶ 161; DRPSAMF ¶ 161.[153]

Mr. Merkin, through Jennyness Consulting, LLC, acted as a consultant to SMC G.P., LLC and SMC, L.P., a position which also entitled Mr. Merkin to 47.5% of the net operating income of both companies and, upon termination of the consulting agreement, to 47.5% of the incentive allocations and performance fees

(ECF No. 211-12) (Oct. 29, 2001). But this agreement does not change the substance of paragraph 158. The Court deems paragraph 158 admitted under Local Rule 56(f), (g).

[151] The Defendants interpose a qualified response, rejecting any implication that Mr. Merkin personally was given the role attributed to SMC G.P.,LLC. DRPSMF ¶ 159. Paragraph 159 does not imply that Mr. Merkin was personally given this role, and so the qualification does not change the substance of the assertion. The Court deems paragraph 159 admitted under Local Rule 56(f), (g).

[152] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 160. The Court deems paragraph 160 admitted under Local Rule 56(f), (g).

[153] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Court deems the Defendants' qualified response admitted for the same reasons described above with respect to paragraph 158. *See supra* note 150.

generated from all these companies' clients and accounts. PSAMF ¶ 162; DRPSAMF ¶ 162.[154] Mr. Merkin was "an investor in one or another" of the Spring Mountain funds, which may have included some "deferred pieces." PSAMF ¶ 163; DRPSAMF ¶ 163.[155]

In 2001 and into 2002, Spring Mountain operated out of Mr. Merkin's offices. PSAMF ¶ 164; DRPSAMF ¶ 164.[156]

### ii. Formation of QP I

On October 29, 2001, Messrs. Steffens, Ho, and Merkin founded Spring Mountain Partners, L.P. QP I Fund by purchasing the first limited partnerships therein. PSAMF ¶ 165; DRPSAMF ¶ 165.[157] The Defendants referred to Mr.

---

[154] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, pointing out that the SMC consulting agreement was with Mr. Merkin's consulting company, not Mr. Merkin personally. DRPSAMF ¶ 162 (citing *Frawley Decl.* Ex. R *Consulting Services Agreement* (ECF No. 211-12) (Oct. 29, 2001)). The Court adjusted the assertion of paragraph 162 accordingly, and deems the modified paragraph admitted under Local Rule 56(f), (g).

[155] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 163. The Court deems paragraph 163 admitted under Local Rule 56(f), (g).

[156] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants also deny this assertion, but their denial fails. Mr. Merkin testified that Mr. Steffens "had an office in my office, before their office was ready, different floor in our building." *Merkin Dep. Tr.* 122:18-21. He also testified Mr. Steffens "worked in the offices of Gabriel in 2001 for a period of time and into 2002." *Id.* at 186:10-12. In opposition, the Defendants offer Mr. Steffens' own affidavit that he had moved into his own offices by August of 2001. *Steffens Reply Decl.* ¶ 8. Viewing the evidence in a light most favorable to the Goldensons, the Court credits Mr. Merkin's deposition testimony and discounts Mr. Steffens' reply affidavit, concluding that Mr. Steffens was working in Mr. Merkin's office into 2002. Consequently, the Court deems paragraph 164 admitted under Local Rule 56(f), (g).

[157] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, disputing the characterization of Mr. Merkin as a "founder" of QP I. DRPSAMF ¶ 165. The Defendants admit, however, that the record evidence cited by the Goldensons shows "a subscription agreement reflecting that Merkin invested in QP I as a limited partner." *Id.* This subscription agreement is dated October 29, 2001—the admitted date of the formation of QP I. *Frawley Decl.* Ex. O *Spring Mountain Partners QP I, Subscription Agreement*, at SMC000000467 (ECF No. 214-15) (Oct. 29,

Merkin as a financial "consultant" to "the Management Company and/or the General Partner" of QP I in communications to investors. PSAMF ¶ 166; DRPSAMF ¶ 166.[158]

As part of his capital commitment to the QP I Fund, Mr. Steffens assigned $2,000,000 of his interest in Ascot to the QP I Fund. PSAMF ¶ 167; DRPSAMF ¶ 167.[159] The Defendants thereafter waived their and Mr. Merkin's management fees in the QP I Fund. PSAMF ¶ 168; DRPSAMF¶ 168.[160]

### e. Mr. Steffens Introduces the Plaintiffs to Spring Mountain

In late 2001, the Steffenses invited the Goldensons to dinner at a restaurant called Main Street in Princeton, New Jersey. PSAMF ¶ 169; DRPSAMF ¶ 169.[161] Although Mr. Goldenson initially thought the dinner "was mostly going to be a social gathering," Mr. Steffens ordered an expensive bottle of wine and, at his wife's

2001)). It is not unfair or misleading to characterize an initial limited partner as a "founder." The Court deems paragraph 165 admitted under Local Rule 56(f), (g).

[158] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty. The Defendants also deny paragraph 166. DRPSAMF ¶ 166. The Goldensons claim that the Defendants referred to Mr. Merkin as a consultant to the "investment team." PSAMF ¶ 166 (citing *QP I COM* at PLS' RSP 000261). The Defendants point out that the QP I COM that the Goldensons cite does not associate Mr. Merkin with the "investment team," as they claim; rather, it refers to him as a consultant to the "Management Company and/or the General Partner." DRPSAMF ¶ 166 (*QP I COM* at PLS' RSP 000261). The Defendants are correct in this regard, and the Court altered the assertion accordingly. The Court deems the modified paragraph admitted under Local Rule 56(f), (g).

[159] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty.

[160] The Court overrules the Defendants' relevance objection; the assertion is relevant to the alleged breach of a fiduciary duty.

[161] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, denying that the Steffenses invited the Goldensons. DRPSAMF ¶ 169 (citing *Steffens Decl.* ¶ 7(d)). The Court is bound to resolve all factual disputes in favor of the nonmovant, and the record supports the Goldensons' version. *Pl.'s D.G. 2011 Dep. Tr.* 24:4-7. Therefore, the Court deems paragraph 169 admitted under Local Rule 56(f), (g).

prompting, the dinner quickly became a discussion of Mr. Steffens' new Spring Mountain venture. PSAMF ¶ 170; DRPSAMF ¶ 170.[162] Mr. Steffens was "eager to tell [Mr. Goldenson]" about his investment strategy. PSAMF ¶ 171; DRPSAMF ¶ 171.[163]

Mr. Steffens told Mr. Goldenson that he had started his first hedge fund, called the QP I Fund, which was a well-diversified "fund of funds" that employed "numerous strategies performed by numerous sub-managers" that would spread any risks across many different investments and market strategies in order to balance its portfolio of funds. PSAMF ¶ 172; DRPSAMF ¶ 172.[164] Mr. Steffens assured Mr. Goldenson that the QP I Fund was a conservative alternative to

---

[162] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, denying "the apparent implication that they plied the Goldensons with wine." DRPSAMF ¶ 170. The record supports the Goldensons version, *Goldenson Decl.* ¶ 3, and so the Court deems paragraph 170 admitted under Local Rule 56(f), (g).

[163] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Goldensons claim that Mr. Steffens "'was eager to tell [Mr. Goldenson] about his [hedge fund] strategy.'" PSAMF ¶ 171 (quoting, with alteration, *Pl.'s D.G. 2011 Dep. Tr.* 24:5-6). The Defendants deny this assertion, in part because "Mr. Goldenson did not testify that Steffens characterized QP I as a 'hedge fund strategy.'" DRPSAMF ¶ 171 (quoting PSAMF ¶ 171). The "strategy" of which Mr. Goldenson testified is ambiguous, but earlier references in the preceding testimony strongly suggest that "strategy" was meant more broadly. *E.g. Pl.'s D.G. 2011 Dep. Tr.* 22:16-19 ("[H]e knew that we invested in municipal bonds, I wasn't planning to change that strategy. And so I really didn't need detailed strategic alternatives."); *id.* at 23:25-24:2 ("[T]he -- weighty, strategic advice that he wanted to give me . . . was not delivered to me in his office"). The Court adjusted the assertion to reflect that the "strategy" was an investment strategy, not specifically a hedge fund strategy.

The Goldensons also claimed that "'[Mr. Steffens] knew that [the Goldensons] . . . were prospective clients.'" PSAMF ¶ 171 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 24:6-7). The Defendants deny this assertion on the grounds that Mr. Goldenson actually said: "'He knew that we, I guess, were prospective clients.'" DRPSAMF ¶ 171 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 24:6-7). The Defendants are correct that this statement is subjective and speculative; Mr. Goldenson had no basis to personally know whether Mr. Steffens considered the Goldensons to be prospective clients. The Court does not credit that portion of paragraph 171.

[164] The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 172. The Court deems paragraph 172 admitted under Local Rule 56(f), (g).

municipal bonds and "a very secure way to invest because you're spreading your money among many different strategies," which would protect their principal. PSAMF ¶ 173; DRPSAMF ¶ 173.[165] Mr. Steffens advised the Goldensons to put their money in hedged investments, and not municipal bonds, because their bonds were not going to be responsive to changing market conditions. PSAMF ¶ 174; DRPSAMF ¶ 174.[166] Mr. Steffens suggested that the Goldensons would "be better off in hedged investments in general," which would provide the Goldensons with superior rates of return to their municipal bonds and a reduced risk of exposure to the adverse market trends he was predicting, including the rising of interest rates. PSAMF ¶ 174; DRPSAMF ¶ 174. The Goldensons' trust and respect for Mr. Steffens led them to take his advice seriously. PSAMF ¶ 175; DRPSAMF ¶ 175.[167]

---

[165] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Goldensons claim that Mr. Steffens portrayed QP I as a "more conservative alternative" to municipal bonds, PSAMF ¶ 173; however, the Defendants deny that the record supports this reading. DRPSAMF ¶ 173 (citing *Pl.'s D.G. 2011 Dep. Tr.* 27:8-11 and *Goldenson Decl.* ¶ 4). The Defendants are correct that no record evidence has Mr. Steffens portraying QP I as "more conservative" than municipal bonds, and the Court adjusted the assertion accordingly. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[166] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Goldensons claim that "Mr. Steffens urged the Goldensons to invest in Spring Mountain," PSAMF ¶ 174, but the Defendants deny that the record supports this interpretation. DRPSAMF ¶ 174 (citing *Pl.'s D.G. 2011 Dep. Tr.* 36:21-37:10 and *Goldenson Decl.* ¶ 4). The Defendants are correct that the record citations do not show Mr. Steffens "urging" Mr. Goldenson to "invest in Spring Mountain." *See Pl.'s D.G. 2011 Dep. Tr.* 36:21-37:10; *Goldenson Decl.* ¶ 4. The Court adjusted the assertion accordingly, and deems the modified assertion admitted under Local Rule 56(f), (g).

[167] The Goldensons assert that "'in general when you have an investment advisor who presents you with an opportunity and you have . . . great trust and respect for that person—in this case Launny [Steffens] was the pinnacle of the profession—his advice was extremely serious advice for [the Goldensons], who took it very seriously.'" PSAMF ¶ 175 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 29:15-20). The Defendants object that this is a conclusory and subjective statement, not a fact. DRPSAMF ¶ 175. The Defendants are correct regarding much of the statement, but there is a kernel of uncontroverted fact that the Court credits. The Court sustains the objection but deems the modified assertion admitted under Local Rule 56(f), (g).

Mr. Steffens then offered to have Mr. Goldenson come to his office in New York City to further discuss the QP I Fund, and told Mr. Goldenson to set up an appointment with his secretary. PSAMF ¶ 176; DRPSAMF ¶ 176.[168]

### f. Mr. Goldenson's Meeting With Messrs. Steffens and Merkin in New York City

#### i. Mr. Steffens Describes the QP I Fund to Mr. Goldenson

Mr. Goldenson met Mr. Steffens to discuss an investment in the QP I Fund in New York City on December 14, 2001. PSAMF ¶ 177; DRPSAMF ¶ 177. During the meeting, Mr. Steffens described "his whole career." PSAMF ¶ 178; DRPSAMF ¶ 178.[169] Mr. Steffens then explained that the minimum investment in the QP I Fund was $2 million. PSAMF ¶ 179; DRPSAMF ¶ 179. Mr. Goldenson reiterated that the Goldensons were not interested in risking their principal. PSAMF ¶ 180;

---

[168]    The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Defendants also object to the use of Mr. Goldenson's affidavit to support the proposition that Mr. Steffens invited Mr. Goldenson to New York City and told him to make an appointment with his secretary. DRPSAMF ¶ 176 (citing *Goldenson Decl.* ¶ 4). In the Defendants' view, this conflicts with Mrs. Goldenson's deposition testimony that "'there was some discussion of'" Mr. Goldenson visiting New York. *Id.* (citing *Pl.'s S.G. Dep. Tr.* 13:21-24). However, this is not a case in which the deposition contradicts a clear answer to an unambiguous question; rather, it is an amplification of earlier, oblique testimony. *Gillen*, 283 F.3d at 26. Because this is not a sham affidavit statement, the Court overrules the Defendants' second objection. Finally, the Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 176. The Court deems paragraph 176 admitted under Local Rule 56(f), (g).

[169]    The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Goldensons claim that "Mr. Steffens began by describing 'his whole career . . . and [how] he had developed this business.'" PSAMF ¶ 178 (quoting with alteration *Pl.'s D.G. 2011 Dep. Tr.* 91:12-21). The Defendants deny this assertion, claiming that the text does not support it. DRPSAMF ¶ 178. The Defendants are correct that the text does not show that Mr. Steffens "began" the meeting with his career, and also does not show that Mr. Steffens described "how he had developed the business" during the meeting. *See Pl.'s D.G. 2011 Dep. Tr.* 91:12-21. The Court has modified the assertion accordingly and deems the modified assertion admitted under Local Rule 56(f), (g).

DRPSAMF ¶ 180.[170]  Mr. Steffens assured Mr. Goldenson that the QP I Fund was

"an extremely conservative investment," that there was not any "risk . . . of . . .

consequence," and that the QP I Fund was a "very-highly-diversified investment

that was a preferential investment to what [the Goldensons] were doing at that

time, which was investing in triple-A Bonds.  [Mr. Steffens] felt [the QP I Fund] was

superior in all respects."  PSAMF ¶ 180; DRPSAMF ¶ 180.[171]

Mr. Steffens repeated that the QP I Fund was a well-diversified "fund of

funds" that employed "numerous strategies performed by numerous sub-managers,"

which made the QP I Fund "a very secure way to invest because you're spreading

your money among many different strategies."  PSAMF ¶ 181; DRPSAMF ¶ 181.[172]

He described "in great detail how they engineered the selection of all of these

strategies" and used multiple "managers so the investments were spread among lots

---

[170]      The Court overrules the Defendants' relevance objection; the paragraph is relevant to the
inducement and reasonable reliance elements of the Goldensons' common law fraud claim and to the
alleged breach of a fiduciary duty.  The Court overrules the Defendants' sham affidavit objection
because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question,
but rather is in the nature of additional facts.  *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at
153.  The Defendants also interpose a qualified response, denying that Mr. Goldenson reiterated or
repeated to Mr. Steffens that the Goldensons were not interested in risking their principal.
DRPSAMF  180 (citing *Steffens Reply Decl.* ¶ 3).  However, the Goldensons' version is supported by
record evidence, *Goldenson Decl.* ¶ 5, and the Court is bound to resolve factual disputes in the
Goldensons' favor.  The Court deems this assertion of paragraph 180 admitted under Local Rule
56(f), (g).

[171]      The Defendants interpose a qualified response to this assertion, denying that Mr. Steffens
told Mr. Goldenson that there was no risk in investing in QP I.  DRPSAMF ¶ 180 (citing *Steffens
Reply Decl.* ¶ 2).  However, the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011
Dep. Tr.* 89:7-9, 89:14-18, 91:18-19, and the Court is bound to resolve factual disputes in the
Goldensons' favor.  The remainder of the qualification does not change the substance of paragraph
180.  The Court deems this assertion of paragraph 180 admitted under Local Rule 56(f), (g).

[172]      The Defendants interpose a qualified response, claiming that Mr. Steffens "did not go into
the detail asserted by Plaintiffs that strategies were 'performed' by submanagers."  DRPSAMF ¶ 181
(citing *Steffens Decl.* ¶¶ 2, 7(d) and *Steffens Reply Decl.* ¶ 4).  However, the Goldensons' version is
supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 27:7-11, and the Court is bound to resolve
factual disputes in the Goldensons' favor.  The Court deems paragraph 181 admitted under Local
Rule 56(f), (g).

of people so if one person didn't do so well in a given month, somebody else might do better." PSAMF ¶ 182; DRPSAMF ¶ 182.[173] Mr. Steffens "was very proud of the fact that he had assembled a great many sort of mathematically-inclined people who really were the genius behind the specific mix of strategies that he had in [the] QP I" Fund. PSAMF ¶ 183; DRPSAMF ¶ 183.[174]

Mr. Goldenson was "very inquisitive" about the facts and circumstances underlying the QP I Fund's investment strategy, and he asked Mr. Steffens "extensive questions about the strategy" of Spring Mountain's first fund. PSAMF ¶ 184; DRPSAMF ¶ 184.[175] At the end of Mr. Steffens' description of the QP I Fund, Mr. Goldenson "indicated that, because of the amount of money that was falling due with the[ir] bonds, [the Goldensons] were willing to consider another investment of

---

[173] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 182, claiming that Mr. Goldenson's testimony represents only "Mr. Goldenson's own description of 'Launny's strategy.'" DRPSAMF ¶ 182 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 42:13). First, Mr. Goldenson clearly stated that Mr. Steffens "told me in great detail how they engineered the selection of all of these strategies," *Pl.'s D.G. 2011 Dep. Tr.* 42:17-18; this is testimony as to what Mr. Steffens said, contrary to the Defendants' claim. Second, although Mr. Goldenson's assertion about the multiple-manager approach is his own description and not a recollection of Mr. Steffens' exact words, the Court infers that Mr. Steffens made this statement during the meeting. There is evidence that he described the multiple-manager approach over dinner in November, *id.* at 27:7-11, and that he described his investment approach "in great detail" in December. *Id.* at 42:17-18. Drawing all reasonable inferences in favor of the Goldensons, the Court concludes that Mr. Steffens described the multiple-manager approach in December as well. The Court deems paragraph 182 admitted under Local Rule 56(f), (g).

[174] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 183. The Court deems paragraph 183 admitted under Local Rule 56(f), (g).

[175] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 184. The Court deems paragraph 184 admitted under Local Rule 56(f), (g).

a similar size [$2 million]." PSAMF ¶ 185; DRPSAMF ¶ 185.[176] Mr. Steffens told

Mr. Goldenson that "I can highly recommend my partner's fund called the Ascot

Fund," which was the only fund he recommended, and then proceeded to tell Mr.

Goldenson "exactly what the Ascot Fund was all about." PSAMF ¶ 186; DRPSAMF

¶ 186.[177]

### ii. Mr. Steffens Describes the Ascot Fund to Mr. Goldenson

Mr. Steffens told Mr. Goldenson that Mr. Merkin was his business partner at

Spring Mountain and was Spring Mountain's investment advisor. PSAMF ¶ 187;

DRPSAMF ¶ 187. When Mr. Steffens brought the Ascot Fund to Mr. Goldenson's

attention, the first thing Mr. Steffens told Mr. Goldenson was that Ascot was

"already a core holding of QP I. It's about 7 percent. We have a great deal of faith

in this, but we think that it's worthy of your consideration for a major additional

investment." PSAMF ¶ 188; DRPSAMF ¶ 188.[178]  Mr. Steffens assured Mr.

---

[176]  The Goldensons also assert that Mr. Steffens sought to "'really get[] [Mr. Goldenson] pretty much primed to invest,'" PSAMF ¶ 185 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 39:22-23), but the Defendants object to this as conclusory and subjective.  DRPSAMF ¶ 185.  The Court sustains this objection and does not credit that claim.

[177]  The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 186.  DRPSAMF ¶ 186 (citing *Steffens Decl.* ¶¶ 8, 13(a)).  However, the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 40:5-8, and the Court is bound to resolve factual disputes in the Goldensons' favor.  The Court deems paragraph 186 admitted under Local Rule 56(f), (g).

[178]  The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 188.  DRPSAMF ¶ 188.  The Court agrees that it is slightly misleading to characterize Mr. Steffens as "present[ing] Mr. Goldenson with the opportunity to invest in Ascot" because, as noted above, Ascot was not Mr. Steffens' fund, and he could not grant access to it on his own.  *See supra* note 62.  The Court adjusted the assertion accordingly.  However, as to the rest of the denial, record evidence supports the Goldensons' version, *Pl.'s D.G. 2011 Dep. Tr.* 112:13-23, 285:20-25, and the Court is bound to resolve factual disputes in the Goldensons' favor.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

Goldenson that because Ascot was already a "core holding" of the QP I Fund, he and his staff at Spring Mountain closely monitored the fund. PSAMF ¶ 189; DRPSAMF ¶ 189.[179]

Mr. Steffens told Mr. Goldenson that "my partner has developed a very reliable proprietary strategy that he's been operating for more than 10 years that he developed." PSAMF ¶ 191; DRPSAMF ¶ 191.[180] Mr. Steffens told Mr. Goldenson that "Ezra [Merkin] traded this strategy – ran the strategy" before explaining what Mr. Merkin's split-strike strategy was in "great detail." PSAMF ¶ 192; DRPSAMF ¶ 192.[181] Mr. Steffens explained to Mr. Goldenson that "Ezra conducted and

---

[179]   The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Court overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of an additional fact. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Defendants also interpose a qualified response. DRPSAMF ¶ 189. Part of the qualification denies that Mr. Steffens verbally assured Mr. Goldenson that Spring Mountain would "closely monitor" Ascot, *id.* (citing *Steffens Decl.* ¶¶ 24-28), but the Goldensons' version is supported by record evidence, *Goldenson Decl.* ¶ 6, and the Court is bound to resolve factual disputes in the Goldensons' favor. The remainder of the qualification does not change the substance of paragraph 189, and so the Court deems paragraph 189 admitted under Local Rule 56(f), (g).
          Paragraph 190 states that "[t]he fact that Ascot was a 'core holding' of the QP I Fund was one of the things that impressed Mr. Goldenson." PSAMF ¶ 190 (citing *Pl.'s D.G. 2011 Dep. Tr.* 106:3-6). The Defendants deny this statement, pointing out that the testimony cited by the Goldensons concerns a later period, well after the December 14, 2001 meeting and after the Goldensons had already invested directly in Ascot. DRPSAMF ¶ 190. The Defendants are correct, and the Court does not credit paragraph 190.

[180]   The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 191, but the record evidence they cite does not relate to what Mr. Steffens told Mr. Goldenson on December 14, 2001. *See* DRPSAMF ¶ 190. The Court deems paragraph 191 admitted under Local Rule 56(f), (g).

[181]   The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response. DRPSAMF ¶ 192. Part of the qualification denies that Mr. Steffens told Mr. Goldenson that Mr. Merkin "personally 'traded' the strategy," *id.* (citing DRPSAMF ¶ 191, *Steffens Reply Decl.* ¶ 4); this denial fails for the same reasons discussed with respect to paragraph 191. *See supra* note 180. The remainder of the qualification does not change

developed and . . . used a computer to have signals to buy and sell simultaneously options surrounding a basket of stocks, and that because you were long and short simultaneously, he said, it's really very secure." PSAMF ¶ 193; DRPSAMF ¶ 193.[182] Mr. Steffens told Mr. Goldenson that "[Ascot] was his partner . . . Ezra Merkin's proprietary strategy and that he was doing the trades, that – that it was on his computer; it was like his algorithm." PSAMF ¶ 194; DRPSAMF ¶ 194.[183] Mr. Steffens emphasized that "Ezra's made a real specialty of this . . . he's quite an amazing trader. He's known to be a terrific trader." PSAMF ¶ 195; DRPSAMF ¶ 195.[184] Mr. Steffens told Mr. Goldenson that Ascot had "very, very steady results," and told him that "you're not going to make as much as you'll make in QP I . . . [Y]ou may make, you know, probably, reliably 8 to 9 to 10 percent with the Ascot Fund, but it's extremely conservative and reliable, and Ezra has been doing this for more than 10 years." PSAMF ¶ 196; DRPSAMF ¶ 196.[185] Mr. Steffens concluded

---

the substance of paragraph 192, and so the Court deems paragraph 192 admitted under Local Rule 56(f), (g).

[182] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 193, but the denial fails for the reasons discussed above. *See supra* note 180. The Court deems paragraph 193 admitted under Local Rule 56(f), (g).

[183] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 194, but the denial fails for the reasons discussed above. *See supra* note 180. However, the Court has omitted the conclusory and subjective portion of the statement that Mr. Steffens spoke "with a great deal of – of pride." The Court deems the remainder of paragraph 194 admitted under Local Rule 56(f), (g).

[184] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification fails for the reasons discussed above. *See supra* note 180. The Court deems paragraph 195 admitted under Local Rule 56(f), (g).

[185] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 196, but the record evidence they cite in support does not controvert the assertion. *See* DRPSAMF ¶ 196 (citing *Steffens Decl.* ¶¶ 5, 13(a), 21). These portions of Mr.

by telling Mr. Goldenson "I really think that you would do well to consider a separate, independent, additional investment in the Ascot Fund." PSAMF ¶ 198; DRPSAMF ¶ 198.[186]

Although Mr. Goldenson was "quite intrigued with the fact that [Ascot] was so secure, that it was a strategy that [Mr. Steffens] said Ezra conducted and developed," using computer signals, he initially was "very concerned about the fact that it was one strategy" and "was extremely inquisitive." PSAMF ¶ 199; DRPSAMF ¶ 199.[187] Mr. Steffens assured Mr. Goldenson that Ascot was even more conservative than the QP I Fund and that the only real risks to Ascot were occasional periods of low to non-existent returns when Mr. Merkin decided current

Steffens' affidavit go to Mr. Steffens' own understanding of Spring Mountain's strategy and Ascot's reliability, not to what he told Mr. Goldenson on December 14, 2001. Even if they did, the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 43:5-12, and the Court is bound to resolve all factual disputes in favor of the Goldensons. The Court deems paragraph 196 admitted under Local Rule 56(f), (g).

Paragraph 197 states that "[i]t was apparent to Mr. Goldenson that Mr. Steffens used Mr. Merkin's ten-year track record to 'help legitimize [Mr. Steffens'] business and his company because he didn't have [his own] track record.'" PSAMF ¶ 197 (citing *Pl.'s D.G. 2011 Dep. Tr.* 46:25-47:4). The Defendants object to this statement as conclusory and subjective. DRPSAMF ¶ 197. The Defendants are correct, and the Court does not credit paragraph 197.

[186] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 198. DRPSAMF ¶ 198 (citing *Steffens Decl.* ¶¶ 8, 13(a)). However, the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 42:5-8, 285:20-255, and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Court deems paragraph 198 admitted under Local Rule 56(f), (g).

[187] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 199. DRPSAMF ¶ 199. The first part of their denial disputes that Mr. Goldenson was "extremely inquisitive"; they point out that he made the decision to purchase Ascot after two hours of back to back meetings and before receiving the Ascot COM. *Id.* (citing *Def.'s D.G. 2011 Dep. Tr.* 51:17-22, 55:14-18, 56:15-17). This issue is primarily one of characterization; the Court, viewing the evidence in a light most favorable to the Goldensons, concludes that Mr. Goldenson was "extremely inquisitive" during the two hours in which he spoke with Mr. Steffens and Mr. Merkin. The Defendants also deny that Mr. Steffens told Mr. Goldenson that Mr. Merkin "conducted and developed [Ascot's strategy] using computer signals," *id.* (citing DRPSAMF ¶¶ 191-94), but this denial fails for the reasons discussed above. *See supra* note 180. The Court deems paragraph 199 admitted under Local Rule 56(f), (g).

market conditions would not allow him to successfully execute the strategy. PSAMF ¶ 200; DRPSAMF ¶ 200.[188] Mr. Steffens' assurances that Ascot "was suitable for [the Plaintiffs] and it was extremely conservative" came in the context of Mr. Goldenson having informed him that the Goldensons did not want to risk their principal. PSAMF ¶ 201; DRPSAMF ¶ 201.[189]

Mr. Steffens then asked Mr. Goldenson "can I introduce my – partner to you?" PSAMF ¶ 202; DRPSAMF ¶ 202.[190] Mr. Goldenson accepted this offer; "[a]fter all, [Mr. Steffens] was suggesting to [him] that [Ascot] was a very secure place, highly secure, to put $2,000,000." PSAMF ¶ 203; DRPSAMF ¶ 203.[191]

---

[188] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Court overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of an additional fact. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Defendants also deny paragraph 200. DRPSAMF ¶ 200 (citing *Steffens Decl.* ¶ 13(a) and *Steffens Reply Decl.* ¶ 5). However, the Goldensons' version is supported by record evidence, *Goldenson Aff.* ¶ 6, *Pl.'s S.G. 2011 Dep. Tr.* 23:17-24:4), and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Court deems paragraph 200 admitted under Local Rule 56(f), (g).

[189] The Goldensons claim that this assurance was "'in the context of [Mr. Steffens] knowing that [the Goldensons] were in municipal bonds and . . . weren't in the market for something that – represented any risk . . . [or] in throwing [their] money at some totally new strategy that nobody knew about.'" PSAMF ¶ 201 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 46:19-24). The Defendants object, in substance, that Mr. Goldenson had no basis for testifying as to what Mr. Steffens "knew." DRPSAMF ¶ 201. The Court sustains this objection, and adjusted the assertion to reflect what the record shows Mr. Goldenson actually said to Mr. Steffens: that he did not want to risk his principal. *See supra* note 170 (discussing PSAMF ¶ 180). The remainder of the denial does not controvert this assertion, as the Court must resolve all factual disputes in favor of the Goldensons. *See* DRPSAMF ¶ 201. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[190] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement element of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 202. The Court deems paragraph 202 admitted under Local Rule 56(f), (g).

[191] The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants interpose a qualified response, denying that Mr. Steffens suggested that making a $2 million investment in Ascot was "very secure" or "highly secure." DRPSAMF ¶ 203 (citing *Steffens Decl.* ¶¶ 8, 13(a)). However, the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011*

### iii. Mr. Goldenson Meets with Messrs. Steffens and Merkin to Discuss the Ascot Fund

Mr. Goldenson had never heard of Mr. Merkin before December 14, 2001. PSAMF ¶ 204; DRPSAMF ¶ 204.[192]  Mr. Steffens introduced Mr. Merkin "with really quite glowing terms.  He said, 'my partner is a brilliant trader' and . . . 'he's known to – to have this proprietary strategy.'  And this was one of the things that greatly attracted [Mr. Goldenson] to join forces with Ezra [Merkin]."  PSAMF ¶ 205; DRPSAMF ¶ 205.[193]

Messrs. Steffens and Merkin then gave Mr. Goldenson a "two-on-one pitch to invest in the Ascot Fund and they were both talking about and encouraging [him] to do the very same thing."  PSAMF ¶ 206; DRPSAMF ¶ 206.[194]  During his meeting with both Messrs. Steffens and Merkin, Mr. Goldenson heard the same description of Ascot that he previously received from Mr. Steffens.  PSAMF ¶ 207; DRPSAMF ¶ 207.[195]  Ezra Merkin "was very happy to describe the fact that . . . he had his own

---

*Dep. Tr.* 42:22-24, and the Court is bound to resolve all factual disputes in favor of the Goldensons. The Court deems paragraph 204 admitted under Local Rule 56(f), (g).

[192]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the reasonable reliance element of the Goldensons' common law fraud claim.

[193]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.     The Defendants also deny paragraph 205, DRPSAMF ¶ 205 (citing *Steffens Decl.* ¶¶ 8, 13(a)), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 44:16-20, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems paragraph 205 admitted under Local Rule 56(f), (g).

[194]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.     The Defendants also deny paragraph 206, DRPSAMF ¶ 206 (citing *Steffens Decl.* ¶¶ 8, 13(a)), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 47:20-48:3, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems paragraph 206 admitted under Local Rule 56(f), (g).

[195]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.     The Defendants also interpose a qualified response, DRPSAMF ¶ 207 (citing DRPSAMF ¶¶ 191-96), but

proprietary strategy" and "was very specific that he did the trading and referred to his computer and the signals . . . and how he did it." PSAMF ¶ 208; DRPSAMF ¶ 208.[196]  Because "Ezra was Launny's partner and – and Launny spoke so very highly of – of his partner and the reliability of this strategy," Mr. Goldenson "was intrigued with it right away, but [he] asked a lot of questions" about the proprietary strategy. PSAMF ¶ 209; DRPSAMF ¶ 209.[197]  Mr. Goldenson understood "proprietary" to mean Mr. Merkin's "personal – like a patented product. . . . That it was an exclusive strategy that he himself had developed and wasn't available all over the place." PSAMF ¶ 210; DRPSAMF ¶ 210.[198]

the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 45:11-23, and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Court deems paragraph 207 admitted under Local Rule 56(f), (g).

[196]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 208, DRPSAMF ¶ 208 (citing DRPSAMF ¶¶ 191-96), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 44:9-45:1, and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Court deems paragraph 208 admitted under Local Rule 56(f), (g).

[197]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 209, DRPSAMF ¶ 209 (citing DRPSAMF ¶¶ 191-96 and *Pl.'s D.G. 2011 Dep. Tr.* 42:25-43:4), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 43:25-44:5, 44:22-45:2, and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Defendants deny "any implication that Mr. Goldenson had the misunderstanding that Steffens and Merkin were 'partner[s]' *relating to Ascot*," DRPSAMF ¶ 209, but the Court reads no such implication in the assertion. Mr. Goldenson has elsewhere identified Mr. Merkin as Mr. Steffens' partner in SMC, distinct from Ascot. *E.g.*, PSAMF ¶¶ 186-87. The Court deems paragraph 209 admitted under Local Rule 56(f), (g).

[198]     The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also object "inasmuch as [the assertion] relies on the testimony of Plaintiffs' expert, Arthur Laby." DRPSAMF ¶ 210. However, even without Mr. Laby's testimony, ample record evidence supports the assertion. *Pl.'s D.G. 2011 Dep. Tr.* 45:3-7; *Goldenson Decl.* ¶ 8. The Defendants also deny the assertion, DRPSAMF ¶ 210 (citing *id.* ¶ 191), but the Goldensons' version is supported by record evidence, *e.g.*, *Pl.'s D.G. 2011 Dep. Tr.* 45:3-7, and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Court deems paragraph 210 admitted under Local Rule 56(f), (g).

As Mr. Merkin described his purported proprietary strategy, Mr. Steffens "was an active part of the discussion" and kept "acknowledging and agreeing with Ezra" by making "comments along the way, really reassuring comments because most of [Mr. Goldenson's] questions had to do with how secure [Ascot] was." PSAMF ¶ 211; DRPSAMF ¶ 211.[199]  Mr. Steffens "repeated that it was a very conservative, very steady strategy" and said that "the strategy seemed to do better in higher-interest-rate environments," which Mr. Goldenson thought "was interesting." PSAMF ¶ 212; DRPSAMF ¶ 212.[200]  Mr. Steffens reiterated that Ascot "'was a strategy that Ezra performs.  He does the trading.  It's done right here.' And – and that was [Mr. Goldenson's] full understanding" based on Mr. Steffens' explanation that his "'partner is an extraordinary trader' right in front of [Mr. Merkin]." PSAMF ¶ 213; DRPSAMF ¶ 213.[201]

Mr. Steffens told "[Mr. Goldenson] that [Mr. Merkin's trading strategy] was a proven and very reliable strategy that [the Plaintiffs] could feel comfortable with as

---

[199]   The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 211, DRPSAMF ¶ 211 (citing DRPSAMF ¶ 191 and *Steffens Decl.* ¶¶ 8, 13(a)), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 45:11-23, 46:6-11, 49:19-21, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems paragraph 211 admitted under Local Rule 56(f), (g).

[200]   The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 212, DRPSAMF ¶ 212 (citing DRPSAMF ¶ 201 and *Steffens Decl.* ¶ 13(a)), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 47:12-19, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems paragraph 212 admitted under Local Rule 56(f), (g).

[201]   The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 213, DRPSAMF ¶ 213 (citing DRPSAMF ¶¶ 191-96), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 48:19-49:15, 50:3-9, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems paragraph 213 admitted under Local Rule 56(f), (g).

conservative investors." PSAMF ¶ 214; DRPSAMF ¶ 214.[202]  Mr. Steffens told Mr. Merkin to "'show Dan [Goldenson] your track record,' and they took out a piece of paper with years and years of – of data showing this remarkable performance." PSAMF ¶ 215; DRPSAMF ¶ 215.[203]  Messrs. Steffens and Merkin claimed that "they were very good at selecting the[] bracketed opportunities" that the execution of Ascot's split-strike strategy depended on and that "their winning ratio was far greater than their losing ratio." PSAMF ¶ 216; DRPSAMF ¶ 216.[204]

---

[202]  The Goldensons assert that "Mr Steffens 'was very eager to tell'" Mr. Goldenson these things. PSAMF ¶ 214 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 48:10).  The Defendants object to this statement as conclusory and subjective, DRPSAMF ¶ 214, and the Court sustains that objection.  The Court adjusted the assertion to reflect what Mr. Goldenson testified Mr. Steffens actually said.  The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny the substance of paragraph 214, but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 48:4-22, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems the modified assertion of paragraph 214 admitted under Local Rule 56(f), (g).

[203]  The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 215, DRPSAMF ¶ 215 (citing DRPSAMF ¶ *Steffens Decl.* ¶ 13(a) and *Pl.'s D.G. 2011 Dep. Tr.* 50:3-13), but the Goldensons' version is supported by record evidence, *Pl.'s D.G. 2011 Dep. Tr.* 50:3-13, and the Court is bound to resolve all factual disputes in the Goldensons' favor.  The Court deems paragraph 215 admitted under Local Rule 56(f), (g).

[204]  The Court overrules the Defendants' relevance objection; the assertion is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants deny the assertion "[t]o the extent Plaintiffs now attempt to insinuate that Steffens had or ever claimed to have anything to do with the formulation of Ascot's strategy or running Ascot." DRPSAMF ¶ 216 (citing DRPSAMF ¶¶ 188, 209).  The record citations provided in the Defendants' response to paragraphs 188 and 209 are Mr. Steffens' affidavit and the Ascot COM, but they do not prove what Mr. Steffens said during the December 14 meeting.  Mr. Goldenson received the Ascot COM after the meeting, *Def.'s D.G. 2011 Dep. Tr.* 55:2-18, making it irrelevant to what Mr. Steffens said at the meeting.  And Mr. Steffens' own declaration cannot, at the summary judgment stage, defeat Mr. Goldenson's testimony.  Although Mr. Goldenson also testified that he knew that Ascot was "'[Merkin's] baby,'" *Pl.'s D.G. 2011 Dep. Tr.* 43:2, this does not prove that Messrs. Steffens and Merkin did not say what Mr. Goldenson claims they said: "'*they* said that . . . *they* were very good at selecting . . . opportunities'" and "'*their* winning ratio was far greater than *their* losing ratio.'" *Id.* at 51:12-16 (emphasis added).  Viewing all evidence in a light most favorable to the Goldensons, the Court concludes that this is a true statement referring to both Mr. Steffens and Mr. Merkin.  Because the Defendants have not controverted paragraph 216, the Court deems the paragraph admitted under Local Rule 56(f), (g).

At the December 14, 2001 meeting, Messrs. Steffens and Merkin told Mr. Goldenson that he had to act quickly in order to invest before the first of the year or else he would have to wait three months. PSAMF ¶ 217; DRPSAMF ¶ 217.[205] As far as Mr. Merkin can remember, this meeting "could well have been" his only face-to-face meeting with Mr. Goldenson. PSAMF ¶ 218 (quoting *Merkin Dep. Tr.* 120:12-13); DRPSAMF ¶ 218.[206]

### g. The Goldensons Invest in the Ascot and QP I Funds

Once the meeting was over, Mr. Goldenson "was very impressed with both strategies and because of the really great confidence and regard and respect that [the Goldensons] had for Launny [Steffens]," the fact that Mr. Merkin was his business partner in Spring Mountain, the fact that Mr. Goldenson considered Mr. Steffens to be his investment advisor, and the fact that Ascot was already a core holding of the QP I Fund, Mr. Goldenson "was prepared to make a commitment." PSAMF ¶ 219; DRPSAMF ¶ 219.[207]

---

[205] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Court overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of an additional fact. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Defendants also deny paragraph 217, DRPSAMF ¶ 217 (citing *Steffens Decl.* ¶¶ 8, 13(a), *Pl.'s D.G. 2011 Dep. Tr.* 55:2-9), but the Goldensons' version is supported by record evidence, *Goldenson Decl.* ¶ 7, and the Court is bound to resolve all factual disputes in the Goldensons' favor. The Court deems paragraph 217 admitted under Local Rule 56(f), (g).

[206] The Court overrules the Defendants' relevance objection; the paragraph is relevant to alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, pointing out that Mr. Goldenson testified that he and Mr. Merkin had direct telephone contact after the December 14 meeting. DRPSAMF ¶ 218 (citing *Def.'s D.G. 2011 Dep. Tr.* 125:24-129:23, 130:13-131:23, *Steffens Decl.* ¶ 13, and PSAMF ¶¶ 115-18). The Court adjusted the assertion to reflect this fact, and deems the modified assertion admitted under Local Rule 56(f), (g).

[207] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Court overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not

Mr. Goldenson felt fortunate to join these partnerships. PSAMF ¶ 220; DRPSAMF ¶ 220.[208] He made the decision to invest in Spring Mountain "based upon the advice that [Mr. Steffens] gave [Mr. Goldenson] . . . and [not only as] the head of the company" but also as someone Mr. Goldenson considered a long-time advisor. PSAMF ¶ 221; DRPSAMF ¶ 221.[209] Mr. Goldenson "made a decision to invest principally on [Mr. Steffens'] advice in his partner's fund, the Ascot Fund," and his "very detailed description." PSAMF ¶ 221; DRPSAMF ¶ 221. The "only reason [the Goldensons] invested with Ezra Merkin was because of Launny Steffens." PSAMF ¶ 222; DRPSAMF ¶ 222.[210]

---

contradict any clear answer to an unambiguous question, but rather is in the nature of an additional fact. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 219. The Court deems paragraph 219 admitted under Local Rule 56(f), (g). The Court adjusted the language of the assertion to reflect that Mr. Goldenson "considered" Mr. Steffens to be his investment advisor; as originally worded, the statement was conclusory.

[208] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim.

[209] The Goldensons claim that Mr. Goldenson "made the decision to invest with Spring Mountain 'based upon the advice that [Mr. Steffens] gave [Mr. Goldenson] as an advisor – and [not only as] the head of the company, but as [their] long-time advisor.'" PSAMF ¶ 221 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 26:1-4). The Defendants object on the grounds that the characterization of Mr. Steffens as a "long time advisor" is conclusory and subjective. The Court sustains this objection, and the Court has rephrased the assertion to show that this was Mr. Goldenson's subjective perception. The Defendants also deny the assertion on approximately the same grounds, DRPSAMF ¶ 221, which denial is resolved with the objection. The Court deems the Defendants' denied response to the modified assertion admitted under Local Rule 56(f), (g).

[210] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also deny paragraph 222, but their denial does not controvert any facts in the assertion. *See* DRPSAMF ¶ 222. The Court deems paragraph 222 admitted under Local Rule 56(f), (g).

In paragraph 223, the Goldensons claim that they "'would have continued to invest in [municipal bonds] except for the fact that [Mr. Steffens] dissuaded [them] not to,'" and they were "'perfectly content to continue investing in municipal bonds and Mr. Steffens in effect pulled [them] away from that course of investing.'" PSAMF ¶ 223 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 22:11-21, 33:2-7). The Defendants object to this statement on the grounds that it is irrelevant; the Court overrules this objection. However, the statement is conclusory and speculative, and so the Court will not credit it.

### i. The COMs for the QP I and Ascot Funds

Within two weeks after Mr. Goldenson's meeting with Messrs. Steffens and Merkin, he received COMs for the QP I and Ascot Funds. PSAMF ¶ 224; DRPSAMF ¶ 224. Mr. Goldenson reviewed the COMs "in the context of what Launny [Steffens] had told [Mr. Goldenson]." PSAMF ¶ 225; DRPSAMF ¶ 225.[211]

## I. The QP I COM

To achieve its investment objective, the QP I COM advised that it employed a "five-step, top-down investment process" whereby it, among other things, identified, evaluated and selected managers for proposed strategies, constructed "a high performing and truly diversified portfolio," tested the portfolio, and "monitor[ed] the portfolio and its underlying managers and [made] adjustments." PSAMF ¶ 226; DRPSAMF ¶ 226.[212] The methodology documented in the COM was "very important" and "significant" to Mr. Goldenson. PSAMF ¶ 227; DRPSAMF ¶ 227.[213]

---

[211]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 225, but their denial does not controvert the factual assertion. *See* DRPSAMF ¶ 225. The Court deems the denied response admitted under Local Rule 56(f), (g).

[212]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty. The Goldensons claim that the COM said that QP I "tested the portfolio by 'monitoring the portfolio and its underlying managers and making required adjustments.'" PSAMF ¶ 226 (quoting *QP I COM* at PLS' RSP 000242). The Defendants interpose a qualified response, asserting, among other things, that the COM does not say that the monitoring and adjusting is a means of testing the portfolio. DRPSAMF ¶ 226. The Court adjusted the assertion to reflect this. The remainder of the qualification does not change the substance of paragraph 226, and the Court deems the modified assertion admitted under Local Rule 56(f), (g).

[213]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim. The Defendants also deny paragraph 227, pointing out that Mr. Goldenson testified that he had decided to invest in the QP I Fund before receiving the QP I COM. DRPSAMF ¶ 227 (citing *Def.'s D.G. 2011 Dep. Tr.* 51:17-22, 55:14-18, 56:15-17). In the Goldensons' passage, Mr. Goldenson testified that he read the COM before investing and the methodology was important to him. *Pl.s' D.G. 2011 Dep. Tr.* 94:8-20. In the Defendants' passage, Mr. Goldenson testified that he had made the decision to invest before reading the COMs, and the COMs did not have a material impact on his decision. *Def.'s D.G.*

The QPI COM stated that "the Submanagers selected by the General Partner will invest in and actively trade securities." PSAMF ¶ 228; DRPSAMF ¶228.[214] The QP I COM also advised prospective investors that they were

> [i]nvited to meet with the General Partner to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of this offering of the interests, and to obtain any additional information, to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

PSAMF ¶ 229; DRPSAMF ¶ 229.[215] The COM promised that the "General Partner and/or Management Company will make available to any prospective Investor such additional information as it may possess, or as it can acquire without unreasonable effort or expense, necessary to verify or supplement the information contained in this Memorandum." PSAMF ¶ 230; DRPSAMF ¶ 230.[216]

---

*2011 Dep. Tr.* 56:15-17. Taking these passages together, the Court infers that Mr. Goldenson decided immediately after the meeting to invest; that he then received the COMs and read them; that the information regarding the QP I Fund's strategy was important and significant in confirming his earlier decision; and that he then made the investment. Because the passages cited by the Goldensons and the Defendants do not contradict each other, the Defendants' passages do not controvert the assertion of paragraph 227, and the Court deems the paragraph admitted under Local Rule 56(f), (g).

[214] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim and to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 228. The Court deems paragraph 228 admitted under Local Rule 56(f), (g).

[215] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 229. The Court deems paragraph 229 admitted under Local Rule 56(f), (g).

[216] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 230. The Court deems the qualified response admitted under Local Rule 56(f), (g).

The Goldensons assert in paragraph 231 that "Mr. Goldenson took advantage of these invitations." PSAMF ¶ 231 (citing *Pl.'s D.G. 2011 Dep. Tr.* 87:14-22). The Defendants deny this, stating that Mr. Goldenson nowhere claims that he met with Mr. Steffens in between receiving the COM and making his investment in QP I. DRPSAMF ¶ 231 (citing *Steffens Decl.* ¶¶ 5, 11(a) and

The QP I COM only identified Mr. Merkin as a "consultant" to the Fund. PSAMF ¶ 232; DRPSAMF ¶ 232.[217] The QP I COM stated that "Schulte Roth & Zabel LLP . . . acts as counsel to the General Partner and the Management Company. In connection with this offering and ongoing advice to the Fund, the General Partner and the Management Company, Schulte Roth and Zabel LLP will not represent the investors." PSAMF ¶ 233; DRPSAMF ¶ 233.[218]

## II.    The Ascot COM

The 2002 Ascot COM[219] gave the fund wide latitude to invest in a number of active investment strategies in the future:

> Ascot Partners, L.P., a Delaware limited partnership formed on August 17, 1992, engages primarily in the practice of index arbitrage, convertible arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among

---

PRDSMF ¶ 88). In fact, Mr. Goldenson elsewhere affirmatively testified that he did not "have subsequent conversations with anyone at Spring Mountain about investing in the QP-I Fund between the time of [his] meeting with Mr. Steffens and the time when [he] made [his] investment." *Pl.'s D.G. 2011 Dep. Tr.* 58:13-21; *see also supra* note 96 (analyzing PRDSMF ¶ 100). In light of that statement, and with no other evidence, a fact-finder could not reasonably conclude that Mr. Goldenson's ambiguous reference to "ask[ing] questions," *Pl.'s D.G. 2011 Dep. Tr.* 87:20, referred to conversations between the December 14, 2001 meeting and the date he invested. The Court does not credit paragraph 231.

[217]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Court overrules the Defendants' objection that the statement is based on the Goldensons' expert, as the QP I COM directly supports the proposition without the expert's affidavit. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 232. The Court deems paragraph 232 admitted under Local Rule 56(f), (g).

[218]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.

[219]    The Goldensons supplied an Ascot COM dated December 2002. *See Frawley Aff.* at Ex. RR *Ascot COM*, at PLS' RSP 000979 (ECF No. 214-42) (December 2002) (*2002 Ascot COM*). This document is presumably not the one that Mr. Goldenson received and reviewed in December of 2001, shortly before making his investment in Ascot. *Def.'s D.G. 2011 Dep. Tr.* 55:2-18. Where necessary, the Court has highlighted any substantial differences in language between the 1996 COM and the 2002 COM.

related securities. The Partnership also may make investments in private debt claims and publicly traded securities of bankrupt and distressed companies and in risk arbitrage as well as make indirect investments, including investments in private investment partnerships, closed-end funds, and other pooled investment vehicles which engage in similar investment strategies (collectively "<u>Other Investment Entities</u>").

PSAMF ¶ 234; DRPSAMF ¶ 234.[220]

The 2002 Ascot COM made several references to using multiple independent money managers:

> The managing partner may delegate investment discretion for all or a portion of the Partnership's funds to money *managers*, other than the Managing Partner, or make investments with Other Investment *Entities*. Consequently, the success of the Partnership may also be dependent upon other money *managers* or investment *advisors* to Other Investment *Entities*. Although the Managing Partners will exercise reasonable care in selecting such independent money *managers* or Other Investment *Entities*, the Managing Partner and the General Partners may not have custody over the funds invested with the other money *managers* or with Other Investment *Entities*. Hence, the actions or inactions on the part of other money *managers* or the

---

[220]    The Court overrules Defendants' relevance objection to paragraph 234; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 234. The Court deems paragraph 234 admitted under Local Rule 56(f), (g).

    The analogous paragraph from the 1996 Ascot COM is nearly identical, but also includes "mutual funds" among the list of "Other Investment Entities." *See 1996 Ascot COM* at 5.

    In paragraph 235, the Goldensons claim that "[t]he Ascot COM's description made no mention of Ascot's one and only investment strategy, which was – as the Defendants[] internally described it – a 'Madoff feeder strateg[y],' or that 'the execution of the strategy is mostly completed by Bernie Madoff.'" PSAMF ¶ 235 (citing *2002 Ascot COM* at PLS' RSP 000983 and *McCloskey Decl.* Ex. T *Ascot Summary* (ECF No. 215-15) (Mar. 27, 2008)). However, the 2002 Ascot COM states that

>    [t]he Managing Partner [Mr. Merkin] may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the Managing Partner. . . . Consequently, the success of the Partnership may also be dependent upon other money managers. . . . The Managing Partner and the General Partners may not have custody over the funds invested with other money managers.

*2002 Ascot COM* at PLS' RSP 000985; *see also 1996 Ascot COM* at 10-11 (analogous language). Although this does not mention Mr. Madoff by name, it advises the potential investor of the basic relationship the Goldensons claim existed between Ascot and Mr. Madoff. Because the Defendants controverted the claim of paragraph 235, the Court does not credit it.

investment *advisors* to Other Investment *Entities* may affect the profitability of the Partnership. . . . *The independent money managers and Other Investment Entities may trade wholly independent of one another and may at times hold economically offsetting positions.*

PSAMF ¶ 236 (emphasis supplied by the Goldensons); DRPSAMF ¶ 236.[221]

The 2002 Ascot COM promised that "[a]ll decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin. Consequently, the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin." PSAMF ¶ 238; DRPSAMF ¶ 238.[222] Similarly, Ascot's 2002 COM promised Mr. Merkin "utilizes a selective approach in evaluating

---

[221] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Goldensons claim that "[t]he Ascot COM also consistently emphasized that the fund would employ *multiple* independent money managers in the future if it began to employ different strategies: [quoting the Ascot COM]." PSAMF ¶ 236 (emphasis in original). The Defendants deny this portion of the assertion, finding it unsupported by the COM's language. The Court agrees, and adjusted the assertion accordingly. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

In paragraph 237, the Goldensons claim that "[b]ased on Messrs. Steffens and Merkin's representations that Ascot's 'split-strike' strategy was 'proprietary,' Mr. Goldenson understood that this strategy – by its very definition – could not be delegated to other money managers." PSAMF ¶ 237 (citing *Goldenson Aff.* ¶ 8). Even crediting Mr. Goldenson's testimony that Mr. Steffens referred to the Ascot strategy as "proprietary," *see supra* note 180 (discussing DRPSAMF ¶ 191), it does not follow as a matter of logic that a "proprietary" strategy could never be delegated. Mr. Goldenson may well have held this belief, but the Court does not conclude that he did so "based on Messrs. Steffens and Merkin's representation that Ascot's 'split-strike' strategy was 'proprietary.'" The Court does not credit the Goldensons' paragraph 237.

[222] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Goldensons also claim that "[t]he Ascot COM promised Mr. Merkin 'retain[ed] overall investment responsibility for [the] portfolio of the partnership.'" PSAMF ¶ 238 (quoting *Ascot COM* at PLS' RSP 000984). The Defendants deny this portion of the assertion, arguing that the Goldensons have taken the quote out of context:

> "When the Partnership engages in indirect investments in Other Investment Entities" . . . "the Managing Partner will retain overall investment responsibility for the portfolio of the Partnership (*although not the investment decisions of any independent money managers managing Other Investment Entities*)."

DRPSAMF ¶ 238 (quoting Ascot COM at PLS' RSP 000984) (emphasis supplied by the Defendants). The Defendants are correct that, in context, the Ascot COM does not say what the Goldensons' fragment suggests. The Court adjusted the assertion of paragraph 238 to remove this language, and deems the modified assertion admitted under Local Rule 56(f), (g).

potential investment situations, generally concentrating on relatively fewer transactions he can follow more closely." PSAMF ¶ 239; DRPSAMF ¶ 239.[223] The COM also represented that Ascot would "execute its trades through unaffiliated brokers." PSAMF ¶ 240; DRPSAMF ¶ 240.[224] It stated that "the managing partner is required to devote substantially his entire time and effort during normal business hours to his money management activities, including (but not limited to) the affairs of the Partnership." PSAMF ¶ 241; DRPSAMF ¶ 241.[225]

The Ascot COM also urged prospective investors to

> [r]equest any additional information they may consider necessary in making an informed investment decision. Each prospective purchaser is invited, prior to the consummation of a sale of any interest to such purchaser, to ask questions of, and receive answers from, the managing partner concerning the partnership and this offering and to obtain any additional information to the extent the managing partner possesses the same or can acquire it without unreasonable effort or expense, in order to verify the accuracy of the information set forth herein.

PSAMF ¶ 24; DRPSAMF ¶ 242.[226]

---

[223]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 239. The Court deems paragraph 239 admitted under Local Rule 56(f), (g).

[224]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 240. The Court deems paragraph 240 admitted under Local Rule 56(f), (g).

[225]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 241. The Court deems paragraph 241 admitted under Local Rule 56(f), (g).

[226]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.

     The Court does not credit paragraph 243. *See supra* note 216 (discussing PSAMF ¶ 231).

The Goldensons received an updated 2006 Ascot COM in November, 2006 which was materially the same as its previous COM. PSAMF ¶ 244; DRPSAMF ¶ 244.[227] The 2006 Ascot COM provided that "[Ascot] may . . . invest in different investment funds and . . . enter into new investment advisory agreements without prior notice to or consent of [Ascot's investors]." DRPSAMF ¶ 244. The 2006 Ascot COM also provided that "'[Ascot] will make investments through third-party managers." *Id.* ¶ 244. This 2006 COM characterized the roles of Morgan Stanley and Mr. Madoff as "unaffiliated . . . principal prime brokers and custodians" responsible for "clearing" transactions. PSAMF ¶ 245; DRPSAMF ¶ 245.[228]

Mr. Madoff had actual custody of the funds he managed for Ascot. PSAMF ¶ 246; DRPSAMF ¶ 246.[229] Mr. Madoff also cleared the securities he purchased.

---

[227] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, highlighting two passages in the 2006 Ascot COM. DRPSAMF ¶ 244. The Court credits those two additional sentences.

[228] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Goldensons claim that the 2006 COM "mischaracterized the roles of Morgan Stanley and Madoff." PSAMF ¶ 245. The Defendants object to this statement as conclusory; in this respect, they are correct, and the Court does not credit "mischaracterized" as a factual assertion. Furthermore, the Goldensons' description of transaction clearing as "ministerial" is also conclusory, and the Court has omitted that characterization. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 245, as altered. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[229] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 246. The Court deems paragraph 246 admitted under Local Rule 56(f), (g).

PSAMF ¶ 247; DRPSAMF ¶ 247.[230]  Morgan Stanley did not clear any of Mr.

Madoff's trades.  PSAMF ¶ 248; DRPSAMF ¶ 248.[231]

> [A]ny reference to Madoff as a prime broker or custodian was itself misleading because it is not the practice in the securities industry for a prime broker or custodian to provide substantive investment advice to clients . . . . [A] prime broker might lend money to a fund, it might have custody of the fund assets, it might do the back-office clearance and settlement . . . [but t]he prime broker is not the substantive manager of a particular fund, and in that sense when [the 2006 Ascot COM] refer[s] to Madoff as a prime broker, that is very misleading, because indeed Madoff . . . was the one who ultimately had responsibility for managing the money.  That's where the ultimate decision was made; there's no question about that.

PSAMF ¶ 249; DRPSAMF ¶ 249.[232]

### ii.    The Mechanics of the Goldensons' Investment in Ascot

During the December 14, 2001 meeting, Mr. Goldenson was instructed to

wire any funds he invested in the Ascot Fund to Ascot's account at Morgan Stanley.

---

[230]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.  The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 247.  The Court deems paragraph 247 admitted under Local Rule 56(f), (g).

[231]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.  The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 248.  The Court deems paragraph 248 admitted under Local Rule 56(f), (g).

[232]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to false statements element of the Goldensons' common law fraud claim and the alleged breach of a fiduciary duty.  The Court overrules the Defendants' objection that Mr. Laby is not competent to testify as to what was misleading to Mr. Goldenson; in this passage, Mr. Laby testifies that the COM was objectively misleading, not misleading to Mr. Goldenson.  That testimony is well within the boundaries set by the Court in its order on the parties' *Daubert* motions.  *See Order on the Parties'* Daubert *Mots.* at 26-28 (ECF No. 190) (Feb. 2, 2013) (*Daubert Order*).  The Defendants' objection that Mr. Laby cannot testify as to who "ultimately had responsibility for managing the money [in Ascot]" is technically correct, but does not require that the statement be altered.  The Court, viewing all evidence in a light most favorable to the Goldensons, concludes that Mr. Madoff was ultimately responsible for managing the money.  *See supra* note 74 (discussing PRDSMF ¶¶ 75-76).  The Defendants also deny this assertion, but the denial fails for the same reason.  *See id.*  The Court deems paragraph 249 admitted under Local Rule 56(f), (g).

PSAMF ¶ 250; DRPSAMF ¶ 250.[233]    Based on Mr. Steffens' instructions, the Goldensons sent their initial $2 million subscription agreements for Ascot and the QP I Fund to Mr. Steffens, along with a thank you for Mr. Steffens' "invitations to join these partnerships."  PSAMF ¶ 251; DRPSAMF ¶ 251.[234]  On January 16, 2002, Mr. Merkin confirmed the Goldensons' $2 million investment in Ascot effective as of January 1, 2002.  PSAMF ¶ 252; DRPSAMF ¶ 252.[235]  Mr. Merkin also confirmed that the QP I Fund had made an additional $2 million investment in Ascot that same day.  PSAMF ¶ 253; DRPSAMF ¶ 253.[236]  On January 17, 2002, Mr. Merkin loaned $2 million to Spring Mountain Partners, L.P.  PSAMF ¶ 254; DRPSAMF ¶ 254.[237]

### h.    Facts About Ascot Unknown To the Goldensons Until 2009

Mr. Merkin formed the Ascot Fund in 1992.  PSAMF ¶ 255; DRPSAMF ¶ 255. Ascot Fund, Ltd. was the offshore companion fund to Ascot Partners, L.P. that

---

[233]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.  The Defendants also deny "any implication that Steffens, as opposed to Merkin or Ascot, gave Mr. Goldenson any instructions whatsoever about wiring funds for a direct investment in Ascot."  DRPSAMF ¶ 250.  The Court reads no such implication in the assertion, and so deems paragraph 250 admitted under Local Rule 56(f), (g).

[234]    The Defendants' objection that paragraph 251 is irrelevant is overruled; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim.  The Defendants also deny that Mr. Steffens instructed Mr. Goldenson to send the subscriptions to him, DRPSAMF ¶ 251 (citing *Steffens Decl.* ¶ 13(a)), but a fact-finder could reasonably credit Mr. Goldenson's version.  *See supra* note 97 (discussing PRDSMF ¶ 101).  The Court deems paragraph 251 admitted under Local Rule 56(f), (g).

[235]    The Court overrules the Defendants' relevance; the paragraph is relevant to the alleged breach of a fiduciary duty.

[236]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.

[237]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.  The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 254.  The Court deems paragraph 254 admitted under Local Rule 56(f), (g).

invested all of its assets with Ascot Partners, L.P. PSAMF ¶ 256; DRPSAMF ¶ 256.[238]

Ascot was a "feeder fund" for Mr. Madoff. PSAMF ¶ 257; DRPSAMF ¶ 257.[239] Mr. Merkin established Ascot "largely but not entirely' for the purpose of investing with Madoff." PSAMF ¶ 258; DRPSAMF 258.[240] Ascot did "virtually nothing" before it invested with Mr. Madoff, and his trading was "absolutely central to what Ascot did." PSAMF ¶ 259; DRPSAMF ¶ 259.[241] Mr. Merkin testified that he "can't imagine" describing the options trading strategy employed by Mr. Madoff as his personal, rather than Mr. Madoff's, trading strategy. PSAMF ¶ 260; DRPSAMF ¶ 260. Mr. Merkin further testified that Mr. Madoff's purported "proprietary

---

[238] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.

[239] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, contending that Mr. Merkin's testimony was only that he did not think it was "'totally off the wall'" to describe Ascot as a feeder fund. DRPSAMF ¶ 257 (quoting *Merkin Dep. Tr.* 34:13-14). However, the Court, viewing the evidence in a light most favorable to the Goldensons, concludes that Ascot was, in fact, a "feeder fund" for Mr. Madoff. The remainder of the qualification does not change the substance of paragraph 257, and so the Court deems paragraph 257 admitted under Local Rule 56(f), (g).

[240] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants also interpose a qualified response, pointing out that Mr. Merkin's actual testimony was that "'[i]t wasn't necessarily the case that [Ascot] was established largely for that purpose.'" *Merkin Dep. Tr.* 25:7-9. However, in his very next breath Mr. Merkin testified that "initially that was the case." *Id.* at 25:9-10. The Court, viewing this evidence in a light most favorable to the Goldensons, concludes that Mr. Merkin "initially" founded Ascot largely for the purpose of investing with Madoff, whatever his later purpose in "founding" Ascot became. The remainder of the qualification does not change the substance of paragraph 258, and so the Court deems the paragraph admitted under Local Rule 56(f), (g).

[241] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 259. The Court deems paragraph 259 admitted under Local Rule 56(f), (g).

strategy" was "not necessarily unique, novel, or proprietary." PSAMF ¶ 261; DRPSAMF ¶ 261.[242]

Ascot's funds were invested primarily with a managed account at Bernard Madoff Investment Securities, LLC. PSAMF ¶ 263; DRPSAMF ¶ 263.[243] In 2001, *MAR/Hedge*'s article "Madoff Tops Charts; Skeptics Ask How" attributed to Madoff a description of the role feeder funds played in his investment operations. PSAMF ¶ 264; DRPSAMF ¶ 264.[244] According to this article, feeder funds "provide all the administration and marketing [materials], raise the capital and deal with investors, says Madoff" and "Madoff Securities' role, he says, is to provide the investment strategy and execute the trades." PSAMF ¶ 264; DRPSAMF ¶ 264.

---

[242]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.
        In paragraph 237, the Goldensons offer the testimony of Mr. Savoldelli, a former Merrill Lynch employee, for the proposition that "Madoff operated a managed accounts structure, whereby 'he didn't have a commingled vehicle that you could invest in,' and only 'very, very large clients were able to go directly to him and others were feeder funds, Fairfield Greenwich, . . . Merkin and others' that 'would collect people.'" PSAMF ¶ 262 (quoting *Savoldelli Dep. Tr.* 54:23-55:3). The Defendants object that Mr. Savoldelli's testimony would not be admissible because, among other things, he lacked personal knowledge of the matter to which he was testifying. DRPSAMF ¶ 262. Mr. Savoldelli stated that he "subsequently learned" of the feeder fund structure, and was "repeating . . . what I understand from after the Madoff explosion." *Savoldelli Dep. Tr.* 55:2, 55:13-15. Mr. Savoldelli is not competent to testify as a lay witness to matters of which he lacks personal knowledge, FED R. EVID. 602, and the Court will not consider his statement.
[243]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 263. The Court deems paragraph 263 admitted under Local Rule 56(f), (g).
[244]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Court overrules the Defendants' hearsay objection because the quote is being offered, not for the truth of the matter asserted, but to show that the Defendants had notice of Mr. Madoff's "feeder fund" structure. The Goldensons claim that Mr. Madoff was "quoted" in the article, PSAMF ¶ 264 (citing *MAR/Hedge Article* at 2), but the Defendants deny that he was "quoted"; they contend that the words were merely attributed to him by the author. DRPSAMF ¶ 264 (citing *MAR/Hedge Article* at 2). This appears to be correct, and the Court adjusted the assertion to reflect this. The remainder of the Defendants' denial does not address the substance of paragraph 264, so the Court deems the modified assertion admitted under Local Rule 56(f), (g).

Between 2001 and 2008, Mr. Madoff "managed substantially all of the assets of Ascot." PSAMF ¶ 265; DRPSAMF ¶ 265.[245] As of December 31, 2007, Ascot had $1,759,650,866.00 invested with Madoff and $0.00 with other managers. PSAMF ¶ 266; DRPSAMF ¶ 266.[246]

### i. Facts About the QP I Fund Unknown to the Goldensons Until 2009

As of October 31, 2008, 9.03% of the hedge fund portion of the QP I Fund was invested in Ascot, with another 9.59% invested in Gabriel, making them the two largest investments in the QP I Fund's portfolio as of that date. PSAMF ¶ 267; DRPSAMF ¶ 267.[247] When the Defendants established the QP I Fund, Ascot was one of only seven funds in the QP I's portfolio; Gabriel was one of the others. PSAMF ¶ 268; DRPSAMF ¶ 268.[248] As of October 31, 2008, Spring Mountain had almost $63 million invested with Mr. Merkin's funds across nine Spring Mountain funds. PSAMF ¶ 269; DRPSAMF ¶ 269.[249] As of October 31, 2008, the QP I Fund was invested 18.62% in funds managed by Mr. Merkin. PSAMF ¶ 270; DRPSAMF

---

[245] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 265. The Court deems paragraph 265 admitted under Local Rule 56(f), (g).

[246] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 266. The Court deems paragraph 266 admitted under Local Rule 56(f), (g).

[247] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty. The Goldensons refer to Ascot as "Ascot/Madoff," but the Defendants interpose a qualified response objecting to this characterization. DRPSAMF ¶ 267. Referring to Ascot as "Ascot/Madoff" is conclusory and vituperative, and the Court does not credit that phrasing. The Court deems paragraph 267 admitted under Local Rule 56(f), (g).

[248] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.

[249] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.

¶ 270.[250]  On April 15, 2008, Defendant Steffens and Spring Mountain Capital, LP represented to investors that the Defendants had a high degree of transparency in Spring Mountain's hedge positions.  PSAMF ¶ 271; DRPSAMF ¶ 271.[251]

Mr. Steffens has sworn that he "did not know or believe that Gabriel Capital, L.P. had invested through Madoff" prior to December 11, 2008.  PSAMF ¶ 274;

---

[250]    The Court overrules the Defendants' relevance objection; the paragraph is partially relevant to the alleged breach of a fiduciary duty.  The Goldensons claim that "[a]s of October 31, 2008, the QP I Fund was invested 43.8% . . . in funds affiliated with Mr. Merkin."  PSAMF ¶ 270 (citing *Frawley Decl.* Ex. SS, at SMC000054050 (ECF No. 211-19) (date unknown)).  The Defendants deny the paragraph on the grounds that it miscalculates the QP I Fund's exposure to Mr. Merkin.  This is correct.  The Goldensons' figure counts, in addition to Ascot (9.03%) and Gabriel (9.59%) the following other funds: (1) Redwood Domestic Fund (which shares a business address with Mr. Merkin's brother  Solomon, *Goldenson Decl.* ¶ 24) at 7.92%; (2) Cerberus Partners, L.P. (with whom Mr. Merkin collaborated on certain investment projects, *Merkin Dep. Tr.* 131:8-19) at 8.12%; and (3) three other SMC funds (SMC New World Fund, L.P., SMC Credit Opportunities Fund, Ltd., and the SMC Leveraged Fund, LLC, PRDSMF ¶ 51) at a combined 9.14%.  No record evidence suggests that Mr. Merkin owned or controlled these funds, so it is improper to count them among funds managed by Mr. Merkin on October 31, 2008.  Any other relationship—the "affiliated with Mr. Merkin" of the Goldensons' paragraph 270—is too vague and speculative to be relevant.  The Court adjusted the paragraph to acknowledge the QP I Fund's exposure to funds managed by Mr. Merkin, and deems the modified assertion admitted under Local Rule 56(f), (g).

[251]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim and to the alleged breach of a fiduciary duty.  However, the Goldensons asserted merely that "[t]he Defendants represented to their investors that they had a 'high degree of transparency' in the QP I Fund's hedge positions."  PSAMF ¶ 271 (quoting *Frawley Decl.* Ex. FF, at PLS' RSP 000194 (ECF No. 214-31) (Apr. 15, 2008)).  The Defendants interpose a qualified response, clarifying the sender of the communication and the date.  DRPSAMF ¶ 271.  These qualifications are relevant and focus the substance of the assertion, and the Court adjusted the assertion accordingly.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

In paragraph 272, the Goldensons claim that "[a]part from the Ascot Fund, however, the Plaintiffs had 'a total lack of transparency in what . . . [the QP I Fund was] investing in.'"  PSAMF ¶ 272 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 112:20-21).  The Defendants deny this assertion.  DRPSAMF ¶ 272.  "Transparency" and "lack of transparency" are both complex concepts that cannot be established without extensive factual underpinnings.  The Court rejects paragraph 272 as conclusory.

In paragraph 273, the Goldensons claim that "[t]he Defendants expressed concerns and 'discomfort' internally about the transparency of the Ascot Fund."  PSAMF ¶ 273 (citing PSAMF ¶¶ 363-69).  The Defendants object to this statement on the grounds that it is merely a summary of other, subsequent assertions.  The Court does not credit paragraph 273, but will address the substance of paragraphs 363 through 369 in due course.

DRPSAMF ¶ 274.[252]  Gabriel had invested between 16% and 30% in Mr. Madoff at all times since 2001 and was 29% invested in Mr. Madoff as of November 30, 2008. PSAMF ¶ 274; DRPSAMF ¶ 274.

### j.    The Defendants' Relationship With J. Ezra Merkin

### i.    Mr. Merkin's Role at Spring Mountain

Mr. Steffens introduced Mr. Merkin as his "partner" and investment advisor to Mr. Goldenson.  PSAMF ¶ 275; DRPSAMF ¶ 275.[253]  The Defendants identified Mr. Merkin as a member of Spring Mountain's investment committee in describing their firm to investors.  PSAMF ¶ 277; DRPSAMF ¶ 277.[254]  The Defendants also

---

[252]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of a fiduciary duty.  The Goldensons assert that "Mr. Steffens also claims he 'did not know or believe that Gabriel Capital, L.P. had invested through Madoff' prior to December 11, 2008." PSAMF ¶ 274 (quoting *Frawley Decl.* Ex. Z *Steffens' Resp. to Pl.'s 1st Set of Interrogs.*, at 4 (ECF No. 211-16) (Mar. 22, 2012).  The Defendants interpose a qualified response, rephrasing the assertion without the word "claims."  DRPSAMF ¶ 274.  The Goldensons' use of "claims" suggests the conclusion that Mr. Steffens did, in fact, know that Gabriel invested through Mr. Madoff.  The Court adjusted the assertion to avoid this conclusory language, and deems the modified assertion admitted under Local Rule 56(f), (g).

[253]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 275.  The Court deems paragraph 275 admitted under Local Rule 56(f), (g).

In paragraph 276, the Goldensons claim that "[a] 'Spring Mountain Capital Employee Organization Chart' depicts Mr. Merkin at the top of the Spring Mountain Capital hierarchy." PSAMF ¶ 276 (quoting *SMC Org. Chart*).  The Defendants deny this assertion, claiming that the chart's depiction does not present Mr. Merkin as the "'top of the . . . hierarchy.'"  DRPSAMF ¶ 276 (quoting PSAMF ¶ 276).  The Defendants are correct.  The Chart lists Mr. Merkin as a "consultant" and the borders of his box are dashed, like other consultants in the hierarchy.  No employees other than Mr. Steffens are connected to Mr. Merkin's box.  Even viewing this evidence in a light most favorable to the Goldensons, a fact-finder could not reasonably conclude that the chart depicts Mr. Merkin at the top of the hierarchy.  He is, at most, depicted as a highly-placed consultant.  The Court does not credit paragraph 276.

[254]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny this statement, pointing out that the 2008 SMC, L.P. Firm Description refers to Mr. Merkin as a "consultant" to the investment committee.  DRPSAMF ¶ 277 (quoting *2008 SMC, L.P. Firm Description* at SMC000006103).  The pages in question begin with the bold, capitalized heading "INVESTMENT TEAM," and states that "[t]he investment committee is comprised of the following individuals."  *2008 SMC, L.P. Firm Description* at SMC000006103.  It then lists five

identified Mr. Merkin as a member of Spring Mountain's "management" to its independent auditor.  PSAMF ¶ 278; DRPSAMF ¶ 278.[255]  On at least one occasion, Mr. Merkin acted on behalf of the QP I Fund and SMC G.P., LLC in consenting to the assignment of Mr. Merkin's own interest in QP I to another SMC fund.  PSAMF ¶ 279; DRPSAMF ¶ 279.[256]  On at least three occasions, Mr. Merkin found investments and investors for the Defendants' funds.  PSAMF ¶ 280; DRPSAMF ¶ 280.[257]  At times, Mr. Merkin communicated with SMC investors on behalf of the Defendants.  PSAMF ¶ 281; DRPSAMF ¶ 281.[258]

---

people, of whom two have the word "Consultant" in parentheses after their names.  *Id.* at SMC000006103 to 6104.  Their names and biographies are otherwise stylistically identical to the non-consultants.  *Id.*  Viewing this evidence in a light most favorable to the Goldensons, the Court concludes that the document claims all five people "comprised" the "investment committee," and were therefore "members" of the committee, notwithstanding their status as consultants.  The Defendants also claim that Mr. Merkin was not actually a member of the committee, DRPSAMF ¶ 277 (citing *Steffens Decl.* ¶ 17), but this is not relevant to what the document says—and, at any rate, a fact-finder could choose not to credit Mr. Steffens' Declaration.  The Defendants have not shown record evidence that controverts the Goldensons' assertion, and the Court deems paragraph 277 admitted under Local rule 56(f), (g).

[255]  The Court rejects the Defendants' relevance objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim.  The Defendants also deny paragraph 278, arguing that the record evidence is "a memorandum to file written by Spring Mountain's auditor, in which the auditor refers to Mr. Merkin parenthetically as 'a former member of SMC management.'"  DRPSAMF ¶ 278 (quoting *McCloskey Decl.* Ex. A *Mem. Re: Madoff Exposure*, at 1).  However, viewing this evidence in a light most favorable to the Goldensons, the Court infers that the auditor wrote this statement to his file because someone at Spring Mountain Capital told him that Mr. Merkin was a former member of SMC management.  This is the substance of the assertion, and the evidence does not controvert it.  The Court deems paragraph 278 admitted under Local Rule 56(f), (g).

[256]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that "Mr. Merkin acted on behalf of the QP I Fund and SMC G.P., LLC in executing various contracts."  PSAMF ¶ 279 (citing *McCloskey Decl.* Ex. L, at SMC000000409 (ECF No. 215-8) (Oct. 1, 2007)).  The Defendants deny the paragraph because, they argue, the record evidence does not show Mr. Merkin "executing" a contract on behalf of QPI, nor does it show "various" contracts.  DRPSAMF ¶ 279.  The Defendants are correct, and the Court adjusted the assertion to reflect what the record evidence actually shows.  The Court deems the the modified assertion admitted under Local Rule 56(f), (g).

[257]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that "[t]he Defendants *regularly* found investments and investors for the Defendants' funds."  PSAMF ¶ 280 (citing *McCloskey Decl.* Ex. B (ECF No. 215-2) (Mar. 4, 2008); *McCloskey Decl.* Ex. C (ECF No. 215-2) (Mar. 8, 2004); and

## ii.   The Defendants Benefited Financially From Their Affiliation With Mr. Merkin

Mr. Merkin's contacts among top hedge fund managers were important for Spring Mountain . . . When [Mr. Steffens] formed Spring Mountain and started QP I in 2001, [he] knew that many of the most successful hedge fund managers were no longer accepting new investors.  But because of Mr. Merkin's strong ties to many of these managers, [the Defendants] hoped to, and did, succeed in investing assets of QP I with these managers.

PSAMF ¶ 284; DRPSAMF ¶ 284.  Mr. Merkin provided the Defendants with "a way

to access Bernie Ma[d]off."  PSAMF ¶ 285; DRPSAMF ¶ 285.[259]

---

*McCloskey Decl.* Ex. D (ECF No. 215-2) (Oct. 16, 2007)) (emphasis added).  The Defendants interpose a qualified response, disputing that this evidence shows "regular" activity.  To the extent it claims "regular" activity, the assertion is conclusory.  The Court adjusted the assertion to reflect what the record evidence actually shows, and deems the modified assertion admitted under Local Rule 56(f), (g).

[258]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that "Mr. Merkin regularly communicated with these investments and investors on behalf of the Defendants."  PSAMF ¶ 281 (citing *McCloskey Decl.* Ex. E (ECF No. 215-3) (Feb. 10, 2008); *McCloskey Decl.* Ex. F (ECF No. 215-3) (May 8, 2003); and *McCloskey Decl.* Ex. K (ECF No. 215-7) (Nov. 18, 2008)).  The Defendants deny the assertion, arguing the record evidence does not support the assertion.  DRPSAMF ¶ 281.  The record evidence consists entirely of emails in which Mr. Merkin is in some capacity representing SMC to investors—but not to "investments."  Furthermore, as in paragraph 280, the word "regularly" is conclusory.  The Court adjusted the assertion to reflect what the record evidence actually shows, and deems the modified assertion admitted under Local Rule 56(f), (g).

In paragraph 282, the Goldensons assert that Mr. Merkin was the president of Centigrade Capital, a Spring Mountain fund unrelated to the funds at issue in this case.  Mr. Merkin's relationship with Centigrade does not appear relevant to the issues before the Court.

[259]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also deny paragraph 285, providing additional content from the passages quoted by the Goldensons: Ascot provided "'a way to access Bernie Ma[d]off *with an Ezra [Merkin] judgment overlay*.'"  DRPSAMF ¶ 285 (quoting *Maurella Notes* at SMC000043686) (emphasis added by Defendants).  Furthermore, the "'bet'" with Ascot "'is really on Ezra's judgment and repu[t]ation.'"  *Id.* (quoting *Maurella Notes* at SMC000043686).  Although the Court has previously acknowledged that this email evidences that the Defendants were relying on Mr. Merkin's judgment in managing Ascot, *see supra* note 72, it does not change the fact that, as Ms. Maurella wrote, SMC was using Ascot as "a way to access Bernie Ma[d]off."  *Maurella Notes* at SMC00043686.  Because the Defendants have not controverted the assertion of paragraph 285, the Court deems the paragraph admitted under Local Rule 56(f), (g).

In paragraph 283, the Goldensons claim that "Mr. Merkin helped 'legitimize' Spring Mountain because Mr. Steffens did not have his own track record."  PSAMF ¶ 283 (citing *Pl.'s D.G.*

Mr. Merkin was a member of the Yeshiva University Investment Committee for roughly 16 years, was the chair of the Investment Committee for around ten of those years, and had a role in making Spring Mountain a consultant to the Investment Committee. PSAMF ¶ 286; DRPSAMF ¶ 286.[260] He was also "Chairman of GMAC Financial Services." PSAMF ¶ 287; DRPSAMF ¶ 287.[261] As a result of Mr. Merkin, "Chrysler retained Spring Mountain Capital, LP to manage $100 million of its pension assets through a portfolio of credit-focused hedge fund managers." PSAMF ¶ 287; DRPSAMF ¶ 287.[262]

Mr. Merkin and Cerberus held a significant position in Aozora Bank, and Mr. Merkin recalled that Cerberus "may have been just over" a majority shareholder in

*2011 Dep. Tr.* 46:17-45:4). The Defendants deny this assertion. DRPSAMF ¶ 283. The Court does not credit the assertion for the reasons described with respect to paragraph 197. *See supra* note 185 (discussing PSAMF ¶ 197).

[260] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants interpose a qualified response, highlighting Mr. Merkin's testimony that he "'may have' had a role in Spring Mountain becoming a consultant to Yeshiva's Investment Committee." DRPSAMF ¶ 286 (quoting *Merkin Dep. Tr.* 49:16). However, the Court, viewing this evidence in a light most favorable to the Goldensons, infers that Mr. Merkin did, in fact, have a role in securing this benefit for Spring Mountain. The Court deems paragraph 286 admitted under Local Rule 56(f), (g).

[261] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[262] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants deny that Chrysler retained Spring Mountain "'as a result of Mr. Merkin.'" DRPSAMF ¶ 287 (quoting PSAMF ¶ 287). The record evidence shows that Chrysler hired Spring Mountain "[a]fter an introduction by Cerberus," *McCloskey Decl.* Ex. N, ¶ 3; that Mr. Merkin had a "strategic relationship" with Cerberus "that cut across lines of existing funds and silos in which we both developed . . . funds together and also invested in various transactions, positions, companies, and loan transactions together," *Merkin Dep. Tr.* 131:13-15; and that Mr. Merkin was also the Chairman of GMAC Financial Services. *Steffens Decl.* ¶ 15(d). Although the evidence is circumstantial, a fact-finder viewing the evidence in a light most favorable to the Goldensons could reasonably infer that but for Mr. Merkin's sponsorship, Spring Mountain would not have been given the Chrysler pension fund to manage. *See supra* note 61 (discussing PRDSMF ¶ 62). Because the Defendants have not controverted the assertion of paragraph 287, the Court deems paragraph 287 admitted under Local Rule 56(f), (g).

Aozora. PSAMF ¶ 288; DRPSAMF ¶ 288.[263] Aozora Bank and SMC, L.P. entered into an agreement to form the Aozora-SMC Fund, through which Aozora Bank then invested in Ascot. PSAMF ¶ 289; DRPSAMF ¶ 289.[264] SMC, L.P. and Aozora Bank entered into a Secondment Agreement pursuant to which two employees of Aozora Bank—Yoshino Ino and Tomohiro Morita—were seconded to SMC, L.P. PSAMF ¶ 290; DRPAMF ¶ 290.[265] Mr. Steffens was made an Outside Director of Aozora Bank. PSAMF ¶ 291; DRPSAMF ¶ 291.[266]

Various "[f]unds at [Mr. Merkin's] discretion" were shareholders in Bank Leumi, and together owned a single digit percentage of the Bank. PSAMF ¶ 292 (quoting *Merkin Dep. Tr.* 129:21-22); DRPSAMF ¶ 292.[267] "Spring Mountain Capital, LP and Bank Leumi le-Israel B.M. entered into a Shareholders Agreement to form and jointly own Leumi SMC Alternative Investments Limited," and Messrs. "Steffens and Ho consented to act as directors" of the fund. PSAMF ¶ 293;

---

[263] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "Mr. Merkin and Cerberus held a significant position in Aozora Bank, which Mr. Merkin recalled 'may have been just over' a majority shareholder of Aozora Bank." PSAMF ¶ 288 (quoting *Merkin Dep. Tr.* 132:7-8). The Defendants interpose a qualified response, clarifying that Mr. Merkin testified that he himself was not a majority shareholder, but thought that Cerberus might have been "'just over.'" DRPSAMF ¶ 288 (citing *Merkin Dep. Tr.* 128:7-128:9, 131:25-132:9 and quoting *Merkin Dep. Tr.* 132:8). The Court adjusted the assertion of paragraph 288 accordingly, and deems the modified assertion admitted under Local Rule 56(f), (g).

[264] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[265] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[266] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[267] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that the funds "'owned a substantial percentage of the Bank," PSAMF ¶ 292 (citing *Merkin Dep. Tr.* 129:14-130:13), but the Defendants interpose a qualified response, citing Mr. Merkin's testimony that the ownership percentage was in the "'single digits.'" DRPSAMF ¶ 292 (quoting *Merkin Dep. Tr.* 130:13). The Court adjusted the assertion to reflect this, and deems the modified assertion admitted under Local Rule 56(f), (g).

DRPSAMF ¶ 293.[268]    The Defendants also "received a money management assignment from" Bank Leumi.  PSAMF ¶ 294; DRPSAMF ¶ 294.[269]

### iii.    The Defendants' Relationship with the Ascot Fund

"At all times, Ascot was one of the funds that QP I invested in" and was one of Spring Mountain's "core" holdings.  PSAMF ¶ 295; DRPSAMF ¶ 295.  Ascot was one of seven funds in QP I's portfolio as of December, 2001.  PSAMF ¶ 296; DRPSAMF ¶ 296.[270]  Donald Seymour and Aldo Ghisletta, the two members of Ascot Fund, Ltd.'s board of directors, were the only two members of the board of Centigrade fund, another SMC fund.  PSAMF ¶ 297; DRPSAMF ¶ 297.[271]  Along with Messrs. Steffens and Ho, Mr. Seymour was one of the three directors of Spring Mountain's Alternative Strategies Fund, Ltd., Leveraged Fund, Ltd., and Overseas I Fund, Ltd., the offshore companion fund to the QP I Fund.  PSAMF ¶ 298; DRPSAMF ¶ 298.[272]  Mr. Seymour sat on the board of the Aozora-SMC Fund, along with Messrs. Steffens and Ho.  PSAMF ¶ 299; DRPSAMF ¶ 299.[273]  On at least two

---

[268]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[269]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 294.  The Court deems paragraph 294 admitted under Local Rule 56(f), (g).

[270]    The Goldensons state that "Ascot was one of only seven funds in [QP I]'s portfolio."  PSAMF ¶ 296.  The Defendants interpose a qualified response, showing that the record citation only establishes that this was the case in December, 2001.  DRPSAMF ¶ 296 (citing *Steffens Decl.* ¶ 22).  The Court adjusted the assertion accordingly, and deems the modified assertion admitted under Local Rule 56(f), (g).

[271]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[272]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[273]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

occasions, including Mr. Goldenson, the Defendants suggested that prospective clients put money into Ascot. PSAMF ¶ 300; DRPSAMF ¶ 300.[274]

The Defendants attempted to set up at least one meeting between representatives of Aozora Bank and Mr. Madoff. PSAMF ¶ 302; DRPSAMF ¶ 302.[275]

---

[274] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "Ascot was a fund that the Defendants routinely offered to their investors." PSAMF ¶ 300 (citing *Pl.'s D.G. 2011 Dep. Tr.* 112:13-23, 285:20-286:3 and *McCloskey Decl.* Ex. M, at SMC000008473 to 8474 (ECF No. 211-26) (Mar. 28, 2008)). The Defendants deny the Goldensons' paragraph 300, finding it unsupported by the record. The Goldensons provided two instances in which the Defendants suggested an Ascot investment to prospective clients (Mr. Goldenson and Ursula Federsel). This is not enough to support the conclusory term "routinely." Furthermore, the Court agrees with the Defendants that in neither case were the Defendants "offering" Ascot to the prospective client; rather, what was communicated was in the nature of a suggestion, or advice. The Court adjusted the assertion of paragraph 300 accordingly, and deems the modified assertion admitted under Local Rule 56(f), (g).

In paragraph 301, the Goldensons claim that "[t]he Defendants answered questions about Ascot and Madoff on behalf of select investors like Aozora Bank." PSAMF ¶ 301 (citing *McCloskey Decl.* Ex. TT (ECF No. 215-38) (various dates) and *Laby Dep. Tr.* 31:23-33:23). The Defendants first object that Professor Laby's expert testimony cannot establish what Mr. Goldenson and Aozora were and were not told; the Court sustains this objection. *See Daubert Order* at 26-28. The remaining record evidence offered by the Goldensons is a heavily redacted series of emails from 2005 to 2008. *McCloskey Decl.* Ex. TT. This exchange is so heavily edited that it is impossible to tell who is asking the questions or in what context the questions occur. With regard to Mr. Madoff, it appears to show that someone was concerned about Mr. Madoff and wanted to arrange a direct communication with him, and that representatives of SMC attempted to elicit the questions that would be asked in that direct communication. *See id.* at SMC000030543 to 37786. With respect to Mr. Merkin, the most that can be gleaned is that someone wanted to "know Ezra's personal commitment on Ariel and Ascot," and that SMC representatives discussed how best to approach Mr. Merkin to get them answered. *See id.* at SMC000030535 to 30536. Even viewing this evidence in a light most favorable to the Goldensons, the Court does not reach any version of the assertion of paragraph 301.

[275] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "[t]he Defendants attempted to set up meetings with Madoff on behalf of select institutional investors like Aozora Bank." PSAMF ¶ 302 (citing *McCloskey Decl.* Ex. SS (ECF No. 215-37) (various dates); *McCloskey Decl.* Ex. TT; and *Laby Dep. Tr.* 31:23-33:23). First, the Goldensons may not establish historical facts through the use of expert testimony. *See Daubert Order* at 26-28. Second, the remaining record citations do not support the conclusory language "select institutional investors like Aozora Bank"; they merely show efforts made to broker a few meetings between Aozora representatives and Mr. Madoff. *See McCloskey Decl.* Ex. SS (ECF No. 215-37) (various dates); *id.* Ex. TT. The Court modified the assertion to reflect what the record evidence supports, and deems the modified assertion admitted under Local Rule 56(f), (g).

As of October 31, 2008, Spring Mountain had over $38 million invested with Ascot across seven Spring Mountain funds. PSAMF ¶ 303; DRPSAMF ¶ 303.

### k. The Defendants' Knowledge of Mr. Madoff's Role in the Management of Ascot

#### i. Knowledge Acquired Through Merrill Lynch

Mr. Steffens was a personal investor in Ascot as of April, 1999. PSAMF ¶ 304; DRPSAMF ¶ 304. Mr. Merkin never concealed any information about Madoff's role in the management of Ascot and its purported trading strategy from Mr. Steffens. PSAMF ¶ 305; DRPSAMF ¶ 305.[276] Mr. Merkin and Mr. Steffens first discussed Ascot's purported trading strategy in the "1990s" while Mr. Steffens was working for Merrill Lynch. PSAMF ¶ 306; DRPSAMF ¶ 306.[277]

Mr. Merkin testified that

> while Lonnie [Steffens] was at Merrill, among his other functions, [he] was responsible at Merrill for lending money to customers of Merrill. One or two of whom, if not more, were significant investors in Madoff's investment programs. And Lonnie and I talked about that in his days at Merrill. Lonnie was familiar with what the [Ascot] investment program was, and Lonnie and I had conversations about the program at Merrill, after Merrill and at Spring Mountain.

PSAMF ¶ 307; DRPSAMF ¶ 307.[278] Mr. Merkin also believes it is "entirely possible" that he discussed Mr. Madoff's purported trading strategy with Mr.

---

[276] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 305. The Court deems paragraph 305 admitted under Local Rule 56(f), (g).

[277] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court altered the assertion to remove the conclusory reference to "Ascot/Madoff." *See supra* note 247. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[278] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the

Steffens between the time he left Merrill Lynch and when he and Mr. Merkin formed Spring Mountain. PSAMF ¶ 308; DRPSAMF ¶ 308.[279]

## ii. Knowledge Acquired at Spring Mountain

When Messrs. Steffens and Merkin first started Spring Mountain out of Gabriel's offices, "the role of the Madoff organization, the management of Ascot . . . was certainly something Lonnie [Steffens] knew. . . . It was sort of all over [Mr. Merkin's] office and Lonnie at that time had an office in [Mr. Merkin's] office." PSAMF ¶ 309; DRPSAMF ¶ 309.[280] Mr. Merkin had "numerous" conversations with Mr. Steffens and Jason Orchard about "Madoff's role in Ascot," and Mr. Merkin had no doubt "whatsoever" that they accurately understood what Mr. Madoff's role in the management of Ascot was. PSAMF ¶ 310; DRPSAMF ¶ 310.[281] Mr. Merkin "would be surprised if Greg [Ho] was not part of an Ascot and a Madoff conversation

---

qualification does not change the substance of paragraph 307. The Court deems paragraph 307 admitted under Local Rule 56(f), (g).

[279] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 308. The Court deems paragraph 308 admitted under Local Rule 56(f), (g).

[280] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants interpose a qualified response, claiming that the record does not support that Messrs. Steffens and Merkin "started" Spring Mountain "out of Gabriel's offices." DRPSAMF ¶ 309. However, the Court considered that issue already and determined that Mr. Steffens was operating out of Gabriel's offices into 2002, during the time he was starting SMC. *Supra* note 156 (discussing DRPSAMF ¶ 164). The Court has also determined that it is fair to characterize Mr. Merkin as a "founder" of SMC. *Supra* note 157 (discussing DRPSAMF ¶ 165). The remainder of the Defendants' qualification does not change the substance of paragraph 309, so the Court deems the paragraph admitted under Local Rule 56(f), (g).

[281] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 310. The Court deems paragraph 310 admitted under Local Rule 56(f), (g).

either at Spring Mountain or in my office or with Spring Mountain clients and so forth." PSAMF ¶ 311; DRPSAMF ¶ 311.[282]

The Defendants understood that Ascot employed a "Madoff feeder strategy," and they knew that Ascot was a feeder fund for Mr. Madoff. PSAMF ¶ 312; DRPSAMF ¶ 312.[283] Spring Mountain's internal description of Ascot as a "Madoff feeder strategy" left no "doubt in [Mr. Merkin's] mind that [the Defendants] understood accurately what Madoff's role in the management of Ascot" was. PSAMF ¶ 313; DRPSAMF ¶ 313.[284]

Ascot provided the Defendants with a "way to access Bernie Ma[d]off via Bernie with an Ezra judgment overlay." PSAMF ¶ 315; DRPSAMF ¶ 315.[285] The

---

[282] The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 311. The Court deems paragraph 311 admitted under Local Rule 56(f), (g).

[283] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 312. The Court deems paragraph 312 admitted under Local Rule 56(f), (g).

[284] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 313. The Court deems the qualified response admitted under Local Rule 56(f), (g).

In paragraph 314, the Goldensons quote from a document prepared by Rutherford Asset Management, LLC for the proposition that "[t]he Defendants well knew that Ascot was created by Mr. Merkin 'as an investment vehicle for family and friends' to serve as 'a conduit to the split-strike strategy managed by Bernard Madoff Investment Securities.'" PSAMF ¶ 314 (quoting *Ascot Investment Recommendation* at SMC000063037). This document shows what Rutherford knew, not what the Defendants knew. The Court does not impute Rutherford's knowledge to the Defendants based solely on this document. The Court does not credit paragraph 314.

[285] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 315. The Court deems paragraph 315 admitted under Local Rule 56(f), (g).

Defendants knew that Ascot was "effectively run by Bernard L. Madoff," who was identified as a "[k]ey manager" of the fund. PSAMF ¶ 316; DRPSAMF ¶ 316.[286]

The Defendants understood that

> the execution of [Ascot's] strategy is mostly completed by Bernie Madoff" and that "the true advantage of the strategy is the ability to execute the trades. . . . Given that Mr. Madoff is one of the largest independent market makers on the street, he has the ability to trade stocks and options inside the bid/ask spread. This access is crucial as it allows the [Ascot] fund to structure trades with the factorable risk/return profile described.

PSAMF ¶ 317; DRPSAMF ¶ 317.[287] The Defendants were also informed by Rutherford Asset Management, LLC (Rutherford) that

> the key advantage to [Ascot's] strategy is low execution costs. As a third-party market maker, Mr. Madoff is able to trade inside the bid-offer spread. . . . Besides this objective advantage, there is a belief that the manager's ability to anticipate short-term market directions (as a result of his market marking activities) also helps to generate returns, which enabled Madoff to purportedly have some flexibility in determining what prices to show.

PSAMF ¶ 318 (internal quotations omitted); DRPSAMF ¶ 318.[288]

The Defendants knew that any software involved in the execution of Ascot's trades was created, operated, and owned by Mr. Madoff. PSAMF ¶ 319; DRPSAMF

---

[286] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 316. The Court deems paragraph 316 admitted under Local Rule 56(f), (g).

[287] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 317. The Court deems paragraph 317 admitted under Local Rule 56(f), (g).

[288] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "[t]he Defendants knew" the information in the language quoted from the Rutherford document. PSAMF ¶ 318. The Defendants deny the assertion on the ground that the Rutherford document cannot show what the Defendants knew because they did not draft it. DRPSAMF ¶ 318. The Court adjusted the assertion to reflect that it shows what the Defendants were told by Rutherford, and deems the modified assertion admitted under Local Rule 56(f), (g).

¶ 319.[289]  The Defendants were aware of Rutherford's opinion that Madoff had "final say" on all of Ascot's trading decisions.  PSAMF ¶ 320; DRPSAMF ¶ 320.[290]  Mr. Steffens knew that Mr. Madoff, not Mr. Merkin, purported to be the "largest trader in the United States in the over-the-counter options market."  PSAMF ¶ 321; DRPSAMF ¶ 321.[291]

### iii. Knowledge Acquired Through the Yeshiva University Investment Committee

Spring Mountain officials, including Mr. Steffens and Jason Orchard, "regularly attended [Yeshiva University] Investment Committee meetings and regularly participated in the process of evaluating managers."  PSAMF ¶ 322; DRPSAMF ¶ 322.[292]  During this time, Mr. Madoff joined the Board of Trustees of

---

[289]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, arguing that the record material the Goldensons cite does not show that the Defendants knew that "any software involved in the execution of Ascot's trades was created, operated and owned by Madoff."  DRPSAMF ¶ 319.  However, the document states that Ascot is "effectively run by Bernard L. Madoff," *McCloskey Decl.* Ex. EEE, at SMC000028336, and the description of software falls within a lengthy promotional description of Mr. Madoff's firm.  *Id.* at SMC000028343 to 28347.  In this context, viewing the evidence in a light most favorable to the Goldensons, the Court infers that the Defendants knew that Ascot's software was developed and owned by Mr. Madoff.  Because the Defendants' qualification does not controvert or change the substance of paragraph 319, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[290]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that the Defendants "knew" the contents of the Rutherford analysis, PSAMF ¶ 320; the Defendants again object to this characterization.  DRPSAMF ¶ 320.  As the Court noted previously, the document shows what Rutherford knew, not what the Defendants knew.  *See supra* note 288 (discussing PSAMF ¶ 318).  The Court adjusted the assertion to reflect that it shows what the Defendants were told by Rutherford, and deems the modified assertion admitted under Local Rule 56(f), (g).

[291]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[292]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

the Yeshiva University and later became the University's treasurer and chairman of its business school.  PSAMF ¶ 323; DRPSAMF ¶ 323.[293]

Yeshiva University was an investor in Ascot, and when the subject of its Ascot investment came up in the Investment Committee meetings, the Committee would "from time to time" refer to Ascot simply as "Bernie."  PSAMF ¶ 324; *Merkin Dep. Tr.* 51:8, 51:12-13; DRPSAMF ¶ 324.[294]  Everyone on the Yeshiva University Investment Committee was "certainly aware of Madoff's role in Ascot, [and] certainly understood that that [wa]s where substantially all the capital was.  And [they] referred to Ascot in shorthand as Bernie."  PSAMF ¶ 325; DRPSAMF ¶ 325.[295]

According to a copy of the 1998 Yeshiva University Conflict of Interest Report to the Board of Trustees, dated March 1999, Ascot was "essentially managed by Bernard Madoff, a member of the [University's] Board of Trustees."  PSAMF ¶ 326; DRPSAMF ¶ 326.[296]  The Conflict of Interest Report's description of Ascot

---

[293]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[294]    The Court overrules the Defendants' relevance; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that "the Committee would refer to Ascot simply as 'Bernie.'"  PSAMF ¶ 324.  The Defendants interpose a qualified response, highlighting Mr. Merkin's testimony that Ascot "might have" been referred to as "Bernie" "from time to time."  DRPSAMF ¶ 324 (quoting *Merkin Dep. Tr.* 51:12-13).  The Court adjusted the assertion to reflect that the moniker was applied "from time to time," but otherwise concludes that the assertion is true.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[295]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 325.  The Court deems paragraph 325 admitted under Local Rule 56(f), (g).

[296]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court overrules the Defendants' hearsay objection because the statement is offered to show Mr. Steffens' knowledge of Mr. Madoff's role in Ascot, not for the truth of Mr. Madoff's role in Ascot.  FED. R. EVID. 801(c).  The Defendants also interpose a qualified

accurately described Mr. Madoff's role at Ascot, and there is no "doubt that the Committee as a whole accurately understood Madoff's role in Ascot," including specifically Messrs. Steffens and Orchard. PSAMF ¶ 327; DRPSAMF ¶ 327.[297]

## l. The Secrecy Surrounding Madoff's Operations

Bernie Madoff's reputation in the securities industry would be an important consideration to anyone who was considering investing money in Ascot. PSAMF ¶ 328; DRPSAMF ¶ 328.[298] Mr. Merkin does not believe that telling potential investors in Ascot that Bernie Madoff was investing their money was "something we were legally required to disclose." PSAMF ¶ 330; DRPSAMF ¶ 330. The

response, but the qualification does not change the substance of paragraph 326. The Court deems the qualified response admitted under Local Rule 56(f), (g).

[297] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 327. The Court deems paragraph 327 admitted under Local Rule 56(f), (g).

[298] The Defendants deny this assertion as unsupported by the record. DRPSAMF ¶ 328. The Plaintiffs referred to Mr. Merkin's deposition transcript in which he answered "Yes" to the question "In your view, would Madoff's reputation in the securities industry be an important consideration to someone who is considering . . . [i]nvesting money with him[?]" *Merkin Dep. Tr.* 67:22-68:8. The Defendants contend that this statement does not support the assertion that Mr. Madoff's reputation would be important to someone investing in Ascot—only to someone investing with Mr. Madoff. DRPSAMF ¶ 328. However, the Court views this objection as cutting the issue too close. Viewing the facts in the light most favorable to the Goldensons, Mr. Merkin's statement supports Plaintiffs' paragraph 328.

In paragraph 329, the Goldensons claim that "'Morally speaking,' Mr. Merkin thought it was 'important for potential investors in Ascot to know with who they were investing and where their money is and who was managing their money.'" PSAMF ¶ 329 (quoting *Merkin Dep. Tr.* 76:17-82:18). The Defendants deny this assertion, arguing that it is unsupported by the record. DRPSAMF ¶ 329. The material the Goldensons quote came from testimony given by Mr. Merkin in the case of *People v. Merkin*, and in that testimony Mr. Merkin appears to agree with the question as the Goldensons phrase it. *See Merkin Dep. Tr.* 78:11-18. However, later in the Goldensons' deposition, Mr. Merkin refused to affirm that answer. He said: "If you are asking me a legal question, the answer is I don't know. If you are asking me a non-legal question I think a great deal depends on the relationship between the advisor and the client." *Merkin Dep. Tr.* 81:6-13. He also said: "I don't remember saying that and . . . I don't remember what I was getting at. . . . I may have simply meant that I wasn't taking a legal view." *Merkin Dep. Tr.* 81:23-82:5. The Goldensons do not direct the Court to any record evidence of Mr. Merkin's testimony in *People v. Merkin*, and a lawyer's quotation of the transcript to him during a later deposition is not evidence. Mr. Merkin effectively denied that he took the moral position that the Goldensons ascribe to him in paragraph 329, and on this record the Court cannot conclude otherwise. The Court does not credit paragraph 329.

investigation of the United States Securities and Exchange Commission (SEC) into

its own failure to discover Mr. Madoff's fraud reported that "[t]hird party hedge

funds and fund of funds that market . . . hedge fund strateg[ies] that invest[] in

[Bernard Madoff] don't name and aren't allowed to name Bernie Madoff as the

actual manager in their performance summaries or marketing literature."  PSAMF

¶ 331; DRPSAMF ¶ 331.[299]

On May 7, 2001, an article appeared in the *Barron's* publication entitled

"Don't Ask, Don't Tell" that related how Madoff told at least one of his investors: "If

you invest with me, you must never tell anyone that you're invested with me.  It's

no one's business what goes on here."  PSAMF ¶ 332; DRPSAMF ¶ 332.[300]

Mr. Merkin admitted that describing Ascot as a Madoff feeder fund would

likely "invite an additional conversation."  PSAMF ¶ 333; DRPSAMF ¶ 333.[301]  To

avoid such questions, Mr. Merkin explained during a telephone conversation with

Mr. Madoff on January 14, 2002, that:

---

[299]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that the quoted assertion "has been widely reported."  PSAMF ¶ 331.  The Defendants deny this, arguing that the SEC investigation report does not support this characterization—and, that if it did, it would be inadmissible hearsay.  DRPSAMF ¶ 331.  The Court adjusted paragraph 331 to reflect that it was not "widely reported," which is conclusory, but instead that the SEC later reported this fact.  The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[300]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court overrules the hearsay objection because the statement is offered, not for the truth of the matter asserted, but to show that the Defendants had notice of Mr. Madoff's secrecy.  The Goldensons claimed that Mr. Madoff made the statement of paragraph 332 to "his investors," PSAMF ¶ 332, but the Defendants interpose a qualified response, arguing that the *Barron's* article only identifies one investor who claimed Mr. Madoff said this.  DRPSAMF ¶ 332.  The Court has modified the assertion of paragraph 332 to reflect this, and deems the modified assertion admitted under Local Rule 56(f), (g).

[301]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 333.  The Court deems paragraph 333 admitted under Local Rule 56(f), (g).

I can always tell when people are going to ask me about Bernie, because when people come to the office, ask me what we're doing and I give them a little sense of it, and they look around and say I know I'm not supposed to talk about this, but can I ask you the following question?  So I told one person, look, you can ask me how Bernie does it and that's fine, but when are you going to ask Bernie?  So he said, look, if I asked him, he'd throw me out.  I said, look, all I can tell you is don't ask so many questions.  Sit tight.  And that's what I tell everybody.

PSAMF ¶ 334; DRPSAMF ¶ 334.[302]  As Mr. Merkin explained, "if you want to stay with Bernie then at some point you have to adapt to that and if you don't want to stay with Bernie or you do want more answers to your questions you have to adapt to that."  PSAMF ¶ 335; DRPSAMF ¶ 335.[303]  Investors had "a choice": either

ask questions and perhaps be invited to pick up his marbles and go home or leave his marbles there and whatever question he was asking that Bernie thought was excessive or annoying he would have to live with. . . . [Y]ou have to make a decision; do you want the investment or not?

PSAMF ¶ 336; DRPSAMF ¶ 336.[304]

---

[302]    The Court overrules the Defendants' relevance objection; the paragraph is partially relevant to the alleged breach of fiduciary duty.  The Goldensons also supplied more of the conversation between Messrs. Merkin and Madoff, but the additional material is not relevant to the legal issues in this case.  The Defendants also deny that the citation shows that Mr. Merkin sought to "avoid" any questions asked of himself, DRPSAMF ¶ 334; however, viewing this evidence in a light most favorable to the Goldensons, the Court concludes that Mr. Merkin's object was avoidance.  The Court deems paragraph 334 admitted under Local Rule 56(f), (g).

[303]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 335.  The Court deems paragraph 335 admitted under Local Rule 56(f), (g).

[304]    The Court overrules the Defendants' relevance objection; the paragraph is partially relevant to the alleged breach of fiduciary duty.  The Defendants also deny paragraph 336, claiming that it does not show that Mr. Merkin said this to multiple "investors."  DRPSAMF ¶ 336.  However, the quoted language comes in the context of a question regarding the telephone conversation quoted in paragraph 334, in which Mr. Merkin said "that's what I tell everybody."  *McCloskey Decl.* Ex. II, at 8-9 (ECF No. 215-27) (Jan. 14, 2002) (*Merkin-Madoff Call Tr.*); *Merkin Dep. Tr.* 91:5-22, 94:5-17.  Viewing all of this evidence in a light most favorable to the Goldensons, the Court concludes that all investors had this "choice" with regard to Mr. Madoff, not merely the exemplar that Mr. Merkin selected in his colloquial back and forth with Mr. Madoff.  The Court deems paragraph 336 admitted under Local Rule 56(f), (g).

Mr. Madoff told Mr. Merkin in January of 2002 that Mr. Merkin "ha[d] transparency, they [the other investors] don't." PSAMF ¶ 337; DRPSAMF ¶ 337.[305] Mr. Merkin admitted that if an investor like Ascot had a directly managed account with Mr. Madoff, then the investor had transparency into Mr. Madoff's operations; however, if an investor invested into a limited partnership like Ascot that had a managed account with Mr. Madoff, only the limited partnership had transparency. PSAMF ¶ 338; DRPSAMF ¶ 338.[306] Mr. Merkin recognized that he too had a "residual lack of transparency" in terms of the amount of funds Mr. Madoff managed and he had "given up guessing." PSAMF ¶ 339; DRPSAMF ¶ 339.[307] According to Mr. Merkin, Mr. Madoff had "been defying gravity for long enough that at some point you could stop caring that much. . . . I've made my peace with Bernie." PSAMF ¶ 340; DRPSAMF ¶ 340.[308]

The Defendants had received Rutherford's opinion that Ascot "historically invested only in an account with Bernard L. Madoff Investment Securities and . . . there [wa]s no documentation tying BMIS to the management of Ascot. . . . [T]he manager's relationship to the managed account is kept confidential, Mr. Madoff is a

---

[305] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[306] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 338. The Court deems paragraph 338 admitted under Local Rule 56(f), (g).

[307] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[308] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 340. The Court deems paragraph 340 admitted under Local Rule 56(f), (g).

very public figure." PSAMF ¶ 341; DRPSAMF ¶ 341.[309] The Defendants knew that Ascot would not provide position sheets showing that it was in fact a Madoff feeder fund. PSAMF ¶ 342; DRPSAMF ¶ 342.[310] The Defendants knew that Ascot did not have any marketing materials; among funds that SMC selected for low volatility, this lack of marketing materials put Ascot in a small minority. PSAMF ¶ 343; DRPSAMF ¶ 343.[311] The Defendants did not have any documentation of any

[309] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also object to and deny the assertion on the ground that the Rutherford opinion does not show what the Defendants "knew," DRPSAMF ¶ 341; the Court adjusted the assertion to reflect that this was the opinion of Rutherford, which the Defendants possessed. *See also supra* notes 288, 290 (discussing PSAMF ¶¶ 318, 320). This addresses the Defendants' objection. The Goldensons also claim that "Mr. Orchard formerly was a senior analyst at Rutherford Asset Management from 2002-2004 and who may 'very well have prepared this document.'" PSAMF¶ 341 (quoting *McCloskey Decl.* Ex. RR *Berman v. Merkin*, at 608:4-5 (ECF No. 215-36) (Nov. 14, 2011)). However, the Defendants properly deny this portion of paragraph 341. DRPSAMF ¶ 341. This statement is speculation on Mr. Merkin's part; the Goldensons have not demonstrated how Mr. Merkin would know that Mr. Orchard prepared the document, and in fact the deposition testimony does not even identify the document being discussed. The Court does not credit this portion of the assertion.

The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 341. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[310] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 342. In particular, and contrary to the Defendants' suggestion, the email states that the Ascot "manager will not provide a position sheet" in response to a query for a position sheet confirming that "Ascot Partner LP is a Madoff feeder or managed account." *McCloskey Decl.* Ex. UU, at 1, 3 (ECF No. 215-39) (Nov. 23 to 28, 2007). The Court deems paragraph 342 admitted under Local Rule 56(f), (g).

[311] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "[t]he Defendants knew that Ascot was one of the few funds that did not have any marketing materials." PSAMF ¶ 343 (citing *McCloskey Decl.* Ex. YY (ECF No. 215-43) (Feb. 2, 2008)). The Defendants interpose a qualified response, denying the implication that Ascot was an "outlier" in this regard. DRPSAMF ¶ 343. The email exchange of Exhibit YY shows that SMC selected ten funds for low volatility, and Ascot was the only one other than SMC's own Alternative Strategies Fund that lacked any form of marketing materials. *McCloskey Decl.* Ex. YY. The Court adjusted the assertion accordingly, and deems the modified assertion admitted under Local Rule 56(f), (g).

agreement between Mr. Merkin and Mr. Madoff that enabled Mr. Madoff to make investment decisions on behalf of Ascot.  PSAMF ¶ 344; DRPSAMF ¶ 344.[312]

### m. The Defendants' Knowledge of the Red Flags Raised by Madoff's Operations

### i. Knowledge Acquired Through Merrill Lynch

From 1997 through 2001, Mr. Steffens was the Vice Chairman of the Board of Directors of Merrill Lynch, a member of the Executive Management Committee of the Board of Directors, and Chairman of Merrill Lynch's U.S. Private Client Group. PSAMF ¶ 345; DRPSAMF ¶ 345.[313]  After he started Spring Mountain, Mr. Steffens continued to serve as Chairman of Merrill Lynch Ventures, LLC.  PSAMF ¶ 346; DRPSAMF ¶ 346.[314]  Mr. Steffens was well aware of Mr. Madoff during his days at Merrill Lynch.  PSAMF ¶ 347; DRPSAMF ¶ 347.[315]  At the time of his departure from Merrill Lynch, Mr. Steffens ran Merrill Lynch Asset Management.  PSAMF ¶ 348; DRPSAMF ¶ 348.[316]

---

[312]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 344.  The Court deems paragraph 344 admitted under Local Rule 56(f), (g).

[313]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[314]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[315]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 347.  The Court deems paragraph 347 admitted under Local Rule 56(f), (g).

[316]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

Fabio Savoldelli worked for Merill Lynch Asset Management from 1999 until 2007. PSAMF ¶ 349; DRPSAMF ¶ 349.[317] Merill Lynch "kept [its] investors out of Bernie Madoff" and Madoff feeder funds. PSAMF ¶ 350; DRPSAMF ¶ 350.[318] People "within the global Merill Lynch and Company, Inc. organization easily spotted numerous red flags indicative of irregular or fictitious lending activities in Madoff's operations including one, impossibly consistent returns with no down years ever." PSAMF ¶ 351; DRPSAMF ¶ 351.[319] Madoff's choice of accountant and the fact that he "always went into cash at the year end so that the accountants couldn't reverse engineer his genius" was also a matter of concern at Mr. Savoldelli's field office of Merill Lynch. PSAMF ¶ 352; DRPSAMF ¶ 352.[320] Madoff's "lack of and

[317] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[318] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection; Mr. Savoldelli was testifying to a business practice of the company for which he worked, not to a "statement." Furthermore, the testimony is offered, not for the truth of the matter asserted, but to show Mr. Steffens' notice of suspicions regarding Mr. Madoff.

The Defendants also deny paragraph 350, citing a number of ambiguities and qualifications in Mr. Savoldelli's testimony. DRPSAMF ¶ 350. Nonetheless, the Court, after careful review and viewing this testimony in a light most favorable to the Goldensons, infers that the broadly worded statement of paragraph 350 is accurate. *See Savoldelli Dep. Tr.* 18:9-20:11, 25:21-22, 26:16-19, 30:17-31:1, 35:6-12, 36:20-37:22, 50:14-24. The Court deems paragraph 350 admitted under Local Rule 56(f), (g).

[319] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. The Defendants also deny paragraph 351, but the denial fails for reasons similar to those described above. *See supra* note 318. The Court deems the Defendants denied response admitted under Local Rule 56(f), (g).

[320] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. The Goldensons claim that Madoff's actions were "a matter of concern at Merill Lynch." PSAMF ¶ 362. The Defendants deny the assertion, in part, on the grounds that Mr. Savoldelli only testified as to what raised red flags for him personally. DRPSAMF ¶ 362. However, at the beginning of the section of questions about "red flags," Mr. Savoldelli apparently agreed that his field office also spotted these red flags. *See Savoldelli Dep. Tr.* 20:12-15 ("Q: You said there were many, many red flags associated with Madoff. And did your field office, to the best of your knowledge? A: Absolutely."). A fact-finder could reasonably conclude that at least Mr. Savoldelli's

defects in independent checks and balances" and the "lack of internal controls as to the existence of actual assets where Madoff served as advisor, the broker and custodian of the assets" was another red flag for the Merrill Lynch Organization. PSAMF ¶ 353; DRPSAMF ¶ 353.[321] Madoff's simultaneous role as advisor, broker, and custodian of the assets he managed was one factor in disqualifying him from Merrill Lynch's consideration as a potential investment; "the whole thing smelled," and "[i]f an analyst would occasionally bring it up as a potential investment in terms of others in it and it's doing well, then it would be quashed pretty much immediately." PSAMF ¶ 354; DRPSAMF ¶ 354.[322] Another red flag for Merrill Lynch was the fact that

> Madoff's public position was that he never asked for financing. He didn't need financing and that's what led people to believing that he was using money from the broker dealer [side of his business] to fund the hedge fund [side of his business], to fund his positions because nobody could find a counterparty with this guy. There was no counterparty.

---

field office was concerned about the issues he then went on to enumerate, including the accounting irregularities. The Court adjusted the assertion of paragraph 352 to reflect this. The remainder of the Defendants' denial does not controvert the modified assertion, and so the Court deems the modified assertion admitted under Local Rule 56(f), (g).

[321]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. The Defendants also deny paragraph 353, but the denial fails for reasons similar to those described above. *See supra* note 318. The Court deems paragraph 353 admitted under Local Rule 56(f), (g).

[322]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. The Goldensons claim that Mr. Madoff's simultaneous roles "generally disqualified" him, PSAMF ¶ 354, but the Defendants deny that the record supports this assertion. DRPSAMF ¶ 354. Mr. Savoldelli testified that serving as "advisor, broker, and custodian of the assets . . . would disqualify you from investments now and then." *Savoldelli Dep. Tr.* 23:23-24:1. The Court adjusted the assertion to reflect this narrower statement. The remainder of the Defendants' denial fails for reasons similar to those described above. *See supra* note 318. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

PSAMF ¶ 355; DRPSAMF ¶ 355.[323]  Merrill Lynch thought Mr. Madoff's returns were a "mathematical impossibility."  PSAMF ¶ 356; DRPSAMF ¶ 356.[324]

Mr. Madoff's "commission structure whereby he left hundreds of millions, if not billions, of dollars in performance and management fees on the table for other[s] such as feeder funds" was "so unnaturally weird" that "[p]eople [at Merrill Lynch] thought he could have been front running, thought a lot of things about what he was doing."  PSAMF ¶ 357; DRPSAMF ¶ 357.[325]  Mr. Merkin, for example, earned over $28 million in management fees from Ascot in 2007 alone.  PSAMF ¶ 358; DRPSAMF ¶ 358.  It was "unusual" for Merrill Lynch to identify a specific fund in which one of its investment advisors would not invest.  PSAMF ¶ 359; DRPSAMF ¶ 359.[326]  It was also "unique" for investment advisors at Merrill Lynch to receive

---

[323]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court also overrules the Defendants' hearsay objection.  *See supra* note 318.  The Defendants also deny paragraph 355, but the denial fails for reasons similar to those described above.  *See supra* note 318.  Contrary to the Defendants' suggestion, the Court concludes that the "questions that surrounded Madoff," *Savoldelli Dep. Tr.* 40:23-24, were one and the same as the "red flags" to which Mr. Savoldelli testified elsewhere.  *E.g.*, *id.* at 29:11.  The Court deems paragraph 355 admitted under Local Rule 56(f), (g).

[324]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court also overrules the Defendants' hearsay objection.  *See supra* note 318.  The Defendants also deny paragraph 356, but the denial fails for reasons similar to those described above.  *See supra* note 318.  The Court deems paragraph 356 admitted under Local Rule 56(f), (g).

[325]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court also overrules the Defendants' hearsay objection.  *See supra* note 318.  The Defendants also deny paragraph 357, but the denial fails for reasons similar to those described above.  *See supra* note 318.  The Court deems paragraph 357 admitted under Local Rule 56(f), (g).

[326]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court also overrules the Defendants' hearsay objection.  *See supra* note 318.  The Defendants also deny paragraph 359 "to the extent Plaintiffs seek to imply that Merrill Lynch had a policy that investment advisors would not invest in Madoff."  DRPSAMF ¶ 359.  Mr. Savoldelli testified that "Policy is overstating it.  There was simply a decision not to.  I don't think there was a policy."  *Savoldelli Dep. Tr.* 25:21-23.  However, the assertion of paragraph 359 does not speak of a "policy," and the assertion can be true even if not investing with Mr. Madoff was an unwritten but widely acknowledged decision within the firm.  *See id.* at 26:4-14.  The Defendants

such a large "number of questions about that one fund. It's one of the major funds that we would have been asked about." PSAMF ¶ 360; DRPSAMF ¶ 360.[327]

Merrill Lynch "would not rely on the SEC to perform the level of due diligence that [Merrill Lynch] would have expected." PSAMF ¶ 361; DRPSAMF ¶ 361.[328] Merrill Lynch's own money was not invested with Madoff and did not lose any money in his Ponzi scheme. PSAMF ¶ 362; DRPSAMF ¶ 362.[329]

### ii. Knowledge Acquired at Spring Mountain

On January 10, 2002, Andrew Panteli sent Mr. Ho an email asking for an analysis on a group of investment funds, including Ascot and Gabriel, and further stated to Mr. Ho that "of the guys we know, I have two main observations: . . .

---

have not controverted paragraph 359, and the Court deems the paragraph admitted under Local Rule 56(f), (g).

[327] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 360. Specifically, viewing all the evidence in a light most favorable to the Goldensons, the Court concludes that the "questions" to which Mr. Savoldelli makes reference were, in fact, criticisms of Mr. Madoff. *See* DRPSAMF ¶ 360; *Savoldelli Dep. Tr.* 30:17-31:1. The Court deems paragraph 360 admitted under Local Rule 56(f), (g).

[328] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. The Goldensons also claim that "A 'sophisticated [investor] would not have invested in Madoff.'" PSAMF ¶ 361 (quoting *Savoldelli Dep. Tr.* 60:12). The Defendants object to this claim as conclusory and subjective. DRPSAMF ¶ 361. They are correct, and the Court does not credit this portion of paragraph 361. The Defendants also deny that the record supports that Merrill Lynch would not rely on the SEC for due diligence; however, viewing Mr. Savoldelli's testimony in a light most favorable to the Goldensons, the Court concludes that this was a general practice of Merrill Lynch. *See Savoldelli Dep. Tr.* 62:4-6 ("The SEC did the audits but we for one would not rely on the SEC to perform the level of due diligence that I would have expected"). The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[329] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection. *See supra* note 318. To the extent the Defendants also make an objection to the basis for the testimony, the Court also overrules this objection; Mr. Savoldelli was testifying based on his own personal knowledge of Merrill Lynch operations. *See Savoldelli Dep. Tr.* 38:5-9. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 362. The Court deems paragraph 362 admitted under Local Rule 56(f), (g).

Madoff – everyone loves him, but we have certain tra[ns]parency issues – cannot square the numbers with the strategy make [sic] if [sic] difficult or [sic] us to get comfortable." PSAMF ¶ 363; DRPSAMF ¶ 363.[330] Mr. Ho replied to Mr. Panteli that he had "same concerns as you on Madoff. Could drop them in our final analysis," to which Mr. Panteli responded that he was "happy you feel the same way about Madoff, although it could be the best thing since sliced bread, it may also be (without prejudice) a dysaster [sic] waiting to happen." PSAMF ¶ 364; DRPSAMF ¶ 364.[331]

The Defendants "recognize[d] and appreciate[d] the discomfort with Bernie's lack of transparency." PSAMF ¶ 365; DRPSAMF ¶ 365.[332] The Defendants understood that the fact that Mr. Madoff self-cleared his trades and the related questions about transparency and fairness that resulted therefrom may have been Ascot's "biggest risk." PSAMF ¶ 366; DRPSAMF ¶ 366.[333] Rutherford gave the Defendants its opinion that

---

[330] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[331] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 364. The Court deems paragraph 364 admitted under Local rule 56(f), (g).

[332] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 365. The Court noted and will consider the relevant facts. *See supra* note 72 (discussing PRDSMF ¶ 72). The Court deems paragraph 365 admitted under Local rule 56(f), (g).

[333] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also deny paragraph 366, arguing that the record evidence is an email from a third party to the Defendants, representing the third party's views of Mr. Madoff. DRPSMF ¶ 366. While that is true, it does not controvert the assertion: that the Defendants "understood" that Mr. Madoff's self-clearing "may have been" Ascot's biggest risk.

[w]hile Mr. Madoff does not offer an account directly to the public, there are a number of vehicles that do give access to the manager. Many of the Madoff conduits are run by organizations that we are better off not doing business with. There are reputational issues with some of the intermediaries, and the fees are often very high.

PSAMF ¶ 367; DRPSAMF ¶ 367.[334] The Rutherford recommendation contrasts Ascot with other "Madoff conduits" that had "reputational issues" and "very high" fees. DRPSAMF ¶ 367.

Mr. Ho read an article entitled "The New Emperors" in October of 2006. PSAMF ¶ 368; DRPSAMF ¶ 368. The article described the "precipitous demise" of a large hedge fund called Amaranth, and mentioned Mr. Madoff's name at its conclusion. PSAMF ¶ 368; DRPSAMF ¶ 368.[335] Mr. Ho forwarded the article to Mr. Steffens with the following note:

Jonathan's article is interesting – and states, in the last paragraph: "Forget about Amaranth; they won't hurt investors again. But does anyone really know what David Shaw, Tom Steyer, James Simons or Bernie Madoff are doing with their billions of dollars every day?" It's interesting that we are invested in ALL four of the names mentioned.

---

*McCloskey Decl.* Ex. TT, at 2. The email put the Defendants on notice of this possibility, which is all that the assertion claims. The Court deems paragraph 366 admitted under Local Rule 56(f), (g).

[334] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "[t]he Defendants knew" the contents of the Rutherford opinion, PSAMF ¶ 367; the Defendants deny that the Defendants "knew" this information. DRPSAMF ¶ 367. The Court adjusted the assertion to reflect that this was information given to the Defendants by Rutherford. The Defendants also deny the assertion as misleading, arguing that the Rutherford opinion contrasts Ascot with those "Madoff conduits" that had "reputational issues" and high fees. *Id.* The Court has added an additional sentence acknowledging this contrast in the Rutherford document. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[335] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that "Mr. Ho read an article called 'The New Emperors' in October of 2006 that mentioned Madoff's name alongside others' in describing the 'precipitous demise' of a large hedge fund called Amaranth." PSAMF ¶ 368. The Defendants interpose a qualified response, objecting to any implication that Mr. Madoff was associated with the "precipitous demise" of Amaranth. The Court adjusted the assertion to make clear that Mr. Madoff was mentioned tangentially, not as a cause. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

PSAMF ¶ 369; DRPSAMF ¶ 369. [336]

### iii.    Knowledge Acquired Through the Media

In May of 2001, an article appeared in the MAR/Hedge publication entitled "Madoff Tops Charts; Skeptics Ask How." PSAMF ¶ 370; DRPSAMF ¶ 370.[337] This article listed a number of red flags raised by Madoff's operations, including: the consistency of his returns with hardly any volatility; that no other managers could duplicate the success of Madoff's execution and his alleged market timing; that Mr. Madoff passed up large amounts on incentive fees and did not borrow money from creditors; and the fact that Mr. Madoff purported to use only over-the-counter options listed on the S&P 100. PSAMF ¶ 371; DRPSAMF ¶ 371.[338]

On May 7, 2001, an article appeared in the *Barron's* publication entitled "Don't Ask, Don't Tell." PSAMF ¶ 372; DRPSAMF ¶ 372.[339] At the time the article was published, *Barron's* was the industry's "leading financial paper." PSAMF ¶

---

[336]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 369. The Court deems paragraph 369 admitted under Local Rule 56(f), (g).

[337]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[338]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection because the article is offered, not for its truth, but to show the Defendants' knowledge of concerns about Mr. Madoff. The Defendants also deny paragraph 371, claiming that the article did not refer to any attributes of Mr. Madoff's operation as "red flags." DRPSAMF ¶ 371. The most relevant definition of "red flag" is "a danger signal." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE at 1616. The section of the article entitled "Questions abound" documents skepticism among investment professionals about Mr. Madoff's purported strategy, *see MAR/Hedge Article* at 2-3; viewing this evidence in a light most favorable to the Goldensons, the Court concludes that an informed reader would view these skeptical questions as danger signals. The remainder of the Defendants' denial does not address the substance of the assertion. Because the Defendants have not controverted paragraph 371, the Court deems paragraph 371 admitted under Local Rule 56(f), (g).

[339]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

373; DRPSAMF ¶ 373.[340] The article relayed that because Mr. Madoff's "returns have been so consistent[,] . . . some on the Street have begun speculating that Madoff's market-making operations subsidize[] and smooth[] his hedge fund returns" and that "some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone" and question "why no one had been able to duplicate Madoff's returns using this strategy." PSAMF ¶ 374; DRPSAMF ¶ 374.[341] When the *Barron's* "Don't Ask, Don't Tell" article came out, Mr. Merkin discussed the article with Mr. Madoff and "may have pulled back some money." PSAMF ¶ 376; DRPSAMF ¶ 376.[342]

---

[340] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also deny paragraph 373 on the grounds that the only record support comes from testimony by Professor Laby, the Goldensons' expert. The Court restricted Mr. Laby to testifying "how the facts of this case tie into the legal framework and the relevant [securities] industry." *Daubert Order* at 27. The fact that *Barron's* was the leading financial paper ties the facts of the case (the appearance of "Don't Ask, Don't Tell" in *Barron's*) to the relevant industry (the financial industry). This is a necessary connection that only an expert could provide, and it is well within the scope of Professor Laby's permissible testimony. Because the Defendants have not controverted paragraph 373, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[341] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' hearsay objection because the article is offered, not for its truth, but to show the Defendants' knowledge of concerns about Mr. Madoff. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 374. The Court deems paragraph 374 admitted under Local Rule 56(f), (g).

In paragraph 375, the Goldensons claim that "[w]hen the *Barron's* and *MAR/Hedge* articles were published, they were widely discussed in the small hedge fund community, especially the *Barron's* article." PSAMF ¶ 375 (citing *Savoldelli Dep. Tr.* 31:14-33:13 and *Merkin Dep. Tr.* 169:5-170:1). The Defendants deny this this. DRPSAMF ¶ 375. Mr. Savoldelli's testimony supporting this assertion is, by his own admission, pure speculation, *see Savoldelli Dep. Tr.* 32:5-15, and Mr. Merkin's testimony only addresses a conversation that he personally had regarding the article. *Merkin Dep. Tr.* 169:5-170:2. Even viewing this evidence in a light most favorable to the Goldensons, a fact-finder could not reasonably conclude that the article was "widely discussed in the small hedge fund community." The Defendants have controverted paragraph 375, and so the Court does not credit it.

[342] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the

### n. The Plaintiffs' Subsequent Dealings With the Defendants

The Goldensons mainly consulted with the Defendants on substantive matters with respect to their Ascot investments; most of their contact with Ascot involved administrative matters, though Mr. Goldenson spoke with Mr. Merkin on substantive issues relating to his Ascot investment "on a couple of key occasions." PSAMF ¶ 377; DRPSAMF ¶ 377.[343] The Defendants often told Mr. Goldenson that the QP I Fund's monthly performance was in large part attributable to Ascot and that Ascot often kept the QP I Fund from losing money in a particular month.

---

qualification does not change the substance of paragraph 376. The Court deems paragraph 376 admitted under Local Rule 56(f), (g).

[343] The Defendants' objection that paragraph 377 is irrelevant is overruled; the paragraph is relevant to the alleged breach of fiduciary duty. In paragraph 377, the Goldensons claim that "the Plaintiffs mainly consulted the Defendants on substantive matters with respect to their Ascot investments and only contacted Ascot regarding administrative matters." PSAMF ¶ 377 (citing *Goldenson Decl.* ¶ 9; *Pl.'s D.G. 2011 Dep. Tr.* 129:9-15). The Defendants deny this. DRPSAMF ¶ 377 (citing DSMF ¶ 119-20, *Def.'s D.G. 2011 Dep. Tr.* 80:24-81:11, 106:11-22, 107:24-108:5). The Defendants also raise a sham affidavit objection. *Id.* As to the sham affidavit, paragraph 9 of Mr. Goldenson's Declaration is actually consistent with his deposition testimony, but inconsistent with paragraph 377 of the Goldensons' statement of additional facts:

> I regularly consulted Mr. Steffens and . . . [Mr.] Ho, on substantive matters with respect to our investments in . . . Ascot. Most of my contacts with Ascot personnel were related to administrative matters. I only recall speaking with Mr. Merkin a couple of other times after making my initial investment in Ascot.

*Goldenson Decl.* ¶ 9. In his deposition, Mr. Goldenson said that "there was active administrative contact with [Ascot representative] Mike Autera. With respect to Ezra Merkin, I talked to him on a couple of key occasions when I had concerns." *Pl.'s D.G. 2011 Dep. Tr.* 128:14-16. Mr. Goldenson went on to explain that these concerns related to market conditions and Ascot's performance. *Id.* at 128:18-129:8. The affidavit does not contradict this deposition testimony; therefore, the Court overrules the Defendants' sham affidavit objection.

However, this record evidence does not support the assertion that the Goldensons "only contacted Ascot regarding administrative matters." PSAMF ¶ 377. Mr. Goldenson testified that he contacted Mr. Merkin on substantive matters "on a couple of key occasions." *Pl.'s D.G. 2011 Dep. Tr.* 128:16. On the other hand, the record evidence cited by the Defendants, showing that Mr. Goldenson spoke with the Defendants about Ascot's "performance," does not controvert the assertion that he spoke to them on "substantive matters." The performance of an investment is substantive. The Court adjusted paragraph 377 to reflect Mr. Goldenson's substantive conversations with Mr. Merkin, and deems the modified assertion qualified under Local Rule 56(f), (g).

PSAMF ¶ 378; DRPSAMF ¶ 378.[344]  On occasions when the Goldensons made additional investments in Ascot, Mr. Goldenson "certainly informed [Mr. Ho] that [they] were making adjustments and [they] were adding [their] IRAs."  PSAMF ¶ 379; DRPSAMF ¶ 379.[345]

Originally, the Goldensons spoke to the Defendants about "Merkin and Ascot . . . practically like clock work [sic] every month because they were telling me how the funds were doing."  PSAMF ¶ 380; DRPSAMF ¶ 380.[346]  This practice continued for at least the first eighteen months after the Goldensons invested in Ascot and the QP I Fund until the parties began to talk "less frequently about the funds because [Mr. Goldenson] was receiving reports and [he] had become quite comfortable with [their] investments."  PSAMF ¶ 381; DRPSAMF ¶ 381.[347]  Thereafter, Mr.

---

[344]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Court also overrules the Defendants' sham affidavit because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts.  *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153.  The Defendants also deny paragraph 378, but the record evidence they cite does not controvert the assertion.  *See* DRPSAMF ¶ 378.  The Court deems paragraph 378 admitted under Local Rule 56(f), (g).

[345]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, characterizing the conversations between Mr. Goldenson and the Defendants regarding Ascot with the one-sided verb "informed" rather than "consulted."  DRPSAMF ¶ 379.  Paragraph 379 does not use the word "consulted," making the qualification irrelevant; however, the Court notes that it has concluded that Mr. Goldenson "consulted" with the Defendants regarding the later Ascot investments.  *See supra* notes 100, 101, 106 (discussing DSMF ¶¶ 104-10, 112-13).  The remainder of the qualification likewise does not change the substance of paragraph 379.  The Court deems paragraph 379 admitted under Local Rule 56(f), (g).

[346]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 380.  The Court deems paragraph 380 admitted under Local Rule 56(f), (g).

[347]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 381.  The Court deems paragraph 381 admitted under Local Rule 56(f), (g).

Goldenson spoke to the Defendants "at least every two months," as he was "very focused on these . . . funds." PSAMF ¶ 382; DRPSAMF ¶ 382.[348] When Mr. Goldenson could not speak to Mr. Steffens, he spoke to Mr. Ho. PSAMF ¶ 383; DRPSAMF ¶ 383.[349] Occasionally, Mr. Steffens would ask Mr. Ho to join his calls with Mr. Goldenson. PSAMF ¶ 384; DRPSAMF ¶ 384.[350] Mr. Goldenson spoke to the Defendants about Ascot during every one of these calls. PSAMF ¶ 385; DRPSAMF ¶ 385.[351]

Mr. Goldenson's regular conversations with Spring Mountain about Ascot's performance included discussion about Mr. Merkin's execution of Ascot's strategy and why it had performed a certain way in current market conditions. PSAMF ¶ 386; DRPSAMF ¶ 386.[352] During Mr. Goldenson's conversations with the

---

[348]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 382. The Court deems paragraph 382 admitted under Local Rule 56(f), (g).

[349]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 383. The Court deems paragraph 383 admitted under Local Rule 56(f), (g).

[350]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 384. The Court deems paragraph 384 admitted under Local Rule 56(f), (g).

[351]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 385. The Court deems paragraph 385 admitted under Local Rule 56(f), (g).

[352]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. In Mr. Goldenson's deposition testimony, he testified that the conversations with the Defendants centered on Ascot's "performance," *e.g.*, *Pl.'s D.G. 2011 Dep. Tr.* 80:24-81:2; however, this is entirely consistent with the alleged discussions of Mr. Merkin's execution of the Ascot strategy in the context of market conditions. The Defendants also deny the substance of paragraph 386 on the same grounds, *see* DRPSAMF ¶ 386 (citing DRPSAMF ¶ 380 (citing Mr. Goldenson's testimony that

Defendants, the Defendants told him that they were closely monitoring Ascot and that it "was performing very well, that it was very reliable, it was a core holding [of the QP I Fund] and that they seemed very pleased with how it was contributing to the overall earnings of the [QP I Fund]." PSAMF ¶ 387; DRPSAMF ¶ 387.[353]

The Defendants never mentioned Mr. Madoff in any capacity during any of these conversations. PSAMF ¶ 388; DRPSAMF ¶ 388.[354] Ascot's written monthly performance reports did not provide any detail or transparency with respect to what options it traded or positions it held. PSAMF ¶ 388; DRPSAMF ¶ 388. Any audited financials the Goldensons saw showed Ascot in treasury bonds. PSAMF ¶ 388; DRPSAMF ¶ 388.

The Goldensons and the Defendants had an agreement, during the first eighteen months of the Goldensons' investment in QP I and Ascot, that they would have regular conversations

---

[353] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The assertion that the Defendants said they were "closely monitoring" Ascot is consistent with Mr. Goldenson's deposition testimony that he regularly discussed its performance with the Defendants. The Defendants would have no way to discuss Ascot's "performance" and Mr. Merkin's execution of the Ascot strategy, *see supra* note 352 (discussing PSAMF ¶ 386), if they were not also "closely monitoring" Ascot. The Defendants also deny the substance of paragraph 387 on the same grounds, *see* DRPSAMF ¶ 386 (citing DRPSAMF ¶ 380 (citing Mr. Goldenson's testimony that he discussed Ascot's "performance" with the Defendants)), and the denial fails for the same reasons. Because the Defendants have not controverted paragraph 387, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[354] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 388. The Court deems paragraph 388 admitted under Local Rule 56(f), (g).

(Footnote text above the line 353:) he discussed Ascot's "performance" with the Defendants)), and the denial fails for the same reasons. Because the Defendants have not controverted paragraph 386, the Court deems the paragraph admitted under Local Rule 56(f), (g).

in order for [the Goldensons] to be comfortable with the investments that [Mr. Steffens] . . . presented [to the Goldensons] and . . . made representations about. [The Goldensons' Ascot and QP I investments] were brand new investments in brand new vehicles and [Mr. Goldenson] was concerned and eager to hear from [the Defendants] about both investments.

PSAMF ¶ 389; DRPSAMF ¶ 389.[355]   Because of the Goldensons' trust and confidence in Mr. Steffens and his professional judgment, and their respect for his stature on Wall Street as the former Vice Chairman of Merrill Lynch and the head of its Private Client Group, it was important to the Goldensons to obtain what they thought was the Defendants' objective evaluation of Ascot.   PSAMF ¶ 390; DRPSAMF ¶ 390.[356]

Mr. Goldenson "always wanted to know – independent of what the Merkin organization was telling [him] . . . what Launny [Steffens] and Greg [Ho] were feeling about that core investment.  Were they still in it, did they like it, was it performing.  That was very important to [Mr. Goldenson]."   PSAMF ¶ 391;

---

[355]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Goldensons claim that "Mr. Goldenson's conversations with the Defendants were necessary" in order for the Goldensons to be comfortable.  PSAMF ¶ 389.  The Defendants interpose a qualified response, disputing that the deposition testimony supports the word "necessary."   DRPSAMF ¶ 389.  The qualification also disputes that Mr. Goldenson's "subjective belief about what he wanted in order to feel comfortable" is relevant.  *Id.*  The Court adjusted the assertion to clarify that the parties had an "agreement in the beginning" to have the meetings, *Pl.'s D.G. 2011 Dep. Tr.* 81:7-8, the purpose of the agreement being to make Mr. Goldenson feel comfortable.  This avoids the conclusory word "necessary" and moots the disagreement over the relevancy of what Mr. Goldenson needed to feel comfortable.  The parties had an agreement to converse, and its purpose was to allay Mr. Goldenson's discomfort about his investment.  The record supports this assertion, and the assertion is a non-conclusory matter of historical fact.  The Court therefore deems the modified assertion admitted under Local Rule 56(f), (g).

[356]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also deny paragraph 390, but the material they cite in support does not controvert the assertion.  *See* DRPSAMF ¶ 390 (citing DRPSAMF ¶¶ 195, 205, 275, 380 and DSMF ¶¶ 128-30).  The Court deems paragraph 390 admitted under Local Rule 56(f), (g).

DRPSAMF ¶ 391.[357]  Although the Plaintiffs' overall exposure to the Ascot Fund "never became as much as it was on Day 1," the Plaintiffs' additional investments in Ascot "more had to do with the fact that having proved itself," the Plaintiffs felt, based on their discussions with the Defendants, that Ascot was a good place to invest their IRAs.  PSAMF ¶ 392; DRPSAMF ¶ 392.[358]

### o.  The Goldensons Become Concerned About the Market in 2007

When Mr. Goldenson "began to be very concerned about general market conditions" in 2007, he expressed that concern to both the Defendants and Mr. Merkin.  PSAMF ¶ 393; DRPSAMF ¶ 393.[359]  The Goldensons had requested a full redemption of their QP I investment in the fall of 2007 but were told they had

---

[357]  The Defendants object, suggesting that paragraph 391 is irrelevant because it describes "what Mr. Goldenson subjectively 'wanted to know.'"  DRPSAMF ¶ 391.  However, the context of Mr. Goldenson's testimony—a description of conversations between himself and Mr. Steffens at social occasions—indicates that this was not some internal, subjective, unspoken desire.  It describes actual questions posed to and answered by Mr. Steffens.  *See Pl.'s D.G. 2011 Dep. Tr.* 113:4-25.  The Court overrules the Defendants' objection; the paragraph is relevant to the inducement and reasonable reliance elements of the Goldensons' common law fraud claim, and to the alleged breach of fiduciary duty.

[358]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also deny paragraph 392, claiming that the fact that the Goldensons withdrew more from Ascot than they put in shows that they did not decide to invest because Ascot had "proved itself."  DRPSAMF ¶ 392.  However, it is undisputed that the Goldensons invested at least some money in Ascot after the initial investment, even if they withdrew more than they invested between 2001 and 2008.  *See id.*  The Court interprets Mr. Goldenson's testimony to mean that, regardless of his withdrawals, he put money in to Ascot because it had proved itself.  The Defendants also claim that Mr. Goldenson did not testify that his discussions with the Defendants were the basis for his decision to invest his IRAs in Ascot.  *Id.*  However, the Court has already concluded that Mr. Goldenson "consulted" with the Defendants regarding these later investments.  *See supra* note 345.  Because the Defendants have not controverted paragraph 392, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[359]  The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 393.  The Court deems paragraph 383 admitted under Local Rule 56(f), (g).

missed the deadline for a year-end redemption. PSAMF ¶ 394; DRPSAMF ¶ 394.[360]

By January 2008, the Goldensons similarly thought "that [they] would take [their] money entirely out of the Ascot Fund." PSAMF ¶ 395; DRPSAMF ¶ 395.[361]

After Mr. Goldenson asked Mr. Merkin in January 2008 how he felt "the market is going to affect your performance" and whether "there is anything I should be concerned about," Mr. Merkin responded:

> [W]e really operate our strategy independent of general daily market activities. We . . . do a certain strategy that we perfected . . . [and] [w]e'll tend to do pretty much the way we've done ever since we got started. We have a pretty good record of capturing, you know, 8 or 9 percent . . . [and] I think you can be comfortable that that should continue.

PSAMF ¶ 396; DRPAMF ¶ 396.[362]

Mr. Goldenson then made "similar inquiries" about Ascot of the Defendants in January, 2008. PSAMF ¶ 397; DRPSAMF ¶ 397.[363] Mr. Goldenson recalls having a specific conversation with Mr. Steffens in January 2008 about the Goldensons' anxiety about their exposure to the Ascot Fund given the economic

---

[360] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[361] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 395. The Court deems paragraph 395 admitted under Local Rule 56(f), (g).

[362] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 396. The Court deems paragraph 396 admitted under Local Rule 56(f), (g).

[363] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 397. The Court deems paragraph 397 admitted under Local Rule 56(f), (g).

environment. PSAMF ¶ 398; DRPSAMF ¶ 398.[364] Mr. Steffens did not tell Mr. Goldenson in January 2008 that it would be advisable to withdraw any portion of the Goldensons' investment in the Ascot Fund; instead, Mr. Steffens allayed his concerns by telling Mr. Goldenson how steady and reliable Ascot was even in this down market. PSAMF ¶ 399; DRPSAMF ¶ 399.[365]

---

[364] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 398. The Court deems paragraph 398 admitted under Local Rule 56(f), (g).

[365] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the alleged breach of fiduciary duty. The Defendants also raise a sham affidavit objection. In his affidavit, cited in supported of paragraph 399, Mr. Goldenson claims that "Mr. Steffens allayed my concerns by telling me how steady, reliable and conservative Ascot continued to be even in the down-market." *Goldenson Decl.* ¶ 12. The Defendants argue that this conflicts with Mr. Goldenson's deposition testimony that he made the Ascot withdrawals in 2008 without consulting the Defendants. DRPSAMF ¶ 399 (citing DSMF ¶ 104-14). First, the Court has ruled that there is a genuine dispute as to whether Mr. Goldenson "consulted" with the Defendants regarding these withdrawals. *See supra* note 345.

Even if Mr. Goldenson did not "consult" with the Defendants regarding the specific withdrawals, Mr. Goldenson's deposition testimony does not render his Declaration statement a sham. In his Declaration, Mr. Goldenson describes one conversation in January 2008 in which Mr. Steffens "allayed [his] fears." *Goldenson Decl.* ¶ 12. In his deposition, Mr. Goldenson testified that he had a conversation with Mr. Steffens about his concerns in January 2008, that Mr. Steffens did not tell him that it would be advisable to redeem money from Ascot, and that he did not consult with the Defendants regarding the specific Ascot withdrawals. *Pl.'s D.G. 2011 Dep. Tr.* 151:2-152:20. However, Mr. Goldenson never testified that Mr. Steffens did not allay his fears about Ascot in the alleged meeting, prior to Mr. Goldenson's independent withdrawals. Furthermore, the deposition transcript shows that the questioner made sharp efforts to keep Mr. Goldenson focused on the questions, at times preventing him from elaborating on details of the alleged meeting with Mr. Steffens. *E.g.*, *id.* at 150:19-25 ("Q. Mr. Steffens never told you that it would be wise for you to withdraw your money from the QP I Fund? . . . A. I expressed my concern – Q. Can you answer my question?"); *id.* at 151:10-16 ("Q. So that was a decision you made on your own, according to your own -- A. My temperament about -- Q. Let me finish. A. All right. Q. That was a decision you made on your own, according to your own logic and reasoning. A. Yes"). In this context, the Court cannot conclude that Mr. Goldenson's later affidavit contradicts any clear statement in his deposition. He is allowed to use an affidavit to clarify oblique or incomplete deposition testimony. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Court overrules the Defendants' sham affidavit objection.

Likewise, although the Defendants deny paragraph 399, the record evidence to which they cite does not controvert the assertion. *See* DRPSAMF ¶ 399. Viewing the evidence in a light most favorable to the Goldensons, the Court finds the deposition testimony and the affidavit entirely

The Goldensons liquidated only $300,000 of their Ascot investments in January, 2008, rather than the entire balance as they originally intended, because of their reliance on Mr. Steffens' assurances that Ascot was a conservative, reliable investment that Spring Mountain would continue to monitor closely. PSAMF ¶ 400; DRPSAMF ¶ 400.[366] The Goldensons made redemptions of $6,000, $20,000, and $5,000 from Ascot in July, 2008 and a redemption of $6,000 in October, 2008 to pay their living expenses. PSAMF ¶ 401; DRPSAMF¶ 401.[367]

Had the Defendants told the Goldensons that Mr. Madoff, not Mr. Merkin, was doing all of the trading for Ascot and that their investments were in Mr. Madoff's custody, the Goldensons would have liquidated their entire Ascot investment. PSAMF ¶ 402; DRPSAMF ¶ 402.[368] Any news that the Goldensons'

consistent with the alleged allaying of fears by Mr. Steffens. The Court deems paragraph 399 admitted under Local Rule 56(f), (g).

[366] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Court also overrules the Defendants' sham affidavit objection. *See supra* note 365. The Defendants deny paragraph 400, but the denial fails for the reasons discussed above. *See supra* note 365. The Court deems paragraph 400 admitted under Local Rule 56(f), (g).

[367] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also deny that the record supports the assertion that the withdrawals were for "living expenses." DRPSAMF ¶ 401. It is true, as the Defendants point out, that in the cited portion of Mr. Goldenson's testimony he does not mention the phrase "living expenses." *Pl.'s D.G. 2011 Dep. Tr.* 151:18-152:20. However, immediately before this exchange he testified that he began systematically withdrawing money from his Ascot IRAs in 2007 because the Goldensons "needed to start actually using" the money; "[w]e needed the IRA funds." *Id.* at 148:14-23. These withdrawals were consistently in the amount of $6,000 per quarter. *Id.* at 148:14-18. Viewing the evidence in a light most favorable to the Goldensons, the Court concludes that he "needed to start actually using" the IRA money to pay part of his living expenses in retirement. The Court further infers that the similarly-sized 2008 withdrawals, occurring at similar intervals, were also for living expenses. Because the Defendants have not controverted the assertion of paragraph 401, the Court deems the paragraph admitted under Local rule 56(f), (g).

[368] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the alleged breach of fiduciary duty. The Court also overrules the Defendants' sham affidavit objection. Although Mr. Goldenson did say "[y]ou're asking me to speculate" in response to the question, he went on to give a lengthy explanation of how uncomfortable he would have felt had he known that Mr. Madoff had

funds were not invested in the manner represented to them would have convinced

them to get out of the market entirely with respect to Ascot. PSAMF ¶ 403;

DRPSAMF¶ 403.[369] The Goldensons would have liquidated their Ascot investments

if they had realized the red flags that had previously been reported about Mr.

Madoff in the media pertained to their Ascot investments. PSAMF ¶ 404;

DRPSAMF ¶ 404.[370]

### p. Mr. Madoff's Arrest and Its Aftermath

### i. The Goldensons' Reaction and the Defendants' Response

When the news of Mr. Madoff's Ponzi scheme broke on December 11, 2008,

the Goldensons did not know that this event would have any personal consequences

---

such an integral role in Ascot's investing. *Pl.'s D.G. 2011 Dep. Tr.* 157:3-20. He also testified earlier that he was prepared to liquidate his entire Ascot holding. *Id.* at 150:11-12. In this context, Mr. Goldenson's statement in his Declaration is consistent with his deposition testimony.

The Defendants also deny paragraph 402, but the denial does not controvert the assertion. *See* DRPSAMF ¶ 402. However, the Goldensons' original paragraph 402 contains conclusory and vituperative phrasing: "Had the Defendants told the Goldensons *the truth* that Madoff, not Mr. Merkin, was doing all of the trading . . . ." PSAMF ¶ 401 (emphasis added). The Court omits "the truth," and deems the modified assertion admitted under Local Rule 56(f), (g).

[369] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the alleged breach of fiduciary duty. The Court also overrules the Defendants' sham affidavit objection. *See supra* note 368. The Defendants also deny paragraph 403, but their denial fails for the reasons discussed above. *See supra* note 368. The Court deems paragraph 403 admitted under Local Rule 56(f), (g).

[370] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the alleged breach of fiduciary duty. The Court also overrules the Defendants' sham affidavit objection. *See supra* note 368. The Defendants also deny paragraph 404, but their denial fails for the reasons discussed above. *See supra* note 368. The Court deems paragraph 404 admitted under Local Rule 56(f), (g).

Paragraph 405 claims that "[t]he Goldensons gave the Defendants the required 90-day notice that they intended to liquidate their QP I investment at the end of the year in September, 2008." PSAMF ¶ 405. Paragraph 406 claims that "Ascot did not hold its investors to a specific notice period for redeeming their investments like the QP I Fund did." PSAMF ¶ 406. Paragraph 407 claims that "In October of 2008, the QP I Fund, which was closed to new investors, acquired an additional $2.5 million interest in Ascot, while the Defendants' Alternative Strategies Fund, LLC, which was open to new investors, liquidated its entire interest in Ascot." PSAMF ¶ 407. None of these assertions appears to be relevant to any legal issue in this dispute.

for them.  PSAMF ¶ 408; DRPSAMF ¶ 408.[371]  They discussed how terrible they felt

for all the people and charities that had been cheated, not knowing that they were

among the victims.  PSAMF ¶ 408; DRPSAMF ¶ 408.

On December 12, 2008, the Defendants sent the Goldensons correspondence

informing them that "[a]lthough we do not have any direct investments with Madoff

Securities, some of our underlying managers do have exposure."  PSAMF ¶ 409;

DRPSAMF ¶ 409.[372]  The letter promised that the Defendants would act "with the

greatest emphasis on protecting our investors' assets" and "continue to act in [their]

best interest during this trying time."  PSAMF ¶ 409; DRPSAMF ¶ 409.[373]

When Mr. Goldenson found out that their Ascot money had been invested

with Mr. Madoff from reading a Yahoo! News article, his wife recalled him "walking

up the stairs, and he had his hands on his head, and he's, like, holding his head,

like somebody died," and telling her "[y]ou won't believe this.  You won't – you just –

you won't believe this."  PSAMF ¶ 410; DRPSAMF ¶ 410.[374]  Mrs. Goldenson was in

---

[371]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the IIED claim.  The Court also overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts.  *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153.  The Defendants also deny paragraph 408, but the material they cite in support of the denial does not controvert the assertion.  *See* DRPSAMF ¶ 408.  The Court deems paragraph 408 admitted under Local Rule 56(f), (g).
[372]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the IIED claim.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 409.  The Court deems paragraph 408 admitted under Local Rule 56(f), (g).
[373]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the IIED claim.
[374]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the IIED claim.  The Defendants also interpose a qualified response, claiming that "Merkin testified that he told Mr.

shock and thought that the news that the money the Goldensons had entrusted to Mr. Merkin based on Mr. Steffens' advice had in fact been managed by Mr. Madoff "was just so unbelievable." PSAMF ¶ 411; DRPSAMF ¶ 411.[375] Based on the Goldensons' long-standing confidence, respect, and trust in Mr. Steffens and his prominent place in the securities industry, they assumed that the Defendants had no idea whatsoever that Mr. Madoff was in any way affiliated with Ascot. PSAMF ¶ 412; DRPSAMF ¶ 412.[376]

---

Goldenson about Madoff's role in Ascot." DRPSAMF ¶ 410 (citing DRPSAMF ¶ 191). The record material cited indirectly by the Defendants shows that Mr. Merkin's general practice was to tell investors about Mr. Madoff's role in Ascot. *Nicholas Decl.* Ex. C *Dep. of J. Ezra Merkin*, at 71:5-9 (ECF No. 226-3) (May 2, 2012) (*Def.'s Merkin Dep. Tr.*)). When asked whether he had told Mr. Goldenson specifically about Mr. Madoff's role in Ascot, Mr. Merkin testified that he "discussed the role of the Madoff office in the management of the [Ascot] fund." *Merkin Dep. Tr.* 122:3-4. However, when pressed as to whether he "specifically remember[ed] Mr. Madoff's name being raised at the meeting," Mr. Merkin said that "that was my practice . . . [i]t was something Lonnie [Steffens] knew. And Lonnie was present in the discussion. . . . And I basically explained it to all the investors." *Id.* at 122:8-22. When pressed further, he admitted "I don't have a specific recollection – I don't remember what I said. I don't remember – you know, I don't remember who was wearing what as that conversation was had." *Id.* at 123:7-12. Viewing this evidence and Mr. Goldenson's testimony in a light most favorable to the Goldensons, the Court concludes that although Mr. Merkin had a general practice of telling investors about Mr. Madoff, he did not follow that practice during the 2001 meeting with Mr. Goldenson. In short, for the purposes of this motion for summary judgment, Mr. Merkin did not tell Mr. Goldenson about Mr. Madoff's role in Ascot. The Court deems Paragraph 410 admitted under Local Ruler 56(f), (g).

[375] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim and to the IIED claim. The Defendants also deny the assertion, claiming that "[w]hat Mrs. Goldenson testified was 'unbelievable' was 'that we lost the money.'" DRPSAMF ¶ 411 (quoting *Pl.'s S.G. 2011 Dep. Tr.* 44:14, 44:17). However, this reading of Mrs. Goldenson's testimony is unduly narrow. She testified that "[i]t was just so unbelievable" after stating that Mr. Goldenson "started telling me what happened," a part of which was "that we lost the money." *Pl.'s S.G. 2011 Dep. Tr.* 44:11-17. The Defendants also deny that the Goldensons' direct investments in Ascot were made "'based on Mr. Steffens' advice,'" DRPSAMF ¶ 411 (quoting PSAMF ¶ 411), but the Court has already ruled that there is a genuine dispute as to that fact. *See supra* note 345. Because the Defendants have not controverted paragraph 411, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[376] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the reasonable reliance element of the Goldensons' common law fraud claim. The Defendants also deny paragraph 412, claiming that the Goldensons did not have "long-standing" confidence, respect, and trust in Mr. Steffens, DRPSAMF ¶ 412 (citing DRPASMF ¶ 137), and that Mr. Merkin had told Mr. Goldenson about Mr. Madoff's role in Ascot. *Id.* (citing DRPSAMF ¶ 191). It is reasonable to characterize a relationship of nine years—from 1999 to 2008—as "long standing," and the Court has

In the aftermath of the Madoff fraud, the Defendants told their employees that if they received "any calls or inquiries from investors or other parties, please forward them to the client relations team." PSAMF ¶ 413; DRPSAMF ¶ 413.[377] For Mr. Goldenson, however, the Defendants had special instructions:

> All conversations with him should be extremely formal and concise. If he is looking for any information or visibility please refer him to Greg [Ho] or Launny [Steffens]. Besides the productivity considerations for both of you, other important reasons are behind my instructions.

PSAMF ¶ 414; DRPSAMF ¶ 414.[378] When Mr. Goldenson called the Defendants after the revelation of the Madoff scheme, they nurtured Mr. Goldenson's false assumption that the Defendants had no idea whatsoever that Ascot had been invested with Madoff. PSAMF ¶ 415; DRPSAMF ¶ 415.[379] At no point following the revelation of Madoff's fraud did the Defendants volunteer generally to the Goldensons that they had known from the outset that all of their money purportedly invested in the Ascot fund "sub-manager" had been funneled to Mr. Madoff and that

---

already determined that for the purposes of summary judgment Mr. Merkin did not inform Mr. Goldenson about Mr. Madoff's role in Ascot. *See supra* note 374. Because the Defendants have not controverted paragraph 412, the Court deems the paragraph admitted under Local Rule 56(f), (g).

[377]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

[378]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 414. The Court deems paragraph 414 admitted under Local rule 56(f), (g).

[379]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Court also overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Defendants also deny the assertion, DRPSAMF ¶ 415 (citing *Pl.'s S.G. 2011 Dep. Tr.* 68:4-6), claiming that Mrs. Goldenson's testimony was ambiguous as to what was said on this call. However, Mr. Goldenson's Declaration is sufficient on its own to support the assertion. The Court deems paragraph 415 admitted under Local Rule 56(f), (g).

the Ascot Fund was nothing more than a "feeder fund" for Mr. Madoff's firm. PSAMF ¶ 416; DRPSAMF ¶ 416.[380]

At no point during the course of Mr. Goldenson's direct conversations and correspondence with the Defendants following the revelation of Mr. Madoff's fraud did the Defendants volunteer to the Goldensons that: (1) the Defendants had known from the outset that all of the Goldensons' investments in the Ascot Fund, either directly with that fund or through the QP I "fund of funds," had been funneled to Mr. Madoff; (2) the Ascot Fund was nothing more than a "feeder fund" for Madoff Securities; or (3) the Ascot Fund itself engaged in no trading whatsoever, let alone a "proprietary" trading strategy of the sort described to the Goldensons by Mr. Steffens, Mr. Merkin, or the various Ascot COMs. PSAMF ¶ 417; DRPSAMF ¶ 417.[381]

### ii. The Defendants' December 15, 2008 Letter to QP I Fund Investors

On December 15, 2008, the Defendants sent their investors in the QP I Fund a letter stating, among other things:

---

[380] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants also interpose a qualified response, objecting that they never believed that the funds were "funneled" to Mr. Madoff and that Ascot was "nothing more than" a feeder fund for Mr. Madoff. DRPSAMF ¶ 416. However, viewing all of the record evidence in a light most favorable to the Goldensons, the Court concludes that the Goldensons have produced sufficient evidence for the Court to conclude for purposes of the pending motion that the assertion of paragraph 416 is true. *See supra* Section II.B.2.k ("The Defendants' Knowledge of Mr. Madoff's Role in the Management of Ascot"). The Court deems paragraph 416 admitted under Local Rule 56(f), (g).

[381] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Defendants deny paragraph 417, but their denial fails for the reasons described above. *See supra* note 380; *see also* Section II.B.2.f.iii (addressing Mr. Merkin's alleged description of the Ascot strategy as "proprietary"). The Court deems paragraph 417 admitted under Local Rule 56(f), (g).

Based on our research, only two funds had direct exposure to Madoff Securities – Ascot Fund Limited and Gabriel Capital, L.P. As of November 30, 2008, Ascot constituted 7.73% of the Fund and Gabriel constituted 7.47%. We believe that substantially all of the Ascot investment was exposed to Madoff Securities, and, based on currently available information; we estimate that approximately 29% of the Gabriel investment was similarly exposed. If these preliminary estimates are correct, the Fund had approximately 9.89% of its assets exposed to Madoff Securities as of November 30, 2008.

PSAMF ¶ 418; DRPSAMF ¶ 418.[382] The December 15, 2008 letter went on to state:

Since the announcement of the Madoff Securities fraud, we have taken affirmative steps to protect our interests. We have retained Simpson Thacher & Bartlett, LLP to provide us with legal advice concerning all transactional, structural, regulatory and litigation issues that may arise in connection with this matter. . . . Our team at Simpson Thacher consists of attorneys with expertise in advising victims of financial fraud. . . . We are evaluating other steps to be taken in order to protect the Fund's assets and expect to have further announcements within the next few days. The partners and employees of Spring Mountain Capital have over $130 million invested across our funds and alongside investor assets and have not at any point this year removed our capital.

PSAMF ¶ 420; DRPSAMF ¶ 420.[383]

---

[382] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty. The Goldensons claim that the Defendants sent this letter to their "partners in the QP I Fund," PSAMF ¶ 418, but the Defendants interpose a qualified response, claiming that the letter was sent to all "investors" in QP I. DRPSAMF ¶ 418. The letter begins "Dear Investor," and so the Court adjusted the assertion to reflect this. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

In paragraph 419, the Goldensons asserted that one of their experts, Patrick E. Conroy, Ph.D., would testify that the December 15 letter was "misleading" for a number of reasons. PSAMF ¶ 419 (citing *Frawley Decl.* Ex. AA *Pl.'s Supplementation to the Expert Witness Designation of Patrick E. Conroy, PhD*, at 2 (ECF No. 211-17) (May 25, 2012) (*Conroy Supplementation*)). The Defendants object that the Conroy Supplementation is an unsworn statement by an attorney, not properly considered at summary judgment. The Court sustains this objection. *See* Fed. R. Civ. P. 56(c)(1)(A); *Brazier v. Oxford Cnty.*, 2008 WL 2065842, at *10 n.6 (D. Me. May 13, 2008), *aff'd*, 575 F. Supp. 2d 265 (D. Me. 2008) ("[S]ummary judgment factual statements must be presented in accordance with Local Rule 56 and . . . a pleading is not evidence").

[383] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the alleged breach of fiduciary duty.

The Goldensons thought that the Defendants had hired counsel "to represent the investors in QP-I to address the fraud and to – to do whatever was necessary to prosecute the wrongdoing." PSAMF ¶ 421; DRPSAMF ¶ 421.[384] However, the Defendants never took legal action against Mr. Merkin, and Simpson Thacher "has never been retained by, or provided legal counsel to, any of the limited partner investors in Spring Mountain Partners QP I . . . in connection with their investments in the Fund." PSAMF ¶ 422; DRPSAMF ¶ 422.[385] When Mr. Goldenson called Spring Mountain approximately a month after Bernard Madoff was arrested to ask "whether [Spring Mountain] had started a lawsuit against Ezra Merkin," they told him that "we're not going to pursue a suit against Mr. Merkin

[384] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Goldensons claim that "[t]he Plaintiffs were 'pleased' to read that the Defendants had hired counsel 'to represent the investors in QP-I to address the fraud and to – to do whatever was necessary to prosecute the wrongdoing.'" PSAMF ¶ 421 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 283:22-25). However, this statement is conclusory as to what Simpson Thacher was hired for, and does not follow from the wording of the letter. The letter states that the Defendants hired attorneys "to provide us with legal advice"—"us" meaning Spring Mountain Capital, not the investors. *See also Order Denying Pl.'s Appeal On Their Mot. to Compel* at 9-10 (ECF No. 186) (Jan. 14, 2013) ("[T]here was no objective or subjective evidence supporting the Plaintiffs' belief that [Simpson Thacher] represented them"). The letter also makes no representation that the attorneys would "address the fraud" or "do whatever was necessary to prosecute the wrongdoing"; instead, their purpose is to advise SMC on "all transactional, structural, regulatory and litigation issues" that might emerge. Even viewing the letter in a light most favorable to the Goldensons, the Court does not conclude that the Defendants had hired Simpson Thacher for the purposes asserted in paragraph 421. The Court adjusted the assertion to reflect that this is what the Goldensons believed the attorneys were hired for, which the record does support. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[385] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Goldensons claim that the substance of paragraph 422 is "[c]ontrary to the Defendants' representations." PSAMF ¶ 422. However, as explained above, the Defendants did not represent that Simpson Thacher would sue Mr. Merkin or that they were retained to represent the limited partners. *See supra* note 384. The Court has removed the clause "[c]ontrary to the Defendants' representations" from the assertion, and deems the modified assertion admitted under Local Rule 56(f), (g).

because, number 1, Mr. Merkin is a partner here and it would be like suing ourselves." PSAMF ¶ 423; DRPSAMF ¶ 423.[386]

Simpson Thacher represented Spring Mountain Capital in connection with inquiries from the United States Attorney's Office, the Office of the New York Attorney General, the Securities and Exchange Commission, and Yeshiva University, and in defense of this lawsuit. PSAMF ¶ 424; DRPSAMF ¶ 424.[387] The Defendants determined that they were entitled to bill Simpson Thacher's legal fees incurred in connection with Madoff-related litigation to the Spring Mountain funds. PSAMF ¶ 425; DRPSAMF ¶ 425.[388] The QP I Fund paid approximately 20% of all

---

[386] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants deny paragraph 423, but the material they cite in support of their denial does not controvert Mr. Goldenson's claim that a customer service representative told him over the phone that "we're not going to pursue a suit against Mr. Merkin because, number 1, Mr. Merkin is a partner here and it would be like suing ourselves." *Pl.'s D.G. 2011 Dep. Tr.* 284:8-11. Viewing the evidence in a light most favorable to the Goldensons, the Court concludes that this was true. The Court deems paragraph 423 admitted under Local Rule 56(f), (g).

[387] In paragraph 424, the Goldensons claim that "Simpson Thacher represented the Defendants' personal interests in connection with [various inquiries] and in defense of the instant lawsuit." PSAMF ¶ 424 (citing *McCloskey Decl.* Ex. ZZ (ECF No. 211-35) (Mar. 26, 2009) (*STB Billing Statement*) and *McCloskey Decl.* Ex. AAA *Decl. of James G. Kreissman in Opp'n to the Mot. to Compel the Produc. of Documents from Simpson Thacher & Bartlett, LLP,* (ECF No. 215-45) (Mar. 19, 2012) (*Kreissman Decl.*)). The Defendants object that this is attorney-client privileged material and that it is irrelevant. The Court overrules the relevancy objection; the assertion is relevant to the Goldensons' IIED claim. The attorney-client privilege has been destroyed because the documents have now been disclosed to the Goldensons through discovery. *See U.S. v. Billmyer*, 57 F.3d 31, 37 (1st Cir. 1995) (holding the attorney-client privilege waived when a party disclosed attorney-client communications to the government). The Defendants also deny that Simpson Thacher represented their "personal interests." DRPSAMF ¶ 424. The cover letter to the STB Billing Statement indicates that the representation is "in connection with our representation of Spring Mountain," *STB Billing Statement* at 200/7, and the Kreissman Declaration states that Mr. Kreissman was "counsel for parties that are now defendants in [this lawsuit]." *Kreissman Decl.* ¶ 6. A fact-finder could not reasonably conclude from this evidence that Simpson Thacher represented Messrs. Steffens' and Ho's "personal interests" in connections with any inquiries from any parties, public or private. The Court adjusted the assertion to reflect that Simpson Thacher represented Spring Mountain Capital, and deems the modified assertion admitted under Local Rule 56(f), (g).

[388] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Court also overrules the Defendants' privilege objection. *See supra* note 387. The Goldensons' claim has an additional subordinate clause: "Despite the fact that

---

of the Defendants' Madoff-related expenses. PSAMF ¶ 426; DRPSAMF ¶ 426.[389]

The QP I Fund suspended its investors' withdrawal rights indefinitely as of December 31, 2008. PSAMF ¶ 426; DRPSAMF ¶ 426. The Defendants adverse to the plaintiff have charged their legal expenses in connection with the instant lawsuit to the QP I Fund; these legal expenses were approximately $495,000 in 2011. PSAMF ¶ 427; DRPSAMF ¶ 427.[390]

The Defendants described the instant litigation to Rothstein Kass, the QP I independent auditor, as relating to "*inter alia*" the QP I Fund's investments "in Ariel and Gabriel," although the QP I Fund did not invest in Ariel. PSAMF ¶ 428; DRPSAMF ¶ 428.[391]

---

Simpson Thacher represented the Defendants' personal interests . . . ." PSAMF ¶ 425. For the reasons explained above, the Court does not credit this part of the assertion. *See supra* note 387. The Defendants' qualification does not otherwise change the substance of the modified assertion, and so the Court deems the modified assertion admitted under Local Rule 56(f), (g).

[389] The Defendants assert the same qualification and objections to paragraph 426 as they did to paragraph 425. The Court overrules the objections, *see supra* note 387, and the Court deems paragraph 426 admitted under Local Rule 56(f), (g). *See supra* note 388.

[390] The Defendants assert the same qualification and objections to paragraph 427 as they did to paragraph 425. The Court overrules the objections, *see supra* note 387, and the Court deems paragraph 427 admitted under Local Rule 56(f), (g). *See supra* note 388.

[391] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. However, the Goldensons claim that "[t]he Defendants described the instant litigation to their QP I investors as relating to the QP I Fund's investments 'in Ariel and Gabriel,' even though the QP I Fund did not invest in Ariel, and the Defendants made no reference to Ascot or Madoff." PSAMF ¶ 429 (quoting *Goldenson Decl.* Ex. D *Spring Mountain Partners QP I, LP Financial Statements and Independent Auditors' Report*, at 19 (ECF No. 211-38) (Dec. 31, 2011) (*2011 QP I Audit*)). The Defendants deny this, citing the same page of the audit. DRPSAMF ¶ 249 (citing *2011 QP I Audit* at 19). The Goldensons omitted the phrase "*inter alia*," or "among others," from their quotation, *2011 QP I Audit* at 19; this phrase does indicate that the lawsuit relates to other matters as well as investments in Ariel and Gabriel. Furthermore, the Defendants are correct that the 2011 QP I Audit represents statements made by the Defendants to their independent auditor, Rothstein Kass, not to the "QP I investors," though the QP I investors all received copies of the audit report. *2011 QP I Audit* at 1. The Court adjusted the assertion to reflect what the record material supports, and deems the modified assertion admitted under Local Rule 56(f), (g).

### iii. Mr. Merkin Resigns From Spring Mountain

Five or six days after the revelation of the Madoff fraud, the Defendants asked Mr. Merkin to resign from his various positions at Spring Mountain because they thought his affiliation "would not aid their efforts to sort out any issues Spring Mountain may have going forward . . . in connection with the Madoff confession and arrest." PSAMF ¶ 429; DRPSAMF ¶ 429.[392] Mr. Merkin "recognized some possibility that Spring Mountain Capital might have some issues." PSAMF ¶ 429; DRPSAMF ¶ 429.[393] To induce Mr. Merkin's resignation, the Defendants made "some promises about funds that were due [him] . . . from Spring Mountain that hadn't been paid yet and they asked for his [resignation] and they said as soon as it was in they would pay them up." PSAMF ¶ 430; DRPSAMF ¶ 430.[394] Mr. Merkin testified that as of May 2, 2012, the Defendants "[c]ertainly [had not paid up these funds] in their entirety," which he estimated is "some multiple of a million dollars" that he still expects the Defendants to pay him back. PSAMF ¶ 431; DRPSAMF ¶

---

[392] The Court overrules the Defendants' relevance objection; the paragraph is relevant to whether the Defendants exercised control over Mr. Merkin. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 429. *See* DRPSAMF ¶ 429. The Court concludes based on Mr. Merkin's testimony that the Defendants asked Mr. Merkin to resign for the reasons to which he testified. *See Merkin Dep. Tr.* 109:25-110:8. The Court deems this portion of the assertion admitted under Local Rule 56(f), (g).

[393] The Court adjusted this portion of the assertion of paragraph 429 to reflect that it was Mr. Merkin's own opinion that Spring Mountain might have had some issues with the Madoff fraud, not the opinion of Messrs. Steffens or Ho. *See Merkin Dep. Tr.* 111:10-12. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[394] The Court overrules the Defendants' relevance objection; the paragraph is relevant to whether the Defendants exercised control over Mr. Merkin. The Defendants also deny that they offered Mr. Merkin money in order to "induce" his resignation, DRPSAMF ¶ 430; however, a fact-finder viewing all evidence in a light most favorable to the Goldensons could reasonably conclude that the promise to pay the money due was made to induce the resignation. *See Merkin Dep. Tr.* 110:8-18. The Court deems paragraph 430 admitted under Local Rule 56(f), (g).

431.[395]  Mr. Merkin was removed as a member of SMC G.P., LLC and SMC, L.P. on

December 18, 2008.  PSAMF ¶ 432; DRPSAMF ¶ 432.[396]

### iv.    The Defendants' Accounting of Madoff Losses

Rather than account for their Madoff losses in December of 2008, the

Defendants reported them as having occurred in November of 2008 by means of

adjustments to already-reported November, 2008 figures.    PSAMF ¶ 433;

DRPSAMF ¶ 433.[397]  The Defendants' monthly report of the QP I Fund's December,

2008 financial performance made no mention of the Madoff losses or how they

would be accounted for.  PSAMF ¶ 434; DRPSAMF ¶ 434.[398]  The report showed

that the Fund had lost 33.11% for the year.  PSAMF ¶ 434; DRPSAMF ¶ 434.

Although the Defendants internally acknowledged that the QP I Fund's exposure to

---

[395]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to whether the Defendants exercised control over Mr. Merkin.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 431.  The Court deems paragraph 431 admitted under Local Rule 56(f), (g).

[396]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to whether the Defendants exercised control over Mr. Merkin.

[397]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the scienter element of the Goldensons' Rule 10b-5 claims.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 433.  The Court deems paragraph 433 admitted under Local Rule 56(f), (g).

[398]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the scienter element of the Goldensons' Rule 10b-5 claims.  The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 434.  The Court deems paragraph 434 admitted under Local Rule 56(f), (g).

In paragraph 435, the Goldensons claim that "[t]he loss figures reported to QP I investors left an investor unable to distinguish Madoff-related losses from non-Madoff related losses."  PSAMF ¶ 435 (citing *Conroy Supplementation* at 4).  The Court has already ruled that it may not consider the Conroy Supplementation for the purposes of summary judgment.  *Supra* note 382 (discussing PSAMF ¶ 419).

Madoff was "material," they initially urged their employees: "DO NOT share this with anyone." PSAMF ¶ 436; DRPSAMF ¶ 436.[399]

### v. The Defendants Change Their Business Model

The collapse of Ascot also forced the Defendants to undergo what they described on December 22, 2008 as a

> dramatic change in the way [they] manage money by complete[ly] disengag[ing] from pooled investment vehicles like the QP I Fund to actively managed accounts, whereby the Defendants would be *active* participant[s] in the investment process to make certain that *our* investment objectives and parameters are being met through *continuous involvement* with the manager.

PSAMF ¶ 437 (internal quotations omitted); DRPSAMF ¶ 437.[400]

### q. The Defendants' Recognition of Their Fiduciary Obligations to Their Investors

The Defendants recognized that securities law prohibited them from:

> (i) employing any device, scheme, or artifice to . . . defraud a client, (ii) making any untrue statement of a material fact to a client or omitting to state a material fact necessary to make the statement made, in light of the circumstances under which they are made, not misleading; (iii) engaging in any act, practice, or course of business which operates or

---

[399]    The Defendants' objection that paragraph 436 is irrelevant is overruled; the paragraph is relevant to the existence of a fiduciary duty. The Goldensons' language in paragraph 436 suggests that the "do not share" instruction was of indefinite duration, *see* PSAMF ¶ 436; the Defendants interpose a qualified response, pointing out that the Defendants informed their investors of the QP I Fund's exposure to Madoff by letter several days later. DRPSAMF ¶ 436. The Court adjusted the assertion of paragraph 436 to reflect this, and deems the Defendants' qualified response to the modified assertion admitted under Local Ruler 56(f), (g).

     In paragraph 437, the Goldensons claim that "[o]n December 19, 2008, the Defendants withdrew $1,000,000 in incentive fees from the QP I Fund, despite the fact that the fund as a whole lost 33.11% of its value in 2008 alone." PSAMF ¶ 437 (citing *Conroy Supplementation* at 3 and *McCloskey Decl.* Ex. XX (ECF No. 211-34) (Jan. 15, 2009) (*January 2009 Flash Report*)). The Court may not consider the Conroy Supplementation for summary judgment purposes, *supra* note 382, and the January 2009 Flash Report does not support the assertion. *See January 2009 Flash Report*. The Court does not credit paragraph 438.

[400]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty.

would operate as a fraud or deceit upon a client; or (iv) engaging in any manipulative act or practice with a client.

PSAMF ¶ 440; DRPSAMF ¶ 440.[401]

The Defendants informed the Goldensons on March 27, 2003 that SMC, L.P. had registered as an Investment Advisor with the SEC because it served as an investment manager to pooled investment funds, including the QP I Fund. PSAMF ¶ 441; DRPSAMF ¶ 441.[402] According to the Defendants' policies,

> [a]s an investment adviser, Spring Mountain Capital, LP, and its non-investment adviser affiliates . . . stand in a position of trust and confidence with respect to our clients. Accordingly, we have a fiduciary duty to place the interests of the clients before the interests of SMC and our Employees.

PSAMF ¶ 442; DRPSAMF ¶ 442.[403]

The Defendants acknowledged that their fiduciary obligations to their investors required them to, among other things:

> (i) render disinterested and impartial advice; (ii) make suitable recommendations to clients in light of their needs, financial circumstances and investment objectives; (iii) exercise a high degree of care to ensure that adequate and accurate representations and other information about investments are presented to clients; (iv) have an adequate basis in fact for any and all recommendations, representations, and forecasts; (v) refrain from actions or transactions that conflict with interests of any client, unless [they] have first

---

[401] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 440. The Court deems paragraph 440 admitted under Local Rule 56(f), (g).

[402] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 441. The Court deems paragraph 441 admitted under Local Rule 56(f), (g).

[403] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the relevant portion of the qualification is legal argument and does not change the substance of paragraph 442. *See* DRPSAMF ¶ 442. The Court deems paragraph 442 admitted under Local Rule 56(f), (g).

disclosed the conflict to the client and the client has (or may be considered to have) waived the conflict; and (vi) treat all clients fairly and equitably.

PSAMF ¶ 443; DRPSAMF ¶ 443.[404]

The Defendants recognized that they had fiduciary duties "[t]o have a reasonable, independent basis for the investment advice provided," to their clients and the "duty to be loyal" to their clients. PSAMF ¶ 444; DRPSAMF ¶ 444.[405] The Defendants acknowledged that they are subject to state fiduciary duty laws in those states where they conduct business or have clients and that, as an investment advisor, they are subject to "common law fiduciary standards." PSAMF ¶ 445; DRPSAMF ¶ 445.[406] The Defendants reiterated their fiduciary obligations to their investors in the wake of the Madoff arrest, assuring them on January 7, 2009 that

> [t]he decision to dramatically change the way we manage hedge fund capital was not an easy one. It involves a comprehensive change in the way we manage money; but we firmly believe that it is the responsible thing to do as fiduciaries of the assets that you have placed under our care.

PSAMF ¶ 446; DRPSAMF ¶ 446.[407]

---

[404] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification is legal argument and does not change the substance of paragraph 443. *See* DRPSAMF ¶ 443. The Court deems paragraph 443 admitted under Local Rule 56(f), (g).

[405] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification is legal argument and does not change the substance of paragraph 444. *See* DRPSAMF ¶ 444. The Court deems paragraph 444 admitted under Local Rule 56(f), (g).

[406] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification is legal argument and does not change the substance of paragraph 445. *See* DRPSAMF ¶ 445. The Court deems paragraph 445 admitted under Local Rule 56(f), (g).

[407] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a fiduciary duty. The Defendants also interpose a qualified response, but the qualification is legal argument and does not change the substance of paragraph 446. *See* DRPSAMF ¶ 446. The Court deems paragraph 446 admitted under Local Rule 56(f), (g).

Mr. Merkin recognized that he had fiduciary duties to Ascot investors. PSAMF ¶ 447; DRPSAMF ¶ 447.[408]

### r.     What the Defendants Did Not Tell the Goldensons

At no time before, during, or after the Goldensons' investments in the QP I and Ascot funds did the Defendants reveal that: (1) Mr. Madoff was involved in the management and/or execution of Ascot's trading strategy in any way, much less that he managed substantially all of Ascot's funds and executed substantially all of its trades; (2) that the split-strike strategy was Mr. Madoff's trading strategy, not Mr. Merkin's; (3) that Ascot was a feeder fund to Mr. Madoff or that almost all of its funds were invested with Mr. Madoff; (4) that Mr. Madoff had custody of substantially all of Ascot's funds and cleared all of the trades he executed on behalf of Ascot himself; (5) that the success of Ascot depended on Mr. Madoff's unique purported ability to trade options, not Mr. Merkin's proprietary software or skill; or (6) that Mr. Madoff had final say on all of Ascot's trading decisions. PSAMF ¶ 448; DRPSAMF ¶ 448.[409]

Had the Goldensons known the facts detailed above prior to their initial investment, they would not have invested in Ascot, in part because they would not

---

[408]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' aiding and abetting and conspiracy claims.  The Court adjusted the Goldensons' paragraph 447 to clarify that Mr. Merkin acknowledged his fiduciary duties to investors specifically in his own Ascot Fund. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[409]     The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a common law fiduciary duty and the alleged Rule 10b-5 violation.  The Defendants also object that paragraph 448 is a summation of earlier statements, but that is not strictly true. Paragraph 448 outlines a list of things that the Defendants never told the Goldensons; it does not assert that those statements are true.  The Court has elsewhere ruled on the substance of each revelation the Defendants allegedly did not make.  *See generally, e.g.*, Section II.B.2.H, *supra* ("Facts About Ascot Unknown to the Goldensons Until 2009").  The Defendants have not controverted the assertion of paragraph 448, so the Court deems the paragraph admitted under Local Rule 56(f), (g).

have been willing to pay Mr. Merkin's high fees just to be able to hand their money over to someone else. PSAMF ¶ 449; DRPSAMF ¶ 449.[410] Had the Goldensons discovered any of these facts they would have immediately taken their money out of Ascot and Spring Mountain because they would have discovered the publicly available information questioning Mr. Madoff's operations. PSAMF ¶ 450; DRPSAMF ¶ 450.[411] Had the Goldensons discovered that Mr. Madoff, and not Mr. Merkin, was in fact the mastermind behind Ascot's trading strategy,

> it would not have been in keeping with [Mr. Goldenson's] approach to have the money go to somebody who Launny [Steffens] told [him] was the . . . expert, [only to] suddenly be told, well, he really isn't the expert. . . . [I]t's like . . . being referred to a – a brain surgeon and you die on the table. Later you find out the brain surgeon didn't even do it. He had somebody else do it.

PSAMF ¶ 451; DRPSAMF ¶ 451.[412]

---

[410] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a common law fiduciary duty and the alleged Rule 10b-5 violation. The Court dismisses as moot the objection to the use of Professor Laby's testimony to establish what the Goldensons would and would not have done; Mr. Goldenson's deposition transcript alone supports the assertion. *Pl.'s D.G. 2011 Dep. Tr.* 156:7-10 ("Ezra Merkin's proprietary strategy . . . was obviously why they charged such high fees to invest in . . . the Ascot Fund. Investing with still another person, passing through Merkin, would not have been something that I would have done"); *id.* at 197:16-20 ("[I]f, in the beginning, we had been told truthfully where the money was going . . . we would have been free to make a decision . . . in the negative – to invest"). The Defendants deny the assertion, but the record material they cite does not controvert it. *See* DRPSAMF ¶ 449 (citing *id.* ¶¶ 132, 402); *supra* note 126 (discussing DRPSAMF ¶ 132); *supra* note 368 (discussing DRPSAMF ¶ 402). The Court adjusted the assertion by replacing the "the truth" with a reference to Section II.B.2.h, and otherwise deems the modified assertion admitted under Local Rule 56(f), (g).
[411] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a common law fiduciary duty and the alleged Rule 10b-5 violation. The Defendants deny the assertion, but the record material they cite does not controvert it. *See* DRPSAMF ¶ 450 (citing *id.* ¶¶ 305, 449 and *Steffens Decl.* ¶ 31 (describing Mr. Madoff's excellent reputation)); *supra* note 276 (discussing DRPSAMF ¶ 305); *supra* note 410 (discussing DRPSAMF ¶ 449). The Court deems paragraph 450 admitted under Local Rule 56(f), (g).
[412] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a common law fiduciary duty and the alleged Rule 10b-5 violation. The Defendants also deny the assertion. DRPSAMF ¶ 451 (citing *id.* ¶¶ 305, 449-50). The Court has already addressed these objections and denials. *See supra* note 276 (discussing DRPSAMF ¶ 305); *supra* note 410

At no time before, during, or after the Goldensons' investments in the QP I and Ascot funds did the Defendants reveal that: (1) Merrill Lynch, where the Goldensons had been clients for many years, purposefully kept its investors away from Mr. Madoff; (2) the Defendants, as well as Merrill Lynch, were aware of "red flags" concerning Mr. Madoff's operations; (3) Mr. Madoff's simultaneous role as advisor, broker, and custodian of assets exposed investors in Ascot to major risks; or (4) the Defendants and others had concerns about Mr. Madoff's lack of transparency. PSAMF ¶ 452; DRPSAMF ¶ 452.[413] If the Goldensons had subsequently found out any of the foregoing, they would have immediately liquidated their Ascot and Spring Mountain investments. PSAMF ¶ 453; DRPSAMF ¶ 453.[414]

---

(discussing DRPSAMF ¶ 449); *supra* note 411 (discussing DRPSAMF ¶ 450). The Court deems paragraph 451 admitted under Local Rule 56(f), (g).

[413]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a common law fiduciary duty and the alleged Rule 10b-5 violation. Like paragraph 448, paragraph 452 is a list of statements the Defendants allegedly did not make to the Goldensons. The Court has already addressed the underlying substance of these non-statements. *See generally, e.g.*, Section II.B.2.h ("Facts About Ascot Unknown To the Goldensons Until 2009"); Section II.B.2.k.i ("Knowledge Acquired Through Merrill Lynch"); Section II.B.2.l ("The Secrecy Surrounding Madoff's Operations"); Section II.B.2.m ("The Defendants' Knowledge of the Red Flags Raised by Madoff's Operations"). The Defendants have not controverted the assertion of paragraph 452, so the Court deems the paragraph admitted under Local Rule 56(f), (g).

[414]    The Court overrules the Defendants' relevance objection; the paragraph is relevant to the existence of a common law fiduciary duty and the alleged Rule 10b-5 violation. The Court also overrules the Defendants' sham affidavit objection because Mr. Goldenson's affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts. *Gillen*, 283 F.3d at 26; *Net 2 Press*, 266 F. Supp. 2d at 153. The Defendants also deny the substance of paragraph 453, DRPSAMF ¶ 453 (citing *id.* ¶¶ 305, 449 and DSMF ¶ 128); however, the material cited does not controvert paragraph 453. *See supra* note 122 (discussing DSMF ¶ 128); *supra* note 276 (discussing DRPSAMF ¶ 305); *supra* note 410 (discussing DRPSAMF ¶ 449). The Court deems paragraph 453 admitted under Local Rule 56(f), (g).

### s. The Goldensons Learn Previously Unknown Facts About Ascot and QP I

The Goldensons learned for the first time that the Defendants were aware that Ascot was a "feeder fund" to Mr. Madoff by reading a January 6, 2009 article in *The Dartmouth* magazine. PSAMF ¶ 454; DRPSAMF ¶ 454.[415] The article also stated that Messrs. Steffens and Ho had founded Spring Mountain Capital with Mr. Merkin in 2001 and that the Defendants would not sue Mr. Merkin because, according to Mr. Ho, Spring Mountain was fully aware of Ascot's investment in Madoff Securities: "I don't understand those assertions by other people because we asked and were given th[at] information." PSAMF ¶ 455; DRPSAMF ¶ 455.[416]

### t. The Goldensons' Emotional Distress

Learning the truth "turned [the Goldensons'] life upside down and it created ongoing stress that has continued to this day." PSAMF ¶ 456; DRPSAMF ¶ 456.[417] The news that Ascot was not what had been represented to them had a

---

[415] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny paragraph 454, arguing that Mr. Merkin testified that he told Mr. Goldenson about Mr. Madoff's role in Ascot. DRPSAMF ¶ 454 (citing DRPSAMF ¶¶ 191, 305, 416). However, the Court already ruled that Mr. Merkin did not tell Mr. Goldenson about Mr. Madoff's role in Ascot. *See supra* note 374. The Defendants' material in response to paragraphs 305 and 416 likewise does not controvert the assertion. *See supra* note 276 (discussing DRPSAMF ¶ 305); 380 (discussing DRPSAMF ¶ 416). The Court deems paragraph 454 admitted under Local Rule 56(f), (g).

[416] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 455. The Court deems paragraph 455 admitted under Local Rule 56(f), (g).

[417] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny the assertion, presenting a large quantity of evidence to suggest that the financial impact of the Goldensons' QP I and Ascot losses was minimal. DRPSAMF ¶ 456. However, this does not speak to the assertion. The Goldensons claim, and a fact-finder could reasonably accept, that "[l]earning the truth" is what "turned [their] life upside down" and "created ongoing stress." PSAMF ¶ 456. It is not the financial loss, in this assertion, that causes the stress; it is the alleged discovery of a betrayal of trust. The Defendants do not controvert paragraph 456, and the Court deems the paragraph admitted under Local Rule 56(f), (g).

"devastating" effect on the Goldensons and was a "constant topic" of discussion. PSAMF ¶ 457; DRPSAMF ¶ 457.[418] The impact of the Defendants' actions on their health has been harder than their loss of wealth:

> [T]o have such faith in the trust and integrity of a person like Launny Steffens and . . . to be sold down the river . . . really destroyed [the Goldensons] and it was a combination not just of the loss of the money, but the fact that a good friend could screw [them] to that extent by withholding truthful, honest information about what the Ascot investment was all about.

PSAMF ¶ 458; DRPSAMF ¶ 458.[419]

### i. Mr. Goldenson's Emotional Distress

Mr. Goldenson suffers from a long history of depression and takes antidepressants every day. PSAMF ¶ 460; DRPSAMF ¶460.[420] One of the reasons that Mr. Goldenson was "very cautious and conservative about investments was that the stock market never meshed well with depression because when . . . [Mr.

---

[418] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny paragraph 457, DRPSAMF ¶ 457 (citing *id.* ¶ 456), but the denial fails for the same reasons discussed above. *See supra* note 417 (discussing DRPSAMF ¶ 456). The Court deems paragraph 457 admitted under Local Rule 56(f), (g).

[419] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny paragraph 458, DRPSAMF ¶ 458 (citing *id.* ¶ 456), but the denial fails primarily for the same reasons discussed above. *See supra* note 417 (discussing DRPSAMF ¶ 456). The Defendants also dispute that the Goldensons were close to Mr. Steffens, pointing out that the Goldensons knew Mr. Steffens for less than two years when they first invested in QP I. DRPSAMF ¶ 458. However, this does not speak to the relationship between the Goldensons and Mr. Steffens after they had known each other for almost ten years, by early 2009. The Defendants have not controverted paragraph 458, and the Court deems the paragraph admitted under Local Rule 56(f), (g).

In paragraph 459, the Goldensons claim that "[s]ince Madoff's arrest, the Goldensons 'have had three years that nobody would want to have in . . . any part of their life, least of which between age 64 and 67. . . . [The Goldensons] thought [they] were ready to live in some degree of retirement.'" PSAMF ¶ 459 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 229:12-16); DRPSAMF ¶ 459. The Defendants deny this statement. DRPSAMF ¶ 459 (citing DRPSAMF ¶ 456). This statement is speculative and subjective, and the Court does not credit it.

[420] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also interpose a qualified response, but the qualification does not change the substance of paragraph 460. The Court deems paragraph 460 admitted under Local Rule 56(f), (g).

Goldenson's] mood went down, [he] would want to sell everything." PSAMF ¶ 461; DRPSAMF ¶ 461.[421] Mr. Goldenson told Mr. Steffens about his depression because it "was a big theme with [him and] . . . because it was part of [him]." PSAMF ¶ 462; DRPSAMF ¶ 462.[422]

Prior to the revelation of the connection between Ascot and Mr. Madoff, Mr. Goldenson's depression was under control and manageable, except for certain episodes. PSAMF ¶ 463; DRPSAMF ¶ 463.[423] Mr. Goldenson "had a terrible response" to learning the new facts about Ascot, which "absolutely threw [him] into a terrible state of mind" where he became overly ruminative and anxious. PSAMF ¶ 464; DRPSAMF ¶ 464.[424] Mr. Goldenson was especially "devastated . . . [b]ecause

---

[421] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny paragraph 461, but their denial does not controvert the assertion. *See* DRPSAMF ¶ 461 (citing *id.* at ¶ 132). The Court, viewing all the evidence in a light most favorable to the Goldensons, concludes that the relationship between Mr. Goldenson's depression and his investment choices is as he presented it. *See also supra* note 126 (discussing DRPSAMF ¶ 132). The Court deems paragraph 461 admitted under Local Rule 56(f), (g).

[422] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants deny paragraph 462 to the extent that it suggests Mr. Steffens was Mr. Goldenson's "investment advisor," and also deny that Mr. Goldenson told Mr. Steffens about his depression. DRPSAMF ¶ 462 (citing *id.* ¶ 137 and *Steffens Reply Decl.* ¶ 6). The Court adjusted the assertion to remove the conclusory reference to an "investment advisor." However, the Court credits Mr. Goldenson's testimony and concludes that Mr. Goldenson did tell Mr. Steffens about his depression. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[423] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants interpose a qualified response, but the qualification does not change the substance of paragraph 463. However, the Court has removed the Goldensons' reference to "[p]rior to the Defendants' fraud . . ." as conclusory. The Court deems the modified assertion admitted under Local Rule 56(f), (g).

[424] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny paragraph 464, claiming that Doctor Spitz's testimony does not support it. DRPSAMF ¶ 464 (citing *McCloskey Decl.* Ex. JJ *Videotaped Dep. of Steven J. Spitz, M.D.*, at 52:16-17, 55:24-57:15, 56:7-14, 84:22-85:11 (ECF No. 211-32) (Mar. 20, 2012) (*Spitz Dep. Tr.*)). However, Doctor Spitz testified that Mr. Goldenson had "six, possibly seven" of the eight symptoms of a "major depressive disorder" during the time that Doctor Spitz treated Mr. Goldenson, of which only five are required for a diagnosis. *Spitz Dep. Tr.* 53:4-5, 51:11-22. He also said that "Dan [Goldenson's] would have been severe," presumably referring to the "major depressive

he trusted Lonnie. And he followed up . . . on this all the time." PSAMF ¶ 465; DRPSAMF ¶ 465.[425] Mrs. Goldenson also believes that Mr. Goldenson was "devastated" because "he . . . was told such a pack of stories about the investment strategy of Merkin, and it was just unbelievable to us." PSAMF ¶ 465; DRPSAMF ¶ 465.[426]

Mr. Goldenson lost the "staying power" in his business affairs that he had prior to his Ascot loss and "[i]t was everything he could do just to get himself out of bed." PSAMF ¶ 466; DRPSAMF ¶ 466.[427] Mr. Goldenson's depression following Mr. Madoff's arrest was the "most severe" in which Dr. Spitz had seen him since he began treating Mr. Goldenson in 2005. PSAMF ¶ 467; DRPSAMF ¶ 467.[428]

---

disorder" to which he referred immediately prior. *Id.* at 51:23-52:6. Viewing this evidence in a light most favorable to the Goldensons, the Court concludes that the assertion of paragraph 464 is true. The Court deems paragraph 464 admitted under Local Rule 56(f), (g).

[425] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny the assertion, DRPSAMF ¶ 465 (citing *id.* ¶¶ 456, 458, 464), but the denial fails for the reasons discussed above. *Supra* note 417 (discussing DRPSAMF ¶ 456); *supra* note 419 (discussing DRPSAMF ¶ 458); *supra* note 424 (discussing DRPSAMF ¶ 464). The Court deems paragraph 465 admitted under Local Rule 56(f), (g).

[426] The Court has modified the Goldensons' second assertion in paragraph 465 to avoid directly crediting Mrs. Goldenson's conclusory statement that the Defendants deliberately lied to Mr. Goldenson. Mrs. Goldenson undoubtedly believes that the Defendants lied to Mr. Goldenson and that his "devastation" is a causal result of that lie.

[427] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny the assertion, DRPSAMF ¶ 466 (citing *id.* ¶¶ 456, 458, 464), but the denial fails in part for the reasons discussed above. *Supra* note 417 (discussing DRPSAMF ¶ 456); *supra* note 419 (discussing DRPSAMF ¶ 458); *supra* note 424 (discussing DRPSAMF ¶ 464). The Defendants also point out that Dr. Spitz testified that at one point during one of his low periods, Mr. Goldenson attended a conference that was frustrating, which contributed to his depression. DRPSAMF ¶ 65 (quoting *Spitz Dep. Tr.* 61:12-16). However, viewing Dr. Spitz's testimony as a whole, the Court concludes that this setback was an aggravating factor, not the primary cause, of Mr. Goldenson's depression and its symptoms. The Court likewise concludes that the alleged fraud by the Defendants was a cause of the depression. *See, e.g.*, *Spitz Dep. Tr.* 57:16-58:20. The Court deems paragraph 466 admitted under Local Rule 56(f), (g).

[428] The Defendants' objection that paragraph 467 is irrelevant is overruled; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also interpose a qualified response to paragraph 467, claiming that Dr. Spitz's testimony does not support the claim that Mr. Goldenson's emotional distress was severe. This qualification fails for the reasons discussed above. *Supra* note

Mr. Goldenson told his psychiatrist that the experience felt "like being raped." PSAMF ¶ 468; DRPSAMF ¶ 468.[429] As a psychiatric matter, the fact that Mr. Steffens concealed important information from Mr. Goldenson concerning his investments coupled with the losses the Plaintiffs suffered as they were approaching retirement caused Mr. Goldenson severe emotional distress. PSAMF ¶ 469; DRPSAMF ¶ 469.[430] Mr. Goldenson's emotional distress was coupled with sleep disturbance, difficulty with initiative, guilt feelings, problematic energy levels, difficulty with appetite, and excessive motor activity. PSAMF ¶ 470; DRPSAMF ¶ 470.[431]

### ii. Mrs. Goldenson's Emotional Distress

The fact that the Defendants' actions caused Mr. Goldenson to go "into a deep depression" in turn affected Mrs. Goldenson's health as well. PSAMF ¶ 471;

---

424 (discussing DRPSAMF ¶ 464). The Court deems the qualified response admitted under Local Rule 56(f), (g).

[429] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Court does not credit the additional material appended to the Defendants' "admitted" response. *Supra* note 23.

[430] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny the assertion, DRPSAMF ¶ 469 (citing *id.* ¶¶ 456, 458, 464), but the denial fails for the reasons discussed above. *Supra* note 417 (discussing DRPSAMF ¶ 456); *supra* note 419 (discussing DRPSAMF ¶ 458); *supra* note 424 (discussing DRPSAMF ¶ 464). The Court deems paragraph 469 admitted under Local Rule 56(f), (g). However, Dr. Spitz's testimony that the alleged fraud "caused" emotional distress that was "severe" is only creditable as a psychiatric conclusion, not as a legal conclusion. The IIED elements of causation and severity are legal conclusions that are not susceptible to resolution in a statement of fact. The Court adjusted the assertion of paragraph 469 to reflect this.

[431] The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim. The Defendants also deny the assertion, DRPSAMF ¶ 470 (citing *id.* ¶¶ 456, 458, 464), but the denial fails for the reasons discussed above. *Supra* note 417 (discussing DRPSAMF ¶ 456); *supra* note 419 (discussing DRPSAMF ¶ 458); *supra* note 424 (discussing DRPSAMF ¶ 464). The Court deems paragraph 470 admitted under Local Rule 56(f), (g).

DRPSAMF ¶ 471.[432]   Mrs. Goldenson is a diabetic and has experienced a "great deal" of "awful" and "horrible" stress as a result of the Defendants' actions.   PSAMF ¶ 472; DRPSAMF ¶ 472.[433]   The number of drugs Mrs. Goldenson takes for her diabetes increased from two to four since Mr. Madoff's arrest.   PSAMF ¶ 473; DRPSAMF ¶ 473.[434]

## III.   DISCUSSION

### A.   Count I:  Breach of Common Law Fiduciary Duty

Count I alleges that the Defendants breached common law fiduciary duties owed to the Goldensons.  *Am. Compl.* ¶¶ 122-28.

The Defendants concede that Maine common law applies to the Goldensons' claim for breach of fiduciary duty.  *Goldenson*, 802 F. Supp. 2d at 251 n.1.  Under Maine law, a defendant cannot be liable for breach of a fiduciary duty unless he stands in a fiduciary relationship to the plaintiff.  *Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 6, 54 A.3d 710.  Consequently, the Court must first determine whether

---

[432]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim.  The Defendants also deny the assertion, arguing that Mr. Goldenson did not "go into a deep depression" and that Mrs. Goldenson's stress was a result of "Mr. Goldenson's 'reaction to the loss of money.'"  DRPSAMF ¶ 471 (quoting *Pl.'s S.G. 2011 Dep. Tr.* 46:23); DRPSAMF ¶ 471.  However, Mrs. Goldenson answered "[o]f course" to the question "[D]id you experience stress as a result of Mr. Goldenson's reaction to the loss of the money?"  *Pl.'s S.G. 2011 Dep. Tr.* 46:22-24.  Viewing this exchange in a light most favorable to the Goldensons, the Court concludes that this "reaction" was in a large part due, not to the loss of money per se, but to betrayal caused by Mr. Steffens' alleged fraud.  *See supra* note 427 (discussing DRPSAMF ¶ 466).  Consequently, Mrs. Goldenson's testimony fully supports the assertion of paragraph 471 and the Defendants have not controverted it.  The Court deems paragraph 471 admitted under Local Rule 56(f), (g).

[433]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim.  The Defendants also deny the assertion, DRPSAMF ¶ 472 (citing *id.* ¶ 471), but the denial fails for the reasons discussed above.  *Supra* note 432 (discussing DRPSAMF ¶ 471).  The Court deems paragraph 472 admitted under Local Rule 56(f), (g).

[434]   The Court overrules the Defendants' relevance objection; the paragraph is relevant to the Goldensons' IIED claim.  The Defendants also deny the assertion, DRPSAMF ¶ 473 (citing *id.* ¶ 471), but the denial fails for the reasons discussed above.  *Supra* note 432 (discussing DRPSAMF ¶ 471).  The Court deems paragraph 473 admitted under Local Rule 56(f), (g).

the summary judgment facts give rise to a fiduciary relationship between the Defendants and the Goldensons—and then, if so, what fiduciary duties were owed and whether the Defendants breached them.

### 1. Existence of a Fiduciary Relationship

#### a. Position of the Parties

##### i. The Defendants

The Defendants argue that a fiduciary relationship does not arise unless there are "'great disparities of position and an uncommon degree of trust and confidence.'" *Motion* at 15 (quoting *Rared Manchester NH LLC v. Rite Aid of N.H., Inc.*, No. 2:10-CV-00203-GZS, 2011 WL 4005304, at *8 (D. Me. Sept. 6, 2011)). First, the Defendants contend that there was no "uncommon degree of trust and confidence" placed in any Defendant, including Mr. Steffens. They argue that "the Goldensons' entire prior course of dealing with Steffens amounted to a handful of social encounters." *Id.* at 16. They insist that the Goldensons did not follow Mr. Steffens when he left Merrill Lynch, but rather maintained their accounts there with their "longtime financial adviser Brian Burns" until 2004, well after they had invested in QP I and Ascot. *Id.* This shows, in the Defendants' view, that "the infrequent, casual social encounters that were the Goldensons' sole interactions with Steffens could not conceivably have given rise to an 'uncommon degree of trust.'" *Id.* at 17 (quoting *Rared Manchester*, 2011 WL 4005304, at *8).

The Defendants also dispute that there was a "disparity of position or influence." *Id.* (quoting *Fitzpatrick v. Teleflex, Inc.*, 763 F. Supp. 2d 224, 231 (D. Me. 2011)). They contend that Maine law requires a "'great disparity; the kind of

disparity that arises from diminished emotional or physical capacity or the letting down of all guards and bars.'" *Id.* (quoting *Fitzpatrick*, 763 F. Supp. 2d at 231) (internal quotations omitted). They point out that Mr. Goldenson was a *Phi Beta Kappa* economics major at Princeton, a sophisticated and successful businessman, and an experienced investor. *Id.* They also point to his "family's enormous wealth" and their use of complex estate planning instruments through their lawyers. *Id.* Finally, the Defendants observe that Mr. Goldenson showed independent initiative in making investment decisions; from funds for instance, in investing in Ascot, Summit, and Eagle, and in withdrawing money without consulting the Defendants. *Id.* at 18-19.

In sum, the Defendants argue that the Goldensons neither placed an uncommon degree of trust and confidence in the Defendants nor suffered from a great disparity of position or influence; therefore, they contend, there was no fiduciary relationship between the Defendants and the Goldensons.[435]

### ii.    The Goldensons

The Goldensons agree with the basic principle that a common law fiduciary relationship arises when one party places trust and confidence in the other, and the one in whom trust is placed enjoys a great disparity of position and influence. *Pl.'s Opp'n* at 14-18. As to uncommon trust and confidence, the Goldensons argue that "[c]ourts routinely recognize that investment advisors hold 'position[s] of trust and

---

[435]    The Defendants' arguments against the existence of fiduciary duties under the 1940 Investment Advisers Act, *Motion* at 19-21, address the nature of the duties owed, not the existence of a fiduciary relationship. The Court addresses the nature of the duties owed in Section III.A.2, *infra*.

owe [their clients] a fiduciary duty.'" *Id.* at 15 (quoting *Rasmussen v. A.C.T. Envt'l Servs.*, 739 N.Y.S.2d 220, 222 (N.Y. App. Div. 2002)). They point to Mr. Goldenson's "'great trust and admiration'" for Mr. Steffens' judgment and industry stature, *id.* (quoting PSAMF ¶ 141), and note that Mr. Goldenson at least subjectively considered Mr. Steffens to be "'above all others'" his investment advisor. *Id.* (quoting PSAMF ¶ 142). The Goldensons argue that they were uncomfortable changing their investment strategy, but Mr. Steffens persuaded them to do so because of his "superior knowledge and his representations that hedge funds were in their best interests." *Id.* at 15. Likewise, they contend that they invested in QP I and Ascot because of their trust and confidence in Mr. Steffens and his representations about the quality of those funds. *Id.* at 15-16.

As to disparity of position and influence, the Goldensons argue that the Defendants "stood in a far superior position than the [Goldensons] with respect to hedge funds and Ascot in particular." *Id.* at 17. In their view, Mr. Steffens knew that Mr. Madoff "essentially managed" Ascot's assets and that Ascot's returns depended solely on Mr. Madoff, but concealed this information from the Goldensons. *Id.* at 17-18. The Goldensons argue that this disparity of knowledge with respect to Ascot and Mr. Madoff fulfills the requirement of disparity of position and influence. *Id.*

### iii.    The Defendants' Reply

In their reply, the Defendants maintain their argument that the Goldensons' contacts with Mr. Steffens prior to their QP I and Ascot investments cannot establish the "uncommon degree of trust" required for a fiduciary relationship.

*Def.'s Reply* at 2-3.  Nor, in the Defendants' view, can the Goldensons' conversations with the Defendants subsequent to those investments.  *Id.* at 3.  The Defendants also dispute that the alleged disparity of knowledge about Ascot between Mr. Steffens and Mr. Goldenson is sufficient to establish a fiduciary relationship.  *Id.* They further highlight Mr. Goldenson's "prodigious business experience," and specifically his proposal to James Straus to start his own hedge fund that would earn "considerably higher" returns than those of Ascot.  *Id.* (quoting DSMF ¶ 20). In the Defendants' analysis, this shows that the Goldensons had not "let down all guards and bars" to the Defendants.  *Id.*

### b.  Analysis

The question of "whether there existed between [the parties] a confidential or fiduciary relationship" is one of fact, not of law.  *Darling v. W. Thrift & Loan*, 600 F. Supp. 2d 189, 205 (D. Me. 2009); *see Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 11 & n.1, 762 A.2d 44 (acknowledging deference to the "findings of the trial court" with respect to the existence of a fiduciary relationship).

In *Morris v. Resolution Trust Corp.*, 622 A.2d 708, 711-12 (Me. 1993), the Maine Supreme Judicial Court sitting as the Law Court held that a jury could rationally have found the existence of a fiduciary relationship when a bank loan agent advised a landowner to use a particular contractor to complete the project for which she received a loan, and to disburse loan funds to the contractor.  The landowner had expressed concern to her loan officer about the contractor's capabilities, and the loan officer "professed superior knowledge of [the contractor's] integrity and work performance."  *Id.* at 712.  The landowner "placed her trust in

that superior knowledge" when she continued to use the contractor, rather than replacing him. *Id.* Unbeknownst to the landowner, the contractor owed money to the bank, and the contractor immediately applied the loan funds against his own delinquency. *Id.* at 711. Although the contractor had suspended work on the project, the loan officer repeatedly assured the landowner that the contractor was continuing to work diligently. *Id.* The Law Court reasoned that, although the landowner may have been a "mature individual[]" who was "[]capable of acting to protect her own interests," there was nonetheless a fiduciary relationship between the loan officer and the landowner because the landowner actually placed trust and confidence in the loan officer and the loan officer had superior knowledge of the contractor's history and performance. *Id.* at 712.

By contrast, the Law Court held that a jury could not reasonably have found a fiduciary relationship when the purchaser of a house followed her bank's suggestion to allow the present owner to perform an inspection to secure a loan guarantee, but the self-inspection failed to reveal serious flaws in the structure. *Stewart*, 2000 ME 207, ¶ 11, 762 A.2d 44. The purchaser consented to the self-inspection with full knowledge that this was irregular and declined to supply her own inspector. *Id.* ¶¶ 5, 12. There was no evidence that she was in a vulnerable or disadvantaged position; she simply made an economic decision to allow the seller to self-inspect the house. *Id.* ¶¶ 4-5, 12. Under the circumstances, the Law Court held that the jury "reasonably could have concluded that [the buyer] placed trust and confidence in the bank," but could not reasonably have concluded that "there was a

great disparity of position and influence." *Id.* ¶ 12. The Law Court distinguished *Morris* on the grounds that the bank in *Stewart* had no special knowledge of or relationship with the seller. *Id.* ¶ 12 n.2.

Here, a fact-finder could reasonably conclude that there was a common law fiduciary relationship between at least Mr. Steffens and the Goldensons. There is ample record evidence that the Goldensons "had great trust and admiration" for Mr. Steffens and subjectively considered him to be their "investment advisor." PSAMF ¶¶ 141-42. As in both *Morris* and *Stewart*, the Goldensons actually placed their trust in Mr. Steffens. And like *Morris*—but unlike *Stewart*—here there is also record evidence that all of the Defendants had knowledge of the relationship between Ascot and Mr. Madoff that was unavailable to the Goldensons. Sections II.B.1.g, II.B.2.k, II.B.2.r, *supra*. That the Ascot COM notified the potential investor that Mr. Merkin could use sub-managers, Section II.B.1.k, *supra*, is immaterial; the Ascot COM did not mention Mr. Madoff, and the Goldensons allegedly had no way to know that Mr. Madoff was involved with Ascot. Section II.B.2.r, *supra*. Given that Ascot was allegedly almost wholly in the business of sub-contracting money management to Mr. Madoff, Section II.B.2.h, *supra*, Mr. Madoff's role is of sufficient magnitude to create a "great disparity" between the Goldensons and the Defendants.

The Defendants cite *Fitzpatrick* for the proposition that a Maine common law fiduciary relationship is beyond the Goldensons' reach, but the facts of *Fitzpatrick* distinguish it from this case. In *Fitzpatrick*, the plaintiff claimed merely that he

acquired a fiduciary relationship with the defendant "by virtue of their respective levels of sophistication in relation to negotiation and sales skills." 763 F. Supp. 2d at 231. The Court held that an arms-length transaction between a manufacturer and a dealer, on its own, does not create a fiduciary relationship, no matter how much "great enthusiasm and excitement" is exhibited by the less sophisticated party. *Id.* But the plaintiff in that case did not allege that the defendant had any special knowledge that he lacked, or even that he had placed unusual trust in the defendant. *Id.* at 226-30. *Fitzpatrick* is therefore entirely inapposite here.

In sum, although the facts are disputed, a fact-finder could reasonably conclude that the Goldensons actually placed trust and confidence in the Defendants, and that there was a great disparity of position and influence in favor of the Defendants. The analysis next proceeds to what duties, if any, arose from this relationship.

### 2. Duties Imposed By the Fiduciary Relationship

#### a. Position of the Parties

##### i. The Defendants

The Defendants argue that, assuming they stood in a fiduciary relationship to the Goldensons, their only fiduciary duties arise under the Maine Uniform Partnership Act, ME. REV. STAT. tit. 31, § 1044 (MUPA). *Motion* at 22. They vigorously dispute the Goldensons' contention, originating in Count I of the Amended Complaint, that the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 *et seq.* (IAA), supplies the applicable duties. *Motion* at 19-21. They argue that the Goldensons did not bring Count I under the IAA, and that no private right of action

exists under the IAA except under very limited circumstances. *Id.* at 19. They further contend that even if the IAA did supply the applicable duties, the IAA would not apply to the Goldensons' direct investment in Ascot because the Defendants did not manage Ascot. They deny the Goldensons' oft-repeated claim that Mr. Steffens and company were "investment advisors" to the Goldensons, arguing that Mr. Steffens' one-time "advice" to Mr. Goldenson about Ascot was not given for "compensation" as required by the IAA. *Id.* at 19-20 (citing 15 U.S.C. § 80b-2(a)(11) (2012)).

Under MUPA, the Defendants contend that they owe duties to the Goldensons only with respect to the QP I investment, and those duties are limited to a duty of loyalty and a duty of care. *Id.* at 22 (citing ME. REV. STAT. tit. 31, § 1044(1)). In the Defendants' view, the duty of loyalty encompasses (1) refraining from stealing property from the partnership, (2) refraining from dealing with the partnership on behalf of a party with an adverse relationship, and (3) refraining from competing with the partnership. *Id.* (citing ME. REV. STAT. tit. 31, § 1044(2)). The duty of care is limited to "'refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of the law.'" *Id.* (quoting ME. REV. STAT. tit. 31, § 1044(3)).

### ii.    The Goldensons

The Goldenson counter that the IAA embraces a pre-existing common law standard of care owed by fiduciaries. *Pl.'s Opp'n* at 18-19. They point to the venerable case of *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 190-91 (1963) for the proposition that the [IAA] "reflects a congressional recognition of

the delicate fiduciary nature of an investment advisory relationship." The Goldensons further argue that the IAA "simply codified the pre-existing common law fiduciary duties investment advisors owe to their clients, it did not create them, and the duties required by the [IAA] arise under the common law." *Pl.'s Opp'n* at 19 (citing *Capital Gains Research*, 375 U.S. at 194).

The Goldensons submit that the IAA defines an "Investment Adviser" as:

> Any person who, for compensation, engages in the business of advising others . . . directly . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(11). They contend that the Defendants fit into this definition because they advised the Goldensons to invest in Ascot as well as QP I for "compensation." *Id.* at 20. They claim that the $2 million loan that Mr. Merkin gave to the Defendants the day after he confirmed the Goldensons' investment in Ascot is one piece of compensation for the Ascot recommendation; others include the benefits the Defendants allegedly realized from their association with Mr. Merkin. *See* Section II.B.2.j.ii, *supra*.

The Goldensons go on to assert that because the Defendants were "investment advisers" to them with respect to Ascot, the Defendants owed them the duties established by the IAA. Specifically, they contend that it is unlawful for the investment advisor "to employ any device, scheme, or artifice to defraud any client or prospective client" and "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

15 U.S.C. § 80b-6. In their view, these strictures apply to the "entire relationship" with the client or prospective client. *Pl.'s Opp'n* at 20.

As to QP I specifically, the Goldensons claim that SEC Rule 206(4)-8 prohibits the Defendants from "'[m]ak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled instrument vehicle.'" *Pl.'s Opp'n* at 21 (quoting 17 C.F.R. § 275.206(4)-8 (2007)).

The Goldensons finally claim that the QP I COM and the SMC, LP Compliance Manual establish additional duties to "identify, evaluate and select managers" and to test and monitor the portfolio and its underlying managers. *Id.* at 21-22. They further claim that the COM and the Compliance Manual established an obligation to provide additional information to investors regarding the fund's operations upon request. *Id.* at 22.

### iii. The Defendants' Reply

In their reply, the Defendants assert that the Goldensons have shown no case in which a fund manager was found to be a fiduciary under the IAA in connection with direct investments in a different fund that he did not manage. *Def.'s Reply* at 4. They limit the reach of SEC Rule 206(4)-8 to the QP I Fund itself, not to the Goldensons' Ascot investment, because the Defendants did not directly manage Ascot. *Id.* Likewise, they contend that the statements in the QP I COM apply only to QP I, not to Ascot. *Id.* at 5. Finally, they deny that the duties outlined in the

Compliance Manual are applicable to the Goldensons because the Goldensons did not have a managed investment account with Spring Mountain Capital. *Id.*

### b. Analysis

At oral argument, the parties battled about whether the IAA creates fiduciary duties that are the same or different than common law fiduciary duties. The Defendants strenuously maintained that the IAA is narrower than typical fiduciary relationships and that it defines "investment adviser" to require that the person giving the advice also make the sale of the investment. The Goldensons equally vociferously contend that the IAA creates a broader rule for investment advisers than for traditional fiduciaries, eliminating the so-called "curbside consult" exception to the creation of a fiduciary relationship. At this point, the Court does not need to resolve whether the Goldensons or the Defendants are correct in their confidently-proclaimed, but diametrically opposed positions.

The definition of "investment adviser" in the IAA does not answer this hotly-contested issue:

> Any person who, for compensation, engages in the business of advising others . . . directly . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(11). In 1987, the Securities and Exchange Commission published an interpretive release to clarify its position on the applicability of the Investment Advisor Act to financial planners, pensions consultants, and other financial service providers:

> Whether a person providing financially related services of the type discussed in this release is an investment adviser within the meaning of the Advisers Act depends upon all the relevant facts and circumstances . . . . A determination as to whether a person providing financial planning, pension consulting, or other integrated advisory services is an investment adviser will depend upon whether such person: (1) Provides advice, or issues reports or analyses, regarding securities; (2) is in the business of providing such services; and (3) provides such services for compensation.

Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, Investment Advisers Act Release No. IA-1092, 52 Fed. Reg. 38,400-01, 38,401-02 (Oct. 8, 1987). Most, if not all, securities brokers who deal with customers fit within this definition.

Under the Defendants' own definition, they were "investment advisers" to the Goldensons for the direct investments the Goldensons made through them in QP I. This alone precludes summary judgment on this basis on the QP I investment. The real battle line is drawn about the investments the Goldensons made directly in Ascot through Ezra Merkin, not through the Defendants, and whether the Defendants may be deemed investment advisers for the Goldensons' investments through another broker.

The Court concludes that the fact that the Defendants did not receive compensation directly from the Goldensons for the Ascot recommendation does not preclude them from being found an "investment adviser" within the meaning of the IAA. In the SEC Release, the following comment appears:

> This compensation element is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee to the total services rendered, commissions, or some combination of the

> foregoing. It is not necessary that a person who provides investment advisory and other services to a client charge a separate fee for the investment advisory portion of the total services.

SEC Release at 38403. Thus, in *United States v. Elliot*, 62 F.3d 1304, 1311 & n.8 (11th Cir. 1995), the Eleventh Circuit held that receiving any "economic benefit," even from a source other than the advisee, is sufficient "compensation" to bring a defendant within the definition of "investment adviser". *See also Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Elliot*).

On this summary judgment record, a fact-finder could reasonably conclude that there was an "understanding between the Defendants and Mr. Merkin that the Defendants would receive compensation or financial benefit from Mr. Merkin or Ascot in exchange for investing in Ascot or directing business to Ascot." *Supra* Section II.B.1.f & n.61 (discussing DSMF ¶ 62). The Goldensons have accumulated sufficient evidence to generate a jury question as to whether the complicated, interwoven financial coziness among Mr. Merkin and the Defendants amounted to such compensation. Even if Mr. Goldenson's subjective belief that Mr. Steffens was his "investment advisor" was otherwise unreasonable, the Defendants were (if the Goldensons' evidence is believed) investment advisors with respect to the Goldensons' direct Ascot investments.

During oral argument, the Defendants strenuously argued that the Third Circuit case of *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013), establishes that under these circumstances, customers like the Goldensons may not maintain a claim under the IAA. However, *Belmont* does not assist the Defendants.

In *Belmont*, the Third Circuit held that a fund and one of its executives did not breach any fiduciary duty arising under the IAA when the executive "touted" another hedge fund to an advisory client and a prospective client, and the hedge fund later turned out to be a Ponzi scheme. 708 F.3d at 479-80, 504-05. The executive had one meeting with the prospective client. *Id.* at 505. Although the executive recommended the hedge fund at that meeting, the prospective client did not make an investment in the hedge fund for approximately two years. *Id.* at 505. The Court held that this one meeting did not give rise to a fiduciary duty under the IAA, and the long delay showed that the prospective client relied only minimally on the advice. *Id.* The Court also held that, assuming the executive did owe a fiduciary duty to the advisory client of his company, he did not breach that duty because there was "no evidence of fraud on the part of [the executive] and no allegation that he benefitted from his recommendation . . . in a manner that would constitute an undisclosed conflict of interest." *Id.*

Unlike the relationship between the executive and the prospective client in *Belmont*, here Mr. Steffens had a relationship with Mr. Goldenson that spanned a number of encounters at which Mr. Steffens allegedly dispensed investment advice. Section II.B.2.b, *supra*. Mr. Goldenson invested in Ascot immediately, Section II.B.2.f, II.B.2.g, *supra*, unlike the prospective client in *Belmont*, who waited two years to make the investment. Although *Belmont* assumed the existence of a fiduciary relationship with the advisory client, it did not hold that such a formal advisor-client relationship was a prerequisite to a fiduciary duty. The facts of this

summary judgment record are less stark than those in *Belmont*, and that case does not bar a reasonable fact-finder from inferring an investment advisor relationship between the Defendants and the Goldensons.[436]

The Goldensons' contention that the IAA "codified the pre-existing common law fiduciary duties investment advisors owe their clients" is, however, a stronger statement of the Supreme Court's view than its opinions allow. In *Capital Gains Research*, the Supreme Court stated that the IAA "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship." 375 U.S. at 191 (internal quotes omitted). The *Capital Gains Research* Court went on to say that its conclusion was "not in derogation of the common law of fraud . . . . To the contrary, it finds support in the process by which the courts have adapted the common law of fraud to the commercial transactions of our society." *Id.* at 192. The Supreme Court went on to say that it could not "assume that Congress, in enacting legislation to prevent fraudulent practices by investment advisers, was unaware of . . . developments in the common law of fraud." *Id.* at 195. The Court wrote that

> even if we were to agree with the courts below that Congress had intended, in effect, to codify the common law of fraud in the Investment Advisers Act of 1940, it would be logical to conclude that Congress codified the common law 'remedially' as the courts had adapted it to the prevention of fraudulent securities transactions by fiduciaries, not 'technically' as it has traditionally been applied in

---

[436]    The Third Circuit's holding as to the advisory client in *Belmont* is inapposite at this stage of the analysis, because the Court's discussion was limited to whether the executive breached an assumed duty—not whether such a duty actually existed. *See* Section III.A.3.b, *infra* (analyzing whether any Defendants breached any fiduciary duties).

damage suits between parties to arm's-length transactions involving land and ordinary chattels.

*Id.* at 195.

Nonetheless, the Supreme Court did recognize that Congress intended to treat investment advisors as fiduciaries, *id.* at 194, and its purpose was to protect both "unsophisticated investors" and "bona fide investment counsel." *Id.* at 191 (internal quotations omitted). To that end, the statute makes certain fraudulent and deceptive behavior by investment advisors unlawful. 15 U.S.C. § 80b-6. It follows that any of these unlawful actions is a breach of a fiduciary duty owed by an investment advisor. Nothing in the statutory language or the purpose of the statute suggests that the duties only attach with respect to funds that the advisor is directly responsible for managing, as the Defendants suggested at oral argument. To the contrary, the statute paints broadly and categorically in all four of its subsections. For instance: "It shall be unlawful for any investment adviser . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *Id.* § 80b-6(1). The statute does not forbid the investment advisor from these actions solely with respect to the funds the investment advisor manages; to the contrary, the purpose of protecting the investor is better served by prohibiting the advisor from engaging in deception with regard to any investment.[437]

---

[437]    *In Morris v. Wachovia Secs., Inc.*, 277 F. Supp. 2d 622, (E.D. Va. 2003), the district court noted that

> [a]ll that need be shown [for a violation of § 80b-6] is that (1) the Defendant is an investment adviser; (2) the Defendant used the mails or any other means or

Furthermore, where the common law provides a cause of action for breach of a duty, statutory law may in some cases supply the duty owed. Even assuming the IAA provides no private right of action, this does not mean that it does not create a standard of care from which a duty arises. *See Belmont*, 708 F.3d at 502-03 (acknowledging the widespread practice of providing a state common law cause of action for breach of a fiduciary duty supplied by the federal IAA). Thus, at a conceptual level, it is possible that the IAA could create a fiduciary duty, breach of which is actionable under the common law of fiduciary duty.

Count I of the Amended Complaint alleges a breach of precisely the standard of care that § 80b-6 establishes—in other words, it alleges a breach of fiduciary duty. Because a fact-finder could reasonably find that Mr. Steffens was an investment advisor to the Goldensons, it follows further that he owed the Goldensons the duties enumerated in 15 U.S.C. § 80b-6.

The same result would arise through the application of the Maine common law of partnerships.[438] Maine law includes a duty of care among those owed by a partner to other partners: "To act with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like

---

instrumentality of interstate commerce, directly or indirectly (3) to make a misstatement or omission of material fact to a client or prospective client; and (4) the Defendant acted negligently.

*Id.* at 644. The Court further observed that "[p]roof of each of these elements would be a violation of § 206(2) [of the IAA, codified at 15 U.S.C. § 80b-6(2)], the subsection of § 206 with the broadest proscriptive reach." *Id.* at 644 n.16.

[438] MUPA is only applicable to partnerships formed after July 1, 2007. ME. REV. STAT. tit. 31, § 1104 (2011). For older partnerships, Maine common law establishes partnership duties. *See Rosenthal v. Rosenthal*, 543 A.2d 348, 352 (Me. 1998).

positions." *Rosenthal*, 543 A.2d at 352. If Mr. Steffens was indeed the Goldensons' "investment adviser" with respect to the direct Ascot investments, then violating the requirements of the IAA would expose Spring Mountain Capital to civil and criminal liability through public enforcement. 15 U.S.C. § 80b-9 (civil); *id.* § 80b-17 (criminal). This would not be a "degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions." Consequently, even if the Defendants were correct that the IAA does not directly create duties actionable in a private suit, the IAA's duties are still effectively applicable to the Defendants and enforceable by the Goldensons by way of Maine partnership law.

As for SEC Rule 206(4)-8, the regulation governs investment advisors to pooled investment vehicles such as QP I, and reaches any statement made "to any investor . . . in the pooled investment vehicle." 17 C.F.R. § 275.206(4)-8. There is little support for the Defendants' contention that Rule 206(4)-8 is applicable only "in connection with investments *made through the pooled vehicle*." *Def.'s Reply* at 4 (emphasis in original). The rule addresses the advisor's statements to the pooled vehicle's investors, but does not necessarily limit its reach to statements made about investments through the pool. There is no reason the rule cannot reach a wrongful statement about a fund in the pool—such as Ascot—where the statement also induced the plaintiff's own direct investment. *See also S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) ("Facts showing a violation of Section 17(a) [of the Securities Act of 1933] or 10(b) [of the Securities Act of 1934] by an

investment adviser will also support a showing of a Section 206 violation"); *S.E.C. v. Quan*, Civil No. 11-723 ADM/JSM, 2013 WL 5566252, at *16 (D. Minn. Oct. 8, 2013) ("[T]he scope of Rule 206(4)–8 . . . is not limited to fraud in connection with the offer, purchase or sale of a security"). The prohibitions of Rule 206(4)-8 are applicable to the Defendants with regard to any advice allegedly given regarding the direct Ascot investments as well as the QP I Fund investments, particularly where Ascot was a "core holding" of QP I.

The Court does not agree that distributing the QP I COM imposed additional fiduciary duties on the Defendants, as the Goldensons appear to contend. *See Pl.'s Opp'n* at 21-22. However, the Goldensons are correct that "[t]he Defendants had fiduciary duties to not make any untrue statements or omit material facts in providing" the information that the QP I COM invites potential investors to request. *Id.* at 22; 15 U.S.C. § 80b-6(1), (2).

In sum, because the Defendants' fiduciary duties arose either directly from the IAA or indirectly by way of Maine partnership law, the Court considers their duties to include those enumerated in 15 U.S.C. § 80b-6 and 17 C.F.R. § 275.206(4)-8.[439] The Defendants owed these duties both with respect to the QP I Fund and to the Goldensons' direct investments in Ascot.

### 3. Breach of Fiduciary Duty

A claim of breach of fiduciary duty requires plaintiff to show that (1) the plaintiff placed trust and confidence in the defendant, (2) there was

---

[439]    To be clear, the IAA does not create the fiduciary relationship; this arises under Maine common law. *See* Section III.A.1.b, *supra*. The IAA supplies some of the duties owed by a fiduciary once such a relationship exists.

a great disparity of position and influence between the parties and favoring the defendant, (3) the defendant engaged in or allowed transactions favorable to the defendant or a third party and adverse to the plaintiff in the course of their relationship, and (4) plaintiff has damages proximately caused by the defendant's breach of fiduciary duty.

*Warner v. Atkinson Freight Lines Corp.*, 350 F. Supp. 2d 108, 124 (D. Me. 2004). The Court addressed the first two elements above, Section III.A.1.b, *supra*; the third and fourth elements remain.

### a.     Position of the Parties

### i.     The Defendants

The Defendants first argue that they breached no fiduciary duty imposed by MUPA. They deny having violated the duty of loyalty by stealing property from the partnership, dealing with the partnership on behalf of an adverse party, or competing with the partnership. *Motion* at 22 (citing ME. REV. STAT. tit. 31, § 1044(2)). They also deny having engaged in any conduct amounting to a violation of the duty of care. *Id.* (citing ME. REV. STAT. tit. 31, § 1044(3)).

As a fallback, the Defendants argue that the IAA imposes only a duty to act in the "'best interest'" of the fund and its investors. *Id.* at 21 n.10 (quoting *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008), *opinion withdrawn*, 573 F.3d 54 (1st Cir. 2009), *reinstated in part*, 597 F.3d 436 (1st Cir. 2010)). The Defendants argue that they met this standard by investing QP I's funds in Ascot "because they thought Ascot was a low-volatility and appropriate investment for QP I" and because they "continu[ed] to monitor QP I's investment in Ascot by reviewing Ascot's trade sheets, audited financials, and performance." *Id.* They point out that

they also had a financial stake in Ascot because of QP I's exposure to Ascot, and that it is "nonsensical" to argue that the Defendants would "sabotage" their own interest by investing in Ascot when it was not in the best interests of the investors. *Id.*

### ii.    The Goldensons

The Goldensons argue that the Defendants had a conflict of interest in recommending Ascot to Mr. Goldenson because of the benefits the Defendants received from associating with and directing business to Mr. Merkin. *Pl.'s Opp'n* at 23. They contend that at least five specific actions breached fiduciary duties owed by the Defendants:

> i)  Identifying Mr. Merkin only as a "consultant" in the QP I Fund's COM and not disclosing the true extent of their relationship with him and Ascot . . .
>
> ii) Failing to give the [Goldensons] "disinterested and impartial advice" about Ascot, a "material" portion of the QP I Fund's portfolio . . .
>
> iii) Representing that the QP I Fund was a diversified "fund of funds" when almost half of the Fund was invested in funds affiliated with Mr. Merkin . . .
>
> iv) Promising QP I investors that they had a "high degree of transparency" in the Fund's positions when they could not square Ascot's strategy with the numbers and did not even know that the QP I Fund's largest holding – Mr. Merkin's Gabriel fund – was thirty percent invested with Madoff . . . and
>
> v) Putting their own personal interests before their investors' despite their representations to the contrary by not bringing claims against Mr. Merkin on their investors' behalf because it "would be like suing [them]selves."

*Id.* at 23 (citing PRDSAMF ¶ 51 and PSAMF ¶¶ 232, 271-74, 363-65, 436, 423, 443).

### iii.     The Defendants' Reply

The Defendants argue that the facts underlying the Goldensons' first alleged breach cannot be true because Mr. Steffens identified Mr. Merkin as his "business partner" and described Ascot as a "core holding" of QP I.  *Def.'s Reply* at 6 (citing PSAMF ¶ 219).  They argue that the second does not apply to QP I, and so is immaterial, and also factually untrue.  *Id.* (citing DRPSAMF ¶ 436).  They contend that the third is untrue because the defendants never "lied" about QP I being a diversified fund of funds; only 18.6% of QP I was invested in Mr. Merkin's funds, and of those funds Gabriel only had a 29% exposure to Madoff.  *Id.* (citing DRPSAMF ¶¶ 270, 274).  They deny that the fourth has any evidentiary support.  *Id.* (citing DSMF ¶¶ 68-70).  Finally, as to the fifth, they deny that they had any fiduciary duty to sue Mr. Merkin.

More generally, the Defendants contend that there is no evidence they "'abused a position of trust'" as to QP I.  *Id.* at 5 (quoting *Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 158 (1st Cir. 2011)).  This is so, they argue, because the QP I Fund earned $864,000 for the Goldensons.  *Id.* (citing DRPSAMF ¶ 180).  They point out that a defendant cannot be liable for breach of fiduciary duty without engaging or allowing transactions "adverse to the plaintiff."  *Id.* at 5-6 (quoting *Warner* 350 F. Supp. 2d at 124).  Because the Goldensons have realized a financial gain from QP I, in the Defendants' view they have not taken any action "adverse to" the Goldensons.  *Id.* at 6.

### b.     Analysis

The Defendants' position rests on the assumption that they had no fiduciary duties with regard to the Goldensons' direct investment in Ascot.  However, as the summary judgment record supports the conclusion that the Defendants were "investment advisors" with regard to the Goldensons' direct investment Ascot, the Defendants' premise is incorrect.  Section III.A.2.b, *supra*.  At the same time, the Goldensons' arguments regarding breach of fiduciary duty are focused exclusively on the Defendants' actions with respect to QP I.

Whatever may be said of the Goldensons' five alleged breaches with regard to the QP I Fund, the summary judgment record shows at least one breach with regard to the Ascot investments.  One of the duties imposed on the Defendants by the IAA was to not "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  15 U.S.C. § 80b-6(2).  Likewise, SEC Rule 206(4)-8 prohibited the Defendants from "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle."  17 C.F.R. § 275.206(4)-8(a)(1).  The Goldensons were first prospective investors and later investors in the QP I Fund, a pooled investment vehicle.  If, as the Goldensons claim, the Defendants misrepresented the fact that Ascot was run by Mr. Merkin using his own "proprietary" strategy, and if they further failed to disclose their knowledge that Ascot was primarily a feeder fund to Mr. Madoff, Sections II.B.2.f, II.B.2.h, *supra*, then these statements would violate

both the IAA (as a transaction that operates as a deceit) and the SEC Rule (as an untrue statement of a material fact and as a deceptive omission of a material fact). These actions benefited the Defendants, Section II.B.2.j.ii, *supra*, and they were adverse to the Goldensons. Section II.B.2.p-t, *supra*. The Goldensons' losses were proximately caused by the breach because the losses were foreseeable at the time of the alleged misrepresentations. Section II.B.2.m, k, *supra*.

Because the record shows at least one set of facts that support a claim for breach of fiduciary duty, the Court need not analyze the Goldensons' other claimed breaches.

### 4. Conclusion as to Count I

The Goldensons have adduced evidence from which a fact-finder could reasonably conclude that the Defendants had a fiduciary relationship with the Goldensons; that the IAA imposed fiduciary duties on the Defendants; and that the Defendants committed at least one breach of those duties. Therefore, the Court denies summary judgment on Count I.

### B. Count VI: Securities Fraud

In Count VI the Goldensons claim that the Defendants are liable for securities fraud under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (Rule 10b-5). *Am. Compl.* ¶¶ 151-61. In order to succeed on their claims under Rule 10b-5, the Goldensons must establish six elements: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 756 (1st Cir. 2011).

The Defendants argue that they are entitled to summary judgment on Count VI because the Goldensons' claims are time-barred. *Motion* at 24-27. In the alternative, they argue that the Goldensons' claim fails on its merits. *Id.* at 28-33. *Id.* This is so, according to the Defendants, because there is no evidence of an actionable misstatement by any Defendant. *Id.* at 28-31. The Defendants also argue that there is no evidence of scienter in any alleged misstatements by Mr. Steffens. *Id.* at 31-33. The Court will address each of these grounds for summary judgment in turn.

### 1. Whether Count VI Is Time-Barred

Actions under 15 U.S.C. § 78j(b) are subject to the limitations period of 28 U.S.C. § 1658(b). Section 1658(b) requires that the action be "brought not later than . . . 5 years after [the] violation." This is a statute of repose, not a statute of limitations. *Goldenson*, 802 F. Supp. 2d at 257-58. The event that triggers the beginning of this period is the misrepresentation by the defendant, not the plaintiff's discovery of the misrepresentation or the harm. *Id.* at 258. The Goldensons filed their first complaint in this case on October 27, 2010; consequently, any misrepresentation made by the defendants prior to October 27, 2005 would normally not be actionable.

However, in denying the Defendants' Motion to Dismiss as to Count VI, the Court recognized an exception to the five year statute of repose. When "the alleged misrepresentations . . . came from a common group of defendants in pursuit of a

common scheme, . . . none of the misrepresentations is time-barred if any of them occurred within the period of repose." *Id.* at 259 (citing *Take-Two Interactive Software, Inc. v. Brant*, No. 06 Civ. 05279(LTS), 2010 WL 1257351, at *6 (S.D.N.Y. Mar. 31, 2010); *In re Dynex Capital, Inc., Sec. Litig.*, No. 06 Civ. 1897(HB), 2009 WL 3380621, at *18 (S.D.N.Y. Oct. 19, 2009); *Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008); *In re iBasis, Inc. Derivative Litig.*, 532 F. Supp. 2d 214, 221 (D. Mass. 2007); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 338 (D. Mass. 2005)). That decision remains the law of this case; the parties now dispute whether the summary judgment record shows facts that bring the Defendants' statements before October 27, 2005 into the exception.

### a.   Position of the Parties

### i.   The Defendants

The Defendants apparently concede that they are a "common group" for the purpose of the exception to the statute of repose. *See Motion* at 26-27; *Def.'s Reply* at 6-8. They contend, however, that any alleged misstatements prior to October 27, 2005 were not part of a "common scheme" with those statements that occurred within the repose period. *Id.*

In support of this position, the Defendants argue that the word "scheme" implicates subsections (a) and (c) of Rule 10b-5, but not subsection (b). Subsection (b) covers "any untrue statement of a material fact" or the omission of a material fact, 17 C.F.R. § 240.10b-5(b); subsections (a) and (c) cover "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *Id.* § 240.10b-5(a), (c). The

Defendants cite the Court's denial of their motion to dismiss for the proposition that the Goldensons' "10b-5 claim rests exclusively on alleged misstatements and omissions by the Defendants." *Motion* at 27 (citing *Goldenson*, 802 F. Supp. 2d at 260-61). They also present caselaw from other circuits holding that misstatements and omissions giving rise to liability under subsection (b) are not enough, on their own, to be actionable under subsections (a) and (c). *Id.* at 26-27 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) and *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)). Adding all this together, they conclude that because the summary judgment record shows, at worst, a series of misstatements and omissions, it cannot establish "scheme liability" under subsections (a) and (c), and cannot bring the Defendants into the "continuing fraudulent scheme" exception to the statute of repose. *Id.*

### ii.    The Goldensons

The Goldensons dispute that the "continuing fraudulent scheme" exception requires, as a predicate, that a plaintiff allege and prove "scheme liability." *Pl.'s Opp'n* at 26-27. They contend that the focus of the repose analysis is the last misrepresentation made. *Id.* at 27 (citing *Goldenson*, 802 F. Supp. 2d at 259, and *Quaak*, 357 F. Supp. 2d at 337). Because the focus is on the last misrepresentation, the Goldensons argue that it is illogical to require the plaintiff to show something other than misrepresentation under Rule 10b-5. *Id.*

The Goldensons cite a recent case from the Southern District of New York for the theory that "an investment advisor to a Madoff feeder had a 'continuing duty to disclose its true concerns [about Madoff] so as to render prior statements of opinion

176

not misleading during the time period Madoff was making trades with Plaintiffs' money.'" *Id.* at 25 (quoting *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324 (S.D.N.Y. 2012)). They interpret *In re Beacon Assocs.* to hold that because the plaintiffs in that case had invested in a feeder fund that was "'closely associated with an alleged fraud—namely, [the investment advisor's] misrepresentations about Madoff throughout'" their relationship with the plaintiffs, "'the period of repose did not begin to run until, at the earliest, December 11, 2008'" (the date of Mr. Madoff's arrest) because of the defendant's continuing material omissions. *Id.* (quoting *In re Beacon Assocs.*, 282 F.R.D. at 324-25).

The Goldensons argue that the Defendants were "closely associated" with Mr. Merkin's alleged fraud because "Mr. Merkin was the Defendants' founder, creditor, owner, partner and investment advisor." *Id.* at 25. Furthermore, the subject matter of the alleged misrepresentations was Mr. Merkin and his hedge fund, Ascot. *Id.* The Defendants cite the 2006 Ascot COM as an example of a misrepresentation made regarding Ascot within the repose period. *Id.* (quoting *Frawley Decl.* Ex. EEE *Third Am. and Restated Limited Partnership Agreement of Ascot Partners, L.P.*, at JEM-GOLD0000572 (ECF No. 214-55) (Oct. 1, 2006) (*2006 Ascot COM*)) ("All decisions with respect to the management of [Ascot] are made exclusively by J. Ezra Merkin") and PSAMF ¶ 317 (stating that the "true advantage" of Ascot is Mr. Madoff's purported trading ability)).[440]

---

[440] The Goldensons' opposition memo cited to PSAMF ¶¶ 317-21, but those paragraphs do not address the contents of any Ascot COMs. Paragraphs 244 and 245 of the Goldensons' additional

The Goldensons also point to a variety of statements by the Defendants in the QP I "COMs" as misleading. *Id.* at 26 (citing PRDSMF ¶¶ 51, 66 and PSAMF ¶¶ 226, 228, 232, 246-48, 255-56, 317, 326-27). However, to the extent these paragraphs address the QP I COM, they only refer to the single QP I COM dated October 2001; they do not refer to any later QP I COM, and the Court is not aware of any.

Finally, the Goldensons point to the alleged conversation between Messrs. Goldenson and Steffens in January, 2008, *id.*, in which Mr. Steffens "allayed [Mr. Goldenson's] concerns" about Ascot "by telling Mr. Goldenson how steady and reliable Ascot was even in this down market." PSAMF ¶ 399. They assert that because they chose to liquidate only $300,000 of their holdings in Ascot in reliance on Mr. Steffens' assurances, the misrepresentation was continuing in its effect. *Pl.'s Opp'n* at 26.

### iii.    The Defendants' Reply

The Defendants observe that the QP I COM on which the Goldensons rely for proof of misleading statements in the repose period was issued in 2001, outside the repose period. *Def.'s Reply* at 6-7. They point out that the 2006 Ascot COM did not contain statements by any of the Defendants. *Id.* at 7. They further argue that any advice Mr. Steffens gave Mr. Goldenson in 2008 is irrelevant because Rule 10b-5 only covers fraud in connection with the purchase of securities; it does not reach

material facts introduce the 2006 Ascot COM. The quoted language is not in either paragraph, but the Court located it in the document.

fraudulent inducement to not sell securities. *Id.* (citing *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977)).

As to *In re Beacon Associates*, the Defendants argue that the case was wrongly decided and is not binding authority on this Court. *Id.* "Treating a defendant's alleged failure to correct prior misrepresentations as a recurring triggering event for purposes of § 1658(b)(2) would eviscerate the statute of repose." *Id.*

Finally, the Defendants claim that, even if they made an actionable misrepresentation after October 27, 2005, only a purchase made in reliance on that particular misrepresentation would be timely. *Id.* at 8.

### b.    Analysis

First, the Defendants are incorrect that the continuing fraudulent scheme exception to the statute of repose requires "scheme liability" under Rule 10b-5(a) or (c). The *Quaak* Court applied the continuing fraudulent scheme exception, using the word "scheme," to a fraudulent misrepresentation claim arising under Rule 10b-5(b):

> Plaintiffs have alleged a primary violation of Rule 10b-5 by defendant through its participation in a manipulative or deceptive scheme intended to mislead investors. Integral to the violation of Rule 10b-5 through this fraudulent scheme is the fraudulent misrepresentation by L & H, improperly recognizing revenue. Under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation, and the unique role of the defendant in this particular scheme does not affect this rule. Thus, the period of repose in this case was triggered on June 30, 2000, the date of L & H's last allegedly false financial statement.

*Quaak*, 357 F. Supp. 2d at 338. Likewise, this Court held that "[b]ecause the alleged misrepresentations in this case came from a common group of defendants in pursuit of a common scheme . . . none of the misrepresentations is time-barred if any of them occurred within the period of repose." *Goldenson*, 802 F. Supp. 2d at 259. The Court concludes—as it did before—that the exception applies to allegations of fraudulent misrepresentation under Rule 10b-5(b).

The Defendants are correct regarding the Goldensons' specific allegations of misrepresentations within the repose period in their opposition brief. The QP I COM to which the Goldensons cite was issued in 2001, well outside the repose period. It cannot serve to establish a continuing fraudulent scheme occurring within the repose period. The 2006 Ascot COM was not written by any defendant in this case, nor does it contain any representation attributable to a defendant.[441] The 2008 conversation between Mr. Goldenson and Mr. Steffens, standing alone in the repose period, would not be enough to establish a continuing fraudulent scheme. At any rate, Rule 10b-5 only applies to fraud that induces the purchase or sale of securities, not fraud that induces an owner to decline to purchase or sell securities. *See Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 414 (1st Cir. 1989). Finally, the Court is wary of embracing any continuing duty to correct prior misrepresentations as an entrée into the exception. If every fraudulent

---

[441] It is conceivable that the 2006 Ascot COM could be a misrepresentation within the repose period, for the purpose of applying the continuing fraudulent scheme exception, if the Court considered Mr. Merkin's statements to be part of the "scheme" as well as those of the Defendants. However, the Goldensons have not asked for that result, and at any rate it is not necessary to bring them within the exception.

misstatement carried with it a continuing duty to correct, creating an infinite procession of triggering events, the statute of repose would be eviscerated.

However, the summary judgment record does show genuine disputes of fact that, if resolved in the Goldensons' favor, would demonstrate material misstatements within the repose period. Between 2005 and 2008, Mr. Goldenson spoke regularly with Messrs. Steffens and Ho regarding the performance of Ascot. PSAMF ¶¶ 382-86. These conversations included discussions of "why it had performed a certain way in current market conditions." *Id.* ¶ 386. The Defendants assured Mr. Goldenson that they were "closely monitoring" Ascot. *Id.* ¶ 387. But the Defendants never revealed the one, critical piece of information that Mr. Goldenson claims was omitted at the outset: that Ascot's trading was handled, virtually in its entirety, by Bernie Madoff. *Id.* ¶ 388. Indeed, if the Goldensons' evidence is believed, the Defendants had no knowledge of Ascot's actual trading strategy—because Ascot's strategy was Mr. Madoff and Mr. Madoff's "trading" was a secret. Section II.B.2.l, *supra* (describing the secrecy surrounding Mr. Madoff's trading); Section II.B.2.k (describing the Defendants' knowledge of Mr. Madoff's connection to Ascot). Under these circumstances, the Defendants could not have honestly explained "why [Ascot] had performed a certain way in current market conditions," and the Defendants could not honestly claim to be "closely monitoring" Ascot.

Furthermore, there are genuine disputes as to whether the Goldensons "consulted with" the Defendants regarding their direct investments in Ascot in

2006, 2007, and 2008. Section II.B.1.l, *supra*. If a fact-finder found that the Goldensons did consult with the Defendants regarding those investments, the fact-finder could also reasonably conclude that the failure to identify Mr. Madoff as the source of Ascot's performance was a material omission without the period of repose.

All of these facts connect with the earlier facts to form a common scheme that extended into the period of repose. Viewing the evidence in a light most favorable to the Goldensons, the common scheme began in 2001 when Mr. Steffens and Mr. Merkin convinced Mr. Goldenson to invest in Ascot without revealing that Ascot was almost wholly a pass-through vehicle to Mr. Madoff. It continued as Mr. Goldenson consulted with Mr. Steffens and Mr. Ho, with the Defendants continuing to make assertions about Ascot that were either misleading or outright untrue. Some of these later misrepresentations and omissions occurred after October 27, 2005.

Consequently, Count VI is not time-barred. The alleged misrepresentations came from a common group of defendants in pursuit of a common scheme, and some of the misrepresentations occurred within the period of repose. *Goldenson*, 802 F. Supp. 2d at 259.

### 2. Commission of Federal Securities Fraud by Defendants Other Than Mr. Steffens

#### a. Position of the Parties

##### i. The Defendants

The Defendants argue that neither Mr. Ho nor the entity Defendants (non-Steffens Defendants) made any actionable misstatement. *Motion* at 28-29. In their

view, the Goldensons have adduced only one possible misstatement by non-Steffens Defendants: the assertion in the QP I COM that the Defendants monitored QP I's investments. *Id.* at 28. As to Ascot, they claim that "the undisputed evidence is that . . . Defendants reviewed Ascot's trade sheets, audited financials, and performance history, and spoke regularly with Merkin and his employees." *Id.* They also claim that the statement that "the success of QP I depended on its submanagers" was "plainly true as to Ascot." *Id.*

The Defendants also dispute that the statements in the QP I COM are material to fraud under Rule 10b-5 because Mr. Goldenson testified that he did not rely on them in making his decision to invest in QP I. *Id.* (citing DSMF ¶ 98). They contend that this absence of reliance is "fatal" to the claim. *Id.*

In the Defendants' view, any statements by non-Steffens Defendants after December 14, 2001 concerned only the "performance" of Ascot; these statements were that Ascot was "'performing well,'" was "'reliable,'" was a "'core holding'" of QP I, and that the Defendants were "'pleased with how [Ascot] was contributing to'" QP I's earnings. *Id.* at 29 (quoting DSMF ¶ 120). The Defendants insist that none of these statements was false. *Id.* (citing *Suna v. Bailey Corp.*, 107 F.3d 64, 70-71 (1st Cir. 1997) for the proposition the plaintiffs have the burden to show falsity).

### ii.    The Goldensons

The Goldensons argue that whether the Defendants actually reviewed Ascot's trade sheets is a disputed fact. *Pl.'s Opp'n* at 28. This is so, they argue, because Ascot would not provide position sheets showing that it was a Madoff feeder fund. *Id.* (citing PSAMF ¶ 342). There is, in their view, "no evidence that the Defendants

actually reviewed Ascot's trade sheets." *Id.* The "more sensible inference," they claim, is that the Defendants could not square Ascot's numbers with its strategy but looked the other way because it was profitable. *Id.* at 29.

Next, the Goldensons argue that the QP I COM was misleading when it "'stated that the success of QP I depended on its submanagers.'" *Id.* (quoting *Motion* at 28). In their view, Mr. Madoff's connection to Ascot was so substantial that failing to identify him as a sub-manager in the QP I COM, while literally accurate, was still misleading. *Id.*

Third, the Goldensons dispute the Defendants' contention that Mr. Goldenson did not rely on the QP I COM. *Id.* They point out that he testified that the QP I Fund's "'five-step, top-down investment process" was "'very important' to his decision-making process." *Id.* (quoting PSAMF ¶¶ 226-27). They cite the Supreme Court case of *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) for the proposition that when there is "an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."

Finally, the Goldensons dispute that the Defendants made no false statements during their regular performance calls with Mr. Goldenson. *Id.* at 30. In general, they contend that failing to identify Mr. Madoff as the manager of Ascot's funds was misleading. *Id.* They point to five specific data of which the Defendants allegedly failed to inform Mr. Goldenson:

> i) Madoff managed Ascot, executed and cleared its trades, facts that investors had a right to know "morally speaking," . . . ;

ii) Merrill Lynch specifically kept its investors out of Madoff . . . ;

iii) [The Defendants] had "discomfort" with Madoff's lack of transparency [and] that *Barron's*, one of Wall Street's leading publications, openly questioned Madoff's returns, which the Defendants themselves could not square with Ascot's strategy . . . ;

iv) Madoff's simultaneous role as advisor, broker and custodian of the assets were major risks that the Plaintiffs needed to be aware of . . . ;

v) Madoff and his feeder funds generally had a negative reputation in the hedge fund industry, even though Mr. Merkin acknowledged that Madoff's reputation would be an important consideration to any investor . . . .

*Id.* (citing PSAMF ¶¶ 255-66, 304-29, 345-76, 448-53 and quoting PSAMF ¶¶ 329, 365).

### iii.    The Defendants' Reply

The Defendants reiterate that the QP I COM's statement that it monitored its investments was truthful and not misleading. *Def.'s Reply* at 9. In their view, Mr. Steffens' sworn Declaration that he and his staff monitored Ascot by reviewing its trade sheets and audited financials contradicts the Goldensons' claim that the Defendants did not monitor Ascot. *Id.* (citing DSMF ¶¶ 66-71, 74-76). Because the Goldensons elected not to depose Mr. Steffens during discovery, the Defendants condemn as conjectural the Goldensons' assertion that the Defendants did not monitor Ascot. *Id.* at 9-10 (citing *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

### b.    Analysis

The Defendants argue that the non-Steffens Defendants are entitled to judgment as a matter of law only because there is no evidence of any actionable

misstatement or omission.  *Motion* at 28-29.  The Motion asserts lack of scienter as an alternate ground only as to Mr. Steffens.  *See id.* at 29-33.

"A[n omitted] fact is material if it is substantially likely 'that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  "Information which 'would have assumed actual significance in the deliberations of a reasonable shareholder' is material."  *Id.* (quoting *TCS Indust.*, 426 U.S. at 449).

Whether a statement is material is a mixed question of fact and law.  *TCS Indust.* 426 U.S. at 450; *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005).  "The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *TSC Indust.*, 426 U.S. at 450.  Judgment as a matter of law is only appropriate when "'reasonable minds cannot differ on the question of materiality.'"  *Id.* (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)).

Two sets of potentially misleading statements are attributable to the non-Steffens Defendants: the statements in the 2001 QP I COM, Section II.B.2.g.i.I, *supra*, and the statements of Mr. Ho during his regular performance calls with Mr. Goldenson.  Sections II.B.1.m, II.B.2.n, *supra*.  The Court considers each in turn.

### i. Statements in the QP I COM

"[T]he fact that a statement is literally accurate does not preclude liability under federal securities laws." *Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994). "'Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead . . . .'" *Id.* (quoting *McMahan v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). "'Emphasis and gloss can, in the right circumstances, create liability.'" *Id.* (quoting *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 203 (5th Cir. 1988)).

The QP I COM promised that it "monitor[ed] the portfolio and its underlying managers and [made] adjustments." PSAMF ¶ 226. Mr. Steffens claims that he and his staff reviewed Ascot's trade sheets "over twenty times" during the time QP I was an investor in Ascot, and found "nothing suspicious." DSMF ¶ 70. However, these trade sheets were prepared by Mr. Madoff and had Mr. Madoff's name stamped on them. *Frawley Aff.* Ex. X (ECF No. 214-23) (various dates). This comported with the Defendants' understanding that Mr. Madoff "executed" Ascot's trading "strategy." DSMF ¶ 73. There is a genuine dispute as to whether the Defendants understood Ascot's "strategy" to be the "split-strike" strategy represented by Mr. Merkin or something else. Section II.B.1.g, *supra*; DSMF ¶ 67; PRDSMF ¶ 67. There is also a genuine dispute as to whether the Defendants found anything "out of the ordinary" in Ascot's audited financial statements. Section

II.B.1.g, *supra*; DSMF ¶ 68; PRDSMF ¶ 68. The Defendants also knew that Ascot would not provide position sheets showing it to be a Madoff feeder fund. PSAMF ¶ 342.

Taking all this evidence together, there are genuine disputes of fact as to whether the non-Steffens Defendants actually "monitor[ed] the portfolio and its underlying managers and [made] adjustments" as the QP I COM claimed. The promise to "make adjustments" after "monitoring" suggests that the adjustments will be made if the monitoring uncovers suspicious or dangerous activity. If the fact-finder credits the Goldensons' evidence and draws all reasonable inferences in their favor, it could conclude that the Defendants were aware of suspicious, out of the ordinary activity with regard to Ascot and did not make appropriate adjustments. This omission would be material because a reasonable investor would view it as having "significantly altered the 'total mix' of information made available." *In re Cabletron*, 311 F.3d at 34.

Furthermore, even allowing that the Defendants trusted Mr. Merkin to be responsible for the hedge fund of which he was the owner and nominal manager, DSMF ¶ 72, the Goldensons' evidence also suggests that the Defendants did not substantially "monitor" Ascot as the QP I COM claimed. Although the Defendants knew that Mr. Madoff was responsible for the vast bulk of Ascot's trading activity, and although they may have reviewed the trade sheets that Mr. Madoff prepared for Ascot, they did not make the deeper inquiry into Mr. Madoff's operation that would be reasonable under the circumstances. If a hedge fund is known to be

functionally a shell for another investment instrument, merely reviewing the trading sheets of the shell alone is not "monitoring" in any reasonable sense of the word. *See Lucia*, 36 F.3d at 175-76. A reasonable investor would view this misrepresentation as significantly altering the "total mix" of information available. *In re Cabletron*, 311 F.3d at 34.

Although Mr. Goldenson's deposition testimony is somewhat contradictory, the Court has already ruled that a fact-finder could reasonably conclude that Mr. Goldenson did not rely on the QP I COM when making his initial decision to invest, but did rely on it to later validate that decision before making the investment. *Supra* note 213. This is sufficient to overcome the Defendants' contention that Mr. Goldenson did not rely on the allegedly false statements in the COM.

### ii. Statements by Mr. Ho in Performance Calls

Likewise, the Court cannot conclude as a matter of law that the Goldensons' five enumerated omissions were not misleading. First, there is a genuine dispute of fact as to whether Mr. Ho's regular conversations with Mr. Goldenson were limited to the performance of Ascot. Section II.B.1.m, *supra*; PRDSMF ¶ 122. The Goldensons insist that these calls "include[d] discussions about Mr. Merkin's purported execution of Ascot's trading strategy." PRDSMF ¶ 122. If a fact-finder credited the Goldensons' claim, then Mr. Ho told Mr. Goldenson that Mr. Merkin was "executing" the trading strategy but did not mention Ascot's connection with Mr. Madoff. In this context, the fact-finder could reasonably conclude that the five enumerated omissions were material to a reasonable investor considering further investment in Ascot. *See* Section II.B.1.l, *supra* (documenting genuine disputes as

to whether Mr. Goldenson "consulted with" the Defendants prior to making further investments in Ascot in 2006, 2007, and 2008).[442]

In sum, the non-Steffens Defendants have not carried their burden to show that the summary judgment record entitles them to judgment as a matter of law.

### 3. Commission of Federal Securities Fraud by Mr. Steffens

The Defendants also argue that the summary judgment record entitles them to judgment as a matter of law as to whether Mr. Steffens committed federal securities fraud under Rule 10b-5. The analysis above shows that it does not. As the managing member of Spring Mountain Capital, DSMF ¶ 48, Mr. Steffens is responsible for the QP I COM, which may have contained false or misleading statements. Section III.B.2, *supra*. Furthermore, Mr. Steffens occasionally participated in the performance calls with Mr. Ho and Mr. Goldenson, in which the Defendants may have made false or misleading statements. PSAMF ¶¶ 383-85; Section III.B.2, *supra*. These disputed facts alone would be sufficient to deny summary judgment to Mr. Steffens on Count VI.

---

[442] Mr. Ho made these statements on calls nominally related to the Goldensons' investment in QP I, not Ascot. Whether his statements can be applied beyond QP I is a closer question. However, Rule 10b-5 only requires "a material misrepresentation or omission . . . [in] connection with the purchase or sale of a security." *City of Dearborn Heights*, 632 F.3d at 756. The rule requires material misrepresentation, scienter, "connection," reliance, causation, and economic loss—but it does not require that the material misrepresentation or omission be made with respect to a security that the advisor has a direct pecuniary interest in selling.

Even under the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, a plaintiff need not allege that the advisor directly profited from the transaction to state a claim under Rule 10b-5:

> A complaint must plead six elements to state a claim for securities fraud under Section 10(b) and Rule 10b–5: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.

*City of Dearborn Heights*, 632 F.3d at 756.

The Goldensons also argue, however, that Mr. Steffens committed federal securities fraud on December 14, 2001, when he represented that Ascot was Mr. Merkin's fund, that Ascot used a proprietary trading strategy developed by Mr. Merkin, and that Mr. Merkin executed the strategy personally.

### a.  Position of the Parties

### i.  The Defendants

The Defendants argue that Mr. Steffens' representation to Mr. Goldenson about Ascot was not a misrepresentation under Rule 10b-5. *Motion* at 29-31. They argue that this statement was, in fact, true; Ascot was Mr. Merkin's fund, Mr. Merkin had "primary responsibility for running the money in Ascot," and he had control over what trading strategy Ascot would use and who would execute it. *Id.* at 30. They also claim that the decision in *In re Merkin* in the Southern District of New York holds Mr. Merkin himself not liable for federal securities fraud on substantially identical statements to his own investors; this, in their view, exonerates Mr. Steffens. *Id.* (citing *In re Merkin*, 817 F. Supp. 2d 346 (S.D.N.Y. 2011)).

As to the scienter element, the Defendants argue that the Goldensons have failed to show that Mr. Steffens believed that it was misleading on his part to characterize Ascot as Mr. Merkin's fund without discussing Mr. Madoff. *Id.* at 32. They cite Mr. Steffens' Declaration as evidence that he sincerely believed that

> (1) Merkin was the person who authorized the parameters for Ascot's trading activity, (2) Merkin decided whether or not Ascot would be trading in the first place, or whether it would be out of the market holding cash, (3) Merkin sometimes diverged from Madoff in deciding when Ascot would be in or out of the market, (4) when Ascot was

trading, Merkin closely supervised Madoff's trade execution and discussed it with him, and (5) the use of the split strike strategy, and the use of Madoff, were always subject to Merkin's discretion and continuing reevaluation.

*Id.* at 32. These beliefs, the Defendants claim, were based on Mr. Steffens' own communications with Mr. Merkin. *Id.* at 33 (citing DSMF ¶ 75).

Finally, the Defendants point to the fact that Mr. Steffens himself had substantial investments in Ascot and lost more money on those investments than the Goldensons did. *Id.* They cite *Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 138 (S.D.N.Y. 1994) for the proposition that summary judgment is warranted when "[t]he economic irrationality of the scheme alleged by plaintiff precludes a reasonable inference of intent to agree to commit fraud."

This evidence, in the Defendants' view, shows that the Goldensons cannot prove the scienter element required to establish fraud under Rule 10b-5.

### ii. The Goldensons

The Goldensons distinguish *In re Merkin* on the ground that it was made "without the benefit of an evidentiary record"—in other words, on a motion to dismiss. *Pl.'s Opp'n* at 30-31. Second, they characterize *In re Merkin* as a decision about whether Mr. Merkin "should have discovered Madoff's Ponzi scheme." *Id.* at 31. Here, by contrast, the Goldensons argue they are alleging that Mr. Merkin misrepresented Ascot as Mr. Merkin's "proprietary" product using a computer algorithm that Mr. Merkin developed himself. *Id.* Third, they claim that unlike the *In re Merkin* defendants, the Defendants here claimed that Ascot was a

conservative fund with very little risk, while having knowledge of "huge risks." *Id.* at 31-32.

The Goldensons offer *People ex rel Cuomo v. Merkin*, No. 450879/09, 2010 WL 936208, at *5-6 (N.Y. Sup. Ct. Feb. 8, 2010) (table) as reaching the opposite conclusion to *In re Merkin*. In that case, a New York state trial court held that a civil complaint against Mr. Merkin survived dismissal, in part because Ascot's COM contained misrepresentations when it stated that "Mr. Merkin 'might delegate investment management duties to independent money managers' because he had already given 'completed control and investment discretion over all of Ascot's. . . funds' and 'had already delegated all investment discretion to'" Mr. Madoff. *Pl.'s Opp'n* at 31 n.17 (quoting *Merkin*, 2010 WL 936208, at *5-6).

The Goldensons further argue that Mr. Steffens demonstrated scienter when he told the Goldensons that Mr. Merkin executed all of Ascot's trades using a proprietary trading strategy and computer algorithms that Mr. Merkin created. *Id.* at 32. They contend that Mr. Steffens knew that the strategy, software, and final trading authority were all Mr. Madoff's. *Id.* They then point to nine facts that, in their view, provide reinforcing circumstantial evidence of Mr. Steffens' wrongful state of mind:

> i) Mr. Steffens was formerly Vice Chairman of Merrill Lynch, an institution that kept their investors away from Madoff and his feeder funds because of the numerous red flags . . . in Madoff's operations . . . ;
>
> ii) Mr. Steffens personally invested in Ascot while at Merrill Lynch and was imminently familiar with Madoff's role in Ascot long before it became one of Spring Mountain's "core" and "material" holdings . . . ;

iii) One of Ascot's board members was also a director of Spring Mountain's off-shore funds . . . ;

iv) Mr. Merkin was Spring Mountain's benefactor, founder, creditor, owner, partner, investment advisor and gave Mr. Steffens access to Wall Street's top hedge fund managers, investment committees and institutional investors . . . ;

v) Ascot would not provide position sheets or marketing materials tying Madoff to Ascot . . . ;

vi) Madoff's lack of transparency, impossible returns and internal conflicts of interest were risks that were both widely reported in the media and entirely inconsistent with what Mr. Steffens told the Plaintiffs . . . ;

vii) Mr. Steffens had to keep Madoff's role in Ascot a secret in order to keep his "access" to "Bernie" . . . ;

viii) Mr. Steffens gave his staff special instructions on how to deal with Mr. Goldenson in the wake of Madoff's arrest . . . ; and

ix) Mr. Steffens misled his investors in correspondence quantifying the QP I Fund's Madoff exposure and accounted for the Fund's Madoff losses in November rather than December, 2008 without timely disclosing this fact.

*Id.* (citing PSAMF ¶¶ 128, 155-68, 275-308, 328-76, 413-14, 418-19, 433-36).

### iii.    The Defendants' Reply

The Defendants maintain that *In re Merkin* is indistinguishable from this case because Mr. Merkin's statements at issue there were "not meaningfully distinguishable" from those allegedly made to Mr. Goldenson.  *Def.'s Reply* at 10. They also insist that even if Mr. Steffens made the disputed statement "that Ascot's strategy was 'proprietary' and Mr. Merkin personally made trades on a computer," the evidence is insufficient to reasonably infer scienter because of the "explicit disclosure" in the Ascot COM that Mr. Merkin could "'delegate investment discretion' to other money managers."  *Id.* at 10-11 (quoting DSMF ¶ 99).  In this

context, the Defendants argue, Mr. Steffens' alleged remarks on December 14, 2001 were not misleading.

The Defendants renew their contention that the evidence is insufficient to support a finding of scienter on Mr. Steffens' part. *Id.* at 11-13. They reiterate Mr. Steffens' belief that Mr. Merkin was in control of Ascot. *Id.* at 11. Because the Goldensons declined to depose Mr. Steffens, they argue, they cannot simply deny the validity of his sworn affidavit to oppose summary judgment. *Id.* at 11-12. The Defendants also cite from internal Spring Mountain documents that, they argue, corroborate Mr. Steffens' understanding that Ascot's exposure to Mr. Madoff was regulated by Mr. Merkin's discretion and judgment. *Id.* at 12 (citing DRPSAMF ¶¶ 317, 365).

The Defendants argue that all of the Goldensons' reinforcing circumstantial evidence is either unsupported by the record or taken out of context. *Id.* But this evidence, in their view, also misses the point: for scienter, it is not enough to show that Mr. Steffens had knowledge of the facts that were allegedly false. *Id.* at 12-13. Rather, the Goldensons must show that Mr. Steffens "'knew or should have known that [his] failure to disclose those facts presented a danger of misleading buyers or sellers.'" *Id.* at 13 (quoting *City of Dearborn*, 632 F.3d at 758).

### b.  Analysis

### i.  Misleading Statements

The same legal standards regarding materiality and summary judgment that apply to the non-Steffens Defendants apply to Mr. Steffens. *See* Section III.B.2.b, *supra*.

Both *In re Merkin* and *People v. Merkin* deserve respect and careful consideration, but neither is binding in the District of Maine. In *In re Merkin*, the district court held that "[t]he use of Madoff as a third-party manager . . . to execute a fund's overall investment strategy does not, without more, give rise to a claim under § 10(b)." *In re Merkin*, 817 F. Supp. 2d at 356. Factually, there is very little to distinguish that case from this one. The plaintiffs there argued that Mr. Merkin "misrepresented his involvement" in Ascot when he stated that "all decisions with respect to the management of the capital of the [Ascot] Partnership [were] made exclusively by J. Ezra Merkin" and "the [Ascot] Partnership's success depends to a great degree on the skill and experience of Mr. Merkin." *Id.* at 355. However, the same Ascot COM that made those statements also said that "the success of the Partnership may also be dependent upon other money managers" and "the actions or inactions on the part of other money managers . . . may affect the profitability of the Partnership." *Id.* (internal quotations omitted). Contrary to the Goldensons' characterization, *In re Merkin* is not only a case about failure to perform due diligence; it is also a case about misrepresentation. *Id.* at 356. Applying *In re Merkin* to the Goldensons' case would bode ill for their success.

The New York trial court in *People v. Merkin* reached a different result. That Court observed that Mr. Merkin "had already delegated all investment discretion to [Mr. Madoff]," and he "admitted that he formed Ascot for the purpose of investing with Madoff and that virtually all of [the fund's] assets were tendered to him." *Merkin*, 2010 WL 936208, at *6. The Court held that "the representations that

Merkin would exercise discretion in managing the funds, and [that] the performance of the funds depended on his skill and judgment" were "misrepresentations . . . beyond reasonable expectation." *Id.* (internal quotations omitted). The Court flatly rejected the defendants' reliance on the 2006 Ascot COM, which stated that Mr. Merkin "might delegate investment management duties to independent money managers." *Id.* at *5. It reasoned that this was a "[g]eneralized disclosure regarding unspecified risks" that would "not shield defendants from liability." *Id.*[443]

Both courts in *In re Merkin* and *People v. Merkin* were dealing with basically the same issue that confronts the Court in this Motion: whether the general statement in the Ascot COM that Mr. Merkin could delegate investment responsibility cured an otherwise untrue statement that Mr. Merkin was the controlling force behind Ascot's trading activity. The parties' dispute here runs along the same fault line.

This Court agrees with *People v. Merkin*. A fund manager cannot make an otherwise false or misleading statement or omission and then rely on one paragraph deep in a lengthy confidential offering memorandum to exonerate him. Although an investor is expected to read and understand the written material provided to him by

---

[443]    In its analysis, the *People v. Merkin* Court acknowledged the federal "bespeaks caution" doctrine, under which "misrepresentations or omissions 'in conjunction with the purchase or sale of securities are considered immaterial where contained in communications or documents including cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable' and not actionable." 2010 WL 936208, at *5. The *Merkin* Court, applying this doctrine as persuasive precedent to New York law, noted that it only applies to future statements, and cannot cure misrepresentations of present or historical facts. *Id.* Neither party here has directly requested application of the "bespeaks caution" doctrine, though the Defendants hinted at it. *See Def.'s Reply* at 10-11.

a fund in which he places his money, this does not give the fund manager a free pass to make any misleading statement he pleases. An oral statement by the fund manager, omitting or denying that the alleged "genius" behind one of the fund's "core holdings" is actually handing his money wholesale to some other entity to invest, is—even with a general disclaimer in the COM—an actionable misrepresentation under Rule 10b-5.[444] Furthermore, the misrepresentation is material because a fact-finder could conclude that a reasonable investor would consider it to significantly alter the "total mix" of information on which he relied.

Viewing the summary judgment record in a light most favorable to the Goldensons, Mr. Steffens committed a material misrepresentation under Rule 10b-5, notwithstanding the general "disclosure" in the then-current Ascot COM. The Court must also determine, however, if he did so with a wrongful state of mind.

### ii.    Scienter

Section 10b-5's scienter element is satisfied "if the speaker acted with fraudulent intent or knowing or reckless disregard of his obligation to disclose." *In re Boston Scientific Corp. Secs. Litig.*, 686 F.3d 21, 29 (1st Cir. 2012). Like other state of mind evaluations, scienter is a highly fact-intensive inquiry, as it turns on a "careful examination of the underlying facts and an evaluation of the credibility of the parties and witnesses." *Teledyne Indust., Inc. v. Eon Corp.*, 373 F. Supp. 191, 195 (S.D.N.Y. 1974); *see also In re Smith & Wesson Holding Corp. Sec. Litig.*, 669

---

[444]    As the Defendants repeatedly emphasize, neither Mr. Steffens nor any of his employees wrote or distributed the Ascot COM, and Mr. Goldenson was not in possession of the COM on December 14, 2001. Thus, it is somewhat striking that Mr. Steffens relies on it so heavily in an effort to cleanse his alleged misrepresentations on that date.

F.3d 68, 77 (1st Cir. 2012) ("[C]ourts are normally cautious about granting summary judgment for the defense on [the] issue [of scienter]"). Summary judgment is usually inappropriate if "there is either some evidence of subjective bad intent, or, alternatively, misstatements or omissions so blatantly improper that bad intent or recklessness can be inferred." *In re Smith & Wesson*, 669 F.3d at 77.

Here, a fact-finder viewing the evidence in a light most favorable to the Goldensons could conclude that Mr. Steffens acted with scienter. The Goldensons' nine enumerated pieces of circumstantial evidence provide a foundation for the inference. Section III.B.3.a.ii, *supra*. On this foundation is laid the fact that "Mr. Steffens told Mr. Goldenson that 'my partner has developed a very reliable proprietary strategy that he's been operating for more than 10 years that he developed,'" PSAMF ¶ 191 (quoting *Pl.'s D.G. 2011 Dep. Tr.* 41:17-19), and that neither Mr. Steffens nor Mr. Merkin disclosed Mr. Madoff's role. Section II.B.2.r, *supra*. Mr. Steffens allegedly made this statement at the end of a half-hour to 45 minute meeting between himself, Mr. Steffens, and Mr. Merkin. *Pl.'s D.G. 2011 Dep. Tr.* 41:13-15. In that meeting, Mr. Steffens allegedly corroborated Mr. Merkin's presentation and urged Mr. Goldenson to invest. Sections II.B.1.j, II.B.2.f.ii, iii, *supra*. And the Goldensons have established record evidence of a quid-pro-quo arrangement between Mr. Steffens and Mr. Merkin in which Mr. Steffens benefited from referring clients to Mr. Merkin. Section II.B.1.f, *supra*. The fact-finder could conclude from this that Mr. Steffens made this alleged false

statement to "induce [the Goldensons] to [invest in Ascot] based on false information." *Def.'s Reply* at 13.

That Mr. Steffens himself invested in Ascot and genuinely believed Ascot to be under Mr. Merkin's ultimate control, Section II.B.1.g, *supra*, does not render this inference unreasonable. An investment advisor can make fraudulent statements to induce a client to invest in a fund in which the advisor also invests; this does not mean that the advisor lacked scienter. Rule 10b-5 scienter does not require any intent to cause the defrauded person to lose money. All it requires is that the defendant induces the investment through the intentional, knowing, or reckless use of false or misleading statements or omissions. *See Capital Gains Research*, 375 U.S. at 192 n.39 ("[I]t is not necessary that the person making the misrepresentations intend to cause loss to the other or gain a profit for himself; it is only necessary that he intend action in reliance on the truth of his misrepresentations") (internal quotations omitted); *Abrahamson v. Fleschner*, 568 F.2d 862, 878 n.27 (2d Cir. 1977) ("Scienter does not require a showing of intent to cause a loss to a plaintiff").

### 4.    Conclusion as to Count VI

Count VI is not time-barred, and the Goldensons have adduced evidence from which a fact-finder could reasonably conclude that all Defendants committed federal securities fraud under Rule 10b-5. Therefore, the Court denies summary judgment on Count VI.

## C.     Count VII:  Securities Fraud as Controlling Persons

Count VII alleges that the Defendants are "controlling persons" within the meaning of Section 20(a) of the Securities Exchange Act of 1934, 48 Stat. 881, *codified at* 15 U.S.C. § 78t(a) (2012) (Section 20(a)).  *Am. Compl.* ¶¶ 162-68.  The Complaint states two discrete sets of allegations giving rise to controlling persons liability.  First, it claims that all Defendants are liable for the Goldensons' damages suffered as a result of all other Defendants (i.e., the entity Defendants).  *Id.* ¶ 168.  Second, it alleges that the Defendants are liable for the Goldensons' damages suffered as a result of Mr. Merkin's alleged wrongful conduct.  *Id.*

### 1.     Position of the Parties

#### a.     The Defendants

The Defendants argue, first, that neither Mr. Ho nor any of the entity Defendants exercised any control over Mr. Steffens.  *Motion* at 34.  They further claim that Mr. Ho did not exercise control over any of the entity Defendants "with regard to any actionable misstatement they made through any written material at any relevant time."  *Id.*  This is so, in their view, because he was not a "managing member" or "managing director" of those entities.  *Id.*  Furthermore, they claim, the "relevant governing corporate documents expressly disclaimed as to Ho any 'right to participate in the conduct of the business.'"  *Id.* (quoting *Ho Decl.* Ex. B *Limited Liability Company Agreement Spring Mountain Capital, LLC*, ¶ 8 (ECF No. 195-11) (Oct. 29, 2001) and *Ho Decl.* Ex. C *Limited Liability Company Agreement Spring Mountain Capital G.P., LLC*, ¶ 8 (ECF No. 202-1) (Oct. 29, 2001)).

### b.     The Goldensons

The Goldensons argue that "control" has a broader meaning than that given by the Defendants. *Pl.'s Opp'n* at 3. In their view, "[o]fficers and directors have the general power to control a company." *Id.* (citing *Neely v. Bar Harbor Bankshares*, 270 F. Supp. 2d 50, 53-54 (D. Me. 2003)). They contend that there are disputed facts that may establish "controlling persons" liability in Mr. Ho (as to the entity defendants) and in all the Defendants (as to alleged Rule 10b-5 violations by Mr. Merkin). *Id.* at 34-35.

As to Mr. Ho, the Goldensons argue that Mr. Ho had considerable authority and discretion over the investment strategy and trading activities of the QP I Fund. *Id.* (citing PRDSMF ¶ 47, PSAMF ¶ 159). They also point out that in their answer the Defendants denied that Mr. Steffens was "'the *sole* managing member'" of the relevant entities, claiming instead that he was "'*a* managing member.'" *Id.* (citing PRDSMF ¶ 48). They further observe that Mr. Ho was the Chief Operating Officer of all three entity Defendants, and bound the QP I Fund and SMC, LLC to various contracts. *Id.* at 35 (citing PRDSMF ¶ 50). Finally, they note that when SMC, L.P. registered as an investment advisor in 2003, it listed Mr. Ho among its "controlling persons." *Id.* (citing *Frawley Aff.* Ex. JJ *FORM ADV*, at PLS' RSP 001205 (ECF No. 214-35) (Feb. 6, 2003) (*SMC Form ADV*).

The Goldensons claim that the Defendants are liable as controlling persons of Mr. Merkin because Mr. Merkin "stood at the top of the Spring Mountain food chain." *Id.* (citing PSAMF ¶ 276). Furthermore, they claim, the Defendants identified Mr. Merkin as a member of their investment and management teams; he

executed contracts on behalf of the QP I Fund and SMC, G.P.; and he found investments and communicated with investors and the Defendants' behalf. *Id.* (citing PSAMF ¶¶ 277-82). Finally, they argue, the Defendants forced Mr. Merkin to give up his ownership stake in Spring Mountain after Mr. Madoff's arrest, despite the fact that they still owed Mr. Merkin several million dollars. *Id.* (citing PSAMF ¶¶ 430-32).

### c.    The Defendants' Reply

The Defendants restate their prior opposition to Mr. Ho's controlling person liability. *Def.'s Reply* at 13. They also find it "preposterous[]" that the Goldensons ascribe to them controlling persons liability for Mr. Merkin's alleged wrongs, despite the fact that Mr. Merkin is not a named party in this lawsuit. *Id.*

### 2.    Analysis

"To meet the control element [of Section 20(a)], the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002). This rule applies equally to persons or companies as the controlled entity. Section 20(a). "Control" means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of [an entity], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (2013). "Officers and directors possess such potential ability to control." *Neely*, 270 F. Supp. 2d at 53.

Taking at face value the Defendants' assertions that Mr. Ho, as a shareholder in the entities, lacked "control" through "ownership of voting securities," there

remains a factual dispute as to whether he possessed and exercised practical control as an officer. The Defendants concede that Mr. Ho was the Chief Operating Officer of SMC, LP, DSMF ¶ 49, which was the general partner of the QP I Fund. DSMF ¶ 47. SMC, LP also identified Mr. Ho as a "*person* [who] has *control* as defined in the Glossary of Terms to Form ADV" when it registered as an Investment Advisor with the SEC. *SMC Form ADV* at PLS' RSP 001204 to 1205 (emphasis in original). The "Spring Mountain Capital Employee Organization Chart" identified Mr. Ho as "President and Chief Operating Officer" of Spring Mountain Capital. *SMC Org. Chart.* He was likewise a member of the investment committee. *Id.*; *2008 SMC, L.P. Firm Description* at SMC000006103; *see also* PRDSMF ¶ 50 (documenting additional instances of control in fact by Mr. Ho). If a fact-finder credited the Goldensons' evidence, it could reasonably conclude that Mr. Ho exercised control in fact over all of the Defendant entities.

The same cannot be said of any Defendants with respect to Mr. Merkin. There is no evidence at all that the Defendants "controlled" Mr. Merkin within the meaning of Section 20(a). No evidence shows that the Defendants had power to "direct[] . . . the management and policies" of Mr. Merkin or of Ascot. Indeed, the summary judgment record strongly suggests just the opposite: if anyone directed the management and policies of Ascot or Mr. Merkin, it was Mr. Madoff, not these Defendants. That Mr. Merkin occasionally acted on behalf of QP I Fund and SMC, G.P., and that he "stood at the top of the Spring Mountain food chain," does not show that the Defendants *controlled* Mr. Merkin; it suggests that he enjoyed a small

degree of control over *them*. And the fact that Mr. Merkin was forced out of his ownership and consulting position after Mr. Madoff's arrest does not show Section 20(a) "control"; at most it shows that Mr. Merkin succumbed to political or moral pressures and bowed out voluntarily.

A fact-finder could reasonably conclude that Mr. Ho exercised control over all the entity Defendants. However, it could not reasonably conclude that any Defendants exercised control over Mr. Merkin. Consequently, the Court grants summary judgment on Count VII only to the extent that it alleges vicarious liability in the Defendants for Rule 10b-5 violations by Mr. Merkin. In all other respects, and as to all Defendants, Count VII survives summary judgment.

### D. Count II: Common Law Fraud

Count II alleges fraudulent misrepresentation and deceit under Maine common law. *Am. Compl.* ¶¶ 129-34.

#### 1. Position of the Parties

##### a. Defendants

The Defendants argue that the requirements for common law fraud under Maine law are similar to fraud under Rule 10b-5. *Motion* at 34-35. The Defendants note another requirement, however: that the plaintiffs show that any omitted fact was "'active[ly] conceal[ed].'" *Id.* at 35 n.16 (quoting *Kezer v. Mark Stimson Assocs.*, 1999 ME 184, ¶ 23, 742 A.2d 898). They argue that the Goldensons cannot show active concealment because there is no evidence of "'steps taken'" by the Defendants to actively conceal Mr. Madoff's role in Ascot. *Id.* (quoting *Kezer*, 1999 ME 184, ¶ 24, 742 A.2d 898).

### b.    The Goldensons

The Goldensons dispute that the requirements for fraud under Rule 10b-5 and fraud under Maine common law are the same.  *Pl.'s Opp'n* at 35-36.  First, in their view, Securities Act fraud does not require the same degree of intent to defraud or the justification for reliance found in common law fraud.  *Id.*  They also dispute that they must show "active concealment," as the Defendants claim; they argue instead that they must show *either* active concealment *or* a special relationship that gives rise to a duty to disclose, such as a fiduciary relationship.  *Id.* at 36 n.22 (citing *Darling v. W. Thrift & Loan*, 600 F. Supp. 2d 189, 206 (D. Me. 2009) and *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1995)).  Second, the Goldensons argue that common law fraudulent misrepresentations are "inherently broader than they are under the 1934 Act."  *Id.* at 36 & n.23 (citing *Eldrige v. May*, 129 Me. 112, 115, 150 A. 378, 379 (1930) and *Darling*, 600 F. Supp. 2d at 201).  Third, they claim that there is an extended statute of limitations for common law fraud.  *Id.* (citing ME. REV. STAT. tit. 14, § 859).[445]

### 2.    Analysis

The Defendants' argument for summary judgment on Count II is almost wholly confined to referencing their arguments regarding Count VI.  The Court

---

[445]    The Goldensons make an unusually cryptic fourth argument: "Fourth, the Plaintiffs can hold the Defendants liable for aiding and abetting Mr. Merkin's fraud."  *Pls.' Opp'n* at 36.  They cite two pages of the Court's earlier Order on the motion to dismiss and 101 paragraphs of their statements of material fact for the proposition that these documents "[r]ais[e] issues of fact with respect to the allegations that allowed the Plaintiffs' fraud claim to survive dismissal."  *Id.* Although the Court appreciates the Plaintiffs' effort to be concise, their fourth point is so terse that it is unintelligible. The Court is unwilling to dig into its earlier order and over a hundred statements of material fact to make the Plaintiffs' argument for them.

already determined that Count VI survives summary judgment. Even if the result were different with regard to Count VI, however, the Defendants waived the argument when they declined to address the Goldensons' contentions that Maine common law fraud is not coterminous with Rule 10b-5.

The burden is on the movant to demonstrate that it is entitled to judgment as a matter of law, and the Defendants have not carried this burden with respect to Count II. Consequently, Count II survives summary judgment.

### E. Counts VIII and IX: Maine Securities Fraud, Joint and Several Liability

Count VIII alleges securities fraud under ME. REV. STAT. tit. 32, § 16509(6). Count IX alleges joint and several liability for securities fraud under ME. REV. STAT. tit. 32, § 16509(7).

#### 1. Position of the Parties

##### a. The Defendants

The Defendants argue that the Maine securities statute is identical in substance to the provisions of 15 U.S.C. § 78j(b) and Rule 10b-5. They argue, principally, that they are entitled to summary judgment on Counts VIII and IX for the same reasons they advance with respect to Count VI. *Motion* at 35-36 (citing ME. REV. STAT. tit. 32, § 16509(6)). They also argue that section 16509 requires that the defendant receive "consideration for providing investment advice." *Id.* at 36 n.17 (citing § 16509(6)). According to the Defendants, Mr. Goldenson's own testimony shows that Mr. Steffens' recommendation of Ascot was "produced on the

spot . . . at a time when the [Goldensons] had paid nothing to Defendants and had no commitment to pay anything at any time." *Id.*

The Defendants argue that they are entitled to summary judgment as to Count IX because joint and several liability for violation of section 16509(7) requires and underlying violation of section 16509(6).

### b.  The Goldensons

The Goldensons argue that their state securities fraud claims survive for the same reasons they offer in opposition to summary judgment on Count VI. *Pl.'s Opp'n* at 36. They also argue that they have shown evidence of the "direct[] or indirect[] . . . consideration" required by section 16509(7). *Id.* at 36 n.24. They contend that the Defendants received "substantial management and performance fees" in exchange for "providing the Plaintiffs with investment advice on the QP I Fund and its 'core holding' Ascot." *Id.* (citing PSAMF ¶ 378). They claim that the $2 million loan received by QP I from Mr. Merkin immediately after Mr. Steffens directed the Goldensons to Ascot is also "consideration." *Id.* (citing PSAMF ¶¶ 252-54). Finally, they maintain that funneling business to Ascot gave Spring Mountain "access to Wall Street's top hedge fund managers, investment committees and contracts." *Id.* (citing PSAMF ¶¶ 285-303).

### 2.  Analysis

There is a genuine dispute of fact as to whether there was an understanding between the Defendants and Mr. Merkin that the Defendants would receive compensation or financial benefit from Mr. Merkin or Ascot in exchange for investing in Ascot or directing business to Ascot. Section II.B.1.f, *supra*. The

Goldensons' evidence of consideration goes to that dispute. If a fact-finder credited the Goldensons' evidence and drew all reasonable inferences in their favor, it could conclude that the Defendants did receive consideration in exchange for directing the Goldensons to Ascot.

The parties agree that, other than the consideration requirement, fraud under section 16509 is substantively identical to fraud under Rule 10b-5. Therefore, because Count VI survives summary judgment and the Goldensons have adduced evidence of consideration, Counts VIII and IX survive as well.

## F.     Count IV: Intentional Infliction of Emotional Distress

Count IV alleges the Maine common law tort of intentional infliction of emotional distress (IIED) against all Defendants. *Am. Compl.* ¶¶ 140-44. Under Maine law, IIED has four elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain that such distress would result from the defendant's conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Vogt v. Churchill*, 679 A.2d 522, 524 (Me. 1996) (internal quotations and alterations omitted). However, the parties here disagree as to only two elements: whether the conduct is "extreme and outrageous," and whether it inflicted "severe emotional distress." *Motion* at 36-38; *Pl.'s Opp'n* at 36-39; *Def.'s Reply* at 13-14.

### 1. Position of the Parties

#### a. The Defendants

The Defendants argue that their alleged misconduct was not "extreme and outrageous" and that the Goldensons have not adduced evidence of severe emotional distress. *Motion* at 37. As to the first element, they argue that the wrongdoing must be "'atrocious'" and "'exceed[ing] all possible bounds of human decency.'" *Id.* (citing *Champagne v. Mid-Me. Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842 and *Siegmund v. Shapland*, 324 F. Supp. 2d 176, 191 (D. Me. 2004)). They assert that these facts do not meet those criteria. *Id.* They further argue their own investment in Ascot makes a finding of "extreme and outrageous" conduct illogical; in their view, they would have had to set out to inflict "extreme and outrageous" emotional harm on themselves. *Id.*

The Defendants also argue that the Goldensons have not suffered severe distress. Measured against the "ordinarily-sensitive plaintiff," they argue that the Goldensons' lost money from Ascot—$1.15 million—is less than their overall gain in SMC funds. *Id.* at 37-38. They cite a 1983 case from the Eastern District of Pennsylvania in which a district court granted summary judgment dismissing a negligent infliction of emotional distress claim, despite fraudulent transactions costing investors their life savings. *Id.* (citing *Kimmel v. Peterson*, 565 F. Supp. 476, 498-99 (E.D. Pa. 1983)).

#### b. The Goldensons

The Goldensons argue, first, that the Defendants' conduct was extreme and outrageous. *Pl.'s Opp'n* at 36-38. Their facts focus on three areas. First, they

highlight the Defendants' knowledge of the "red flags" raised by Mr. Madoff's operations and of Ascot's connection to Mr. Madoff. *Id.* at 37. Second, they focus on the Defendants' allegedly knowing misrepresentations of Ascot to the Goldensons, despite the Goldensons' trust in their objectivity. *Id.* Third, they focus on the Defendants' actions after Mr. Madoff's arrest: their initial concealment of what they had known about Ascot all along, their instructions to staff to deal specially with Mr. Goldenson, their supposed claims to investors that Simpson Thacher would represent the investors' interests, their charging of legal fees to the QP I Fund and other Spring Mountain funds, and their representation in the audited financial statements that Mr. Goldenson's lawsuit related to the QP I Fund's investments in Ariel and Gabriel, not in Ascot. *Id.* at 37-38.

The Goldensons also argue that they suffered severe emotional distress. They attribute the brunt of their distress, not to the loss of wealth, but to the perceived betrayal by their friend Mr. Steffens. *Id.* at 38. They further point out that Mr. Goldenson had informed Mr. Steffens of his "long, well-chronicled history of depression precisely because it affected his investment planning." *Id.* at 39. They cite Dr. Spitz's evaluation that Mr. Goldenson's distress was "severe" and that he had a "terrible response" to the incident. *Id.*

### c.    The Defendants' Reply

The Defendants' reply sounds a cautionary note: that if their alleged misconduct generates liability for IIED, then "every fraud or fiduciary duty claim would double as an IIED claim." *Def.'s Reply* at 13. They point to this Court's case law for authority that this must not be so. *Id.* at 13-14 (citing *Green v. Me. Sch.*

*Admin. Dist. No. 77*, 52 F. Supp. 2d 98, 114 (D. Me. 1999) (characterizing IIED claims as "a uniquely disturbing class of cases that defies easy categorization")).

### 2. Analysis

#### a. Extreme and Outrageous Conduct

The Goldensons are correct that it is normally for the fact-finder to determine when conduct is extreme and outrageous. *Rubin*, 503 A.2d at 699-700. However, that does not end the inquiry at this stage. The character of the conduct represents the application of law to facts, and as such it is a mixed question of fact and law. The Court could decide as a matter of law that no reasonable fact-finder could find this conduct extreme and outrageous. *Champagne*, 1998 ME 87, ¶ 16, 711 A.2d 842. The best guidance for making this judgment is not the varied, colorful verbal formulations of courts that have evaluated IIED claims; rather, it is in the conduct that has and has not been held to be extreme and outrageous.

In *Rubin*, the Law Court held that a defendant committed extreme and outrageous conduct when it failed to deliver a memorial stone on time for a religious ceremony, contrary to its repeated assurances, and with knowledge of the religious significance of the stone to the plaintiff. 503 A.2d at 696, 700. In addition to the religious significance, the *Rubin* Court found the existence of a breached contractual relationship to be a weighty factor in evaluating the outrageousness of the conduct. *Id.* at 700. Likewise, in *Curtis v. Porter*, 2001 ME 158, ¶¶ 14-15, 784 A.2d 18, the Law Court held that a jury could find it "extreme and outrageous" to participate in planning a nighttime robbery of a pizza delivery person. In *Vogt*, 679 A.2d at 522-25, the Law Court held that a fact-finder could reasonably find extreme

and outrageous conduct when an ex-husband conducted a campaign of harassing publicity and vindictive, groundless litigation against his ex-wife's divorce attorney.

By contrast, the Law Court held that it was not "extreme and outrageous" for a hospital to accidentally permit a newborn infant to nurse from a maternity patient who was not his mother. *Champagne*, 1998 ME 87, ¶ 16, 711 A.2d 842. The baby nursed from the wrong patient for three to five minutes, and then, when the nursing staff discovered the error, he was promptly returned to the nursery with no ill effects suffered. *Id.* ¶ 2. Although the mother was horrified, the Law Court held that this behavior, even if reckless, did not rise to the level of extreme and outrageous. *Id.* ¶¶ 15-16.

Applying Maine precedent, this Court granted summary judgment on an IIED claim when school administrators allegedly recommended that a teacher not be given tenure because she cooperated with a police investigation at the school and for other improper reasons. *Green*, 52 F. Supp. 2d at 101-06. The Court found that other than the potentially improper employment decision, there was nothing to suggest that the activity was highly culpable or malicious. *Id.* at 114. The Court expressed concern that "[i]llegality alone" not become a sufficient grounds for IIED, so that the tort would be preserved for "uniquely disturbing . . . cases that def[y] easy categorization." *Id.*

What distinguishes *Rubin*, *Curtis*, and *Vogt* from *Champagne* and *Green* is the presence of emotionally distressing factors beyond mere illegality. In *Rubin*, the factor was the religious significance of the headstone coupled with the presence of a

contractual relationship. In *Curtis*, it was the terrifying circumstances of a nighttime robbery. In *Vogt*, it was a pattern of vindictive and deliberately harassing behavior. In *Champagne* and *Green*, by contrast, the plaintiffs showed only that the defendants had engaged in some behavior that merited civil sanction—but not, in either case, behavior that would normally produce high levels of emotional distress. The line between extreme and outrageous behavior and mere illegality lies in the gray area between these functional definitions of actionable and non-actionable conduct.

Viewing the Goldensons' evidence in a light most favorable to them and drawing all reasonable inferences, it appears that Mr. Goldenson had a relationship with Mr. Steffens characterized by trust and admiration. Sections II.B.2.b, II.B.2.c, *supra*. The Goldensons invested a substantial portion of their life savings in the QP I Fund and Ascot based on that trust relationship. Sections II.B.2.e, II.B.2.f, II.B.2.g, *supra*. Mr. Goldenson informed Mr. Steffens of his history of depression and its relationship to his investment decisions. Section II.B.2.t.i, *supra*. Mr. Steffens, knowing of the Mr. Goldenson's trust and special vulnerability, placed his money into an instrument whose true character and risks he deliberately misrepresented. Sections II.B.2.h, II.B.2.i, II.B.2.k, II.B.2.m, *supra*. Over the course of approximately seven years, Mr. Steffens continued, personally and through his delegates, to misrepresent the character of Ascot to Mr. Goldenson. Sections II.B.2.n, *supra*. These misrepresentations reached their crescendo in the 2008 conversation in which Mr. Steffens persuaded a nervous Mr. Goldenson to

keep his money in Ascot despite Mr. Goldenson's serious reservations about the market.  Section II.B.2.o, *supra*.

These facts, taken together, fall within the range of behaviors that a fact-finder could reasonably conclude is extreme and outrageous.  Mr. Goldenson's trust in Mr. Steffens, together with the contractual relationship, is akin to the religious significance and contractual relationship from *Rubin*.  It is less directly comparable to the criminally terrifying circumstances of the nighttime robbery from *Curtis* or the long pattern of vindictive and harassing behavior from *Vogt*, but there is a similar element of vulnerability and exploitation.  The situation here is far more serious than the merely illegal conduct of firing a teacher for bad cause in *Green*, or the merely reckless conduct of delivering a baby to the wrong mother to nurse in *Champagne*.

This is not to say that every investment advisor who misrepresents a fund to his client is liable for IIED.  What distinguishes this situation from the ordinary case of fraud and breach of fiduciary duty is the special trust and friendship that Mr. Goldenson apparently held for Mr. Steffens, and of which Mr. Steffens was aware.  Therefore, although a fact-finder could reasonably characterize Mr. Steffens' alleged conduct as extreme and outrageous with regard to Mr. Goldenson, these are the only two people between whom the characterization holds.   The entity defendants did not commit extreme and outrageous conduct against any of the plaintiffs, nor did Mr. Ho—and Mr. Steffens did not demonstrate any extreme and outrageous behavior toward Mrs. Goldenson, who apparently had very little to do

with him personally.  DSMF ¶ 33.  The facts that meet the requirements of extreme and outrageous conduct are unique to the relationship between Mr. Goldenson and Mr. Steffens.

### b.    Severe Emotional Distress

Because Mr. Goldenson is the only plaintiff who was the subject of potentially extreme and outrageous behavior, his is the only emotional distress whose severity is relevant to the IIED claim.

In order to meet the requirement of severe emotional distress, the Goldensons "must demonstrate that the harm alleged reasonably could have been expected to befall the ordinarily sensitive person."  *Theriault v. Swan*, 558 A.2d 369, 372 (Me. 1989) (citing *Gammon v. Osteopathic Hospital of Me. Inc.*, 534 A.2d 1282, 1285 (Me. 1987)).  If the fact-finder concludes that they have satisfied this test, the Defendants must "take [their] victim[s] as [they] find [them]" in terms of damages. *Id.*

Mr. Goldenson alleges that as a result of Mr. Steffens' misrepresentations and his own subsequent financial losses, Mr. Goldenson was devastated and suffered a severe and long-lasting depression.  Section II.B.2.t.i, *supra*.  The Defendants vigorously deny that mere financial setbacks can meet the requirement of "severe emotional distress," particularly in wealthy individuals such as the Goldensons.  However, the financial setbacks were only part of the cause of Mr. Goldenson's distress; Dr. Spitz testified that the feelings of betrayal by Mr. Steffens, in whom Mr. Goldenson had placed very significant trust, were an equal cause of

the depression.[446]  Contrary to the Defendants' view, an ordinarily sensitive person could well be expected to suffer serious emotional harm through deliberate betrayal by someone in whom he placed a great deal of trust and a great deal of money.[447]

### c.  Conclusion as to Count IV

A fact-finder could reasonably conclude that Mr. Steffens' conduct toward Mr. Goldenson was extreme and outrageous; however, as between any other two Plaintiffs and Defendants, such a characterization would be unreasonable.  An ordinarily-sensitive person could be expected to suffer severe emotional distress as a result of Mr. Steffens' alleged conduct.  Therefore, Count IV survives as between Mr. Steffens and Mr. Goldenson only.  The Court will grant summary judgment on Count IV in all other respects.

### G.  Counts III and V:  Aiding and Abetting Tortious Conduct, Civil Conspiracy

Count III alleges that the Defendants aided and abetted each other and Mr. Merkin in breaching fiduciary duties and defrauding the Goldensons.  *Am. Compl.* ¶¶ 135-39.  Count V alleges that the Defendants engaged in a civil conspiracy to commit the torts described in Counts I – V (breach of common law fiduciary duty, common law fraud, aiding and abetting tortious conduct, and IIED).

---

[446]   The Defendants do not attack the causation element of IIED.  *See Motion* at 36-38; *Def.'s Reply* at 13-14.  Therefore, the Court confines its analysis to the severity of the emotional distress, deeming the causation element admitted for the purposes of this Motion.

[447]   The Defendants' citation to *Kimmel* is unavailing.  That case analyzed the extreme and outrageous nature of conduct on facts similar to those now before the Court.  *Kimmel*, 565 F. Supp. at 498-99.  The defendants in that case conceded, for the purpose of a motion to dismiss, that the conduct caused severe emotional distress.  *Id.* at 498.  The *Kimmel* Court did not, therefore, address the severity of the plaintiffs' alleged emotional distress.  *See id.*  As described in detail above, this Court respectfully disagrees with the *Kimmel* Court's analysis of the extreme and outrageous nature of this fact pattern.  Section III.F.2.a, *supra*.

### 1. Position of the Parties

#### a. The Defendants

The Defendants argue that they are entitled to summary judgment on Counts III and V because the underlying tort claims fail on the merits. *Motion* at 38.

#### b. The Goldensons

The Goldensons contend that Counts III and V should survive, in part, because genuine disputes of fact preclude summary judgment as to the underlying tort claims. *Pl.'s Opp'n* at 40.

The Goldensons also argue that they may hold the Defendants liable for engaging in a conspiracy and for aiding and abetting Mr. Merkin's fraud and breaches of fiduciary duty. *Id.* at 39. They argue that Mr. Merkin acknowledges that he owed a fiduciary duty to Ascot's investors. *Id.* (citing PSAMF ¶ 447). They also argue that "[c]ourts have found that [Mr. Merkin] made fraudulent misrepresentations to those investors." *Id.* (citing *People v. Merkin*, 2010 WL 936208, at *10). Consequently, the Goldensons claim that there are genuine disputes of fact as to whether the Defendants aided and abetted Mr. Merkin's torts. These include, in their view:

> i) Describing Mr. Merkin to Mr. Goldenson as a "terrific" and "amazing" trader who had developed a "proprietary" trading strategy for Ascot that he himself conducted using [a] personal computer algorithm he created . . . ;
>
> ii) Telling the risk-adverse Mr. Goldenson that Ascot was even more conservative than the QP I Fund, even though they well knew that Madoff's lack of transparency, impossible returns and self-cleared trades were some of the inherent risks that caused Merrill Lynch – the Goldensons' former investment bank – to keep its investors away from Madoff and his feeder funds . . . ; and

iii) Concealing Madoff's role in the management of Ascot throughout the course of the Defendants' relationship with the Plaintiffs.

*Id.* at 39-40 (citing PRDSAMF ¶ 91, 108 and PSAMF ¶¶ 135, 140-42, 191-96, 205-16, 255-66, 345-78, 448-53).

### c.     The Defendants' Reply

The Defendants reply that the Goldensons have not provided evidence that the Defendants "acted in design with, or assisted Merkin in committing a tort against them." *Def.'s Reply* at 14. They also insist that the claims must fail because the Goldensons have not alleged a tort against Mr. Merkin. *Id.* (citing *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 351 (S.D.N.Y. 2007)).

### 2.     Analysis

First, the Court already determined that all the underlying common law tort claims in this lawsuit survive on their merits, except the IIED claim as between parties other than Mr. Steffens and Mr. Goldenson. Therefore, the principal ground on which the Defendants argue for summary judgment on Counts III and V fails. Although the Defendants other than Mr. Steffens might not themselves be primarily liable for IIED, they could still be liable through aiding and abetting or civil conspiracy.

Mr. Merkin's torts are a different matter. In moving for dismissal of Counts III and V at the pleadings stage, the Defendants did not argue that either claim should fail because the Goldensons alleged no torts against Mr. Merkin. *See Mot. to Dismiss* at 30-31 (ECF No. 26) (Dec. 28, 2010). As a result, in denying that motion,

the Court only addressed the vicarious liability of the Defendants as among each other; it did not address the sufficiency of the allegations of conspiracy or aiding and abetting with regard to Mr. Merkin. *See Goldenson*, 802 F. Supp. 2d at 269-70. The Defendants did not raise this issue until their brief in reply to the Goldensons' opposition to the Motion for Summary Judgment. *See Mot. to Dismiss* at 30-31; *Def.'s Reply Mem. in Further Support of Mot. to Dismiss* at 7 (ECF No. 31) (Feb. 17, 2011); *Motion* at 38-39; *Def.'s Reply* at 14.

In general, when multiple defendants are jointly and severally liable, a plaintiff need only sue one of the joint tortfeasors to recover the full amount of the damage. *Peerless Ins. Co. v. Progressive Ins. Co.*, 2003 ME 66, ¶¶ 7-9, 822 A.2d 1125. Civil conspiracy and aiding and abetting are two alternate theories of vicarious liability. *See Cohen v. Bowdoin*, 288 A.2d 106, 111-12 (Me. 1972); *New England Surfaces v. E.I. Du Pont de Nemours & Co.*, 517 F. Supp. 2d 466, 496-97 (D. Me. 2007), *rev'd in part on other grounds*, 546 F.3d 1 (1st Cir. 2008). However, neither theory is an independent ground for civil liability; each requires the commission of an underlying tort. *New England Surfaces*, 517 F. Supp. 2d at 496-97. In the Defendants' view, the fact that the Amended Complaint does not allege a distinct tort against Mr. Merkin is fatal to the derivative liability claims in Counts III and V. *Def.'s Reply* at 14.

The Court concludes that Counts III and V alleging a conspiracy among the impleaded Defendants for aiding and abetting Mr. Merkin's allegedly fraudulent conduct survive summary judgment. The fact that civil conspiracy and aiding and

abetting are derivative claims does not mean that the primary tortfeasor actually needs to be joined as a defendant; it simply means that all elements of the primary tort must be proved to the fact-finder. *See Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) ("Joint tortfeasors are not considered indispensable parties under federal law . . . . Whatever prejudice results . . . from being forced to proceed without [an absent tortfeasor] is simply that inherent in the principle of joint and several liability"). Although the Goldensons have not enumerated the specific torts that they allege Mr. Merkin committed, their outlines are clear enough: they embrace, at least, common law fraud and common law breach of fiduciary duty. *See Pl.'s Opp'n* at 39-40; Section II.B.2.h, *supra*. At trial, the Goldensons will have to prove that Mr. Merkin actually committed specific torts and the Defendants aided and abetted him, or that the Defendants conspired with him to commit the torts.

The Court denies summary judgment on Counts III and V.

## H. Count XI: Unjust Enrichment/Constructive Trust

Count XI alleges that the Defendants were unjustly enriched by receiving financial benefits from Mr. Merkin in exchange for referring the Goldensons to Ascot, and also by receiving management and performance-based fees from the Goldensons in exchange for investment advice. *Am. Compl.* at 42. It seeks the equitable remedy of constructive trust. *Id.*

### 1. Position of the Parties

#### a. The Defendants

The Defendants contend that the unjust enrichment claim should fail because the underlying claims for breach of fiduciary duty and fraud lack merit. *Motion* at

38.  They also argue that the claim must fail for two other reasons.  First, they maintain that they have not been enriched by their actions with respect to the Goldensons, but in fact have lost money.  *Id.*  This, they submit, precludes a finding of unjust enrichment.  *Id.* (citing *Schuchart & Assocs. V. Solo Serve Corp.*, No. SA-81-CA-5, 1983 WL 1147, at *23 (W.D. Tex. June 28, 1983) (unpublished)).  Second, they claim that they earned management and performance fees pursuant to a contract with the Goldensons.  *Id.* at 38-39.  They submit that the contractual relationship disallows any finding of unjust enrichment because unjust enrichment allows recovery for value received by a party only when there is no contract.  *Id.* (citing *Top of the Track Assocs. v. Lewiston Raceways, Inc.*, 654 A.2d 1293, 1296 (Me. 1995); *June Roberts Agency, Inc. v. Venture Props., Inc.*, 676 A.2d 46, 49 n.1 (Me. 1996); and *Innovative Network Solutions, Inc. v. Onestar Commc'ns, LLC*, 283 F. Supp. 2d 295, 303-04 (D. Me. 2003)).

Finally, the Defendants respond to the Court's concern, expressed in its order on their Motion to Dismiss, that fraud between contracting parties might provide an exception to the legal bar for unjust enrichment when a contractual relationship exists.  *Goldenson*, 802 F. Supp. 2d at 271.  The Defendants supply a table decision from a New York trial court to the effect that there is no such exception for fraudulent conduct between contracting parties.  *Motion* at 39 (citing *MT&T Bank Corp. v. Gemstone CDO VIII, Ltd.*, 23 Misc.3d 1105(A), at *19 (Sup. Ct. N.Y. Cty. Apr. 7, 2009) (table)).

### b. The Goldensons

The Goldensons reply that the Defendants were unjustly enriched in four different ways: (1) by charging legal fees to investors; (2) by withdrawing $1 million in incentive fees from the QP I Fund in December, 2008; (3) by charging management fees for "engineering a specific mix of trading strategies" when QP I was "almost 50% invested with funds affiliated with Mr. Merkin"; and (4) by "reap[ing] massive rewards by affiliating with Mr. Merkin." *Pl.'s Reply* at 40.

The Goldensons do not address the Defendants' arguments that unjust enrichment is not appropriate where there was a contractual relationship between the parties. *See id.*

### 2. Analysis

Because the Goldensons do not dispute the legal bar raised by the Defendants in their motion, the Court deems the argument waived and grants summary judgment on Count XI.

## IV. CONCLUSION

The summary judgment record in this case is highly contentious and riddled with genuine disputes of fact. Rule 56 requires the Court to view those disputes favorably to the Goldensons and determine the scope of inferences and conclusions to which the record could lead a reasonable fact-finder. The truth of the allegations is not now a matter for the Court to decide; it may be that the Defendants will prevail at trial. Whatever may be the ultimate outcome before a civil jury, however, this summary judgment record requires that the Goldensons be allowed to make their case to one.

The Court issues this Order under seal for the time being. However, despite the extensive prior sealing of the docket in this case, the Court has substantial misgivings as to whether the Order, or any part of it, should remain sealed. In *United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013), the First Circuit recently issued a reminder that although the public does not have a general right of access to civil actions and civil discovery motions may not be subject to public disclosure, the considerations are different for "materials . . . introduced as evidence at trial []or submitted to the court as documentation in support of motions or trial papers." *Id.* at 55. If the parties take the position that the Order or any portions of the Order must be sealed, the Court ORDERS counsel to file within ten days of the date of this Order, a memorandum justifying their position and describing which portions of the Order they contend must be sealed from public scrutiny. If the Court has not received such memoranda within ten days of the date of this Order, the Order will be unsealed in its entirety.

The Court GRANTS the Defendants' Motion for Summary Judgment (ECF No. 196) only

(1) as to Count IV, except between Mr. Steffens and Mr. Goldenson;
(2) as to Count VII, to the extent the Count alleges controlling persons liability for Rule 10b-5 violations by Mr. Merkin; and
(3) as to Count XI in its entirety.

In all other respects, the Court DENIES the Motion for Summary Judgment.

SO ORDERED.

_/s/ John A. Woodcock, Jr._
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2014