DANIEL R. GOLDENSON, et al.,   )
                                )
          Plaintiffs,   )
                                )
          v.               )      2:10-cv-00440-JAW
                                )
JOHN L. STEFFENS, et al.,     )
                                )
          Defendants.   )

## ORDER ON MOTION TO BIFURCATE AND MOTIONS IN LIMINE

Daniel and Suzanne Goldenson and various entity plaintiffs (the Goldensons) are taking John L. Steffens, Gregory Ho, and various entity defendants (the Defendants) to trial on charges that they committed fraud, breaches of fiduciary duty, and intentional infliction of emotional distress. The allegations of liability arise from the connection between the Ascot Fund, owned and operated by J. Ezra Merkin, and the spectacular collapse of Bernard Madoff's Ponzi scheme. In short, the Goldensons allege that the Defendants sold them on Ascot while concealing that it was really nothing more than a feeder to Mr. Madoff's "investment fund." Now before the Court are a number of pretrial motions relating to evidence, testimony, and other trial procedure.

## I.    MOTION TO BIFURCATE

### A.    Background

The Defendants move to bifurcate the issue of punitive damages from the main trial on liability under Federal Rule of Civil Procedure 42(b). *Mot. to Bifurcate*

*Punitive Damages from Liability and Compensatory Damages* at 1 (ECF No. 249) (*Def.'s Mot. to Bifurcate*). In parallel, they ask that they not be required to respond to the Goldensons' renewed discovery request for the Defendants' tax returns until such time as the Court determines that the jury may properly consider punitive damages. *Id.* at 1-2. The Goldensons object to both requests. *Pl.'s Opp'n to Def.'s Mot. to Bifurcate Punitive Damages from Liability and Compensatory Damages* (ECF No. 256) (*Pl.'s Bifurcation Opp'n*).

This motion to bifurcate is tangled up with a discovery dispute. On February 9, 2012, the Goldensons requested from the Defendants "[a]ll individual federal income tax returns and supporting statements and forms, including any amendments thereto, filed by John L. Steffens and Gregory P. Ho for tax years 2007 through 2011." *Def.'s Mot. to Bifurcate* Attach. 1 *Letter from Alfred C. Frawley IV to David Spears*, at 1 (ECF No. 249) (*Renewed RFP No. 9*). The Magistrate Judge denied the Plaintiffs' Motion to Compel production of the returns as "premature." *Report of Hr'g and Order Re: Disc., Scheduling* at 3 (ECF No. 103) (*Order on Disc.*). However, the Magistrate Judge held that "[t]he plaintiffs are free to renew RFP No. 9 following the court's resolution of anticipated summary judgment motions if Steffens and Ho remain potentially liable for punitive damages." *Id.* at 3-4. The Goldensons renewed this request on March 13, 2014, following the Court's disposition of the motion for summary judgment. *Renewed RFP No. 9.* The Defendants move the Court to deny this renewed request. *Def.'s Mot. to Bifurcate* at 5.

## B.     Discussion

Under Federal Rule of Civil Procedure 42(b), the Court may bifurcate a trial on one or more issues "[f]or convenience, to avoid prejudice, or to expedite and economize" the trial.  The party moving for bifurcation bears the burden to show that it will meet these criteria.  *See F & G Scrolling Mouse, L.L.C. v. IBM Corp.*, 190 F.R.D. 385, 387 (M.D.N.C. 1999) (collecting district court cases)).  The decision to bifurcate is an exercise of the Court's discretion.  *Gonzalez-Marin v. Equitable Life Assurance Soc'y of U.S.*, 845 F.2d 1140, 1145 (1st Cir. 1988).

In this case, there is very little, if any, prejudice to the Defendants from the jury's consideration of whether the Plaintiffs have sustained their burden to establish the Defendants' liability for punitive damages under the Maine standard set forth in *Tuttle v. Raymond*, 494 A.2d 1353, 1363 (Me. 1985).  To prove liability for punitive damages, a plaintiff must establish by clear and convincing evidence that "the defendant[]s' conduct was motivated by ill will towards the plaintiff[s] or that the defendant[s] engaged in deliberate conduct which, while motivated by something other than ill will toward any particular person, is so reprehensible that malice toward a person injured as a result of the conduct can be implied."  DONALD G. ALEXANDER, MAINE JURY INSTRUCTION MANUAL § 7-114 (4th ed. May 2012) (ALEXANDER); *Tuttle*, 494 A.2d at 1363.

The Defendants' worry that the jury will be confused by the differing standards of proof—preponderance and clear and convincing evidence—is unconvincing, because the Court will in any event be required to instruct the jury on the clear and convincing standard on the common law fraud count.  ALEXANDER §

7-30 ("To prevail in the action for fraud, the plaintiff must prove the following facts by clear and convincing evidence").

The Defendants' second concern is that the jury will be confused by the introduction of the term "malice" into the trial. However, the Court is not convinced that the introduction of this term, carefully explained, will cause the jury any undue confusion.

The Court agrees with the Defendants, however, that the introduction of the Defendants' wealth into the liability phase of this trial would be potentially prejudicial. Therefore, the Court will initially pose only the liability question on punitive damages to the jury. If the jury renders a verdict for the Goldensons on the punitive damages count, the Court will allow the parties to proceed with further evidence on the punitive damages count only, including the wealth of the Defendants. This is somewhat similar to what Judge Hornby of this District did in *Shannon v. Sasseville*, 684 F. Supp. 2d 169, 172 (D. Me. 2010).[1]

As the Court has determined that the jury may consider the punitive damages count during the liability phase of trial, and as the Plaintiffs must have the Defendants' tax returns in order to prepare for the possibility that they will be required to present evidence on the proper amount of punitive damages, the Court agrees with the Plaintiffs that the time has come for the Defendants to hand over

---

[1] The Court acknowledges that in *Shannon*, the jury first reached only the issue of compensatory damages; however, the Shannon case involved a claim against the plaintiff's uncle for sexual abuse, and the jury's finding of liability virtually mandated submission of the punitive damages question to the jury. *Shannon*, 684 F. Supp. 2d at 172. Here, as it is possible given the tonal differences among the counts the jury could find the Defendants liable on all underlying compensatory counts and not liable on the punitive damages count, the Court has decided to pose the punitive damages question directly to the jury.

their tax returns to the Plaintiffs. Although the Plaintiffs have argued that they should be allowed to introduce the returns to establish the Defendants' receipt of money from Ezra Merkin and to impeach Mr. Steffens, the Court does not reach those issues. Before the Goldensons seek to introduce evidence of the Defendants' wealth or the information revealed in their tax returns to the jury other than in the punitive damages phase of trial (if any), they must first approach the Court and obtain express permission to do so.

## II.    MOTION TO COMPEL OFFER OF PROOF

The Defendants next request that the Court direct the Goldensons to submit an offer of proof before trial regarding the proposed testimony of expert witness Arthur Laby, Esq. *Mot. to Compel Pls. to Submit an Offer of Proof Concerning Expert Testimony of Arthur Laby* (ECF No. 250) (*Def.'s Mot. to Compel*). The Goldensons oppose this motion. *Pl.'s Opp'n to Defs.' Mot. to Compel Pls. to Submit an Offer of Proof Concerning Expert Testimony of Arthur Laby* (ECF No. 255) (*Pl.'s Opp'n to Mot. to Compel*).

This dispute has its roots in two previous orders of the Court. On February 25, 2013, the Court issued an order on the parties' respective motions to exclude each other's experts. *Order on the Parties'* Daubert[2] *Mots. to Exclude Expert Testimony* (ECF No. 190) (*Daubert Order*). This order included a section restricting the scope of Professor Laby's trial testimony.[3] *Id.* at 26-30. On March 7, 2014, the Court issued its order on the Defendants' motion for summary judgment. *Order*

---

[2]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).
[3]    Arthur Laby, Esq. is a professor of law at Rutgers School of Law – Camden.

*Granting In Part and Denying In Part Defs.' Mot. for Summ. J.* (ECF No. 236) (*Summ. J. Order*). The Summary Judgment Order referred to Professor Laby's deposition testimony to resolve several disputed factual matters. *E.g.*, *Summ. J. Order* at 28 n.66, 29 n.68. The order also defined the legal framework applicable to the Goldensons' claims. *Id.* at 149-224.

### A.     Position of the Parties

### 1.     The Defendants

The Defendants invoke the Court's "gatekeeping" function under Federal Rule of Evidence 702: to "'ensure . . . before admitting expert testimony . . . [that] the testimony is such that it will assist the trier of fact in understanding or determining a fact in issue.'" *Def.'s Mot. to Compel* at 4 (quoting *Correa v. Cruisers, A Division of KCS Int'l, Inc.*, 298 F.3d 13, 24 (1st Cir. 2002) and citing *Morin v. E. Me. Med. Ctr.*, 780 F. Supp. 2d 98, 103-04 (D. Me. 2010)). In their view, an offer of proof is appropriate because following the Summary Judgment Order "it is no longer clear what Professor Laby can testify to at trial." *Id.* at 5. They contend that under the Court's *Daubert* Order and Summary Judgment Order, "the question of what a fiduciary duty consists of and what standards of conduct it imposes is a legal one that cannot be answered through expert testimony." *Id.* Comparing the legal and factual issues left in play by the Summary Judgment Order to the restricted scope of testimony the Court imposed in the *Daubert* Order, the Defendants conclude that there is no room left for Professor Laby's expert testimony. *Id.* at 5-6.

## 2.    The Goldensons

The Goldensons first argue that it is procedurally improper for the Court to require an offer of proof before trial. *Pl.'s Opp'n to Mot. to Compel* at 2. They next point out that the Defendants had an opportunity to explore the facts underlying Professor Laby's opinions at his deposition. *Id.* at 3. In particular, they fault the Defendants for steering Professor Laby toward legal conclusions in his deposition and avoiding the facts underlying those conclusions. *Id.* (citing *Aff. of Jay P. McCloskey* Attach. 50 *Dep. of Arthur B. Laby, Esq.*, at 27:13-32:11 (ECF No. 215) (*Laby Dep. Tr.*) and quoting *Laby Dep. Tr.* at 31:16). Finally, the Goldensons point out that the Court has already qualified Professor Laby as "'a qualified expert on securities laws and the securities industry.'" *Id.* at 4 (quoting *Daubert Order* at 27).

Despite their opposition to providing an offer of proof, the Goldensons' reply brief includes a section entitled "Professor Laby's Anticipated Testimony" that quotes extensively from their expert designation. *Id.* at 4-8 (citing, among other things, *Decl. of Max Nicholas* Attach. 1 *Pl.'s Expert Witness Designations* (ECF No. 142) (*Nicholas Decl.*)).

### B.    Discussion

Although the Defendants' concerns about the permissible scope of Professor Laby's testimony are legitimate, there is no need for a pre-trial offer of proof to resolve them. The Court already ruled that "the proper place to define legal terms, such as 'fiduciary duty' and 'good faith and fair dealing,' is in the jury instructions because 'it is not for the witnesses to instruct the jury as to the applicable principles of law, but for the judge.'" *Daubert Order* at 26 (quoting *Nieves-Villanueva v. Soto-*

*Rivera*, 133 F.3d 92, 99 (1st Cir. 1997)). The Court determined that Professor Laby could "opine on how the facts of this case tie into the legal framework and the relevant industry." *Id.* at 27. Nothing about the Summary Judgment Order changed that conclusion. The legal framework in this case, although it will be given to the jury by the Court, applies to a complex industry and contains a variety of terms of art that lay jurors may not understand at the outset. Professor Laby will testify as to how, in his view, the facts fit into the legal framework.

Professor Laby "may not testify about his legal conclusions concerning whether the Defendants owed the Plaintiffs fiduciary duties or breached those duties." *Id.* at 28. The Court has every intention to "'exercise reasonable control over the mode and order of examining witnesses and presenting evidence,'" *id.* at 30 (quoting FED. R. EVID. 611(a)), to prevent Professor Laby from "engag[ing] in narratives and summarize[ing] contested facts." *Id.* However, the legal framework the Court defined in the Summary Judgment Order neither threatens to render Professor Laby's testimony wholly superfluous nor calls into question the sufficiency of the Court's previous ruling in the *Daubert* Order.

The Court dismisses as moot the Defendants' Motion to Compel.

## III. MOTION IN LIMINE REGARDING INDEMNIFICATION AND SIMPSON THACHER

In opposing the Defendants' motion for summary judgment, the Goldensons argued that the Defendants' indemnification for their legal fees by Spring Mountain Partners QP I, LP (the QP I Fund) was evidence in support of the Defendants' liability for intentional infliction of emotional distress (IIED). *Pl.'s Opp'n to Defs.'*

*Mot. for Summ. J.* at 37-38 (ECF No. 212).  They also argued that the Defendants'
notice to QP I Fund investors, that Spring Mountain Capital had hired the law firm
of "Simpson Thacher"[4] to represent "us" following the revelation of the Madoff
fraud, was relevant to the IIED claim.  *Id.*  In responding to these assertions in the
Goldensons' statement of additional material facts, the Defendants raised relevancy
objections, claiming the facts were not material to any legal dispute raised by the
complaint.  *E.g.*, *Defs.' Reply to Pls.' Statement of Additional Facts* ¶¶ 421-28 (ECF
No. 224).  The Court ruled on each of these relevancy objections, holding the facts
relevant to the IIED claim.  *Summ. J. Order* at 132-35 nn.383-91.  However, the
Court did not discuss these facts in detail in its ruling that part of the IIED claim
survived summary judgment.  *See Summ. J. Order* at 212-16.

The Defendants now request that the Court prevent the Goldensons from
introducing at trial evidence or arguments of: (1) the Defendants' indemnification
for their legal fees by the QP I Fund; and (2) representation of the Spring Mountain
entities by Simpson Thacher.  *Mot. to Exclude Evidence and Arguments Relating to
Indemnification and Prior Representation* (ECF No. 251) (*Def.'s Mot. to Exclude*).
The Goldensons object.  *Pls.' Opp'n to Defs.' Mot. to Exclude Evidence and
Arguments Relating to Indemnification and Prior Representation* (ECF No. 257)
(*Pl.'s Opp'n to Mot. to Exclude*).

---

[4]      Simpson Thacher & Bartlett LLP.

### A. Position of the Parties

#### 1. The Defendants

The Defendants' first position is that the evidence of their indemnification by the QP I Fund is not relevant under Federal Rule of Evidence 401 and should be excluded under Rule 402. *Defs.' Mot. to Exclude* at 2-3. This is so, they contend, because the Goldensons had notice of this indemnification from the Confidential Offering Memorandum (COM) that Mr. Goldenson reviewed before he invested in the QP I Fund. *Id.* (citing *Decl. of Max C. Nicholas* Attach. 1 *Confidential Memorandum*, at PLS' RSP 000297 (ECF No. 252) (*QP I COM*)). They assert that the indemnification provision is "not ambiguous and is not a disputed fact at issue for trial." *Id.* at 3. Because, in the Defendants' view, their indemnification is consistent with this contract provision, it cannot be relevant to any of the Goldensons' claims. *Id.* at 3.

Even if the indemnification were relevant, the Defendants argue that its probative value would be substantially outweighed by the danger of unfair prejudice, making it inadmissible under Rule 403. *Id.* at 4-6. They are concerned that the indemnification evidence will encourage the jury to improperly compare the parties' abilities to pay their legal fees and invite an emotional response. *Id.* at 4-5. They are also concerned that they would have to respond to this evidence with their own evidence of their contractual right to indemnification, and also encourage the jury to find liability in the Defendants' because it would appear that they will be unharmed financially by having to pay damages. *Id.* at 5. They compare the

indemnification evidence to evidence of insurance, generally barred under Rule 411. *Id.* at 5-6.

Finally, the Defendants anticipate that the Goldensons will argue that Spring Mountain Capital's notice to its investors that it had retained Simpson Thacher contributed to Mr. Goldenson's severe emotional distress. *Id.* at 7. They offer a decision by Judge Rich earlier in this case that "'the available objective evidence does not demonstrate that the plaintiffs were [Simpson Thacher's] clients' and that '[t]he letters on which the plaintiffs rely cannot reasonably be construed so to indicate.'" *Id.* at 7 (quoting with alterations *Memorandum Decision on Pls.' Mot. to Compel* at 19-20 (ECF No. 136) (*Mem. Dec.*)). They argue that this decision is the law of the case and should not be revisited. *Id.* at 7-8.

### 2. The Goldensons

The Goldensons argue that the Defendants' indemnification for their legal fees by the QP I Fund is relevant to several of their claims. *Pl.'s Opp'n to Mot. to Exclude* at 3-7. First, they characterize as a "core defense" the Defendants' position that they were not investment advisors to the Goldensons. *Id.* at 3-4. They argue that the indemnification clause only operates against claims brought "'in connection with their professional roles' *as* investment advisors." *Id.* at 4 (quoting *Defs.' Mot. to Exclude* at 3) (emphasis supplied by the Goldensons). This, in their view, makes the indemnification agreement relevant to almost all of their claims. *See id.* at 3-4.

Next, the Goldensons dispute that the QP I COM represents a contractual indemnification obligation from QP I to the Defendants; they assert that "the COM is not a contract." *Id.* at 4. Rather, they contend that the QP I COM merely refers

to the Fund's partnership agreement, which is the binding contract. *Id.* However, the Goldensons assert, with some emphasis, that "*there is no Fund Agreement between the Defendants and the Plaintiffs.*" *Id.* (emphasis in original). They deny that there exists any evidence that the Defendants and the QP I investors agreed to any contractual indemnification agreement. *Id.* at 5.

The Goldensons next argue that the Defendants are charging their legal fees to the QP I Fund, not pursuant to an indemnification agreement, but as expenses under the COM's provision for such expenses. *Id.* at 5. They quote from the QP I COM for the proposition that such expenses are only to be paid for services "***performed or paid on behalf of the Fund*** by the Management Company." *Id.* (quoting, with emphasis, *QPI COM* at PLS' RSP 000280).

As their final point on the topic of relevance, the Goldensons argue that the indemnification agreement is relevant to the IIED claim, the "Defendants' scienter" (presumably the scienter element of the federal securities fraud claim, *see Summ. J. Order* at 173-74), and also breach of fiduciary duty, fraud, conspiracy, and punitive damages. *Id.* at 6.

The Goldensons also contend that the evidence of the indemnification agreement is not unfairly prejudicial under Rule 403. *Id.* at 7-8. In their view, because the evidence is probative of the Defendants' wrongful conduct, any prejudice is not an unfair prejudice. *Id.*

Lastly, the Defendants argue that evidence of Simpson Thacher's representation of Spring Mountain is admissible. *Id.* at 10. They deny that the

Magistrate Judge's ruling—that "'the available objective evidence does not demonstrate that the plaintiffs were [Simpson Thacher's] clients'"—affects their present contention that the Defendants fraudulently charged QP I investors for Spring Mountain Capital's legal fees. *Id.* at 10 (quoting *Mem. Dec.* at 7). In the alternate, they argue that the jury might conclude that the Defendants were trying to "lull their investors into a false sense of security" by pretending that Simpson Thacher had been hired "'to protect the [QP I] Fund's assets.'" *Id.* (quoting *Nicholas Decl.* Attach. 6 *Letter From Spring Mountain Capital to Investor* (ECF No. 252) (*Investor Letter*)).

## B. Discussion

Relevant evidence is generally admissible. FED. R. EVID. 402. Evidence is relevant if it tends to make any material fact either more or less likely to be true. FED. R. EVID. 401. However, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." FED. R. EVID. 403.

### 1. The Indemnification Agreement and Federal Rule of Evidence 411

The indemnity provision in the QP I COM is as follows:

Indemnification. The Fund Agreement provides that the Fund shall, to the fullest extent permitted by law indemnify and hold harmless each Indemnified Party from and against any loss or expense suffered or sustained by him/her/it by reason of the fact that he/she/it is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided that such loss or expense resulted from a mistake of judgment on the part of an Indemnified Party, or from action or inaction that did not constitute gross negligence, willful

misconduct or bad faith, or for losses due to the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Party provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard of care set forth above. The Fund Agreement also provides that the Fund will, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct. In the event that such an advance is made by the Fund, the Indemnified Party will agree to reimburse the Fund to the extent that it is determined that it was not entitled to indemnification.

*QP I COM* at PLS' RSP 000297.[5]

Under Federal Rule of Evidence 411,

[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

Courts are divided on whether indemnification agreements, outside the context of a liability insurance contract, are within the scope of Rule 411. *Compare Elliott v. S.D. Warren Co.*, 134 F.3d 1, 7-8 (1st Cir. 1998) (acknowledging, without criticism, a district court's decision to exclude evidence of indemnification under Rules 403 and 411); *Larez v. Holcomb*, 16 F.3d 1513, 1518, 1520 n.6 (9th Cir. 1994) (reciting that "[i]t has long been the rule in our courts that evidence of insurance or other indemnification is not admissible on the issue of damages," but declining to rest this conclusion on Rule 411); *Curtis Mfg. Co. v. Plasti-Clip Corp.*, 933 F. Supp. 94, 100-01 ("[T]he court finds that said [indemnification] agreement is subject to

---

[5] The Goldensons argue that this is unenforceable because the Defendants have not produced a Fund Agreement signed by any QP I investors. This may be a consideration for the jury in deciding whether the indemnity agreement exists, but it does not go to whether evidence of the indemnity agreement is within the scope of Rule 411.

Rule 411"); *with Holcomb*, 16 F.3d at 1523-24 (Pregerson, J., concurring in part and dissenting in part) ("[T]he *protection to insurance companies* rationale for excluding evidence under FRE 411 does not justify restricting admission of evidence regarding the city's obligation to indemnify its officers for compensatory damage awards"); *Huff v. Jackson*, C.A. No. C-11-149, 2013 WL 625045, at *1 (S.D. Tex. Jan. 2, 2013) ("Rule 411 applies only to liability insurance, not all types of indemnification"); *DSC Commc'ns Corp. v. Next Level Commc'ns*, 929 F. Supp. 239, 242-43 (E.D. Tex. 1996).

On its face, it is unclear whether Rule 411 applies to private indemnification agreements of the sort at issue here. The 1972 advisory committee note to Rule 411 gives one rationale for the rule:

> The courts have with substantial unanimity rejected evidence of liability insurance for the purpose of proving fault, and absence of liability insurance as proof of lack of fault. At best the inference of fault from the fact of insurance coverage is a tenuous one, as is its converse. More important, no doubt, has been the feeling that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds.

Professors Wright and Graham, however, having performed an exhaustive survey of cases and commentary on Rule 411, find this rationale subject to heavy attack from both academics and judges, and conclude that the advisory committee's justification is "shabby in the light of these criticisms." CHARLES ALAN WRIGHT & KENNETH GRAHAM, JR., 23 FEDERAL PRACTICE AND PROCEDURE § 5362, at 436 (1980 & Supp. 2014). Professors Wright and Graham suggest that a number of other factors underlay the adoption (and persistence) of Rule 411 "in the face of the collective scorn of the writers": (1) conformity with state practices; (2) a need to defend the "package of procedures designed to preserve the fault system of liability against the

tendency of juries to engage in ad hoc compensatory schemes"; and (3) a conservative preference for "undermining by exceptions rather than the direct overthrowing of the rule." *Id.* at 437-38. They also suggest that it may be a mechanism to assist subrogated insurers in maintaining a cloak of invisibility during jury proceedings in which they purport to "be" the insured party. *Id.* at 433-36.

The two most compelling rationales in this laundry list are protecting the fault system of liability from "ad hoc compensatory schemes" and protecting a subrogated insurer. To the latter point, the district court in *DSC Communications* identified six factors useful in distinguishing "liability insurance" to which Rule 411 might apply from other types of indemnification:

1) The insurer is paid to take the risk in question;

2) the insurer is well able to pay;

3) the insurer has agreed to indemnify the insured from liability to third persons as contrasted with coverage from losses sustained by the insured;

4) the insurer will spread the loss among its policy holders;

5) the insured will be disinclined to take an action which might cause the insurer to pay on a liability claim since the insured's premiums will rise; and

6) the insured is insuring a future risk.

*DSC Commc'ns*, 929 F. Supp. at 243. Of these factors, only the fourth and sixth have even a tenuous fit with the relationship between the QP I Fund and the Defendants. The Court concludes that the QP I Fund is not a subrogated insurer.

There is some weight to Professors Wright and Graham's suggestion that the policy of Rule 411 is an integral part of the fault system of liability, designed to counterbalance "the tendency of juries to engage in ad hoc compensatory schemes." This is consistent with the advisory committee's oblique suggestion that a jury will decide the case on "improper grounds."[6] The wrinkle, in this case, is that the entity that would indemnify the defendants is the QP I Fund itself, in which the Goldensons are limited partners. In other words, if the indemnification is enforceable, it is the plaintiffs themselves, not some deep-pocketed and remote insurance company, who will be stuck with a pro rata portion of the bill. In sum, although many indemnification agreements might trigger the "improper grounds" rationale of Rule 411, that rationale is not applicable here.

The Court concludes that, in the unusual circumstances of this case, Federal Rule of Evidence 411 does not bar evidence of this indemnification agreement.

### 2. Relevance

#### a. The Indemnification Agreement

To recap, the Goldensons' four theories of relevance are: (1) that the indemnification agreement goes to whether the Defendants were the Goldensons' "investment advisors"; (2) that the QP I Fund's obligation to indemnify the Defendants hinges on a Fund Agreement that does not exist, and is therefore

---

[6] The Court sees little distinction between dissuading "ad hoc compensatory schemes," WRIGHT & GRAHAM § 5362, at 437, and the concern that "knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds." FED. R. EVID. 411, 1972 advisory committee note. Whatever delicate language is used to dress up the concept, the basic concern here is that a jury, knowing that the defendant won't himself have to pay a money award and that it will be paid by some other entity with deep pockets, will happily award an unreasonably large amount of money damages.

fraudulent; (3) that the Defendants are charging Madoff-related legal expenses to their investors pursuant to the QPI COM's "expenses" provision, not the indemnity provision, which limits expenses to those expenses performed "on behalf of the Fund"; and (4) that the Court already determined that the Defendants' billing of their legal fees is relevant. *Pl.'s Opp'n to Mot. to Exclude* at 3-7.

The first theory is not persuasive. The Goldensons rest this theory on the Defendants' statement, in their Motion to Exclude, that they are being indemnified for their costs defending a suit brought against them "'in connection with their professional roles.'" *Id.* at 4 (quoting *Def.'s Mot. to Exclude* at 3). This language is from a brief, not the COM. The language in the COM claims that the Fund Agreement permits indemnification for any "loss or expense suffered or sustained [by an Indemnified Party] by reason of the fact that he/she/it is or was an Indemnified Party." *QP I COM* at PLS' RSP 000297. An "Indemnified Party" is "the General Partner, Management Company, and any of their respective partners, members, managers, directors, officers, employees, consultants, agents, and legal representatives." *Id.* This definition has nothing to do with status as an "investment advisor" or with actions taken by the Indemnified Party.

The second and third theories of relevance are, in essence, that the Defendants' charges of legal expenses to the QP I Fund are fraudulent. The problem with these theories is that they are largely outside the scope of the Complaint. The First Amended Complaint alleges a wide variety of fraud with regard to the sales practices and operation of the QP I Fund and Ascot partners

before the Madoff fraud came to light. Its allegations of wrongdoing after the revelation of the Madoff fraud—leaving aside the IIED claim—are limited to claims that the Defendants continued to obscure the Madoff-Ascot-Spring Mountain relationship. *See First Am. Compl.* ¶¶ 55, 56, 106, 107, 108, 110, 111-15, 127(H), 127(I), 157, 158. It contains no allegation that the Defendants improperly charged their legal fees to the QP I Fund under either the expense or indemnification provisions.

The Goldensons' effort to attack the Defendants' funding of their defense is troubling. They have accused the Defendants of extremely serious fraud, and want to argue to the jury that the Defendants' efforts to defend themselves from that accusation are further ongoing fraud. Absent any concrete allegation in the Complaint, the Goldenson may not extend their arguments about fraud and breach of fiduciary duty to the Defendants' effort to defend themselves.

The Goldensons' final theory of relevance with regard to the indemnification is that the Court already ruled it relevant to the IIED claim in the Summary Judgment Order. *Pl.'s Opp'n to Defs.' Mot. to Exclude* at 6 (citing *Summ. J. Order* at 135 nn.384-91). The only portion of this cited material that addresses the indemnification is footnote 390, discussing paragraph 427 of the Goldensons' statement of additional material facts. *See Summ. J. Order* at 135 n.390. That paragraph asserted, as the Court modified it slightly: "The Defendants adverse to the plaintiff have charged their legal expenses in connection with the instant lawsuit to the QP I Fund; these legal expenses were approximately $495,000 in

2011." *Id.* at 135. In footnote 390, the Court summarily overruled the Defendants' oft-repeated relevancy objection with reference to a similar objection in paragraph 425, which the Court ruled was relevant to the IIED claim. *Id.* at 134 n.388. In light of the additional evidence and analysis presented here, the Court is not prepared to treat footnote 390 as law of the case on the relevance of the indemnification agreement at trial.

The Court concludes that evidence of the indemnification agreement is not relevant to any trial issue. The Court provisionally grants the Defendants' motion in limine as to indemnification. If the context of the trial generates some basis to revisit this decision, the Court will do so on either party's motion.

### b. Simpson Thacher's Representation

News of Mr. Madoff's fraud broke on December 11, 2008. *Decl. of John L. Steffens* ¶ 32 (ECF No. 197). On December 15, 2008, Spring Mountain Capital notified investors that it had retained Simpson Thacher "to provide us with legal advice concerning all transactional, structural, regulatory and litigation issues that may arise in connection with this matter. . . . We are evaluating other steps to be taken in order to protect the Fund's assets . . . ." *Investor Letter*. The Defendants argue that this evidence is inadmissible because it is irrelevant, but they do not claim it is unfairly prejudicial. *See Defs.' Mot. to Exclude* at 7-8.

The Defendants are correct that the Magistrate Judge already ruled that "the available objective evidence does not demonstrate that the plaintiffs were [Simpson Thacher's] clients," and that "[t]he letters on which the plaintiffs rely cannot reasonably be construed to so indicate." *Mem. Dec.* at 19. The Court will not permit

the Goldensons to offer the letter to prove that they were Simpson Thacher's clients. Furthermore, for the reasons discussed above, the Court will not permit the Goldensons to argue that this letter is evidence of fraud, breach of fiduciary duty, or extreme and outrageous conduct.

However, the letter is relevant to Mr. Goldenson's subjective (and mistaken) belief that Simpson Thacher had been hired to represent the interests of the QP I investors, which in turn is relevant to the causation and severity of his alleged emotional distress. If the jury believes that Mr. Goldenson truly understood Simpson Thacher to be representing the investors, and it furthermore believes all of the other factual underpinnings of the Defendants' alleged extreme and outrageous conduct, then Mr. Goldenson's subjective belief would make it more likely that the wrongful conduct was a cause in fact of Mr. Goldenson's distress. It would also make it more likely that Mr. Goldenson's emotional distress was "severe," since it would support the proposition that he felt deep betrayal when he learned the additional facts of Mr. Madoff's involvement and the Defendants' alleged cover-up activities.

The Court denies the Defendants' motion in limine as to Simpson Thacher's representation, but will give a limiting instruction to the jury on its proper use if the Defendants request it.

## IV. MOTION IN LIMINE REGARDING ANALYSES PERFORMED ON ASCOT

The Goldensons move the Court to preclude any Defendant from testifying that he or other Spring Mountain staff members performed any analysis of Ascot's

trades. *Pl.'s Mot.* In Limine *to Preclude the Defs. From Testifying as to Any Analyses Performed on Ascot* (ECF No. 253) (*Pls.' Mot. to Preclude*). The Defendants object. *Defs.' Opp'n to Pls.' Mot.* In Limine *to Preclude The Defs. From Testifying as to Any Analyses Performed on Ascot* (ECF No. 258) (*Defs.' Opp'n to Mot. to Preclude*). The Defendants also attach an affidavit from attorney David Spears and accompanying exhibits in support of their opposition. *Decl. of David Spears* (ECF No. 259) (*Spears Decl.*).

### A.    Position of the Parties

#### 1.    The Goldensons

The Goldensons argue that the Defendants failed to disclose any documents related to their purported analysis of Ascot's trade sheets during discovery, in violation of Federal Rule of Civil Procedure 26(a), (e). *Pls.' Mot. to Preclude* at 1-2. They argue that a proper sanction under Rule 37(c) would be to preclude the Defendants from testifying that he performed these analyses.

The Goldensons first point to Defendant John L. Steffens' response to an interrogatory asking him to describe "'any and all due diligence that You or Spring Mountain performed with respect to Madoff in connection with the investments of any Spring Mountain fund.'" *Id.* at 1 (quoting *Aff. of Alfred C. Frawley IV* Attach. 25 *Resps. of John L. Steffens to Pls.' First Set of Interrogs.* at 4 (ECF No. 214) (*First Interrog. Resps.*)). Mr. Steffens answered that "'Spring Mountain (a) relied upon investigation of Madoff carried out by J. Ezra Merkin and entities with which he was associated; and (b) considered information relating to Madoff that they had access to.'" *Id.* at 1-2 (quoting *First Interrog. Resps.* at 4-5). They view this as

inconsistent with Mr. Steffens' claim, in his affidavit in support of the motion for summary judgment, that Spring Mountain analysts "'tested Ascot's performance and volatility in different markets using statistical models and reported to [Mr. Steffens] their conclusion that in a wide range of markets Ascot should have low volatility and was likely to yield unspectacular but steady returns.'" *Id.* at 2 (quoting *Decl. of John L. Steffens In Support of Defs.' Mot. for Summ. J.* ¶ 24 (ECF No. 198) (*Steffens Decl.*)).

In discovery, the Goldensons requested

> "[a]ll documents, communications and ESI [electronically stored information] depicting or concerning the Plaintiffs' investments in Ascot between September 1, 2001 and the present, including without limitation any such documents, communications and ESI regarding such investments made by and through Ascot's status as a Sub-Manager or Portfolio fund of Spring Mountain."

*Id.* at 2 n.1 (quoting *Pls.' Reply to Defs.' Resp. to Pls.' Mot. for Enlargement of Time Permitted for Designation of Expert Witnesses* Attach. 1 *Pls.' First Req. for Produc. of Docs. and Things*, at 7 (ECF No. 74) (*Pls.' First Produc. Req.*)).   They also requested

> "[a]ll documents, communications and items of ESI depicting or concerning Bernard L. Madoff and/or Bernard L. Madoff Investment Securities LLC in the possession of Spring Mountain, including all documents, communications and items of ESI sent by Spring Mountain to investors in any Spring Mountain fund."

*Id.* (quoting *Pls.' Mot. to Compel the Produc. of Docs.* Attach. 6 *Defs.' Objections to Pls.' Second Req. for Produc. of Docs.*, at 8 (ECF No. 104) (*Defs.' Second Produc. Objections*)).

In the Goldensons' view, the Defendants should have produced documentary evidence of their "qualitative analysis" of Ascot in response to these requests. *Id.* at 2. Because they did not, the Goldensons conclude that either the documents do not exist or the Defendants are withholding them in violation of Rule 26. *Id.* at 4. The Goldensons assert that this is particularly unfair because, in their portrayal, Mr. Steffens has "changed his story concerning what he knew about Madoff's role in Ascot." *Id.* at 4. As evidence of this change in position, they compare Mr. Steffens' answer to the First Amended Complaint, *Answer to Am. Compl.* ¶¶ 5, 106 (ECF No. 46) and his first interrogatory response, *First Interrog. Resps.* ¶ 10, to his later declaration in the summary judgment motion. *Steffens Decl.* ¶ 29. They urge that "[i]n the interests of the integrity of the discovery process" the Defendants should not be allowed to "testify[] as to the adequacy of their due diligence into Madoff at trial." *Id.* at 5. The Goldensons also claim that they have suffered prejudice from the non-production of Ascot analyses because their forensic accounting expert was unable to review them. *Id.*

### 2. The Defendants

The Defendants' position is straightforward: The documents do not exist, and the Goldensons did not ask the right questions. *Defs.' Opp'n to Pls.' Mot. to Preclude.* They point out that the interrogatory question to which Mr. Steffens responded asked about his due diligence into Mr. Madoff, not into Ascot. *Id.* at 2. When Mr. Steffens submitted his declaration in support of summary judgment, he swore to the due diligence that he performed on Ascot, not Mr. Madoff. *Id.* at 3. They further swear, supported by Attorney Spears' affidavit, that they are not

"sitting on a secret stash of trade sheets and reviews of Ascot's trades that they intend to spring on Plaintiffs at trial." *Id.* at 4 (citing *Spears Decl.* ¶¶ 1-3).

The Defendants further deny that Mr. Steffens' alleged inconsistencies are material to an analysis under Rule 37, and also deny that there are any inconsistencies between his statements. *Id.* at 5-6. They distinguish between Mr. Steffens' earlier assertion, that he did not know Mr. Madoff was making "all, virtually all or most of the purported investment decisions concerning Ascot," and his later assertion that he believed "that at various times 'Madoff executed Ascot's trades pursuant to a limited grant of discretion from [Mr.] Merkin.'" *Id.* at 6. In the Defendants' view, these two statements are completely consistent. *Id.* at 7.

The Defendants conclude that the Goldensons' remedy is to challenge Mr. Steffens' credibility at trial, perhaps using his interrogatory responses as prior inconsistent statements under Federal Rule of Evidence 607. *Id.* at 7.

### B.     Discussion

Federal Rule of Civil Procedure 37(c) provides that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

The Goldensons urge the Court to preclude Mr. Steffens from testifying to any "qualitative analyses" he or his staff performed on Ascot because they failed to disclose them during discovery under Rule 26.

First, the Court addresses the preliminary matter of Mr. Steffens' purportedly inconsistent interrogatory responses and affidavit. The relevance of

these statements to the Goldensons' motion to preclude him from testifying to his staff's analyses of Ascot is murky. The existence of un-produced Ascot analyses has very little to do with what Mr. Steffens said, at different times, about what he knew about Ascot and Mr. Madoff. However, to assuage any doubts that the Court might have overlooked some factors relevant to the exercise of its discretion, the Court will examine these details.

The Goldensons' two sets of interrogatories to Mr. Steffens asked very specific questions. They defined "Ascot" and "Madoff" separately. *Spears Decl.* Attach. 1 *Pls.' First Set of Interrogs. Propounded to Def. John L. Steffens*, ¶¶ 9, 11 (ECF No. 259) (*First Interrogs.*); *Spears Decl.* Attach. 2 *Pls.' Second Set of Interrogs. Propounded to Def. John L. Steffens*, ¶¶ 9, 11 (ECF No. 259) (*Second Interrogs.*)). In Interrogatory 4, in the first set, the Goldensons asked:

> 4. Describe any and all due diligence investigation that You or Spring Mountain performed with respect to Madoff in connection with investments of any Spring Mountain fund.

*First Interrogs.* ¶ 4. Mr. Steffens answered:

> Steffens and Spring Mountain (a) relied upon investigation of Madoff carried out by J. Ezra Merkin and entities with which he was associated; and (b) considered information relating to Madoff that they had access to.

*First Interrogs. Resps.* ¶ 4.

In Interrogatory 10, in the first set, the Goldensons asked:

> 10. Please state whether the fact or belief that Madoff was making all, virtually all or most of the purported investment decisions concerning Ascot Partners, L.P. and/or the Ascot Fund, Ltd. was material information upon which a reasonable investor would rely in deciding whether to acquire interests in those funds, and if You contend that such information was immaterial to that decision, specify

all information, statements, documents, statutes, regulations or grounds of any kind, whether based in fact or law, upon which You rely in support of that position.

*First Interrogs.* ¶ 10.  Mr. Steffens replied:

Steffens did not have knowledge or otherwise have reason to believe that Madoff was making all, virtually all or most of the purported investment decisions concerning Ascot Partners, L.P. and/or the Ascot Fund Limited.

*First Interrogs. Resps.* ¶ 10.

In Interrogatory 16, in the second set, the Goldensons asked:

Please describe Your knowledge, as it existed prior to December 1, 2008, of the degree in which Madoff participated in the Investment Decisions of Ascot Partners, L.P. and Ascot Fund Limited.

*Second Interrogs.* ¶ 16.  Mr. Steffens answered:

[P]rior to December 1, 2008, Steffens believed that at various times Madoff executed trades on behalf of Ascot Partners, L.P. pursuant to a limited grant of discretion from Merkin.

*Spears Decl.* Attach. 4 *Resps. of John L. Steffens to Pls.' Second Set of Interrogs.* ¶ 16 (ECF No. 259) (*Second Interrogs. Resps.*)); *see also Steffens Decl.* ¶ 29.

The Court agrees with the Defendants that there is very little here on which to base a finding of inconsistency.  Mr. Steffens swore in his first interrogatory response that he did not believe that Mr. Madoff was making "all, virtually all or most of the purported investment decisions concerning [Ascot]."  In his second interrogatory response, he swore that he believed that Mr. Madoff "executed trades on behalf of [Ascot] pursuant to a limited grant of discretion from Merkin."  His sworn statement in support of the summary judgment motion was of similar substance.  As the Defendants point out, making all or virtually all of the decisions about a fund is different from executing trades under a limited grant of discretion.

Mr. Steffens swore that he did not understand the first statement to be true, but he did understand the second statement to be true. The Court perceives no inequitable changing of position that would factor into its decision on a Rule 37(c) sanction.

Turning to the heart of the matter, the Court also perceives no discovery violation that would justify a sanction of any kind under Rule 37(c). In the first set of interrogatories, the Goldensons asked Mr. Steffens what diligence he had performed on Mr. Madoff, not what diligence he had performed on Ascot. *First Interrogs.* ¶ 4. Mr. Steffens said that, with respect to Mr. Madoff, he relied on information provided to him by Mr. Merkin. *First Interrogs. Resps.* ¶ 4. This statement does not require or imply that he did not perform qualitative analysis on Ascot itself. Later, the Goldensons asked for documents "depicting or concerning the Plaintiffs' investments in Ascot," *Pls.' First Produc. Req.* at 7, and documents "depicting or concerning Bernard L. Madoff and/or Bernard L. Madoff Investment Securities LLC." *Defs.' Second Produc. Objections* at 8. In response to these requests, the Defendants produced no qualitative analysis or trade sheets of Ascot, and swear that they have none in their possession. *Spears Decl.* ¶¶ 1-3. Then, still later, Mr. Steffens swore that he personally reviewed Ascot's trade sheets and directed his staff to perform qualitative analysis of Ascot and that they reported back to him favorably. *Steffens Decl.* ¶ 27.

First, the Court is not entirely convinced that written Ascot qualitative analyses, if they exist, would be within the scope of either of the two document production requests. Nonetheless, assuming they were, the fact that the

Defendants did not produce documents memorializing such a qualitative analysis does not necessarily imply that it was never done. The Spring Mountain staff could well, as the Defendants suggest and internal memoranda confirm, have reviewed the trade sheets at Ascot in an "on-site visit" and not taken them into Spring Mountain's possession. *See Defs.' Opp'n to Pls.' Mot. to Preclude* at 4 n.1 (citing *Spears Decl.* Attachs. 7, 8 (ECF No. 259)). The "qualitative analyses" may have been oral reports of the Spring Mountain staff's reasoned conclusions based on the Ascot trade sheets they allegedly reviewed. While this may not be exemplary business practice, it is not logically impossible. At any rate, counsel for the Defendants swear that they possess no such documents, and the Court perceives no principled grounds on which to disbelieve that claim. Consequently, there is no reason to impose sanctions on Mr. Steffens under Rule 37(c).

The Court denies the Goldensons' Motion to Preclude the Defendants From Testifying as to Any Analyses Performed on Ascot.

## V. MOTION IN LIMINE REGARDING DEFENDANTS' REDACTIONS

The Goldensons identify sixteen email chains, produced by the Defendants during discovery with certain names and information redacted, that they ask the Court to review *in camera* and compel the Defendants to un-redact. *Pls.' Mot.* In Limine *Concerning the Defs.' Redactions of Relevant Information* (ECF No. 254) (*Pls.' Mot. re: Redactions*). In the alternate, they ask the Court to preclude the Defendants from testifying as to what they told their investors about the relationship between Ascot and Mr. Madoff. *Id.* The Defendants object. *Defs.'*

*Opp'n to Pls.' Mot.* In Limine *Concerning the Defs.' Redactions of Relevant Information* (ECF No. 260) (*Defs.' Opp'n re: Redactions*).

### A.    Position of the Parties

In the Goldensons' view, they will be prejudiced by the redactions because they make it difficult to understand who sent what to whom. *See generally Pls.' Mot. re: Redactions.* They note that the Court already expressed some confusion with the identities of the correspondents in one of the redacted emails, in its Summary Judgment Order. *Id.* at 9 (citing *Summ. J. Order* at 97 n.274). Furthermore, the Goldensons view it as unfair for the Defendants to testify to what they told their investors about Ascot and Madoff, because the redactions made it impossible for the Goldensons to discover witnesses who would testify to the contrary. *Id.* at 9-10.

The Defendants make four points in response. *Defs.' Opp'n re: Redactions.* First, they observe that this is essentially a discovery dispute, and the discovery period closed on May 7, 2012. *Id.* at 2. The Defendants posit that the Goldensons' motion to compel the disclosure of the redacted names is two years late. *Id.* at 2, 5. They also recall that Judge Rich denied a substantially identical motion from the Goldensons on May 9, 2012, which the Goldensons did not appeal or ask the Judge to reconsider. *Id.* at 3-4 (citing *Report of Hr'g and Order re: Discovery* (ECF No. 123)).

Second, the Defendants point out that the Goldensons have cited no legal authority for their request to preclude the Defendants from testifying as to their business practices.

Third, the Defendants note that the Goldensons elected not to depose Mr. Steffens, Defendant Gregory Ho, or any of the entity defendants during discovery. *Id.* at 5-6. They suggest that the Goldensons could have used a deposition to find out more context and information about the Defendants' alleged practice of informing their clients about the Ascot-Madoff relationship. *Id.* This, in their view, belies the Goldensons' argument that it would be unfair to allow the Defendants to testify on this subject at trial. *Id.*

Finally, the Defendants dispute the merits of the Goldensons' request to un-redact the emails. *Id.* at 7-8. They deny that there would be any probative value to viewing the names underlying the emails that would outweigh the privacy concerns of the third parties concerned. *Id.* at 7.

## B. Discussion

"[The Goldensons'] motion is a discovery motion in the guise of a motion in limine." *Falconer v. Penn Maritime, Inc.*, 232 F.R.D. 34, 35 (D. Me. 2005). General discovery in this case closed on May 7, 2012, exactly two years before the Goldensons filed this motion in limine. *Compare Report of Hr'g and Order re: Disc., Scheduling Mots.*,at 8 (ECF No. 98) *with Pls.' Mot. re: Redactions*.[7] The Goldensons' motion is therefore exceedingly untimely. *See* FED. R. CIV. P. 16(b); D. ME. LOC. R. 16.2(c)(2). Furthermore, the Goldensons have given no reason at all to explain why they could not have raised and resolved this dispute during the discovery period. *See Pls.' Mot. re: Redactions.*

---

[7]     Judge Rich extended the deadline to take expert depositions to May 21, 2012. *Report of Hr'g and Order re: Disc., Scheduling*, at 4 (ECF No. 103).

Furthermore, as to at least one of the email chains presently in dispute, the Defendants are correct that Judge Rich already considered and rejected the Goldensons' arguments here. *See Report of Hr'g and Order re: Disc.* (ECF No. 123) (*Order re: Disc.*); *compare Decl. of David Spears in Opp'n to Pls.' Mot. re: Redactions* Attach. 1, at Ex. A (ECF No. 261) *with Pls.' Mot. re: Redactions* Attach. 5 (ECF No. 254). He ruled that "although . . . the [third-party] investors' identities were arguably relevant, the probative value of the disclosure of their identities was too attenuated to outweigh the invasion of their privacy interests . . . or the court's trial management concerns." *Order re: Disc.* at 2. The Goldensons did not appeal that order or move for reconsideration, and now give no reason to call that conclusion into question.

Finally, any prejudice to the Goldensons will be minimal. Although the Court struggled to place one isolated redacted email into context during the summary judgment stage, the Goldensons will have the benefit of examining Mr. Steffens and Mr. Ho on the witness stand to establish precisely that necessary context.

"If [the Defendants] failed to produce discoverable documents, this should have been brought to the Court's attention [two years] ago, when the case was still in its discovery stage, not on the eve of trial." *Falconer*, 232 F.R.D. at 35. The Court denies the Goldensons' Motion *In Limine* Concerning the Defendants' Redactions of Relevant Information and denies the Goldensons' motion for a hearing on this matter.

## VI.  CONCLUSION

The Court

(1) GRANTS in part and DENIES in part the Defendants' Motion to Bifurcate (ECF No. 249);

(2) DENIES the Defendants' Motion to Compel Offer of Proof (ECF No. 250);

(3) GRANTS IN PART the Defendants' Motion to Exclude Evidence and Arguments Relating to Indemnification and Prior Representation by Simpson Thacher (ECF No. 251), to the extent it seeks to exclude evidence of the QP I Fund's indemnification of the Defendants, and otherwise DENIES the motion;

(4) DENIES the Goldensons' Motion *In Limine* to Preclude the Defendants from Testifying as to Any Analyses Performed on Ascot (ECF No. 253); and

(5) DENIES the Goldensons' Motion *In Limine* Concerning the Defendants' Redactions of Relevant Information (ECF No. 254).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 7th day of July, 2014